UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


TREVENIA BROWN,                    )
                                   )
            Plaintiff,             )
                                   )
        -v-                        ) CAUSE NO.
                                   ) 1:20-CV-01154-JPH-MJD
ROBERT WILKIE, SECRETARY OF        )
THE UNITED STATES DEPARTMENT       )
OF VETERANS AFFAIRS,               )
                                   )
            Defendant.             )


        The deposition upon oral examination of

TREVENIA BROWN, a witness produced via Zoom

videoconference and sworn remotely before me, Robin P.

Martz, RPR, Notary Public in and for the County of

Johnson, State of Indiana, taken on behalf of the

Defendant with the witness located in Phoenix, Arizona

on March 12, 2021, at 11:00 A.M., pursuant to all

applicable rules.


STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800)869-0873

```
 1                         APPEARANCES

 2    FOR THE PLAINTIFF:  (Via Videoconference)

 3           Denise M. Clark, Esq.
             CLARK LAW GROUP, PLLC
 4           1100 Connecticut Avenue, N.W., #920
             Washington, DC  20036
 5

 6    FOR THE DEFENDANT:  (Via Videoconference)

 7           J. Taylor Kirklin, Esq.
             U.S. DEPARTMENT OF JUSTICE
 8           UNITED STATES ATTORNEY'S OFFICE
             SOUTHERN DISTRICT OF INDIANA
 9           10 West Market Street, Suite 2100
             Indianapolis, IN  46204
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        INDEX OF EXAMINATION

2    DIRECT EXAMINATION

3         Questions BY MR. KIRKLIN                           5

4    EXAMINATION

5         Questions BY MS. CLARK                           107

6                        INDEX OF EXHIBITS

7    NUM.            DESCRIPTION                          PAGE

8    Exhibit 1    Transcript from Department of            8
              Veterans Affairs Office of
9             Resolution Management
     Exhibit 2    Amended Responses to First Set          25
10            of Interrogatories
     Exhibit 3    Request for reasonable                  44
11            accommodation January 17, 2014
     Exhibit 4    January 23, 2014 Email Bates No.        49
12            DEF1563
     Exhibit 5    February 6, 2014 Request for            56
13            Reassignment for Medical Reasons
     Exhibit 6    Letter from Doctor Huff                 60
14   Exhibit 7    February 10, 2014 Letter from           63
              Ena Lima
15   Exhibit 8    VA Form 0857a Bates No. DEF248          70
     Exhibit 9    February 27, 2014 Email from Jim        73
16            Dean
     Exhibit 10   Request for Medical                     77
17            Documentation
     Exhibit 11   Emails Bates No. DEF247                 78
18   Exhibit 12   Denial of Accommodation Request         80
              Bates No. DEF245
19   Exhibit 13   August 1, 2014 Letter from             84
              Doctor Huff
20   Exhibit 14   Employee Monthly Performance           87
              Review
21   Exhibit 15   Aspen Performance Totals               91
     Exhibit 16   January 8, 2014 Email from Adam        96
22            Kinder
     Exhibit 17   February 12, 2014 Email from Mr.       97
23            Dean
     Exhibit 18   March 17, 2014 Warning of              99
24            Unacceptable Performance
     Exhibit 19   March 17, 2014 Proposed              101
25            Reprimand

Page 4

| 1  | Exhibit 20 | April 9, 2014 Reprimand          | 101 |
|    | Exhibit 21 | July 17, 2014 Letter of Concern | 103 |
| 2  | Exhibit 22 | July 18, 2014 Career Ladder Promotion | 104 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER:  My name is Robin Martz, an

2      associate of Stewart Richardson & Associates,

3      Indianapolis, Indiana.  Today's date is

4      March 12, 2021.  The time is 11:00 A.M.  This

5      deposition is being held remotely via Zoom with the

6      deponent located in Phoenix, Arizona .  The

7      deponent's name is TREVENIA BROWN.  Will counsel

8      please identify themselves for the record.

9          MS. CLARK:  Denise Clark for the plaintiff.

10         MR. KIRKLIN:  Taylor Kirklin, United States

11     attorney for the defendant.

12         COURT REPORTER:  Do the parties stipulate and

13     agree that the witness may be sworn remotely by the

14     court reporter?

15         MR. KIRKLIN:  Yes, defendants will stipulate

16     to that.

17         MS. CLARK:  Yes.

18                  TREVENIA BROWN,

19  having been first duly sworn to tell the truth, the

20  whole truth, and nothing but the truth took the stand

21  and testified as follows:

22  DIRECT EXAMINATION

23  BY MR. KIRKLIN

24  Q  All right, Ms. Brown.  I know we've never met.  My

25     name is Taylor Kirklin.  I'm an assistant United

1    States attorney.  I represent the defendant, the

2    Secretary of Veterans Affairs, in the lawsuit that

3    we're here about today.  Just before we get

4    started, I know that you've not been a party to any

5    other litigation.  So does that mean you've not sat

6    for a deposition before?

7  A  That's correct.

8  Q  Okay.  So let me just go over a couple of ground

9    rules then.  You understand you're giving testimony

10    today under oath just like if you were sitting in a

11    courtroom, right?

12  A  That's correct.

13  Q  Your answers to my questions are being taken down

14    by the court reporter.  And that means that we need

15    you to give verbal "yes" or "no" answers to

16    questions.  So nods of the head or shakes of the

17    head won't do.  Can you do that?

18  A  Yes.

19  Q  And you're doing a great job so far, but it's very

20    important during a deposition that we wait for each

21    other to finish our sentences.  So I'm going to ask

22    that you wait for me to finish a question before

23    answering.  And I will likewise wait until you

24    finish answering my question before I ask another

25    one.  Okay?

1  A  Yes.

2  Q  If you don't understand a question that I ask

3     today, just ask me to rephrase that question.  But

4     if you don't ask me to rephrase a question, I'm

5     going to assume you understood the question.  Is

6     that fair?

7  A  Yes.

8  Q  Is there any reason whatsoever that you can't

9     provide complete and truthful testimony today?

10  A  No.

11  Q  All right.  So as we go throughout the day today,

12     I'm going to show you some exhibits that I'm

13     marking on the screen here.  Are you using a tablet

14     or a computer or a phone to do this Zoom

15     deposition?

16  A  Laptop.

17  Q  A laptop.  So you can see my video right now,

18     right?

19  A  Yes.

20  Q  Okay.  Do you have any of the exhibits that have

21     been marked in front of you, or have you not

22     received those?  And it's fine if you haven't.

23  A  No.  I'm sorry.  Yeah.  Go ahead.

24  Q  That's completely fine.  If you don't have them,

25     that's what I assumed.  I just wanted to make sure.

1   What I'm going to do is I'm going to share my

2   screen, and you'll see the exhibits in front of

3   you.  And I'm going to ask you some questions about

4   those exhibits.  Okay?

5   A  Okay.

6   Q  Do you remember in connection with the Office of

7   Resolution Management's investigation of your claim

8   that preceded this lawsuit, that you gave a

9   telephonic affidavit to an investigator?

10  A  Rephrase the question.

11  Q  Yeah.  Do you remember in connection with the

12  administrative investigation of this case, taking

13  part in a telephonic interview with an

14  investigator?

15  A  I can't recall.

16  Q  All right.  Let's see if this helps you.

17  A  I'm sorry.  I couldn't hear you.

18  Q  Let's see if this exhibit helps us.

19  A  Okay.

20       (Exhibit 1 was marked.)

21  Q  I'm sharing on screen what is marked as Exhibit 1

22  to this deposition.  You see at the top of Exhibit

23  1, Department of Veterans Affairs Office of

24  Resolution Management.  Do you see the portion I

25  just highlighted?

Page 9

```
 1   A   It's very small.  Can you make it bigger, please.

 2   Q   Sure.  So I'm zooming in on what's page one of the

 3       transcript.  Do you see it now?

 4   A   Yes.

 5   Q   And do you see your name a few lines below that?

 6   A   Yes.

 7   Q   And then down, same page, do you see where it says

 8       Transcript of Proceedings?

 9   A   Yes.

10   Q   And it says before EEO Investigator Karen Mason.

11       Do you see that?

12   A   Yes.

13   Q   Okay.  Does that refresh your recollection that in

14       connection with the administrative investigation,

15       you took part in a telephonic discussion with an

16       EEO investigator named Karen Mason?

17   A   Yes.

18   Q   Okay.  And you understood that you were giving

19       testimony under oath when you did that, right?

20   A   Yes.

21   Q   So you understood that you needed to tell the

22       truth, right?

23   A   Yes.

24   Q   And in connection with this telephonic interview

25       with the EEO investigator, you were given an
```

Page 10

1    opportunity to read the transcript of the testimony

2    you gave, weren't you?

3    A  I'm not sure at what point.

4    Q  But at some point you were; is that correct?

5    A  I'm assuming.  I can't really recall.

6    Q  Would it be fair to say that you took part in this

7       discussion with the EEO investigator sometime in or

8       around 2014 or thereabouts?

9    A  Yes.

10   Q  So the events that you were talking about with the

11      EEO investigator were much fresher in your mind

12      when you did the telephonic affidavit than they are

13      today; is that correct?

14        MS. CLARK:  Objection to the form of the

15      question.

16   Q  You can answer.

17   A  Repeat the question.

18   Q  Yeah.  Would you agree with me that at the time you

19      gave the testimony in Exhibit 1, the events at

20      issue in this lawsuit were closer in time than they

21      are today?

22   A  Yes.

23   Q  Would you agree that that means that it would be

24      easier to remember events at issue in the lawsuit

25      at the time you gave the testimony in Exhibit 1

Page 11

1    than today?

2         COURT REPORTER:  Ms. Clark, I am having

3    trouble hearing your objection.

4         MR. KIRKLIN:  For the record, Denise, I can't

5    hear what you're saying either.

6         MS. CLARK:  Objection to form.  You can

7    answer.

8  A  Repeat the question, please.

9  Q  Would you agree that it is easier to recall events

10   when they are closer in time to the time you're

11   giving testimony?

12 A  Yes.

13 Q  Do you know, do you recall also in addition to the

14   testimony in Exhibit 1, giving testimony at

15   hearings before the EEOC in July of 2015?

16 A  Rephrase the question.

17 Q  Do you recall giving testimony before the EEOC in

18   July of 2015?

19 A  I'm not really sure if I knew it was testimony.  I

20   believe I was explaining the situation or why I

21   felt I was being discriminated against, and that I

22   wasn't being provided reasonable accommodation

23   based on my current condition.

24 Q  And when you did that, you sat in a room with the

25   administrative law judge, right?

Page 12

1   A   From my understanding, that exhibit that you showed

2       me was my communication with the EEOC associate.  I

3       don't believe that was the law judge at that time.

4   Q   Correct.  I'm not asking you about Exhibit 1 now.

5   A   Okay.

6   Q   I'm saying in addition to Exhibit 1, do you

7       remember in July of 2015 sitting in a room with an

8       administrative law judge and giving, I'm going to

9       call it testimony about the facts of the case?

10  A   I believe it was video conference so I wasn't

11      physically in the room, but there was -- I believe

12      that was the date.  I can't recall exactly, but

13      there was a time that I did provide video

14      testimony, I suppose if that's what you're calling

15      it, regarding the case.

16  Q   Okay.  Do you have any reason to believe that when

17      you were giving that testimony before the EEOC in

18      July of 2015 that it was not testimony under oath?

19  A   No.

20  Q   Okay.  Would you agree that there was a court

21      reporter who was recording your testimony at those

22      EEOC hearings in July 2015?

23  A   Yes.

24  Q   And you were represented by counsel at the hearings

25      before the EEOC in July of 2015?

1    A   Yes.

2    Q   And so you knew you had to tell the truth at the

3        EEOC hearings, right?

4    A   Yes.

5    Q   All right.  Let's talk about your background.

6        Where are you originally from?

7    A   Florida.

8    Q   What part of Florida?

9    A   Tampa.

10   Q   Where did you go to high school?

11   A   My family is all from the Tampa area.  My father

12       was in the Air Force so we traveled.  Once he

13       retired, which was during, I believe, my junior

14       year in high school, I attended high school in

15       Tampa.

16   Q   Okay.  Did you go to college?

17   A   Yes.

18   Q   Where did you go?

19   A   University of South Florida.

20   Q   Where is that located?

21   A   In Tampa.

22   Q   And what year did you graduate from USF?

23   A   2007.

24   Q   You said that your father was in the military so

25       you had moved around in childhood.  At any point

Page 14

1       during that childhood, did you live in

2       Indianapolis?

3   A   No.

4   Q   But this suit is about the time that you lived in

5       Indianapolis, right?

6   A   Yes.

7   Q   What year did you move to Indianapolis?

8   A   If I recall properly, I believe it might have been

9       2011.  I'm not quite positive.

10  Q   And what was the reason you moved to Indianapolis?

11  A   Better job opportunities.

12  Q   Was that a better job opportunity for you or

13      somebody else?

14  A   Both my husband and I.

15  Q   So did you move with your husband then?

16  A   Yes.

17  Q   And what does your husband do for a living?

18  A   Production.  He was a production supervisor,

19      production, just mainly in the production field.

20  Q   And you have children in addition to your husband,

21      right?

22  A   Yes.

23  Q   In 2011, how many children did you have?

24  A   Two.

25  Q   And what were their ages in 2011?

Page 15

1  A  I believe 19 and 21, I believe.  This is just off

2     the top of my head.

3  Q  Sure.  I'm just asking for your best recollection.

4  A  Yeah, best of my recollection doing the math.

5  Q  Okay.  I understand.  When you moved to

6     Indianapolis, did your children move with you?

7  A  Initially, yes.

8  Q  And then did they move somewhere else after a

9     while?

10  A  They moved back to Florida.

11  Q  Do you know approximately when they moved back to

12     Florida?

13  A  Maybe 2012.

14  Q  And did they move back to Tampa or the Tampa area?

15  A  Yes.

16  Q  Do they still live in Tampa today?

17  A  Yes.

18  Q  Where were you working before you moved to

19     Indianapolis, immediately before?

20  A  Social Security Administration in Tampa.

21  Q  And you said you moved to Indianapolis for a better

22     job opportunity.  Does that mean the job you got at

23     the Veterans Service Center was preferable to you

24     in some way?

25  A  It was a lateral position.  The opportunity was for

Page 16

1      my husband.

2    Q   And just generally speaking, what was that

3        opportunity that was beneficial to him?

4    A   It was a manufacturing lead position.

5    Q   So this suit is about your employment at the

6        Veterans Service Center, right?

7    A   This suit was about not being reasonably

8        accommodated due to my disability.

9    Q   Right.  I understand that.  The context in which

10        you're bringing those claims is your employment

11        with the Department of Veterans Affairs, right?

12    A   I can't agree with that.  It is due to not being

13        reasonably accommodated due to my disability.  So

14        can you rephrase the question, please.

15    Q   Yeah.  When you moved to Indianapolis, were you

16        employed by the Department of Veterans Affairs?

17    A   Prior to moving there, no.

18    Q   Okay.  After you moved to Indianapolis, did you

19        become employed by the Department of Veterans

20        Affairs?

21    A   Yes.

22    Q   And when you were employed by the Department of

23        Veterans Affairs, did you work specifically for the

24        Veterans Service Center?

25    A   Yes.

1   Q   Where was your job, where was your office located

2       when you worked for Veterans Service Center?

3   A   Initially in Indianapolis.

4   Q   And I'm asking you where in Indianapolis was it

5       located, what part of town?

6   A   Downtown.

7   Q   Was it on Pennsylvania Street?

8   A   I believe so.

9   Q   What area of town did you live in when you lived in

10      Indianapolis?

11  A   Initially, I can't recall exactly what side of

12      town, but it was maybe on the east.  I really

13      cannot say exactly what the address was or where it

14      was, no.

15  Q   Did you live downtown or in the suburbs?

16  A   I suppose you would call it the suburbs, but it

17      wasn't initially, no, it was not downtown.

18  Q   You were living you think on the east side of town

19      then?

20  A   I believe so.

21  Q   Do you remember any landmark or areas of town that

22      were close to where you lived?

23  A   No, I can't recall.

24  Q   And you currently live in Arizona, right?

25  A   Phoenix, yes.

Page 18

1    Q    When did you move to Arizona?

2    A    October 2019.

3    Q    Does that mean that you lived in Florida from

4         approximately 2014 to 2019?

5    A    Yes.

6    Q    And what was the reason you moved to Arizona?

7    A    Just wanted to live in Phoenix.

8    Q    You don't have any family that's in the Phoenix

9         area?

10   A    No.

11   Q    Other than perhaps your husband.  Okay.  All right.

12        So this suit is about a skin condition that you

13        suffer from that's called hidradenitis suppurativa;

14        is that correct?

15   A    Yes.

16   Q    And that's a very -- I'm sure I mispronounced that.

17        For the record my understanding of the spelling of

18        that is h-i-d-r-a-d-e-n-i-t-i-s,

19        s-u-p-p-u-r-a-t-i-v-a.  I think I got that right.

20        When did you start experiencing symptoms from that

21        condition?

22   A    Initially in -- I can't remember the date.  I'm

23        sorry.

24   Q    I'm not asking for an exact date just approximately

25        when.

Page 19

 1   A   I had flare-ups, maybe slight flare-ups starting

 2       back in 2008.  That's simply an approximate.  I

 3       don't know the exact date.  I don't know.

 4   Q   Sure.  And, again, I'm just asking for your best

 5       recollection.  But it's fair to say that that

 6       condition started to manifest itself ten-plus years

 7       ago.  Is that fair?

 8   A   I guess that's fair.

 9   Q   When it first started, how did you notice it?

10   A   Abscesses under my arm.

11   Q   And when you say "abscess," can you describe for me

12       what you mean.

13   A   Boils, like large bumps, large, just large

14       abscesses.

15   Q   And you were living in Florida at the time that it

16       first manifested; is that correct?

17   A   It was slight, but yes.

18   Q   Did you say it was slight?

19   A   Well, it wasn't, it wasn't -- it hadn't exacerbated

20       itself to the extent that it did when I was living

21       in Indianapolis.

22   Q   Do you know what causes this condition?

23   A   No.

24   Q   Do you know if it's genetic or an infection or

25       something else?

```
 1   A   I know that the abscesses can lead to infection,

 2       which I have experienced, but I do not know what

 3       causes the disorder, no.

 4   Q   Is it correct that your experience with the

 5       condition is intermittent, by which I mean

 6       sometimes you have flare-ups and sometimes not?

 7   A   Sometimes the flares can last an extended period of

 8       time, but, yes, there are times when the condition

 9       may be less painful during that time, yeah.  And

10       sometimes where it can be extremely more painful or

11       debilitating.

12   Q   But it's fair to say the condition waxes and wanes,

13       right?  It's not the case that you have abscesses

14       on your body a hundred percent of the time; is that

15       correct?

16           MS. CLARK:  Counsel, are you talking about --

17           MR. KIRKLIN:  I'm sorry, Denise, I can't hear

18       you.

19           MS. CLARK:  My objection is with regards to

20       the vagueness of your question.  What time period

21       are you asking her about, when she was working

22       there or just generally anytime?

23           MR. KIRKLIN:  I'm just asking since this has

24       manifested itself, is it the case that sometimes

25       she has abscesses, and sometimes she doesn't.
```

```
                                                    Page 21
 1            MS. CLARK:  What period of time?  While she
 2       was working at the Department of Veterans Affairs
 3       or at any period of time in her life?
 4            MR. KIRKLIN:  I'm just trying to ask since it
 5       has developed since approximately 2008.
 6            MS. CLARK:  I'm going to lodge the same
 7       objection, vague.  You can answer if you understand
 8       the question.
 9    A  It varied throughout different periods.  So
10       sometimes there was extended periods of flare-ups
11       where, yes, it was constant.  And there were some
12       periods where it did wax and wane.  But without
13       knowing a specific period that you're referring to,
14       it's difficult to answer that.
15    Q  Is it true that in the ten-plus years since this
16       condition started, there's been at least one period
17       of time in which you did not have an abscess on
18       your body?
19    A  At least one period, yes.
20    Q  In 2006, how frequently did you experience
21       flare-ups?
22    A  I can't recall.
23    Q  And when I use the term "flare-up," is that a
24       terminology that you understand?
25    A  Yes.
```

1   Q   And by that I mean a period of time when your body

2       is having breakouts of these abscesses, right?

3   A   Yes.

4   Q   Did the flare-ups from this condition become more

5       frequent over time?

6   A   Yes.

7   Q   In 2011 when you moved to Indianapolis,

8       approximately how frequently were you getting

9       flare-ups?

10  A   I can't recall but not very frequently.  I don't

11      know how frequent, but I can tell you it wasn't as

12      frequent as they became once I'd been there for

13      some time.

14  Q   Okay.  In 2013, do you recall how frequently you

15      were having flare-ups?

16  A   I can't recall how frequently.  I believe it was

17      more constant because it required constant

18      intervention, like, with incisions from the

19      doctors, which I wasn't previously experiencing

20      prior to that time frame you just mentioned.

21      Previously, I could accommodate the condition with

22      various methods, but in 2013, I was finding myself

23      frequently pursuing invasive, or what I consider

24      invasive, treatments to help relieve the pain or

25      the swelling and the pressure, which was extremely

Page 23

1       painful and debilitating.

2   Q   Okay.  So let's talk about that specific time

3       period, 2013.  When you had a flare-up, how would

4       it typically affect your body?

5   A   It would make it difficult to sometimes walk

6       because I would have pain in certain areas that

7       would make it difficult to ambulate.  I'd have

8       pain.  It would make it hard for me to sit

9       comfortably.  It would make it difficult for me to

10      reach for items, to hold my arm in a natural

11      position without propping it up on something or --

12      that's basically.  And it would be debilitating

13      pain.

14  Q   Is the pain that you experienced caused by the

15      abscesses or by something else?

16  A   By the abscesses.

17  Q   So where on your body would you get abscesses in

18      2013?

19  A   Sometime in my groin area and sometimes mostly

20      under my arm, armpits.

21  Q   Okay.  So is it, am I understanding you correctly

22      that the reason why it might be painful to sit is

23      because you might have an abscess in your groin

24      area?

25  A   Yes.  And --

Page 24

1   Q   And the reason -- go ahead.

2   A   And it would be painful because I can't sit my arm

3       or lay my arm next to my side.  And the pain would

4       be just from simply the pressure of a boil that's

5       the size of a golf ball in my armpit.  So it would

6       just be a constant throbbing pressure pain, which

7       would need to be incised in some cases to drain the

8       abscess and to relieve some of the pain and

9       pressure that would allow me to do something as

10      simple as lay my arm next to my side.

11  Q   Okay.

12  A   Just sitting would be difficult.

13  Q   And is it the same for reaching for something, you

14      might have an abscess in your arm area, and that's

15      what would cause it to be painful to reach for

16      something?

17  A   Yes, and depending on the size of the boil, it

18      could just be constant pain and throbbing and

19      pressure.  So in addition to not being able to or

20      having additional pain from reaching or just

21      sitting and just trying to just sit in a natural

22      position, just the constant pain of the abscess,

23      large abscesses being there would be painful, would

24      be debilitating.

25  Q   At any point when you were living in Florida prior

Page 25

1    to moving to Indianapolis, were you seeing a

2    physician for treatment for this condition?

3  A  Yes, I remember seeing a dermatologist.

4  Q  Did you have treatments for abscesses at that time?

5  A  If I can recall, it was only topical.

6  Q  And by topical, you mean they were giving you cream

7    or some other medicine to put on the abscesses?

8  A  Yes.

9       (Exhibit 2 was marked.)

10  Q  All right.  So I'm going to share another exhibit

11    for you on my screen here.  All right.  So

12    Ms. Brown, I'm putting up on the screen Exhibit 2.

13    And these are the Amended Responses to the First

14    Set of Interrogatories.  Have you seen these

15    before?

16  A  Please make it bigger.

17  Q  Sorry.  Better?

18  A  Thank you.  Yes.

19  Q  Exhibit 2 is a document you've seen before, right?

20  A  I believe so, yes.

21  Q  Okay.  And just going to page 10 of 12 of Exhibit

22    2, it's got your signature there --

23  A  Okay.  Yes.

24  Q  -- dated March 11th, right?

25  A  Uh-huh.

Page 26

1    Q   Very quickly, I'm just going to show you, this is

2        the response to Interrogatory No. 5, which asked

3        about medical professionals that you've consulted

4        or seen in connection with this skin condition.

5        And I just wanted to clarify one thing in your

6        answer.  You identified three providers, Doctor

7        Huff, Chapel Hill Franciscan Immediate Care, and

8        Florida Westcoast Skin and Cancer Center, right?

9    A   Yes.

10   Q   Is Florida Westcoast Skin and Cancer Center the

11       doctor that you were seeing prior to Indianapolis,

12       or is that a new doctor that you saw after you

13       moved back to Florida in 2014?

14   A   I believe that doctor was prior to moving.

15   Q   Okay.  So does that mean that when you moved back

16       to Florida, you started going to Florida Westcoast

17       Skin and Cancer Center again?

18   A   I don't -- I have another, I guess, doctor that

19       was, that I saw once I moved back to Florida.

20   Q   So you're saying that Florida Westcoast Skin and

21       Cancer Center is a physician that you saw in 2011

22       or prior?

23   A   If I can recall properly, I believe so.

24   Q   I'm just a little confused about that because my

25       understanding of interrogatory response was that

Page 27

1    you were providing your providers from the time

2    period of 2013 to 2015.  So I'm confused about

3    whether Florida Westcoast was a provider you saw in

4    2014 or 2015 when you moved back to Florida or

5    whether it was earlier.

6  A  I would have to look through my paperwork honestly.

7    It's been a few years so it's difficult to recall

8    completely.

9  Q  But is it fair to say that when you moved back to

10   Florida in 2014, you didn't start going back to the

11   same doctor that you had seen in 2011?

12 A  No, I did not.

13 Q  Okay.  That was just the question that I was trying

14   to understand.

15        All right.  So when you moved to Indianapolis,

16   approximately when did you start see Doctor Robert

17   Huff for treatment?

18 A  I can't recall.

19 Q  Doctor Huff's practice is called Dermatology,

20   Incorporated, right?

21 A  I believe so.

22 Q  Do you know why you selected to go to Doctor Huff?

23 A  No, I can't recall why.

24 Q  Do you know whether he specializes in the skin

25   condition that you suffer from?

1    A    I know he's a dermatologist, which specializes in

2         skin conditions so I would assume that he would be

3         an adequate physician to address the issue.

4    Q    Yeah.  And that's fair.  And I agree that from the

5         name of his practice that he's likely a

6         dermatologist.  I'm just asking if you know whether

7         he had any particular specialty in hidradenitis

8         suppurativa.

9    A    From my understanding -- I don't know, no.  I can't

10        recall.

11   Q    Do you recall the circumstances by which you went

12        to Chapel Hill Franciscan Immediate Care for

13        treatment?

14   A    Mainly when I was unable to get an appointment with

15        Doctor Huff.  Usually there was a waiting period

16        like there is with most doctors.  When you make an

17        appointment, it's either several days or sometime a

18        week or weeks.  And the immediate care clinic is

19        how I would get immediate care.  They would incise

20        the abscess to help relieve some of the pressure

21        and pain and allow the abscess to drain, which

22        would provide me some relief, immediate relief.

23   Q    To your knowledge you went to Chapel Hill

24        Franciscan Immediate Care on more than one

25        occasion?

Page 29

```
 1   A   Yes.
 2   Q   And is it fair to say that you went there in order
 3       to get treatment quicker than Doctor Huff could
 4       provide?
 5   A   Yes.
 6   Q   I'm not familiar with Chapel Hill Franciscan
 7       Immediate Care.  But is that just an immediate care
 8       facility, not a facility specifically devoted to
 9       dermatology?
10   A   Just an immediate care facility.  I'm not aware of
11       any immediate care that specializes completely in
12       that condition.
13   Q   Fair enough.  Was it located conveniently to your
14       house?
15   A   If I can recall properly, I believe so.
16   Q   Can you approximate how many times you went to
17       Chapel Hill Franciscan Immediate Care?
18   A   Not fairly, no.  I know it was many times, but I
19       can't tell you exactly.  I know it was over eight,
20       maybe -- I don't know exactly.
21   Q   Okay.  Over eight.  Do you think it was less than
22       20?
23   A   I believe so.  I really can't say for sure.
24   Q   I'm just asking for an approximation.  Let's talk
25       about your work history at the Veterans Service
```

1       Center.  If I call that the VSC, will you

2       understand what I'm talking about?

3   A   Yes.

4   Q   What does the VSC do?

5   A   Process disability claims for veterans.

6   Q   And what was your job title when you worked for the

7       VSC?

8   A   Veterans service representative.

9   Q   Can you describe for me what a veterans service

10      representative does?

11  A   Basically collect medical information that would

12      help support a veteran's claim, review medical

13      evidence, request exams, basically prepare the

14      claim for the decision made by a rating specialist.

15  Q   Does that job involve speaking on the phone with

16      people that are submitting disability claims?

17  A   Sometimes.

18  Q   Does it involve exchanging information via email

19      with veterans?

20  A   No, not necessarily.  I mean, that could occur, but

21      it wasn't a frequent part of the job, no.

22  Q   Does it involve managing paperwork for claims?

23  A   It would be managing the case file.

24  Q   Tell me, how is the case file typically maintained,

25      in paper or electronic.

1  A  Initially it was paper.

2  Q  Let's talk specifically about the time period of

3     2014.  Were most of the claim files being

4     maintained in paper or electronic?

5  A  I believe at that time it may have been paper.

6  Q  Do you think there was any portion of the claim

7     process that was done electronically, or was it

8     basically paper?

9  A  It may have been during the period of conversion,

10    but I believe at that time it was still mainly

11    processed using paper files.

12 Q  When you are talking about process of conversion,

13    what are you referring to?

14 A  Where they were transferring the files to

15    electronic files.  They were transferring paper

16    files to electronic files.

17 Q  They were converting into electronic files?

18 A  Yes.

19 Q  And are you still employed by the VSC now?

20 A  Yes.

21 Q  But you work at the office in Phoenix, not

22    Indianapolis, right?

23 A  Correct.

24 Q  Approximately when did you start working at the VSC

25    in Indianapolis?

Page 32

1    A   Difficult to remember the exact date.  I'm thinking
2        it was 2011.  I'm not quite positive.  And it was
3        in September of either -- I think it was in 2011.
4    Q   Okay.  And I believe you said earlier today that
5        you had moved to Indianapolis in 2011 so that would
6        make sense if you started in or around September of
7        2011, right?
8    A   If I recall properly, yes.
9    Q   I mean, you don't recall living in Indianapolis for
10       a year while not being employed, right?
11   A   No.
12   Q   At the time that you started work at the VSC, did
13       you attend an orientation session?
14   A   I believe so, yes.
15   Q   In that orientation did you learn about things like
16       the EEO policies the VA maintained?
17   A   I can't recall exactly what was covered.  I know
18       they covered benefits so I can't really recall if
19       they covered the EEOC.  I can't remember.
20   Q   Do you know whether the VA maintains EEO policies
21       online?
22   A   I don't know.
23   Q   Did you ever go look for them?
24   A   No.
25   Q   When you were hired at the VSC, what was your pay

1    grade?

2    A   I believe it was a seven.

3    Q   That means GS7?

4    A   Yes.

5    Q   And did that pay grade go up at some point?

6    A   Yes.

7    Q   And I've seen in paperwork in this case, your

8        position referred to I believe it's a journey level

9        position.  Does that ring a bell to you?

10   A   Yes.

11   Q   What does that mean?

12   A   I believe it means when you would be considered a

13       specialist in that particular position.  You

14       would -- I guess, you're no longer a trainee.

15   Q   Would it be equivalent to a career employee so

16       somebody who is going to be with the VA for a long

17       period of time?

18   A   I wouldn't really equate it to that.  I believe

19       journey is related to the position itself and not

20       necessarily with your longevity with the VA.

21   Q   Okay.  Fair enough.  In 2013, do you know what pay

22       grade you were being paid at?

23   A   I believe it was a 10.  I'm not sure when I

24       increased to an 11 eventually, but I don't know

25       what date that was.

Page 34

1   Q   Do you know what your pay grade was at the time you

2       moved back to Florida in 2014?

3   A   I don't know if I received my 11 yet.  I'm not

4       really sure.  It's quite possible, I don't know.

5   Q   And I don't know either.  I'm just asking for your

6       best recollection.  The VA in Indianapolis is

7       organized into different teams, correct?

8   A   Yes.

9   Q   And is it fair to say that each of those teams

10      worked on a specific type of claim?

11  A   At the time I would say yes.

12  Q   So when you started at the VSC, what team did you

13      work on?

14  A   If I recall, it might have been core.

15  Q   Let's talk about the core team.  What does the core

16      team do?

17  A   I don't believe they still have those teams, by the

18      way, so this is just my recollection of what it was

19      at the time.

20  Q   Let me just rephrase that question.  In 2013 or

21      thereabouts, what did the core team do?

22  A   If I recall properly, they worked claims with more

23      contentions is what they called them or conditions.

24      Like, the express team would do claims with, I

25      believe, one to three issues.  I really can't

Page 35

```
 1       remember the specific amount of disabilities that
 2       were assigned to each team, but typically the core
 3       team worked either more complex claims or some
 4       claims that maybe had more conditions than maybe
 5       the express team.
 6    Q  Other than core and express teams, were there other
 7       teams that were at the VSC in 2013 and 2014?
 8    A  If I can recall properly, I don't know if special
 9       ops operations was part of that, or if that was
10       something that was dissolved prior or later than
11       that time frame.  I can't be specific.  Those teams
12       rotated and changed throughout my time there at the
13       VA.  So if I'm recalling properly, I would say that
14       the teams consisted of the express, core, and
15       special ops.
16    Q  Did you ever work for special ops?
17    A  I have.  I'm not sure what time frame.  I don't
18       know if it was, what time that was or if it was in
19       Indianapolis even.  I don't know.
20    Q  If I told you that from the documents I've seen, in
21       2013 you were working on the express team, would
22       that sound right to you?
23    A  No, that would not sound right.
24    Q  So you think you were working on the core team in
25       2013?
```

1   A   I believe I was.

2   Q   Were you working on the express team prior to

3       moving to the core team?

4   A   I can't recall.  And I don't know if that was the

5       express team or that would have been the training

6       team that you're referring to.  I'm not really

7       quite sure, but I don't recall working directly for

8       the express team.  I remember after training I was

9       assigned to the core team, if my recollection

10      serves correct.

11  Q   Just to make sure I'm understanding you correctly,

12      to the best of your recollection during the time

13      that you were working at the VSC in Indianapolis,

14      you were assigned to the core team?

15  A   As far as I can recall.

16  Q   Other than the training team, you don't remember

17      working at any other teams at that office in

18      Indianapolis, right?

19  A   Because of how long ago this was, I can't really

20      recall completely, no.

21  Q   All right.  So you started at approximately a GS7.

22      And by the time you moved back to Florida in 2014,

23      you were either a GS10 or a GS11, right?

24  A   I believe so, yes.

25  Q   When your pay grade went up, did your job duties

1    change?

2  A  Typically what changes is the amount of production

3    that's required.

4  Q  What do you mean by that?

5  A  Depending upon the grade depends on how many claims

6    you're required to complete in any given day.

7  Q  So you're being paid more because you can process

8    more claims.  Is that fair to say?

9  A  That's typically how the grades work, yes.

10  Q  Let's talk about processing claims.  And you're

11    going to have to forgive me.  This is not an area

12    I'm familiar with.  So can you walk me through when

13    you're processing a claim what needs to be done,

14    just your garden variety claim.

15  A  Well, first you have to verify the service, verify

16    that the veteran has honorable service, that he is,

17    in fact, a veteran based on the amount of time,

18    length of time that he served and in what branch.

19    You would have to determine what conditions he's

20    claiming, if he -- review his service treatment

21    records to determine if he was treated in service

22    for those conditions.  You would have to determine

23    if he served in any type of -- depending upon the

24    claim filed, if he served in an imminent danger pay

25    area or if he was exposed to any type of chemicals

1    or radiation.  You'd have to, based on the evidence

2    of record, determine if he is subject to an exam,

3    which would allow the examiner to diagnose the

4    condition.  You would request an opinion,

5    requesting that the examiner gave a medical opinion

6    as to if he believes or she believes that the

7    condition is related to service.

8         It would also involve promulgating the claims

9    and the awards once the decision is made by the

10   RVSR, providing notification of the decision,

11   withhold any type of retire pay, any other type of,

12   any type of, I guess any type of pay that would be

13   withheld due to veterans retirement or any other

14   type of benefits that he would receive, process

15   dependency claims.  All that is part of the

16   processing of the claim.  That's pretty much it.

17   Q  Talking specifically about the 2013 to 2014 time

18      period, when a claim came to you to be processed

19      how would it come to you, in hard copy or by email?

20   A  Hard copy.

21   Q  Just show up in your inbox, did somebody come

22      around and hand out the claims, how did it work?

23   A  I don't recall completely.  Different supervisors

24      may have had different methods.  I don't know.  I

25      can't recall if they just handed them out.  I know

Page 39

 1      they were paper files at the time.  I'm not really

 2      sure how the work was disbursed.

 3   Q  And continuing to talk about that specific time

 4      period when you're doing things like verifying the

 5      service and the claim or determining whether the

 6      veteran had an honorable discharge, what tools are

 7      you using to verify this?

 8   A  The records, the DD214, the personnel records, the

 9      service treatment records.

10   Q  And are those records that would come in that file

11      that is given to you?

12   A  Yes.

13   Q  And once you're done processing a claim file, and,

14      again, I'm specifically talking about the 2013 to

15      2014 time period, what would you do with it?

16   A  It would be given to a rater to make a decision on

17      the claim.

18   Q  What do you mean by that, decision on the claim?

19   A  Decide whether the veteran should be granted

20      benefits.

21   Q  And I've seen indications in some of the documents

22      in this case about accuracy ratings.  I don't know.

23      Maybe I'm not using the right terminology there.

24      Do you know what I'm talking about?

25   A  You may be referring to quality.

Page 40

1    Q   Quality.  Thank you, yeah.  How is that quality

2        determined for a claim?

3    A   It's based on your accuracy.

4    Q   And who determines this?

5    A   Quality team.

6    Q   So when does a claim go to the quality team in that

7        flow?  You said that you hand it off to a rater.

8        Does it go to the quality team after the rater?

9    A   No, the quality team would randomly select cases to

10       review.

11   Q   So the quality team is pulling out claims and going

12       through them and checking the work that the VSRs

13       are doing, correct?

14   A   Correct.

15   Q   In 2014, specifically in January of 2014, your

16       immediate supervisor was Jim Dean, right?

17   A   I can't recall, but he was my supervisor at one

18       point.  He was my last supervisor when I was there

19       at Indianapolis.  No, actually, he may not have

20       been the last one, but he was one supervisor, yes.

21   Q   Do you know when Mr. Dean became your supervisor?

22   A   No.

23   Q   Do you know who was your supervisor before

24       Mr. Dean?

25   A   I am unable to remember her name.

Page 41

```
 1   Q   Was it a woman then?

 2   A   I believe so, yes.

 3   Q   Do you know who was your supervisor after Mr. Dean?

 4   A   Her first name was Tamieka.  I'm not really sure of

 5       her last name.  I can't remember her last name.

 6   Q   If I said Graves, would that sound right to you?

 7   A   Yes, that sounds right.

 8   Q   Do you know when Tamieka became your supervisor?

 9   A   No, but she was my supervisor up until the time I

10       left.

11   Q   In 2014, what position did Michael Stephens occupy

12       at the VSC?

13   A   I believe he was the director.

14   Q   Is that the top position at the office?

15   A   I don't know if it's the top position.  I believe

16       there -- I don't know.

17   Q   Would you say it's a high-level position?

18   A   Yes.

19   Q   What position in 2014 did Yvonne Hamilton occupy?

20   A   Yvonne Hamilton.  I don't know who Yvonne Hamilton

21       is.  I'm not familiar with that name.

22   Q   Are you familiar with the name Debra Street?

23   A   The name sounds familiar.

24   Q   Do you know what position she occupied in 2014?

25   A   I can't recall.
```

Page 42

1   Q   Are you familiar with the name Adam Kinder?

2   A   Yes.

3   Q   Do you know what position he occupied at that time?

4   A   I know at one point he was a supervisor.  I'm not

5       really sure if he was promoted to what position.  I

6       know he might have been acting assistant,

7       assistant -- I'm sorry -- service center manager at

8       one point.  I don't know.  I remember him being a

9       supervisor.  And I think he may have been promoted,

10      but I can't recall completely.

11  Q   You don't know what level he occupied vis-a-vis

12      Mr. Dean.  Is that fair to say?

13  A   I know at one point he was the supervisor, but I

14      believe that, like I stated, that he was an

15      assistant or an acting assistant service center

16      manager at one point.  I can't remember.

17  Q   Does that mean that to the best of your

18      recollection he occupied a position that was higher

19      in authority than Mr. Dean or Ms. Street?

20  A   I believe at one point, yes.

21  Q   In 2014, what position do you recall Ena Lima

22      occupied?

23  A   Service center manager.

24  Q   And what did you understand the job duties of the

25      service center manager to be?

Page 43

```
 1   A   To manage the production aspect of the facility as
 2       relation to claims.
 3   Q   Did you also know somebody named Sonya Wilson when
 4       you worked at Indianapolis VSC?
 5   A   Yes.
 6   Q   What position did she occupy in 2014 to the best of
 7       your understanding?
 8   A   Human resources specialist in 2014.
 9   Q   About how many people worked at the Indianapolis
10       VSC?
11   A   I have no idea.
12   Q   Do you think it was more than a hundred?
13   A   Possibly, yes.
14   Q   In 2014, how many people worked on the team that
15       you were on?
16   A   I can't say exactly, maybe 15.  I don't know.
17   Q   And how many other teams were there aside from the
18       team that you were on?
19   A   I really can't say.  I don't know, maybe -- I don't
20       know.  Without guessing, I can't say.  I don't
21       know.
22   Q   All right.  In 2013, you were approved for FMLA
23       leave, right?
24   A   I was approved for FMLA.  I'm not sure of the date
25       but yes.
```

Page 44

```
 1   Q   What led you to seek approval for FMLA?
 2   A   Because of the time period that I was missing due
 3       to my pain from my condition and the flare-ups,
 4       they were increasing in severity.  And they were
 5       occurring more frequently, which was causing me to
 6       miss more time at work.  It was affecting my
 7       ability to concentrate, which I felt it would be in
 8       my best interest to apply for FMLA.
 9   Q   Just to make sure I understand, you were missing
10       time, and you felt that FMLA would allow to you
11       take more time off to deal with your medical
12       condition.  Is that fair to say?
13   A   That's fair to say.
14   Q   Do you know when -- and, sorry, I should have asked
15       this.  That FMLA approval had to do with the
16       hidradenitis suppurativa, right?
17   A   Yes.
18   Q   Do you know who was your supervisor when you were
19       approved for FMLA leave?
20   A   No, but I remember during the times using a portion
21       of the leave, Jim Dean may have been my supervisor
22       at that time so I don't know if he was a supervisor
23       the entire time, but I know at one point he was the
24       supervisor.
25           (Exhibit 3 was marked.)
```

Page 45

1    Q   All right.  I'm going to share another exhibit here

2        on the screen for you.  I'm showing you what's been

3        marked as Exhibit 3 down here at the bottom.  This

4        is a document that has Bates No. DEF205.  It's one

5        page.  Ms. Brown, do you recognize this document?

6    A   Yes.

7    Q   What do you recognize it to be?

8    A   My request for reasonable accommodation.

9    Q   So this is a letter that you submitted to Michael

10       Stephens, right?

11   A   Yes.

12   Q   And it's dated January 17, 2014, right?

13   A   Yes.

14   Q   And in this letter the first line says, "I'm

15       requesting a transfer to the St. Petersburg,

16       Florida regional office due to a significant

17       hardship," right?

18   A   Yes.

19   Q   Why did you decide to submit this on the basis of,

20       as you write, a significant hardship?  Why did you

21       choose those words?

22   A   I can't say why at that time I chose those words.

23   Q   Do you know whether you talked to a union

24       representative prior to submitting Exhibit 3?

25   A   At that time I don't believe I had consulted any

Page 46

```
 1        type of help with the union or anyone else.

 2   Q    So does that mean you hadn't talked to HR prior to

 3        submitting Exhibit 3?

 4   A    I don't believe so.  And I know I didn't talk to

 5        any.  I wasn't consulting anyone at that point.

 6   Q    Do you know if prior to submitting Exhibit 3, you

 7        looked on the VA's website to determine if it had

 8        any guidance for seeking a reasonable

 9        accommodation?

10   A    I don't recall.

11   Q    What was the reason you wanted to go to the

12        St. Petersburg, Florida regional office?

13   A    It's where all my family was at the time, my

14        children, my adult children, my siblings, my

15        father.  I felt that this would be beneficial to

16        have not only the psychological and emotional

17        support but the physical support during the times

18        that I was experiencing debilitating pain and

19        unable to adhere to my daily activities or just

20        move around.  I thought that my children and my

21        family that was there would provide support for me

22        that I didn't have in Indianapolis.

23   Q    Looking at the second paragraph in Exhibit 3, I'm

24        highlighting it here on the screen.  You write "I

25        have a chronic health condition for which I'm FMLA
```

Page 47

```
 1        approved.  It requires services and care of a
 2        specialist, which is not available to me in the
 3        state of Indiana."  Do you see that?
 4   A    Yes, I do.
 5   Q    Let me back up a little bit.  Was Doctor Huff, was
 6        his care not sufficiently specialized for you?
 7   A    Can you make that bigger, please.
 8   Q    Oh, yeah, sorry.  Is that better?
 9   A    Yes.  I felt that the extended period of time it
10        took for me to get appointments with Doctor Huff
11        during my flares was inadequate.  And the fact that
12        I had to go to a walk-in clinic and get incised by
13        different physicians or whoever was the attending
14        physician at the time that wasn't familiar with my
15        condition or my personal health or anything was not
16        satisfactory.  So it wasn't, per se, my
17        dissatisfaction with Mr. Huff.  It was just that I
18        can't say if he was a specialist in that.  As far
19        as I know, he was a dermatologist.
20   Q    Do you know whether prior to January 2014 you had
21        shopped around the Indianapolis area for other
22        dermatologists that might be able to give you
23        better treatment?
24   A    I can't recall.
25   Q    Do you know whether as of January 17, 2014, whether
```

Page 48

```
 1        or not you had located a specialist in the
 2        St. Petersburg, Florida area that might be able to
 3        give you better treatment?
 4    A   I believe so but I can't recall the facility or the
 5        name.  I really don't know at that point.
 6    Q   So in submitting the letter in Exhibit 3, did you
 7        ever ascertain whether or not there was an open
 8        position in the St. Petersburg, Florida office that
 9        you could fill?
10    A   I believe I was instructed to look at openings on
11        the USA gov website.  I really can't say at what
12        point that was suggested to me, but I -- that's it.
13    Q   Do you know whether or not prior to submitting
14        Exhibit 3 you actually found an open spot on the
15        USA gov website?
16    A   I can't say.
17    Q   Looking at the next sentence in Exhibit 3, you
18        write, "There are two facilities in the region
19        which I wish to transfer that will help me properly
20        manage my condition."  Do you see that?
21    A   Yes.
22    Q   What does "facilities" mean in that sentence?  What
23        are you talking about there?
24    A   I can't say what I meant at that time that I wrote
25        that, but I'm assuming just doctor's office.
```

Page 49

1  Q  Okay.  That was my question.  Are those medical

2     facilities or something else?

3  A  Like I stated, I can't say exactly what my train of

4     thought was at that time in 2014, but reading it

5     now, it would look to me to be like a facility, a

6     doctor's office, or some type of medical practice.

7  Q  But it's fair to say that sitting here today you

8     can't tell me the names of either of those

9     facilities, right?

10 A  No.

11 Q  Okay.  Just so the record's clear, what I just said

12    is correct, yes?

13 A  Which part?

14 Q  That you cannot identify the names of those

15    facilities, correct?

16 A  Correct.

17 Q  Okay.  Thank you.  Do you know what the criteria

18    were that you used to identify these two

19    facilities?

20 A  Back in 2014, I can't recall, no.

21 Q  Do you know whether you were intending to go to

22    both of them or one or the other?

23 A  I can't recall.

24        (Exhibit 4 was marked.)

25 Q  All right.  I'm going to share Exhibit 4 for you on

Page 50

```
 1        the screen.  Exhibit 4 has a Bates No. DEF1563.

 2        It's a one-page email dated Thursday,

 3        January 23, 2014.  So I'm going to make the email

 4        bigger so you can see.  Can you see that okay?

 5   A    Yes.

 6   Q    Do you recognize Exhibit 4?

 7   A    Yes.

 8   Q    That's an email you received, right?

 9   A    Yes.

10   Q    Exhibit 4 is dated January 23, 2014.  And it

11        references a meeting you had with Ms. Lima on

12        January 22, 2014, right?

13   A    Yes.

14   Q    Do you remember having that meeting with Ms. Lima

15        on January 22nd?

16   A    Yes.

17   Q    Do you remember where it was?

18   A    In her office.

19   Q    Do you remember what time of day?

20   A    I believe it was in the afternoon.

21   Q    Other than you and Ms. Lima, was anyone else

22        present for that meeting?

23   A    No.

24   Q    How long did that meeting last?

25   A    Not long.
```

Page 51

1  Q  Less than ten minutes?

2  A  I can't say.  I know it wasn't long.

3  Q  Do you remember what Ms. Lima said during that

4     meeting?

5  A  Yes.

6  Q  What did she say?

7  A  She told me that just because I have a disability

8     means nothing, and she doesn't owe me anything.

9     Those are the phrases I remember distinctly.

10 Q  Let's back up there.  The purpose of that meeting

11    on January 22nd was to give you the results of

12    the transfer request, right?

13 A  Yes.

14 Q  Had you spoken with anyone in HR about that request

15    prior to meeting with Ms. Lima?

16 A  Yes, I submitted the paperwork to Sonya Wilson.

17 Q  And after you submitted it to Ms. Wilson, did you

18    ever talk to anybody in HR about it?

19 A  Sonya Wilson was in HR.

20 Q  Right.  I'm saying after you submitted it to her,

21    did you have any other conversations with anyone in

22    HR?

23 A  No, the decision was given to Ena Lima to make.  So

24    no, no one in HR further elaborated on the decision

25    or my reasonable accommodation request or what

Page 52

```
 1      documentation would be required or what my other
 2      options are.  This was the only notification I
 3      received regarding my request.
 4  Q   So when you went to Ms. Lima's office on
 5      January 22nd, can you walk me through what the
 6      conversation was.  What did she say?
 7  A   I can't remember exactly.  I remember her just
 8      stating that my request was denied.  And I
 9      elaborated on the fact that I was requesting the
10      transfer due to my condition.  And she said that
11      doesn't matter.  She doesn't owe me anything.
12  Q   Are you familiar with the allegations in this
13      lawsuit that claims that Ms. Lima said "You can't
14      go have a meltdown in HR"?
15  A   I don't recall.
16  Q   So you don't recall her saying that?
17  A   No, I remember what was emotional to me at the
18      time, which was her saying that she didn't owe me
19      anything, and just because I had a disability, that
20      doesn't matter.
21  Q   Okay.  But I'm asking do you recall her saying "You
22      can't go have a meltdown in HR"?
23  A   No, I don't recall.
24  Q   And am I understanding you correctly that to the
25      best of your recollection, you did not have
```

1   conversations with anyone in HR on January 22, 2014

2   about this request?

3   A  The only thing I remember is having, submitting my

4      documentation to Miss Sonya Wilson, who is an HR

5      rep, her providing that documentation to Miss Lima,

6      and Miss Lima denying my request.

7   Q  And how did you react when Ms. Lima informed you of

8      this?

9   A  I can't recall.  I'm sure I was upset, but it would

10     just be expressing my disapproval.  Basically, that

11     would be it.

12  Q  Do you know where you went after the meeting?

13  A  No, I don't recall.

14  Q  Do you recall why Ms. Lima sent you this email in

15     Exhibit 4 the next day?

16  A  No, I don't know why she did that.  Obviously, the

17     email says to follow up on our meeting.  I don't

18     know what her train of thought was, but so no.

19  Q  Do you recall requesting to have the decision to

20     this request be put into writing for you?

21  A  It's possible because that would be the

22     professional thing to do, but, no, I do not recall.

23  Q  And I'm going to put Exhibit 4 back up on the

24     screen for you.

25  A  Okay.

Page 54

1   Q   Okay.  So Exhibit 4 has you in the "To" line,

2       right?  Do you see that?

3   A   Yes.

4   Q   And then carbon copied on it is Jim Dean, and he

5       was your team coach, your immediate supervisor,

6       correct?

7   A   Yes.

8   Q   And then it also has Donald Young, right?

9   A   Yes.

10  Q   What position did Mr. Young occupy at the time to

11      the best of your recollection?

12  A   I believe he was the assistant coach.

13  Q   He would have been kind of like Mr. Dean's

14      right-hand man for lack of a better term?

15  A   Assistant.

16  Q   But he was another supervisor to you, right?

17  A   Yes.

18  Q   Okay.  Do you recall whether you and Ms. Lima had

19      an argument on January 22nd when she told you

20      this?

21  A   We had a discussion.

22  Q   You wouldn't characterize it as an argument?

23  A   No.

24  Q   Do you know whether anybody raised their voice

25      during that meeting?

Page 55

1   A   I don't believe so.

2   Q   And let's talk about the comments that you remember

3       Ms. Lima making.  I didn't write down what you had

4       said earlier.  But what is the specific comment

5       that you said stuck out in your mind?

6   A   The phrase that stuck out the most is that she

7       didn't owe me anything.

8   Q   And do you think that she was saying "I don't owe

9       you anything"?

10  A   I don't know what she was referring to.

11  Q   So do you remember verbatim what she said, or do

12      you just remember the gist of it?

13  A   That statement was verbatim.

14  Q   Can you tell me the verbatim statement that she

15      said?

16  A   She doesn't owe me anything.

17  Q   And how did that comment make you feel?

18  A   I suppose it made me feel belittled.

19  Q   Did you talk to anybody about how Ms. Lima's

20      comment made you feel?

21  A   I don't recall.

22  Q   Do you know whether you talked to HR about it?

23  A   I don't recall.

24  Q   What was your relationship like with Ms. Lima prior

25      to January 22, 2014?

Page 56

1    A   We didn't have much interaction.  I guess I

2        wouldn't say we had a relationship at all.

3            MR. KIRKLIN:  Okay.  We've been going about an

4        hour and a half.  Are you doing okay, or do you

5        want to take a break?

6            THE WITNESS:  I'm okay.

7            MR. KIRKLIN:  Anyone?

8            (A brief recess was taken.)

9    BY MR. KIRKLIN

10           (Exhibit 5 was marked.)

11   Q   So we are back on, and I'm going show you another

12       exhibit on the screen here.  This will be Exhibit

13       5.  It's a one-page document that has Bates No.

14       DEF255.  Ms. Brown, do you recognize Exhibit 5?

15   A   Can you enlarge it, please.

16   Q   Yeah.  Of course.  Is that better?

17   A   Yes.

18   Q   Okay.  Do you recognize Exhibit 5?

19   A   Yes.

20   Q   What is it?

21   A   Looks like it's a request for reassignment for

22       medical reasons.

23   Q   That's the document that you submitted on

24       February 6, 2014, right?

25   A   Yes.

1  Q  And you submitted it specifically to Mr. Stephens,

2     right?

3  A  Yes.

4  Q  Do you know why you addressed this memorandum to

5     Mr. Stephens?

6  A  No, I don't know why.  I don't recall.

7  Q  And the memo says it's submitted through Ms. Lima

8     and Mr. Dean, right?

9  A  Yes.

10 Q  And then it's carbon copied to Christina Clark, who

11    looks like she was your union steward; is that

12    correct?

13 A  Yes.

14 Q  And in the first paragraph here you write "Per the

15    2011 VA/AFGE Master Agreement."  Do you know what

16    that document is?

17 A  No, I don't recall.

18 Q  Do you know whether that's the agreement between

19    the VA and the union?

20 A  Possibly.

21 Q  Do you know why you phrased Exhibit 5 as being "Per

22    the 2011 VA/AFGE Master Agreement"?

23 A  That was with assistance with the union steward

24    there, Miss Clark.  She assisted me with creating

25    this document.  So I can't say what her reasoning

Page 58

```
 1      was, or I can't remember.

 2   Q  So she was directing you to phrase it as per

 3      Article 13 of the Master Agreement.  Is that fair

 4      to say?

 5   A  Yes.  She assisted me with developing this

 6      document, yes.

 7   Q  Thank you.  And in the second paragraph of Exhibit

 8      5, you say, "I have a serious chronic medical

 9      condition hidradenitis suppurativa Stage II, which

10      causes me severe debilitating pain and necessitates

11      medical intervention regularly," right?

12   A  Yes.

13   Q  And then in the next paragraph you say, "A transfer

14      of the St. Petersburg area will allow me to seek

15      out a medical specialist recommended by Doctor Huff

16      so that my condition can be better managed and

17      allow me to maintain more regular attendance at

18      work," right?

19   A  Yes.

20   Q  And that's consistent with your testimony earlier

21      about FMLA and indicating that this condition was

22      forcing you to need to miss days of work, right?

23   A  Yes.

24   Q  And in that paragraph that we just looked at, you

25      say a transfer would allow you to seek out a
```

Page 59

1    medical specialist recommended by Doctor Huff.  Do

2    you know who -- let me ask that differently.  Do

3    you know whether that refers to a specific person

4    that Doctor Huff recommended to you or

5    alternatively whether you were going to be seeking

6    somebody out?

7         MS. CLARK:  Objection --

8         COURT REPORTER:  Ms. Clark, I can't hear you.

9         MS. CLARK:  The objection is that the

10    documents that have already been produced as an

11    exhibit in this matter, in this deposition,

12    Doctor Huff actually identified the organization he

13    thought that she should seek.

14  Q  Ms. Brown, is that consistent with your

15    recollection?

16  A  Repeat the question.

17  Q  Do you know whether or not Doctor Huff had

18    identified a specific specialist for you to see, or

19    whether you were going to be seeking somebody else

20    out?

21  A  I don't recall.

22  Q  And you attached a note from Doctor Huff to the

23    request in Exhibit 5, right?

24  A  I believe so.

25  Q  You write in the last sentence of paragraph two "I

1       am attaching a medical statement from my physician,

2       Doctor Robert Huff, in support of my request,"

3       right?

4   A   Yes.

5           (Exhibit 6 was marked.)

6   Q   I'm going to show you Exhibit 6.  Exhibit 6 is a

7       one-page document with Bates No. DEF1585.  I'm

8       going to zoom in here for you.  Do you recognize

9       Exhibit 6?

10  A   Yes.

11  Q   Is that the statement from Doctor Huff that you

12      attached to Exhibit 5?

13  A   I believe so.

14  Q   Okay.  Do you know, can you tell me where in

15      Exhibit 6 Doctor Huff identified a specific treater

16      that you should see?

17  A   It says of care to an appropriate dermatologist in

18      St. Petersburg.

19  Q   So that's the reference you think that is included

20      in Doctor Huff's letter.  Do you know if that was a

21      specific person or if it was just any appropriate

22      dermatologist?

23  A   I don't recall.  I don't know what his -- yeah.

24  Q   I'm going to ask you in Exhibit 6, Doctor Huff in

25      the first paragraph writes "My first encounter with

Page 61

1    Ms. Brown occurred in June of 2012."  Do you see

2    that?

3 A  Yes.

4 Q  Does that sound accurate to you that that's the

5    first time you went to Doctor Huff's practice?

6 A  Could be, yes.

7 Q  Do you have any reason to think it's incorrect?

8 A  No.

9 Q  And then he continues on and says, "She was last

10   seen by my physician assistant in June of 2013."

11   Do you see that?

12 A  Yes.

13 Q  When you were going to Dermatology, Incorporated,

14   did you sometimes receive treatment from a

15   physician assistant?

16 A  I can't really recall, but on some occasion that

17   may have been the only person available for the

18   soonest appointment.

19 Q  If I told you that in parts of the record in this

20   case I've seen reference to a physician assistant

21   named Lauren, would that sound like somebody you

22   may have seen at some point?

23 A  I don't know.

24      MS. CLARK:  Objection.  If counsel has access

25   to the document that actually identifies the name

Page 62

1    of the assistant, I suggest you show her that

2    document as opposed to asking her to guess.  I will

3    object to the form.

4  Q  Does that sound correct to you that prior to

5    February 2014, the last time you received treatment

6    at Dermatology, Incorporated was June of 2013?

7  A  That was the last seen as far as from the date of

8    that notice.  Had I been seen after that, I can't

9    say.

10 Q  Do you have any reason to think that portion of

11   Exhibit 6 is incorrect?

12 A  No.

13 Q  Who did you give Exhibits 5 and 6 to at the VA?

14 A  I can't recall.

15 Q  Do you know whether they were given to HR?

16 A  I can't say.

17 Q  Do you recall at the time that you submitted

18   Exhibits 5 and 6 to the VA, requesting any specific

19   accommodation?

20 A  Rephrase that question, please.

21 Q  At the time -- you agree with me that Exhibits 5

22   and 6 were in early February of 2014 submitted to

23   the VA, right?

24      MS. CLARK:  Objection to form.

25 A  Yes.

Page 63

1   Q   At the time that you submitted Exhibits 5 and 6, do

2       you recall asking the VA for any specific

3       accommodation?

4           THE WITNESS:  I'm sorry, Miss Clark, I didn't

5       hear what you said.

6           MS. CLARK:  I just raised an objection.  It's

7       on the record so moving on to his next question.

8   Q   So you can answer my question, Ms. Brown.

9   A   Restate the question, please.

10  Q   At the time that you submitted Exhibits 5 and 6 to

11      the VA, do you recall making any specific request

12      for a specific type of accommodation?

13  A   To be transferred.

14  Q   Other than being transferred, do you remember

15      asking for any other accommodation?

16  A   I wasn't given the opportunity.

17  Q   What do you mean by that?

18  A   I never had a discussion with anybody regarding, a

19      meeting for reasonable accommodation.  But what I

20      wanted out of the request was the transfer as is

21      stated in the documents.

22          (Exhibit 7 was marked.)

23  Q   Let's go on to Exhibit 7.  Exhibit 7 is a two-page

24      document.  It's Bates No. DEF203 to 204.  I'm going

25      to zoom in on the date on the first page.  It is

Page 64

1      February 10, 2014.  Do you see that?

2   A  Yes.

3   Q  And it's from Ms. Lima, right?

4   A  Yes.

5   Q  And it's to you, right?

6   A  Yes.

7   Q  Okay.  And this is the letter, as stated in the

8      first sentence of the first full paragraph, that

9      responds to your request for reassignment under the

10     Master Agreement, right?

11  A  Yes.

12  Q  And Ms. Lima copies five people in the cc line.  Do

13     you see that?

14  A  Yes.

15  Q  She copied Mr. Stephens, right?  And then

16     Ms. Hamilton, Mr. Dean, Miss Street, and

17     Mr. Kinder, right?

18  A  Yes.

19  Q  Did you think it was inappropriate for Miss Lima to

20     copy these people on the response?

21  A  Yes, I believe it was a violation of my right to

22     privacy regarding my medical condition.

23  Q  And can you elaborate on that?  Why did you think

24     that was a violation?

25  A  Because she stated that I suffer from a

```
 1      dermatological disorder that's chronic and
 2      unpredictable in nature.  And they didn't need to
 3      know that.  That's my private medical information
 4      that should not have been shared with any of those
 5      people.  To me, it was emotional, and it was
 6      damaging.  It was intended to hurt me.  That was my
 7      feeling.
 8   Q  Am I hearing you correctly that you think it was
 9      inappropriate of her to include all of these
10      individuals on the cc line?
11   A  Along with my personal medical information, yes.
12   Q  So looking back at Exhibit 5, Exhibit 5 is directed
13      Mr. Stephens, right?
14   A  Yes.
15   Q  And you copied Mr. Dean on it, right?
16   A  Yes.
17   Q  So what it is it about the inclusion of
18      Mr. Stephens and Mr. Dean in Exhibit 7 that you
19      thought was inappropriate?
20   A  They weren't the only ones on that.  And I chose to
21      share that information.  That's not someone else
22      choosing to share it for me.  I have the right to
23      share my information with whom I see fit, but it's
24      not her responsibility to violate my privacy by
25      divulging that information to people that I have
```

Page 66

1    not agreed to.

2  Q  Right.  But as of February 10, 2014, Mr. Stephens

3     and Mr. Dean already knew that information because

4     you told them in Exhibit 5, right?

5  A  The other parties on the letter did not.

6  Q  Okay.  I understand that, and we will get to those

7     people.  I'm trying to talk about Mr. Stephens and

8     Mr. Dean first.  Okay.

9        So what do you think was inappropriate about

10     including Mr. Stephens or Mr. Dean in Exhibit 7,

11     given that you had already told them this

12     information a few days prior?

13  A  For Mr. Stephens and Mr. Dean, they already had

14     that information so I don't see that that was

15     inappropriate.

16  Q  Okay.  Now, Ms. Hamilton, Miss Street, and

17     Mr. Kinder were all supervisory or managerial

18     employees at this time, right?

19  A  Yes.

20  Q  What does that abbreviation AVSCM next to Miss

21     Street's name mean to the best of your

22     recollection?

23  A  Assistant Veterans Service Center Manager.

24  Q  That would be someone in the hierarchy that's above

25     the coach, right?

Page 67

1  A  Yes.

2  Q  Can you tell me how did the inclusion of

3     Ms. Hamilton, Ms. Street, or Mr. Kinder cause you

4     stress?

5  A  Violation of my privacy.

6  Q  And how did that manifest itself?

7  A  Rephrase your question.

8  Q  Yeah.  Did you experience stress as a result of

9     that?

10 A  Emotional, yes.

11 Q  Did you talk about that emotional stress with

12    anyone?

13 A  Maybe the union rep at the time.  I'm not really

14    sure.

15 Q  Did the inclusion of Miss Hamilton, Miss Street, or

16    Mr. Kinder embarrass you?

17 A  Yes.

18 Q  Why?

19 A  Because it divulged private information about my

20    health.

21 Q  Ms. Lima, she characterized this as a

22    dermatological disorder, right?

23 A  Yes.

24 Q  And Doctor Huff's note in Exhibit 6 characterizes

25    it as a disorder of the skin, right?

Page 68

1   A   Yes.

2   Q   And dermatological just means relating to the skin,

3       right?

4   A   I don't know the definition but yes.

5   Q   In Exhibit 7, Ms. Lima says that this condition is

6       "chronic and unpredictable in nature," right?

7   A   Yes.

8   Q   And in Exhibit 6, Doctor Huff characterizes your

9       condition as chronic and often unpredictable,

10      right?

11  A   Yes.

12  Q   But in Exhibit 7, Ms. Lima did not actually

13      identify the specific name of your condition, did

14      she?

15  A   No.

16  Q   But in Exhibit 6, Doctor Huff did specify the name

17      of the condition, correct?

18  A   Yes.

19  Q   In Exhibit 7, and I'm highlighting here the third

20      full paragraph, Ms. Lima writes "The medical

21      statement provided by Doctor Huff failed to

22      demonstrate that you were unable to perform your

23      assigned duties as a GS9 veterans service

24      representative."  Do you see that?

25  A   Yes.

Page 69

1  Q  Do you think that's inaccurate?

2  A  To a certain extent.

3  Q  How?

4  A  Because the pain made it difficult to concentrate,

5     which made it difficult to perform the duties of my

6     job.

7  Q  Do you think that is explained in the letter that

8     Doctor Huff submitted in Exhibit 6?

9  A  He expressed that the pain can be debilitating.

10    And pain, debilitating pain can inhibit a person's

11    ability to concentrate.

12 Q  Would you agree that in February of 2014 you were

13    still entitled to take FMLA leave if you were

14    having flare-ups?

15       MS. CLARK:  Objection.  At what point in time?

16       MR. KIRKLIN:  I said in February 2014.

17 A  Restate the question or rephrase it, please.

18 Q  In February of 2014, were you entitled to take FMLA

19    leave?

20 A  I believe that was during the time frame it had

21    been approved.  I can't say for sure, but if I was

22    approved at that time, yes, I was still able to

23    take FMLA.

24 Q  And so if you were having a flare-up in February of

25    2014, you could take FMLA to not go to work, right?

Page 70

```
 1   A   Yes.

 2   Q   And in Exhibit 7, the last paragraph of the first

 3       page, Ms. Lima says "If you believe that you need

 4       an accommodation due to a disability or workplace

 5       barrier that precludes you from performing the

 6       essential functions of your position, you may

 7       request a reasonable accommodation by completing VA

 8       Form 0857a."  Do you see that?

 9   A   Yes.

10   Q   And you did subsequently submit the VA Form 0857a,

11       right?

12   A   I don't -- I believe so.

13           (Exhibit 8 was marked.)

14   Q   Let's look at that.  I'm putting on the screen

15       Exhibit 8, which is a one-page document, Bates No.

16       DEF248.  Ms. Brown, this is your handwriting on

17       Exhibit 8, right?

18   A   Yes.

19   Q   And down at the bottom left corner it says VA Form

20       0857a, right?

21   A   Yes.

22   Q   Okay.  And you submitted this on February 24, 2014?

23   A   Yes.

24   Q   And in the portion of Exhibit 8 that says reason

25       for request, you wrote "Please refer to doctor's
```

Page 71

```
 1        letter," right?

 2   A    Yes.

 3   Q    And in writing that, you were referring to the

 4        letter from Doctor Huff in Exhibit 6, right?

 5   A    I believe so.

 6   Q    Do you know whether you had submitted to the VA any

 7        other letters from your doctor prior to

 8        February 24, 2014?

 9   A    I know subsequently I did, which was the letter

10        that they approved my reasonable accommodation

11        transfer using.

12   Q    And we'll get to that.  I agree with you.  But my

13        question was before this date.

14   A    Not that I recall.

15   Q    And in a portion of Exhibit 8 that says

16        accommodation requested, you refer to the doctor's

17        letter submitted on February 6th.  And then you

18        say you originally requested reasonable

19        accommodation on January 17, 2014.  And that is

20        referring to Exhibit 3, right?

21   A    Yes.

22   Q    And then you write "and again on January 23, 2014"

23        in Exhibit 8, right?

24   A    Yes.

25   Q    Okay.  What were you talking about in Exhibit 8
```

Page 72

```
 1        when you said "and again on January 23, 2014"?

 2    A   I think I submitted another request.  I believe

 3        there were two requests by this date; one, the

 4        initial transfer that was directed to, that was

 5        provided to Miss Wilson and then the letter or

 6        request that was submitted directed to Doctor

 7        Stephens that the union representative assisted me

 8        with.  Both of those I consider to be requests for

 9        reasonable accommodation.

10    Q   Right.  I understand that, but now I'm confused

11        because in Exhibit 8 you say January 23, 2014,

12        right?

13    A   Uh-huh.

14    Q   And Exhibit 3 is the first request, right?

15    A   Okay.

16    Q   It's dated January 17, correct?

17    A   Yes.

18    Q   And Exhibit 5 is the second request, right?

19    A   Okay, yes.

20    Q   And it's dated February 6th, right?

21    A   Yeah.

22    Q   So we've got a request on January 17 and a request

23        on February 6th.  And I'm trying to understand

24        what you meant when you said January 23, 2014.

25    A   There had to be another request.
```

Page 73

1   Q   So you think that there was a third request prior
2       to Exhibit 8?
3   A   Well, I mean, from looking at the notice, it looks
4       like I'm saying that there was a request on the
5       17th.  I then again requested on the 23rd, and
6       then I made a subsequent request on this date
7       you're showing me, which is February, this February
8       date.  As far as I can recall looking at this
9       notice, that's what it tells me.
10  Q   Okay.  Do you know any -- if there was another
11      request submitted on January 23, 2014, do you know
12      any details about who it was submitted to or what
13      form it was submitted in?
14  A   Not without doing additional research or looking
15      through my paperwork.
16  Q   Do you think you could have been referring to
17      Ms. Lima's email marked as Exhibit 4, which is
18      dated January 23, 2014?
19  A   I don't know if it's possible that I responded to
20      that email.  I don't really know.  I don't know.
21          (Exhibit 9 was marked.)
22  Q   Okay.  And I'm showing now Exhibit 9, which is a
23      one-page document Bates No. DEF253.  And I will
24      zoom in here for you.  Exhibit 9 is an email from
25      Jim Dean, and it's addressed to you, right?

Page 74

1    A   Yes.

2    Q   And it's dated February 27th, right?

3    A   Yes.

4    Q   So this as an email you received following a

5        meeting with Mr. Dean and others on

6        February 27, 2014, right?

7    A   Yes.

8    Q   Do you recall what time of day that meeting took

9        place?

10   A   No.

11   Q   Do you recall who was present at the meeting?

12   A   Union rep, Rachel Gentry, Sonya, Jim Dean, and

13       myself.

14   Q   So it's the people that are included in the email

15       in Exhibit 9, right?

16   A   Yes.

17   Q   Do you know how long that meeting lasted?

18   A   No.

19   Q   Mr. Dean writes in Exhibit 9, "I did acknowledgment

20       of receipt of request for reasonable

21       accommodation."  Do you see that?

22   A   Yes.

23   Q   Do you remember Mr. Dean giving you an

24       acknowledgment form for your reasonable

25       accommodation form at that meeting?

Page 75

1   A   I don't recall.

2   Q   And then in the next paragraph Mr. Dean says, "We

3       clarified the hardship transfer process."  Do you

4       see that?

5   A   Yes.

6   Q   Do you remember Mr. Dean or Ms. Wilson discussing

7       the hardship transfer process at that meeting on

8       February 27th?

9   A   No.

10  Q   Mr. Dean goes on to write, "You and your union

11      representative will file an appeal on your prior

12      denial of your request for a hardship transfer."

13      Do you see that?

14  A   Yes.

15  Q   Do you recall filing such an appeal?

16  A   I don't recall.

17  Q   The next paragraph he says, "For the reasonable

18      accommodation your stated that you had no

19      limitation."  Do you see that?

20  A   Yes.

21  Q   Do you recall discussing the limitations you had

22      during that meeting?

23  A   No.

24  Q   And then he writes, "You stated that you had no

25      interim accommodation," right?

Page 76

1   A   Are you asking me if I had any interim

2       accommodations, or are you just reaffirming what's

3       stated in the notice?

4   Q   I'm saying Mr. Dean writes that you stated you had

5       no interim accommodations in the email, right?

6   A   It's stated there in the email, yes.

7   Q   Do you remember asking for interim accommodations

8       during that meeting?

9   A   I don't recall being provided any interim

10      accommodations.  And I don't believe I would have

11      known what the options would have been.

12  Q   Did you ever ask what interim accommodations might

13      be available?

14  A   I don't recall.

15  Q   Do you recall whether you replied to Mr. Dean's

16      email in Exhibit 9 with any corrections of the

17      information he was putting in here?

18  A   I don't recall.

19  Q   In the next paragraph Mr. Dean says, "I gave you VA

20      Form 0857e, Request for Medical Documentation,"

21      right?

22  A   It's stated there, yes.

23  Q   Do you disagree that he gave you that form at the

24      meeting?

25  A   I don't recall.

Page 77

 1              (Exhibit 10 was marked.)

 2    Q   I'm going to show you Exhibit 10, which is a

 3        two-page document, Bates No. DEF1137 to 1138.  And

 4        it is titled down at the bottom left corner VA Form

 5        0857e.  Can you see that?

 6    A   Yes.  Can you enlarge it for me, please.

 7    Q   Yes.  Sorry.  Is that better?

 8    A   Yes.

 9    Q   Do you remember seeing Exhibit 10 in February of

10        2014?

11    A   I can't recall.  Possibly.

12    Q   Do you know whether you ever gave a form like

13        Exhibit 10 to Doctor Huff to fill out?

14    A   I don't recall.

15    Q   Do you know whether you gave it to the Chapel Hill

16        facility that you were getting immediate care from?

17    A   I don't recall.  I remember requesting to know what

18        was inadequate about my medical documentation that

19        I had previously submitted.  And I don't believe

20        that information was ever provided to me.

21    Q   Going back to Exhibit 9, Mr. Dean wrote, "I stated

22        that if you feel you have submitted the medical

23        evidence to forward me an email stating so."  Do

24        you see that?

25    A   Yes.

Page 78

1    Q   Do you think that you ever sent Mr. Dean an email

2        to that effect?

3    A   I believe I would have, but I really can't recall.

4        I don't know why I wouldn't have considering I had

5        the medical documentation, and I obviously felt

6        that it should have been adequate at the time, but

7        I can't recall if I did.

8            (Exhibit 11 was marked.)

9    Q   So I'm going to go to Exhibit 11, which is a

10       one-page document, Bates No. DEF247.  And let's go

11       through the emails in chronological order so I will

12       go down to the bottom --

13   A   Okay.

14   Q   -- to the email from Donald Young to you dated

15       March 25, 2014.  Do you see that?

16   A   Yes.

17   Q   Okay.  Mr. Young writes here "During the

18       interactive meeting on February 27, 2014, you were

19       given the opportunity to provide sufficient medical

20       documentation identified on VA Form 0857e in

21       support of your request.  As of today, HR has not

22       received sufficient medical documentation from you

23       for the deciding management official to make the

24       determination."  Do you think that between

25       February 27, 2014 and March 25, 2014, you provided

1    to the VA any additional documentation aside from

2    the letter from Doctor Huff that we looked at

3    previously today?

4  A  I don't recall.  I don't believe so, but in the

5    notice they said sufficient, which, again, they did

6    not tell me why my notice was insufficient, which

7    would have allowed me the opportunity to provide

8    sufficient documentation.  So sufficient, they

9    never told me what was insufficient.

10 Q  Okay.  And then in the next email from you to

11   Mr. Young you write, "Please refer to the doctor's

12   certification that has already been provided,"

13   right?

14 A  Yes, along with the missing information from my

15   doctor.  So that's what I was requesting

16   clarification as to what was inadequate about the

17   doctor's certification that I provided, which I

18   never received, or which I don't believe or recall

19   I have ever received.

20 Q  By doctor's certification there, you're referring

21   to the letter by Doctor Huff dated in early

22   February of 2014, right?

23 A  I believe so.

24 Q  Do you recall during this time period the VSC

25   providing you with an extra chair or break?

Page 80

1   A   No.

2   Q   So you don't think that happened?

3   A   No.

4       (Exhibit 12 was marked.)

5   Q   I will mark Exhibit 12, which is a two-page

6       document Bates No. DEF245.  And looking at the

7       second page of Exhibit 12, your signature is there

8       along with the date of 4-2-2014, right?

9   A   Yes.

10  Q   Do you recall receiving Exhibit 12 on

11      April 2, 2014?

12  A   I believe so, as far as I recall.

13  Q   If you got it in person or by email?

14  A   I can't recall.

15  Q   Do you recall whether you sat down with Ms. Lima,

16      and she gave it to you?

17  A   I don't believe I sat down with Ms. Lima.  And I'm

18      not sure if Ms. Lima was -- no.  Go ahead.  I don't

19      believe I sat down with Ms. Lima.

20  Q   So looking above your signature on the second page

21      of Exhibit 12, Exhibit 12 is signed by Ms. Lima on

22      the box that says DMO signature, right?

23  A   Yes.

24  Q   Do you know what DMO means?

25  A   No.

Page 81

1   Q   If I told you deciding management official, would

2       that sound right to you?

3   A   Yes.

4   Q   Can you recall any conversations you had with the

5       VA about the content of Exhibit 12 at or around the

6       time that it was given to you?

7   A   No, no.

8   Q   And in the first page of Exhibit 12, the form says

9       "If you need to visit a medical specialist outside

10      of the commuting area, you may request leave in

11      accordance with the appropriate leave requesting

12      procedures."  Do you see that?

13  A   Can you enlarge that for me, please.

14  Q   Yeah.  Do you see that sentence I highlighted?

15  A   Yes.

16  Q   Did you not think that that was an appropriate

17      accommodation to your condition?

18  A   I didn't think it was feasible, no.

19  Q   Why wouldn't it be feasible?

20  A   To transfer, to travel back and forth, no.

21  Q   Travel back and forth between where and where?

22  A   She was, I assume she was referring to Florida.  I

23      really don't know.  I mean, I, obviously, at the

24      time, no, I don't believe it was an adequate

25      accommodation.

Page 82

1  Q  Do you know whether at the time you received this

2     you had already started being under the care of a

3     specialist in Florida?

4  A  No, I don't, at that time, no.

5  Q  So you could have gone to see a specialist in

6     Kentucky, Ohio, or Illinois, right?

7        THE WITNESS:  Did you say something,

8     Miss Clark?  I couldn't hear you.  Still couldn't

9     hear.

10       MS. CLARK:  No, I did not.

11       THE WITNESS:  Okay.  Thank you.

12 A  Repeat your question, please.

13 Q  Yeah.  I'm just asking why you think that this is

14    telling you that you had to go see a specialist in

15    Florida instead of seeing a specialist in a state

16    that neighbors Indiana.

17 A  I was under the impression that this was pertaining

18    to my request for transfer.

19 Q  That's because the request for transfer was the

20    accommodation that you wanted, right?

21 A  That I was requesting, yes.

22 Q  All right.  And you mentioned this just a couple

23    minutes ago, later in 2014 you were transferred to

24    St. Petersburg, right?

25 A  In October of 2014.

Page 83

1    Q   Okay.  Did you submit a new request prior to that
2        transfer going through?
3    A   I submitted another letter from my doctor to a
4        different HR associate there.  I can't remember.  I
5        believe her name was Julie.  I can't remember her
6        last name.
7    Q   Do you know when you submitted that to Julie?
8    A   No.
9    Q   It would have been sometime between April 3, 3014
10       and October 2014, right?
11   A   That could be fair to say.  Don't know for sure.
12   Q   Do you know the reasons why that application was
13       successful?
14   A   I don't know.  Letter was pretty similar to the
15       previous letter I submitted, other than maybe one
16       sentence or one phrase, but, no, it was a pretty
17       similar documentation.  So I don't know why that
18       one was successful, and the others were not.
19   Q   When you submitted that second request, did you
20       submit it with a VA Form 0857a or some other type
21       of form or a letter or something else?
22   A   I was under the impression that a specific form
23       wasn't required to request a reasonable
24       accommodation, but at the time I submitted the last
25       request, I can't recall what documentation, I mean,

Page 84

1       what form I submitted with the letter.

2           (Exhibit 13 was marked.)

3   Q   Looking at Exhibit 13, which is a two-page document

4       Bates No. DEF 1586 to 1587, this is that second

5       letter from Doctor Huff that you submitted in

6       connection with the transfer to Florida that was

7       successful, right?

8   A   Can you increase it, please.  I believe so, yes.

9   Q   Okay.  And date on that is August 1, 2014, right?

10  A   Yes.

11  Q   Does that sound about the time that you submitted

12      this second request?

13  A   It would be, yes.  It would be around that time.

14  Q   And when you went back to Doctor Huff to get the

15      second letter, what did you tell him?

16  A   I don't recall.

17  Q   Did you tell him specific information that needed

18      to be included in the second letter?

19  A   I really don't recall the conversation.

20  Q   Did HR give you guidance on what to put in the

21      letter?

22  A   No.

23  Q   Did the union give you guidance on what to put in

24      the letter?

25  A   I can't really recall.  Possibly, but I can't

Page 85

```
 1       recall.
 2    Q  Do you know when you were notified that the
 3       transfer to St. Petersburg was being granted?
 4    A  Sometime in October, I believe, or maybe it was the
 5       end of September or sometime in October.
 6    Q  And you started work down at St. Petersburg in
 7       October of 2014, right?
 8    A  Yes.
 9    Q  You had to move fairly quickly?
10    A  I think it was a two-week time frame.
11    Q  I mean, that's pretty tight for moving a thousand
12       miles though, wouldn't you agree?
13    A  That's how important it was to me, yes.
14    Q  And did your husband have to move with you?
15    A  Yes, he did.
16    Q  So did he quit his job and relocate down there with
17       you?
18          MS. CLARK:  Objection, relevance.  You can
19       answer though.
20    A  I can't recall the circumstances around his
21       position, but I believe that he did.  He didn't
22       have a job when we moved back.  I think he found a
23       new job.  So I think -- I can't recall completely,
24       but I believe he found a new job when we moved back
25       to Florida.
```

1    Q   In 2014, in addition to seeing Doctor Huff and the

2        other physicians for treatment of your skin

3        condition, you were also seeing Doctor Patel for

4        mental health treatment, right?

5    A   Yes.

6    Q   Do you know when you started seeing Doctor Patel?

7    A   I don't know the date.

8    Q   Can you give your best approximation?

9    A   Maybe 2012.

10   Q   And is it correct to say that in connection with

11       your request for transfer to Florida, you never

12       submitted documentation from Doctor Patel in

13       support of those transfer requests, right?

14   A   No.

15   Q   But just to make sure, what I said is correct,

16       right?

17   A   I did not provide any documentation from Mr. Patel.

18           MR. KIRKLIN:  Thank you.  We've been going

19       about an hour since our last break.  Ms. Brown, do

20       you want to take another break?  Are you okay?

21           THE WITNESS:  Sure.  It's up to everybody

22       else.  I'm okay.

23           MR. KIRKLIN:  I'm happy to do it if anybody

24       wants a break.  I'm at natural stopping point.

25           MS. CLARK:  How much longer do you think

Page 87

1    you're going to be?

2         MR. KIRKLIN:  I don't know, not that much

3    longer, an hour.

4         MS. CLARK:  So I would suggest a ten-minute

5    break if you're only going to be another hour.  If

6    you're going to be longer than another hour, I

7    would want to give the court reporter a little bit

8    more of a break than that.

9         MR. KIRKLIN:  Let's do ten minutes.

10        (A brief recess was taken.)

11  BY MR. KIRKLIN

12        (Exhibit 14 was marked.)

13  Q  I'm going to share another exhibit here.  Exhibit

14     14 is a one-page document Bates No. DEF251.  And I

15     will zoom into the top, and we will go down a

16     little bit.  So the top of Exhibit 14 is titled

17     Employee Monthly Performance Review.  Do you see

18     that?

19  A  Yes.

20  Q  Are these performance reviews that you received on

21     a regular basis when you were working at the

22     Indianapolis VSC?

23  A  I believe monthly, as it's stated.

24  Q  And this particular one is dated 12-12-13.  Do you

25     see that?

Page 88

1   A   Yes.

2   Q   And it has your grade position as GS10.  Does that

3       sound correct to you?

4   A   Sounds right.

5   Q   And it has you on the core team.  I think that's

6       consistent with what you testified earlier, right?

7   A   Yes.

8   Q   And then Mr. Dean is listed as a supervisor.  And

9       when you got the monthly performance reviews, did

10      they come to you electronically, or did you get

11      them in hard copy at this time period?

12  A   I can't really recall for sure.

13  Q   Did you have a sit-down with your coach or

14      supervisor to discuss what was in it?

15  A   Sometimes.  I can't say at that time.  I'm sorry.

16      I know now I receive them sometime mostly

17      electronically or some, you know, but I can't say

18      at that time.

19  Q   Do you specifically recall having a conversation

20      with Mr. Dean to discuss the performance review in

21      Exhibit 14?

22  A   I don't recall exactly, no.

23  Q   And I want to ask you about the performance

24      evaluation and the service delivery output section

25      on the lower half of the document.  You see the

Page 89

```
 1       line here that says Goal 5.5?
 2   A   Yes.
 3   Q   What does goal mean in that context?
 4   A   I guess what you're expected to achieve.
 5   Q   Is that referring to a number of claims that need
 6       to be processed?
 7   A   Yes.
 8   Q   So is it on a per-day basis?
 9   A   I suppose that may have been per day.
10   Q   And do you understand the difference between the
11       next two numbers here, actual and cumulative?  Can
12       you explain the difference to me?
13   A   I believe cumulative would have been for the entire
14       year or for whatever time period they were
15       counting.  Normally it's the fiscal year.  And
16       actual may have been at that moment or that month
17       that they're referring to in the monthly report
18       there, if I'm not mistaken.
19   Q   In the section below that where it says quality
20       accuracy, is that what you were talking about
21       earlier today when you would have your work
22       reviewed by the quality team?
23   A   Yes.
24   Q   Other than the monthly performance reports that you
25       were getting, did you get other reports about the
```

1    accuracy of your work as it was rated by the

2    quality team?

3  A  Not as far as a performance evaluation but if you

4    received a quality review, so I believe sometimes

5    they would give you a report based on that

6    particular review.

7  Q  And you said earlier today that as your pay grade

8    went up, your output numbers went up as well,

9    right?

10  A  Yes.

11  Q  Okay.  So that's talking about the service delivery

12    output goal of 5.5, right?

13  A  Yes.

14  Q  Do you know whether as your pay grade went up, the

15    accuracy level that you were expected to meet also

16    went up?

17  A  Possibly, yes.

18  Q  Do you know one way or the other?

19  A  I believe it is.  I mean, it's that way now.  Well,

20    I can't really say.  It changes so often, but at

21    that time, that would probably be accurate.

22  Q  And then down in the final section of Exhibit 14,

23    the exhibit says currently you were in a career

24    ladder position.  Do you see that?

25  A  Yes.

Page 91

 1  Q  Is that the same thing as the journey level

 2     position that we talked about earlier today?

 3  A  Yes.

 4  Q  And in the next sentence the exhibit says, "In

 5     order to certify your promotion to next level GS11,

 6     your quality must be at 93 percent and your output

 7     at six actions," right?

 8  A  Yes.

 9  Q  So that means in order to get your next promotion,

10     you needed to meet both the quality and the

11     productivity benchmarks that were set for the

12     position, right?

13  A  Yes.

14  Q  And would you agree with me that Exhibit 14

15     indicates that you weren't meeting on a cumulative

16     basis the output or the accuracy quotas that you

17     were being expected to meet?

18  A  It appears that way, yes.

19        (Exhibit 15 was marked.)

20  Q  I'm going to go to Exhibit 15, which is a one-page

21     document DEF211.  I will zoom in here.  The title

22     at the top of Exhibit 15 is Aspen Performance

23     Totals.  Do you see that?

24  A  Yes.

25  Q  Can you tell me what Aspen is?

Page 92

1  A  It was a program used to count our production.

2  Q  It's a program that VSC uses to monitor employee

3     production?

4  A  Yes.

5  Q  And on Exhibit 15, it says run at 1-21-2014.  Do

6     you see that?

7  A  Yes.  Can you enlarge it for me, please.

8  Q  I'm sorry.  My apologies.  Is that better?

9  A  Yes.

10 Q  And then going down into the grid that's in the

11    body of the document, it's got your name, right?

12 A  Yes.

13 Q  And then it says Lane Express.  Do you know what

14    that means?

15 A  Those were the lanes that we spoke of previously.

16 Q  Is that the same thing as team?

17 A  Yes.

18 Q  So does that mean that at some point you were

19    working in the express team?

20 A  That's what it says, yes.

21 Q  Do you actually recall working on the express team

22    because I thought you said earlier today you

23    didn't?

24 A  I can't recall.  Like I mentioned, it may have been

25    when it was during the training portion of the job.

Page 93

```
 1        I don't really know.  You know, we changed teams

 2        sometimes or coaches.  So I really can't say.  That

 3        was a long time ago, but I mainly remember being

 4        mostly on the core team.

 5   Q    Okay.

 6   A    If it says it there, then it's possible.

 7   Q    I'm just asking for your best recollection.  I'm

 8        just trying to understand what the document says as

 9        well.  Going to two boxes over under the header

10        Daily Productivity Rate, do you see that?

11   A    Yes.

12   Q    And then it has a goal parentheses of 5.5 of the

13        box below that.  Do you see that?

14   A    Yes.

15   Q    And 5.5 was the productivity goal for the GS10

16        position that we saw on Exhibit 14.  Do you

17        remember that?

18   A    I remember the exhibit, yes.

19   Q    All right.  Then looking a few columns over, it

20        says items record or items records.  Do you see

21        that?

22   A    Yes.

23   Q    Do you know what that means?

24   A    Not necessarily.

25   Q    Do you have any idea at all?
```

Page 94

```
 1   A   How many claims I worked, which I don't believe --
 2       I don't know how -- I don't know.  I'm not really
 3       sure.  I'm sorry.
 4   Q   That's okay.  If you don't know, you don't know.
 5       Do you know what total weight means, the next
 6       column?
 7   A   I really can't say.  I'm not sure if they're
 8       calculating this to include the entire fiscal year
 9       or not and how much this particular, you know,
10       period will weigh into my total production.  I
11       really don't know.
12   Q   And if we go over a few more columns, it has a
13       column for regular hours, and then it has next one
14       that says excluded time.  Do you see that?
15   A   Yes.
16   Q   Do you know what excluded time means as it's used
17       in this column?
18   A   It would be any time you weren't available to work,
19       could include leave, any time off, any downtime
20       that they give you for training, any extra time
21       that they might give you for doing any other work
22       that may not be production based.
23   Q   Do you know whether excluded time would include
24       time on FMLA?
25   A   I believe it would because it would be downtime so,
```

Page 95

1    yeah.  And it would include leave so I believe it

2    would.

3  Q  Okay.  And going over a few more columns, the

4    exhibit has a column titled Quality Reviews.  Do

5    you see that?

6  A  Yes.

7  Q  Does that column indicate that within the time

8    period of this particular exhibit, you had 20

9    different claim files that were subject to review?

10 A  Yes.

11 Q  What's the difference between quality reviews and

12    issues reviewed, the next column?

13 A  Issues pertain to the number of conditions that may

14    be included in each claim.  Like, some may have one

15    condition.  Some may have two.  Some may have more

16    so the issues relate to the, yeah.

17 Q  So am I understanding you correctly that if the

18    number in the issues reviewed column is 60, and

19    quality review is 20, that averages out to three

20    issues per claim file?

21 A  Sounds about right.

22 Q  Does that sound like a reasonable number of issues

23    to be in a claim file?

24 A  For, yeah, for some claims, yes.

25 Q  What about with respect to claims that were through

 1      the express line?

 2   A  That sounds reasonable for that.

 3   Q  And as a VSR, you were required to sign up for 20

 4      hours of mandatory overtime per month, right?

 5   A  During certain periods, yes.

 6         (Exhibit 16 was marked.)

 7   Q  So I'm going to show you Exhibit 16.  It's a

 8      three-page document Bates No. DDE269 to 271.  And I

 9      will zoom into the top page here.  It's an email

10      from Adam Kinder dated January 8, 2014.  And do you

11      see the "to" and "cc" fields are several different

12      distribution lists.  Do you see those?

13   A  Yes.

14   Q  Would you have been included in the distribution

15      list in the "to" line here, which is

16      VAVBAIND/RO/VSC?

17   A  Yes.

18   Q  Okay.  So this is an email that you did receive,

19      right?

20   A  I would imagine so, yes.

21   Q  And in Exhibit 16, Mr. Kinder writes, "Mandatory

22      overtime for following positions consists of 20

23      hours of overtime per month."  And then he has a

24      bullet point list.  And the second one is all VSRs,

25      right?

Page 97

1   A   Yes.

2   Q   And you were a VSR in January of 2014, right?

3   A   Yes.

4   Q   So at this time you were subject to the mandatory

5       overtime provisions that Mr. Kinder was announcing,

6       right?

7   A   According to this document, yes.

8   Q   Do you recall Mr. Dean asking you to submit hours

9       that you were going to work overtime in early 2014?

10  A   I don't remember the date, but I do remember him

11      requesting that information.

12          (Exhibit 17 was marked.)

13  Q   So I will show you Exhibit 17, which is a one-page

14      document Bates No. DEF272.  And it's an email from

15      Mr. Dean to you, right?

16  A   Yes.

17  Q   And it's dated February 12, 2014, right?

18  A   Yes.

19  Q   And Mr. Dean writes, "I have not received your

20      mandatory OT hours for February 2014."  And OT

21      there means overtime, right?

22  A   Yes.

23  Q   So how did this process work?  Did all the VSCs

24      have to send their supervisor an email that said

25      which hours they were going to work overtime for

Page 98

```
 1        each specific month, or was there some other

 2        arrangement?  Can you walk me through that?

 3    A   I don't really know if this was something that was

 4        just at this RO or if other ROs did the same.  I

 5        can't even say if this was consistently applied

 6        throughout the service center there in Indianapolis

 7        so I really don't know.  But I do remember this

 8        email or being asked to submit the overtime hours.

 9    Q   Before February 2014, during a month when you did

10        submit overtime hours, how did you do it?

11    A   I can't recall.  I can assume it was based on this

12        email that it was this way, but I can't remember.

13    Q   And by "this way," do you mean that you would just

14        tell your boss I'm going to work overtime during

15        these hours in this month?

16    A   I can assume so, yes.  I mean, based on this email,

17        yes.

18    Q   Okay.  And then in this email in Exhibit 17

19        Mr. Dean says, "I'm directing you to give me your

20        hours and days for February OT hours by COB

21        tomorrow (02-13-14)."  You understood Mr. Dean to

22        be telling you that he wanted you to submit your

23        overtime hours for the month by the next day,

24        right?

25    A   Yes.
```

Page 99

1  Q  And you said earlier that you remember receiving

2     this email.  So how did you react to this email?

3  A  I really cannot say how I reacted.  I do know that

4     I was having difficulty working my 40-hour-work

5     week so I would imagine that it would be difficult

6     or almost impossible for me to work any hours over

7     a regular 40-hour period because of the condition

8     that I was suffering and because of my FMLA.  I was

9     taking a lot of time off.  So I would imagine based

10    on that information that I would probably say that

11    would create a problem or, you know, additional

12    stress or a problem for me basically.  So I would

13    assume that's how I would have responded.

14 Q  Do you know whether you actually submitted overtime

15    hours to Mr. Dean in response to Exhibit 17?

16 A  I don't really remember how I responded to this.

17       (Exhibit 18 was marked.)

18 Q  So I'll mark Exhibit 18, which is a one-page

19    document, Bates No. DEF256.  And I'll zoom into the

20    top, and we'll go down it.  At the top it's dated

21    March 17, 2014.  And it's a memo from Mr. Dean to

22    you titled Warning of Unacceptable Performance,

23    right?

24 A  Yes.

25 Q  Okay.  Mr. Dean in the body of this email says that

1      your performance was not meeting the cumulative

2      standards for your position, right?

3   A  Yes.

4   Q  And then down at the bottom of Exhibit 18 is your

5      handwriting, right?

6   A  Yes.

7   Q  And you say "I disagree with this memo.  I have

8      been requesting reasonable accom since 1-17-14 due

9      to my health, which has been ignored."  Did I read

10     that correctly?

11  A  Yes.

12  Q  Do you remember if you had an in-person meeting

13     with Mr. Dean when you got this memo?

14  A  If so, I can't remember the meeting.  I'm sorry.

15     No.  I don't know.  I could assume so, but I can't

16     recall.

17  Q  And can you walk me through why you believe that

18     the reasonable accommodations led you to disagree

19     with what was being included in the memo?

20  A  I felt that if the reasonable accommodation was

21     granted, that would help me with my condition and

22     ultimately help me perform my job duties.

23  Q  And by reasonable accommodation there, are you

24     talking about the transfer to Florida?

25  A  Yes.

1            (Exhibit 19 was marked.)

2    Q   And then I'm going to show you Exhibit 19.  This

3        is a two-page document.  It's also dated

4        March 17, 2014.  And it's Bates No. DEF266 to 267.

5        And the title of Exhibit 19 is Proposed Reprimand.

6        Do you see that?

7    A   Yes.

8    Q   Do you remember receiving this proposed reprimand?

9    A   Yes.

10   Q   And proposed reprimand in Exhibit 19 is

11       specifically about submission of overtime hours to

12       your team coach, right?

13   A   About not working the overtime apparently.

14   Q   Do you have any reason to dispute that you didn't

15       work overtime in February 2014?

16   A   Maybe not.  I was on FMLA, and I was missing a lot

17       of time at work.  So I mean, it's highly likely

18       that I didn't complete the overtime.

19   Q   Do you know whether you submitted a response to

20       Exhibit 19?

21   A   I really don't know.

22            (Exhibit 20 was marked.)

23   Q   I'm going to mark as Exhibit 20 a one-page

24       document, Bates No. DEF257.  And it's dated

25       April 9, 2014.  And the subject is reprimand.  Do

1    you see that?

2  A  Yes.

3  Q  Do you remember receiving Exhibit 20?

4  A  I believe so, yes.

5  Q  Do you know if you received it by email or in

6     person?

7  A  I remember meeting with Mr. Kinder once, I believe,

8     so I don't know if it was the first document you

9     showed me a moment ago or if it was this one, but I

10    think -- I don't know.  One I may have received by

11    email, but I really can't say for sure which one,

12    but I know one was in person.

13 Q  Can you recall the specifics of that meeting with

14    Mr. Kinder?

15 A  Just reiterated what was in the notification, and I

16    may have explained that I was on FMLA at the time.

17    I'm sure that would have come up because of how

18    much time I was missing from work due to my

19    condition.  So it was obvious to me that that

20    condition and my FMLA due to both was inhibiting my

21    ability to do the overtime, which at that time I

22    don't understand why it wasn't being taken into

23    consideration.

24 Q  Did that understanding subsequently change?

25 A  I really don't know.  I think -- I really don't

1    know what happened.  I guess at this point -- I

2    really don't know.  I can't recall.  I'd be

3    speculating.  I'm sorry.

4         (Exhibit 21 was marked.)

5  Q  Okay.  I'm going to mark as Exhibit 21, a one-page

6    document, Bates No. DEF 1532.  And it's another

7    memorandum.  The date is July 17, 2014.  Do you see

8    that?

9  A  Yes.

10 Q  And the subject is letter of concern, right?

11 A  Yes.

12 Q  Okay.  It's from Tamieka Graves, right?

13 A  Yes.

14 Q  And you testified earlier that Ms. Graves became

15    your team coach after Mr. Dean left that position,

16    right?

17 A  Yes.

18 Q  Do you remember Ms. Graves giving you the document

19    marked as Exhibit 21?

20 A  I don't personally remember.  I'm sure it's there

21    so possibly I'm sure she did, but I don't remember

22    actually physically at that time receiving it.  It

23    was a long time ago.

24 Q  Do you know whether after she took over as your

25    team coach, Ms. Graves had conversations with you

1       about the need to improve your quality output?

2    A  Yeah, that was her responsibility as my coach so

3       yes.

4    Q  And do you remember how you responded to Ms. Graves

5       mentioning of that?

6    A  No, I don't know how I responded.

7    Q  Do you know if you were still on FMLA at this time?

8    A  I don't know.

9            (Exhibit 22 was marked.)

10   Q  And Exhibit 22 is a three-page document, Bates No.

11      DEF1533 to 1535, which is dated July 18, 2014.  Do

12      you see that?

13   A  Yeah.  Can you enlarge it for me.

14   Q  I'm sorry.

15   A  Okay.  Yes.

16   Q  And the subject is career ladder promotion, right?

17   A  Yes.

18   Q  And in Exhibit 22, Ms. Graves talks about your

19      being scheduled for a career ladder promotion to

20      GS11 in September of 2014, right?

21   A  Yes.

22   Q  But she says that she's recommending delaying that

23      promotion for 90 days based on your output and

24      performance data, right?

25   A  Yes.

1  Q  Can you explain to me how the output element and

2     performance elements were impacted by your FMLA

3     leave?

4  A  I'm sorry.  Rephrase the question.

5  Q  I guess I should ask.  At this time, do you recall

6     whether or not you were still taking FMLA leave?

7  A  I really can't remember at that time.  I know some

8     periods I was taking more leave, and some periods I

9     was taking less leave depending upon the severity

10     of flare-ups and psychologically how I was feeling

11     and if I was able to concentrate at the times when

12     the pain was either worse or better.  So I

13     really -- but I can't tell you at this particular

14     moment what was happening.

15  Q  Do you recall comparing July 2014 to December 2013

16     whether your flare-ups were more frequent or not?

17  A  I can't say.  I would imagine that my attendance at

18     work might be able to reveal that, but based on

19     those dates, I can't go back.  You know, I can't

20     recall.

21  Q  Just to make sure I understand that last point, are

22     you saying that if your attendance records at work

23     indicated that you were absent more days, that

24     probably meant that your flare-ups were worse at a

25     given period of time?

```
 1   A   I can't say that 100 percent because it really -- I
 2       can't say because at some point if I was getting
 3       reprimanded and threatened with being fired,
 4       although I had FMLA or not doing overtime, I don't
 5       really know how I responded at that time.  If I was
 6       still having flare-ups and still forcing myself to
 7       endure the pain and psychological distress to go to
 8       work and keep my job.  So I can't, I can't answer
 9       that for sure.  I can't say if that exactly -- I
10       don't know.
11   Q   I'm just trying to understand what you're telling
12       me.  Are you saying -- let me ask this:  Were you
13       only taking FMLA for flare-ups, or was there more
14       than one thing that might lead you to take FMLA
15       leave?
16   A   Based on my recollection, it was mainly during
17       extreme flare-ups.
18   Q   Okay.  So wouldn't it be fair then if you were
19       taking more FMLA in a given month to conclude that
20       your flare-ups in that month were worse than in a
21       month when you took fewer FMLA leave days?
22   A   Not necessarily because I would assume if I was on
23       FMLA and I couldn't work a full work week, they
24       wouldn't be requiring me to do overtime, but since
25       I was still being reprimanded based on that
```

Page 107

```
 1      information, I may have changed my, you know, what

 2      I was doing based on that because of fear of losing

 3      my job so I really can't say.  I may have forced

 4      myself to do things that previously I wasn't, I

 5      wouldn't do because I was afraid to lose my job.

 6  Q   What things are you talking about there?

 7  A   Enduring the pain and going to work.  So I don't

 8      know back in 2014 if that's what I was doing.

 9          MR. KIRKLIN:  I think, Ms. Brown, those are

10      all the questions I have for you.

11          MS. CLARK:  I have a few questions for you.

12  EXAMINATION

13  BY MS. CLARK

14  Q   Trevenia, can you hear me okay?

15  A   Yes, I can hear you.  You're fading out, again,

16      Miss Clark.  I'm sorry.

17  Q   The first question I have to ask you --

18          MR. KIRKLIN:  We cannot hear you.

19          MS. CLARK:  Just give me a second.

20  Q   Miss Brown, when you made your request in January

21      of 2014 for this transfer to St. Petersburg, in

22      Exhibit 3, did you expressly state that you had a

23      chronic health condition?

24  A   Yes.

25  Q   Is that based on your doctor advising you that you
```

Page 108

```
 1      had a chronic health condition?

 2   A  Well, the doctor did state that the condition is

 3      chronic, but I guess my experiences with my

 4      condition as far as the debilitating pain and the

 5      effects it had on my daily life activities led me

 6      to know that it's a chronic condition as well.

 7   Q  You answered the question.  So when you said it was

 8      a chronic condition to -- you said this to Michael

 9      Stephens.  Did anyone from the VA ask you for any

10      information about the condition?

11   A  No.

12   Q  Did anyone from the VA in January of 2014 come and

13      sit down with you to talk to you about other

14      accommodations that might be provided to you other

15      than this hardship transfer you were requesting?

16   A  No.

17   Q  Did anyone from the VA ask you specifically why you

18      were unable to get proper treatment for the

19      condition?

20   A  No.

21   Q  There was a hearing back in July of 2015; is that

22      correct?

23   A  Yes.

24   Q  And you were under oath during that hearing; is

25      that correct?
```

1   A   Yes.

2   Q   Is there any reason for you to believe that you

3       made any statements during that hearing that were

4       untrue at the time?

5   A   No.

6   Q   If you don't recall something today regarding

7       something that was said in 2015, that doesn't mean

8       that it was untrue back in 2015; is that correct?

9   A   That's correct.

10  Q   You've not been asked today, but I'm going to ask

11      you if you recall during the time that the

12      condition was at its worst, did you ever have any

13      abscesses that actually broke while you were at the

14      office?

15  A   Yes, that would frequently happen.  And sometimes I

16      had a -- one time there was a boil that was the

17      size of a golf ball.  And it burst while I was at

18      the office.  And it damaged my clothing and not to

19      mention the embarrassment from not being able to

20      wear deodorant because of my skin and because of my

21      underarms.  So that was extreme embarrassment

22      because sometimes the odor.  And that is something

23      that, you know, many people with this, you know,

24      who don't, aren't aware of this condition may not,

25      may know.  So, yeah, I did have many -- I did have

```
 1        circumstances where, yes, the abscess did leak and
 2        burst while I was at work.
 3   Q    And did you explain that to Ena Lima or to
 4        Mr. Stephens or Mr. Dean when you were trying to
 5        get an accommodation?  Did you ever explain those
 6        circumstances?
 7   A    I believe I did to a certain extent, but I was
 8        never really given the opportunity to explain
 9        anything about the condition.  I wasn't asked.
10        It's like no one asked me about what documentation
11        or what evidence was missing from my doctor's
12        notes.  Nobody really asked me anything about the
13        condition, but because -- no, they never asked.
14   Q    I'm trying to understand.  Was this a situation
15        where you were filling out forms, sending in
16        letters and handing them in, and then the only
17        other communication was a notice, a written notice
18        back to you?
19   A    Of denial, yes.
20   Q    And I'll just ask about Ms. Lima in particular.
21        Did she ever ask you to accompany her into her
22        office or in a room where the two of you could talk
23        so you could describe to her what was happening?
24   A    No.
25   Q    Did anyone among these supervisors in particular
```

Page 111

```
1       who are identified in this February, I guess it's

2       Exhibit 7, which is the February 10 notice about

3       your accommodation request, did any, did any of

4       these individuals who are cc'd by Miss Lima, did

5       they ever sit down with you and say, hey, I got

6       this memo, can you explain to me what the condition

7       is?

8    A  No.

9    Q  And when Miss Lima gave you the notice, did you ask

10      her, did you send her, like, a note or anything

11      asking her what additional medical evidence do you

12      need?

13   A  I believe at one point I did ask what medical

14      document -- in one of those exhibits that he

15      presented, I believe I did ask for them to clarify.

16      I believe it was through email or somewhere.  I

17      forget who it was addressed to.  But I did ask for

18      them to tell me what my medical documentation was

19      lacking.

20   Q  Did you ever get --

21   A  No.

22   Q  Do you remember anyone specifically asking you for

23      an interim accommodation?

24   A  No.

25   Q  In Exhibit 13, this is the second note from
```

Page 112

1    Doctor Huff's office August 1, 2014.  He went into

2    more detail about the surgical drainage that his

3    physician assistants, I guess, had helped you with

4    in 2012 and 2014.  So if you had been asked to

5    provide more specifics about your office or

6    interactions with his office, would he have been

7    able to provide this information in a separate note

8    earlier than August of 2014?

9         MR. KIRKLIN:  Object to form.

10   A  Most definitely.

11   Q  You can answer.

12   A  Yes, most definitely.

13   Q  In that same memo he states that it was likely that

14      the condition would continue to need intermittent

15      medical care and possible surgical intervention.

16      Is that something that if you had been asked to

17      provide earlier than August 2014, that Doctor Huff

18      could have made a statement regarding that?

19   A  Yes.

20        MR. KIRKLIN:  Same objection.

21   A  Yes.  The answer is yes.

22   Q  He also makes the following statement in that

23      August 14 note, that if the condition is not

24      managed resulting painful scarring with contracture

25      formations can occur.  Rarely, in long-standing

Page 113

1    lesions, development of secondary skin cancers have

2    been documented.  Again, if he had been asked for

3    this earlier in 2014, is this something that he

4    could have stated?

5        MR. KIRKLIN:  Same objection.

6  A  Yes.

7  Q  Now, in the same note he states that you had found

8    a center specializing in the treatment of

9    hidradenitis suppurativa in St. Petersburg.  And it

10    specifically lists Florida Westcoast Skin and

11    Cancer Center.  Do you recall when you had

12    identified Florida Westcoast Skin and Cancer Center

13    and provided him with that information?

14  A  No, I don't recall exactly.

15  Q  Ultimately, you were transferred, isn't that

16    correct?

17  A  Yes, I was.

18  Q  Let me make sure I understand.  Was that based on a

19    request for a medical transfer, or was that based

20    on a request for a disability accommodation, do you

21    know?

22  A  I believe it was a reasonable accommodation.

23  Q  And when was that transfer effective?

24  A  I'm sorry, I couldn't hear you.

25  Q  When was that transfer effective?

Page 114

1   A   I believe I started in the St. Petersburg office

2       October 16th.

3   Q   Of?

4   A   Two thousand -- I believe it was '14.

5   Q   So before the hearing that took place in July of

6       2015?

7   A   Yes.

8   Q   Do you recall who in the Indianapolis office would

9       have processed this request?

10  A   Human resources.

11  Q   Do you recall anyone in particular at human

12      resources?

13  A   Yes, her first name, first name was Julie.  I can't

14      remember.  I can't remember her full name.

15  Q   So just to be clear, this was based on your

16      completion of the form that's identified as VA

17      form -- let me ask this:  Was this request

18      something you put on regular paper, or did you fill

19      out a VA form?

20  A   If I can recall, I believe I just gave them the

21      doctor's note or the doctor's letter.  I don't

22      remember if I filled out the reasonable

23      accommodation form.  I believe I just handed Julie

24      the doctor's letter and told her what I was

25      wanting.  And shortly after, it was approved.

Page 115

1  Q  Do you recall when you gave that to her?

2  A  No, I'm assuming it was around the date of

3     Doctor Huff's second letter.

4  Q  The August letter?

5  A  Yes.

6  Q  Was Jim Dean still your supervisor then?

7  A  No.

8  Q  Who was your supervisor?

9  A  I think it was Tamieka Graves.

10 Q  Mandatory overtime, is that something that was

11    still going on in August of 2014?

12 A  I can't recall.

13 Q  Were you still having to use FMLA to tend to your

14    health condition?

15 A  I believe so.  I can't honestly say for sure.

16 Q  Is Jim Dean Caucasian?

17 A  I'm sorry.  I couldn't hear you.

18 Q  Is Mr. Dean Caucasian?

19 A  Yes.

20       MR. KIRKLIN:  Objection, relevance.

21 Q  Is Miss Graves Caucasian?

22 A  No.

23       MR. KIRKLIN:  Same objection.

24 Q  Do you recall if Julie in human resources was

25    Caucasian?

Page 116

1    A   Yes.

2            MR. KIRKLIN:   Objection.   This is not a race

3        discrimination suit, but you can answer.

4            MS. CLARK:   She's answered.

5    Q   Do you know if there were any changes in the HR

6        department by August of 2014?

7    A   Sonya was out.   She had taken leave.   She was on

8        extended leave because I believe her husband fell

9        ill.   So Julie was handling the request.

10   Q   Did that make her responsible for all of HR at that

11       time?

12   A   I'm not sure.   I believe she may have been the

13       senior HR representative or associate at that time,

14       but I know she was responsible.   She's the one that

15       accepted my request.

16   Q   Was Miss Lima still in the office in August of

17       2014?

18   A   I believe so, but I don't think she circumvented

19       this request.   I believe she was -- I don't know if

20       she -- I think this request just went through HR.

21   Q   Did you ever have a conversation with Miss Graves

22       about your medical condition?

23   A   Not personal information relating to the condition

24       itself but that I was, what I was going through

25       with the reasonable accommodation request.

Page 117

1  Q  Do you know, is that a conversation that you may

2     have had in or around July of 2014?

3  A  Possibly.

4  Q  After your transfer in August, would she have had

5     any input about your career ladder promotion?

6  A  I'm sorry.  You cut out.

7        MR. KIRKLIN:  I'm confused.  Who are we

8     talking about?

9        MS. CLARK:  Tamieka Graves.  Your Exhibit 22,

10    Counsel, is what I'm referencing at the moment.

11 Q  Tameika Graves gave you a memo about your career

12    ladder promotion that she says she delayed for 90

13    days.  And that was signed off on July 17, 2014.

14    Do you remember that?

15 A  Yes.

16 Q  My question is about whether or not that 90-day

17    delay in the career ladder promotion was still in

18    effect when you transferred to St. Petersburg in

19    August of 2014?

20       MR. KIRKLIN:  Objection.  I don't think she

21    transferred in August of 2014, but she can answer.

22 A  No, I don't believe it was when I transferred.

23 Q  So did you get your career ladder promotion?

24 A  I believe I did, yes.

25 Q  Do you know when you got it?

Page 118

1   A   May have been in September.

2   Q   Okay.  Which is in Exhibit 22, Ms. Graves memo to

3       you actually says that you were scheduled for this

4       career ladder promotion effective

5       September 21, 2014.  Does that sound like the time

6       when it went into effect?

7   A   Yes.

8   Q   So that 90-day delay that she was recommending in

9       Exhibit 22 ultimately did not have a negative

10      effect on your ability to get that career

11      promotion; is that correct?

12  A   No.  That's correct.

13  Q   And that's notwithstanding the fact that you were

14      still struggling due to your condition, as you've

15      testified today, in meeting your goals in terms of

16      output and meeting the standards of VSRS, correct?

17  A   That's correct.

18  Q   Earlier, I had asked you about whether or not you

19      had suffered the bursting of any of your boils or

20      abscesses while you were in the office.  But did

21      you ever show, like, Miss Lima or anyone in HR your

22      clothing after that had happened?

23  A   No.

24  Q   Was there any member in the workforce who would

25      have seen the stains on your clothing or would have

1       noticed?

2    A  It's possible, but I was embarrassed about the

3       condition so I didn't share much, or I tried as

4       much as possible.

5    Q  And how would you hide it when something like that

6       would happen?

7    A  Put on a sweater or just try not to lift my arm,

8       and, plus, the smell would be bad.  So, I mean, it

9       was just a lot of embarrassment.

10   Q  Did the condition make walking painful?

11   A  Yes.

12   Q  Did the condition make lifting your arms painful?

13   A  Yes.

14   Q  Did the condition make stooping painful?

15   A  Yes.

16   Q  If you had to bend over, was that painful?

17   A  Yes.

18   Q  Were you taking anything other than

19      over-the-counter pain relievers like Tylenol or

20      Advil?

21   A  Sorry.  You faded out.

22   Q  Were you taking any pain medication other than,

23      like, Tylenol or Advil, anything stronger than

24      those over-the-counter drugs?

25   A  No, not that that I can -- no.

1   Q   Not that you recall, okay.  After you were

2       transferred, remind me again what month did you

3       actually go to St. Petersburg.

4   A   In October 2014.

5   Q   Between August 2014 and October when you

6       transferred to St. Petersburg, did you experience

7       the condition subsiding in any way?

8   A   No, I was still having flare-ups.

9   Q   After you got to St. Petersburg, was there a point

10      in time when the condition started to subside?

11  A   Yes.

12  Q   Do you recall approximately when?

13  A   It was several months.  It was several months.

14  Q   Did you, in fact, go to the Florida Westcoast Skin

15      and Cancer Center, did you go there after your

16      transfer?

17  A   I'm not sure if it was that one or if I picked

18      another doctor's office, or I may have seen more

19      than one.

20  Q   So you continued to seek treatment after you

21      transferred?

22  A   Yes.

23  Q   Did any of these physicians that you saw, did any

24      of them tell you whether or not the condition was

25      impacted by stress?

Page 121

```
 1    A    Yes, stress can exacerbate the condition.

 2    Q    Did any of them tell you that it is a condition

 3         that you can cure?

 4    A    No.

 5    Q    So as of today, you still deal with this condition;

 6         is that correct?

 7    A    On a much less basis.  It's the flare-ups are rare

 8         compared to what I had experienced in Indianapolis.

 9    Q    But you still but you are still -- it's not a

10         condition that's gone away, correct?

11    A    No, no, I still have occasional flares.

12    Q    When you transferred to St. Petersburg, were you

13         required to work in the office?

14    A    No, the doctors there filled out a reasonable

15         accommodation request for me to work at home.

16    Q    And that was approved immediately?

17    A    Maybe after maybe a month or two at the most.  I

18         can't remember exactly.  It was shortly after I

19         arrived in St. Petersburg I was approved for a

20         reasonable accommodation.

21    Q    And so you have been permitted to telework since

22         your transferred to St. Petersburg?

23    A    That is correct.

24    Q    And is that, how many days a week are you allowed

25         to telework?
```

Page 122

1   A   At that time it was four days a week.

2   Q   And today?

3   A   I'm sorry?

4   Q   I guess today, are you still working there today?

5   A   Yes, I'm still with the VA.

6   Q   And because of the pandemic, it's now five days a

7       week; is that correct?

8   A   Correct.

9   Q   Have you had any evaluations in St. Petersburg?

10  A   Yes.

11  Q   Performance evaluation.  Do you know what your

12      performance evaluations have been since your

13      transfer?

14  A   Always successful.

15          MS. CLARK:  I have no further questions.

16          MR. KIRKLIN:  I don't have any redirect.

17          COURT REPORTER:  This ends the deposition of

18      Ms. Brown.  The time is 2:34 p.m. Are there any

19      stipulations for the record, and would you like a

20      copy?

21          MR. KIRKLIN:  I don't think there are any

22      stipulations other than the one that we did at the

23      beginning as to the virtual swearing in for

24      defendant.  I believe we ordered the E-tran with

25      the exhibits.

Page 123

1       MS. CLARK:  Plaintiff will want an E-tran

2   also.

3

4       (The deposition concluded at 2:34 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 124

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION

 3

 4
    TREVENIA BROWN,              )
 5                               )
                 Plaintiff,      )
 6                               )
            -v-                  ) CAUSE NO.
 7                               ) 1:20-CV-01154-JPH-MJD
    ROBERT WILKIE, SECRETARY OF  )
 8  THE UNITED STATES DEPARTMENT )
    OF VETERANS AFFAIRS,         )
 9                               )
                 Defendant.      )
10

11              Job No. 160045

12

13        The deposition of TREVENIA BROWN,taken in the
    above-captioned matter, on March 12, 2021, and at the
14  time and place set out on the title page hereof.
              It was requested that the deposition be
15  transcribed by the reporter and that same be reduced
    to typewritten form.
16            It was agreed that the reading and signature
    by the deponent to the deposition were waived on
17  behalf of the parties plaintiff and defendant by their
    respective counsel, the witness being present and
18  consenting thereto, the deposition to be read with the
    same force and effect as if signed by said deponent.
19

20

21           STEWART RICHARDSON & ASSOCIATES
             Registered Professional Reporters
22           One Indiana Square, Suite 2425
                 Indianapolis, IN  46204
23                  (800)869-0873

24

25
```

Page 125

1    STATE OF INDIANA

2    COUNTY OF JOHNSON

3        I, Robin P. Martz, a Notary Public in and for

4    said county and state, do hereby certify that the

5    deponent herein was by me first duly sworn to tell the

6    truth, the whole truth, and nothing but the truth in

7    the aforementioned matter;

8        That the foregoing deposition was taken on

9    behalf of the Defendant; that said deposition was

10   taken at the time and place heretofore mentioned

11   between 11:00 a.m. and 2:34 p.m.;

12       That said deposition was taken down in

13   stenograph notes and afterwards reduced to typewriting

14   under my direction; and that the typewritten

15   transcript is a true record of the testimony given by

16   said deponent;

17       And that the reading and signature by the

18   deponent to the deposition were waived on behalf of

19   the parties plaintiff and defendant by their

20   respective counsel, the witness being present and

21   consenting thereto, the deposition to be read with the

22   same force and effect as if signed by said deponent.

23       I do further certify that I am a disinterested

24   person in this cause of action; that I am not a

25   relative of the attorneys for any of the parties.

1         IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my notarial seal this 25th day of

3    March, 2021.

4    

5                          Robin P. Martz
                      NOTARY PUBLIC SEAL

6                          STATE OF INDIANA
                    Commission No. NP0677410

7    My Commission expires:  My Commission Expires March 2, 2024
    March 3, 2024

8    

9    Job No. 160045

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25