**Page 1**

1      DEPARTMENT OF VETERANS AFFAIRS

2      OFFICE OF RESOLUTION MANAGEMENT

3

4   IN THE MATTER OF:   )

5   TREVENIA BROWN,    )

6        Complaint No.

7           )

8     200J-0326-2014101326

9     Complainant, )

10  -vs-        )

11  VA REGIONAL OFFICE,  )

12  INDIANAPOLIS, INDIANA, )

13     Respondent. )

14

15

16     A F F I D A V I T

17   TRANSCRIPT OF PROCEEDINGS in the

18   above-entitled cause of the telephonic

19 examination of TREVENIA BROWN Before EEO INVESTIGATOR

20       KAREN MASON.

21

22

23

24

25  Reported by: Sherri L. Jolley

---

**Page 2**

1     T R A N S C R I P T I O N

2     INVESTIGATOR MASON: My name is Karen

3 Mason and I am an EEO Investigator assigned to investigate

4 the discrimination complaint of Ms. Trevenia Brown, ORM

5 Case Number 200J-0326-2014101326 filed on April 18th,

6 2014 against Officials of the VA Regional Office in

7 Indianapolis, Indiana. This is the affidavit of Ms.

8 Brown.

9     Ms. Brown, do you solemnly swear or

10 affirm that the information given in response to the

11 following questions are true and complete to the best of

12 your knowledge and belief?

13    MS. BROWN: Yes.

14     INVESTIGATOR MASON: Please note that

15 this oath is issued without a pledge of confidentiality.

16 This means that parties with a need to know will have

17 access to the information contained within this

18 investigative report.

19     It should be noted that to the extent

20 that you use names of employees or other witnesses,

21 including veterans and beneficiaries, I may redact the

22 names and substitute an identifier before making the

23 transcript part of the EEO file to the fullest extent

24 possible.

25 BY INVESTIGATOR MASON:

---

**Page 3**

1    Q.   Ms. Brown, please state and spell your

2 name for the record.

3    A.   Trevenia Brown. It's

4 T-R-E-V-E-N-I-A, Brown, B-R-O-W-N.

5    Q.   Okay, ma'am. Do you have a

6 representative for your case?

7    A.   I did. At this moment I removed her

8 for this oral testimony.

9    Q.   So as of today or right now you do not

10 have a representative?

11    A.   Not at this moment, no.

12    Q.   Okay. Please identify your position

13 and grade.

14    A.   I'm a Veteran Service Representative

15 and I am a GS-10.

16    Q.   Okay. Let me go back. I forgot to

17 read the claims. Let me go back.

18    A.   Uh-huh.

19    Q.   The claims that are accepted for

20 investigation are: Whether complainant was subjected to

21 a hostile work environment based on disability as

22 evidenced by the following events. Number 1: On

23 January 22nd, 2014, complainant's request for a hardship

24 transfer was denied.

25     Claim 2: On January 22nd, 2014, Ena

---

**Page 4**

1 Lima, Assistant Service Center Manager, told

2 complainant, "Just because you have a disability, no one

3 owes you anything. They don't have to do anything, and

4 you can't go have a meltdown in Human Resources to get

5 moved."

6     Claim Number 3: On February 10th, 2014,

7 complainant's request for reassignment was denied.

8     Claim 4: On March 17th, 2014,

9 complainant received a warning of unacceptable

10 performance.

11     Claim 5: On April 1st, 2014,

12 complainant's request for reasonable accommodation was

13 denied.

14     Claim Number 6: On April 9th, 2014,

15 complainant was issued a reprimand.

16     Okay. You've already stated your name,

17 position, and grade. Please identify the name and

18 facility — name and location of the facility where you

19 are employed.

20    A.   In Indianapolis Regional Office.

21    Q.   And what is your current employment

22 status -- career, temporary, probationary, et cetera?

23    A.   Career.

24    Q.   How long have you been employed in this

25 position? From when to when?

---

**EXHIBIT 1** 

DEF000124   B1

Page 5

1    A.    September 26, 2012 -- no, no.  It had
2  to be 2011.  And I'm currently in the position now.
3    Q.    Who is your first-line supervisor?
4    A.    At this moment, it's Tameka Graves
5  (ph).
6    Q.    Who is your second-line supervisor?
7    A.    I guess the person above her would be
8  the Assistant Service Center Managers, which would be Deb
9  Street and Adam Kindler -- or Kinder.
10    Q.    Can you spell Kinder, please?
11    A.    K-I-N-D-E-R.
12    Q.    That was Adam Kinder.  And the other
13  person's name was Gail?
14    A.    Deborah, last name Street,
15  S-T-R-E-E-T.
16    Q.    Okay.  Does your facility have a
17  harassment policy; and if so, what does the policy
18  indicate that you should do if you believe you have
19  witnessed or been subjected to harassment?
20    A.    Yes, they do have a policy.
21  Basically, in the policy it suggests that you can go your
22  front-line supervisor or anyone in the facility that you
23  feel comfortable discussing it with, or you can contact
24  EEO if you feel like you've been discriminated against.
25    Q.    Now, some background questions.  What

Page 6

1  is your disability?
2    A.    I have hidradenitis suppurativa.
3    Q.    Oh, could you please spell that?
4    A.    Yeah.  It's H -- I think it's
5  h-y-d-r-a-d-e-n-i-t-i-s, suppurativa,
6  S-U-P-P-U-R-I-V-A (sic).  And secondary to that or I
7  guess in addition it's mental, which is anxiety,
8  depression --
9    Q.    Okay.
10    A.    -- which --
11    Q.    Yes?
12    A.    -- which can be associated with the
13  condition.
14    Q.    Now, when was your condition or
15  disability diagnosed?
16    A.    Goodness.  I don't know the exact
17  date.  I do know it was before I moved to Indianapolis,
18  which was three years ago now.  So I would probably say
19  maybe five, six years.  I would dare to say -- let's go
20  a little further because I've been dealing with this for
21  a while.  We'll say eight.
22    Q.    Eight years, so 2006?
23    A.    Possibly.  That's just an estimate or
24  an approximate date.
25    Q.    Okay.  What caused your disability?

Page 7

1    A.    I don't know.  The physician said it
2  could be genetic.  You know, I could've been genetically
3  predisposed or just something that I developed over time.
4    Q.    How long is it expected to last?
5    A.    It's a chronic condition.  There is no
6  ending date.
7    Q.    So you're stating your disability is
8  permanent?
9    A.    Pretty much, because what happens is
10  I go through periods of flare-ups, so -- and it's
11  indefinite.  I mean, there's really not a -- I mean, I
12  don't -- it won't go away.
13    Q.    What is your healthcare provider's
14  assessment of your condition?
15    A.    His assessment?  Basically, he's just
16  stating that -- actually, he wrote a letter to my agency
17  at one point where he stated that my condition is chronic,
18  it's unpredictable in nature.  I can -- the condition
19  creates painful flare-ups that can be debilitating at
20  times; and it may be or it could be in my best interest
21  to have access to my family for not only, you know, support
22  physically but in some cases socially or mentally because
23  the condition may cause depression because of pain and
24  anxiety due to, you know, the possibility of flare-ups
25  or the fear that a flare-up may occur or become, you know,

Page 8

1  extremely painful or debilitating.
2    Q.    Okay.  You mentioned your doctor or
3  your healthcare provider sent some documentation to the
4  facility?
5    A.    During my last request, the one that
6  states for a reasonable accommodation -- well, actually,
7  during the two separate -- the two second requests, I
8  submitted that doctor's letter with my request for
9  medical reassignment, and I submitted that same doctor's
10  letter with my request for reasonable accommodation.
11        And in that letter the doctor did mention
12  that transferring -- you know, he supports that decision
13  for my desire to transfer because that is where my family
14  is and, you know, I can seek a specialist out there that
15  would be able to assist me.
16    Q.    Okay.  Does your disability limit
17  anything you would do normally in everyday life?  And if
18  yes, what normal life functions are limited and how are
19  they limited?
20    A.    Because the condition -- there's
21  flares that create sometimes large cysts under my arms,
22  breasts, or in the lower region, if that happens, the pain
23  is extremely overwhelming and it causes pain to do
24  anything -- to walk, to do anything, to bathe, to even
25  move.

Page 9

```
 1            Sometimes I just have to lay with one or
 2    more of my extremities -- if I have flare-ups in more than
 3    one area at a time, I might have to lay with my arm propped
 4    up to keep the pressure -- or actually adding additional
 5    pressure to the area, you know, just to try to relieve
 6    some type of pressure or pain.
 7        Q.      And what are the main duties that you
 8    are required to carry out on your job?
 9        A.      Basically, I process just service
10    connection claims for veterans, so it does require me to
11    sit at my desk. I use the computer. Sometimes I'm
12    required to move case files around that vary in size. It
13    does require me to do a lot of movement, going back and
14    forth to the printer or to discuss cases with other
15    employees which causes a lot of movement.
16            And during flares, sometimes it's hard
17    for me to move around because I have to walk with my arm
18    elevated to alleviate some of the pressure; or if it's
19    down in the lower part of my body, then I wouldn't be able
20    to move at all. You know, I'd have to -- only for
21    necessary reasons, like using the restroom or something
22    to that effect.
23            But at work, you know, if I have to move
24    around and walk, it's extremely painful because, like I
25    said, I have to have my arm elevated which hurts my neck,
```

Page 10

```
 1    my back, you know, basically. I mean, it's just
 2    extremely -- the pain is practically debilitating to
 3    where if I don't have to move during those flares, it's
 4    best.
 5        Q.      Are you able to perform these duties
 6    as someone else would normally be able to perform these
 7    duties?
 8        A.      Oh, yeah. I can perform my duties.
 9    Well, you mean on like a regular -- like my normal duties
10    for the position?
11        Q.      Well, would you say your ability to
12    perform these duties differs slightly, moderately, or
13    significantly from someone else performing your job, I
14    guess, in light of your disability?
15        A.      Only during flares and during flares,
16    yes, I think it would severely prevent me -- or at least
17    inhibit me from -- or it would at least be extremely
18    painful, you know, during my flare-ups.
19        Q.      So I guess you're saying during your
20    flare-ups, your ability to perform these duties is
21    slightly, moderately, or significantly impacted?
22        A.      Honestly, it's depending upon the
23    size, the location. All these different situations
24    determine whether or not I'm incapacitated in a way or
25    if I'm able to move around and just be uncomfortable and
```

Page 11

```
 1    in pain. So sometimes it can be moderate, sometimes it
 2    could be severe, which would require some type of medical
 3    or surgical intervention from my doctor, or sometimes it
 4    can just be slight where, you know, it's the beginning
 5    of a flare-up and it doesn't, you know, get out of hand
 6    or maybe it will drain before it actually gets too large
 7    and it's just a nuisance or an aggravation. But it can
 8    be either -- all three on occasion.
 9        Q.      Okay. Do you take any medication
10    because of your disability or impairment?
11        A.      I am currently taking -- I get
12    prescribed antibiotics right now by my doctor, which I
13    have been on and off for years. I have a topical
14    ointment. What else do I have? But that's pretty much
15    -- for my anxiety and depression, I take something for
16    that.
17        Q.      And what do you take for the anxiety?
18        A.      I'm on Zoloft, and I recently -- I
19    think it's albuterol. He added that med to me towards
20    the end of January or early February when I started having
21    these issues and -- with my employer, which is causing
22    me more emotional distress. So he prescribed me a new
23    med in addition to my Zoloft.
24        Q.      You're saying albuterol?
25        A.      I believe that's the name.
```

Page 12

```
 1        Q.      Does these medications have any side
 2    effects that substantially limit a major life activity?
 3        A.      Sometimes the antibiotics can upset my
 4    stomach, but no, not to where it would -- no.
 5        Q.      Excuse me. Does these medications
 6    have any side effects that impact your ability to perform
 7    your duties?
 8        A.      No.
 9        Q.      Okay. Do you need any devices?
10        A.      No.
11        Q.      Excuse me. Let's get to the first
12    claim: On January 22nd, complainant's request for a
13    hardship transfer was denied. Please identify the
14    information responsible for denying your hardship
15    transfer.
16        A.      Ena Lima.
17        Q.      And was she aware of your disability?
18        A.      Yes.
19        Q.      Okay. Now, when did she become aware
20    of your disability?
21        A.      I was approved for FMLA in June of
22    2013, and that has to go through the front office for
23    approval. I don't believe she was the one that actually
24    approved it, but yes, with my initial request for the
25    hardship, I submitted a letter addressed to the Director
```

Page 13

1    that basically stated the condition that I suffer from,
2    the problems that it's causing me, and how a transfer
3    could assist me in not only possibly performing my duties
4    but providing, you know, the other options for treatment
5    and possibly, you know, with psychological support from
6    my family that's down there in Florida where I was trying
7    to transfer back.
8        Q.    Okay. So you're saying she became
9    **aware of your disability in -- I'm not sure. Did you**
10   **state --**
11       A.    Let's see. Well, I was on FMLA back
12   in -- like I said, in June. I don't -- I can't -- when
13   I had the conversation with Ms. Lima on the date that she
14   said, "Just because you have a disability doesn't mean
15   anything," I discussed with her specifically the
16   hardships that I'm having with my condition and why it's
17   important for me to be able to transfer. And then she
18   just went on to say why she wouldn't be able to -- she
19   spoke with the Director. They discussed my situation,
20   my reason, my performance, and my attendance.
21       And at that point I told Ms. Lima, I said,
22   "I'm on FMLA. My attendance is covered or protected, so
23   how could that be an issue?" And then she went on to say
24   it was my performance for this fiscal year, and I
25   explained to her that my flare-ups, you know, because of

Page 14

1    my condition and different issues that I was having
2    pertaining to my condition, I was -- you know, the pain,
3    et cetera, it was affecting my performance.
4        And I explained that possibly if I'm able
5    to transfer that may assist me with the days that I was
6    having off or missing, along with, you know, my
7    performance, which is very important to me, which I
8    explained to her. And I told her that my last performance
9    evaluation was satisfactory, so I don't understand why
10   that would be an issue if I'm telling them that my issues
11   regarding my job performance is related to my situation
12   with my condition.
13       Q.    Okay. At this time, who was your
14   **direct-line supervisor?**
15       A.    Jimmy Dean, last name D-E-A-N.
16       Q.    Okay. And was he aware of your
17   **disability?**
18       A.    Yeah. I mean, yeah, he knew. I mean,
19   I was on FMLA. They all knew I was on FMLA for my
20   condition.
21       Q.    So you're saying based on that he was
22   **aware -- should've been aware of your disability?**
23       A.    Yes, ma'am.
24       Q.    Okay. Well, when did you make a
25   **request for a hardship transfer?**

Page 15

1        A.    I believe it was on January 17th is
2    when I provided the letter addressed to the Director and
3    went -- and that's when I went to HR and filled out the
4    hardship paper.
5        Q.    Okay. And to whom did you make this
6    **request?**
7        A.    I originally gave the letter to my
8    front-line supervisor who said he was going to take it
9    down to HR. And then he came back with the letter. He
10   gave me back the letter and he said that, "You need to
11   fill out a form" -- no, "I need more" -- oh, I know what
12   I did.
13       I gave him a letter and I gave him my FMLA
14   paperwork as supporting documents. And basically, he
15   came back with the letter and he said -- he wrote, "You're
16   going to need more medical documentation." And I said,
17   "Am I able to use my FMLA? You know, I'm on FMLA. It
18   states the condition that I have, the issues that I have
19   -- you know, I encounter during my flare-ups. Can I use
20   that?" And he said he didn't know, so I told him I'd go
21   directly down to HR myself.
22       So I went to HR, spoke with Sonia Wilson,
23   where I explained to her, you know -- asked her, you know,
24   "Why do I need to submit -- why do I need to obtain
25   additional medical evidence when I'm on FMLA?" And she

Page 16

1    explained to me, "Well, we can't just use the evidence
2    without your knowledge," because basically, you know,
3    it's a separate type of request. My FMLA request and this
4    request for hardship is two separate requests.
5        So I said, "Okay." So I said, "Can I
6    give     you -- you know, this is what I have. I
7    want to use my FMLA paperwork. Can I do that?" She said,
8    "Yes." Okay. She asked me if I wanted to submit the
9    letter that I addressed to the Director with the -- with
10   my FMLA papers, and she assisted me in filling out the
11   hardship transfer sheet.
12       And during that time I signed a sheet
13   saying that relocation fees would not be paid, et cetera.
14   She said that she would go ahead and take it to the front
15   office and someone will let me know about the decision.
16   And then Ena Lima on the date that I stated that she said,
17   "Just because you have a disability," well, I -- on my
18   way out of the office that        day -- because I was
19   waiting to hear from her; it had been -- a couple days
20   had passed and I was waiting to hear from her. I hadn't
21   heard from her.
22       She had sent me an e-mail saying that,
23   you know, "Call me when you get a chance to discuss the
24   decision for your hardship transfer." And -- okay. So
25   I tried to call more than once. I didn't get her. I

Page 17

```
 1    believe I left a message on one of those occasions.  I
 2    didn't -- you know, didn't -- I wasn't able to speak with
 3    her that day.  So at the end of my shift, I went by her
 4    office and she was talking to Deborah Street, and I asked
 5    her, you know, "Can I speak with you regarding, you know,
 6    the transfer?"  And she was like, "Yes."  She's like,
 7    "Come on in my office."
 8         Q.    Okay.  Before we get to that, let me
 9    ask    you --
10         A.    Oh, okay.
11         Q.    Okay.  What specifically did you
12    request as a hardship transfer?
13         A.    I requested a transfer to the St.
14    Petersburg Regional Office as a VSR.
15         Q.    Okay.  And how would a hardship
16    transfer assist you in performing your duty?
17         A.    Basically, what I wanted is to seek a
18    specialist for my condition because this particular
19    condition is difficult to treat.  And my experience with
20    the antibiotics hasn't been completely successful.  Some
21    other type of treatments that my current doctor suggested
22    I really wasn't interested in because they have a
23    potential of causing cancer or -- and basically, my other
24    options are either surgery of some sort or -- just
25    basically surgery or some other experimental treatments
```

Page 18

```
 1    that have, you know, been successful with other patients.
 2         But because of the difficulty treating
 3    it, you know, I want to seek a specialist who's actually
 4    -- actually treats numerous patients with my condition.
 5    I feel that my current doctor -- although he is a
 6    dermatologist, I don't feel that he can truly understand
 7    the hardships or the difficulties that I go through on
 8    a daily basis because I don't -- you know, I can't have
 9    same-day appointments with him, which is sometimes
10    important, especially if I need surgical or some type of
11    intervention because of the flare-ups.
12         You know, I can't take it sometimes
13    because of the pain, so I have to go seek treatment.  And
14    that particular doctor, I can't get in on the same day.
15    Sometimes I have to wait a week or two in order to get
16    into his office, which causes me to go to walk-in clinics
17    and get treatment, which I feel is not in my best interest
18    --
19         Q.    Okay.
20         A.    -- because my last -- uh-huh.
21         Q.    So you said moving to Florida would
22    help this?
23         A.    Yeah.  I think seeking a specialist
24    who can possibly help me find a treatment that would help
25    me, and sometimes the different type of treatments --
```

Page 19

```
 1    there could be side effects, and I felt that having my
 2    family or people there that can assist me would be very
 3    important.
 4         Or if I wanted to have surgery, I want
 5    to be able to recover or, you know, I would just feel a
 6    lot more comfortable being able to pursue my different
 7    treatment options.  And then I want to have access to,
 8    like I said, a physician who specializes in this because
 9    they'll know how important it is for me to get in the same
10    day or --
11         Q.    Now, what was the process for
12    requesting a hardship transfer?  You mentioned a form
13    earlier --
14         A.    The process --
15         Q.    -- you was told to complete or
16    something.
17         A.    Yeah.  There was a hardship transfer
18    form that I filled out in HR.  It was just one form.  I
19    think -- I'm trying -- well, I'm trying to think what was
20    actually on the form.  I actually didn't get a copy of
21    that initial one that I filled out, but I got a copy of
22    her decision, I suppose,        but -- yeah, there was
23    a form.  It was called a hardship -- it's a hardship
24    transfer request.
25         Q.    And you're saying you did complete
```

Page 20

```
 1    this form or you didn't complete this form?
 2         A.    I did complete the form and submitted
 3    my FMLA paperwork and a letter explaining my problems with
 4    my condition and how transferring to the St. Pete RO would
 5    help.
 6         Q.    Okay.  Did you discuss this request
 7    with any management officials or HR officials?
 8         A.    Yes.  I spoke with Sonia Wilson.  I
 9    explained this to her.  And she basically told me -- what
10    did she say at that moment?  She said -- well, I explained
11    to her why I want to see a specialist and, you know, my
12    different situations of being here away from my family.
13    And she basically said      that -- well, she said,
14    "That doesn't have -- that's not a hardship transfer."
15    And I said, "Well, what is it, you know?"  And she was
16    like, "That's not what it is."  But she didn't tell me,
17    you know, what to do.
18         So I asked her again -- I was like, "Well,
19    this is what I know for it to be.  You know, I'm having
20    hardship."  So she -- and I said -- and she's like, "You
21    can't -- that's not a sufficient reason for a hardship
22    transfer."  And I basically told her, "Look, that's what
23    I want to use.  I'm having -- I have a condition that I
24    need" -- but like I said, she didn't go on and tell me
25    anything.  I don't know.
```

Page 21

1    So she -- so I insisted on submitting,
2  you know, the form with the documentation. She in no way
3  -- I told her about my condition, what problems I'm
4  having, and she just said, "Okay. Well, I'll submit this
5  to the front office." Okay.
6    So, you know, at this point, I was
7  getting upset because I felt like she was -- she wasn't
8  being helpful. The only thing she was tell -- trying to
9  tell me is what I can't do or what something isn't, and
10  I was asking her, you know, how I can proceed, you know,
11  because of what I'm asking      for -- because I want
12  to see a specialist because of my disability.
13    You know, and I did mention -- at that
14  point, I said, "Well, from my understanding, you know,
15  that should be a reasonable accommodation request, you
16  know, under ADA." You know, she was like, "No, not to
17  see a specialist." She's like, "That's not a legitimate
18  reason." So basically going back and forth with her,
19  basically, you know.
20    It just -- she said, "Okay. Well, if
21  that's what you want to do, you know, you go ahead, fill
22  this out. She pulled up my performance evaluation,
23  printed that out. She pulled up -- she -- my resume, and
24  she attached it." And she says, "I'm going to give this
25  to the front office and you'll hear something." But that

Page 22

1  all went through, like, my first-line supervisor, then
2  HR, back to my supervisor, then I went to HR.
3    Q.    Okay. Now, who denied your request?
4    A.    Ena Lima.
5    Q.    How did you become aware that your
6  request had been denied?
7    A.    She sent me an e-mail initially that
8  said, you know, come -- you know, "Call me to discuss your
9  situation." After I went into her office and we had a
10  conversation, when I went back to my desk, I asked her
11  -- I said, "Ms. Ena" -- I sent her an e-mail and said,
12  "Can you send me my reason for denial to -- in writing?
13  Can you give me that decision in writing?" And then she
14  responded to my e-mail, or she sent me an e-mail basically
15  with the letters denied in caps in the subject. And then
16  somewhere in there she put, you know, "As I explained,
17  we discussed with the Director," blasé, blah.
18    I don't have the e-mail in front of me,
19  but I can get it. She basically -- hold on. She
20  basically said -- like, it was explained -- a discussion
21  with the -- they evaluated my reason and my performance
22  and determined that, you know, my request couldn't be
23  approved.
24    And, you know, basically that
25  conversation I had with her before she sent that e-mail,

Page 23

1  I asked her -- when she told me it was denied because of
2  my performance, I was like, "What does that have to do
3  with, you know, my -- what I'm" -- my last evaluation was
4  fully satisfactory. I was just promoted in October, and
5  in January is when I put in my request. So basically,
6  they were using like two months or three months of my
7  performance, you know, information with the decision that
8  they made.
9    I think I was promoted -- it was the end
10  of September when I became a GS-10. And I was fine. And
11  then shortly after that, you know, they moved me to
12  another team. But yeah, Ena Lima, she sent the denial.
13  She's the one that sent the letter -- or denial saying
14  it was -- she was discussing it on the Director's behalf.
15    Q.    Okay. So you're saying for the FY '13
16  rating period you was rated what again?
17    A.    Fully satisfactory.
18    Q.    Okay. You're saying a few months
19  later after that they -- you were informed your
20  performance wasn't up to par, so to speak?
21    A.    Well, what happened is -- I believe in
22  October is when the paperwork for the promotion went
23  through. And then in November or December I was moved
24  to another team -- the core team, which the consensus on
25  the floor is that the core team is more difficult than

Page 24

1  some of -- you know, more -- the      other -- some of
2  the other teams, like the express team which I was on.
3  And then they moved me to the core team.
4    And then when I was moved to the core
5  team, which consists of more complicated issues or
6  disabilities, more -- the number of disabilities can be
7  a lot more than on express. Express usually has like two
8  or three contentions or -- also known as disabilities.
9  Or on core we can have anywhere from three to 30, you know.
10    And at that time, when they moved me, I
11  wasn't given any what I would consider or call ramp-up
12  time in order to review new policies, procedures, laws
13  that have changed since I was on the core team maybe a
14  year before that. Changes happen every day, and I wasn't
15  given an opportunity to catch up on those changes before
16  they were counting my production, I guess, against me.
17    And along with my -- the time I was
18  missing for my condition, you know, it was just a number
19  of different, I guess, issues involved there that all,
20  you know, was related to my performance. But I have never
21  felt like I have had a problem with actually doing my job.
22  But for some reason, you know, I started having issues
23  once they transferred me to core.
24    And I don't know how much in depth you
25  want me to go, but I kind of feel like the quality team

DEF000129

Page 25

1  -- their, I guess, reviews have a large impact on our
2  performance evaluations.  And I guess it depends on your
3  relationship with the quality team or who you know, I
4  guess, would depend on what the outcome would be, I
5  suppose, as far as your evaluation, because sometimes
6  some people on the quality team, they'll go to some people
7  and, "Look, I'm giving you a heads-up.  This claim,
8  something isn't right.  Can you fix it?  I'll pick
9  another case," et cetera.
10       But most of us on the floor feel like,
11  you know, you can find an error in any one of those claims
12  because some of them go back to, you know, the seventies
13  or eighties.  And at one point at this office they said,
14  "Okay, if you're the last one to touch it, anything that
15  happened from the life of the claim, if there's something
16  wrong in there, it's your responsibility to catch it and
17  fix it," which isn't -- you know, that can't happen and
18  maintain production.
19       But I kind of feel, you know, like some
20  people on the quality team are used to target some people.
21  And I kind of believe that's what happened with me.  I
22  wasn't having        any -- very -- I wasn't having
23  issues with my performance until after they moved me.
24  And I really think the reason why I was moved initially
25  is because since I was approved for FMLA and latter in

Page 26

1  that year when I started having a little bit  flare-ups
2  -- more flare-ups, I feel like I was being punished
3  because I was using FMLA.
4       Q.     And when were you moved to the core
5  team?
6       A.     I think in October or November.
7       Q.     Okay.  Besides Ms. Lima -- you said
8  you did discuss this with Ms. Lima -- your denial?
9       A.     Yeah.  I discussed that in her office.
10  Basically, we had a conversation about -- when she told
11  me the reason why I was being denied, I'm like, "Wait a
12  minute."  You know, I just explained to her what's going
13  on in my -- you know, my life.  And I was like, you know,
14  "It's really important for me to be able to transfer.  My
15  health is extremely important to me, and so is my job."
16       And she basically told me, "Well, Ms.
17  Brown, you have to do what you have to do."  And I said
18  to her -- I said, "Well, I thought this meeting or me
19  requesting a hardship transfer is.  It's me taking
20  initiative to -- you know, for my health -- for my
21  betterment of my health and to help me with my job,"
22  because, like I said, it's important to me to have good
23  performance or, you know, for my career.
24       Q.     Did you discuss this denial with
25  anyone else besides Ms. Lima?  Any other management

Page 27

1  officials or with anyone else in HR?
2       A.     Well, what I did is once -- okay.  When
3  I      sent -- after I had that conversation with
4  Ena, I went back to my desk and that's where I sent her
5  an e-mail and said, "Can you provide me, you know, the
6  reason for my denial for my health in writing?"  When I
7  sent that e-mail to her, I copied the Director and the
8  Assistant Director.
9       Q.     Now, who was the Director and
10  Assistant Director?
11       A.     Michael -- at that time, Michael
12  Stevens is Director, and Yvonne Hamilton was the
13  Assistant Director.  And because of the conversation I
14  had with Ena -- because I was like, "Ena, you know, what's
15  more important than a person's health?"  I'm like, "You
16  guys have transferred people all the time back and forth
17  for various reasons.  There was a person that was here
18  that you guys let transfer because her boyfriend was in
19  another state, or because -- to take care of a parent or
20  for numerous reasons."
21       And I stated that, you know, this is for
22  me and my health.  I'm like, "I don't understand what
23  could be more important to -- than that.".  And that's when
24  she said, "Well, you got to do what you have to do."  And
25  I was telling her, you know, I can't walk away from my

Page 28

1  job.  I need my insurance.  I need -- you know, I can't
2  walk away.  And then, like I said, I cc'd the -- because
3  I knew something -- because to me it just didn't feel
4  right.  I'm like, this just doesn't make sense.
5       I felt like, you know, she -- I don't know
6  -- like, I wasn't being taken seriously, or I felt like
7  my condition was being marginalized.  I felt like I was
8  being marginalized.  And a lot of people don't know what
9  this condition is or -- because you can't really see it
10  on somebody, you know.  I don't know if people just
11  disregard it, but I felt like, you know, they didn't take
12  me seriously; like, my health was of no concern of theirs.
13       And I even asked her -- I said, "Well,
14  Ms. Lima," I said, "what happens if my health starts to
15  fail?  You know, who's fault would that be?" because I
16  feel like, you know, me being able to see a specialist
17  could help me and help with my flare-ups or reduce them
18  or maybe just help -- you know, maybe have it subside or
19  go into remission.  I don't know.  But I feel like I
20  should be able to pursue that, you know, for my health.
21       And I don't know.  She just -- I was
22  extremely upset when I left her office, and that's when
23  I sent the e-mail and copied the Director and the
24  Assistant Director, because I felt like she can't just
25  totally disregard it like it      didn't -- like it

Page 29

```
 1   doesn't exist.
 2        Q.      Well, did the Director respond to your
 3   e-mail?
 4        A.      No.  The Director nor the Assistant
 5   Service -- I mean, the Assistant Director, nobody
 6   responded to me to try to find out what was going on.  So
 7   no.  So that was the end of that particular -- well,
 8   actually, after that happened, that's when I called the
 9   EEO line because I was at that point devastated.  I just
10   -- I couldn't believe that -- you know, the conversation
11   I had with her.
12        Q.      Okay.  Are you aware of a coworker who
13   requested a hardship transfer and was granted a hardship
14   transfer?
15        A.      I believe her name was Sakinah.  I
16   don't know her last name, but I could probably get it.
17        Q.      Do you know how to spell the first
18   name?
19        A.      S-A-K-I-N-A-H, I believe.  And she
20   was granted a transfer for her to see her boyfriend or
21   to move to where her boyfriend was.  And there was another
22   woman, Deborah, she was -- Deborah Mitchell -- or Mitchum.
23   She was granted a transfer to help take care of her father
24   in Chicago, and that was shortly after I started.  That
25   was maybe six months after I had started there -- here.
```

Page 30

```
 1        Q.      Okay.  So neither of these
 2   individuals have a disability?
 3        A.      No.
 4        Q.      Okay.  Now, how was -- the first lady
 5   you mentioned, how was she treated differently than you?
 6        A.      Well, how was she treated differently?
 7   Let's see.  I just feel like my situation wasn't taken
 8   seriously.
 9        Q.      Well, you mentioned this individual.
10   She got a hardship transfer and you didn't.  And do you
11   have any reason to think why this person was treated
12   differently than you?
13        A.      Because I think they don't think I have
14   a disability.
15        Q.      And that's the same for the other lady
16   you mentioned, Ms. Mitchum?
17        A.      Yeah.  I just think that they don't
18   think I have a disability of some sort or I just don't
19   think -- I think that they -- my condition has been
20   marginalized this entire time.  I haven't been taken
21   seriously.  My condition has just been disregarded.
22        Q.      Okay.  Did you tell any management
23   officials that you believed the denial of your hardship
24   transfer to be harassment?
25        A.      No.  Well, did I?  Let me think.  I
```

Page 31

```
 1   don't know.  I was just so distraught at that point.  I
 2   felt it was more discrimination than harassment.
 3        Q.      Okay.  So did these events create a
 4   hostile work environment for you?
 5        A.      Yeah, because when she responded in
 6   all caps on that e-mail, considering the sensitivity of
 7   the situation and, you know, how important my health and
 8   my job is to me, I felt, you know -- I felt violated.  Like
 9   I said, she -- I knew that -- I kind of feel like she
10   intended to cause me pain.  I felt that was extremely
11   insensitive, unnecessary.  You know, I think she
12   intended to do me harm by doing that.
13        Q.      And why do you say this, ma'am?
14        A.      Because of her -- how she responded to
15   the e-mail, how she sent me the e-mail and she put denied
16   in all caps in the subject line.
17        Q.      Okay.  Can you send me a copy of that
18   e-mail?
19        A.      Yes, ma'am.
20        Q.      Okay.  How did this event impact your
21   career or salary or grade or benefits or anything like
22   that?
23        A.      Well, it caused me emotional distress
24   and, actually, that caused me to go to my -- back to my
25   psychiatrist and request for additional help.  I told him
```

Page 32

```
 1   what was going on at my job.  I told him, you know, about
 2   the transfer.  I told him that, you know, I'm -- about
 3   being, I guess, more depressed because -- after this
 4   incident because I kind of felt in a sense, you know, I
 5   don't want to say -- well, yeah, I guess in a way hopeless
 6   or -- I kind of felt -- because at the time when she put
 7   denied she didn't tell me anything else.
 8             She didn't say, you know, what I could
 9   do, how I could do it; you know, "If you do this, then,
10   Trevenia, you know, we'll be able to help you out," or,
11   "If you get this documentation or" -- I wasn't told
12   anything, just denied in all caps.  And basically in the
13   letter, you know, basically saying, you know, "We have
14   denied your request."
15        Q.      Okay.  So these events, I guess -- how
16   did this event impact your career or salary?
17        A.      Well, it started affecting my job even
18   more because of the depression and anxiety.  I mean, now,
19   I felt like, okay, now, I can't even get the medical
20   treatment that I want.
21             And, you know, with this condition, the
22   even thought of -- or of an impending flare-up is
23   psychologically -- is hard, because how painful it is to
24   where if I feel like I'm about to get a flare-up, it's
25   -- you know, it's extremely difficult because I'd had bad
```

Page 33

1  experiences with surgical intervention at the walk-in
2  clinics that I'm forced to go to because I can't see my
3  doctor, my dermatologist, you know.
4          I kind of feel like, okay, so now I'm
5  going to have to continue with the -- you know, with going
6  to the -- to different people. I don't want to continue
7  to go -- I want one doctor that knows me, who treats me;
8  especially if somebody is going to be cutting on me, you
9  know, I need the same person because the last time I went
10  to the walk-in clinic, I was in so much pain it's like
11  I was almost butchered. It was awful.
12          And I -- you know, to me, the thought that
13  I'm going to have to continue to go through this -- and
14  it could potentially -- you know, I was having increased
15  flare-ups, you know, during that time, and that's the
16  reason -- one of the reasons why I -- well, actually, the
17  reason why I put in the request to transfer, because I
18  felt it would be in my best interest, you know, to have
19  one specialist, to have somebody I can see, and to have
20  the support -- psychologically and mentally -- when I'm
21  impaired because of the pain. But yeah, it just really
22  drove me into a deeper depression.
23      Q.      Okay. Let's go to the next claim: On
24  February 10th, 2014, complainant's request for
25  reassignment was denied. Please identify the individual

Page 34

1  responsible for denying your reassignment request.
2      A.      It was Ena Lima.
3      Q.      When did you make a request for
4  reassignment?
5      A.      Hold on one moment. February 24th --
6  no, it must have been February 24th.
7      Q.      Okay. The claim states it was
8  February 10th that your request was denied. Is that an
9  incorrect date?
10      A.      No. Most likely it's right because I
11  submitted -- hold on. If I can get through my paperwork
12  -- if I could find it. Okay. Request for reassignment.
13  Let's see. February 7th.
14      Q.      Okay. You did that on February the
15  7th?
16      A.      Uh-huh.
17      Q.      And to whom did you make the request
18  to?
19      A.      I submitted a memorandum along with my
20  doctor's letter. It was directed to Mr. Michael Stevens,
21  who is the Director. And I put through Ena Lima and my
22  coach Jimmy Dean.
23      Q.      Okay. Now, where did you request to
24  be reassigned?
25      A.      To Tampa -- I mean, to the St.

Page 35

1  Petersburg, Florida regional office.
2      Q.      And how would a reassignment assist
3  you in performing your duties?
4      A.      Basically allowing me to see a
5  specialist that might help me or had the possibility of
6  help reducing my flare-ups, and having my family around
7  to help me, you know, mentally and physically during my
8  time of need, basically.
9      Q.      Did you discuss this request with any
10  management officials or Human Resources?
11      A.      The memorandum that I submitted with
12  my doctor's letter, it basically states that I have a
13  serious, chronic medical condition that causes severe,
14  debilitating pain, how my request to the regional office
15  will help me. It says the -- it would allow me to seek
16  out my medical specialist so my condition can be better
17  managed; hopefully allow me to maintain a more regular
18  work attendance.
19      Q.      Okay. Who denied your request?
20      A.      Ena Lima.
21      Q.      How did you become aware that your
22  request had been denied?
23      A.      She sent me an e-mail, and in that
24  e-mail she included some information from my doctor in
25  that e-mail. And then she cc'd quite a few people on that

Page 36

1  e-mail that I felt was a violation of my privacy and was
2  unnecessary, and I felt that that was yet another way that
3  she was trying to humiliate me or make me -- I guess hurt
4  me in a way.
5      Q.      Okay. Now, do you have a medical
6  release form on file?
7      A.      No.
8      Q.      Okay. Now, who did she send this
9  e-mail to? I guess she sent it to you. And who else was
10  the --
11      A.      She copied my supervisor, Jim Dean.
12  She copied the Director and the Assistant Director. She
13  also copied the Assistant Service Center Managers, which
14  are Deborah Street and Adam Kinder.
15      Q.      Now, what did the e-mail state that you
16  felt was a violation of your privacy?
17      A.      Basically -- well, she attached --
18  what did she say here? She said, "You submitted a medical
19  statement in support of your request from Dr.
20  a dermatologist. He indicated that you suffer from a
21  dermological (sic) disorder that is chronical (sic) and
22  unpredictable in nature."
23          And then she put in there -- oh, he
24  further stated that, "Relocation to Florida is essential
25  in controlling your disease," which I think she was just

DEF000132

Page 37

1   -- that's not, you know, exactly how it was put, and I
2   kind of feel like she was just trying to take a jab at
3   me there, but -- and then she says -- basically, that was
4   the part that I felt like that didn't need to be, you know,
5   told to everybody. that, okay, I have a disease and
6   basically telling what my doctor is and what my doctor
7   said. I didn't think that was necessary.
8       Q.      Do you have a -- could you forward me
9   a copy of that e-mail?
10      A.      Yes, ma'am. I can -- yeah, I think I
11  still have it in my inbox at work, but I have paper copies
12  too, if you want me to fax it.
13      Q.      Okay. Well, whatever is easiest for
14  you.
15      A.      Okay.
16      Q.      Okay. So -- now, what was the process
17  for requesting a reassignment, or what is the process?
18      A.      I don't know. Basically, everything
19  I was doing was basically a shot in the dark. I didn't
20  know what to do. Nobody explained to me what to do, so
21  basically, you know, I wasn't -- this is extremely
22  important to me. I wasn't going to just let it go, so
23  my thing was, okay, well, maybe I did the wrong thing.
24  Maybe it wasn't a hardship transfer. Maybe that wasn't
25  the proper request. Okay. Since it's my medical

Page 38

1   condition, maybe a medical reassignment would be the
2   proper request to make. So I decided, okay, so I'll send
3   a memo requesting the medical reassignment, and that's
4   when I requested a letter from my doctor supporting my
5   request.
6       And basically, in that letter that she
7   denied me the medical reassignment, she basically said,
8   "The medical statement provided by Dr. Huff fails to
9   demonstrate that you are unable to perform your assigned
10  duties. Therefore your request is inappropriate and
11  consequently denied," which I never said that I was unable
12  to perform. This was so I could keep my job and, you know,
13  enjoy the benefits of employment per se, I guess. I mean,
14  I don't -- when I'm there and I'm not in pain, I can do
15  my job. I enjoy my job.
16      But that's basically what she said, that
17  it's just been denied. And then she says, "On January
18  23rd, I informed you that your request for a hardship
19  transfer request to the St. Petersburg office had been
20  denied because you are failing to meet the requirements
21  of your performance standards," which was only three
22  months, I believe, from my last performance evaluation
23  which was fully satisfactory.
24      "Consideration of hardship transfer
25  requests are made at the Director's discretion. In

Page 39

1   considering hardship requests, the Director reviewed the
2   reason for the hardship." That was all put in this letter
3   to ask for the reassignment.
4       Then at the bottom she says, "If you
5   believe that you need accommodation due to a disability
6   or a workplace barrier that precludes you from performing
7   the essential duties of your position, you may request
8   a reasonable accommodation by completing VA Form 0857 and
9   submit it to your immediate supervisor."
10      So that's what she put at the bottom of
11  this letter (unintelligible) if can't do your job or if
12  there's something that's preventing you from doing your
13  job, then you can request a reasonable accommodation,
14  which I've never said I couldn't do my job or, you know
15  --
16      Q.      Okay. Did you discuss the denial with
17  any other management officials?
18      A.      No, because I kind of felt like, okay,
19  after I initially cc'd the Director, the Assistant
20  Director, got no response, and then she cc'd everybody,
21  I figured, okay, well, hell, everybody knows, you know.
22  It's no secret. And then, actually, what I did do is I
23  sent the e-mail -- let me see the date of the e-mail I
24  sent to the Director on March 10th. No, no, hold on a
25  second.

Page 40

1       Well, I had sent an e-mail asking to meet
2   with the Director because, you know, I'm thinking, okay,
3   this is just out of hand; you know, maybe they don't know
4   what's going on. I feel like, you know, Ena is just --
5   she basically made up her mind that she wasn't going to
6   let me transfer, period. And she did everything in her
7   power, I felt, to stand in my way.
8       And basically what happened is I sent the
9   letter to the Director asking to speak with him, you know,
10  regarding some issues that I'm having. He agreed. His
11  secretary sent me an e-mail saying, "Okay, well, you said
12  you wanted to meet. Can you meet today?" And basically,
13  you know, I was okay with meeting.
14      And then he sent me back an e-mail saying
15  that he thinks that Ena and Sonia should attend the
16  meeting. At this point, you know, I was -- I basically
17  -- I knew Ena was in no way trying to help me, and I really
18  felt like the things that she's done or that she did so
19  far, I wasn't willing to emotionally go through any type
20  of I guess what I'm thinking would have been like a verbal,
21  you know -- I don't want -- for lack of a better word,
22  altercation between, you know, her and Sonia telling me
23  what I did or didn't do right, you know.
24      I wanted to meet with him without them
25  because I felt like Ena especially was my problem or, you

Page 41

1    know, a major concern of mine. I felt like she wasn't
2    basically doing her job, and I felt like Sonia, who is
3    the HR rep -- I felt that her and Ena, you know, were going
4    to be there for each other.
5        Q.    So you declined the meeting request?
6        A.    Yeah, I declined a meeting.
7        Q.    Did you let the Director know why you
8    was declining the meeting?
9        A.    Basically -- what did I say? No. I
10   basically just said, "I'm researching all of my options
11   at this point."
12       Q.    Okay. Are you aware of a former
13   coworker or a coworker who requested a reassignment and
14   was granted a reassignment?
15       A.    Not a medical reassignment, no.
16       Q.    Or any other possible reassignment?
17       A.    I don't know. I know there has been
18   people we transferred out and into the office. I really
19   don't know under what circumstances for all of them --
20   just the two that I mentioned prior that it was the woman,
21   Deborah Mitchum, who went to Chicago to take care of her
22   father and then the other girl, Sakinah, she was
23   transferred, I believe it was -- I don't know if it was
24   somewhere in Ohio or something, and that was for her --
25   because of a boyfriend.

Page 42

1        Q.    Okay. Did you tell any management
2    officials you believed the denial of your reassignment
3    request to be harassment?
4        A.    Let me see. No. I don't think I did.
5    I might have. At this point I just felt like after she
6    cc'd everybody, I was humiliated. I felt violated, and
7    I kind of felt like I couldn't trust any of the management
8    officials there at this point. And I felt that because
9    of Ena's position as the Service Center Manager, I mean,
10   I just felt like I didn't have any recourse -- not in the
11   office.
12       Q.    Okay. How did these events create a
13   hostile work environment or harassment for you?
14       A.    Yeah, because I believe she violated
15   my privacy. And because of the type of condition I have,
16   it's humiliating for people to know those personal, you
17   know, things about you and just even putting in there that
18   somebody has, you know, a disease and what type of doctor
19   I'm seeing and all this crazy -- I just -- you know, I
20   felt like that was a      way -- her way of trying
21   to humiliate me.
22       Q.    Okay. Did you tell anyone about your
23   concerns that you were being harassed?
24       A.    Yes, actually. I -- there was -- I
25   guess the union reps there. Who else? Honestly, I

Page 43

1    didn't trust very many people around there at this point,
2    especially management. So no, everything I was doing was
3    basically out of the office, like through the EEO
4    Counselor or basically dealing with the union.
5        Q.    And how did the union respond?
6        A.    Basically, at this office, I don't
7    really think they take me very seriously, but basically
8    the -- the union basically was just trying to help me
9    figure out I guess my options. And I just explained that,
10   you know -- what happened to me and what Ena has been
11   doing. So yeah, I guess it would be the union.
12       Q.    What was the outcome of those
13   discussions with the union?
14       A.    I had at this point explained to them
15   that I had already filed an EEO complaint, so, you know,
16   I was going to go that route because from my understanding
17   I could've either did a grievance or the EEO. And since
18   I initially submitted my, you know, EEO request back in
19   January, I just went with that.
20       Q.    Okay. Why do you believe you were --
21   you were discriminated against because of your disability
22   when your reassignment request was denied?
23       A.    Again, I think that she was just making
24   a joke of it. She just didn't take me seriously. She
25   did not -- you know, it's a very serious issue for me,

Page 44

1    you know, physically and mentally. And for her to just,
2    you know, disregard it and make light of it, in a way,
3    and then cc everybody, I just felt like, you know, well,
4    she -- it was intended to harm or harass me or -- I don't
5    know what it -- make me quit. I don't know what it was,
6    but I know it wasn't to help me.
7        Q.    Okay. Let's go to the next claim: On
8    April 1st, 2014, complainant's request for a reasonable
9    accommodation was denied. Please identify the
10   individual responsible for denying your reasonable
11   accommodation request.
12       A.    Ena Lima.
13       Q.    To whom did you make your request to?
14       A.    A reasonable accommodation request
15   was made with my supervisor, Jim Dean, and Sonia Wilson,
16   the HR person.
17       Q.    Okay. When did you make a request for
18   a reasonable accommodation?
19       A.    The form I had, it says
20   acknowledgement of receipt of request was for February
21   24. I guess that was the interactive process.
22       Q.    Okay. What specifically did you
23   request as an accommodation?
24       A.    For a transfer to St. Petersburg,
25   Florida. And I submitted another copy of my doctor's

Page 45

1  certification.
2      Q.     And is there a form for a reasonable
3  accommodation request?
4      A.     Well, this particular form just says
5  acknowledgement of receipt of request. On the top of the
6  form it says that -- hold on. Yeah, there is a form.
7  Yeah, there was a form that I filled out. On the top of
8  that form it said something like, "This form is not
9  required, but it's for recordkeeping purposes."
10     Q.     So there's no reasonable
11  accommodation form?
12     A.     I did fill out a form. I'm trying to
13  -- okay. I don't -- there was a form that I filled out.
14  I'm sorry. I don't have -- it doesn't look like I have
15  that form right here. I apologize. I assumed that all
16  the information that I submitted would've been part of
17  my file. I'm sorry. Let's see.
18     Q.     Okay. I guess while you're looking,
19  how did you become that your request had been denied?
20     A.     By a letter from my -- a denial -- a
21  letter -- it was the 08 -- Form 0857-G. Actually, I did
22  find that     form -- written confirmation of --
23  wait a minute. Yeah, request for accommodation, the
24  0857-A, I filled that out on February 24th.
25             And in that I put, "Please refer to my

Page 46

1  doctor's letter submitted on February 6th. I originally
2  requested reasonable accommodation as of January 17 and
3  again on       January 23rd. No interactive
4  process has yet to take place." And then they gave me
5  -- the denial of my accommodation request was given to
6  me. What is the date on here? It says the denial of my
7  accommodation request was given to me on April 2nd.
8      Q.     Okay. Who denied your request?
9      A.     Ena Lima. And at that time she was the
10  Assistant Director. See, what's going -- yeah. I don't
11  know. I guess -- I don't know if you can understand --
12  where I felt I was between a rock and a hard place, because
13  at this point, when she denied my reasonable
14  accommodation request, she was the Assistant Director,
15  because the Assistant Director went to another office.
16             So she had a temporary assignment, I
17  guess, as the Assistant Director, you know. And then she
18  was -- she appointed herself the designated management
19  official over my reasonable accommodation request.
20     Q.     Okay. What justification did she
21  provide for denying the request?
22     A.     She said -- hold on. On the thing she
23  says, "You do not have a disability covered by the
24  Rehabilitation Act." And then she says, "The medical
25  documentation provided was not adequate," which nobody

Page 47

1  told me this. I had submitted the documentation already
2  when she was responded with the -- saying that it was --
3  you know, my request was inadequate, not my doctor's
4  letter.
5             So then she said -- in the detailed
6  reason it says, "The medical information you provided was
7  not sufficient to show that you have a disability covered
8  by the Rehabilitation Act. Specifically, your medical
9  documentation did not show a substantial limitation,"
10  which is an absolute lie because in that letter it says
11  that the pain can be debilitating.
12             It says, "If you need to visit a medical
13  specialist outside the commuting area, you may request
14  leave in accordance with the appropriate leave requesting
15  procedures." So that's basically -- and so they didn't
16  go on and tell me, okay, if medical documentation was not
17  adequate, what is it missing? What do I need? What are
18  my other options? You're just telling me to take leave
19  and go to Florida and get treatment and come back like
20  I have money for that when I'm taking all this leave
21  without pay to get treatment and -- because I'm going
22  through flare-ups.
23             So that was her solution or her -- you
24  know, that -- and at the bottom of the form it says, "If
25  you wish to request reconsideration of the decision, you

Page 48

1  must within seven days or you can" -- and then it says,
2  "request reconsideration by the designated management
3  official."
4             Okay. This is still Ena, so I guess --
5  the thing is, is I through this entire process have felt
6  like I've had absolutely no recourse because Ena has been
7  -- because of her position within the agency, Service
8  Center Manager and at some time during my request the
9  Assistant Director, I just felt, you know -- I felt, you
10  know, I'd be lucky to keep a job now, you know, because
11  apparently she's doing all she can to stand in my way.
12             And then after I was written up -- I'm
13  sorry, that's another -- that's another one.
14     Q.     Okay. Did you request to have your
15  reasonable accommodation request go to a Reasonable
16  Accommodation Committee?
17     A.     I didn't know. Yeah, I really -- I
18  didn't know what there was -- you know, I assumed that
19  between the Human Resources associates, you know, Ena,
20  my -- somebody would know the proper procedures. And I
21  couldn't go to Ena because our communication between each
22  other, it was gone after our first meeting.
23     Q.     Well, you're saying she was acting as
24  the Associate Director?
25     A.     Assistant Director --

Page 49

1    Q.    Oh.
2    A.    -- when she appointed herself
3    designated management official over my reasonable
4    accommodation request.
5    Q.    Well, who was doing her position while
6    she was the Associate or Assistant Director?
7    A.    Adam Kinder.
8    Q.    Okay. Did you discuss this --
9    A.    And he -- I'm sorry?
10   Q.    Did you discuss this with him?
11   A.    Yes, I did.
12   Q.    And when was this?
13   A.    I discussed that when he gave me that
14   reprimand.
15   Q.    Okay. Well, we'll get to that when we
16   get to the reprimand issue. Okay. Did management offer
17   an alternative reasonable accommodation?
18   A.    No. Basically, when I had my initial
19   meeting with Sonia, the interactive process for that
20   reasonable accommodation, she basically asked me -- I
21   told her what I needed. She basically told me that
22   reasonable accommodation is for if I need a special chair
23   or if I needed to take extra breaks or a longer lunch or
24   something. That's how she explained it to me.
25        And I said -- basically told Sonia --

Page 50

1    this is the HR person that told me this. And I was like,
2    "No, I don't need any of those. Those, you know, are
3    workplace adjustments. I don't need a workplace
4    adjustment. You know, I'm asking for a transfer." You
5    know, again, I got upset. Every time I'm crying. You
6    know, I just -- okay. You know, they're against me, you
7    know. That's what I felt like.
8         And she asked me, you know, "Do you need
9    a chair? Do you need something?" I'm like,
10   (unintelligible) what I needed. She told me, "Well,
11   that's not the kind of -- that's not the request. You
12   know, that doesn't fall under reasonable accommodation."
13   Basically, I'm like (unintelligible) fell under
14   reasonable accommodation. And basically she told me no.
15        Before then I had requested from Ms. Ena
16   -- let me get my dates. (unintelligible) policies and
17   procedures (unintelligible) policies and procedures
18   regarding a hardship transfer, medical reassignments,
19   reasonable accommodation requests, et cetera. And she
20   did give me -- and when I was in that meeting with the
21   reasonable accommodation (unintelligible) --
22   Q.    You were breaking up a bit, ma'am.
23   A.    Oh, I'm sorry.
24   Q.    That's okay.
25   A.    Do you mind -- can I call you back on

Page 51

1    a different phone? I'll be okay. Never mind.
2    Q.    Okay.
3    A.    Okay. When I was (unintelligible)
4    Sonia, I actually (unintelligible) on that paperwork that
5    I got from Ena (unintelligible).
6    Q.    You're still breaking up a bit, ma'am.
7    A.    (unintelligible). Hold on for me.
8    All right. Ma'am?
9    Q.    Yes.
10   A.    All right. So basically, when I was
11   in there with her, I pointed to her on that paperwork
12   (unintelligible) that they gave me the procedures and the
13   policies (unintelligible). Right here it says that
14   (unintelligible) medical reasons (unintelligible).
15        And I told her that -- I was like -- she
16   said, "Oh" -- because at first she was telling me, "No,
17   no, you can't get a hardship transfer for that"
18   (unintelligible) which was my original request. None of
19   them have been very -- they weren't very -- they didn't
20   give me any information, okay, or just -- and when I did
21   show them -- like, in that (unintelligible) that she was
22   -- and she (unintelligible).
23   Q.    Ma'am, you're still -- we're breaking
24   up still a little bit there. Hello?
25   A.    Hello?

Page 52

1    Q.    Yeah.
2    A.    All right. Am I breaking up?
3    Q.    No, you sound better. I can hear you
4    now, rather. Did you tell any management official that
5    you believed the denial of the RA request to be
6    harassment?
7    A.    Did I tell any management -- yes.
8    Q.    Who did you tell?
9    A.    When I had the conversation with Adam
10   Kinder, at this point, after -- after Ena put herself in
11   the position of denying me for the third time, and then
12   they were, you know, in the process of writing me up for
13   not doing mandatory overtime, although I had FMLA, I
14   explained to Adam -- I told him that I felt like that the
15   reprimand was reprisal or, you know -- and Ena actually
16   did the proposal for the reprimand. The only reason she
17   did not do the official write-up is because Adam was in
18   her position at that time.
19        And basically, when I was in the office,
20   I said to him everything. I'm like, "Sonia and Ena, for
21   some reason, they have a problem with me. I don't know
22   why." I said, "I don't have a problem with anyone here.
23   I'm a good worker. I'm dedicated. You know, I don't
24   understand why I'm having a problem here. I feel like
25   they're harassing me." You know, I asked him even if he

DEF000136

Page 53

1  could look into the transfer situation. And he basically
2  told me he didn't want to step on anybody's toes. And
3  I'm like, you know, upset again.
4         I said -- well, I tried to explain to him
5  what's going on. He told me, "Well, if you have a problem
6  with Ena, Ena has a manager." And at this time -- like
7  I said, at this time, Ena was the Assistant Director. So,
8  you know -- and I just felt like, you know, I didn't have
9  any recourse. But I did explain to Adam what was going
10  on. And my supervisor at that time, I explained to him
11  what problems I was having. He knew what I was going
12  through and that they were denying my request. And he's
13  since been demoted or, you know, he's out on the floor
14  now.
15     Q.     Is that Mr. Dean?
16     A.     Yes.
17     Q.     And why was he demoted?
18     A.     I don't know. I don't know. I mean,
19  I don't know. But all I know is he was, you know, demoted.
20  And I explained to Adam -- I'm like, "I communicate well.
21  Had this guy told me, you know, or explained to me anything
22  about, you know, the process of" -- I said, "I didn't know
23  there was a particular process for me to ask you guys to
24  use my FMLA hours. I asked to use my hours. I didn't
25  know I had to do something. Is there a form? What is

Page 54

1  there to do other than me to tell you -- ask you to use
2  my hours?" I had at that point over like 150 FMLA hours.
3     Q.     Okay. So let me see. So we're
4  talking about Mr. Kinder, so let's go to the next issue
5  on April 9th, 2014, complainant was issued a reprimand.
6     A.     Yes.
7     Q.     And you identified Mr. Kinder as the
8  one responsible for giving you a reprimand?
9     A.     Yeah. He was the one who did the
10  official write-up. I was given a proposed reprimand, I
11  believe, like a month prior. And --
12     Q.     And you said that was from Ms. Lima?
13     A.     Yes.
14     Q.     Okay. And Mr. Kinder was -- and he's
15  aware of your disability?
16     A.     Well, after he was cc'd that denial for
17  medical reassignment from Ms. Lima, then, yes, I will
18  assume that, yes, he knew.
19     Q.     Okay. And the charging official is
20  Mr. Kinder?
21     A.     The one who did the reprimand, yes, he
22  at -- at that time, he was the Acting Service Center
23  Manager.
24     Q.     And when did you become aware that you
25  were being given your reprimand?

Page 55

1     A.     On that same day. They did a proposed
2  reprimand, but after I explained that I have FMLA, you
3  know, maybe there's just some confusion or
4  misunderstanding, you know, I could barely -- at that
5  point I was having flare-ups frequently. I said, "I can
6  barely do my regular work schedule, my regular work day.
7  How do you -- how do you expect me to do mandatory overtime
8  at this point?"
9     Q.     Okay. So what justification was
10  provided for you -- to you for the reprimand?
11     A.     Saying I didn't follow directions. I
12  was told that I needed to sign up for mandatory overtime.
13     Q.     Okay. And you said because you had a
14  FMLA on file you did not have to do the mandatory overtime?
15     A.     Well, I had been doing the mandatory
16  overtime. And that particular month in question, I was
17  having issues, so I couldn't.
18     Q.     Now, which month was this?
19     A.     I believe -- let's see. That might
20  have been in March or -- February or March. But I was
21  doing as much overtime as I could, you know, but for that
22  particular month I -- I couldn't. I was just, "Please
23  use my mandatory overtime hours -- I mean, my FMLA hours."
24         And I even sent e-mails to Sonia. I
25  said, "Sonia," I said, "Jimmy keeps asking me about my

Page 56

1  overtime. I've asked him a number of times to use my FMLA
2  hours." I said, "As of this" -- I said, "Nobody's told
3  me what my responsibility as an employee is to get you
4  guys to use my FMLA hours. I don't know what to do other
5  than to tell you to use my FMLA hours." And then she
6  responded saying, "Well, what you have to do is sign up,
7  and then if you don't want to do it, then you
8  could -- or if you can't do it, then you can" -- but this
9  was -- this was after the fact.
10         This was once they already wrote me up,
11  I believe. And I'm thinking, okay, well, what's going
12  on here? This is not right. I have -- and I'm like, I'm
13  on the Department of Labor website. It says I can use
14  it. I even cc'd that to Sonia saying, "Okay, it says that
15  I can use my mandatory overtime hours (sic). It doesn't
16  say anything specific that I need to do, and you guys,
17  you know, at this point didn't tell me, and then you're
18  going to write me up, you know."
19     Q.     Okay. So when did everyone -- the
20  mandatory overtime, when did that start to become --
21     A.     Oh, that's been going on for maybe two
22  years now.
23     Q.     Okay. You've had no -- so when did you
24  begin to have problems doing the mandatory over -- you
25  said you were doing it --

Page 57

1    A.    See, everything went south for me
2    probably like in January. I started having more frequent
3    flare-ups.
4    Q.    So before January 2014, you were
5    working mandatory overtime?
6    A.    Yeah, I believe so. I think even in
7    January I did some, if I'm not mistaken. But yeah, I've
8    been doing mandatory overtime. It really hasn't been an
9    issue. That's why I don't understand why they would, you
10   know, even write me up, because it's not like I've just
11   been refusing to do overtime.
12   Q.    Okay. So why was the reprimand
13   unacceptable to you?
14   A.    Because I pretty much felt like -- like
15   I told Adam -- I told him it was -- I felt like it was
16   retaliation. I thought that it was just something else
17   that Ena was doing to get at me. I even told him -- I
18   said, "I feel like Ena is poking at me; any little thing
19   that she can do, you know, she's doing it." And other
20   things have transpired that I felt like was harassment,
21   but I guess it -- it could be left up to my, you know,
22   interpretation or perception.
23   Q.    Okay. Now, what were the exact
24   instructions you were accused of not following? I know
25   you mentioned overtime, but what was the exact

Page 58

1    instructions?
2    A.    They basically said, "You need to sign
3    up for your mandatory overtime hours. And then if you're
4    unable to do your mandatory overtime hours on that
5    particular day, then you would call in and request for
6    them to use the hours -- the mandatory overtime hours --
7    I mean the FMLA hours."
8          And I asked them for something in writing
9    because at this point I didn't trust Ena or Sonia or my
10   supervisor. And at this point, I -- I asked for something
11   in writing. And I said, "Sonia, can you please provide
12   me Central Office guidance or procedures on what my
13   responsibility is as an employee?" And I never got that.
14   Q.    Okay. Now, prior to getting your
15   reprimand, were you ever issued any oral or written
16   communications or counselings prior to being issued a
17   reprimand?
18   A.    You know, my supervisor, he was
19   sending me little -- you know, like an e-mail saying,
20   "(unintelligible) sign up for mandatory overtime." And
21   I'd respond saying, "Can you please use my FMLA hours?"
22   And then I never got a response or anything from him
23   saying, "No, you can't." And I remember the last time
24   he sent me an e-mail saying, "Oh, I'm directing you to
25   give me your mandatory overtime hours for" -- I think it

Page 59

1    was March. And I basically, okay, respond. I'm like,
2    "And my overtime -- my FMLA hours -- can I use my FMLA
3    hours?" you know.
4          And I think -- wait a minute. I think
5    in February I just -- or no, it must have been the next
6    month. No, no. No. But for that particular month,
7    that's like I told him -- I'm like, "Just please -- just
8    use my mandatory overtime." And I think
9    (unintelligible) person and asked her basically, you
10   know, what the procedure was for using my FMLA hours. She
11   was helping me out a little bit with trying to do a
12   grievance with Adam, setting up a meeting to -- I guess
13   to have him look at it and reconsider the write-up. And
14   we were in the process, going back and forth.
15         Adam was out of town back and forth. He
16   was willing to meet with me, and then shortly thereafter
17   he decided that it wasn't the right process. I needed
18   to go to my first-line supervisor to dispute the write-up.
19   And basically, between me and the union person, we were
20   like, "Why, when you're the one that wrote it up?" And
21   at this point I had a new supervisor, and I'm like, "Why
22   would I drag that person into this? You're the one that
23   wrote it up -- wrote me up for not doing it."
24         I had a different supervisor, who's been
25   demoted, and now I'm just out there. But by then I

Page 60

1    believe I had already filled out my EEO paperwork and
2    received something saying that -- also about the
3    grievance because I filed the EEO thing first and it's
4    going to be handled there. so -- then that's when I just,
5    you know -- I just let it go. And he wasn't willing to
6    meet with me anyway, so I just decided to let the EEO
7    process handle it.
8    Q.    Had you previously been subjected to
9    any other disciplinary actions?
10   A.    No.
11   Q.    Did you discuss the reprimand with any
12   other management officials or with Human Resources?
13   A.    No. At this point I -- my
14   relationship with Sonia had gone south, because there
15   were some other issues where I had tried mediation early
16   on with my EEO process. And there was a few things that
17   between them and Sonia that they were doing that I felt
18   was not right.
19   Q.    Okay. Well, did you tell any
20   management officials you believed being issued a
21   reprimand was harassment?
22   A.    Yes.
23   Q.    Who did you tell?
24   A.    Adam Kinder.
25   Q.    Okay. And how did these events create

Page 61

1  a hostile work environment/harassment to you?
2      A.      Well, at this point, I felt like I was
3  being targeted now.  It was one thing that they were
4  denying -- you know, that Ena was denying my request and
5  giving me no (unintelligible), nothing that I could do
6  in order to maybe help my situation or myself other than
7  just go down there and get treatment when you can.  I felt
8  like, you know, that was already -- I was, you know --
9  it was already wrong to me.
10      And then with the reprimand, I kind of
11  felt like, okay, now, my job is being threatened.  I feel
12  that my character now is being threatened.  I feel that
13  my professionalism is being threatened.  So that had, you
14  know, even more of a emotional and psychological effect
15  for me because at this point I'm thinking, okay, now,
16  she's trying to get rid of me.
17      And she was the Assistant Director at
18  this time, so I felt like, you know, whatever, she can
19  do what she wants.  So it was extremely stressful at this
20  point.  You know, I just -- I could barely function.  I
21  had to go get more meds just to be able to go to work and
22  even function.  Now, after I felt like they were
23  targeting me, I just didn't know what I was going to do.
24  I just thought that, okay, now, they're going to try to
25  fire me.

Page 62

1      Q.      Okay.  Are you aware of any coworkers
2  who failed to perform mandatory overtime?
3      A.      I have -- I know some that maybe got
4  -- got  like -- no, not -- nobody had gotten written up
5  for it.  Maybe some people who, like, who didn't do, like,
6  their complete 20 hours, maybe an hour or two short or
7  so, but --
8      Q.      Okay.  They didn't get reprimanded or
9  any other disciplinary action?
10      A.      No.  I don't believe I know of anyone
11  personally who has been reprimanded for this -- for that.
12      Q.      Okay.  Let's go to the next event:  On
13  January 22nd, 2014, Ena Lima, Assistant Service Center
14  Manager, told complainant, ".Just because you have a
15  disability, nobody owes you anything, you don't have to
16  do anything, and you can't go have a meltdown in Human
17  Resources to get removed."  Did Ms. Lima make this
18  comment to you?
19      A.      Yes, ma'am.
20      Q.      Now, what were the circumstances
21  behind this conversation?
22      A.      Well, that was the conversation when
23  she said that they were denying my hardship transfer.
24  And that's when I went on to explain to her, "Oh,
25  (unintelligible) my health.  You know, I have a

Page 63

1  condition, a disability.  I'm FMLA approved.  I need to
2  see my specialist."
3      I went on to explain what my situation
4  was and, you know -- and basically, that's when she said
5  that, "Just because you have a disability doesn't mean
6  anything."  And from that point, you know, that's when
7  I -- I said I -- I basically got from the conversation
8  we had that just because I have a disability I'm not going
9  anywhere.
10      Q.      What was your response when she made
11  these statements?
12      A.      What did I say to her?  That's when I
13  basically asked her, "So what if my health fails?"
14  (unintelligible) whose responsibility -- who will be
15  liable?
16      Q.      You told her what about liability,
17  again?  Part of you broke up.
18      A.      Yeah.  I asked her -- I told her -- I
19  said, "So you're telling me" -- I said, "I don't see
20  anything that would be more important than, you know, my
21  health."  And basically, I told her, "So what happens if
22  my health begins to fail?  Who's liable?"  And then she
23  says, "You have to take responsibility for your own
24  health."
25      And then that's when I went on to, you

Page 64

1  know, "Well, that's what I thought I was doing by
2  requesting a transfer, you know, taking responsibility
3  for my health."  And then that's when I'm like, "I can't
4  leave.  You know, you just want me to walk away from my
5  job and my insurance?  I can't do that."  And I basically
6  told her I'm not leaving there without my job.
7      Q.      Okay.
8      A.      And then I think that's when she, you
9  know --
10      Q.      Now, when she made these statements --
11  what was her tone of voice when she made these statements
12  to you?
13      A.      Oh, she was extremely rude.  At one
14  point, she even told me she could do without my little
15  attitude.  And at that point I didn't think I had an
16  attitude, because I was basically questioning her about
17  the denial.
18      I was like, "Well, I don't understand how
19  it can be denied.  You guys just transferred people for,
20  you know, many other reasons less serious than their
21  health or a medical condition."  And basically, I was
22  questioning her, and she was like, "Oh, well, I could do
23  without your little attitude."  She says, "Nobody" -- and
24  that's when she said, "Just because you have a disability
25  doesn't mean anything."

Page 65

1      You know, but that -- I -- I was extremely
2  offended.  I was -- I felt like I was being -- she was
3  demeaning.  I think she marginalized me and my condition.
4  I think -- it was just very emotional for me.  I thought
5  I was extremely wronged, and that's the reason why that
6  -- I think that next day is when I called and filed an
7  EEO -- you know, called the -- to talk to a counselor.
8      Q.    Okay.  Did you tell Ms. Lima that you
9  believed her statements to you were harassment?
10     A.    No.
11     Q.    Did you tell any management officials
12  -- I guess any other management officials that you
13  believed these statements were harassment?
14     A.    Yeah.  On that particular statement,
15  I don't believe I discussed that with -- oh, yes.  I told
16  -- not management official, I told the union.
17     Q.    And what --
18     A.    I felt like all the management was, you
19  know -- well, not at that point.  But no, I didn't tell
20  them because I -- I just thought that her remarks were,
21  you know, like I said, offensive, demeaning, and I was
22  being marginalized.  I felt like I was -- the reason why
23  I felt it was disability discrimination is because I felt
24  like she made the decision that my disability wasn't, I
25  guess, a disability.

Page 66

1      I don't know.  I don't know.  I mean,
2  that's how -- I felt like I wasn't even given a fair chance
3  to provide adequate documentation or given any other
4  recourse.  I was just, you know, disregarded.  I kind of
5  felt like she did not think I had a disability, even though
6  she said I had a disability; but apparently to her it
7  wasn't serious enough for it to be taken, you know, I
8  guess, seriously.
9      Q.    Okay.  When she made these statements
10  to you, were there any witnesses to that event?
11     A.    No.  It was just the two of us.
12     Q.    Okay.  Okay.  The last event:  On
13  March 17th, 2014, complainant received a warning of
14  unacceptable performance.  Please identify the
15  individual responsible for giving you this warning for
16  unacceptable performance.
17     A.    It was Jim Dean.  It was my -- at that
18  time, it was the supervisor.  And I think I even put on
19  that          form -- I even wrote on there that I've
20  been requesting reasonable accommodation.  I feel that
21  my -- per my -- any problems that I'm having with my
22  performance is directly related to, you know, my
23  condition or not being able to receive the specialized
24  treatment that I feel I need.  I was just telling them
25  that, you know, the condition and it being painful,

Page 67

1  sometimes I can't concentrate if I'm in pain.  It's hard
2  to keep up with production, you know, or just stay focused
3  if I'm in extreme pain.
4      Q.    Okay.  So Mr. Dean was responsible for
5  the warning of unacceptable performance?
6      A.    (unintelligible).
7      Q.    Let me see.  Where were we?  So you're
8  saying Mr. Dean gave you the warning of -- you identified
9  him as the person responsible for giving you a warning
10  of unacceptable performance?
11     A.    Yes.
12     Q.    And he was the charging official?
13     A.    Yeah.  He was my supervisor at that
14  time.
15     Q.    Okay.  When did you become aware that
16  you were being given this warning of unacceptable
17  performance?
18     A.    I didn't know.  From my
19  understanding, I was under the impression that you had
20  time to ramp up your production, you know, especially once
21  they moved you to another team.  I mean, I really didn't
22  think I was having any issues.  It was only like two
23  months or three months or so or, you          know --
24  from my promotion, so I don't understand, like,
25  (unintelligible) amount of time why, how it could have

Page 68

1  just gone south like that, you know.
2      Q.    What justification was provided to you
3  for the warning of unacceptable performance?
4      A.    Just production issues.
5      Q.    Now, your production -- had your
6  production fallen off?
7      A.    Well, yeah, I think it wasn't as -- I
8  don't remember exactly what it was, but it was -- yeah,
9  it was      less -- it did go down.  Yeah.  Once I
10  started having my issues, like, starting in January, I
11  think that's when my production -- I guess I started
12  seeing some issues with my production.
13      And then I think -- around that time or
14  a little before that is when they increased my quality
15  reviews from five to ten, which I thought -- I don't know.
16  You know, if -- because of the relationship with the
17  quality team, let's just say I -- I didn't trust it.
18     Q.    You didn't trust -- you said your --
19     A.    The fact that they increased my
20  quality reviews from five to ten.
21     Q.    Okay.  Is there any sort of
22  documentation with that, I mean, a memo stating as of this
23  date your production standards have increased from five
24  to ten or something along those lines?
25     A.    I'm sure I could probably find

Page 69

1  something.
2      Q.    Okay. Now, why was a warning of
3  unacceptable performance unacceptable to you?
4      A.    Let's see. Because I kind of felt
5  like I've been telling them this entire time that I need
6  reasonable accommodations. And I just felt that I was
7  very forthcoming with explaining to them what my issues
8  were and how they could help me. And I did explain that,
9  you know, my job performance is extremely important to
10  me.
11          I haven't had a problem with my
12  performance in the past. I had never been on a
13  Performance Improvement Plan. I've received two
14  promotions since I've been there. I'm an extremely hard
15  worker. I'm dedicated I just didn't -- you know, that's
16  -- I just didn't -- and then because I was moved and, you
17  know, a few different situations, I just -- I didn't feel
18  it was right.
19      Q.    Well, have you ever been placed on a
20  Performance Improvement Plan?
21      A.    No.
22      Q.    Okay. Since receiving this warning
23  of unacceptable performance, have you been placed on a
24  Performance Improvement Plan?
25      A.    No.

Page 70

1      Q.    Okay. Did you discuss the warning of
2  unacceptable performance with the charging official?
3      A.    Yes, but the -- the supervisor at that
4  point, he --
5      Q.    That was Mr. Dean?
6      A.    Yes.
7      Q.    Now, when did this discussion take
8  place?
9      A.    On -- oh, I'm sorry. No, I had that
10  conversation with Donald Young. He was -- he did that
11  paperwork on behalf of Jim Dean, because I think he was
12  out of the office that day.
13      Q.    Okay. So you had a discussion with
14  Donald Young?
15      A.    Yeah. And basically, you know, I was
16  telling him -- I was like, "This is just crazy." I told
17  him, "I feel like, you know" -- I even told him I thought
18  it was retaliation. And I told him that I'm having a
19  problem -- yeah, I did tell him I was having a problem
20  with Ena and, you know, that        things -- the
21  discussions I had with Jim Dean. And I was just basically
22  explaining to him, "I'm having some real issues here."
23          And then that's when I put on that form
24  -- on the -- on the thing that, you know, (unintelligible)
25  reasonable accommodation and it's just being ignored.

Page 71

1  Nobody's even -- you know, they're acting like I didn't
2  even request anything. I'm just forgotten and brushed
3  to the side, and nobody has even told me what I had to
4  do and how I had to do it.
5      Q.    Okay. Now, what was his response when
6  you   felt -- when you told him you felt this situation
7  was harassment?
8      A.    Well, he is the one did the proposed
9  reprimand that was issued by Ena.
10      Q.    Mr. Young did the proposed reprimand?
11      A.    No; on behalf of Jim Dean, because Jim
12  was -- Jim Dean prepared the paperwork, and then he was
13  out that day that --
14      Q.    Well --
15      A.    -- he had Donald Young go over the
16  paperwork with me.
17      Q.    Okay. So you're saying Mr. Dean did
18  the proposed and the actual --
19      A.    Well, he -- the proposed reprimand was
20  written up by Ena. Now, the --
21      Q.    Wait. Wait. We're discussing the --
22  let me see -- the warning for unacceptable performance.
23      A.    Okay. Okay. Yeah, that was Jim
24  Dean.
25      Q.    Okay. He proposed -- so he did the

Page 72

1  warning for unacceptable performance?
2      A.    Yeah.
3      Q.    Okay. So when you was issued the
4  warning of unacceptable performance, that was Mr. Young
5  on behalf of        Mr. Dean; is that what you were
6  saying?
7      A.    Yes, ma'am.
8      Q.    Now, when did all this occur? The
9  claim states March 17th. Was that when you had this
10  discussion?
11      A.    That sounds about right. Yeah.
12      Q.    Okay. So you discussed this with Mr.
13  Young. Did you ever go back and discuss it with Mr. Dean?
14      A.    He was in the office when me and Sonia
15  and there was another union rep -- when we were having
16  problems. And yeah, I did tell him. And just like I told
17  Sonia, I said that, "Ena is poking at me. Ena is
18  harassing me." You know, I detailed them out at that
19  point. I said, "I don't know what this is about," I said,
20  "but, you know, Ena is taking it upon herself to cause
21  me a lot of problems."
22      Q.    Okay. So let's go back. When Mr.
23  Young gave you the warning of unacceptable performance,
24  you told him it was in retaliation or harassment, and --
25      A.    Yeah. It was -- he was there, and I

Page 73

1  had my union rep in there with me.  Her name -- what is
2  her name?  I've forgotten the girl's name.  Rachel --
3  Rachel Gentry.  She was in the office with me with Donald
4  Young when he was going over that paperwork.  And that's
5  when I didn't -- I said, "I do believe that this is
6  retaliation."  And --
7          Q.      How did Mr. Young respond to that?
8          A.      He said that -- (unintelligible).
9          Q.      What did you say again?  You kind of
10 was garbled there.
11         A.      He said that he didn't agree with that
12 --      with -- he didn't -- he said he didn't agree
13 with it.
14         Q.      So how did this conversation end?
15 What was the outcome of the discussion?
16         A.      Basically, I told him -- well, you
17 know, I mean, he couldn't do anything.  He was the
18 Assistant (unintelligible).  I mean, basically, you
19 know, I just told him, "Just give me a copy so I can forward
20 it on to my EEO Counselor."
21         Q.      Okay.  Besides Mr. Young, did you tell
22 any management officials or anyone in HR that you believed
23 this warning was harassment or --
24         A.      No, because after a while, my
25 communication with HR, it deteriorated along this path,

Page 74

1  you know.  So my interaction with them was just what I
2  had to do, you know, like when I was talking to her about
3  the reasonable accommodations and things like that.  But
4  no, I didn't -- I didn't tell anybody in HR.  No.
5          But Sonia was well aware of all my
6  issues,      so -- I kind of felt like everybody knew.
7  I mean, I don't know how true that is, but I felt since
8  Ena -- once she cc'd everybody and then once I cc'd the
9  Director and the Assistant Director, and then -- you know,
10 the thing is what I told Adam when I finally met him is
11 I said -- you know, I said, "This feels like a slap in
12 the face to me," I said, "because I truly, honestly
13 thought that you were going to be the first person to talk
14 to me and try to find out what's going on and how you can
15 help."
16          I said, you know -- you know, "I figured
17 that this was -- that you were going to be the first humane
18 person in this office, you know, to actually even, you
19 know, address my concerns or even see what's going on."
20 And he was like, you know -- I told him that because after
21 he told me -- I thought really he was going to try to help
22 me.  I thought then      meeting -- he didn't tell me
23 initially what the meeting -- he sent me an e-mail and
24 said he wanted to meet with me.  So I'm thinking, okay,
25 well, maybe this is about my transfer.

Page 75

1          So -- and at that time he was the acting
2  Service Center Manager, so I felt like, okay, well, you
3  know, maybe this is, you know, somebody finally trying
4  to help me out.  And then I told him -- when I went in
5  there, he told me it was for the reprimand.  I said, "I
6  feel like this is just -- this is a slap in the face."
7  I didn't see this coming.  And, you know, I just feel like
8  -- that's when I told him about the -- Ena and the
9  harassment and the fact that I felt like that that
10 reprimand was retaliation.  And -- but I did tell him
11 that.  I told him that, you know, I felt -- I didn't see
12 that coming.  I just --
13         Q.      Now, how did this event, proposed --
14 excuse       me -- the warning of unacceptable
15 performance affect you or impact your career or salary
16 or benefits?
17         A.      It affected my performance.
18 Everything that was going on from the time that I had that
19 conversation with Ena, anything that happened after that,
20 it -- it was affecting my performance.  My performance
21 has since gotten much better, only because I kind of feel
22 like they've left me alone, I guess, in a way and allowed
23 me to focus on my work instead of constantly pulling me
24 away to give me some type of -- you know, I felt like every
25 day I was going to work I was getting an e-mail for some

Page 76

1  type of meeting or some type of discussion or some type
2  of -- you know, some type of negative impact on me to
3  where, you know, not only did I not want to go to work;
4  when I was there, it was really hard for me to concentrate.
5          And the fact that the job is
6  production-based, you know, it's -- you really can't have
7  an off day.  So when there's a situation where you go in
8  and you're in pain or distracted in any way, then you might
9  not make your production that day.
10         So -- especially with the -- you know,
11 the emotional impact that this has all had on me, you know,
12 it was really, really affecting my performance,
13 especially when you think the manager -- the Service
14 Center Manager and at that point the Acting Director, you
15 know, had it out for you.  And then I did talk to the
16 Director one day.
17         Q.      When was this?
18         A.      No.  I saw him -- it was in passing.
19 When was this?  This was -- this must have been after --
20 you know,      it -- I can't say, but it was in
21 passing.  And I -- you know, at this point, I think I had
22 been crying.  And he asked me -- he was like, you know,
23 "How is everything going?"  And I was like, "Not good."
24          And I was (unintelligible) talk to
25 him.  He was like, "Oh, you know, I'm sorry," and then

DEF000142

Page 77

1  he ran off. You know, I'm like okay. So my -- you know,
2  I kind of felt like everybody knew what was going on with
3  me, you know. And, you know, I kind of -- I just felt
4  like I didn't -- nobody there was going to help, you know,
5  especially with their manager, you know, being the one
6  that I was having a problem with. She's basically the
7  lead manager there. The only person she's under is the
8  Director.
9      Q.    Okay. Do you feel like getting this
10  warning for unacceptable performance was -- this action
11  that was taken was the result of your disability?
12      A.    Well, I kind of feel like my disability
13  -- the fact that they had been ignoring my request for
14  reasonable accommodation and the impact that it had on
15  me. Emotionally and psychologically, it did impact my
16  production.
17      Q.    Okay. Are you aware of any direct
18  evidence of discrimination related to your disability?
19      A.    No. Only that it just wasn't taken
20  seriously. They -- I feel like Ena used her own medical
21  opinion other than my doctor's. You know, I just felt
22  like they decided that my disability was insufficient.
23  I don't believe it was -- it was, you know, discussed with
24  any type of medical provider, because they could've, you
25  know, explained to them, you know, how difficult this

Page 78

1  condition is to live with and that, you know, sometimes
2  it is hard to function. But she decided to use her own
3  medical opinion over my doctor's.
4          Each time, like, I felt like I was -- I
5  didn't have the right kind of disability in order for them
6  to help me. You know, just because my disability was not
7  well-known or that it's covered up, you can't really see
8  it, you know, that they kind of felt like there's nothing
9  wrong with me.
10          And I kind of felt -- I even told them
11  -- I'm like, "Isn't this what the ADA -- isn't that what
12  all this is about, so you can't treat me like this based
13  on your own opinion of me and my condition?" I don't --
14  yeah, I just -- they just basically -- like I said, they
15  just discounted me and my condition, like it didn't
16  matter, it was nothing.
17      Q.    Okay. Is there anything else
18  pertinent to this investigation that we have not
19  discussed?
20      A.    Let me see. No. I really can't
21  really think of anything else at this moment. Only that
22  nobody has       come -- well, yeah, nobody has
23  come to me to try to -- I mean, make anything right at
24  this point. I mean, each time it's just been -- they just
25  left me out there, just out there.

Page 79

1          Nobody -- and, you know, the thing is,
2  is somebody called me from the Reasonable Accommodation
3  office basically asking me about my reasonable
4  accommodation request. And I explained what was going
5  on, and I explained that Sonia, you know, was the one who
6  gave the, you know, interactive (unintelligible), et
7  cetera. And basically, the woman was saying that, you
8  know, Sonia was not (unintelligible).
9      Q.    Pardon? I think you started to break
10  up again, ma'am.
11      A.    She said that Sonia wasn't on the list
12  of people for the person to handle reasonable
13  accommodations for the VA office. It was some gentleman
14  on that list. And she was telling me that just anybody
15  can't just decide that they want to be the reasonable
16  accommodation person (unintelligible) trained that's
17  involved. And coincidentally, you know, Sonia
18  (unintelligible).
19      Q.    You're breaking up again, ma'am.
20      A.    You there?
21      Q.    Yes.
22      A.    Okay. One moment she was, okay, the
23  Human Resources rep, and then on another e-mail, she's
24  the EEO Coordinator, and then on another e-mail she's the
25  Reasonable Accommodation Coordinator. See, Ena kept

Page 80

1  appointing her to different positions that would
2  basically keep her and Sonia in control of every one of
3  my requests. Any time I tried to go around them, Ena
4  found herself in a situation to try -- or she put Sonia
5  in a situation to try to, I guess, prevent me from having
6  any type of positive outcome.
7          And when I talked to the reasonable
8  accommodation lady I already told her I had an EEO claim,
9  so she said she was going to question the office about
10  their processes because basically I told her that nobody
11  told me anything . She was like, "Well, basically, they
12  can't just deny you." Denial is like the last resort,
13  and they have to get other approval outside of, you know,
14  just their own opinion as to whether or not I need
15  reasonable accommodation or if I have a disability or not.
16      Q.    Which individual told you this, ma'am?
17      A.    I don't -- it was from the -- she was
18  the regional Reasonable Accommodation Coordinator.
19      Q.    Oh, you don't know who that individual
20  is, ma'am?
21      A.    I think her name is Gwendolyn. I'm
22  not sure of her last name, but she is the VBA Regional
23  Reasonable Accommodation Coordinator.
24      Q.    Okay. And you spoke to her and -- do
25  you remember when this conversation took place, I mean,



Page 81

1    approximately?
2        A.      Hold on.  This was shortly after -- so
3    it had to be -- it was in March.  No, no, it had -- because
4    my reasonable accommodation was denied in April, so it
5    had to be sometime towards the middle of April.
6        Q.      Okay.  Well, that's all the questions
7    I had.  Is there anything else you'd like to add?
8        A.      Let's see.  No.  Basically, you know,
9    if -- could I give any names of people that if, you know
10   -- that could I guess -- how does that work if you guys
11   wanted to talk -- investigate with some of like my
12   coworkers or something?
13       Q.      What would your coworkers testify to?
14       A.      I guess the atmosphere or -- like,
15   especially with -- you know, that it's (unintelligible)
16   that sometimes the office targets people for particular
17   reasons.
18       Q.      Let me see.  And you're saying they'd
19   be willing to testify to this?
20       A.      I'm sorry?
21       Q.      You're saying they'd be willing to
22   testify to this?
23       A.      I think so.  Yes.
24       Q.      Let me see.  How many people would
25   that be?

Page 82

1        A.      Let's see.  One just got fired, and
2    she was targeted.  She was on FMLA.  Another one, she
3    knows about these issues.  She -- I'd say about at least
4    two people -- two or -- two people positively.  And then
5    the union rep, she can tell you.  She's had numerous
6    problems with them.
7        Q.      Okay.  Let me see.  How about this?
8    Why don't you ask these individuals would they mind
9    testifying, you know, with -- having it recorded by a
10   recorder, downloaded for testimony, I mean, where you
11   have to swear to; and ask them if they'd be willing to
12   do this.  And for the ones that say yes, could you then
13   send me those names of those individuals?
14       A.      Yes.
15       Q.      Oh, okay.  Okay.  So that's two
16   positives and a union representative, so that's about
17   three people?
18       A.      Yes.
19       Q.      Oh, okay.  Well, let me see.  How long
20   -- do you know when you may have those names?
21       A.      I mean, I have the names.  I just need
22   to talk to them and see if it's okay.  But, you know, I
23   mean, it possibly may not help, because this is about,
24   you know, their specific denials of my requests.  So I
25   suppose I can just go with what I, you know, provided

Page 83

1    already, because this is pretty much just, you know,
2    specific to me, I guess, you know.
3        Q.      Well, we'll get -- what was that you
4    said, again, ma'am?
5        A.      I guess -- I kind of feel like these
6    are really specific to me.  I mean, the other issues, I
7    think it's related, but I don't think it's, I guess,
8    directly related to my denials for my transfers and the
9    reprimand, et cetera.  So by that probably -- the other
10   people probably won't be necessary.
11       Q.      Well, ma'am, that's up to you.
12       A.      Okay.  Well, if I -- let's just say --
13   okay.  There was one -- I could probably get back with
14   you tomorrow.
15       Q.      Oh, okay.  Well, let me see.  Could
16   you send me an e-mail?
17       A.      At least one of them, or maybe two.
18       Q.      Okay.  Well, could you just send me an
19   e-mail about that, I mean, with those names --
20       A.      Okay.
21       Q.      -- or whatever -- however the
22   conversations with those individuals go?
23       A.      Okay.
24       Q.      Okay, ma'am.  Well, that was all the
25   questions I had for you today.  Thank you for your time.

Page 84

1        A.      You're welcome.  Thank you.
2        Q.      Okay.  Bye.
3                (WHEREIN, the proceeding was
4    adjourned.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

```
 1              CERTIFICATE OF AFFIANT
 2       DEPARTMENT OF VETERANS AFFAIRS
 3       OFFICE OF RESOLUTION MANAGEMENT
 4
 5    IN THE MATTER OF:    )
 6    TREVENIA BROWN,      )
 7            Complaint No.
                           )
 8            200J-0326-2014101326
            Complainant, )
 9    -vs-                 )
10    VA REGIONAL OFFICE,  )
11    INDIANAPOLIS, INDIANA, )
           Respondent. )
12
            ACKNOWLEDGMENT OF AFFIANT
13        I, Trevenia Brown, do hereby acknowledge
14    that I have read and examined the pages of the
15    transcript of my affidavit and that:
16        (Check appropriate box)
17        [ ] the same is a true, correct, and
18    complete transcription of the answers given by me
19    to the questions therein recorded.
          [ ] except for the changes noted in the
20    attached Errata sheet, the same is a true,
21    correct, and complete transcription of the
22    answers given by me to the questions therein
23    recorded.
24
25        _____       _____
          Signature          Date
```

Page 86

```
 1            ERRATA SHEET
 2    Page and line number    Correction or change
      as reported:            and reason therefor:
 3    _____    _____
 4    _____    _____
 5    _____    _____
 6    _____    _____
 7    _____    _____
 8    _____    _____
 9    _____    _____
10    _____    _____
11    _____    _____
12    _____    _____
13    _____    _____
14    _____    _____
15    _____    _____
16    _____    _____
17    _____    _____
18    _____    _____
19    _____    _____
20    _____    _____
21    _____    _____
22    _____    _____
23    _____    _____
24
25
```

Page 87

```
 1           CERTIFICATE OF NOTARY PUBLIC
 2              STATE OF MISSOURI
 3        I, Sherri L. Jolley, within and for
 4    the State of Missouri, do hereby certify that the tape
 5    transcription in the witness whose testimony appears in
 6    the foregoing transcript in the caption hereof and
 7    thereafter transcribed by me; that said transcript is a
 8    record of the testimony given by said witness; that I am
 9    neither counsel for, related to, nor employed by any
10    parties to the action; and further that I am not a relative
11    or employee of any counsel or attorney employee of any
12    counsel or attorney employed by the parties hereto, nor
13    financially or otherwise interested in the outcome of the
14    action.
15
16
17
18
19        _____
20             Sherri L. Jolley
21
22
23
24
25
```

DEF000145