**In The Matter Of:**

*Brown v.*
*McDonald, et al.*

---

*Brown v. McDonald, et al.*
*July 20, 2015*
*EEOC Hearing - Volume I*

---

*Smith Reporting*
*400 North High Street - Suite 200*
*Muncie, Indiana  47305*
*1-800-700-3566 / 765.284.7836*
*www.smithreporting.net*



SMITHREPORTING
INDIANA COURT REPORTERS

Min-U-Script® with Word Index

DEF000393

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 2 of 274 PageID #: 362
**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

1

UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
DETROIT FIELD OFFICE

EEOC Case No.   470-2015-00017X

Agency No.     200j-0326-2014101376

TREK K. CARETHERS
ADMINISTRATIVE JUDGE


TREVENIA BROWN,                    )
                                   )
        Complainant,               )
                                   )
        -vs-                       )
                                   )
ROBERT A. MCDONALD,                )
SECRETARY DEPARTMENT OF            )
VETERANS AFFAIRS,                  )
                                   )
        Respondent Agency.         )


VOLUME I


REPORT OF PROCEEDINGS had at the hearing of

the above-entitled cause before TREK K.

CARETHERS, Administrative Law Judge,

commencing on the 20th day of July, 2015, at

the hour of 10:00 a.m., at 101 W. Ohio

Street, Indianapolis, Indiana.




Reported by:  Joyce E. Shinault, RPR, CPE

2

A P P E A R A N C E S

ON BEHALF OF THE COMPLAINANT:

    Denise M. Clark, Esq.
    CLARK LAW GROUP, PLLC
    1250 Connecticut Ave. NW, Suite 200
    Washington, DC  20036
    dmclark@benefitcounsel.com

ON BEHALF OF THE AGENCY:

    Nicholas Miller, Esq.
    Danielle Kalivoda, Esq.
    DEPARTMENT OF VETERANS AFFAIRS
    REGIONAL COUNSEL
    575 N. Pennsylvania Ave,  Rm. 644
    Indianapolis, IN  46204
    Nicholas.Miller6@va.gov

ALSO PRESENT:  Richard Benson,
                Legal Assistant

DEF000395

Case 1:20-cv-01154-JPH-MJD  Document 39-4  Filed 07/02/21  Page 4 of 274 PageID #: 364
**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

3

I N D E X

WITNESS:                                    PAGE:

TREVENIA BROWN
    Examination by Ms. Clark.................6
    Examination by Mr. Miller.............130
    Examination by Ms. Clark.............197
    Examination by Mr. Miller.............214
    Examination by Ms. Clark.............224
    Examination by Mr. Miller.............225


MICHAEL HAMPTON
    Examination by Ms. Clark.............229

DEF000396

4

# INDEX OF EXHIBITS

ADMITTED

EXHIBIT NO.

1 -Certification of Health Care
   Provider for Employee's Serious
   Health Condition (FMLA)................20

2 -Application to Become a Leave
   Recipient Under the Voluntary Leave
   Transfer Program.....................36

3 -E-mail, 1-23-14 (Brown00005)..........47

4 -Dr. Huff correspondence (Brown00027)...53

5 -E-mail, 2-20-14 (Brown00007)..........69

6 -E-mail chain, 3-25-14 (Brown00014 -
   00020)...............................72

7 -Memorandum, 5-21-14...................81

8 -Memorandum, 7-17-14...................83

9 -Correspondence, 8-1-14 (Brown00028 -
   00029)...............................96

10 -E-mail, 10-1-14 and attached SF52......96
(Withdrawn)

11 -Medical record (Brown00066)..........111

12 -Medical record (Brown00065)..........111

13 -Medical record (Brown00064)..........111

14 -Medical record (Brown00060 - 00062)...111

15 -Medical record (Brown00056 - 00059)...111

16 -Medical record (Brown00053 - 00055)...111

17 -Medical record (Brown00050 - 00052)...111

18 -Medical record (Brown00046 - 00049)...111

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 6 of 274 PageID #: 366
**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

5

# INDEX OF EXHIBITS
## (Continued)

ADMITTED

EXHIBIT NO.

19 -Medical record (Brown00067 - 00070)...111

20 -Medical record (Brown00083 - 00084)...111

21 -Medical record (Brown00085 - 00086)...111

22 -Medical record (Brown00035 - 00037)...111

23 -Medical record (Brown00087 - 00089)...111

24 -Medical record (Brown00039 - 00040)...111

25 -Medical record (Brown00042 - 00045)...111

26 -Medical record (Brown00038)...........111

27 -Memorandum, 5-21-14 (Agency Exh. X)...185

28 -Blank VA Form 0857e.................200

29 -E-mail chain, 2-27-14 (Agency Exh. O).217

DEF000398

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

6

1           JUDGE CARETHERS:  We're convened

2    here for the hearing of Trevenia Brown versus

3    the Department of Veterans Affairs on

4    July 20, 2015, at approximately 10:37 a.m. at

5    the Indianapolis field office.  This is

6    taking place via video conferencing.  The

7    Administrative Judge is in the Detroit field

8    office while everyone else is at the

9    Indianapolis District Office.

10          The matter is Trevenia Brown versus

11   the Department of Veterans Affairs, EEOC No.

12   470-2015-00017X, Agency No.

13   200j-0326-2014101376.

14          Will the parties please enter their

15   appearance, beginning with the Complainant.

16          MS. CLARK:  On behalf of the

17   Complainant, Denise Clark.  And I have

18   assisting me today, Richard Benson.

19          JUDGE CARETHERS:  All right.

20   Thank you very much.  And the Agency?

21          MR. MILLER:  Nicholas Miller,

22   representing the Agency.

23          MS. KALIVODA:  And Danielle

24   Kalivoda for the Agency.

25          JUDGE CARETHERS:  All right.

DEF000399

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

7

1   Thank you very much.  I want to put some

2   things on the record.  There was a motion --

3   a motion to modify the witness list.  There

4   was opposition by the Agency.  I have made

5   some rulings that were off the record, but I

6   want to put them on the record.

7        Particularly, Complainant sought that

8   three individuals be permitted to testify.

9   Two of them were previously approved, but

10  were not able to appear today.  Those

11  witnesses are Dr. Robert Huff, who was

12  pre-approved but could not appear today.  The

13  other doctor was Dr. Patel, I believe.  Let

14  me see what was his name.  Dr. Patel.  He was

15  pre-approved, not available to testify today.

16  I made a ruling that the doctors' affidavits

17  would not be accepted in lieu of their

18  testimony.  I have stated or ruled that they

19  can testify either today or tomorrow via

20  telephone if they are available, but their

21  affidavits would not be accepted in lieu of

22  their testimony.

23        The third witness, which was the

24  Complainant's husband, Mr. Michael Hampton, I

25  did allow that witness.  He was not

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

8

1    previously pre-approved, but since he's only

2    going strictly to damages and he'll be

3    subject to cross-examination today, I

4    permitted -- I have ruled that he will be

5    permitted to testify today.  That's it

6    regarding that motion.

7              MS. CLARK:  Your Honor, with

8    regard to the motion, Complainant wishes just

9    to lodge its objection to the denial of the

10   admission of the affidavits.

11             JUDGE CARETHERS:  Okay.  Duly

12   noted.  Prior to going on the record this

13   morning, we had a prehearing conference held

14   on June 18, 2015, where the parties discussed

15   the possibility of settlement.  They did not

16   reach settlement.  Also discussed the issue

17   of today's hearing in terms of what issues

18   would be heard.

19        The issues are framed as follows.

20   Whether the Complainant was subjected to a

21   hostile work environment based on disability

22   as evidenced by the following six events:

23        (1) On January 22, 2014,

24   Complainant's request for a hardship transfer

25   was denied.

DEF000401

9

1          (2) On January 22, 2014, Ena Lima,

2    Assistant Service Center Manager, told

3    Complainant, "just because you have a

4    disability, nobody owes you anything.  They

5    don't have to do anything" and "you can't go

6    have a meltdown in Human Resources to get

7    moved."

8          (3) On February 10, 2014,

9    Complainant's request for reassignment was

10   denied.

11         (4) On March 17, 2014, Complainant

12   received a warning of unacceptable

13   performance.

14         (5) On April 1, 2014, Complainant's

15   request for a reasonable accommodation was

16   denied.

17         (6) On April 9, 2014, Complainant was

18   issued a reprimand.

19         Events 3, 5, and 6 were accepted as

20   independent claims.  Events 1 through 6

21   constitute a harassment claim by the

22   Complainant.

23         During our prehearing conference,

24   Agency objected to Owen Barwell on grounds of

25   relevance.  The witness was approved

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

10

1   nonetheless as he possessed potentially

2   relevant testimony regarding the selection of

3   Dr. Chin and his qualifications.  All of the

4   other proposed witnesses by the Agency and

5   Complainant were approved that day.  I've

6   already talked about the motion to modify.

7          MR. MILLER:  Your Honor, I'm sorry

8   to interrupt.  I don't -- did we discuss a

9   Dr. Chin?

10          MS. CLARK:  No.  The reason there

11  was an objection to Owen Barwell on grounds

12  of relevance is that we advised you during

13  the prehearing conference that he had not

14  spoken with the Complainant.  Dr. Chin is not

15  a witness in this case.  Nor is Susan -- I

16  don't believe Susan Burke was someone who was

17  presented by the Agency either.  I don't

18  think.  You tell me.

19          MR. MILLER:  I think she was

20  withdrawn.

21          MS. CLARK:  Okay.  So you withdrew

22  her.  Okay.  So Dr. Chin is not anyone who is

23  a witness --

24          JUDGE CARETHERS:  Okay.  I stand

25  corrected on that.  The hearing is a

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

11

1   continuation of the investigatory process.

2   The purpose of the hearing is to give the

3   Complainant an opportunity to be heard on her

4   complaint, thereby supplementing the

5   investigative record with examination and

6   cross-examination of witnesses.

7            My function as the presiding official

8   is to ensure that an equitable and

9   expeditious hearing is conducted which

10  produces all relevant and material necessary

11  to resolve this complaint in a fair and

12  impartial manner.

13           As you know, there's a court reporter

14  in the room.  During the course of the

15  hearing we may have to go off the record for

16  a number of purposes.  Note that I only may

17  instruct the court reporter to go off the

18  record.  Any requests to go off the record

19  must be made through me.

20           Going to the issue of stipulations.

21  There are no current stipulations, is that

22  correct?  Parties, beginning with the Agency?

23           MR. MILLER:  That's correct, Your

24  Honor.

25           JUDGE CARETHERS:  Complainant?

DEF000404

12

1          MS. CLARK:  We --

2          JUDGE CARETHERS:  There are no

3     stipulations, correct?

4          MS. CLARK:  There are no

5     stipulations.

6          JUDGE CARETHERS:  Great.  The

7     parties may proceed with opening statements

8     unless the parties want to waive.  Do the

9     parties want to have opening statements,

10    beginning with the Complainant?

11         MS. CLARK:  Complainant waives

12    opening statement in this matter.

13         JUDGE CARETHERS:  Okay.  Agency,

14    would you like an opening statement or are

15    you waiving?

16         MR. MILLER:  The Agency will waive

17    as well.

18         JUDGE CARETHERS:  Okay.  Let's go

19    to the first witness, which is the

20    Complainant herself, Ms. Trevenia Brown.  Is

21    that correct?

22         MS. CLARK:  That's correct.

23         JUDGE CARETHERS:  Okay.  Great.

24    Obviously, you know that I'm Administrative

25    Judge Trek Carethers.  I'm presiding over

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

13

1    this hearing today.  You are a current

2    federal employee; is that correct?

3            MS. TREVENIA BROWN:  Yes.

4            JUDGE CARETHERS:  Your time here

5    will be considered excused official duty

6    time.  There will be no reprisal for any of

7    the testimony you give today.

8            Court Reporter, can we have this

9    witness sworn in.

10           (The witness is sworn by the court

11   reporter.)

12           JUDGE CARETHERS:  Great.  I have

13   to give you instructions before we begin

14   taking the testimony.  The first thing is

15   that you must maintain the volume of your

16   voice, speak loud so everyone can hear you

17   and the speakers can pick you up.  Do you

18   understand?

19           THE WITNESS:  Yes.

20           JUDGE CARETHERS:  The court

21   reporter is taking everything down that's

22   being said.  Two people cannot speak at the

23   same time.  Please allow the questioner to

24   finish posing the question before you begin

25   answering.  Do you understand?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

14

1        THE WITNESS:  Yes.

2        JUDGE CARETHERS:  All of your

3    responses must be orally or verbally given.

4    You cannot use gestures to give your answers,

5    such as shaking your head up and down.  Do

6    you understand?

7        THE WITNESS:  Yes.

8        JUDGE CARETHERS:  If you do not

9    understand the question, please let us know

10   and I will have the question rephrased if I

11   find it necessary.  Do you understand?

12       THE WITNESS:  Yes.

13       JUDGE CARETHERS:  Only answer the

14   question that's addressed to you.  You're not

15   allowed to change the question and then

16   answer it.  Do you understand?

17       THE WITNESS:  Yes.

18       JUDGE CARETHERS:  If there's an

19   objection to the question by one of the

20   attorneys, do not answer the question.  I

21   will make a ruling on it and then I will

22   instruct you on whether you should answer the

23   question or not.  Do you understand?

24       THE WITNESS:  Yes.

25       JUDGE CARETHERS:  I may ask you

DEF000407

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

15

1    some questions.  The mere fact that I'm

2    asking you questions should not indicate to

3    you that you're testifying poorly or well.

4    Do you understand?

5              THE WITNESS:  Yes.

6              JUDGE CARETHERS:  Okay.  Could you

7    please state and spell your name for the

8    record?

9              THE WITNESS:  Sure.  It's Trevenia

10   Brown.  It's spelled T-R-E-V-E-N-I-A.  Last

11   name Brown, B-R-O-W-N.

12             JUDGE CARETHERS:  Thank you very

13   much.  Complainant, this is your witness.

14   You may begin.  This person was approved for

15   three hours.  Go ahead.

16             TREVENIA BROWN,

17   having been first duly sworn to tell the

18   truth, the whole truth, and nothing but the

19   truth relating to said matter, is examined

20   and testifies as follows:

21   EXAMINATION,

22      QUESTIONS BY MS. CLARK:

23   Q.  Ms. Brown, you've already stated your name

24   for the record.  Can you tell me where you

25   currently reside?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

16

1   A.   8500 Belcher Road, Apartment 106.  And that

2        is in Pinellas Park, Florida 33781.

3   Q.   And you've already stated for the record that

4        you're an employee of the Department of

5        Veterans Affairs.  Could you please tell us

6        which office you're working in?

7   A.   I currently work out of the St. Petersburg

8        Regional Office in St. Petersburg, Florida.

9   Q.   What is your position?

10  A.   Veterans service representative.

11  Q.   And when were you first hired?

12  A.   September 21st -- 25th, I'm sorry, 2011.

13  Q.   Okay.  Did you receive any evaluation --

14       performance evaluations between September,

15       2011 and November, 2013?

16  A.   Yes.

17  Q.   And can you tell me how you were rated in

18       those evaluations?

19  A.   Fully successful.

20  Q.   Okay.  For the record, we'd like to point to

21       the Record of Investigation, Bates-stamped

22       00233, 00234, and 00294.  I believe that's

23       where her evaluations are located.

24            JUDGE CARETHERS:  I'm there.

25

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

17

```
1       BY MS. CLARK:

2   Q.  All right.  During your initial employment

3       period, were you given any time to learn

4       about how to evaluate medical conditions and

5       standards that apply?

6   A.  Basically, I was given a chance to learn my

7       position, which is to collect different type

8       of documents and medical evidence for a rater

9       to make a decision on the claims, on

10      disability claims.

11  Q.  Were there separate teams within your

12      division?

13  A.  Yes.

14  Q.  And did they evaluate different kinds of

15      disability claims?

16  A.  Yes.

17  Q.  Did you ever move from one team to another?

18  A.  Yes.

19  Q.  And were the types of claims that you were

20      reviewing, did they ever change?

21  A.  Yes.

22  Q.  And were you required to evaluate claims

23      under different standards?

24  A.  Under different --

25  Q.  Or were the standards all the same?
```

DEF000410

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

18

1    A.   All the standards were the same.

2    Q.   And then were there any claims that were more

3         complicated than others?

4    A.   Yes.  So in some teams, the consensus is that

5         there are cases on those teams that are more

6         difficult.  Or more complex.

7    Q.   All right.  So during the period that I've

8         mentioned earlier, September of 2011 to

9         November, 2013, had you engaged in all these

10        activities we just discussed; being on

11        separate teams, evaluating different types of

12        claims, moving from one team to another,

13        evaluating complicated claims?

14   A.   Yes.

15   Q.   And you were rated as fully successful with

16        regard to all of that activity?

17   A.   Yes.

18   Q.   And your last evaluation, did that take you

19        through September, 2013?

20   A.   Yes.

21   Q.   That's September 30th, correct?

22   A.   Yes.

23   Q.   Very good.  Thank you.  At any time before

24        September 30, 2013, had you been advised that

25        you had poor performance or you weren't

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

19

1       meeting your mark?

2   A.   No.

3   Q.   Thank you.  So I want to talk about another

4       activity here.  Did you ever apply for FMLA?

5   A.   Yes.

6   Q.   Do you know when that occurred?

7   A.   It was between June 13th and June 19th of

8       2013.

9               MS. CLARK:  Your Honor,

10      Complainant's Exhibit Number 3, I believe,

11      reflects the application.  Your Honor, I'd

12      like --

13              JUDGE CARETHERS:  I'm still

14      getting there.

15              MS. CLARK:  I'm sorry?

16              JUDGE CARETHERS:  I'm still

17      getting there.  Hold on a second, because I

18      don't have it as a -- when you say Exhibit 3,

19      did you put a bookmark?  Yes, you did.

20      There's the certification.  Okay, I have it.

21              MS. CLARK:  Okay.  Thank you.

22      BY MS. CLARK:

23   Q.   I'd like to present this to you.

24   A.   Okay.

25   Q.   Can you review that document.  Does that

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

20

1      appear to be the certification that you

2      filed?

3   A.  Yes.

4   Q.  Let me just kind of go through this with you.

5      On page --

6                  JUDGE CARETHERS:   I'm sorry to

7      interrupt.   Are you planning to admit this in

8      the record as an exhibit?

9                  MS. CLARK:   Yes, I am.

10                 JUDGE CARETHERS:   Let's do that

11     now.   Let's have that -- first of all, are

12     there any objections by the Agency to this

13     proposed exhibit?

14                 MR. MILLER:   No, Your Honor.

15                 JUDGE CARETHERS:   Okay.   So let's

16     have that marked as Exhibit 1.   And it's

17     admitted.

18                 (Exhibit 1 was marked for

19     identification and received into evidence.)

20     BY MS. CLARK:

21  Q.  So Ms. Brown, drawing your attention to page

22     2.   And at the top of page 2 you discuss your

23     condition.   And you say it's chronic and

24     intermittent.   Can you explain, first of all,

25     what was the condition that you have?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

21

1   A.   Hidradenitis suppurativa.

2   Q.   Can you tell me what that is?

3   A.   It's a condition where I have -- I get cysts

4        in different folds and different -- of my

5        various limbs.  And sometimes it can be under

6        more than one limb or affect more than one

7        limb at a time.  When these -- at first it

8        starts with slight irritation, which then it

9        creates in some cases a large cyst that needs

10       medical intervention.

11            Sometimes the cysts drain on their

12       own by expelling whatever's inside, sometimes

13       onto my clothes.  The condition sometimes

14       during flare-ups affects my ability to wear

15       deodorant, which affects my comfort level

16       that I have around people.

17            The condition has debilitating pain.

18       During the times of the flare-ups, something

19       as simple as gravity is my enemy.  Just

20       sitting here with the pull of gravity, the

21       large boils or cysts would be excruciating to

22       where I would -- it would be difficult for me

23       to concentrate on any task without just

24       paying attention to the pain.

25            Basically, when those flare-ups

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

22

1    occur, depending upon where they are or how

2    large they are, sometimes I have to just sit

3    with an elevated arm or an adjusted limb or

4    whatever in order to alleviate some of the

5    pressure and pain caused by the large cysts.

6         It makes it difficult to move.  When

7    I get in a position where some of the pain is

8    alleviated, I want to stay in that position

9    as long as possible because any type of

10   moving or agitation is extremely painful.

11   Pain medicine really isn't something that is

12   suggested because this is a chronic condition

13   that is -- the pain medicine really didn't

14   help me because of the pressure involved.

15   And in some cases until the pressure is

16   alleviated, the pain will not go away.

17        And that's where medical intervention

18   comes into play, to where I would be required

19   to go see my doctor in order to alleviate

20   some of the pressure and the pain so I could

21   function as normal as possible while the

22   flare-up is still decreasing, or going back

23   to normal.

24        And if there are instances in some

25   cases where I have flares in more than one

DEF000415

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

23

1    arm at a time, which happened quite

2    frequently during these issues that I was

3    having with the Agency, if it happens under

4    more than one arm at a time, then of course

5    it's more difficult for me to get around and

6    it's even more painful.

7            And as far as the pain medicine, I've

8    asked my doctor, Dr. Huff, even, for pain

9    medicine, that doctor's office.  And they

10   basically advised against it because I'd be

11   on pain and that medication constantly, and

12   it's a possibility of it being addictive

13   considering the amount and the constant

14   frequency that I would be required to take

15   that pain medicine.

16           So as you can see, just daily

17   functioning with this type of condition

18   because of the pain and the inability to

19   move, stoop, walk, bend, anything that would

20   increase the amount of gravity, the

21   positioning, the pressure, anything.

22           And for you to get a better

23   understanding of how this condition could

24   affect me, is if have a flare-up under one or

25   more arm, if I'm required to just sit in a

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

24

1    particular situation to prevent the pressure

2    from being placed on any type of, you know,

3    sensitive area up under my arm or in between

4    my legs or up under my breasts where these

5    incidents can occur, and have and do, when

6    that happens it can create additional issues

7    with my neck because of course it's not

8    normal to, for long term, to have to sit with

9    an elevated arm or an adjusted -- or a

10   certain way that's unnatural.

11          So when that happens, it can create

12   other issues like neck pain, shoulder pain,

13   different -- different levels of uncomfort

14   (verbatim), depending upon like I said, the

15   -- where it's at, the size, and -- and if

16   it's affecting more than one limb at a

17   particular time.

18          And there is also psychological

19   impact that's associated with this condition,

20   because when I have just the slightest

21   inkling that I might have a flare-up, the

22   anxiety is increased.  And which in turn

23   creates an additional problem for me because

24   now I'm scared that I might have to go into

25   the doctor and get cut, because I'm scared

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

25

1      and afraid that the condition or the flare-up

2      or the particular cyst might get so large to

3      where, you know, I will be immobile.  And it

4      hurts to lay down.  It hurts to sit.  It

5      hurts to just walk.  It just hurts.  And so

6      I'm in a situation of constant debilitating

7      pain as referenced in this FMLA document that

8      my doctor sent.  He said that the pain can

9      be, I believe, debilitating.  If I'm not

10     mistaken, he states that it is unpredictable,

11     and that it will be something that I will

12     deal with, I mean, indefinitely.

13          So this is not something that is

14     temporary, and it's unpredictable.  And in

15     most cases when I'm dealing with increased

16     stress, it causes additional problems for me,

17     additional flare-ups.

18          So as far as the psychological

19     impact, again, the anxiety of a possible

20     flare-up can drive me into a depression.  And

21     I mean, it's a very hard disability to deal

22     with.  Because like I said, there's no way --

23     there's really not very many treatments that

24     have helped for me, you know, in the past.

25     And I've made my -- you know, it really --

DEF000418

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

26

 1      like I said, it really hasn't helped me in

 2      the past, so because of that, it's quite

 3      frightening because I don't know what I can

 4      do other than get cut.

 5          And that's basically the gist of

 6      this.  I'm always getting -- I'm always

 7      getting -- it's just pain.  That's basically

 8      what the condition is.  Mainly pain, anxiety,

 9      depression.  More pain.

10  Q.  I want to talk about a couple of things on

11      page 2.  Did Dr. Huff complete this form for

12      you?

13  A.  Yes.

14  Q.  Okay.  Did he answer the question -- on

15      Question 3 in particular, identifying the

16      functions that you would be unable to

17      perform?  Did he fill that out?

18  A.  Yes.

19  Q.  He did?

20  A.  Yes.

21  Q.  And so he has diagnosed you at Hurley Stage

22      II.  Do you know what Hurley Stage II is?

23  A.  If I can recall from my knowledge, it's once

24      the flare-ups have been -- become more

25      persistent or require more medical treatment.

DEF000419

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

27

1     I believe Stage I is just simple or less

2     frequent flares.

3  Q.  So the flare-ups would come more often; is

4     that correct?

5  A.  During certain times, yes.

6  Q.  All right.  And is this his language here

7     where he says, with flares due to pain and

8     drainage, the patient may be unable to

9     perform all work functions?  Is that his

10    statement?

11  A.  Yes.

12  Q.  Now, does Dr. Huff have a physician

13     assistant?

14  A.  Yes.

15  Q.  And what is her name?

16  A.  I can't recall.

17  Q.  Can I point you to the first page of the

18     document, at the bottom there.

19  A.  I'm sorry, hold on.  Oh, I'm sorry.  I see.

20     I can't read that.

21  Q.  Right next to provider name, Dermatology Inc.

22     The page is marked.  The very first page, I

23     think.

24  A.  Oh, I'm sorry.

25  Q.  That's okay.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

28

1   A.   Lauren -- yes, Lauren Fahey.

2   Q.   Okay.

3               MS. CLARK:   Your Honor, could you

4        hear that?

5               THE WITNESS:   Lauren Fahey.

6               JUDGE CARETHERS:   Lauren Fahey.

7   BY MS. CLARK:

8   Q.   All right.  And did you see Ms. Fahey when

9        you were under Dr. Huff's care?

10  A.   Yes.

11  Q.   And if you go to page 4 of this form, is it

12       Ms. Fahey who signs this form?

13  A.   Yes.

14  Q.   Okay.  Did you speak to Ms. Fahey when she

15       was completing this form on your behalf?

16  A.   No.

17  Q.   Okay.  You provided this to Dermatology, Inc.

18       for completion, is that correct, or did HR

19       provide it to them?

20  A.   I believe I provided this.

21  Q.   Okay.  And then this is the document that

22       came back for you to submit to Human

23       Resources?

24  A.   Yes.

25  Q.   All right.  I also want to note that

29

1      Ms. Fahey, in completing this form, indicates

2      at the bottom of the second page that there

3      could be including -- the symptoms include

4      severe pain to the touch, sinus tracts.  Can

5      you tell me what sinus tracts are, if you

6      know?

7   A.  Basically, I believe it's like the tunneling

8      that connects -- I don't know the medical

9      term, but the -- how I know what it is, is

10     because when you get more than one cyst,

11     sometimes there are channels that connect one

12     cyst to the other.  And what that does is

13     like if I start having a flare-up of one cyst

14     or one area that I may have had an issue with

15     in the past, the sinus tract could cause --

16     could be connected to another cyst that now

17     because this cyst has flared, it causes

18     irritation and it causes another flare.

19         And sometimes because of incisions or

20     scarring, this creates from incisions that

21     I've had in the past, it can create tunnels

22     which, you know, like I said, it affects my

23     flares.  And sometimes like I have had a

24     situation to where practically the entire

25     part of my underarm is swollen or affected.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

30

1       It could be three flares at one time in three

2       different areas under my arm, you know,

3       depending upon -- like I said, the tracts

4       usually it's called.  And that usually

5       happens after increased number of flares.

6              So it's something like that you would

7       get after -- I don't know the exact number,

8       but it isn't something you would get or

9       develop from like one flare that you had

10      incised.  It's something that may occur from

11      several incisions.

12   Q.  I think you've testified so far about some of

13      the things that impacted -- that this

14      condition impacted, but I want to go across

15      and talk about a few others.  Did this

16      condition affect your ability to lift items?

17   A.  Oh, yeah.  I couldn't -- I wouldn't be able

18      to lift.  If I had a flare in my arm, and I

19      couldn't use or support the weight with the

20      other arm that maybe at the time did not have

21      a flare, then yes, it would.

22   Q.  Okay.  And at work were you required to lift

23      things?

24   A.  Sometimes we had files.  At that point I

25      believe we still had paper files in the

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

31

1      office.  Now we're a little bit more virtual.

2      But yeah, there were paper files in the

3      office that we were required to scan and move

4      around.

5  Q.  I think you mentioned that this condition

6      affected your ability to walk; is that true?

7  A.  In some cases, yes, it did.

8  Q.  Okay.  Can you explain that a little bit, how

9      it did that?

10 A.  Well, it's all about the pain and the

11     pressure.  Sometimes the pain can be so

12     agonizing that I wouldn't -- I can't walk or

13     wouldn't want to.  If I put myself, like I

14     said previously, in a particular situation,

15     if there was somebody around that could go

16     get the glass of water for me, that would be

17     ideal.  If there was somebody who I needed to

18     go fix the meal and if I didn't have to move

19     at that particular time during the flare,

20     then I wouldn't want to.

21          So that was the importance of -- one

22     of the main reasons I wanted to go to Indy is

23     because of the support -- I mean, to Tampa,

24     because that's where all my family is,

25     besides my husband.  I wanted to be able to

**DEF000424**

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

32

1   have access to different support, which I

2   didn't in some cases when he wasn't home.

3   There was no one else there that could help

4   me.

5   Q. And so did this impact your ability to dress

6   yourself or bathe yourself?

7   A. Oh, yes.  It affects -- I wouldn't -- if I

8   had to put something over my head to get

9   dressed, I wouldn't be able to do that during

10   flares, no.  I couldn't get dressed.  I

11   couldn't do anything.

12   Q. Going back to Exhibit 1, again the second --

13   bottom of the second page, Ms. Fahey

14   indicates that these cysts could

15   spontaneously drain or need to be surgically

16   drained.

17   A. Yes.

18   Q. In your experience while you were here, did

19   you ever have a cyst spontaneously drain?

20   A. Yes.  I mean, that does happen, yes.

21   Q. And it happened while you were working?

22   A. Yes, yes.  And it has happened frequently.  I

23   mean, going to get a surgical intervention is

24   the last thing that I want to do.  That's

25   because it increases the pain that is already

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

33

1    debilitating, to have someone incise you.

2    And then after that happens, it's still open

3    and the wound is -- it's a wound on top of

4    the cyst now that has to drain and it has to

5    heal.  So, yes.

6  Q.  Okay.  And how did that make you feel when

7    you had a drain -- when there was drainage

8    while you were --

9  A.  It's humiliating.  In the bathrooms, if you

10   know, I mean the regular bathroom, there's

11   stalls and then there's the main mirror and

12   the water with the sinks.  Well, it's very

13   difficult to address an issue that you either

14   can't see -- you know, I have to look in the

15   mirror, so -- I mean, it's just, you know, I

16   have to clean myself up.  And if there was

17   somebody around or that came through the

18   bathroom, that would -- this condition to me

19   is not something that you want to discuss.

20   It's very -- it's nasty.  I mean, for lack of

21   a better word.  And it's not something that

22   you want to share with many people or even

23   have people know, really.  So any time that

24   it was a situation that I might be in a

25   situation where somebody might see me or do

DEF000426

34

1   something, that wasn't a good feeling.  I

2   mean...

3  Q.  Going to what I think is page 3 of this

4   document --

5  A.  Uh-huh.

6  Q.  -- towards the bottom of that document, there

7   was an estimation of frequency of the

8   flare-ups and the duration.  Is that

9   estimation, from what you can see, what you

10   experienced?

11  A.  In the past.  But during this period, after

12   this would have been filled out, it got

13   extremely worse.

14  Q.  Okay.  This period, do you mean starting in

15   or around November 2013?

16  A.  Yes.

17  Q.  Okay.  Until what time?

18  A.  Well, I mean, it just continually increased.

19   I know in May I was practically out of leave.

20   I had to apply for voluntary leave transfer.

21  Q.  May of what year?

22  A.  May of -- I think it's '13.

23           MR. MILLER:  Your Honor, if I

24   could, Ms. Brown has some notes that she's

25   referencing.

DEF000427

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

35

1    BY MS. CLARK:

2    Q.  Are those notes you're referencing or notes

3         you're taking?

4    A.  I'm taking them.

5              MR. MILLER:  You are taking notes,

6         currently?

7              THE WITNESS:  I'm taking notes,

8         yeah.

9              MR. MILLER:  Okay.  Anyway, if

10        she's referencing these notes, I would object

11        to that during her testimony.

12             JUDGE CARETHERS:  Yeah, you

13        shouldn't be referring to -- okay.  I'm going

14        to sustain the objection.  You should not be

15        referring to any notes during your testimony.

16        If you're referring to the ROI, that's fine,

17        if you're directed to by the representative.

18        But you shouldn't be referencing anything

19        while you're testifying.

20             THE WITNESS:  I understand, sir.

21             MR. MILLER:  Thank you.

22    BY MS. CLARK:

23    Q.  All right.  Do you recall if you still had

24        sick leave in December of 2013?

25    A.  I may have had a little sick leave, because I

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

36

1    know in January of that year, of the

2    following year, I requested voluntary leave

3    transfer because at that point I was out of

4    leave balance.

5           MS. CLARK:  Okay, Your Honor,

6    we're going to go to what is marked in our

7    Exhibits as Exhibit 4.  Unfortunately, it's

8    not Bates-stamped, but it's the application

9    to become a leave recipient under voluntary

10   leave transfer.

11          JUDGE CARETHERS:  Okay.  And are

12   you going to have it admitted?

13          MS. CLARK:  Yes, Your Honor.

14          JUDGE CARETHERS:  Let's do that

15   now.  Is there any objection to this exhibit,

16   Agency?

17          MR. MILLER:  No objection, Your

18   Honor.

19          JUDGE CARETHERS:  Okay.  This

20   document is admitted as Exhibit 2.  Can we

21   have this marked by the court reporter.

22          (Exhibit 2 was marked for

23   identification and received into evidence.)

24   BY MS. CLARK:

25   Q.  Okay, Ms. Brown, if you can take a look at

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

37

1      that document, or those two documents.

2   A.  (Witness complies).  Yes.

3   Q.  All right.  Now, by this point in time -- and

4       this is filled out, looks as if it was filled

5       out December 30, 2013.  You had already been

6       approved for FMLA; is that correct?

7   A.  Yes.

8   Q.  All right.  And do you recall when that

9       approval started, actually?

10  A.  Between June 13th and 19th.

11  Q.  Okay.  Thank you.  And so were you approved

12      for intermittent leave?

13  A.  Yes.

14  Q.  Why did you fill out this form?

15  A.  Because at this time I knew my leave was

16      being reduced, or I didn't have any.  And it

17      may have been a time where -- well, actually

18      this was a time where I was having a flare, a

19      pretty bad flare.  So I needed to take time

20      off.

21  Q.  Okay.  Do you recall who you turned this form

22      in to?

23  A.  I believe I gave it to my supervisor at the

24      time, Colleen Curtsy (phonetic).

25  Q.  Uh-huh.  Okay.  And what did she say in

DEF000430

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

38

1       response to receiving this?

2   A.  That she would take it to the front office.

3   Q.  Okay.  Now, the second page, is that a donor,

4       someone who donated leave to you?

5   A.  I don't think I've ever seen this form,

6       but...

7   Q.  You can take a moment and look at it.

8   A.  (Witness complies).  Yes, that's what it

9       appears to be, yes.

10  Q.  Okay.  So you did receive some donation of

11      leave at this time?  Is that what it appears?

12  A.  Yes.

13  Q.  Did you ever have any discussion with James

14      Dean regarding this request?

15  A.  I had -- once I returned from my leave in

16      January, I was assuming -- or I believe I was

17      told that I received donated leave.  So I was

18      assuming that it would be on my next check.

19      And when it was not, then yes, I did have a

20      discussion with Mr. Dean about why it was not

21      on my pay stub.

22  Q.  And did he tell you why?

23  A.  He told me at the time he did not know if I

24      wanted to use the donated leave.

25  Q.  Did you clarify that for him?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

39

1   A.   Yes.  I told him it was very important that I

2        be able to use the leave because I was

3        receiving leave without pay for several --

4        for some period.  So it was very important

5        that I receive the pay.  Why would I choose

6        to receive no pay over voluntary -- other

7        than leave that was donated to me.

8   Q.   Okay.  Did that ever get corrected?

9   A.   Yes, it did.

10  Q.   And how long did you have to wait for that

11       correction?

12  A.   I believe it may have been like the following

13       paycheck, if I'm not mistaken.

14  Q.   All right.  Was there a time that you filed

15       for an application for hardship transfer?

16  A.   Yes.

17  Q.   Do you remember approximately when that

18       occurred?

19  A.   January 17th.

20  Q.   Okay.  And who did you submit that to?

21  A.   Sonya Wilson.

22  Q.   Did Ms. Wilson have a discussion with you

23       regarding that?

24  A.   Basically I discussed with her -- what did we

25       discuss.  That was when I gave her my FMLA

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

40

1     paperwork along with the -- I gave her the

2     FMLA paperwork that is right here, Exhibit 1,

3     along with the hardship transfer request.

4     And there was a letter that I included that

5     was addressed to Dr. -- I mean, to Director

6     Stephens that referenced that I had a chronic

7     health condition that I was FMLA approved

8     for.

9          I also mentioned to Mr. Stephens in

10    that letter that my situation was impacting

11    my career, my ability to do my job.  It was

12    impacting my financial situation, and that

13    being with my family in Florida was very

14    important to me.  Or that was necessity --

15    that was a necessity.

16         I mean, that was all expressed in the

17    letter that I gave to Dr. -- well, actually,

18    I gave Sonya, with the FMLA paperwork and the

19    hardship transfer.

20  Q.  All right.

21  A.  And I remember during the discussion that she

22    said she could not use my FMLA paperwork

23    unless she got my approval, in which I told

24    her at the time that I was giving my approval

25    for her to submit my FMLA paperwork along

DEF000433

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

41

1  with the hardship transfer and the letter

2  that was addressed to Dr. Stephens.  I mean,

3  Mr. Stephens.  I'm sorry.

4  Q.  Now, this first request for hardship

5  transfer, did you get a response?

6  A.  Initially the response I received from

7  Ms. Lima was verbal.  It was -- she requested

8  that I meet with her in order to discuss the

9  decision of my hardship request.  I met with

10  her in her office.  And at the time in her

11  office, she explained to me that my request

12  was being denied due to my performance and

13  due to my leave balance.

14      I then asked Ms. Lima, I said how

15  could my leave balance be an issue when I

16  have FMLA and my leave balance is protected.

17  And I asked her, I said as far as my

18  performance is concerned, I recently had a

19  performance evaluation that was fully

20  successful.  I was promoted in September, I

21  believe, or October, that previous year,

22  okay.  I was promoted.

23      And then I asked her, I said, I was

24  recently promoted, and I'm telling you that

25  the reasons that I'm having problems with my

42

1       career at this point was because of my

2       disability and the issues that my disability

3       is causing me.  And that is the reason why I

4       requested the hardship transfer.

5              I went on to explain to her, she

6       basically said oh -- I believe she took -- I

7       don't know.  I was just basically trying to

8       understand why I was being denied for two

9       reasons that I feel were inappropriate and

10      not correct.

11             I explained about my condition being,

12      you know, a disability and that ADA would be

13      something that should be considered in this

14      situation.  And I was -- basically she

15      disregarded my -- she acted as if my

16      condition, my disability, did not matter.

17             And then she proceeded to act like I

18      did not matter, once she took offense that I

19      was questioning her about the reason for the

20      denials.  Because I did not think that that

21      was a valid reason, attendance and

22      performance.  So I asked her, you know, and

23      basically, she took it as --

24             MR. MILLER:  Your Honor, I object

25      to the -- she has no idea how Ms. Lima took

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

43

1   any statements.

2          MS. CLARK:   Your Honor, she's

3   actually testifying to her reaction, her

4   reading of Ms. Lima while she was in the

5   room.

6          JUDGE CARETHERS:   I'm not going to

7   sustain the objection.  She's giving her

8   presence.  Go ahead, you may continue.

9          THE WITNESS:   Okay.  So when I'm

10  in the office with her, I'm asking Ms. Lima,

11  I'm like why am I being denied because of my

12  performance when I was recently promoted.

13  Why am I being denied because of attendance

14  when I'm on FMLA.

15         And she went and she basically -- she

16  got offended because I was questioning her

17  authority, which I believe that's how she

18  felt.  And then that's where she made the

19  statement that just because you have a

20  disability -- and that was made after I went

21  on to tell her, well, look, I have a

22  disability.  I need to get home to my family.

23  I need to be able to seek the type of

24  treatment that I feel I deserve.  And that

25  was something that she was unwilling to

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

44

1    comprehend.  And this was all done verbally.

2         Once I went back to my desk, I sent

3    an e-mail to Ms. Lima.  I believe it was the

4    same day or it may have been the following

5    day.  I sent an e-mail to Ms. Lima, and I

6    said, Ms. Lima, can you please provide me

7    documentation in writing of my denial, of my

8    hardship denial.  And I even put in there,

9    for my health.  Because she was, to me,

10   disregarding me, my condition.

11        And Judge, to me, that's relevant

12   during some of these proceedings where she

13   just mentions that I have a skin condition or

14   a skin disease, I might say, where she

15   mentions this, a skin condition.  So I felt

16   like they did not even give me -- they

17   treated me like I didn't have a condition,

18   and they didn't even give me a chance to

19   prove it.  Even after I asked.

20        But in that situation, not only after

21   I requested in writing the reasons for -- the

22   reasons for my denial for my health, Ms. Lima

23   responded with denied in all caps in the

24   subject line.  And that was so demeaning and

25   humiliating to me.  And considering how

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

45

1      important and how sensitive this situation

2      was to me, for her to put denied in all caps

3      was a spit in the face.  I felt like I meant

4      nothing.  I wasn't human.

5                  MS. CLARK:  Your Honor, before we

6      go further with the testimony, I want to

7      reference in the ROI, Section C-2.  And the

8      Bates-stamp numbers are 202 through 241, in

9      the ROI.

10     BY MS. CLARK:

11  Q.  Ms. Brown, if you could -- some of these

12     documents are among Section C-2.  And so I

13     want to ask first and foremost, is your

14     letter to -- you might have to turn the

15     page -- is your letter to the director making

16     a request for the hardship transfer among

17     these documents?

18  A.  Yes.

19  Q.  Can you see the Bates-stamp number at the

20     bottom there?

21  A.  The number at the bottom?

22  Q.  Uh-huh, yeah.

23  A.  00205.

24  Q.  Yeah, is that -- that's your letter to them?

25  A.  Yeah.  That was the letter I issued on

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

46

1       January 17th.

2   Q.  All right.  And were there any documents that

3       you submitted with that?

4   A.  It was the hardship transfer form --

5   Q.  Okay.  And do you see --

6   A.  -- and my FMLA paperwork.

7   Q.  Okay.  And do you see the transfer form?  I

8       think it's --

9   A.  Yes.

10  Q.  Is that the transfer form?

11  A.  Yes.

12  Q.  Okay.  And the FMLA paperwork is what you

13      also submitted?

14  A.  Yes.

15  Q.  Before you -- yeah.  Can you reference the

16      bottom of the page where the transfer form

17      is?  I think it's right there, with the

18      Bates-stamp numbers.

19  A.  Oh, I'm sorry.

20  Q.  Yeah.

21  A.  I'm sorry.  00207.

22  Q.  00207.  Okay.  And do you see the paperwork,

23      the FMLA paperwork as part of this?  It may

24      not -- just check and see if you see it.

25  A.  No.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

47

1  Q.  All right.  And then was there a separate

2      memo that was sent or that was explaining

3      what your condition was?

4  A.  Yes.  That was part of my second request for

5      medical reassignment.

6  Q.  All right.  We'll come back to that.

7              MS. CLARK:  I'm going to, now,

8      Your Honor, I'd like to point you to

9      Complainant's Exhibit 5.  And it's our --

10     it's marked denial of hardship transfer

11     request e-mail.

12             JUDGE CARETHERS:  I have it.  Are

13     you going to admit this?

14             MS. CLARK:  Yes, we'd like to.

15             JUDGE CARETHERS:  Okay.  Is there

16     any objection to this, Agency?  Agency, is

17     there any objection to this?

18             MR. MILLER:  No, Your Honor.  No

19     objection.

20             JUDGE CARETHERS:  Exhibit 3 is

21     admitted.  Can we have this marked as

22     Exhibit 3, and it's admitted.

23             MS. CLARK:  Yes, Your Honor.

24             (Exhibit 3 was marked for

25     identification and received into evidence.)

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

48

```
 1       BY MS. CLARK:
 2   Q.  Ms. Brown, you earlier testified regarding
 3       your e-mail response from Ms. Lima.  Is that
 4       the document reflecting the e-mail response?
 5   A.  Yes.
 6   Q.  Okay.  And you indicated something about the
 7       denial being in all caps.  Is that in the --
 8   A.  Yes.  It's in the subject line.
 9   Q.  Okay.  When you submitted this request, did
10       you talk to Ms. Sonya Wilson on this first
11       request?
12   A.  Basically when I went down to her office with
13       my FMLA paperwork, the letter from Ms. -- to
14       Mr. Stephens -- yes, I was trying to explain
15       to her what I was basically trying to do;
16       that I wanted to transfer to Florida and it
17       was related to my medical condition.
18   Q.  Okay.  Did you say you wanted an
19       accommodation?
20   A.  I don't remember saying I wanted an
21       accommodation.  I did tell her that I was
22       having medical problems.  I was having issues
23       with my disability that was affecting my job,
24       and that I needed -- my request was -- that I
25       felt that would help me, would be to transfer
```

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

49

```
 1        to St. Petersburg Regional Office to be with

 2        my -- close to my family.

 3   Q.   Okay.  Do you know if she understood that to

 4        be a request for an accommodation?

 5                  MR. MILLER:  Your Honor, I object.

 6        She has no idea what Ms. Sonya Wilson

 7        believed at that time or what she thought.

 8                  JUDGE CARETHERS:  I'll sustain the

 9        objection.  Do not answer that question.

10        Next question.

11                  MR. MILLER:  I'm sorry.  Was that

12        sustained, that objection?

13                  JUDGE CARETHERS:  That was

14        sustained, that objection.  She doesn't know

15        whether or not the person understood it to be

16        a reasonable accommodation.

17        BY MS. CLARK:

18   Q.   Did Ms. Wilson ask you whether you were

19        requesting an accommodation?

20   A.   I don't remember her asking.  Basically, the

21        only thing Ms. Wilson -- when I explained to

22        her my problem, I explained to her what I was

23        trying to accomplish, and that I needed a

24        hardship transfer, because that's what I

25        thought it was based on my knowledge.  That
```

50

1    it was -- I was having a hardship.  So I

2    figured, okay, well, it was a hardship

3    transfer, and I wanted to prove the type of

4    hardship I was having, and that was the

5    letter and my FMLA.

6         So I felt at the time that I

7    submitted all the pertinent or necessary

8    information, I mean, for a hardship.  But no,

9    she didn't -- I don't think she mentioned

10   what it was.  She told me that it -- that my

11   request that I was making and with the

12   doctor's request and with the FMLA paperwork,

13   she said that that wasn't a hardship request.

14   She did -- I remember her saying something

15   like my request wasn't appropriate.  And I'm

16   like -- but she never -- she only asked me if

17   I wanted -- and then she asked me if I wanted

18   to submit my medical documentation.  She had

19   to get approval from me.  So that's where I

20   approved that she can submit my FMLA

21   paperwork with the hardship transfer.

22        So I just -- I felt like she wasn't

23   giving me any information.  She didn't

24   provide me any -- she didn't feel like my

25   reasoning was relevant, or that it applied.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

51

1    Q.   Okay.  Did you ask her to explain anything

2         regarding a hardship transfer request

3         process?

4    A.   I believe I asked her if it wasn't a hardship

5         then what was it.  And I don't believe she

6         gave me clarification.

7    Q.   Do you recall if you ever spoke to Mr. Dean

8         about your request?

9    A.   When I initially submitted my request, I

10        submitted it to Mr. Dean.  But he gave it

11        back to me, saying that my -- that's when he

12        gave it back to me and said that my -- Sonya

13        told him that the FMLA document wouldn't

14        suffice.  Or he told her that I needed

15        medical documentation or he couldn't

16        submit -- I remember now.

17             She couldn't submit -- she couldn't

18        use my FMLA paperwork because it was in a

19        different file.  That's not something that

20        she could take upon herself.  She had to get

21        my approval in order to use my medical

22        information from another request for this

23        particular request.  And then that's when I

24        went down -- after he gave me back the

25        documents, I went and took it to Sonya.  And

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

52

1           that's when she asked me -- I gave her my

2           approval to submit the FMLA paperwork along

3           with the hardship transfer request.

4    Q.    Okay.  And after you gave her the approval,

5           did she indicate whether you needed to submit

6           any additional documentation, medical

7           documentation?

8    A.    No.  No.

9    Q.    Okay.  And did she ever -- all right.  After

10          you -- I think that's all.  Well, with regard

11          to Exhibit 3, I just have one other question.

12          After you received the e-mail, did you have

13          any further discussion with Ms. Lima?

14   A.    No, that was it.  I didn't get any type of

15          information about what I could do, how I

16          could proceed, if it was even possible for me

17          to get to Florida, what my other options

18          were, if I could -- nobody told me anything.

19          This was the only response I received from my

20          hardship transfer request.

21   Q.    All right.  Was there a time when -- let's

22          see.  I want to go to Complainant's

23          Exhibit 7.

24                  MS. CLARK:  And, Your Honor, it is

25          a February 7, 2014 letter from Dr. Huff.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

53

1     JUDGE CARETHERS:  Are you going to

2     be admitting this?

3               MS. CLARK:  We'd like to.

4               JUDGE CARETHERS:  Okay.  Agency,

5     any objection to this?

6               MR. MILLER:  No objection.

7               JUDGE CARETHERS:  Can we have this

8     marked as Exhibit 4, and it's admitted.

9               (Exhibit Number 4 was marked for

10    identification and received into evidence.)

11    BY MS. CLARK:

12    Q.  Was this a document that you submitted with

13        the first hardship transfer request?

14    A.  No.  This was submitted with the medical

15        reassignment request.

16    Q.  Okay.  So do you remember when you submitted

17        a request for reassignment due to medical

18        reasons?

19    A.  February 7th.

20    Q.  February 7th, okay.  And to whom did you

21        submit that request?

22    A.  I went through the chain of command.  I think

23        I gave it to my supervisor at the time, Jim

24        Dean.  I requested that it go through, I

25        guess, Ena Lima to -- let's see.  Yes, Ena

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

54

1        Lima to Michael Stephens.

2    Q.  Are you referencing something in the ROI,

3        Ms. Brown?

4    A.  Yes.

5    Q.  Can you tell us what page that is?

6    A.  0202.  This is the memorandum that I

7        submitted with this letter from Dr. Huff.

8        And at the top of the letter it says, through

9        Ena Lima, service center manager.  And it

10       says Coach Jim Dean.  And he was the one that

11       I actually handed it to.

12   Q.  Okay.  Did Ms. Lima talk to you regarding

13       that request?

14   A.  No, she did not.

15   Q.  Did she indicate whether she needed any

16       additional medical documents?

17   A.  No, she did not.

18   Q.  I just want to take one step back before you

19       submitted this.  When you got the denial to

20       the hardship transfer, did anyone tell you

21       that you had to submit a VA Form 0857 or any

22       document to request a reasonable

23       accommodation?

24   A.  No.

25   Q.  Okay.  So then you submit this letter which

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

55

1       we've been talking about, which is Exhibit 4.

2   A.  Yes.

3   Q.  And do you know if Director Stephens actually

4       saw this document?

5   A.  I don't know.

6   Q.  Did you ever hear from Director Stephens?

7   A.  No.  But when Ena Lima responded, she CC'd

8       everybody -- well, the top management.  So I

9       knew that he was aware.

10  Q.  So with regard to this letter, I just want to

11      go through it for a moment.  Does the letter

12      from Dr. Huff state your medical condition?

13  A.  Yes.

14  Q.  And does it indicate in here that it's a

15      disorder of the skin?

16  A.  Yes.

17  Q.  Okay.  Does it state that it's severe and

18      debilitating pain that you're experiencing?

19  A.  Yes.

20  Q.  Does it request a transfer to help treat your

21      disability?

22  A.  I'm sorry.  Repeat that, please.

23  Q.  Does it request a transfer to help treat your

24      disability?

25  A.  Yes.

DEF000448

56

1   Q.   Does it indicate that the disability is

2        chronic and unpredictable?

3   A.   Yes.

4   Q.   Does it indicate that there are secondary

5        bacterial infections and scarring that causes

6        this debilitating pain?

7   A.   Yes.

8   Q.   And does it indicate that there are

9        psychological impacts from the condition?

10  A.   Yes.

11  Q.   Does it also indicate at the bottom that if

12       there are additional questions or concerns,

13       to contact his office?

14  A.   Yes.

15  Q.   And one thing, just before that last

16       sentence, does Dr. Huff express an opinion in

17       here that relocation was essential to the

18       control of your disease?

19  A.   Yes.  He stated that he believed having close

20       support of my family as I'm confronted with

21       these medical challenges associated with

22       hidradenitis would be beneficial, yes.

23  Q.   Okay.  So this is now the second request, and

24       now you've gotten a letter -- in addition to

25       the FMLA form you now have this additional

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

57

1      letter from Dr. Huff, even inviting

2      additional questions and concerns --

3   A.  Yes.

4   Q.  -- to be directed to him?

5   A.  Yes.

6   Q.  Did you receive a response once you submitted

7      this request for reassignment due to medical

8      reasons?

9   A.  Yes, I did.

10  Q.  Okay.  And from whom did you receive it?

11  A.  Ena Lima.

12  Q.  What did she say?

13  A.  Ms. Lima responded by -- basically she felt

14     it necessary to already state that, look, we

15     already denied you one time for your hardship

16     request.  She found that necessary.  And she

17     stated the reason.

18          She even stated in this letter that

19     in my response that I stated that I have a

20     serious chronic medical condition that

21     necessitates regular medical intervention.

22     She referenced that.  So she knows it.  She

23     knows I'm having these problems and the type

24     of intervention that may be necessary.

25          And then she stated that I submitted

58

1    medical evidence that indicated that I suffer

2    from a dermatological disorder that is

3    chronic and unpredictable in nature.  So

4    again, she knows that it's chronic and it is

5    unpredictable.  And he further stated that

6    relocation to Florida is essential to

7    controlling your disease, which when I

8    heard -- when I read that disease,

9    considering that she CC'd several people that

10   were not -- did not need this information

11   about me, my condition, me personally.  I

12   mean, I don't understand why they needed this

13   particular information.  I felt that it was

14   to humiliate me because she's saying that I

15   have a skin condition and that it was a

16   disease.

17        I don't know very many skin diseases,

18   but the ones that I do, it's pretty bad.  I

19   mean, I can think of Legionaires, I can think

20   of any other disease that somebody may have

21   that's not -- that could probably be

22   something contagious.  Who knows.

23        But I felt like that's where she was

24   leading.  It was meant to humiliate or

25   embarrass me.  I also feel that in this

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

59

1    letter, like I said, she CC'd several people,

2    and one of the people being Mr. Stephens at

3    the time, the assistant director, my coach,

4    another assistant director -- no, assistant

5    service center manager, both -- two assistant

6    service center managers, she CC'd on this

7    letter stating that I have a skin disease.

8         And then she went on to say that --

9    she stated that she refused my hardship

10   because I was failing to meet requirements of

11   my performance standards.  And she also said

12   that if I needed an accommodation due to

13   disability or workplace barrier that

14   precludes me from performing my essential

15   duties of my position, you may request the

16   Form 08578.

17        Judge, when I saw that, I said to

18   myself, so they're saying they want me to say

19   I can't do my job.  That's not -- that's what

20   I took when I read this.  I was like that's

21   not helping me because I never said I

22   couldn't do my job.  Basically what I said

23   was during certain situations and flares, I

24   had difficulty, and there were certain things

25   that they could do or that they could me with

60

1    that could basically help alleviate or reduce

2    some of those barriers.  Or, you know, I

3    mean, or some of the problems that I was

4    having.  But there was nothing that was

5    preventing me from doing my job.

6          So to me, that -- she didn't state

7    anywhere in there -- it said Dr. Huff failed

8    to demonstrate that you are unable to perform

9    your assigned duty.  So that's where she was

10   going with that.  She basically was saying

11   that well, because he didn't say you can't do

12   your job, then, oh, well.  And if you feel

13   like you can't do your job -- this is how I

14   interpreted this, Judge.  I interpreted it as

15   if you can't do your job, then fill out the

16   0857a.

17         Nowhere in this letter or this

18   response did she state that my -- what my

19   medical evidence was missing.  And the reason

20   that I felt like okay, well, what do you

21   mean, it doesn't say I can't do my job.  I

22   never said that.  There was never -- so I

23   didn't understand how -- this didn't help me

24   at all.  It didn't give me any type of appeal

25   rights.  It didn't tell me what else I could

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

61

1     get from my doctor.  It didn't tell me if

2     there was any other accommodations that

3     possibly could help me.  It didn't tell me

4     anything.

5           MS. CLARK:  Just for purposes of

6     the record, Your Honor, Ms. Brown, are you

7     reading from the ROI?

8           THE WITNESS:  Yes.

9     BY MS. CLARK:

10   Q.   Okay.  And this is the document that's from

11     Ms. Lima to you?

12   A.   Yes.

13   Q.   Dated -- what's the date?

14   A.   February 10th.

15   Q.   And what are the Bates-stamp numbers on that

16     document, please?

17   A.   00203.

18   Q.   To?  What's the next page?

19   A.   00204.

20   Q.   All right.  Thank you.

21   A.   And as you see --

22           JUDGE CARETHERS:  Before you go

23     any further -- I'm sorry to interrupt.

24     Before you go any further, Ms. Clark, could

25     you please just tell me the location of

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

62

1  Dr. Huff's letter that she attached to the

2  request?

3  MS. CLARK:  Yeah, I think we just

4  entered that as Exhibit 4, already, Your

5  Honor.

6  JUDGE CARETHERS:  Okay.  Thank

7  you.

8  BY MS. CLARK:

9  Q.  Ms. Brown?

10  A.  Okay.  I lost my train of thought.

11  Q.  Was there a time that in speaking with

12  Ms. Lima, did you ask if there were any -- if

13  the VA had any procedures for reasonable

14  accommodations?

15  A.  There was -- because I didn't feel like I was

16  receiving information, all of my requests

17  were in writing.  And I did not receive any

18  type of any helpful information, like I said,

19  explaining to me any appeals.  So you

20  understand, I felt like maybe -- I wasn't

21  getting any help from them.  They weren't

22  providing me any information that I felt like

23  could help me get to Florida.

24  This type of response, Judge, is

25  all I got from them, just like the denied in

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

63

1    all caps.  All of my requests were in

2    writing, and I felt that the professional

3    manner would be for them to respond to me

4    with my appeal rights at least, or at least

5    explain to me what I need to do.  But because

6    I didn't get that, I did request, I believe

7    it was -- I requested their transfer

8    procedures.  I did request that.  And I had

9    that in the meeting with Sonya, where I

10   pointed out to her -- well, that was during

11   separate -- that was the reasonable

12   accommodation request.  But I did, I did

13   request the transfer policies and procedures

14   from Ms. Lima, yes.

15   Q.   Okay.  And did she ever provide you with the

16        transfer policies and procedures?

17   A.   She -- yes, she did.

18   Q.   Okay.  And when did she do that?

19   A.   I don't remember the date.

20   Q.   And did you review those transfer policies

21        and procedures to see if there was anything

22        that you had not submitted to her?

23   A.   Basically, it did not tell me too much about

24        it.  I mean, that paperwork could not tell me

25        what was missing from my medical

64

1    documentation.  Basically what that

2    information told me is that a transfer for --

3    in my situation or something similar to my

4    situation would be relevant.  And that is

5    something that I pointed out to Ms. Wilson in

6    a later meeting that I had.

7         Once I was provided that

8    documentation, I pointed out to her that a

9    hardship transfer does -- there was a medical

10   clause under a hardship transfer that could

11   have been applied in my situation.  And I

12   pointed that out to her.  And she went on to

13   state, well, maybe you just need to try it

14   again.  Or I mean, she did not tell me

15   what -- nobody was telling me what to do.

16        I was fishing, Your Honor.  I mean,

17   Judge, that's all I was doing.  I was trying

18   to get to Florida.  And I don't think -- I

19   think they misunderstood the importance of

20   and how dire the situation was to me.  And I

21   even put on here at the bottom of the letter

22   -- oh, no, that was in January.  I'm sorry.

23   Q.  Which letter are you speaking of now?

24   A.  That was the first letter I gave to

25       Mr. Stephens.  I even explained to him how

DEF000457

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

65

1     important my job is to me and how performing

2     successfully is very important.  So I

3     explained -- all this was explained to

4     everyone there.  So for them to say that they

5     were going to deny me because of something

6     like my performance doesn't make sense to me.

7  Q.  Okay.  Ms. Brown, did you find that Ms. Lima

8     was helpful in this process?

9  A.  No.

10  Q.  Can you tell me how her reaction to you

11     impacted you?

12  A.  It drove me into a deep depression.  And it

13     made me feel hopeless.  To be honest with

14     you, it brought back memories of issues that

15     happened with my mother when she had similar

16     problems and before she passed away.  She was

17     trying to get home to Florida.  This is not

18     the same situation, but it was similar.

19         I mean, it was emotional, Your Honor,

20     extremely.  At certain points I shut down.  I

21     didn't want to do anything.  I even explained

22     that to my therapist when I went to see him

23     in February, that I basically -- I'm shutting

24     down.  I'm -- I feel hopeless.  I'm in deep

25     despair.  My meds weren't working the way

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

66

1      they should.  I was in a very -- I was in a

2      very low desperate place.

3   Q.  Did you have any flare-ups during this

4      period?

5   A.  Yes.

6   Q.  Can you describe those flare-ups, please?

7   A.  During these periods that I was being -- what

8      I felt mistreated or at least not taken -- or

9      at least my -- what I felt is my situation

10     and my condition was being totally

11     disregarded and dismissed, I was having

12     increased flares during that time.

13           During that time, I remember having

14     more than one under both arms during certain

15     times.  And that was the worst that it has

16     ever been where I had multiple flare-ups in

17     multiple locations.  So the aggravation and

18     the stress, it impacted my disability and

19     the -- mentally and physically.

20  Q.  Do you recall, shortly after the denial of

21     this reassignment, whether you had any issues

22     raised with you regarding your FMLA balances?

23  A.  There were no issues, no, because I had an

24     FMLA balance.  I had balance -- I had a large

25     balance of FMLA leave.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

67

1   Q.   So you had leave that was still available to

2        you?

3   A.   For FMLA, yes.

4   Q.   Okay.  Was there a time that you were -- that

5        you had to work on certification testing?

6   A.   There was a time that -- yes.  When I was up

7        for -- I'm trying to think, during what time

8        period that was.  Had to be in 2014, yes.

9        And it was -- but I was up for certification,

10       yes, with all the peers.  So everybody that I

11       started with.  Yes, there was a

12       certification test during this time or

13       sometime during this time.

14  Q.   Did your disability impact at all your

15       ability to meet the skills testing?

16  A.   I did explain to numerous people that my

17       disability was impacting my job and my

18       performance.

19  Q.   Okay.  Did you ever have -- did you receive

20       an e-mail regarding the certification skills

21       test?

22  A.   There were some e-mails that were sent out to

23       different -- I mean, to the entire RO

24       basically telling everybody who qualified to

25       take the test, or -- and then after everybody

**DEF000460**

68

1      passed the test, who passed the test.  So

2      yeah, there were e-mails sent out to the RO.

3   Q.  And did that have an impact on you?

4   A.  Yes.  It was humiliating, because I was

5      not -- it was a few months prior that I was

6      just moved to a new team that they had

7      started using that data.  And I believe it

8      only consisted of a few months, which they

9      decided to use that in order to determine

10     that I wasn't meeting or able to take the

11     certification test.

12          But again, that was only from after

13     being moved from one team to another and I'd

14     only been on the new team for about

15     three months maybe, if I'm not mistaken.

16          MS. CLARK:  Your Honor, we'd like

17     to admit one of the e-mails that Ms. Brown is

18     testifying about.

19          JUDGE CARETHERS:  Where exactly is

20     it?

21          MS. CLARK:  It is under

22     Complainant Exhibit 9.

23          JUDGE CARETHERS:  Okay, hold on a

24     second.  Exhibit 9.  And it's an e-mail of

25     congratulations to certification test

69

1    passers.  Is that the one?

2              MS. CLARK:  That's correct, Your

3    Honor.

4              JUDGE CARETHERS:  Is there any

5    objection to this by the Agency?

6              MR. MILLER:  No, Your Honor.

7              JUDGE CARETHERS:  It is being

8    marked as Exhibit 5 by the court reporter and

9    it's admitted.

10              (Exhibit 5 was marked for

11    identification and received into evidence.)

12    BY MS. CLARK:

13  Q.  And is this one of the e-mails you were

14    discussing earlier?

15  A.  Yes.

16  Q.  Ms. Brown, were you required to do mandatory

17    overtime?

18  A.  Yes.

19  Q.  Can you explain why that was a requirement

20    for you?

21  A.  The Agency has had a backlog of claims for a

22    while now.  So one of the -- I guess one of

23    the things that the Agency is doing to try to

24    reduce that backlog is to implement -- or

25    that they did do, is to implement mandatory

DEF000462

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

70

1          overtime.  Which I was required to do

2          20 hours per month.

3     Q.   And was there a time when you sought

4          clarification about how that would work with

5          your FMLA?

6     A.   Yes.  There was a number of occasions where I

7          requested that Mr. Jim Dean, my supervisor,

8          use my FMLA hours in lieu of my mandatory

9          overtime.

10    Q.   Okay.  And what was his response?

11    A.   I asked him if I -- he never responded saying

12         I could not use it.  The only thing I

13         remember was receiving an e-mail later on, I

14         think in March, saying that I'm demanding you

15         to provide me your mandatory overtime hours,

16         which I responded can you please use my FMLA

17         hours.  I believe that's what I responded, or

18         at least verbally.  Or told him to please use

19         my FMLA hours, and I even sent him an e-mail

20         asking my FMLA balance just in case there was

21         some type of discrepancy between the amount

22         of FMLA hours I thought I had and the FMLA

23         hours that they had on their books.  Which he

24         did respond.

25              And I don't know the exact number,

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

71

1    sir, but I know it was over a 100 hours,

2    might have been over 150 at the time.  So I

3    knew I had sufficient FMLA balance to use

4    towards my mandatory overtime.

5                MS. CLARK:  Your Honor, we have

6    the e-mail exchange between Ms. Brown and

7    Ms. Wilson under Exhibit -- Complainant's

8    Exhibit 13.

9                JUDGE CARETHERS:  We are now on

10   Complainant's Exhibit 13, is that correct?

11               MS. CLARK:  Yes, Your Honor.

12               JUDGE CARETHERS:  Okay.  Great.

13   Are you planning to have this admitted?

14               MS. CLARK:  We would like to have

15   this exhibit admitted.  I'm now presenting it

16   to the Agency.

17               JUDGE CARETHERS:  Let me know if

18   you have any objection by the Agency.

19               MR. MILLER:  No objection, Your

20   Honor.

21               JUDGE CARETHERS:  Okay.  Can we

22   have this marked as Exhibit 6, and it's

23   admitted.

24               (Exhibit 6 was marked for

25   identification and received into evidence.)

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

72

1       BY MS. CLARK:

2    Q.  Ms. Brown, you can take a moment and review

3        the e-mail exchanges.

4    A.  (Witness complies).  Yes.

5    Q.  Ms. Brown, this e-mail exchange happened in

6        March of 2014, correct?

7    A.  Yes.

8    Q.  But you had been on FMLA since the previous

9        summer, right?

10   A.  Yes.

11   Q.  So were you required to do mandatory overtime

12       in June, July, August, of 2013 through

13       December, 2013?

14   A.  I can't remember exactly the dates, but I

15       believe I was.  And -- I believe so.  Yes.

16   Q.  And did you receive any kind of e-mails from

17       anyone regarding your mandatory overtime?

18   A.  No.

19   Q.  During that time period?

20   A.  No.

21   Q.  Were there any problems scheduling your

22       mandatory overtime during that time period?

23       Prior to 2014?

24   A.  No, there was no problem.

25   Q.  And had you asked prior to 2014 to apply your

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

73

1        FMLA to the mandatory overtime?

2    A.  Not that I recall.

3    Q.  Do you know how much overtime you were

4        requested to work in 2013?

5    A.  I believe it's been the same 20.

6    Q.  Same 20 hours?

7    A.  Yes.  Yeah, it's 20 hours.

8    Q.  So prior to 2014, you were able to -- with

9        the condition, you were able to still work

10       your mandatory overtime?

11   A.  It was required, yes.

12   Q.  Okay.  So in 2014, when these e-mails were

13       occurring, was there a reason why you were

14       asking to have your FMLA applied here?

15   A.  Yeah.  During this time, I was experiencing

16       increased time off, or leave without pay.  I

17       was off of work quite a bit.  And that all

18       started in January when I found it

19       necessary -- after I came back from leave and

20       requested the voluntary leave transfer,

21       that's when I evaluated my situation and

22       determined that the transfer would be best

23       after having several weeks off without pay.

24       And I knew that I couldn't continue to rely

25       on others for voluntary leave.  That was not

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

74

1      a long term solution.  So I felt that my long

2      term solution would be to transfer.  So I

3      was...

4  Q.  Okay.  At this point in time, did you ask

5      anyone to explain to you whether you could

6      apply your FMLA hours towards the overtime?

7  A.  Yes.  I asked Jim Dean on a number of

8      occasions.

9  Q.  Okay.  And just for purposes of making sure

10     we're clear on the record about what you mean

11     by that request, does that mean that you

12     would work a regular -- was it 40 hours a

13     week?

14 A.  On the times that I could.  But during these

15     times, I was missing a lot of work.

16 Q.  Okay.  And so you were asking to just --

17     because you were taking FMLA leave for a lot

18     of these time periods, you were asking to

19     apply the FMLA leave to the mandatory

20     overtime also?

21 A.  Yes.  And I remember explaining to Mr. Dean,

22     I said, Mr. Dean, I'm having difficulty

23     working my core hours.  Because of my

24     condition, I'm having trouble working the

25     core 40 hours.  I'm missing days.  I'm

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

75

1      having -- there is really no way that I would

2      be able to work the mandatory overtime.

3      Could you please apply my FMLA leave.  And I

4      never received a clear response.

5   Q.  Okay.  Did you ask if there was anything that

6      prevented the application of FMLA leave hours

7      to the mandatory overtime?

8   A.  Yes.  I sent an e-mail -- it may be here.

9      Let me see.  Yes.  I sent an e-mail to Sonya

10     and to -- I copied my supervisor, Jim Dean,

11     and his assistant coach, Donald Young, at the

12     time, where I stated, "as of March 25th I

13     have not received any written guidance as to

14     how my FMLA should be applied to my mandatory

15     overtime hours or my responsibility as an

16     employee regarding such requests.  I have

17     requested on numerous occasions that my FMLA

18     hours be used in lieu of working mandatory

19     overtime.  This is the information that I

20     received from the Department of Labor site.

21     Please advise me with written documentation."

22   Q.  Did you ever get a response?

23   A.  I did receive a response from Sonya that

24     basically said you have to schedule your

25     leave in order to schedule my OT.  And that's

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

76

1          the only way they're going to apply it, I

2          suppose.  That's from -- I got from her

3          response.

4     Q.   I'd like to direct your attention to the

5          second -- I'll just ask.  Did you receive a

6          reprimand with regard to this overtime issue?

7     A.   Yes.  And I believe I was already asking

8          about how to apply my FMLA hours.  I was -- I

9          had asked already on several occasions.

10         But instead of getting a response of how I

11         was supposed to, you know, use my FMLA hours,

12         if there was anything that I needed to do,

13         instead of receiving a response, I got a

14         proposed reprimand.

15    Q.   Okay.  So just to be clear, before you got

16         the response you were describing earlier from

17         Sonya Wilson about just apply the hours, you

18         received a proposed reprimand?

19    A.   I believe so.

20    Q.   And who did you receive that from?

21    A.   The proposed.  That was -- Donald Young did

22         that.  That was the assistant coach at the

23         time.  I think he was just filling in because

24         my supervisor at the time was out.  So I

25         signed those documents, I believe, with

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

77

```
 1       Mr. Young.

 2   Q.  Okay.  Was the reprimand ever finalized?

 3   A.  Yes.

 4   Q.  It was?

 5   A.  Yes.

 6   Q.  And was there any kind of meeting regarding

 7       the reprimand?

 8   A.  Yes.

 9   Q.  Can you describe that, please?

10   A.  I met with Adam Kinder.  At the time

11       Mr. Kinder was in Ena Lima's position.  He

12       was acting service center manager.  At that

13       time my supervisor, Jim Dean, had been

14       demoted or stepped down, whichever it was.

15       But he was no longer my supervisor.  So

16       Mr. Kinder, he finalized the reprimand.

17            During that meeting I explained to

18       Mr. Kinder that I felt I was being harassed

19       by Ena, that I felt like they were wrongly

20       denying my transfer request.  Because I

21       believe I had two already that I had

22       requested.  I asked him to look into it for

23       me.  I asked him what could I do.

24            Mr. Kinder basically said that we're

25       here, we're past that, we're going to
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

78

1    finalize the reprimand.  And if you have a

2    problem with Ms. Lima, he didn't want to step

3    on anybody's toes.  That's what was explained

4    to me.

5         I explained to him how my condition

6    was affecting me, how I needed to transfer.

7    I explained how this impact -- how I felt

8    like I was being retaliated against.  I

9    explained that -- I basically explained to

10   him everything that was going on and I asked

11   for his help.

12   Q.   When you met with Mr. Kinder -- I want to

13        point you to the first page of what is

14        Exhibit 6.  Had you already had the exchange

15        with Ms. Wilson about the -- what you had

16        found out concerning FMLA interference and

17        retaliation?

18   A.   Had I verbally had?

19   Q.   Well, before the proposed reprimand was

20        finalized, do you recall if you had already

21        had this exchange with Ms. Wilson about what

22        you had found out concerning your protections

23        under the FMLA?

24   A.   Am I able to ask what day was the proposed

25        reprimand?

DEF000471

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

79

1   Q.   Let's see.

2   A.   Or the final?  Is that what you're asking me,

3        the final?

4   Q.   Yeah, the communication in this Exhibit,

5        which is Exhibit 6, on page 2, indicates that

6        you had received a proposed reprimand.  That

7        e-mail is dated March 17th.

8   A.   Okay, so yes.  That was after the proposed

9        reprimand.  After I received the proposed

10       reprimand, yes, I did send a correspondence

11       to Sonya stating that I went on the

12       Department of Labor website.  And I basically

13       copied some text off their website saying

14       that it was unlawful for any employer to

15       interfere with, restrain, or deny the

16       exercise of or the attempt to exercise any

17       right provided by the FMLA.

18            And it also says that it is unlawful

19       for an employer to discharge or discriminate

20       against any individual for opposing any

21       practice or because of involvement in any

22       proceedings related to FMLA.

23            So, yes, I copied that.  And I also

24       copied on that e-mail, required overtime

25       hours not worked by the employee because of

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

80

1        an FMLA qualifying reason may be counted as

2        FMLA leave.  So that was part of my e-mail to

3        Sonya prior to the formal reprimand.

4   Q.   The proposed reprimand becoming final?

5   A.   Before the proposed reprimand became final,

6        yes.

7   Q.   And let me make sure I understand.  That

8        e-mail, which is the first page of Exhibit 6,

9        that was copied to Donald Young and to Jim

10       Dean?

11  A.   Yes.

12  Q.   But do you know if Mr. Kinder received a copy

13       of this e-mail?

14  A.   No, I do not.

15  Q.   Do you know if Mr. Kinder spoke with either

16       Mr. Young or Mr. Dean before finalizing this

17       proposed reprimand?

18  A.   No, I do not.  But I did explain to

19       Mr. Kinder my feelings then that I did

20       provide this information to them regarding

21       how it is unlawful to interfere with FMLA.  I

22       told him that.

23  Q.   Okay.  And that was the day that you met with

24       him that he said he was going to finalize the

25       proposed reprimand?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

81

 1   A.   Yes.

 2   Q.   Okay.  Was there a time when you applied for

 3        a voluntary leave transfer program in or

 4        around May of 2014?

 5   A.   Yes.

 6   Q.   Okay.  And do you know if that was approved?

 7   A.   I believe it was, yes.

 8                  MS. CLARK:  Your Honor, this is

 9        exhibit -- Complainant's Exhibit 14, and it's

10        entitled May 21, 2014, voluntary leave

11        transfer memorandum.  It is not Bates-

12        stamped.

13                  JUDGE CARETHERS:  Are you planning

14        to admit this?

15                  MS. CLARK:  We'd like to.

16                  JUDGE CARETHERS:  Agency, any

17        objection to this?

18                  MR. MILLER:  No objection, Your

19        Honor.

20                  JUDGE CARETHERS:  Can we have it

21        marked as Exhibit Number 7, and it's

22        admitted.

23                  (Exhibit 7 was marked for

24        identification and received into evidence.)

25

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

82

1      BY MS. CLARK:

2   Q.  Ms. Brown, this memo expresses that you were

3       in need of a medical procedure that would

4       require convalescence, a convalescence

5       period.  Do you recall what procedure that

6       was?

7   A.  Yes.  I had a surgical procedure with

8       Dr. Huff.

9   Q.  And was this one of the surgical procedures

10      to alleviate pressure with regard to one of

11      the cysts that you had?

12  A.  It was related to, yes.

13  Q.  You'll need to speak up.

14  A.  Yes, it was related to my condition.

15  Q.  Thank you.  Ms. Brown, was there a time when

16      you needed to recertify for FMLA, if you

17      recall?

18  A.  Not that I recall.

19          MS. CLARK:  Your Honor, we'd like

20      to admit at this time Complainant's

21      Exhibit 16.

22          JUDGE CARETHERS:  You want this to

23      be admitted?

24          MS. CLARK:  Yes, we would.

25          MR. MILLER:  No objection.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

83

1          JUDGE CARETHERS:  Okay.  Can we

2     have this marked as Exhibit 8, and it is

3     admitted.

4          (Exhibit 8 was marked for

5     identification and received into evidence.)

6     BY MS. CLARK:

7  Q.  Ms. Brown, does that refresh your

8     recollection?

9  A.  Yes, it does.

10  Q.  Do you recall if there were any issues

11     concerning recertification at that time?

12  A.  No.

13          MS. CLARK:  If you don't mind, may

14     I have the ROI for a second.  Thank you.

15     Your Honor, at this time we're going to

16     direct Ms. Brown's attention to the ROI at

17     00248.

18          JUDGE CARETHERS:  Okay.

19     BY MS. CLARK:

20  Q.  Ms. Brown, I want to -- now that I've

21     finished up the FMLA discussion I wanted to

22     have with you, I wanted to talk about, again,

23     a request -- did you make another request for

24     transfer due to your health condition?

25  A.  Yes.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

84

1   Q.   Okay.  And you're at 00248 in the ROI.  Can

2        you tell me what document that is?

3   A.   That's a written confirmation of request for

4        accommodations.

5   Q.   Okay.  And what's the date you submitted

6        that?

7   A.   February 24th.

8   Q.   Okay.  And after you submitted that document,

9        did you receive any kind of feedback from

10       anyone?

11  A.   After I submitted this documentation, the

12       only feedback I remember receiving was an

13       e-mail from, at the time, Donald Young

14       stating for me to submit medical

15       documentation.

16  Q.   Okay.  And again, can you tell me, did you

17       have a conversation with Mr. Young about the

18       medical documentation that he was seeking?

19  A.   I responded to Mr. Young's e-mail, in which I

20       stated that I feel or believe I've already

21       submitted medical documentation by -- from

22       Dr. Huff.  Well, that I submitted medical

23       documentation already, and if it wasn't

24       sufficient, please tell me what information

25       it was missing so I could basically get that

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

85

1     information.  But I never got that.

2  Q.  Okay.  So Mr. Young asked you for the medical

3     documentation, you advised him that you

4     believed you had already submitted sufficient

5     documentation?

6  A.  Yes.

7  Q.  Because of what you had submitted with the

8     FMLA paperwork?

9  A.  And the letter from Dr. Huff, at that time.

10  Q.  Okay.  All right.  So there was also the

11     letter from Dr. Huff.

12  A.  Yes.

13  Q.  So that was already part of your record; is

14     that correct?

15  A.  Yes.  And I submitted it with this paperwork,

16     actually.  I submitted a copy of I believe

17     almost everything I'd submitted already.

18  Q.  As you're looking at that, if you don't mind

19     for the record, could you note the

20     Bates-stamp numbers in the ROI for the Judge.

21     Thank you.

22  A.  For the written confirmation of request for

23     accommodation, it's February 24th.

24  Q.  And that's Bates number 00248?

25  A.  00248.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

86

1   Q.   Thank you.

2   A.   And then I submitted the letter that I had

3        already submitted to Mr. Stephens, the

4        January 17th letter I resubmitted on February

5        24th, and that's on 00249.   And then I did

6        submit my doctor's letter again with that

7        request.   I believe it would have been on the

8        24th as well, because that's the date I

9        date-stamped everything.   And then I

10       submitted the memorandum again.

11            So I -- and then that's why I wrote

12       on this written confirmation of request for

13       accommodation, I said in here, please refer

14       to the doctor's letter submitted on

15       February -- I think I put 6 on there.   And

16       then I wrote on here, I originally requested

17       reasonable accommodation on January 17th and

18       again on January 23rd.   And no interactive

19       process is yet to take place.   And then I put

20       reason for request, please refer to my

21       doctor's letter.

22   Q.   Okay.   Was there a response to those

23        requests, that you can recall?

24   A.   Yes, there was.   The only correspondence I

25        received after I submitted that form is the

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

87

1    e-mail from Dr. Young where I responded

2    saying I've already submitted my doctor's

3    letter.  Please just tell me what's wrong

4    with it so I can get sufficient

5    documentation.  I never -- I did not receive

6    a response from that e-mail.  When I sent

7    that e-mail, I never got anything back saying

8    that my -- something was wrong with the

9    letter.

10         So the only thing I got was on

11   April 1st, I believe, if I'm not mistaken,

12   was a denial from Ena.  Where she appointed

13   herself the designated management official

14   over my request, because at that point she

15   was acting assistant director.

16         And not to mention, if I had to

17   appeal that request, she would have been the

18   appeals -- Ms. Ena Lima would have been the

19   appeal person, because she was the DMO for

20   this request.  So the only time I was given

21   the option to appeal or to do anything, I

22   would have still had to go to Ms. Lima to get

23   her help.

24  Q.  Okay.  Prior to getting the response from

25   Mr. Young to this submission, did you have a

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

88

1       meeting at all with your union

2       representative?

3    A.  During the interactive process, the only one

4       I had, which after I submitted the written

5       request for reasonable accommodation, then I

6       had the first and only interactive process.

7       In that meeting there was Jim Dean, there was

8       Rachel Gentry, and Sonya Wilson.  And I'm

9       sorry, can you repeat what the question is?

10   Q.  No, I think you've just answered my question.

11   A.  Okay.

12   Q.  And during this meeting, did you describe

13      your disability and its symptoms?

14   A.  Yes.  I believe I was crying.  I was

15      extremely upset.  I explained to everyone in

16      the room how painful this condition was, how

17      desperate my situation was, and how I just

18      needed and wanted help.  That's all I wanted

19      was help.  And could someone please help me.

20      And basically, I was told by Ms. Wilson that

21      a reasonable accommodation is when you need a

22      special chair, when you need extra breaks, or

23      when you need, you know, something similar.

24      I was told -- at this point, no one still

25      discussed the transfer that I was requesting

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

89

1       and how they could help me with that.  Nobody

2       offered with any help to help me get to

3       Florida.

4  Q.  Okay.  And during this meeting, did anyone

5       inform you that they needed more medical

6       documentation than what was already submitted

7       with the FMLA paperwork and the letters from

8       Dr. Huff and your memorandum?

9  A.  Only the letter from -- only the e-mail from

10      Mr. Young saying that you still haven't

11      submitted medical evidence, which I responded

12      saying yes, I did, and if there's something

13      wrong with it, please explain to me why.

14         The only other time I was told

15      anything about my medical documentation was

16      from the denial that Ms. Ena Lima did for the

17      reasonable accommodation where I believe she

18      mentions on there something about my medical

19      documentation not being -- but she still

20      didn't go into what it needed or what it was

21      missing or what was not adequate about that

22      letter so I could go to my doctor and get it.

23      And the only interim accommodation I was

24      provided was an extra chair or breaks.  Extra

25      breaks or a different chair or something to

DEF000482

90

 1       that extent.

 2   Q.  Ms. Brown, can you turn to the ROI at 00247.

 3   A.  (Witness complies.)  Oh, yeah, I forgot about

 4       that e-mail.

 5   Q.  Can you tell us what this e-mail was?

 6               MS. CLARK:  Your Honor, this is an

 7       e-mail dated March 25th from Ms. Brown asking

 8       about additional -- inquiring about what

 9       additional medical information.

10       BY MS. CLARK:

11   Q.  Can you please explain that e-mail exchange?

12   A.  Yes.  This e-mail is where I sent an e-mail

13       to Sonya and I CC'd Jim Dean.  And I said, if

14       you're unable to provide the reasonable

15       accommodation requested, please provide the

16       reasons and what accommodation that you, the

17       Agency, propose would benefit me.  And then I

18       went on and -- yeah.

19               And then that's where -- okay, this

20       is the second paragraph or the part of this

21       e-mail where I sent Mr. Young the request

22       saying, please refer to my doctor's

23       certification.  It's already been provided.

24       And please provide me with the details of my

25       decision and the information missing from my

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

91

1       doctor's certification if it does not

2       suffice.

3              And I went on to even ask for my

4       right to appeal.  So I was pleading and

5       begging for information.  I couldn't get

6       information from them.  And I was -- I just

7       couldn't get the information I needed in

8       order to proceed.

9              MS. CLARK:  Your Honor, is this an

10      appropriate time possibly to take a break for

11      the court reporter?

12             JUDGE CARETHERS:  Yeah, if you

13      want to take a break.  You have an hour and

14      20 minutes left.  So let me stop the timer.

15      Sure, we'll go off for break.

16             (A recess was taken.)

17             JUDGE CARETHERS:  Okay.  We're

18      continuing the hearing of Trevenia Brown

19      versus the Department of VA.  We're

20      continuing with the testimony of the

21      Complainant, Ms. Brown.

22             You may continue, Ms. Clark.  Just to

23      let you know, Ms. Clark, you have an hour and

24      20 minutes approximately.

25             MS. CLARK:  Thank you.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

92

1        BY MS. CLARK:

2    Q.  Ms. Brown, do you recall anyone after -- or

3        beginning in January of 2014, do you recall

4        anyone speaking to you about performance

5        issues?

6    A.  Since January?

7    Q.  January, 2014.

8    A.  Not that I can recall.  I wasn't under any

9        type of performance improvement plan or --

10       no.

11   Q.  No?  Okay.  Are you aware of a report called

12       the ASPEN report?

13   A.  Yes.

14   Q.  Can you tell me what that measures?

15   A.  That's basically by how we, I guess for lack

16       of a better word, clock our work, or how --

17       what type of work we do and how much work we

18       do.

19   Q.  Do you know if that report is adjusted in any

20       way to take into account FMLA time off?

21   A.  I know when we have days off, we can check a

22       box, or put in what's called excluded time to

23       where that time is not supposed to affect

24       negatively your overall performance.

25       Supposed to be based on the number of hours

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

93

1      you worked.

2  Q.  Okay.  And do you recall if you were checking

3      that box off?

4  A.  It would have been me adding in or including

5      my excluded time, yes.

6  Q.  And with you adding the excluded time, had

7      anyone informed you that -- let me ask, when

8      did you start adding or noting that you had

9      excluded time?

10  A.  Any time.  It's not only FMLA, it's any time

11      you miss a day.

12  Q.  So any time that you miss a day?

13  A.  Yes.

14  Q.  And do you know if the report can be run

15      excluding that notation?

16  A.  It should, yeah.  I believe we can.

17  Q.  Let me make sure my question is clear.

18  A.  Okay.

19  Q.  Can the report be run in a way to show that

20      you've taken a leave without pay or an FMLA

21      leave time off?

22  A.  Once we put in our excluded time it's

23      supposed to be calculated in there.  I don't

24      know how it's calculated, but -- supposed to

25      be taken into consideration.  I don't know

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

94

1     how that works, though.

2  Q.  Okay.  And who did you understand that to be

3     the case from?

4  A.  Just from working off ASPEN for the time

5     period that I've been there.

6  Q.  Okay.  So you're not -- you're not a hundred

7     percent sure whether or not that's the case?

8  A.  I'm not a hundred percent sure how it works

9     or how it's all computated (verbatim), you

10    know, with the time off and everything.

11  Q.  Now, at some point did you have to make

12    another -- did you make another request for a

13    transfer?

14  A.  I made a total of three requests.

15  Q.  You made a total of three requests?

16  A.  Yes.

17  Q.  So was there a request for reasonable

18    accommodation that you had -- that you

19    discussed with Julie Barrett?

20  A.  No.

21  Q.  Okay.  So you never had a discussion with

22    Julie Barrett?

23  A.  No.

24  Q.  Are you aware of any e-mails from Julie

25    Barrett to you asking to discuss or have an

DEF000487

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

95

1      interactive process meeting with you?

2   A.  There was one, but it wasn't related to this.

3      This is when they were -- when I was being

4      sent to Spark, or to a training session out

5      of the state.  And I requested to be excluded

6      for that because it was right around the time

7      I was to get my sutures removed from my

8      medical intervention with Dr. Huff.  So at

9      that point, my sutures were still in during

10     the time I was supposed to attend this Spark

11     training, so I requested to be excluded.  And

12     they used a reasonable accommodation to do

13     that.

14  Q.  Okay.  So they excluded you from that

15     training because you had that medical

16     procedure that was upcoming?

17  A.  Yes.

18  Q.  All right.

19  A.  I mean, that was the reason I requested to be

20     excluded from Spark, because I was -- I had

21     that medical intervention.

22  Q.  All right.

23          MS. CLARK:  At this time, Your

24     Honor, I'd like to direct the witness's

25     attention to Complainant's Exhibit 17 and 18.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

96

1          JUDGE CARETHERS:  I'm there.  Are

2      you planning to have these admitted?

3          MS. CLARK:  Yes.  We'd like to

4      have them admitted as...

5          JUDGE CARETHERS:  9 and 10?

6          MS. CLARK:  Yeah.

7          JUDGE CARETHERS:  Any objection

8      from the Agency?

9          MR. MILLER:  No objection.

10          JUDGE CARETHERS:  Have both marked

11      as 9 and 10 by the court reporter, and

12      they're admitted.

13          (Exhibits 9 and 10 were marked for

14      identification and received into evidence.)

15      BY MS. CLARK:

16  Q.  Are you familiar with these documents?

17  A.  I've never seen these.  The letter, I have.

18  Q.  Which is marked as Exhibit 9?

19  A.  Yes.

20  Q.  Exhibit 10, are you familiar with that

21      document?

22  A.  No.  I've never seen these.

23  Q.  So let's talk about Exhibit 9 first.  Do you

24      recall this letter being written on your

25      behalf?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

97

1   A.   Yes.

2   Q.   Why was that letter prepared?

3   A.   Because I was still trying to transfer and

4        get my reasonable accommodation.  So because

5        the last denial was basically referencing

6        that my trans -- I believe the one for --

7        said something about my medical documentation

8        not being -- I'm sorry.  From what I

9        remember, I needed this.  This was another

10       attempt to transfer.  Because they said my

11       medical documentation, I either hadn't

12       submitted or wasn't sufficient, my only

13       thought process was, well, maybe the letter

14       wasn't sufficient.  Maybe I need to get

15       another letter, maybe it didn't have all the

16       information that was necessary.  So this was

17       just another attempt to provide the

18       information that would get me transferred.

19  Q.   And so was this letter prepared by Dr. Huff?

20  A.   Yes.

21  Q.   And again, does this letter explain what your

22       diagnosis is?

23  A.   Yes.

24  Q.   Does it explain in the correspondence what

25       the complications are from the disease?

98

1    A.   Yes.  And it does state, which always is in

2         the back of my mind, is this rarely, in

3         long-standing lesions, development of

4         secondary skin cancers have been documented.

5         So yes, I do remember this letter.

6    Q.   Okay.  And what is it that's significant

7         about the development of secondary skin

8         cancers?

9    A.   The problem is, is because I -- that was the

10        issue -- one of the issues with my treatment

11        that I received with this condition, is

12        because some of the suggestions by the

13        doctors that I've had with certain

14        medications, has a potential to cause cancer.

15        Some of them, some of the procedures are

16        experimental.  I mean, it's really basically

17        on what works on what people when it comes to

18        this particular condition.

19             Again, with the -- my mother passed

20        away of cancer.  And earlier when I mentioned

21        that this had an emotional impact on me, is

22        because when my mother was in DC dying of

23        cancer, her children were in Florida.  And

24        had to scrape up money to come see her and to

25        help her when she needed it.  And we were at

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

99

1    home, she ended up on life support, so we

2    couldn't say our goodbyes because she was

3    away from her family.  And she did not have

4    her children or her grandchildren by her side

5    when she passed away.

6         This was something that -- so because

7    of how my mother passed, this actually has an

8    impact on the type of treatment that I'm

9    willing to receive.  Because for her

10   condition, one of the treatments had the

11   potential to cause cancer.  And I wasn't

12   willing to take that chance.  And again,

13   because like I said, with anxiety, it's very

14   difficult, when you think of worse case

15   scenarios, where your brain and your mind is

16   racing into what could happen to me.  You

17   know, I could have -- who knows.  I mean,

18   nobody knows.

19        And none of these people were doctors

20   who were making a decision on whether or not

21   I had a disability, or not transferring me,

22   what type of impact, and whether it be

23   physical or mentally.  They never -- they

24   didn't know the kind of impact that this

25   would have on me.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

100

```
 1              But because of these -- like I said,
 2      because of the treatments that were suggested
 3      to me that I wasn't willing to entertain, and
 4      because of how my mother passed away, away
 5      from family so long away, I felt because of
 6      how my condition was progressing and how bad
 7      it was becoming, that it was in my best
 8      interest to be with family and to be -- to
 9      have that family support because of the
10      anxiety and depression.
11              So this entire situation had brought
12      back emotional issues regarding, like I said,
13      my mother's death.
14 Q.   Before your transfer, had you had an incident
15      at all that was a difficult surgical
16      incident?
17 A.   Yes.  One of the reasons that I wanted to
18      transfer, other than the reason of being with
19      my family and having family support, one of
20      the reasons was because with Dr. Huff, it was
21      difficult to get immediate appointments.  I
22      could only get -- sometimes I would have to
23      wait two weeks to get into his office.  And
24      if there was a requirement for surgical
25      intervention, I couldn't get -- I couldn't
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

101

1       get in to see him.

2               So on some occasions, I was required

3       to go to a walk-in clinic.  And on some

4       occasions -- every time I went to the walk-in

5       clinic for surgical intervention, there was a

6       different doctor, there was -- that didn't

7       know my medical history; didn't know my

8       background; didn't know of any complications

9       that I may have.

10              And what happened, the very last time

11      I went to the walk-in clinic, the doctor -- I

12      don't know if she couldn't differentiate

13      between the scar tissue and the lesion or

14      possible cyst, to where it was -- I felt like

15      I was butchered that day.  That was the last

16      time I went to that walk-in clinic.

17              And that was one of the incidents

18      that made me decide that I need to

19      re-evaluate how I'm treating my condition and

20      how I'm treating myself.  And that's when I

21      made the decision that transferring and being

22      with my family and having that support, and

23      being able to possibly find a doctor where I

24      can get immediate treatment, you know, along

25      with having that family support, that was

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

102

1      very important to me.

2  Q.  Exhibit 10.  Can you take a moment, is this

3      the SF-52 approving your transfer to

4      St. Petersburg?

5  A.  I've never seen this document.  Either one.

6  Q.  Okay.  So you're not familiar with whether

7      this is the personnel action supporting your

8      transfer?

9  A.  I don't know.

10 Q.  Okay.  So you've never seen this?

11 A.  No.

12           MS. CLARK:  We'll withdraw Exhibit

13     10, Your Honor, since the witness is not

14     familiar with it.

15           JUDGE CARETHERS:  Okay.

16     Exhibit 10 is withdrawn.

17 BY MS. CLARK:

18 Q.  Were you ultimately transferred --

19 A.  Yes.

20 Q.  -- to St. Petersburg?  Do you know when that

21     went into effect?  Do you recall when that

22     was?

23 A.  I know my start date in St. Petersburg was

24     October 6th.  If I can recall, I believe I

25     had maybe two weeks to get there.  So it was

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

103

1      approved maybe a little, you know, within

2      that time frame, within maybe two weeks

3      before that.

4  Q.  All right.  Ms. Brown, during this period,

5      I'm going to say specifically between

6      November 2013 and the time of your transfer,

7      did you feel that you were harassed by anyone

8      at the VA?

9  A.  Yes.

10  Q.  Can you say who?

11  A.  Ena Lima.

12  Q.  And can you tell me how she harassed you?

13  A.  By placing herself in every possible

14      situation to deny my claim, like appointing

15      herself DMO to where when I had to appeal I

16      had to go through her.  She denied every

17      request -- when she CC'd everybody on that

18      one e-mail, I felt that was unnecessary and a

19      form of harassment and humiliation.  I felt

20      when she denied -- wrote denied in all caps,

21      I feel like that was a form of harassment.  I

22      feel like when she -- I feel like she

23      basically treated me with no compassion and

24      she -- I feel like she had no intention on

25      transferring me.  That was my personal

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

104

1       feeling.  Like her only intention was to find

2       a way to humiliate and deny me and not

3       transfer me.  I feel she had no intentions on

4       transferring me.

5    Q. Did she ever make any statements that led you

6       to believe that she was not going -- that she

7       was intentionally trying to bar your

8       transfer?

9    A. Yes, when we were in the office and she said

10      just because you have a disability doesn't

11      mean we have to do anything for you.  So that

12      proves -- I brought up my disability, I asked

13      her, you know, and she's basically telling

14      me, look, just because you have a disability

15      means nothing to us.  We don't have to do

16      anything for you.

17          And from that point, I felt like her

18      only interest was to deny me and to make sure

19      I was denied.  And that's why she made every

20      attempt to place herself in a situation to

21      where she could deny me.  And not provide me

22      any recourse.  She didn't -- not only did she

23      deny me, she did not even ask -- tell me what

24      I could do or how I could do it.  So I felt

25      like that was a form of harassment.  To me, I

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

105

1    felt like that was -- it was to demean me, it

2    was to dismiss me, and it was meant to harass

3    and bully me.  That's my personal feelings

4    through this entire process with Ena Lima.

5  Q. Was there anyone else in the Agency you

6    believed were harassing you?

7  A. I felt many that others were not helping me,

8    and under Ena's direction, that could have

9    possibly been the case.  I don't -- I did

10   feel like I was being bullied because of so

11   much that was happening.  And Ena's position,

12   she was at almost the top of the food chain.

13   Who do you go to when you're -- the person

14   who you feel is harassing you is the acting

15   assistant director in the office and has

16   total control over you and your well-being.

17   What do you do.

18       I mean, do you think that -- you know,

19   she's everybody's supervisor.  Everybody who

20   was writing me up, Mr. Kinder, Mr. Dean,

21   Mr. Young, she was over everybody.  So I

22   really -- I mean, I felt like she was

23   harassing me, yes.

24       I felt harassed when they were

25   denying my FMLA, because I was asking them to

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

106

1    use my FMLA.  So yes, I felt harassed.  I

2    felt like they were trying to send me into a

3    deeper spiral of depression.  They did not

4    know what my mindset was.  Who knows.  I

5    could have went and killed myself with the

6    amount of pain and despair that I was in.

7    But they didn't take that into consideration.

8    They played doctor and decided that my

9    medical condition did not only not exist, but

10   that my doctor's certifications were --

11   didn't matter.

12        And not only that, that they did not

13   have to go further up the VA chain in order

14   to deny my request, because as far as they

15   were concerned, I didn't have a disability.

16   So they didn't have to go to the chain of

17   their command in order to deny a reasonable

18   accommodation.  She did not feel that was

19   necessary because I didn't have -- as far as

20   she was concerned, they dismissed me and my

21   condition like I didn't have one.

22        So I never was granted all my rights

23   when it came to my transfer.  I never made it

24   to the attorney or the doctor within the

25   organization that could look at the denial

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

107

```
 1        and say this transfer is totally reasonable,
 2        why wouldn't you transfer her.  Why not.  It
 3        seemed like to me they were just looking for
 4        reasons not to transfer me instead of trying
 5        to find reasons to help me.  So that's total
 6        harassment.
 7   Q.   All right.  So let me ask, do you recall the
 8        day you actually filed your internal EEO
 9        complaint?
10   A.   It was the day after -- I believe it was the
11        day after I spoke with Ena Lima in her office
12        and she sent me the e-mail and denied in all
13        caps.
14   Q.   That's the January e-mail?
15   A.   That's the January e-mail.  That day after, I
16        believe I called the EEOC because I felt so
17        violated.
18   Q.   Okay.  So after that January e-mail the
19        proposed reprimand occurred, is that correct?
20        And I will give you Exhibit 6 to refresh your
21        recollection.
22   A.   I'm sorry.  Could you restate your question?
23   Q.   Yeah.  Your EEO complaint was in January?
24   A.   Yes.
25   Q.   The overtime hour issue which resulted in the
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

108

1     proposed reprimand, that happened in

2     February, correct?

3  A.  The proposed reprimand, yes.  The actual --

4  Q.  The proposed reprimand happened in February?

5     Just look at Exhibit 6.

6  A.  It was March 17th.

7  Q.  Okay.  March 17th?

8  A.  Uh-huh.

9  Q.  Okay.  And the request for reassignment for

10    medical reasons, that was denied in February,

11    is that correct?

12 A.  Yes.

13 Q.  And your formal request for reassignment --

14    was there one more request for reassignment

15    that was denied after your EEO complaint?

16 A.  There were two denied after my EEO complaint.

17 Q.  All right.  Ms. Brown, did you work with our

18    office to prepare discovery in this matter?

19 A.  Yes.

20 Q.  And do you recall us requesting you to secure

21    medical documents in response to the Agency's

22    discovery requests?

23 A.  Yes.

24            MS. CLARK:  Your Honor, I believe

25    this is under Complainant's Exhibit 20.  I

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

109

1    believe it starts with 20, but let me be

2    doubly sure.  Yes, Exhibit 20, 21, 22, 23,

3    24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 35,

4    36, are medical records that have been

5    secured from Ms. Brown's medical vendors,

6    which we would like to have admitted in this

7    matter.

8                JUDGE CARETHERS:  That was just

9    essentially proposed Exhibits 20 through 36,

10   is that correct?

11               MS. CLARK:  Essentially, yes.

12               JUDGE CARETHERS:  Okay.  Agency,

13   is there any objections to these exhibits?

14               MR. MILLER:  Are those the

15   documents you provided?

16               MS. CLARK:  They've been produced

17   to you, yes.

18               MR. MILLER:  No objection.

19               JUDGE CARETHERS:  Okay.  We have

20   16 exhibits, so we would go -- could we have

21   each one marked.  I guess we'll begin with

22   Exhibit 11.

23               MS. CLARK:  Actually 10, because

24   we withdrew 10.

25               JUDGE CARETHERS:  Yeah, I'm going

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

110

1    to keep -- I'm going to keep 10.

2              MS. CLARK:  Oh, you're going to

3    keep -- okay.

4              JUDGE CARETHERS:  It's withdrawn,

5    but it's still going to be 10, Exhibit 10.

6              MS. CLARK:  Gotcha.

7              JUDGE CARETHERS:  Okay.  We'll

8    start with Exhibit 11, and it looks like

9    there's 16 exhibits, so I guess it all the

10   way to 27, I guess.  Can we have them marked

11   and admitted.

12             MS. CLARK:  Your Honor, you want

13   these all marked individually, or can we mark

14   them all as 11?

15             JUDGE CARETHERS:  What I

16   originally was doing is marking them

17   individually 11 through 27.  I was just

18   matching them up from your exhibit -- what,

19   Exhibit 20 was to become Exhibit 11.  Exhibit

20   21 was to become Exhibit 12, and so forth.

21             MS. CLARK:  All right.  So mark 65

22   as 12.  64 is 13.

23             JUDGE CARETHERS:  While we are

24   doing, this let's just go off the record.

25             MS. CLARK:  Sure.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

111

1           (A recess was taken.)

2           (Exhibits 11 through 27 were

3    marked for identification and received into

4    evidence.)

5           JUDGE CARETHERS:  We're continuing

6    the hearing of Trevenia Brown versus the

7    Department of Veterans Affairs.  We just took

8    a brief moment to mark all the exhibits that

9    were accepted.  I believe they're Exhibits 11

10   through 27.  We'll continue to take the

11   testimony of Ms. Brown.  Ms. Clark, you may

12   continue.

13   BY MS. CLARK:

14   Q.  Ms. Brown, I had asked you earlier if you had

15       assisted with the securing of your medical

16       records in response to the Agency's document

17       request.  You've testified that you did.

18   A.  Yes.

19   Q.  Okay.  I'm going to present first, Exhibits

20       11, 12, 13, 14, 15, 16, and 17.  I'm going to

21       present these to you collectively.  Now, do

22       you see with regards to the document that's

23       marked as 11?

24   A.  Uh-huh.

25   Q.  Okay.  Can you tell me which physician's

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

112

1      record that is?

2   A.  Dr. Huff.

3   Q.  Okay.  Can you look at the bottom of that

4       document.  Does that indicate the assessment

5       and plan for you?

6   A.  Yes.

7   Q.  And what does it indicate?

8   A.  Basically that we discussed the history of

9       the disorder, its chronic unpredictable

10      course, treatment options, the recommended

11      trial of Cleocin T lotion, and she was

12      advised to give us a progress report 6 to 8

13      weeks.  Depending upon the response we

14      discussed laser and possible Clindamycin and

15      Rifampin.

16  Q.  Okay.  And so the disease that's noted here

17      is Hidradenitis Suppurativa Hurley Stage II?

18  A.  Yes.

19  Q.  All right.  Can you go to the next document

20      behind that.  Is that also -- is that from

21      attending physician Lauren Fahey?

22  A.  Yes.

23  Q.  And again, does it indicate your illness?

24  A.  Yes.

25  Q.  And does it give a treatment plan?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

113

```
 1    A.   Yes.

 2    Q.   Can you go to the next document you have.

 3         And is this a treatment note also from Lauren

 4         Fahey?

 5    A.   Yes.

 6    Q.   And does she indicate what your course of

 7         treatment would be?

 8    A.   Yes.

 9    Q.   Can you explain what she --

10    A.   Says that she would continue taking Keflex

11         for the remainder of her 10-day course, and

12         stated that I have declined draining these

13         lesions today and will call if this is

14         necessary in a few days.

15    Q.   All right.  Can you go to the next exhibit.

16    A.   (Witness complies.)

17    Q.   All right.  And this is a visit note from

18         April 29, 2014, is that correct?

19    A.   Yes.

20    Q.   All right.  And I want to go specifically to

21         the images, which would be three pages in.  I

22         think it's page 3.  Okay.  Does this note

23         where your lesions are?

24    A.   Some of them.

25    Q.   Some of them.  Okay.  Are these -- do you
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

114

1    know why these particular ones were noted?

2  A.  That may be what I pointed out on that visit.

3  Q.  On that visit as being what?

4  A.  Problematic.

5  Q.  Do you recall problematic how?

6  A.  Well, reading this, it would seem that I was

7    currently experiencing flares, multiple, and

8    that I'm trying to get treatment other than

9    trying to get it lanced.

10 Q.  Okay.  And was one of the treatments

11   recommended, if I'm correct here, that you'd

12   be on a steroid treatment.

13 A.  That was one of the suggestions, yes.

14 Q.  And did you begin steroids?

15 A.  I tried a few treatments.  I don't remember

16   exactly the name of the medications.  I'm

17   sorry.

18 Q.  Okay.  Do you recall if they were -- how they

19   affected you at work?

20 A.  Mainly -- the only negative effect I've had

21   from medication is like upset stomach,

22   sometimes diarrhea from the medicine.  Yeah,

23   that's pretty much it.

24 Q.  Okay.  If you could go to the next document,

25   unless there's anything else you want to

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

115

1      point out in that record.

2   A.  No.

3   Q.  Okay.  Can you go to -- I think the next

4       treatment note is dated May 22, 2014, is that

5       correct?

6   A.  Yes.

7   Q.  And on this day you saw Dr. Huff, is that

8       correct?

9   A.  Yes.

10  Q.  And you had a procedure this day?

11  A.  Yes.

12  Q.  What procedure did you have?

13  A.  I had a cyst removed.

14  Q.  And is this the procedure that you requested

15      time off for that you were granted?

16  A.  Yes.

17  Q.  Do you recall how long your -- you had to

18      recuperate following this procedure?

19  A.  I don't exactly remember.  I'm trying to

20      think when I had to come back.  Suture

21      removal 14 days.  Yeah, a couple weeks.

22  Q.  All right.  And then there's a treatment note

23      of June 5, 2014.  Is that when your sutures

24      were removed?

25  A.  Yes.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

116

1    Q.   All right.  And do you have a treatment note

2         of June 24, 2014?

3    A.   Yes.

4    Q.   And you saw Dr. Huff this day also?

5    A.   Yes.

6    Q.   And can you tell me what this was for?

7    A.   I was having complications from the suture

8         removal.  I mean, from the incision and the

9         suture removal.  I was having increased pain,

10        inflammation.  So I went in for him to take a

11        look at it and see if it was still in good

12        shape.

13   Q.   Okay.  Do you recall if you had already

14        returned to work by June 24, 2014?

15   A.   I believe I had.

16   Q.   So this was impacting you at work?

17   A.   Yes.  This condition has been ongoing, has

18        impacted me for a while.

19   Q.   But this particular cyst and its treatment --

20   A.   Oh, yeah.

21   Q.   -- had impacted you at work?

22   A.   Oh, yeah.

23   Q.   Do you recall how it impacted you at work?

24   A.   Mainly pain.  Mainly pain.

25   Q.   Okay.  Can I ask, with regard to these cysts

117

1       that we've been looking at, this particular

2       cyst, does just the wearing of clothing alone

3       or the rubbing of clothing against these

4       areas cause pain?

5   A.  Yes.

6   Q.  All right.  And then you have Exhibit --

7   A.  17.

8   Q.  Okay.  And is that a treatment of July 10th?

9   A.  No, that was the last one to follow up from

10      my --

11  Q.  Okay.  So the last one you have is -- okay.

12      Thank you.  All right.  And the last exhibit

13      number you were looking at was?

14  A.  17.  Yeah, 17.

15  Q.  All right.  Do you have 18 in front of you?

16  A.  I saw 18 in there.

17  Q.  Can you look at Exhibit 18.  And is that the

18      note from July 10, 2014?

19  A.  Yes.

20  Q.  So is this regarding a new growth?

21  A.  Yes.

22  Q.  And can you tell me where that occurred?

23  A.  It was under the left underarm.

24  Q.  Okay.  Had it started to drain on its own?

25  A.  I think I wanted to get it drained.  Yeah, I

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

118

1        did.  I got it drained that day at the

2        office.

3    Q.  You got it drained that day at the office?

4    A.  Yeah.

5    Q.  And what would lead to a conclusion that you

6        needed to have it drained?

7    A.  The pain and the pressure.

8    Q.  Okay.  All right.  And can you turn to 00048.

9        Is that the location of where the cyst was?

10   A.  Yes.

11   Q.  And it was causing you pain there?

12   A.  Yes.

13   Q.  And just for purposes of understanding, these

14       illustrations that show these little

15       pinpoints, was that actually the size of the

16       cysts?

17   A.  No.

18   Q.  Can you describe for the record what was

19       normally the size of these cysts?

20   A.  Can I draw on this?

21   Q.  Well, let's not draw on it, but I mean, are

22       we talking something --

23   A.  We're talking practically the entire -- it

24       goes up here to the under -- to the upper

25       part of the arm to where -- to the most

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

119

1      sensitive part.  So the swolling (verbatim)

2      and the inflammation and the swelling and

3      puss and everything would have been from

4      underneath the mid part of the armpit all the

5      way to the under part of this part of my arm

6      it would have been swollen.  All the way out

7      there.

8  Q.  Thank you.  I'd like to give you what is

9      marked as Exhibit 19.  Now, these appear to

10     be notes from different facilities?

11  A.  Uh-huh.

12  Q.  Were these the walk-in clinics, or can you

13     explain where these -- or the facilities and

14     why you were there?

15  A.  The first two look like they were cultures

16     that were sent.  So sometimes based on what

17     comes out, they might send it for culture to

18     see if there's anything in there that might

19     require any type of additional treatment.  So

20     the first two is when they sent cultures out.

21     That means it was pretty bad if they had to

22     send cultures of something, for some reason.

23  Q.  Do you recall ever having a discussion with

24     Dr. Huff about the results of the cultures?

25  A.  Each time they were negative.

DEF000512

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

120

1   Q.   Negative, okay.

2   A.   Yeah.

3   Q.   Very good.

4   A.   The second one -- I mean the third one, looks

5        like it was -- yeah, it was a culture.

6   Q.   Do you recall whether this culture came back

7        negative or not?

8   A.   I don't remember -- I've never received a

9        positive one.

10  Q.   Okay.  So your cultures have usually come

11       back negative, but they have sent out results

12       of the drainage for testing?

13  A.   Yes.

14  Q.   All right.  I'd like to present you with

15       Exhibit 20.

16  A.   Yes.

17  Q.   Are you familiar with this medical record?

18  A.   Yes.

19  Q.   Can you tell me which doctor this was a

20       medical record of?

21  A.   It was my psychiatrist.

22  Q.   And his name?

23  A.   Dr. Patel.

24  Q.   And why did you start to see Dr. Patel?

25  A.   Well, originally it was because of anxiety

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

121

1      and depression.  That was originally.  And it

2      says how it is associated with my condition,

3      how my condition causes this anxiety and

4      depression.

5   Q.  And can you note, on this particular

6      document, at the bottom it says 00083.  Did

7      you talk to Dr. Patel about what was

8      happening to you at work?

9   A.  Yes.

10  Q.  Does he note that here?

11  A.  Yes.

12  Q.  Do you recall what specifics you may have

13      discussed with him?

14  A.  Basically I explained that I felt at this

15      point I had an EEO claim, and that I was

16      having problems, I felt like I was being

17      targeted at work, they were denying my

18      transfers, even though I had this condition

19      that I was suffering from, and how it made me

20      feel.

21  Q.  Okay.  And did he put you on any medication

22      for your anxiety and emotional distress?

23  A.  Yeah.  He did.  He increased -- he gave me a

24      new med.  He added Wellbutrin, I believe.

25      But yes, he prescribed me a new medication.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

122

1   Q.   Okay.  Let me make sure.  In the middle of

2        that document it talks about current meds?

3   A.   Uh-huh.

4   Q.   Levora.  Do you know what you were taking

5        that for?

6   A.   That's birth control.

7   Q.   Okay.  Sertraline?

8   A.   That was for anxiety and depression.

9   Q.   And so he added Wellbutrin to this?

10  A.   Yeah, he added another med, yes.

11  Q.   All right.  Thank you.  I'll give you

12       Exhibit 21.  So were the treatments starting

13       to have an effect?  Can you tell from this

14       medical note?

15  A.   Yeah.  Yes.

16  Q.   And this was in April of 2014 that you met

17       with him?

18  A.   Yes.

19  Q.   Is there a document right behind that one?

20       And again, did he still want you to continue

21       with the treatment plan?

22  A.   Yes.

23  Q.   Do you recall yourself what that treatment

24       plan was?

25  A.   Just the new meds that he just prescribed me.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

123

1    Q.   All right.  I'm going to give what you is

2         marked as Exhibit 22.  Is this also a medical

3         record from Dr. Patel?

4    A.   Yes.

5    Q.   Okay.  And was this -- let's see, you went to

6         see him on August 20, 2014?

7    A.   Yes.

8    Q.   And you remained on the treatment plan; is

9         that what this record reflects?

10   A.   Yes.

11   Q.   All right.  I'll give you what's marked as

12        Exhibit 23.  Is this also from Dr. Patel?

13   A.   Yes.

14   Q.   Now, it says at the top here it's a final

15        report.  Do you know what that means?

16   A.   No.

17   Q.   Okay.  This appears to be the same visit as

18        we saw in Exhibit 22 of August 20, 2014.  Is

19        this just an additional record?

20   A.   Looks like it.

21   Q.   Okay.  Thank you.  I'll give you what's

22        marked as Exhibit 24.  This says patient

23        visit instructions at the top, although

24        again, this appears to also be from your

25        August 20th visit?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

124

1   A.   Yeah.

2   Q.   Do you recall what your instructions were

3        from Dr. Patel?

4   A.   No.  I think we discussed my job, how it's

5        affecting me.  We discussed that I'm still

6        trying to transfer.  And that's it.  He just

7        asked about my meds.  That's -- I think this

8        might have been just a follow-up.  I'm not

9        really sure.

10  Q.   All right.  Exhibit 25.  Can you tell us what

11       these records are, Ms. Brown?

12  A.   It looks like encounters I had at

13       Dermatology, Inc.

14  Q.   Are those your co-payments that you made

15       during that time period?

16  A.   Yeah.

17  Q.   Can you just look briefly and see what dates

18       were covered by these bills?

19  A.   Looks like the encounter here was July 10,

20       2014.  An April 29th encounter.  And May

21       22nd, June 5th.  They have June 4th on here,

22       April 29th, and then July 10th.

23  Q.   Let me provide you Exhibit 26.  And is this

24       an invoice for Dr. Patel's office?

25  A.   Yes.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

125

1   Q.   Okay.  And again, another co-payment?

2   A.   Yes.

3   Q.   All right.  With your treatment having

4        concluded with Dr. Patel by August 20th, is

5        it fair to say that at that point in time

6        that the transfer had been approved?

7   A.   No.

8   Q.   It had not been approved by August 20th?

9   A.   No.

10  Q.   When had the transfer actually been approved

11       then?

12  A.   As far as I know, two weeks prior to

13       October 6th, because October 6th is my start

14       date in St. Pete.  So they didn't trans --

15       they didn't complete my transfer until...

16  Q.   Okay.  All right.  So by August 20th when you

17       were having your -- when you were still under

18       treatment with Dr. Patel, you still did not

19       know about your circumstances as far as a

20       transfer?

21  A.   No.  And I just told him that I was still

22       trying to transfer.  So he's leaving it in

23       here, or somewhere, one of those treatments,

24       he basically said, you know, keep me posted.

25       And if I'm still here, still in Indy, then I

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

126

1          could go see him for my next follow-up.

2      Q.   Okay.  After your transfer took place, you

3          said you started in October of 2014?

4      A.   Uh-huh.

5      Q.   Was there a time when you requested an

6          accommodation in St. Petersburg?

7      A.   Yes.

8      Q.   Can you tell me when you made that request?

9      A.   I don't know the exact date, but it had to be

10         maybe about two or three months ago.

11     Q.   Two or three months ago, so it was in 2015?

12     A.   Yeah.

13     Q.   So you had worked -- what was the position

14         that you were placed in, in St. Petersburg?

15     A.   VSR.

16     Q.   So you were still in a VSR position?

17     A.   Yes.

18     Q.   And you had worked in that position, and

19         there was a point at which you made a request

20         for an accommodation.  What was the

21         accommodation you requested?

22              MR. MILLER:  I object.  This is

23         completely irrelevant.

24              MS. CLARK:  It's relevant to

25     understanding the process and how it was

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

127

1    followed.

2                  MR. MILLER:  That's a completely

3    different regional office, Your Honor.

4                  MS. CLARK:  The VA has an

5    overarching set of rules regarding

6    accommodation requests.  And we think it's

7    relevant to this case in terms of the request

8    that she made in St. Petersburg.

9                  JUDGE CARETHERS:  I'm going to

10   sustain that objection because I think that

11   it's remote in time and it's different

12   decision-makers, et cetera.  And it's not the

13   issue in this case.  I don't believe it's

14   relevant.

15                 MS. CLARK:  Okay.

16                 JUDGE CARETHERS:  Do not answer

17   the question.  Next one.

18   BY MS. CLARK:

19   Q.  Was there a time when you became aware of

20       what the VA rules for accommodation requests

21       are?

22   A.  Only at this office within last three months.

23       No one within the Indy office explained to me

24       the process.

25   Q.  Okay.  Did you actually receive a copy of the

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

128

1    VA's accommodation request procedures while

2    you were at St. Petersburg?

3              MR. MILLER:  Your Honor, I think

4    you -- I object on the same grounds.  I think

5    you've already made a ruling.

6              JUDGE CARETHERS:  I'm going to

7    sustain the objection.  I did do that.  Do

8    not answer that question.  Next question.

9              MS. CLARK:  All right.  And the

10   Complainant just wants to note for the

11   record, we think it's very relevant as to

12   both objections.

13   BY MS. CLARK:

14   Q.  With regard to your requests here in

15       Indianapolis, did anyone ever provide you

16       with the VA's rules for a reasonable

17       accommodation request?

18   A.  No.

19   Q.  Did they ever tell you what the procedures

20       were for a reasonable accommodation request?

21   A.  No.

22   Q.  Did you ever have an interactive meeting with

23       Julie Barrett?

24   A.  No.

25   Q.  Did you have an interactive meeting with

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

129

1      anyone who is the local reasonable

2      accommodations designee?

3  A.  Sonya, during my third request.

4  Q.  Do you know for a fact that Sonya was the

5      local reasonable accommodations designee?

6  A.  No.

7  Q.  Or officer?

8  A.  No.

9  Q.  Okay.

10  A.  From my understanding, I thought it was Julie

11     Barrett.  But Sonya took that responsibility.

12     So...

13  Q.  Was there anyone higher than Sonya or Lima

14     who you were able to address your request for

15     a reasonable accommodation?

16  A.  Anyone higher?  I would believe -- I don't

17     know.  I mean...

18  Q.  Did you send one of your letters to the

19     director, Director Stephens?

20  A.  I sent two letters to Director Stephens.

21  Q.  Okay.  And did Director Stephens ever respond

22     to you directly himself?

23  A.  No.

24  Q.  Okay.  Who responded to those letters that

25     you had addressed to Director Stephens?

DEF000522

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

130

1    A.   Ena Lima.

2    Q.   Okay.

3              MS. CLARK:   I have no further

4         questions.

5              JUDGE CARETHERS:   Agency, your

6         witness.

7              MR. MILLER:   Thank you, Your

8         Honor.

9         EXAMINATION,

10            QUESTIONS BY MR. MILLER:

11   Q.   Let's go back a little bit again.   We'll

12        probably cover some of the same stuff we've

13        talked about, but that's part of the process.

14        Before you came to Indianapolis, where did

15        you used to live?

16   A.   I lived in Florida.

17   Q.   Okay.   What part of Florida?

18   A.   Tampa.

19   Q.   And do you have family members down there?

20   A.   Yes.   My children are here, my father is

21        here, my sister is here, extended family,

22        cousins, aunts, uncles, they're all here in

23        Florida.

24   Q.   Okay.   But you decided to apply for a

25        position in Indianapolis?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

131

```
 1   A.   Yes.  That's my right.

 2   Q.   Well, I was just --

 3   A.   Yes.

 4   Q.   Okay.

 5   A.   Yes, sir.

 6   Q.   And you did know you had this condition?

 7   A.   Yes.

 8   Q.   Okay.  So what was your thought process

 9        making that determination to move to

10        Indianapolis away from your family?

11   A.   Well, my condition wasn't as bad as it became

12        to be once I was working at Indy for three

13        years almost.  So I guess it's quite

14        understandable that it's a possibility that

15        things progressed, which I think that to me

16        is what happened.  So at the time, no, it

17        wasn't that bad.

18   Q.   And you started September 23, 2011?

19   A.   25th.  I think it was the 25th.

20   Q.   And your position at that time when you were

21        first hired on was VSR Express Team?

22   A.   No.  I was on the Core.

23   Q.   You were on the Core at that time?

24   A.   Uh-huh.  That's what they call the training

25        team.
```

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

132

 1   Q.   And how long were you on that?

 2   A.   Probably a little over a year.  I don't know

 3        the exact dates.

 4   Q.   And so you arrive on September 23, 2011, and

 5        your request for reasonable accommodation --

 6        or I'm sorry, your request for FMLA on

 7        June 19, 2013?

 8   A.   Yes.

 9   Q.   Okay.

10   A.   Somewhere around those dates.  I don't know

11        the exact, date but it was around June 13th,

12        June 19th.

13   Q.   And at this point did have you any local

14        family members in Indianapolis?

15   A.   My husband was here.  But he was working

16        second, third shifts, various shifts.

17   Q.   Okay.  And your children?

18   A.   No, they were not here.

19   Q.   Okay.  And who were they staying with?

20   A.   They're grown.  They're here in Florida on

21        their own.

22   Q.   Okay.  All right.  So you applied for FMLA

23        and you obtained it, is that correct?

24   A.   That's correct.

25   Q.   And you didn't request a transfer at this

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

133

1      time?

2  A.  Excuse me?

3  Q.  You didn't want to request a transfer at this

4      time for your FMLA?

5  A.  No, I didn't.

6  Q.  And what doctor were you seeing then?

7  A.  Since I attended -- since I was in

8      Indianapolis, I started seeing Dr. Huff.

9  Q.  Okay.  The whole time you've been here?

10 A.  Pretty much, other than the times I was

11     forced to go to the walk-in clinic because I

12     couldn't see him.

13 Q.  Okay.  So you've been with the same

14     dermatologist since you've been here?

15 A.  Pretty much, yes.

16 Q.  And you would agree they granted your FMLA

17     request?

18 A.  Yes.

19 Q.  And were you able to use those hours?

20 A.  Yes.

21 Q.  All right.  Did you exhaust all those hours,

22     FMLA hours?

23 A.  Eventually, yes.

24 Q.  All right.  And --

25 A.  I believe.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

134

```
 1   Q.   Okay.  And did you exhaust your annual leave
 2        and sick leave?
 3   A.   I know on obviously a number of occasions
 4        because I applied for voluntary leave
 5        transfer.
 6   Q.   Okay.  And were you ever disciplined for
 7        using your -- exhausting your leave,
 8        essentially?
 9   A.   Disciplined?
10   Q.   Yeah.  Did you receive a disciplinary action
11        for using too many hours of sick leave,
12        annual leave?
13   A.   No, but I was changed from one team to
14        another once I started using more hours.
15   Q.   Have any other employees been changed from
16        one team to another?
17   A.   Yes, but there has been people who have been
18        on teams for years, while others get
19        transferred from one team to another each
20        year.  So there are -- there is no -- I've
21        never seen any type of documentation showing
22        the rhyme or reason behind how and when
23        someone is transferred.  So there's no, I
24        guess, rotation chart.
25   Q.   Okay.  But you'll agree that other people
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

135

1   have been transferred as well?

2   A.  It's happened, yes.

3   Q.  Okay.  Do you know approximately how many?

4   A.  No.

5   Q.  Now, it indicated that you needed to be off

6       more than two weeks, probably?

7   A.  Uh-huh.

8   Q.  Were you allowed to take that time?

9   A.  Yes.

10  Q.  And did you receive any disciplinary action

11      for that?

12  A.  I was denied my transfer for taking FMLA

13      leave.

14  Q.  And again, you applied to be entered in the

15      voluntary leave transfer program?

16  A.  Yes.

17  Q.  And that was approximately December of 2013?

18  A.  It would have been January, right?

19  Q.  Yeah, December 31, 2013.

20  A.  I remember it being after I came back from

21      my -- I don't remember the exact date, but

22      yes, I requested it.

23  Q.  The first of the year?

24  A.  Somewhere around there.

25  Q.  And that was granted as well?

DEF000528

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

136

1   A.   Yes.

2   Q.   All right.  Do you know if you were

3        granted -- do you know if anybody provided

4        you with additional sick leave or annual

5        leave?

6   A.   From my understanding, someone donated leave

7        to me, yes.

8   Q.   Okay.  Were you allowed to use that?

9   A.   At a later date, yes.

10  Q.   Okay.  And to your knowledge, Colleen

11       Kirksey, did she approve that, along with

12       Yvonne Hamilton?

13  A.   Yes.

14  Q.   Then approximately January 17, 2014, you

15       requested an immediate hardship transfer to

16       St. Petersburg, Florida?

17  A.   Yes.

18  Q.   I guess, what prompted -- you were there from

19       2011 to 2014.  What prompted this request?

20  A.   Well, as you can see from my FMLA requests,

21       my condition was getting worse.  And I was

22       depleting my leave because of constant missed

23       days due to my flare-ups.  So once I realized

24       that okay, I'm exhausting my days, I need to

25       apply for FMLA, because that's -- you know,

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

137

 1       that would be my next step.  Because I didn't

 2       have any leave and I was using -- I would

 3       need additional time off because my condition

 4       and because of my flare-ups were increasing.

 5    Q.  Did they ever deny you time off?

 6    A.  No.

 7    Q.  Those were never denied?

 8    A.  No.

 9    Q.  You could use your FMLA?

10    A.  Yes.

11    Q.  Leave without pay?

12    A.  Yes.

13    Q.  Sick leave?

14    A.  Yes.

15    Q.  Annual leave?

16    A.  Yes.

17    Q.  Donated leave?

18    A.  At a later date.

19    Q.  Okay.  But they didn't deny you that?

20    A.  It wasn't provided to me when it should have,

21       but at a later date, yes, they did.

22    Q.  This hardship transfer, your request was

23       specifically to move to St. Petersburg,

24       Florida?

25    A.  Uh-huh.

DEF000530

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

138

1   Q.   Not to transfer within the department, not to

2        transfer to a different position in the

3        Indianapolis Regional Office, it was

4        specifically for St. Petersburg, Florida; is

5        that correct?

6   A.   Yes.   That's the closest regional office to

7        where my family is located.

8   Q.   And to your knowledge, you were denied based

9        on your performance?

10  A.   Based on my discussion with Ena Lima in her

11       office, and her response on my hardship

12       transfer request, I was denied for my

13       performance.   And there is documentation

14       showing that she denied me based on my FMLA

15       use.   That is in the ROI, I believe.

16  Q.   Do you deny that you were having -- you were

17       performing sub-par?

18  A.   My condition was affecting my performance,

19       yes.

20  Q.   And so you'll agree with that?

21  A.   My condition was affecting my performance.

22  Q.   And so it looks like January 2nd, she sends

23       you an e-mail.

24  A.   Who is she?

25  Q.   I'm sorry.   Ena Lima.

DEF000531

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

139

1   A.   Okay.

2   Q.   And she wants to have a discussion with you

3        about your hardship request.

4   A.   Okay.

5   Q.   Is that correct?

6   A.   She sent me an e-mail saying that she wanted

7        to relay Mr. Stephen's decision regarding my

8        hardship request.  Yes, I remember that

9        e-mail from her.

10  Q.   So in your mind it was Director Stephens that

11       made that decision on the hardship request?

12  A.   No, it was Ena.  Her name was on the

13       documentation.

14  Q.   And did you meet with her at 1 o'clock on

15       that date?

16  A.   I don't remember what time it was.  I believe

17       it was later on that day, because I was on my

18       way out of the office and I had my bag and my

19       jacket with me.

20  Q.   Okay.  But you recall actually meeting with

21       her in her office?

22  A.   Yes.

23  Q.   All right.  Did she try to explain to you why

24       the hardship request was denied?

25  A.   She said it was because of my performance and

DEF000532

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

140

```
 1        because of my attendance.

 2   Q.   And did she discuss anything with you in

 3        regard to a request for reasonable

 4        accommodation or any other options?

 5   A.   No.

 6   Q.   Okay.  What she explained to you was based

 7        upon your performance?

 8   A.   And my attendance, is what was stated to me

 9        in her meeting.

10   Q.   The actual e-mail from Ena where she has

11        denied, it's is C-3, Complainant's C-3.

12   A.   I'm familiar with that, yes.

13   Q.   Okay.  If you could read the highlighted --

14   A.   That's what she put in writing after I

15        requested a written reason.

16   Q.   But what is she --

17   A.   And verbally she said for my performance and

18        because of my attendance.  Once I requested

19        documentation in writing, she put in writing

20        that it was based on your performance for

21        fiscal year-to-date in the VSR position.  So

22        fiscal year-to-date would have been after my

23        last promotion, which occurred in I believe

24        October.  So the date of that letter is what?

25   Q.   It's January 23, 2014.
```

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

141

1   A.   So from October to January 23rd would be the

2        date of the performance information that she

3        would be using, instead of my last

4        performance evaluation.

5   Q.   Okay.  During this period of time on

6        January 21, 2014, hadn't you changed to

7        another position?

8   A.   Yes, I was changed from the Express team.  I

9        believe that happened -- I believe it was the

10       end of that fiscal year.  So it had to be

11       either late October or November where I was

12       transferred over to the Core team.

13  Q.   Okay.  And did you go from a GS-9 to a GS-10?

14  A.   Yes, I believe I did.

15  Q.   And a GS-10 has different performance

16       standards?

17  A.   Yes, each grade has different performance

18       standards.

19  Q.   Okay.  And so the previous fiscal year review

20       had to do with your GS-9 position, not your

21       GS-10 position?

22  A.   That's correct.  But I was only in the GS-10

23       for a couple months, so I don't feel that

24       that was adequate time to determine what my

25       performance was.  Plus within the Agency,

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

142

1    once you're transferred to a new team, you

2    get a 60-day time frame to learn all the new

3    details on the new team.  So --

4  Q.  But would you agree you weren't meeting your

5    performance standards as a GS-10 at that

6    time?

7  A.  I agree that my disability was affecting my

8    performance.

9  Q.  Okay.  So you weren't meeting performance

10    standards?

11  A.  My disability was affecting my performance.

12        MS. CLARK:  Your Honor, I'd ask

13    that Counsel let the witness complete her

14    answer because I think he cut her off at one

15    point.

16        MR. MILLER:  Sorry, Your Honor.

17        JUDGE CARETHERS:  Yeah, you've got

18    to let her complete her answer.

19        MR. MILLER:  Sure.  Thank you.

20  BY MR. MILLER:

21  Q.  So October, didn't the 60 days already pass

22    at that point?  You said that you --

23  A.  It possibly is true.  But again, my

24    disability was affecting my performance.  So

25    that's all I was telling everybody and I was

143

1       asking for help.

2   Q.  Okay.  And so you go through the hardship

3       transfer route?

4   A.  I did what route -- the only thing I knew to

5       do, which I thought I was having a hardship,

6       so I tried to do a hardship transfer request.

7   Q.  Did someone tell you to do a hardship

8       transfer request, or was that your decision?

9   A.  That was the only request I knew to do.  So I

10      felt that it would be sufficient if I

11      provided like a reason that I was having my

12      hardship.  And I felt that if there was

13      anything else that they needed, they'd tell

14      me.

15  Q.  Okay.  Before you made a hardship request,

16      did you go to anybody and ask what should I

17      do?

18  A.  I didn't think it was necessary, because I

19      was having a hardship --

20  Q.  Okay.

21  A.  -- and that's a hardship transfer request.

22  Q.  Okay.  And the hardship transfer was denied?

23  A.  Yes.

24  Q.  And by, it looks like Director Stephens;

25      would you agree to that?

DEF000536

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

144

1   A.   From his -- he signed the form, yes.

2   Q.   Okay.  And then on May 21st -- who is

3        Gwendolyn Gantt?  Do you recall that name?

4   A.   She may be the reasonable accommodation

5        person in Baltimore.  I'm not sure, though.

6   Q.   Okay.  And that's the person that you had

7        contacted?

8   A.   Well, I was contacting everybody.  I was

9        pleading for help.  I was in a desperate

10       situation.

11  Q.   Okay.  After you received the denial that was

12       either January 21st or 22nd for the hardship

13       transfer, did you go to Sonya Wilson's office

14       to discuss it?

15  A.   I'm sorry, on what date?  Could you repeat

16       that.

17  Q.   Roughly, January 22nd or 21st of 2014?

18  A.   Was that during the hardship transfer?  That

19       was the hardship transfer, right?

20  Q.   Yes.

21  A.   Yes, I remember taking -- that's when I went

22       to her office.  She gave me -- she gave me

23       the hardship form.  I remember that.

24  Q.   Sonya Wilson?

25  A.   Yes, she gave me the form to fill out.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

145

1   Q.   No, I'm talking about the day of the denial.

2   A.   Oh.  You said Sonya.

3   Q.   Yeah, did you meet with Sonya about -- Sonya

4        Wilson about this?

5   A.   No, I wouldn't have requested to meet with

6        Sonya.  Ena requested to meet with me

7        regarding the...

8   Q.   All right.  And again, you were put on

9        notice, looks like January 27, 2014.  Is it

10       correct that you weren't allowed to sit for

11       the certification test?

12  A.   That's correct.

13  Q.   Okay.  And that was because of performance?

14  A.   Yes.

15  Q.   And do you recall who gave that to you?

16  A.   I think it was Jim Dean.

17  Q.   Okay.  Did you have any discussion with

18       Mr. Dean about performance issues at this

19       time?

20  A.   What date was that?

21  Q.   January 27th, roughly.

22  A.   So he knew already that I was requesting a

23       transfer, and I believe I already explained

24       to him that -- and everyone else involved,

25       that my condition was affecting different

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

146

1   aspects of my life, which the career was one
2   of them.
3 Q. Okay.  Then on February 10, 2014, did you
4   request an Article 13 transfer?
5 A. I don't know what a -- oh, well, that was --
6   yes.  The medical reassignment, yes.
7 Q. And that's under Article 13 of your -- the
8   contract?
9 A. That was from assistance from the union.  I
10   don't know anything about the Articles.  I
11   haven't even read it.  So I requested, as far
12   as I know, a medical reassignment request.
13 Q. Okay.  And did you submit the same -- you
14   submitted the same information that you had
15   submitted previously, essentially, other
16   than --
17 A. Not for the medical reassignment, no.  The
18   medical reassignment is when I sent the
19   memorandum to Mr. Stephens, through Ena and
20   Jim Dean, and I submitted my letter from
21   Dr. Huff.
22 Q. Okay.  And it also says that a transfer to
23   the St. Petersburg area will allow me to seek
24   out medical specialists recommended by
25   Dr. Huff.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

147

1   A.   That's a question?  I'm sorry.

2   Q.   Had you identified the specialists in

3        St. Petersburg at that point?

4   A.   I was looking.  I'm not sure if I had

5        identified one at that point yet.

6   Q.   All right.  And that's as of February 6, 2014

7        that you hadn't identified a specialist yet?

8   A.   I'm not sure of the dates exactly.

9   Q.   Okay.  Was Dr. Huff's -- I don't know --

10       medical ability insufficient?

11  A.   He wasn't a specialist.

12  Q.   Okay.

13  A.   And because I couldn't get into his office

14       when I needed to, yes, I suppose it would

15       have been insufficient for me in my

16       treatment.

17  Q.   But you don't indicate that you couldn't get

18       into his office in these documents.

19  A.   Why would that be necessary?  All they need

20       to know is -- well, if it was necessary,

21       maybe somebody could have asked me for

22       additional information.  I don't know.  I

23       only provided information that I thought was

24       necessary.

25  Q.   Okay.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

148

1    A.   Until someone told me or was willing to tell
2         me otherwise.
3    Q.   So again, your request under the contract for
4         medical reassignment, was it your
5         understanding that it was denied again due to
6         your performance?
7    A.   I really didn't understand why that one was
8         denied.  Basically, Ena just explained in
9         my -- in the response that my doctor's letter
10        was inadequate.  And it didn't state whether
11        or not -- it didn't state that I couldn't do
12        my job.
13   Q.   Right.  And it did identify that on
14        January 23rd you were informed that your
15        request for hardship had been denied, and
16        again, that's based upon your performance.
17   A.   She reiterated the initial hardship response,
18        and stated that the denial of the initial
19        hardship response was because of my
20        performance, yes.
21   Q.   Okay.
22   A.   But the second request was because my doctor
23        didn't say that I couldn't do my job.  That
24        was the medical reassignment, the response.
25        That's what I understood from the response

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

149

1        that she gave.

2    Q.  Well, when you talk about that you've never

3        indicated that you can't do your job --

4    A.  It was difficult many times during my

5        flare-ups.

6    Q.  If you look at the Report of Investigation,

7        you actually -- I think you say that you were

8        able to perform the essential functions of

9        your position.  Is that not correct?

10            MS. CLARK:  I'm going to object to

11       the line of questioning to the extent that

12       this seems to be leading questions and not

13       direct questions.  And you're --

14            MR. MILLER:  It's on cross.

15            MS. CLARK:  Actually, it's not.

16       My understanding of the order at the

17       pre-hearing conference, it was going to be

18       direct, direct, cross, cross.  That's what I

19       understood.

20            MR. MILLER:  That's fine.  Your

21       Honor, these are statements taken out of the

22       ROI.

23            MS. CLARK:  And if you could

24       reference where in the ROI --

25            MR. MILLER:  I will.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

150

1          MS. CLARK:  Yeah.  I appreciate

2     that.  Thank you.

3          JUDGE CARETHERS:  That was my

4     question, where was this in the ROI.  I

5     guess, if you could locate --

6          MR. MILLER:  Yeah, sure.  It's

7     126, page 10, lines 5 through 10.

8          JUDGE CARETHERS:  ROI, page 126?

9          MR. MILLER:  Yes.  Page 10.

10          JUDGE CARETHERS:  And it's page

11     10, okay.  Gotcha.

12          MR. MILLER:  Oh, I'm sorry, 126.

13          JUDGE CARETHERS:  And could you

14     just point me generally where she says she --

15          MR. MILLER:  Lines 5 through 10.

16     It indicates, are you able to perform these

17     duties as someone else would normally be able

18     to perform these duties.  And she indicates,

19     oh, yeah, I could perform my duties.

20     BY MR. MILLER:

21  Q.  So, I mean, you had indicated that on this

22     date you were able to perform essentially

23     your position.

24  A.  I can do -- I'm sorry.

25          MS. CLARK:  I was going to object

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

151

1    in terms of this date, because I don't know
2    what date is being referenced in the
3    transcript.  But go ahead and answer.
4  A.  I reiterated during -- when I'm not having
5    pain, and I'm not having my flare-ups, I can
6    do my job.  But because I'm on production,
7    when I am having those flare-ups and I'm
8    unable to concentrate, those days impact my
9    overall performance.  So if I have a week or
10   a few days that I'm in agonizing pain, then
11   those days would impact my performance.  And
12   if you take the rest of the month and include
13   the days that I was there and that my
14   performance was impacted, then of course my
15   overall performance would reflect any time
16   that I was having issues.
17 Q.  If you look at the same page, ROI 126, page
18   12, on lines 9 through 10.  It should be on
19   the same page.
20 A.  Okay.
21 Q.  Lines 9 through 10.  You indicate that, okay,
22   do you need any devices, and you say no.  Any
23   assistive devices.
24 A.  There are no assistive devices that could
25   assist me.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

152

```
 1   Q.   Okay.  Then on page 129, page 24, lines 20
 2        through 21.  You say I have -- I never said
 3        that I was unable to perform.  I can do my
 4        job.  I enjoy my job.
 5   A.   Uh-huh.
 6   Q.   Do you recall making that statement?
 7   A.   Yes, I enjoy my job.  I never had a problem
 8        with not doing my job.  The only problems has
 9        been if I'm having a flare-up or I'm having
10        issues that affect my performance.
11   Q.   Then on page 133, on page 39, line 14, you
12        state, I've never said I couldn't do my job.
13   A.   That's correct.  I said my disability affects
14        my performance.
15   Q.   Okay.  And when, in fact, you were having
16        these flare-ups, you were permitted to take
17        liberal leave?
18   A.   When I didn't have leave, then that means I
19        was receiving leave without pay.  So in some
20        situations, no, I had to --
21   Q.   I thought you --
22   A.   If it wasn't as bad.  I mean, sometimes if it
23        was an extended period, of course.  I mean, I
24        did like apply for voluntary leave.
25   Q.   Yeah, you did apply for that --
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

153

1   A.   Yeah, I did that a number of times, yes.

2   Q.   So even though you would be out of sick or

3        annual leave, you wouldn't necessarily have

4        to take leave without pay.  You could --

5   A.   It doesn't necessarily guarantee that I would

6        get voluntary leave transfer hours.

7   Q.   But you did?

8   A.   I did on one occasion.  And it was way less

9        than the time that I had off.

10  Q.   Okay.  Now, if you look back at this denial,

11       Ms. Lima specifically states, if you believe

12       that you need an accommodation due to a

13       disability or workplace barrier that

14       precludes you from performing the essential

15       functions of your position, you may request a

16       reasonable accommodation by completing a

17       form.  And essentially, you thought that was

18       inappropriate for her to state.

19  A.   I didn't think it was inappropriate.  I

20       suppose I felt that that was leading, just

21       like this conversation is, is that I can't do

22       my job.  I'm able to do my job.  I enjoy my

23       job.  The problems that I had with my

24       performance was directly related to my

25       disability with my flare-ups.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

154

1          So in this paragraph where she says,

2     if you can't do your job -- there's nothing

3     that they could have provided me, a device,

4     extra breaks, extra lunches, anything that

5     would have assisted me while I'm there on

6     location to do my job.  There was nothing.

7     So there was not a situation that I couldn't

8     do my job so tell me how you can -- tell me

9     how we can help you do your job.  That wasn't

10    an issue.  I needed help trying to tell me

11    how I can get to Florida for family and to

12    the doctor for treatment.

13  Q.  Well, I mean, were there any other options at

14    all that you would have considered as far

15    as --

16  A.  That wasn't asked of me.

17  Q.  Well, I mean, were there?  That you would

18    have accepted as a reasonable accommodation?

19          MS. CLARK:  I'm just going to

20    object, asking to speculate, but go ahead and

21    answer if you can.

22          THE WITNESS:  No.  Because my

23    family was there.

24    BY MR. MILLER:

25  Q.  So to you, it wouldn't have made a

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

155

1      difference.

2   A.  Was there a different accommodation I would

3       have accepted in the meantime?  Possibly.

4   Q.  Okay.

5   A.  Like tele-work, that wasn't provided as an

6       option to me.  And I would have accepted

7       tele-work during that time that they refused

8       to transfer me claiming that I had

9       insufficient documentation.  I would have

10      done tele-work.

11  Q.  Okay.  Do you recall having a conversation

12      with Sonya Wilson about an interim

13      accommodation?

14  A.  When she requested if I wanted a chair or

15      extra breaks.  She told me that that was what

16      an accommodation was, a chair or extra

17      breaks.

18  Q.  Did you mention --

19  A.  I said with my condition, that would not

20      suffice.

21  Q.  Okay.  So you didn't even want to discuss an

22      interim accommodation with Sonya Wilson --

23  A.  Not about --

24              MS. CLARK:  Objection.  That

25      mischaracterizes testimony.

DEF000548

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

156

1          MR. MILLER:  Okay.  But --

2          JUDGE CARETHERS:  Okay, hold on a

3     second.  Hold on a second.  I'm not even sure

4     if he got the whole question out.  But from

5     what I heard, you weren't even interested in

6     discussing any interim accommodations, and

7     then I heard an objection.  And I think the

8     objection was that it's speculating.  Is

9     there any response or offer of proof by the

10    Agency to the objection?

11         MR. MILLER:  Well, she's the one

12    making the request, so she's the only one

13    that's going to know whether or not she would

14    have accepted anything other than a transfer

15    to Florida.

16         JUDGE CARETHERS:  All right.  I

17    overrule the objection.  You may answer the

18    question.

19         THE WITNESS:  No, sir, because my

20    family.  My family was there.  And that was

21    one of the main issues that I wanted to get

22    to Florida.  I needed my family support.

23    BY MR. MILLER:

24    Q.  So in your discussion with Ms. Wilson about

25        your reasonable accommodation request, did

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

157

1    you state that you didn't want an interim

2    accommodation, that you just wanted to be in

3    St. Pete?

4              MS. CLARK:  Objection.  Leading.

5    There's been no statement from the witness

6    about an interim -- whether she would or

7    would not accept an interim accommodation.

8    There's been no evidence presented that an

9    interim accommodation was presented to her

10   for consideration.

11             MR. MILLER:  I think she just

12   admitted to the conversation she had with

13   Ms. Wilson and the discussion about an

14   interim accommodation.

15             MS. CLARK:  No, she did not.

16             JUDGE CARETHERS:  Okay.  From my

17   understanding, she testified that Ms. Wilson

18   did offer a chair and offered something else,

19   and that she rejected that.  I also

20   understood that she testified to the fact

21   that her main -- that she wanted to go to

22   St. Pete, Florida.  I think his question was

23   going straight to the issue about going to

24   Florida, essentially.  So I'm going to

25   overrule the objection.  You may answer the

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

158

1    question.

2                    THE WITNESS:  I'm sorry.  What was

3    the question again?

4                    MR. MILLER:  Ma'am, do you mind

5    reading that back.

6                    (Whereupon, the record was read as

7    requested.)

8                    THE WITNESS:  I didn't know about

9    any interim accommodations that would have

10   been appropriate that was provided to me.

11   The only thing that was provided to me was an

12   extra break and a different chair.  Had a

13   different accommodation been presented to me,

14   yes, I may have been willing to accept that

15   until my final request for a transfer to

16   St. Pete was finalized either by a transfer

17   or -- I mean, I was willing to take other

18   employment, even.  But at this point, Sonya

19   did not provide me with anything other than

20   an extra chair -- an extra break or an

21   additional chair, which I knew because of my

22   condition and because of my circumstances and

23   situation, that that wouldn't happen.  That

24   wouldn't work for me.

25

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

159

1    BY MR. MILLER:

2    Q.   Did you indicate -- did you provide any

3         possible options?

4    A.   I didn't know of my options.   That's what I

5         felt that the reasonable accommodation

6         interaction process was for, for them to tell

7         me about tele-work.

8    Q.   Did you get upset at some point during this

9         meeting where you would refuse to talk to

10        Ms. Wilson and you walked over and looked out

11        the window?

12   A.   Oh, no.   I don't remember anything like that.

13   Q.   You wouldn't speak to them?

14   A.   No.   There was only one incident that I

15        remember, and this is I believe, after two --

16        the first two denials.   I don't remember the

17        date that Ms. Wilson came down to talk to

18        Mr. Young, asked Mr. Young to come get me so

19        he can speak to me.   And this was after I had

20        sent Sonya an e-mail, maybe 10 minutes

21        before.

22             And after I sent the e-mail to Sonya,

23        she came out of her office, she walked down

24        to speak to Mr. Young, which was my assistant

25        coach, and ask me to come talk to her.   And

160

1        the only thing I told Mr. Young, is I said,

2        please ask Ms. Wilson to respond to my e-mail

3        and to my request or any inquiries in

4        writing.  Because at this point, lip service

5        would not suffice.  That was not getting me

6        any closer to Florida.

7            I needed what they were refusing to

8        provide me, which was written documentation

9        of my denials, my appeal rights, my other

10       options.  That's what they were refusing to

11       get me.  And her telling me verbally was not

12       going to help me.  I wanted the thing, that

13       particular thing, in writing.  Or that

14       incident might have been about the FMLA.  And

15       that's when I was sending her the

16       correspondence about please tell me what I

17       have to do in order to use my FMLA.

18           And any other time, Sonya did not have a

19       problem responding to me through e-mail.  To

20       me, I understood that the most professional

21       way to correspond is through e-mail so we can

22       keep records.  You know, I need to be able to

23       see what was written, just like we can refer

24       back to this information in this report.  Her

25       telling me what to do verbally does not help

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

161

1       me.  It did not help me, and I wanted it in

2       writing.  So...

3   Q.  So --

4   A.  That was the only incident where I was -- and

5       that was after several requests had already

6       been made.

7   Q.  Was Rachel Gentry a part of this meeting with

8       Sonya Wilson?

9   A.  Yes.

10  Q.  Okay.  And do you recall Ms. Gentry stating

11      to Ms. Wilson that she would -- that she

12      would explain the reasonable accommodation

13      process to you?

14  A.  I don't recall.

15  Q.  Okay.

16  A.  We were in there about reasonable

17      accommodation, but I don't know.  I was

18      crying that day, and I was in excruciating

19      pain.  I was having a flare-up, which I

20      expressed to everyone in the room.

21  Q.  Okay.

22  A.  So that may have been maybe I was emotional

23      and I was crying in pain, and maybe she

24      misunderstood that for me being unwilling to

25      accept whatever information that she was

DEF000554

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

162

1    trying to provide, which I still haven't

2    received to this day from them, that they

3    claim that they were trying to convey except

4    they refused to convey it in writing.

5              JUDGE CARETHERS:  Ms. Brown?

6              THE WITNESS:  Yes.

7              JUDGE CARETHERS:  The question was

8    just simply, do you recall Ms. Gentry saying

9    she would explain the accommodation process,

10   and I thought you said you didn't recall.

11             THE WITNESS:  I don't.  No, sir.

12             JUDGE CARETHERS:  I'm not sure

13   what you're --

14             THE WITNESS:  Sorry.

15             JUDGE CARETHERS:  -- responding to

16   at this point.

17             THE WITNESS:  I'm understand.  I'm

18   sorry.

19             JUDGE CARETHERS:  Thank you.  Next

20   question?

21             MR. MILLER:  Thank you, Your

22   Honor.

23   BY MR. MILLER:

24   Q.  During these discussions with regard to the

25       request for reasonable accommodation that you

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

163

1       submitted, did Ms. Wilson or anyone else

2       request that you provide additional medical?

3   A.  I received an e-mail from Mr. Young stating

4       to please -- you have not yet submitted your

5       medical documentation.  And that's where I

6       responded saying I've already submitted the

7       information.  If it does not suffice, please

8       provide me with the information that is

9       missing so I can provide it.  That's what I

10      remember.

11  Q.  Okay.  And do you recall receiving an e-mail

12      from Jim Dean wherein -- or actually, didn't

13      they give you a VA Form 0857e to fill out --

14  A.  On that last -- on my third request, yes,

15      they did.

16  Q.  And did you ever fill that out?

17  A.  Yes, I did.

18  Q.  And did the doctor sign off on that?

19  A.  They didn't request that the doctor sign off

20      on anything.  I submitted my medical

21      evidence, the letter from Dr. Huff.

22      Everything else I had already submitted.  I

23      resubmitted with that last request.

24  Q.  You don't recall Jim Dean giving you Form

25      0857e to have your provider complete?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

164

1   A.   No, I don't recall that.  Because he had the

2        conversation, he asked me did I already

3        submit the information.  If you feel that you

4        have already submitted the information, just

5        tell me.  And I did tell him that I feel that

6        I've already submitted the medical

7        documentation.

8   Q.   So you didn't seek additional?

9   A.   Not at that time, no.  I was waiting for a

10       response for what was wrong with the medical

11       documentation I had already submitted.

12  Q.   Okay.  Are you familiar with that VA Form

13       0857e?

14  A.   E?

15  Q.   Yes.

16  A.   Now I am, yes.

17  Q.   You are now?

18  A.   Yes.

19  Q.   Okay.  And that requests specific

20       information?

21  A.   Yes.

22  Q.   And when he asked you to provide additional

23       medical documentation using this form, did

24       you look at that form to see what they were

25       requesting?

DEF000557

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

165

1    A.   How did he submit that form?  Are you saying

2         he submitted it through e-mail?

3    Q.   It's my understanding he provided it to you

4         in an e-mail.

5    A.   I'm sorry, what is your question?

6    Q.   When he indicated to you that we need some

7         more additional information from your medical

8         provider, and using the VA Form 0857e, did

9         you look at the form?

10   A.   I don't remember.  I don't recall having --

11        or -- the only thing, like I said, only thing

12        I remember is he did say that I needed to

13        submit new medical documentation.  I don't

14        remember if he gave me the form or if he just

15        verbally said that, or if it was my recall

16        from Mr. Young's letter saying we need it.

17   Q.   I'm going to hand it to you to refresh your

18        memory.  Just look at it, and hand it back to

19        me when you're finished.

20                  JUDGE CARETHERS:  Mr. Miller?

21                  MR. MILLER:  Yes, Your Honor?

22                  JUDGE CARETHERS:  It would be

23        helpful also if you give a time frame when

24        this is occurring.

25                  MR. MILLER:  Okay.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

166

1          JUDGE CARETHERS:  At least in

2     relation to what requests we're talking

3     about.

4          MR. MILLER:  Sure, I will.

5          THE WITNESS:  Oh, yes, okay.

6     Well, then he must have, because I remember

7     this statement where he stated, if you feel

8     that you have submitted the medical evidence,

9     to forward me an e-mail stating so.  You do

10    not have to state that today.  You have

11    15 days.  So that's when I responded from --

12    eventually saying that I feel like I already

13    submitted the medical documentation.

14    BY MR. MILLER:

15    Q.  Okay.  So you didn't look --

16    A.  I don't remember.

17    Q.  And this was around February 27, 2014?

18    A.  The only thing I know is I was referring them

19        to my medical certification that I had

20        already provided.  And at this point I felt

21        that my medical documentation was sufficient.

22        And until someone was willing to tell me

23        otherwise, I couldn't or what was -- I didn't

24        even -- yeah.

25    Q.  Well, if you were concerned about your

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

167

1     medical documentation being insufficient, and

2     the VA has a particular form for this, why

3     wouldn't you go and have this form filled

4     out?

5  A.  Because I had already went to my doctor who

6     already took his time to write the letter

7     with the information that I feel was

8     sufficient.  And if it was not, then I was

9     waiting for a response from them telling me

10    what was wrong my written documentation -- my

11    certification.

12  Q.  Do you think that by them giving you this

13    form that that was their attempt to help you

14    with your medical documentation?

15  A.  No.

16  Q.  Did you ever compare the form to what your

17    medical provider stated in his memorandum?

18  A.  I'm not -- I'm not a doctor.  I wouldn't have

19    been filling out that form, so I wouldn't

20    know if it would have been adequate or not.

21    Basically the only thing I did was submitted

22    the medical certification and I was waiting

23    for someone to tell me what was wrong.

24  Q.  So you made no attempt to get further

25    information using this form?

DEF000560

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

168

1   A.   Not until somebody replied to me with why my

2        original certification was inadequate.

3   Q.   Do you recall receiving an e-mail from Donald

4        Young on March 25, 2014, asking if you had an

5        opportunity to obtain that information

6        requested on the VA form?

7   A.   Yes.

8   Q.   Do you recall what your response was?

9   A.   Yes.  My response was I felt that I already

10       submitted my medical documentation with the

11       medical certification from Dr. Huff.  And

12       that's where I stated if it wasn't adequate,

13       please tell me what is wrong with the letter.

14  Q.   And again, March 25th of 2014, did you at

15       this point take an opportunity to look at the

16       VA Form 0857e?

17  A.   I was waiting for a response from them

18       regarding what was wrong with my medical

19       certification already.

20  Q.   So you made no effort to do that?

21              MS. CLARK:  Objection.  Asked and

22       answered.

23              JUDGE CARETHERS:  Actually, I

24       don't think she did answer the question

25       directly.  So actually I'm going to overrule

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

169

1         the objection.  Please answer the question.
2    A.   Did I make any further attempt to get that
3         form filled out; is that what you asked?
4    Q.   Or even look at it?
5              MS. CLARK:  Is it two questions?
6    A.   I don't remember --
7              MR. MILLER:  Okay.
8    A.   I don't remember personally.  I don't
9         remember that form, per se.  I really don't.
10        So I can't say -- if I don't remember -- I
11        don't know if I would have referred back to
12        it.  I mean, I don't remember that form.
13   Q.   Did you make any effort to provide this form
14        to your provider to have them fill it out?
15   A.   I don't remember getting the form.  I just
16        don't remember.
17   Q.   Okay.  Now, do you recall receiving the
18        denial of reasonable accommodation
19        approximately April 2, 2014?
20   A.   Yes.
21   Q.   Do you recall why they believed it was --
22   A.   Can you give me the page number, please.
23   Q.   Yeah.  It's ROI 245 and 246.
24   A.   And I'm sorry, what was your question?
25   Q.   Did you recall receiving this documentation?

DEF000562

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

170

1   A.   Yes.

2   Q.   And the reasons for the denial?

3   A.   Yes.  And it says the medical documentation

4        provided was not adequate.  So it does say

5        that I provided medical documentation, but

6        it's saying that it was not adequate.  Which,

7        that's what I was waiting on.  I was waiting

8        for what information was inadequate about my

9        medical documentation.

10  Q.   Okay.

11  A.   That's exactly what it says here.

12  Q.   And does it indicate on the last line --

13       could you read that?

14  A.   Which last line, please?

15  Q.   The last line under detailed reasons for the

16       denial.

17  A.   It says if you need to visit a medical

18       specialist outside of the commuting area, you

19       may request leave in accordance with the

20       appropriate leave requesting procedures.  I

21       see that.

22  Q.   Okay.  And were you doing that?

23  A.   No.  I did not have the financial means to do

24       that.  That was not an option.

25  Q.   Okay.  Why wouldn't that be an option?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

171

1   A.   How could I fly to Florida every time I

2        wanted to see a specialist considering that

3        my condition is unpredictable and chronic.

4        And I was receiving leave without pay at the

5        time.

6   Q.   Okay.  And weren't you being treated by

7        Dr. Huff?

8   A.   Not adequately or to my satisfaction.  I

9        wasn't able to see him like I wanted to.  I

10       didn't have access.

11  Q.   Okay.  Did you look around for any other

12       specialist here in the Indianapolis area?

13  A.   Again, that was only one reason why -- one of

14       the reasons why I wanted to transfer.  One of

15       the most important reasons to me was because

16       of my family.  I needed that family support.

17       I needed that social support.  I needed my

18       kids.  I needed -- I needed people there who

19       loved me and who could help me.

20            So a specialist, only finding a

21       specialist here in Indiana, that wouldn't

22       have sufficed.  I wouldn't have had my

23       family.

24  Q.   Okay.  Thank you.  And did you meet with

25       Ms. Lima about this denial?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

172

1    A.   No, I did not.  We did not have a meeting

2         about that, no.

3    Q.   Okay.  Had you researched or looked into

4         specialists in Florida that could treat your

5         condition?

6    A.   I did throughout that time.  It was an

7         extended period of time from when I initially

8         started my request to when I -- so I don't

9         know exactly what dates or the...

10   Q.   Okay.  Let's talk about the Spark training.

11        What is Spark?

12   A.   Spark was -- I guess, what do you want to

13        call it.  It's a training.  It was a

14        training.  It was a training.

15   Q.   Is it a mandatory training?

16   A.   I don't know if it's mandatory.  I have -- I

17        don't know.

18   Q.   Okay.  But you were asked to attend that

19        training?

20   A.   Yes.

21   Q.   Do you recall where it was?

22   A.   I believe it was in Virginia.

23   Q.   And did you have any issues with attending

24        that training?

25   A.   Yes.  At that point I still had my sutures

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

173

```
 1        in.  I think I had my sutures removed the day

 2        after I was supposed to show up for that

 3        Spark training.  And I felt that because

 4        of -- and even I had complications regarding

 5        that same suture removal, which later

 6        required me to revisit Dr. Huff's office.  So

 7        that would have been a horrible situation for

 8        me to be in Virginia having chronic issues

 9        related to a recent surgical procedure that I

10        had.

11   Q.   And you requested a reasonable accommodation

12        to not attend?

13   A.   I did not request a reasonable accommodation.

14        Basically, what I said -- or I believe I

15        stated that I wanted to be excused from the

16        Spark training because of my surgery.

17   Q.   Okay.  And do you recall whether or not they

18        treated it as a reasonable accommodation?

19   A.   I remember receiving an e-mail from Julie

20        Barrett sometime later, that might have been

21        like a month or closer around the time that I

22        was due to transfer, closing out a reasonable

23        accommodation request.  It wasn't -- I didn't

24        know what it was.  I thought originally when

25        I had seen it, it was associated with my
```

DEF000566

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

174

```
 1        request to transfer.  So we did not have a

 2        reasonable accommodation process, no.  I

 3        didn't request.  I just requested to be

 4        excused from training.

 5   Q.   And were you excused from training for your

 6        medical condition?

 7   A.   I don't know for what reason they excused me.

 8        I was excused.

 9   Q.   Well, what did you request it for?

10   A.   Because of my surgery.

11   Q.   Okay.  And they granted it?

12   A.   Yes.  Eventually, after Ena Lima said that

13        they would -- they would -- they would help

14        me see somebody in Virginia if I needed to

15        see the doctor.

16   Q.   And you didn't --

17   A.   Why would I -- I'm trying to find a doctor

18        who knows me and knows my body and my

19        situation and my condition, so I won't have

20        an experience like what happened at the

21        immediate care clinic.  So the last thing I

22        was interested in was having some -- another

23        random doctor possibly cutting me.

24   Q.   And so you didn't go to the training?

25   A.   No, I did not.
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

175

1   Q.   Okay.  Did you work here at the regional

2        office?

3   A.   I believe during that time I may have -- I

4        mean, I was still here in Indy, so...

5   Q.   Well, were you working during the Spark

6        training here in Indianapolis?

7   A.   I don't know if I was there the entire time.

8        I don't know if I had missed days.  I don't

9        know.  During most of that time -- I mean, I

10       don't know.  I do know that I had to get my

11       sutures removed the day before I was supposed

12       to go -- I mean, the day after I was supposed

13       to go to Spark.  And then as far as my

14       medical documentation is concerned, it shows

15       I had a follow-up visit because of that same

16       condition, that same stitch removal that was

17       I believe like that -- I don't know if was

18       during still probably Spark.  I'm not really

19       sure.  But I was still having issues, so it

20       was good that I didn't go.

21   Q.  Do you recall receiving an e-mail from Adam

22       Kinder discussing mandatory overtime?

23   A.  No.  He sent out a regional -- a letter to

24       the regional office about mandatory overtime.

25   Q.  So you saw that?

DEF000568

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

176

1  A.  Yes, but it didn't reference anything about

2      FMLA and how I could use my FMLA hours.

3  Q.  Okay.  But you'll agree that you were

4      required to put in 20 hours of overtime per

5      month?

6  A.  Yes.

7  Q.  Okay.  And FMLA is used -- and in your case,

8      it was for intermittent FMLA, which is my

9      understanding that you don't know when it's

10     going to happen, but it could happen?

11 A.  Uh-huh.

12 Q.  All right.  How were you scheduling your FMLA

13     in the future when you weren't sure that you

14     were going to have a flare-up or you were

15     having some sort of condition for those

16     20 hours every month?

17 A.  Well, at that point I was having frequent

18     flare-ups.  So I don't know, maybe I was

19     having a flare-up during that time.  It's not

20     a matter of me saying oh, it might happen in

21     the future, no.  During that time I was

22     having constant irritation, aggravations, and

23     flare-ups.  So that may have been happening

24     during each one of those times that -- those

25     two months specifically.  Because I believe

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

177

1        it was January and February, or at least

2        February, where I didn't do the mandatory

3        overtime.  And January is when I missed

4        two weeks on the voluntary leave transfer.

5        So I was having medical issues at that point.

6   Q.   Well, do you know -- if you're having an

7        issue, whatever it may be, and you have FMLA

8        and you need to take a day off, what do you

9        do to do that?

10  A.   I call in.

11  Q.   Okay.  Who do you call?

12  A.   A supervisor.

13  Q.   Okay.  And who was your supervisor at the

14       time?

15  A.   At the time, Jim Dean.

16  Q.   All right.  So you didn't want to have to

17       call in, you just wanted to use the 20 hours

18       randomly?

19  A.   At some point I was extending myself for even

20       being able to do my core hours.  Because at

21       some points I was in extreme pain, but

22       because of my leave without pay, or -- you

23       know, because it's just not a matter of the

24       being able to take leave.  It's a matter of

25       not getting paid all the time for the leave.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

178

1    So some cases, you know, yeah, I may have had

2    to drag myself in, in pain.  And I did that

3    on numerous occasions.  And so I could have

4    been having a flare-up that entire month

5    already.

6    Q.   Do you recall receiving an e-mail from Jim

7    Dean on approximately February 12, 2014,

8    about your failure to sign up for mandatory

9    overtime?

10   A.   Yes.

11   Q.   Okay.  And do you recall it saying that, I

12   haven't received your mandatory overtime for

13   February.  I'm directing you to give me your

14   hours and days of February OT by close of

15   business tomorrow, which was February 13,

16   2014?

17   A.   I remember -- I believe I did.  I'm not sure

18   about the days.  If you want to direct me to

19   something in the ROI, maybe I can look at it.

20   Q.   Okay.  Did you ever submit your proposed

21   hours for mandatory overtime to Mr. Dean?

22   A.   I did, I believe, like right -- I'm not sure,

23   but at one point, yeah, I believe I did.

24   Q.   Okay.  When was that?

25   A.   After the proposed reprimand, I believe.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

179

1  Q.  Okay.  So why didn't you submit or just pick

2      hours of overtime that --

3  A.  Because I knew I wasn't going to be able to

4      work it at that time.

5  Q.  Okay.  Did you not understand that you could

6      call in on that date, on your overtime date,

7      and say I want to use my FMLA for this date?

8  A.  I didn't think that was procedure for FMLA.

9      That's why I was asking for written

10     documentation of what I needed to do, which

11     wasn't provided to me until after the

12     reprimand was already proposed.

13  Q.  Okay.  So again, it doesn't really answer the

14     question why you didn't.

15  A.  Because I didn't know to do that until after

16     I received the proposed reprimand, with that

17     e-mail from Sonya saying, oh, this is what

18     the person has to do, when she responded to

19     Rachel.

20  Q.  Well, I mean, weren't you -- weren't you

21     already using FMLA?

22  A.  Not for mandatory overtime.

23  Q.  But you'd been pretty familiar with it.

24     You'd been using it for some time.

25  A.  Not for mandatory overtime.

DEF000572

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

180

1   Q.   For other leave?

2   A.   For other leave, yes.

3   Q.   Okay.  And that process was, you're scheduled

4        on a date, is that right, to work --

5   A.   I'm sorry, what was scheduling a date?

6   Q.   The process is, you're scheduled on a date to

7        work.

8   A.   Overtime?  What day -- what are you talking

9        about, regular day?

10  Q.   Just regular day.

11            MS. CLARK:  Objection.  In terms

12       of leading.  I mean, again, this is supposed

13       to be direct, and he is asking leading

14       questions.

15            MR. MILLER:  I'll withdraw the

16       question, Your Honor.  Thank you.  Sorry.

17            JUDGE CARETHERS:  Go ahead.

18  BY MR. MILLER:

19  Q.   Can you tell me the process of how you used

20       FMLA in the past?

21  A.   I would -- I would call in and request to use

22       FMLA.

23  Q.   Okay.  So when did you request how to use

24       your FMLA for the overtime?

25  A.   You said when did I request?  How?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

181

1   Q.  When did you seek guidance on how to use your

2       FMLA for your overtime?

3   A.  I didn't receive guidance, not until after

4       the proposed reprimand.

5   Q.  Did you request guidance before the proposed

6       reprimand?

7   A.  I visited the Department of Labor website.

8   Q.  Okay.  That's all?

9   A.  I asked my supervisor if I could use my FMLA

10      hours.

11  Q.  Okay.  What did he say?

12  A.  He -- I don't remember receiving a response

13      from him.

14  Q.  Okay.  Then on May 20, 2014, you made a

15      request for -- because you were going to be

16      out for a surgical procedure?

17  A.  Uh-huh.

18  Q.  And then you were going to have to be off and

19      use your FMLA.  Do you recall that?  And that

20      you'd asked for the voluntary leave transfer

21      program again?

22  A.  Yes.  I asked for voluntary leave because I

23      knew I was going to be out for a little

24      while.  Yes.

25  Q.  Okay.  And that's Complainant's C-7 or

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

182

1     Defense Exhibit 7.  And you were approved for

2     that; is that correct?

3  A.  The voluntary leave transfer?

4  Q.  Yes.

5  A.  Yes.

6  Q.  Do you know who approved you for that?

7  A.  No.

8         MR. MILLER:  I'd like to mark this

9     as Agency Exhibit A.

10         JUDGE CARETHERS:  We're not going

11     to do Agency, and we're just going to go

12     exhibit numbers.  So let me look at the last

13     exhibit number, which I believe was 27.  So

14     28 would be the new exhibit number.

15         MR. MILLER:  Okay.  Thank you.

16         JUDGE CARETHERS:  Does opposing

17     counsel have a copy of what we're -- have you

18     seen it?  And once you have a chance to

19     review it, can you let me know if there's any

20     objection to that exhibit.

21         MS. CLARK:  I have no objection to

22     the exhibit.

23         MR. MILLER:  All right.  Thank

24     you.

25         JUDGE CARETHERS:  All right.  Can

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

183

1      we have this marked as 28, and it's admitted.

2                  MR. MILLER:  Thank you, Judge.

3      BY MR. MILLER:

4   Q.  I'll hand you what's marked as Exhibit 28

5       (sic).  Do you recall seeing this?

6   A.  Yes, I remember this.

7   Q.  And who were the people that approved your

8       leave transfer request?

9   A.  It went through Ena Lima.  Looks like it

10      was -- well, she concurred.  Michael

11      Scheibel, the assistant director.  And

12      somebody signed it on behalf of Ena.  It's

13      not Ena's signature.

14  Q.  So it was approved, and you were able to get

15      signed up for that; is that right?

16  A.  Yes.

17  Q.  All right.  Do you recall whether or not you

18      received any hours through that program?

19  A.  No, I don't.

20                  MS. CLARK:  Your Honor, just one

21      second, in terms of the marking of the

22      number.  I wanted to make sure we're not out

23      of sync anywhere.

24                  JUDGE CARETHERS:  I didn't hear

25      what you said.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

184

1          MS. CLARK:  We're just double

2    checking the numbers, Your Honor.  We think

3    we may actually be at 27.

4          JUDGE CARETHERS:  Let me go back.

5    When you entered that batch of exhibits, I

6    believe there were 16 exhibits, weren't

7    there?  And we were already -- we were at

8    Exhibit 11, I believe.  We were at 11, but 10

9    was removed but it would still remain 10.

10          MS. CLARK:  Right.

11          JUDGE CARETHERS:  So didn't we go

12    from Exhibit 11 to Exhibit 27?

13          MS. CLARK:  The numbering is

14    actually only through 26.  There was a number

15    that had no exhibit under it.  Yeah, Exhibit

16    34 on Complainant's list.  So I think, Your

17    Honor, when you did the numbers through -- I

18    think it was 20 through 32 --

19          JUDGE CARETHERS:  20 through 36.

20          MS. CLARK:  Yeah, through 36.

21    That 34 was not included in that when we went

22    through the individual list.

23          JUDGE CARETHERS:  Okay.  Okay, so

24    we were at 26, so what was marked as 28

25    should have been 27; is that correct?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

185

1    MS. CLARK:  Yeah, it's being

2    marked as 27.

3    (Exhibit 27 was marked for

4    identification and received into evidence.)

5    JUDGE CARETHERS:  Okay, great.

6    Let me mark my notes.  Just so we're clear,

7    27 was the approval of the leave transfer

8    request?

9    MS. CLARK:  Yes, Your Honor.

10   Yeah, the one dated May 21, 2014.

11   JUDGE CARETHERS:  Okay.  And

12   Mr. Miller, I just want to note for you that

13   you referenced some documents that you said

14   are proposed exhibits, but you haven't

15   necessarily admitted them.

16   MR. MILLER:  Okay.

17   JUDGE CARETHERS:  Just to let you

18   know.

19   MR. MILLER:  Okay.  Is 27

20   admitted?

21   JUDGE CARETHERS:  Yes, 27 is

22   admitted.  And that's your first admitted

23   exhibit.

24   MR. MILLER:  Thank you.

25

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

186

1       BY MR. MILLER:

2   Q.  After you had received the reprimand, did

3       you file a grievance or contest that?

4   A.  I had discussed that with Rachel about the

5       process, and I think she may have grieved it

6       for me.

7   Q.  Okay.  Did you ask her to do that?

8   A.  I felt it was inappropriate.  Yes.

9   Q.  As far as your medical appointments, it

10      appears that you had -- let me know if I'm

11      wrong -- it appears that you had two issues

12      where you had to have a cyst drained.  This

13      was provided in this medical.

14  A.  It might have been more than two.

15  Q.  Okay.  These are the same medical documents

16      that your counsel provided to you to review.

17      If you could go through and let me know how

18      many cysts you had to have surgically --

19  A.  Well, there was a few that I chose not to.

20      Like there was one that I reference in here

21      that I had flare-ups at the time of my visit,

22      but elected to not have it surgically

23      drained, the cyst surgically drained.  So you

24      mean for the ones that I elected to have --

25  Q.  Sure.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

187

1   A.   -- surgically drained?  Because I have

2        flare-ups constantly that I do not get

3        surgically drained, and that is my -- I

4        choose that because of the pain and the

5        creation of sinus tracks from the incisions.

6   Q.   Okay.  So how many times have you --

7   A.   So let's see.

8             JUDGE CARETHERS:  Mr. Miller, what

9        documents is she referring to right now?

10            MR. MILLER:  They're the same

11       medical documents that Counsel had provided.

12       I can go through them.

13            JUDGE CARETHERS:  Okay, that's

14       fine.  I just didn't know what she was

15       looking at.

16            MR. MILLER:  Yeah, they're the --

17       all her medical documents.

18            JUDGE CARETHERS:  Okay, her

19       medical -- okay.

20            THE WITNESS:  I believe there may

21       have been two, from my recollection, that

22       were actually drained.  Other than -- does

23       that include the May treatment?  Yeah, looks

24       like I elected -- with Dermatology Inc., it

25       looks like I may have had two.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

188

1     BY MR. MILLER:

2  Q.  Okay.  Could you identify which exhibits

3      those are for the Administrative Judge, the

4      ones you're referring to?

5  A.  I'm sorry?

6  Q.  Can you identify the exhibit numbers for the

7      times that you went in to have it surgically

8      drained?

9  A.  Looks like 12.

10           MS. CLARK:  Exhibit 12?

11 A.  Looks like it.  13, I declined.  And Number

12     15, and Number 18.  That's it.  Looks like

13     there's three.

14           JUDGE CARETHERS:  And can we just

15     have a clarification, because if I

16     understand, it was two instances of being

17     surgically drained, but I believe she just

18     read off three exhibits.  So is there three

19     times or is it two of them are referring to

20     the same drain?

21        Can someone clarify that, Mr. Miller?

22     Because I've got Exhibits 12, 15, and 18.

23           MS. CLARK:  She referenced 12, 13,

24     15, and 18.  She said 13 reflects a declined

25     drainage.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

189

1          JUDGE CARETHERS:  Right.  So 12,

2     15, and 18 are the ones she actually -- are

3     the ones I understood actually got drained.

4     So is that three instances or is two of them

5     referring to the same one.  That's what I'm

6     trying to figure out.

7          MR. MILLER:  Okay, yeah, I'm going

8     to go through them.  I'll go through the

9     exhibits with the witness.

10          JUDGE CARETHERS:  Okay.  Great.

11     You may proceed.

12     BY MR. MILLER:

13  Q.  If you look at Exhibit 12, where does that

14     indicate that you had that surgically

15     drained?

16  A.  It says the patient will have CBC with

17     differential hepatic panel checked.  After we

18     get the results -- so they had to do some

19     type of incision in order to have -- what are

20     they getting the results from?  They had to

21     do some type of surgical procedure in order

22     for them to send a panel out for -- to get

23     results of some sort.

24  Q.  Okay.  So you don't know whether or not you'd

25     had the procedure done, or they're talking

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

190

```
 1        about --
 2   A.   Well, I wouldn't have come back for them to
 3        get a -- I mean, to do a culture.  They do
 4        the culture the same day.
 5   Q.   It says assessment and plan.
 6   A.   This one right here says, patient will have
 7        CBC with differential and hepatic panel
 8        checked.  After we get the results back the
 9        patient will be given clindamycin.  So that
10        was some -- that was some other type of
11        treatment.  Yeah, that was -- they were
12        checking my liver or something.
13   Q.   Okay.  So this wasn't --
14   A.   No, it wasn't a cyst.
15   Q.   So Exhibit 12 is not a...
16               JUDGE CARETHERS:  An instance of a
17        drain, correct?
18               MR. MILLER:  It's an instance
19        where there was no drain.
20               THE WITNESS:  It was a treatment,
21        sir.
22        BY MR. MILLER:
23   Q.   And then Exhibit 13, as you'd indicated
24        before, you didn't want it drained?
25   A.   No, I didn't.
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

191

1   Q.   And then on May 22, Exhibit 15, that's where

2        you had your surgical procedure and had

3        something drained?

4   A.   Yes.

5   Q.   Okay.  And then it looks like July 10th you

6        had another procedure, Exhibit 18.  All

7        right.  And this was since you'd been living

8        here since 2011?

9   A.   That was the surgery that I had with

10       Dr. Huff.  That does not include the

11       incisions that I had at the walk-in clinic.

12       So yes, those were for Dr. Huff.

13  Q.   Do you have -- I don't see any documentation

14       from a walk-in clinic.  Was that not

15       provided?

16  A.   It was requested.  So I don't know if it's...

17  Q.   So you don't have any documentation showing

18       that you went to a walk-in clinic?

19  A.   Not on me, no.

20  Q.   And outside of Dr. Huff and Dr. Fahey, is

21       there anyone else in the Indianapolis area

22       that you saw for treatment?

23  A.   Yes.  My last visit, I had to see Dr. Huff's

24       associate colleague in Avon because I

25       couldn't get in to see him, which was quite

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

192

```
 1          common.  And because I didn't want to go back
 2          to the immediate care clinic, I decided to go
 3          see his colleague in Avon, which was, you
 4          know, a little drive, but...
 5    Q.    Okay.  So you were able to see someone even
 6          if you couldn't see Dr. Huff?
 7    A.    There was still a delay, which was
 8          unacceptable for me.  But in that instance,
 9          yes, I was able to see -- not every time --
10          in these instances there was usually a wait
11          for an appointment regardless of which
12          office.
13    Q.    Okay.  But again, since 2011 -- I mean, from
14          the documentation that I have, I show that
15          you had two cysts drained; is that correct?
16    A.    There were additional, but it was in a
17          different facility.
18    Q.    Okay.  And you eventually obtained -- you
19          eventually were approved a reasonable
20          accommodation to move to Florida in the
21          St. Pete area.
22    A.    Say that again?
23    Q.    You were granted the opportunity to move to
24          Florida?
25    A.    They approved my transfer request?
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

193

1   Q.   Yes.

2   A.   Yes.

3   Q.   Okay.  And how long have you been there in

4        Florida now?

5   A.   Since October 6th is when I started at the

6        new RO.

7   Q.   Okay.  And where do you live?

8   A.   In Pinellas Park.

9   Q.   And who is your treating physician now?

10  A.   I can't think of the name of the doctor's

11       office.

12  Q.   You can't -- you don't recall your

13       dermatologist?

14  A.   No, because it's a new one, and I don't know

15       the name off the top of my head.

16  Q.   Okay.  Do you know where it's located?

17               MS. CLARK:  Objection.  Relevancy.

18       We've already had an objection to discussing

19       current accommodations in St. Petersburg.

20       I'm not sure, if we're going to cut off those

21       discussions, why we should be talking about

22       treatment in St. Petersburg.  It's not part

23       of this claim.

24               MR. MILLER:  Well, the whole

25       reason --

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

194

1             JUDGE CARETHERS:  Just a minute.

2    What's the offer of proof regarding that?

3          MR. MILLER:  Well, the whole

4    reason that she's claimed that she needs to

5    move to St. Petersburg is to find a -- what

6    she would call an appropriate treating

7    physician and to be with family.

8         And I'm just trying to figure out

9    whether or not that's occurred.  I guess, it

10   goes to motive of a request.

11         MS. CLARK:  We would object that

12   motive is not an issue here.  If, in fact,

13   the reasonable accommodation procedures are

14   being followed by the VA, they don't speak to

15   motive.  They speak only to whether or not

16   there is a disability and whether the

17   accommodation request can be provided without

18   an undue hardship to the Agency.

19        JUDGE CARETHERS:  Well, here is

20   what I'm going to do.  I'm going to sustain

21   the objection.  At first I thought maybe it

22   would go to whether or not she was disabled.

23   However, really that's beyond the time frame

24   we're really looking at anyway.  So I sustain

25   the objection.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

195

1          MR. MILLER:  Okay.  Thank you,

2     Your Honor.

3     BY MR. MILLER:

4  Q.  And you're currently in your VSR position?

5  A.  Yes.

6  Q.  Are you on FMLA?

7  A.  Not right now.  I'm working at home right now

8     for a reasonable accommodation.

9  Q.  Okay.  You are working from home, okay.

10          MR. MILLER:  I don't have any

11     further questions, Your Honor.

12          JUDGE CARETHERS:  All right.

13     Thank you.  Cross-examination.  Ms. Clark,

14     you're up.

15          MS. CLARK:  Yes.  Your Honor,

16     since -- I'm going to go with the last

17     question, and since Mr. Miller opened the

18     door, I would request the ability to speak to

19     Ms. Brown about her accommodation request,

20     because he asked the question and she

21     answered it.

22          JUDGE CARETHERS:  Which question

23     are you referring to?

24          MR. MILLER:  I just asked about

25     FMLA.  I didn't ask about --

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

196

1           MS. CLARK:  And she responded --

2     in response to his question, she did respond

3     regarding the fact that she is now working at

4     home.

5           MR. MILLER:  But I can't guess

6     what she is going to tell me.  I can't know

7     what she's going to tell me.  So she was non

8     responsive to my request, essentially.

9           JUDGE CARETHERS:  Yeah, since it

10    was a non responsive answer, there's nothing

11    to -- there's nothing to follow up on or to

12    clarify.  So I'm going to sustain the

13    objection in terms of going back to an area

14    that I've already ruled as off limits.

15          MS. CLARK:  Okay.  Your Honor, I

16    would ask that there be reconsideration

17    regarding the ability to discuss the Agency's

18    procedures, because there's nothing to

19    suggest that those procedures don't apply to

20    all of the VA's offices.  And I'm not asking

21    it in connection with my cross-examination

22    now.  I just ask that Your Honor would

23    consider that through the rest of this

24    proceeding.

25          JUDGE CARETHERS:  Well, I have no

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

197

1    problem with you examining the procedures of

2    the Indianapolis VA regarding accommodation

3    requests.  What I held was irrelevant was the

4    accommodation procedures used at another

5    facility.

6            MS. CLARK:  They're the same -- my

7    point is they're the same.  They're the same

8    procedures.  There's nothing --

9            JUDGE CARETHERS:  That may or may

10   not be.  Okay.  I'll put it this way.  If

11   they are the same procedures, if you go over

12   the procedures in Indianapolis, by your

13   reasoning, that goes over the procedures of

14   the St. Petersburg, Florida.

15           MS. CLARK:  Yeah.

16           JUDGE CARETHERS:  So essentially

17   if you go over the Indianapolis procedures,

18   then you're getting what you want, is what

19   I'm stating.

20           MS. CLARK:  Understood, Your

21   Honor.

22   EXAMINATION,

23      QUESTIONS BY MS. CLARK:

24  Q.  Ms. Brown, I just have a couple of questions

25      following up -- hopefully just a couple

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

198

1      questions following up on the direct

2      testimony.  In fact, could you provide me a

3      copy of the ROI there.  Thank you.

4            While I'm looking for the document,

5      Ms. Brown, you were asked questions about the

6      number of drainages that you had.  The

7      drainages that you just went over in the

8      medical records, those were drainages in

9      2014, correct?

10  A.  Yes.

11  Q.  Could you please speak up.

12  A.  Yes.

13  Q.  Were there drainages that you had in 2013?

14  A.  Yes.

15  Q.  And were those all with Dr. Huff or were they

16      with other offices?

17  A.  They were with other offices.

18  Q.  Do you recall how many drainages you had in

19      2013?

20  A.  Maybe five.  But the drainages are last case,

21      last option.  I don't want to get it drained.

22  Q.  Can you --

23  A.  I do everything in my power to prevent from

24      getting it drained.

25  Q.  Can you explain why?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

199

1   A.   Because when you get it drained, it opens a

2        wound, and now I have an incision that's open

3        to infection and that can create other sinus

4        tracts that affects -- and scar tissue that

5        can further, you know, complicate my issues.

6        So I don't want to get my cysts drained.

7             So like what's referenced in the

8        medical evidence, if I go, I -- you know, I

9        don't want to get it drained.  At this point,

10       if I'm in excruciating pain, I want them to

11       look at it, see if it's infected, see if

12       there's anything wrong.  If there's any way

13       that I can -- you know, anything else that I

14       can do.  Like I said, drainage is the last

15       possible option.  But I did have several

16       drains -- cysts drained at another facility

17       in 2013, yes.

18

19

20

21

22

23

24

25

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

200

1      MS. CLARK:  Can we go off the
2    record for just a minute?
3      JUDGE CARETHERS:  Yes, we can.
4    Let's go off the record.
5      (A discussion was held off the
6    record.)
7      JUDGE CARETHERS:  Okay.  We're
8    going to accept this as Exhibit 28.  It's
9    going to be Form 0857e.
10     (Exhibit 28 was marked for
11    identification and received into evidence.)
12   BY MS. CLARK:
13  Q.  Ms. Brown, we've now given you what's marked
14    as Exhibit 28, which I understand is VA Form
15    0857e.  Can you tell us at the top of that
16    document what it is, what it says?
17  A.  It says request for medical documentation.
18  Q.  Okay.  Do you recall receiving this document?
19  A.  I really do not recall receiving this
20    document.
21  Q.  And do you recall any e-mails in which you
22    would have that document connected to it?
23  A.  No.
24  Q.  And do you recall anyone handing you that
25    document?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

201

 1   A.   Not to my knowledge, no.

 2   Q.   Okay.  And I'd appreciate it if you could

 3        turn to -- could you go to Exhibit 9, I think

 4        it is, and Exhibit 4.

 5   A.   (Witness complies.)

 6   Q.   All right.  I think earlier there was a

 7        question about whether or not you had gotten

 8        the information that this document requires

 9        from a health care provider.  And so here is

10        my question.

11             In looking at the two exhibits which

12        are Exhibit 4 and Exhibit 9, which are

13        letters from Dr. Huff, can you tell me

14        whether or not he references that you're

15        seeking some sort of an accommodation,

16        whether he calls it an accommodation or

17        whether he says it's you're looking for some

18        type of leave or anything?

19   A.   (Witness reading.)  I'm sorry.  Can you

20        repeat your question?

21   Q.   Yes.  Does it indicate that you've advised

22        Dr. Huff you're seeking some -- that you're

23        seeking leave?

24   A.   That I'm seeking leave?

25   Q.   Yes.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

202

 1   A.  Yes.

 2   Q.  Does it indicate that you have a disability?

 3   A.  Yes.

 4   Q.  So does he describe in both Exhibit 9 and

 5       Exhibit 4 the condition that you were

 6       suffering at that time?

 7   A.  Yes.

 8   Q.  Does it describe whether or not the

 9       disability impacts your ability to work?

10   A.  Let me find that.  It says frequent time off

11       from work may be required when her condition

12       flares.  Did I answer the question?

13   Q.  Does it talk about anywhere in those letters

14       whether or not there are things you cannot do

15       because of your condition?

16   A.  It does say it was debilitating, debilitating

17       pain.  It does say -- hold on, let me finish

18       reading this.  Okay.  He does state that it

19       results in significant pain, morbidity, and

20       poor quality of life.  And extreme pain

21       requiring -- basically it looks like frequent

22       time off from work because of the pain.

23   Q.  When you were asked to provide additional

24       documentation, did anyone indicate to you

25       that it was important for Dr. Huff to say

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

203

1       what parts of your job you could not perform?

2   A.  No.

3   Q.  And when you asked if there was something

4       insufficient about his letters, did anyone

5       indicate to you that the letters failed to

6       address any of your job responsibilities or

7       job functions that you could not perform?

8   A.  No.  Well -- yeah, no.

9   Q.  Does the letter indicate the severity and

10      duration of your impairment, either Exhibit 4

11      or Exhibit 9?

12  A.  Yes.

13  Q.  Okay.  Does it discuss any of your -- any

14      life activities, not work activities, life

15      activities that are difficult for you to

16      perform, either Exhibit 4 or Exhibit 9?

17  A.  Sorry, I'm tired.  So it's taking me a while

18      to take this in.

19  Q.  Yeah, take your time.

20  A.  No, I don't see anything.  I can't -- it says

21      debilitating pain, chronic with significant

22      psychological toll.  And that -- it says it

23      can cause significant physical and

24      debilitating pain.  And says it's essential

25      to help me control my condition.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

204

1    Q.   Doesn't the letter, in particular I think

2         it's Exhibit 4, indicate that the

3         psychological impact on patient requires the

4         need for supportive network of family and

5         possible mental health care?

6    A.   Yes.

7    Q.   Okay.  Does it say how the requested

8         accommodation would assist you with enjoying

9         the benefits of employment or essential

10        functions of the job or applying for -- well,

11        you already had the job -- performing your

12        job functions or enjoying the benefits of

13        employment?

14   A.   It says I would benefit from having close

15        support of my family as I am confronted with

16        these medical challenges.

17   Q.   Okay.  So if you had been asked to have

18        Dr. Huff answer these specific questions

19        which I believe on this form are under

20        Section 9 of the document, and there's one,

21        two, three, four, five specific questions,

22        would you have directed him to?

23   A.   Most definitely.  If that's all it needed,

24        most definitely.

25   Q.   I'd like to turn your attention to the ROI,

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

205

1          it starts at 320, page 320.  Ms. Brown, have

2          you ever seen this document?  It's the VA

3          handbook for processing requests for

4          reasonable accommodations from employees and

5          applicants with disabilities.  Are you

6          familiar with this document?

7     A.   I don't remember seeing this.

8     Q.   Okay.  Thank you.  I want to direct your

9          attention to what is Bates-stamped page 339.

10         And do you see where it discusses the

11         interactive process?

12    A.   Yes.

13    Q.   And do you recall having any communication

14         between yourself and the DMO?

15    A.   No.

16    Q.   Okay.  Do you know who the DMO was for the

17         Indianapolis office?

18    A.   No.  It was Ena when she appointed herself

19         during my reasonable accommodation request.

20         But no, I do not know who the normal DMO was,

21         no.

22    Q.   Do you have some reason to believe that she

23         was not the normal DMO?  Or what leads you to

24         reach that conclusion?

25    A.   Because once I -- I think I knew because of

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

206

1      her current position that she was acting in

2      at that point.  I don't know.  But I just --

3      I didn't know who the DMO was.  I didn't

4      know.  I didn't even know the term DMO until

5      I seen it on the denial for April 1st that

6      Ena's name was on.

7  Q.  Okay.  Let's assume for the moment that she

8      was probably the DMO, okay?  Did she sit down

9      with you and ask you how your condition was

10     impacting your work?

11 A.  No.

12 Q.  Was there anyone -- did Ms. Wilson ask you

13     how your condition was impacting your work?

14 A.  Not that I recall.  No.

15 Q.  All right.  I'm going to direct you to page

16     341.  It says when medical information is

17     needed for disability determination.  First,

18     the opening statement is that it shouldn't be

19     requested to support every accommodation

20     request.  But obviously that statement itself

21     appears to be a judgment statement.

22          So my question now to you, we've

23     talked about this form which is Exhibit 28.

24     You've testified at this point that you never

25     saw it?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

207

1    A.   No.

2    Q.   Do you recall how much time you were given to

3         get medical information?

4    A.   I believe on the one, it says at the bottom

5         of one of the forms -- no, because that was

6         the days I had to appeal.  So somewhere I

7         believe somebody said it was maybe 15, but

8         no, I can't recall.  Nobody told -- I don't

9         remember exactly.

10   Q.   Okay.  And do you see here in the middle of

11        page 341, 12-A, where it says 90 days may be

12        sufficient to secure the medical information?

13   A.   Yeah, I see that.

14   Q.   So when you were asking folks to tell you

15        what wasn't sufficient --

16   A.   Uh-huh.

17   Q.   -- did anyone ever come back to you to say

18        within X number of days, please have your

19        doctor fill out this form and hand it to you?

20   A.   No.

21   Q.   Did anyone look at Dr. Huff's letter after it

22        was received and indicate to you that you had

23        some additional time to ask him to answer

24        certain questions that his letter didn't

25        address?

DEF000600

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

208

1    A.   No.

2    Q.   Let me turn your attention to page 351.   Do

3         you see under 21, denial of reasonable

4         accommodation, it says insufficient medical

5         documentation?

6    A.   Uh-huh.

7    Q.   So it reads that the employee, when

8         requested, doesn't provide -- or did not

9         provide sufficient medical documentation to

10        establish a covered disability or a need to

11        provide a reasonable accommodation, that can

12        be a basis for denying a reasonable

13        accommodation request.   Okay.

14             Do you see here where it says the

15        medical documentation should not be requested

16        when the disability is obvious or the

17        employee has already submitted documentation

18        to the VA in the past for the same functional

19        limitation?

20   A.   I see that, yes.

21   Q.   Okay.   Did you provide documentation in

22        connection with your FMLA request?

23   A.   Yes.

24   Q.   And did you provide -- who did you provide

25        that to?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

209

1    A.   Sonya.

2    Q.   Okay.  And when you had discussions with

3         Sonya, did you ever authorize her to release

4         that information in connection with your

5         reasonable accommodation request or your

6         hardship request or your request for

7         reassignment for medical reasons?

8    A.   Yes.

9    Q.   And at any time that you gave her that

10        authorization, did Sonya indicate to you that

11        there were still additional things that were

12        needed?

13   A.   No.

14   Q.   All right.  Sticking with this same exhibit,

15        would you turn to page 31.  I'm sorry.  It is

16        31 in the book.  It is Bates-stamped 349.

17   A.   (Witness complies.)

18   Q.   Do you see at the top where it discusses

19        tele-work?

20   A.   Yes.

21   Q.   Did any one indicate to you that telework was

22        a reasonable accommodation that you might

23        consider?

24   A.   No.

25   Q.   Did you know whether telework was available

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

210

```
 1        at the Indianapolis office?
 2   A.   I didn't know that it was an option for VSRs,
 3        so I didn't if that was.
 4   Q.   You didn't know if it was an option for your
 5        position; is that what you're saying?
 6   A.   Yes.
 7   Q.   Did you know anyone who was working under a
 8        telework accommodation at the Indianapolis
 9        office?
10   A.   No.
11   Q.   Okay.
12   A.   Not to my knowledge.
13   Q.   Not to your knowledge, all right.  If you had
14        been offered telework or were informed that
15        telework was available, is that an
16        accommodation that you would have considered?
17   A.   Yes.
18   Q.   And why is that?
19   A.   It would have allowed me to have more control
20        over my environment, which may have been -- I
21        may have been able to work through some of
22        the flares at home by being able -- having
23        freedom to adjust my body or my limbs, or do
24        whatever I needed to do in order to work at
25        the time.  I mean, it would have helped with
```

DEF000603

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

211

```
 1        my attendance, I think, my ability to

 2        actually possibly work during these times.

 3        At least until I was able to get the

 4        transfer.

 5   Q.   Okay.  So during this period of time there

 6        were actually periods where you were taking

 7        leave without pay and not receiving any

 8        income; isn't that correct?

 9   A.   That's correct.

10   Q.   If telework was available, you would have

11        been able to perform your job function --

12                  MR. MILLER:  Objection.  That's

13        speculative.  We have no idea whether or not

14        she would have been able to perform the job

15        function by telework.

16                  MS. CLARK:  I haven't finished my

17        question.

18                  JUDGE CARETHERS:  May I have an

19        offer of proof regarding that?

20                  MS. CLARK:  An offer of proof

21        regarding whether she would have been able to

22        perform her job functions?

23                  JUDGE CARETHERS:  He's basically

24        saying that your question assumes facts that

25        are not in evidence.
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

212

1          MS. CLARK:  Okay.  Well, I'll

2     withdraw the question and start again.  I

3     don't think I got the question completely

4     out, but...

5     BY MS. CLARK:

6  Q.  Ms. Brown, if telework was available to you,

7     would you have performed your job functions?

8  A.  I would have attempted to, to the best of my

9     ability.

10  Q.  Okay.  And if telework was available to you,

11     and you were performing work under a telework

12     program, you would have earned your income;

13     is that correct?

14  A.  That's correct.

15  Q.  With the additional earned income, would you

16     have been able to see if there was a

17     specialist in Indiana?  Was that something

18     that you would have been able to afford?

19  A.  To see a specialist in Indianapolis?

20  Q.  Yes.

21  A.  If I was working at home, it would help my

22     financial situation.  I mean, I don't...

23  Q.  Were you not seeking a specialist in part

24     because you could not afford to pay for one?

25  A.  I couldn't -- I mean, I was having financial

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

213

1    problems.  I couldn't afford a lot at that

2    point.  I couldn't -- if I was able to do

3    telework, I do believe that would have helped

4    -- or at least I could have tried it out to

5    see if it was even a short-term solution even

6    if it wasn't a long-term solution.

7  Q.  And finally, just to go back and clarify some

8    questions earlier on Mr. Miller's direct.

9    Were you able to perform your job functions

10   efficiently with this condition?

11 A.  When I didn't have my flare-ups and wasn't

12   being distracted by the pain, yes.

13 Q.  There was also a question about why you

14   wouldn't seek a transfer within the

15   Indianapolis office.  Would a transfer within

16   the Indianapolis office have provided you

17   with the type of accommodation that would

18   address your condition?

19 A.  No.

20        MS. CLARK:  I have no further

21   questions.

22        JUDGE CARETHERS:  Okay.

23   Mr. Miller, your witness.

24        MR. MILLER:  Thank you.

25

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

214

```
 1        EXAMINATION,
 2           QUESTIONS BY MR. MILLER:
 3    Q.  Since you've been with the VA, I assume
 4        you've had health insurance?
 5    A.  Since I've been with the VA?
 6    Q.  Yeah.
 7    A.  Yes.
 8    Q.  And you've had health insurance the whole
 9        time?
10    A.  Yes.
11    Q.  Okay.  You indicated before that you did not
12        receive any information with regard to that
13        VA form that they had requested you to have
14        filled out by your doctor?
15    A.  I don't recall that form.  I don't recall
16        receiving that form.
17               MR. MILLER:   (Providing documents
18        to Ms. Clark.)
19               MS. CLARK:   I would object to the
20        extent that this form does not have an
21        attachment to it.  It indicates that there's
22        an attachment.  If you've got the e-mail that
23        has the attachment, I don't have any problem
24        with that.  I'm not sure if it's in here.
25        Yeah, so that one I would object to.
```

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 216 of 274 PageID #: 576
Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

215

1    Otherwise, I don't have objections to any of

2    these.

3              MR. MILLER:  Okay.  What did you

4    say your objection is?

5              MS. CLARK:  I object to this one

6    to the extent -- see, this one talks about an

7    attachment that's not there.  I mean, if we

8    have the original one that shows that he

9    attached it, I have no issue.  The remaining

10   ones I don't have an objection.  That last

11   one, I have no objection to that one.  No

12   objection to the second one.  No objection to

13   that one.  Object to that one.  And no

14   objection to the very last one.

15             MR. MILLER:  Your Honor, I'm

16   marking as exhibit -- are we at 29?

17             JUDGE CARETHERS:  Yes, we are.

18   Exhibit 29.

19             MR. MILLER:  Okay.  This is in

20   Agency Exhibit O, and the number is 3, 4, 5,

21   and 8.

22             JUDGE CARETHERS:  Quick question,

23   because when I look at my folder that has

24   your Agency exhibits, I have one that says

25   Exhibit 3, Exhibit 4, Exhibit 2.  Then

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

216

1    exhibit medical redacted and exhibits

2    redacted.  And you just mentioned Exhibit 5.

3    I'm not sure what that is.

4              MS. CLARK:  It's actually -- Your

5    Honor, Mr. Miller, he did submit them in

6    batches like you indicated, but at the bottom

7    right-hand corner, he has Agency Exhibit

8    letters.  And I think this is Exhibit letter

9    O.  I can't remember what batch it came in,

10   though.

11             MR. MILLER:  Yeah, I don't recall

12   the batch, but it was -- it's bookmarked.

13             JUDGE CARETHERS:  I'm trying to

14   figure out which file do I have to open up to

15   see it, because I have five different

16   options.

17             MR. MILLER:  I think it's probably

18   2.

19             JUDGE CARETHERS:  Okay, hold on a

20   second.  Okay.  Exhibit J, M, N.  Okay, let

21   me just open them all.  Okay, when I look at

22   these bookmarks most of them are identified

23   by letter.

24             MR. MILLER:  Right.  So letter O.

25             JUDGE CARETHERS:  Okay, O.

DEF000609

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

217

1          MR. MILLER:  Agency Exhibit O,

2     page 3, page 4, page 5, and page 8.

3          JUDGE CARETHERS:  Okay.  Is there

4     any objection to that exhibit by the

5     Complainant?

6          MS. CLARK:  No.  We worked that

7     out already.

8          JUDGE CARETHERS:  Okay.  Great.

9     Can we have it marked as 29, and it's

10    admitted.

11         (Exhibit 29 was marked for

12    identification and received into evidence.)

13         MR. MILLER:  Thank you, Judge.

14    BY MR. MILLER:

15  Q.  I'll hand you what's marked as Exhibit 29,

16    which is Agency Exhibit O, page 3, 4, 5, and

17    8.  You'd indicated earlier that you didn't

18    have a conversation regarding that -- the

19    reasonable accommodation form, or it wasn't

20    provided to you.  If you could look at that,

21    and let me know if you recall receiving that

22    document from the Agency at some point.

23  A.  (Witness complies.)  I still don't remember

24    getting the form.  I really don't remember

25    getting that form.  Had I gotten that form,

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

218

1        this -- that was the same information that

2        would have been filled out on my FMLA

3        paperwork.  So I would have had no problem

4        with going to Dr. Huff, instead of him

5        writing another letter.  Yeah, I don't

6        remember getting that form.  I'm sorry, I

7        just don't recall.

8    Q.  Okay.  Now, you testified earlier when I

9        asked about had you attempted to seek a --

10       whether you considered getting a specialist

11       in the Indianapolis area, and you said, no,

12       that would be pointless.  Essentially all you

13       wanted was to move to Florida.

14   A.  I wanted -- I needed my family.

15   Q.  Okay.

16   A.  That's all.  I mean, that's -- I mean, I

17       needed my family.  And obviously because I

18       wasn't satisfied with my ability to get

19       treatment through the means that I was here

20       in Indy, I felt that between the family and

21       the access to treatment, that was the best

22       thing for me.

23   Q.  So your ability to telework --

24   A.  That just would have been a temporary.

25   Q.  It would have made no difference?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

219

1    A.   I would have wanted to still transfer.

2    Q.   Okay.  And --

3    A.   Because my family wasn't here.  They weren't

4         going to be with me in the house while I'm

5         teleworking.

6    Q.   And when you go through your doctor's

7         letters, you pointed out that you needed

8         frequent time off for the pain.

9    A.   Uh-huh.

10   Q.   Wasn't the Agency providing you frequent time

11        off for the pain?

12   A.   I was using my FMLA.  Yes.

13   Q.   And annual leave?

14   A.   Yes.

15   Q.   Voluntary leave program?

16   A.   Uh-huh.

17              MR. MILLER:  No further questions.

18              JUDGE CARETHERS:  Okay.  Let me

19        make sure I don't have any questions.

20        I have a question, because I was kind of

21        confused about something you had testified in

22        terms of -- from my understanding previously,

23        you testified that during a flare-up the pain

24        was essentially debilitating; is that

25        correct?

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

220

1          THE WITNESS:  Your Honor, it

2     depends.  Each flare-up is different.

3     Sometimes I have a flare-up and it could be

4     debilitating.  Other times it would be a

5     nagging pain.  Other times it could be -- so

6     the flare-ups and severity, it really --

7     it varies.

8          JUDGE CARETHERS:  Okay.  Let me

9     try it this way.  One of the things that was

10    mentioned was that telework -- my question is

11    specifically, how would telework help you

12    with the flare-ups, is my question to you.

13         THE WITNESS:  Well, it probably

14    wouldn't help me with the flare-up.  It would

15    have helped me deal with what comes with the

16    flare-up, like not wearing deodorant, like

17    being able to adjust my body to where I could

18    relieve or alleviate at least some of the

19    pain, without -- you know.  I mean, basically

20    just maneuvering myself, having access to a

21    private restroom so I could tend to my

22    abscess or leakage, and just basically being

23    in a comfortable environment would maybe help

24    me with my pain.  I don't know.  I can only

25    think it might have helped me with some of

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

221

1    the issues during my flare-ups.

2              JUDGE CARETHERS:  Okay.  And as it

3    relates to your position in Indianapolis, I

4    understand; you know, your flare-ups and

5    stuff like that.  I just want to clarify

6    something.  There was something in the

7    environment of Indianapolis that was

8    contributing or aggravating your flare-ups;

9    is that correct?

10             THE WITNESS:  There was after they

11   started denying my transfer requests, because

12   the stress aggravates my condition.  And it

13   aggravated my anxiety, too.  So during that

14   process I had more frequent flares.

15             JUDGE CARETHERS:  And during these

16   flare-ups that were the debilitating kind,

17   there was essentially nothing that -- correct

18   me if I'm wrong.  Is there anything that the

19   Agency could have provided you to assist you

20   in doing your job when you had one of your

21   debilitating flare-ups?

22             THE WITNESS:  No.  I mean...

23             JUDGE CARETHERS:  In terms of the

24   denial of the hardship transfer, and also I

25   guess to a certain extent the reassignment,

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

222

1     my understanding was that part of the denial

2     was based on performance.  Was that your

3     understanding?

4              THE WITNESS:  The hardship

5     transfer, Ena told me that the reason was due

6     to my performance and attendance in the

7     meeting.  And then when she submitted me my

8     response in writing, she said it was my

9     performance, yes.  For the first one.  For

10    the second one, she stated that my medical,

11    there was something wrong.  My doctor's

12    letter didn't state that I couldn't do my job

13    without the accommodation, I guess.

14             JUDGE CARETHERS:  As relates to

15    the hardship transfer in terms of

16    performance, was that regarding you not

17    meeting the production goals, or what exactly

18    was insufficient alledgedly about your

19    performance?

20             THE WITNESS:  That I wasn't

21    meeting my performance goals.

22             JUDGE CARETHERS:  Okay.  And I

23    assume you're stating you were not meeting

24    performance goals because your -- was that

25    related to your attendance or why weren't you

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

223

1    meeting -- let me put it this way.  Why

2    weren't you meeting your production goals?

3                 THE WITNESS:  Because of my

4    disability.

5                 JUDGE CARETHERS:  And specifically

6    about your disability, was it because of your

7    attendance, or could you specify a little bit

8    more why your disability wasn't allowing you

9    to meet your production goals?

10                THE WITNESS:  The pain, sir.  It's

11   hard to concentrate with the pain.

12                JUDGE CARETHERS:  So in terms of

13   not meeting production goals, it wasn't

14   related to attendance, it was related to the

15   pain you were experiencing; is that correct?

16                THE WITNESS:  From my knowledge, I

17   don't believe that my attendance was hurting.

18   Like we discussed earlier about the ASPEN

19   data and how they used the mid days to

20   calculate the entire, you know, production,

21   but it -- the pain was preventing me from

22   concentrating.

23                I had increased anxiety during that

24   time too, so that was affecting -- anxiety,

25   depression, all this was aggravating my

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

224

1    condition.  All of them.

2                    JUDGE CARETHERS:  Okay.  That's it

3    for my questions.  Ms. Clark, do you have any

4    follow-up based on my questions, my questions

5    only?

6                    MS. CLARK:  Yeah.

7                    JUDGE CARETHERS:  Go ahead.

8    EXAMINATION,

9        QUESTIONS BY MS. CLARK:

10   Q.  Very quickly.  I just want to make sure that

11   I'm clear.  The Judge asked whether the

12   attendance had any impact on your ability to

13   do your job, and do you think that -- whether

14   or not you think it did.

15   A.  Well, I guess, if I think -- I mean, it

16   could.  Because if I was absent or if I was

17   in pain and then I couldn't concentrate, then

18   the next result would have been me not going

19   to work which would have been my attendance.

20   So, I mean, it may have affected -- impacted

21   my overall performance numbers.

22                    MS. CLARK:  I have no further

23   questions.

24                    JUDGE CARETHERS:  All right.  And,

25   Agency, do you have any follow-up based on

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

225

```
 1          either my questions or Ms. Clark's question?

 2                  MR. MILLER:  Yes.

 3      EXAMINATION,

 4          QUESTIONS BY MR. MILLER:

 5   Q.  You said part of the problem with regard to

 6       your production is that it's hard to

 7       concentrate when you were in pain.  How would

 8       telework or a transfer to Florida have made

 9       any difference in your ability to concentrate

10       with your -- when you're in pain?

11   A.  Well, as far as teleworking is involved, I

12       stated that probably would have been probably

13       a good temporary solution until I was

14       transferred to Florida.  And that being

15       because, like I say, I can elevate my arm or

16       my leg, or alleviate some of the pressure

17       that would have been placed on my neck or my

18       shoulders by constantly having my arm

19       elevated in an awkward position that wouldn't

20       have gone across well at work.

21   Q.  Isn't that something you could have done at

22       work?

23   A.  No.

24   Q.  Don't they have cubicles you were working out

25       of?
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

226

```
 1   A.   I don't think putting my leg up on the cube
 2        or something would have been -- something
 3        that I would be wanting to do.
 4   Q.   But you could have if you wanted to?
 5   A.   No, I don't think that would have been an
 6        option.
 7                 MR. MILLER:  I don't have anything
 8        further.
 9                 JUDGE CARETHERS:  That concludes
10        the testimony of this witness.  Let's go off
11        the record.
12                 (A recess was taken.)
13                 JUDGE CARETHERS:  Is everyone
14        back?  Okay.  We are continuing the hearing
15        of Trevenia Brown versus Department of
16        Veterans Affairs.  We have our next witness
17        here who I believe is Mr. Hampton.  Is that
18        correct?
19                 MR. HAMPTON:  Yes, sir.
20                 JUDGE CARETHERS:  Okay.  Great.
21        My name is Administrative Judge Trek
22        Carethers.  I'm presiding over this hearing.
23        Are you a current federal employee?
24                 MR. HAMPTON:  No, I'm not.
25                 JUDGE CARETHERS:  All right.
```

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

227

1     That's what I thought.  Could we have this

2     witness sworn?

3          (The witness is sworn by the court

4     reporter.)

5          JUDGE CARETHERS:  Before we can

6     begin taking your testimony, I have to give

7     you some preliminary instructions.  The first

8     one is that you must maintain the volume of

9     your voice.  Do you understand?

10          THE WITNESS:  Yes.

11          JUDGE CARETHERS:  All your answers

12     must be verbally given.  You cannot shake

13     your head up and down.  Do you understand?

14          THE WITNESS:  Yes.

15          JUDGE CARETHERS:  If you don't

16     understand a question, please let us know and

17     I'll ask the questioner to rephrase it if I

18     find it necessary.  Do you understand?

19          THE WITNESS:  Yes, I do.

20          JUDGE CARETHERS:  Only answer the

21     question that's addressed to you.  You cannot

22     reformulate the question or answer a

23     different question.  Do you understand?

24          THE WITNESS:  Yes.

25          JUDGE CARETHERS:  If there is an

DEF000620

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

228

1    objection by one of the attorneys to a

2    question, do not answer it.  I will make a

3    ruling on the objection and I will let you

4    know whether you should answer the question

5    or not.  Do you understand?

6              THE WITNESS:  Yes.

7              JUDGE CARETHERS:  Could you

8    please -- well, finally, I may ask you some

9    questions.  The mere fact that I'm asking you

10   questions should not indicate that you are

11   testifying poorly or well.  Do you

12   understand?

13             THE WITNESS:  Yes, I do.

14             JUDGE CARETHERS:  Could you please

15   state and spell your name for the record?

16             THE WITNESS:  My name is Michael

17   Jerome Hampton.  M-I-C-H-A-E-L, J-E-R-O-M-E,

18   H-A-M-P-T-O-N.

19             JUDGE CARETHERS:  Thank you very

20   much.  Ms. Clark, your witness.

21             MICHAEL HAMPTON,

22   having been first duly sworn to tell the

23   truth, the whole truth, and nothing but the

24   truth relating to said matter, is examined

25   and testifies as follows:

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

229

1      EXAMINATION,

2          QUESTIONS BY MS. CLARK:

3   Q.  Mr. Hampton, where do you reside?

4   A.  In Pinellas Park, Florida.

5   Q.  Mr. Hampton, where are you currently

6       employed?

7   A.  I'm not currently employed.

8   Q.  And, Mr. Hampton, do you know the Complainant

9       in this matter?

10  A.  Yes.  She's my wife.

11  Q.  Thank you.  How long have you been married --

12  A.  A little --

13  Q.  -- to the Complainant?

14  A.  A little over 8 years.

15  Q.  And was there -- are you aware of the medical

16      condition that she suffers from?

17  A.  Yes.  It's been an ongoing condition.

18  Q.  And what have you witnessed with regard to

19      how she handles that condition?

20  A.  It's -- it's according to her -- to the pain.

21      And the duress she's under.  If she's under a

22      lot of duress, obviously that creates more

23      flare-ups, which create more pain.  And so

24      it's all according to the duress she's under

25      and the flare-ups themselves.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

230

1   Q.   Did you live in Indianapolis with the

2        Complainant?

3   A.   Yes.

4   Q.   All right.  And in or around January, 2014,

5        were you aware of anything that might have

6        been increasing flare-ups?

7   A.   The situation that was ongoing at her job

8        with the HR and assistant director.  She was

9        attempting to put -- get herself in a better

10       position so that she would gain more control

11       over the flare-ups, which we have done many

12       times over the years.  And she couldn't get

13       any help from the Agency here in

14       Indianapolis.

15  Q.   And what did you understand was important to

16       the Complainant to get control over the

17       flare-ups?

18  A.   It's the same as it's always been.  We've

19       been together for 22 years.  And when this

20       happened, she needs to have control over her

21       environment, and the stress level needs to be

22       minimized.  Having me and my family and her

23       family around obviously helps a great deal.

24       And so we knew what to do in this situation.

25       We've had to do it before.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

231

1   Q.   When you were living here in Indianapolis,

2        was it just the two of you?

3   A.   Initially it was.  Our son wasn't finished

4        with high school, so he moved down here and

5        finished high school.  Our daughter also came

6        down and, you know, started working, got her

7        an apartment.  So we actually relocated the

8        whole -- well, our unit, we actually

9        relocated the whole family here.  But soon

10       after my son graduated, he left.  He went

11       back to Tampa.  And soon after that, so did

12       my daughter.

13  Q.   Can you tell me what year that was?

14  A.   Had to be 2013, 2014.

15  Q.   While they were living here in Indianapolis,

16       were they ever -- were they ever called upon

17       to assist the Complainant when she was ill or

18       when she had flare-ups?

19  A.   I was mostly doing that, but on occasion,

20       yes.

21  Q.   So on occasion they were asked to assist

22       their mother?

23  A.   Yes.

24  Q.   All right.  Let's talk a little bit about

25       what you were witnessing in 2014.  Did

DEF000624

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 233 of 274 PageID #:
593
Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

232

1      Ms. Brown speak to you about her encounters

2      with HR at the VA?

3  A.  Yes, she did.  We talk about everything.  And

4      this was -- this was a situation that she

5      didn't have any control over.  She cannot

6      control these flare-ups.  She doesn't have a

7      way to make this go away other than trying to

8      control her environment and the people and

9      the situations around her.  And the HR rep

10     here for the Agency, man, she didn't do

11     anything.  Every single time we came to her

12     and asked for something either in writing or

13     verbally, she just -- she wasn't really able

14     to provide anything.  It was like pulling

15     teeth.

16 Q.  Now, you didn't accompany Ms. Brown, did you,

17     when she had her meetings with HR, correct?

18 A.  No.

19 Q.  So what you understood would be from the

20     written responses from HR to Ms. Brown?

21 A.  Yes.  And the conversations that we had.

22 Q.  And the conversations you had, okay.  Did

23     Ms. Brown ever mention Sonya Wilson as an

24     individual she had encounters with?

25 A.  If this is the HR person.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

233

1    Q.   All right.  And so was this the person you're

2         describing as not doing anything with the

3         requests that were being made?

4    A.   Yes.  Unhelpful.  It just was -- there was

5         nothing there.  Once the request was made,

6         and the denial was given, there wasn't really

7         anything other than a denial.  There was no,

8         you can appeal this, here is your next course

9         of action, this is the procedure or policy

10        for this.  There was never really any of

11        that.

12   Q.   And from your vantage point, how did that

13        impact Ms. Brown?

14   A.   Obviously it was very stressful.  It

15        exacerbated the situation.  If you can't get

16        people to do what I'm assuming their job is,

17        in your most dire time of need, it's going to

18        compound the stress.  And it did.  You know,

19        she flared up like crazy for weeks at a time.

20   Q.   Did she discuss with you an individual named

21        Ena Lima?

22   A.   Yes.

23   Q.   And what did Ms. Brown tell you about

24        Ms. Lima's -- her encounters with Ms. Lima?

25                   MR. MILLER:  Your Honor, this

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

234

1    calls for hearsay.

2              MS. CLARK:  Your Honor, the rules

3    before this Agency call for -- allow hearsay.

4    And with regards to -- typically with regards

5    to testimony that is excluded, it's an issue

6    of relevancy.  I've never seen hearsay be the

7    basis on which testimony would be excluded.

8    But I'm not asking him to testify about what

9    Ms. Lima said to him.  I'm asking him about

10   his impressions of what Ms. Brown was going

11   through when she was discussing Ms. Lima.

12             JUDGE CARETHERS:  On that basis

13   I'll allow the question.  Objection

14   overruled.  You may answer the question.

15             THE WITNESS:  Can I have the

16   question again?

17             MS. CLARK:  Can you read that

18   back.

19             (Whereupon, the record was read as

20   requested.)

21             MR. MILLER:  That's a direct --

22             JUDGE CARETHERS:  Yeah, that's a

23   little bit different.  I'm going to sustain

24   the objection.  You may ask the question in

25   the way you described it to me, Counsel.

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

235

BY MS. CLARK:

Q.  Mr. Hampton, how did Ms. Brown appear when
    she was discussing her encounters with
    Ms. Lima?

A.  She was -- she was -- she was very upset.
    She felt like Ms. Lima was intentionally
    creating a stressful environment for her.  We
    spoke several times about Ms. Lima.  She
    always seemed to have found her way into the
    situation.  On occasions that it was supposed
    to be Trevenia and the HR person, Ms. Lima
    always seemed to find her way into the
    situation and create more stress.

Q.  So when that happened, you saw that it
    created more stress for Ms. Brown?

A.  Yes.

Q.  Are you aware of Ms. Brown making a request
    for a transfer?

A.  Yes.

Q.  And do you know the reasons why she made the
    request for transfer?

A.  She made the request for the transfer because
    she needed to gain better control over her
    environment and situation to do what we know
    it takes to help control the illness.

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

236

```
 1   Q.   Let me follow up with your answer and ask
 2        you, what are the things that you experience
 3        that it would take to control the condition?
 4        What are the things that you witnessed or
 5        things that you would do to help control the
 6        condition?
 7   A.   Well, basically just alleviating as much
 8        stress as possible.  Being understanding,
 9        because there is more than just physical pain
10        here.  That's only a part of the illness.
11        You know, there's a lot of -- a lot of mental
12        stuff going on too there.  And she would
13        get -- it's kind of like when she was
14        pregnant, she was moody all the time, she was
15        real mean and nasty to me for no reason.  It
16        was just one of those situations where she
17        was not herself at all.  And obviously under
18        a great deal of stress, that was not related
19        to the job in the way that it was the work
20        causing the stress, as much as the people
21        that she was trying to get to help her.
22   Q.   Can you tell me what things that you
23        personally would try to do to assist
24        Ms. Brown?
25   A.   Everything.  I mean, just everything.  The
```

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

237

1    cooking, cleaning, the assisting her with her

2    being able to get around.  When these

3    flare-ups get really bad, she's pretty much

4    bedridden.  And it's really nothing she can

5    do, you know.  She can't -- in these

6    particular scenarios, her upper body, it's

7    debilitating.  It's just like it sounds.  She

8    can't really do anything.  So help her eat,

9    you know, help her get dressed.  Help her --

10   I mean, pretty much her basic day-to-day

11   functions, I had to be there to help her do

12   it.  And that went from -- that went from

13   everything.  That went from eating, from

14   bathing, to, I mean, everything.

15 Q.  Where were you working in Indianapolis when

16      you were here?

17 A.  I was working for Pepsico at their Gatorade

18      facility.

19 Q.  What kind of hours were you working?

20 A.  It was all three shifts.  The way Gatorade

21      works here is once you're employed you're

22      part of their team.  And if they need you,

23      you don't have any choice but to work.  So I

24      worked night shift, I worked mid shift, I

25      worked mornings.  You know, regular day,

DEF000630

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

238

1    early morning.  I mean, whatever they needed.

2    You normally worked an 8 to 10-hour shift.

3    But if somebody called off, you had to stay a

4    half a shift.  So a lot of times there were

5    12-hour days or more.  It made it difficult

6    to work knowing the kind of pain that she was

7    in.  So consequently, I ended up missing time

8    from work.  And, you know, it put me in a

9    situation where my job started to be in

10   jeopardy.  And I am a Type I diabetic.  I

11   have high blood pressure.  So I started to

12   get sick.  So it was just -- it was a mess.

13   To say the least, it was a mess.

14   Q.  So after your grown children left, then there

15       was less support for Ms. Brown and less

16       support for you when you had to work those

17       shifts?

18   A.  It was a combination.  It was not only less

19       support for her, but it was more stress.  So

20       not only did I not get a chance to be there

21       as much as I needed to be, but you know, the

22       situation with the -- with the associates at

23       the office, it made it worse.  You know, it

24       was like every single time she had to take a

25       few days off, or a week sometimes, when she

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

239

```
 1      came back, they was throwing something else

 2      at her.

 3              One time she came in and she had a

 4      write-up sitting waiting on her.  One time

 5      she came in and -- it was just something

 6      every single time.  It was about a two or

 7      three-month period where she was having a lot

 8      of trouble, and she was having problems.

 9      And, you know, there are a lot of medications

10      that they'll try to prescribe for this, but

11      those medications, you know, some of the side

12      effects cause cancer.  And so it wasn't -- it

13      wasn't one of those thing where we could just

14      medicate it away.  You actually had to

15      physically support the person.  So it wasn't

16      like we could just give her painkillers and

17      it would all go away.  It doesn't work like

18      that.

19   Q. Did you notice whether Ms. Brown had any

20      negative emotional reaction after the denial

21      of the first request for transfer?

22   A. Yes.  She submitted a letter with that

23      request explaining the situation completely.

24      And my wife is a very good writer.  She

25      understands and is able to communicate on a
```

DEF000632

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

240

1      very high level.  And her nor I could

2      understand what the problem was with the

3      denial.  And again, Ms. Lima exacerbated the

4      situation by initially not even offering a

5      written denial.  She had to -- she had to

6      request the denial in writing.  And when she

7      received the denial, the word denied was in

8      all capital letters.  It was as if to say,

9      hell no.

10  Q.  And how would you describe Ms. Brown's

11      reaction to that?  What did you witness?

12  A.  She cried.  I mean, it hurt her deeply.  She

13      was trying to get help.  She knew she needed

14      to have a better support system around her,

15      and nobody was even -- man, nobody was even

16      human in this situation.  Nobody even cared

17      at all.  It was like maybe if she had skin

18      cancer, they may have been able to understand

19      it a little better.  But I think because it

20      wasn't something that they could relate to or

21      knew enough about, they just made a lot of

22      assumptions.  And it really hurt her.  You

23      know, a lot of stuff happened or was said

24      that caused emotional duress.  Can I give an

25      example?

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

241

1   Q.   Please do.

2   A.   As I said, she's a very competent worker.

3        During the time where it came time for her to

4        test for her promotion, Ms. Lima posted all

5        the people who were going to be able to take

6        the test for everybody to see with my wife's

7        name omitted, with no real explanation at the

8        time of why she wasn't able to take the test.

9        And we couldn't understand that, because on

10       her previous evaluation, she was -- she was

11       all green.  Everything was good.

12            So we couldn't understand why -- why

13       it was done the way it was done.  You know,

14       it just seemed like it was to -- to try and

15       humiliate her in front of her peers,

16       basically.  She had peers coming up to her

17       that same day asking her what was going on,

18       why her name wasn't on the list, and what's

19       going on with her and Ms. Lima.  So she had

20       associates -- she had fellow employees asking

21       what was going on, and not really being able

22       to say anything about it.

23            I mean, it just -- it made it worse.  It

24       was one of those situations where it didn't

25       have to be done that way.  But unfortunately,

**Brown v. McDonald, et al. - July 20, 2015**
**EEOC Hearing - Volume I**

242

```
 1         Ms. Lima found that necessary to do.  Which
 2         in the end, she still ended up taking the
 3         test anyway.  So it was like -- to me, it was
 4         solely done to embarrass and degrade her in
 5         front of her peers, basically.  And when she
 6         took the test, she tested tops in the test.
 7         She was one the highest scores for the test.
 8         So it was like -- it was just -- was hurtful
 9         for her and me because we take pride in what
10         we do.  And we do it well.  I mean, that's
11         the fact.
12    Q.   Were you aware that Ms. Brown had a reprimand
13         placed in her personnel file?
14    A.   Yes.  This was one of the times that she was
15         out for like a week.  And when she came back,
16         that's what I mean, every single time she
17         missed some time and came back, you had
18         something like that reprimand waiting on her,
19         or a -- just it was always something
20         derogatory.  And it was either Sonya or
21         Ms. Lima spearheading it.
22    Q.   Do you know, with all that was happening, did
23         you ever understand Ms. Brown, whether she
24         trusted folks at the Agency?
25    A.   I can't see how she would trust them.  I
```

243

1    mean, I just can't see how she would.

2    Obviously she did not.  Anytime you're in a

3    professional environment and you're doing --

4    you're following the rules and you're

5    submitting paperwork and you're submitting

6    requests, and you're not even getting a

7    written -- you're not even getting a response

8    in writing, I mean, it makes it to where --

9    it makes it seem a little underhanded at

10   times.  It made it seem like maybe you was

11   trying to say something that -- or do

12   something face-to-face that you weren't

13   willing to put on paper.  So there were

14   things said and done at that hearing probably

15   will never have wind of.

16          So Ms. Lima -- man, she -- a couple

17   of these times she was so nasty and mean,

18   that we -- we had no choice but to go to the

19   next step or the next level.  I mean, it just

20   was very hurtful to be in this situation.  We

21   came all the way from Florida here.  She

22   accepted this job.  We moved here.  We took a

23   lot of risk to be here, first off.  And for

24   us to need a little help with this -- we just

25   assumed that we would be able to trust people

DEF000636

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

244

1    and that people would do what they -- what

2    the rule or the handbook or whatever they was

3    supposed to be following, that they would do

4    what it required.

5         But when we was looking at what the

6    rules was, it was obvious that nobody was

7    following the rules.  That we were the only

8    ones playing by the rules.  And that --

9              MR. MILLER:  Your Honor, we're

10   getting into a pretty long narrative.  I

11   don't know if he's answered the question or

12   not.

13             MS. CLARK:  I think he's answered

14   the question.

15   BY MS. CLARK:

16   Q.  Mr. Brown (sic), have you noticed recently

17   whether -- I'm sorry.  Mr. Hampton, have you

18   noticed recently whether Ms. Brown is

19   suffering the same level of flare-ups as she

20   did back in January, February, I guess, the

21   early part of 2014?

22   A.  Of course not.  She has a better support

23   system.  And there's not the pressure and

24   the -- I want to say bullying going on now.

25   I mean, she has the -- obviously she has

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

245

1   access to the doctor more now, but I don't

2   feel like that was as important as her being

3   able to be with family and around family.

4        I believe -- or I should say I know,

5   because I've been there, that obviously her

6   getting a chance to be around family and get

7   more comfortable like that, helped with the

8   situation.  She hasn't had nearly as much

9   flare-up.  Obviously the stress level has

10  been down.  We just -- it's a lot.  It's like

11  night and day, actually.  Right now she's

12  doing excellent.  She's not really having the

13  kind of problems she was having here.  And

14  it's due to the stress that she was under.

15  She was under a lot of stress.

16        MS. CLARK:  I have no further

17  questions.

18        JUDGE CARETHERS:  Mr. Miller, your

19  witness.

20        MR. MILLER:  I don't have any

21  questions of this witness.

22        JUDGE CARETHERS:  This concludes

23  the testimony of this witness.  You're free

24  to go today.  Let's go off the record.

25        (The hearing was adjourned at 5:16

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

246

1      p.m., and continued to the next day.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brown v. McDonald, et al. - July 20, 2015
EEOC Hearing - Volume I

247

```
STATE OF INDIANA      )
                      )  SS:
COUNTY OF SHELBY      )
```

CERTIFICATE OF COURT REPORTER

I, Joyce E. Shinault, the undersigned Court Reporter and Notary Public, residing in the County of Shelby, State of Indiana, do hereby certify:

That I reported to the best of my ability in machine shorthand all of the words spoken by all parties in attendance during the course of the ensuing proceedings, including objections, if any, made by all counsel present;

That I later reduced my stenographic notes into the foregoing typewritten transcript form, which typewritten transcript is a true record of the testimony given by this witness as stated above;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney or employee of any of the parties; that I am not a relative of an employee of such attorney or counsel; and that I am not financially interested in this action.

IN WITNESS HERETO, I have affixed my Notarial Seal and subscribed my signature below this _____ day of August, 2015.


_____
Joyce E. Shinault, RPR, Notary Public


My Commission Expires:
September 8, 2023

County of Residence:
Shelby

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 249 of 274 PageID #: 692

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

## A

**ability (16)**
21:14;30:16;31:6;
32:5;40:11;67:15;
147:10;195:18;
196:17;202:9;211:1;
212:9;218:18,23;
224:12;225:9
**able (47)**
7:10;30:17;31:25;
32:9;39:2;43:23;
68:10;73:8,9;75:2;
78:24;101:23;
129:14;133:19;
149:8;150:16,17,22;
153:22;160:22;
171:9;177:20,24;
179:3;183:14;192:5,
9;210:21,22;211:3,
11,14,21;212:16,18;
213:2,9;220:17;
232:13;237:2;
239:25;240:18;
241:5,8,21;243:25;
245:3
**abscess (1)**
220:22
**absent (1)**
224:16
**accept (4)**
157:7;158:14;
161:25;200:8
**accepted (9)**
7:17,21;9:19;
111:9;154:18;155:3,
6;156:14;243:22
**access (5)**
32:1;171:10;
218:21;220:20;245:1
**accommodation (80)**
9:15;48:19,21;
49:4,16,19;54:23;
59:12;63:12;85:23;
86:13,17;88:5,21;
89:17,23;90:15,16;
94:18;95:12;97:4;
106:18;126:6,20,21;
127:6,20;128:1,17,
20;129:15;132:5;
140:4;144:4;153:12,
16;154:18;155:2,13,
16,22;156:25;157:2,
7,9,14;158:13;159:5;
161:12,17;162:9,25;
169:18;173:11,13,18,
23;174:2;192:20;
194:13,17;195:8,19;
197:2,4;201:15,16;
204:8;205:19;
206:19;208:4,11,13;
209:5,22;210:8,16;
213:17;217:19;
222:13
**accommodations (9)**
61:2;62:14;84:4;
129:2,5;156:6;158:9;
193:19;205:4
**accompany (1)**
232:16
**accomplish (1)**
49:23
**accordance (1)**
170:19
**according (2)**
229:20,24
**account (1)**
92:20
**across (2)**
30:14;225:20
**act (1)**
42:17
**acted (1)**
42:15
**acting (4)**
77:12;87:15;
105:14;206:1
**action (4)**
102:7;134:10;
135:10;233:9
**activities (4)**
18:10;203:14,14,
15
**activity (2)**
18:16;19:4
**actual (2)**
108:3;140:10
**actually (31)**
37:9,17;40:17;
43:3;54:11;55:3;
85:16;99:7;107:8;
109:23;118:15;
125:10;127:25;
139:20;149:7,15;
163:12;168:23,25;
184:3,14;187:22;
189:2,3;211:2,6;
216:4;231:7,8;
239:14;245:11
**ADA (1)**
42:12
**Adam (2)**
77:10;175:21
**added (3)**
121:24;122:9,10
**addictive (1)**
23:12
**adding (3)**
93:4,6,8
**addition (1)**
56:24
**additional (26)**
24:6,23;25:16,17;
52:6;54:16;56:12,25;
57:2;90:8,9;119:19;
123:19;136:4;137:3;
147:22;158:21;
163:2;164:8,22;
165:7;192:16;
202:23;207:23;
209:11;212:15
**address (5)**
33:13;129:14;
203:6;207:25;213:18
**addressed (5)**
14:14;40:5;41:2;
129:25;227:21
**adequate (6)**
89:21;141:24;
167:20;168:12;
170:4,6
**adequately (1)**
171:8
**adjonrned (1)**
245:25
**adjnst (2)**
210:23;220:17
**adjusted (3)**
22:3;24:9;92:19
**Administrative (4)**
6:7;12:24;188:3;
226:21
**admission (1)**
8:10
**admit (5)**
20:7;47:13;68:17;
81:14;82:20
**admitted (25)**
20:17;36:12,20;
47:21,22;53:8;69:9;
71:13,15,23;81:22;
82:23;83:3;96:2,4,
12;109:6;110:11;
157:12;183:1;
185:15,20,22,22;
217:10
**admitting (1)**
53:2
**advise (1)**
75:21
**advised (6)**
10:12;18:24;
23:10;85:3;112:12;

201:21
**Affairs (5)**
6:3,11;16:5;111:7;
226:16
**affect (5)**
21:6;23:24;30:16;
92:23;152:10
**affected (4)**
29:25;31:6;
114:19;224:20
**affecting (11)**
24:16;48:23;78:6;
124:5;138:18,21;
142:7,11,24;145:25;
223:24
**affects (6)**
21:14,15;29:22;
32:7;152:13;199:4
**affidavits (3)**
7:16,21;8:10
**afford (3)**
212:18,24;213:1
**afraid (1)**
25:1
**again (35)**
25:19;32:12;58:4;
64:14;68:12;83:22;
84:16;86:6,10,18;
97:21;98:19;99:12;
112:23;122:20;
123:24;125:1;
130:11;135:14;
142:23;145:8;148:3,
5,16;158:3;168:14;
171:13;179:13;
180:12;181:21;
192:13,22;212:2;
234:16;240:3
**against (4)**
23:10;78:8;79:20;
117:3
**Agency (46)**
6:12,20,22,24;7:4;
9:24;10:4,17;11:22;
12:13,16;20:12;23:3;
36:16;47:16,16;53:4;
69:5,21,23;71:16,18;
81:16;90:17;96:8;
105:5;109:12;130:5;
141:25;156:10;
182:9,11;194:18;
215:20,24;216:7;
217:1,16,22;219:10;
221:19;224:25;
230:13;232:10;
234:3;242:24
**Agency's (3)**
108:21;111:16;

196:17
**aggravated (1)**
221:13
**aggravates (1)**
221:12
**aggravating (2)**
221:8;223:25
**aggravation (1)**
66:17
**aggravations (1)**
176:22
**agitation (1)**
22:10
**ago (2)**
126:10,11
**agonizing (1)**
31:12;151:10
**agree (7)**
133:16;134:25;
138:20;142:4,7;
143:25;176:3
**ahead (6)**
15:15;43:8;151:3;
154:20;180:17;224:7
**alledgedly (1)**
222:18
**alleviate (6)**
22:4,19;60:1;
82:10;220:18;225:16
**alleviated (2)**
22:8,16
**alleviating (1)**
236:7
**allow (5)**
7:25;13:23;
146:23;234:3,13
**allowed (5)**
14:15;135:8;
136:8;145:10;210:19
**allowing (1)**
223:8
**almost (3)**
85:17;105:12;
131:13
**alone (1)**
117:2
**along (6)**
40:1,3,25;52:2;
101:24;136:11
**although (1)**
123:23
**always (7)**
26:6,6;98:1;
230:18;235:9,12;
242:19
**among (2)**
45:12,16
**amonnt (4)**

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 250 of 274 PageID #: 6300

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

23:13,20;70:21;
106:6
**annual (6)**
134:1,12;136:4;
137:15;153:3;219:13
**answered (5)**
88:10;168:22;
195:21;244:11,13
**anxiety (12)**
24:22;25:19;26:8;
99:13;100:10;
120:25;121:3,22;
122:8;221:13;
223:23,24
**Apartment (2)**
16:1;231:7
**appeal (10)**
60:24;63:4;87:17,
19,21;91:4;103:15;
160:9;207:6;233:8
**appeals (2)**
62:19;87:18
**appear (5)**
7:10,12;20:1;
119:9;235:2
**appearance (1)**
6:15
**appears (7)**
38:9,11;123:17,24;
186:10,11;206:21
**applicants (1)**
205:5
**application (4)**
19:11;36:8;39:15;
75:6
**applied (8)**
50:25;64:11;
73:14;75:14;81:2;
132:22;134:4;135:14
**apply (15)**
17:5;19:4;34:20;
72:25;74:6,19;75:3;
76:1,8,17;130:24;
136:25;152:24,25;
196:19
**applying (1)**
204:10
**appointed (2)**
87:12;205:18
**appointing (1)**
103:14
**appointment (1)**
192:11
**appointments (2)**
100:21;186:9
**appreciate (2)**
150:1;201:2
**appropriate (5)**

50:15;91:10;
158:10;170:20;194:6
**approval (8)**
37:9;40:23,24;
50:19;51:21;52:2,4;
185:7
**approve (1)**
136:11
**approved (19)**
7:9;9:25;10:5;
15:14;37:6,11;40:7;
50:20;81:6;103:1;
125:6,8,10;182:1,6;
183:7,14;192:19,25
**approving (1)**
102:3
**approximately (8)**
6:4;39:17;91:24;
135:3,17;136:14;
169:19;178:7
**April (9)**
9:14,17;87:11;
113:18;122:16;
124:20,22;169:19;
206:5
**area (9)**
24:3;29:14;
146:23;170:18;
171:12;191:21;
192:21;196:13;
218:11
**areas (2)**
30:2;117:4
**arm (13)**
22:3;23:1,4,25;
24:3,9;30:2,18,20;
118:25;119:5;
225:15,18
**armpit (1)**
119:4
**arms (1)**
66:14
**around (21)**
21:16;23:5;31:4,
15;33:17;34:15;81:4;
95:6;132:10,11;
135:24;166:17;
171:11;173:21;
230:4,23;232:9;
237:2;240:14;245:3,
6
**arrive (1)**
132:4
**Article (2)**
146:4,7
**Articles (1)**
146:10
**aspects (1)**

146:1
**ASPEN (3)**
92:12;94:4;223:18
**assessment (2)**
112:4;190:5
**assigned (1)**
60:9
**assist (6)**
151:25;204:8;
221:19;231:17,21;
236:23
**assistance (1)**
146:9
**Assistant (13)**
9:2;27:13;59:3,4,4,
5;75:11;76:22;87:15;
105:15;159:24;
183:11;230:8
**assisted (2)**
111:15;154:5
**assisting (2)**
6:18;237:1
**assistive (2)**
151:23,24
**associate (1)**
191:24
**associated (4)**
24:19;56:21;
121:2;173:25
**associates (2)**
238:22;241:20
**assume (3)**
206:7;214:3;
222:23
**assumed (1)**
243:25
**assumes (1)**
211:24
**assuming (3)**
38:16,18;233:16
**assumptions (1)**
240:22
**attached (2)**
62:1;215:9
**attachment (4)**
214:21,22,23;
215:7
**attempt (7)**
79:16;97:10,17;
104:20;167:13,24;
169:2
**attempted (2)**
212:8;218:9
**attempting (1)**
230:9
**attend (3)**
95:10;172:18;
173:12

**attendance (13)**
42:21;43:13;140:1,
8,18;211:1;222:6,25;
223:7,14,17;224:12,
19
**attended (1)**
133:7
**attending (2)**
112:21;172:23
**attention (8)**
20:21;21:24;76:4;
83:16;95:25;204:25;
205:9;208:2
**attorney (1)**
106:24
**attorneys (2)**
14:20;228:1
**August (7)**
72:12;123:6,18,25;
125:4,8,16
**aunts (1)**
130:22
**authority (1)**
43:17
**authorization (1)**
209:10
**authorize (1)**
209:3
**available (8)**
7:15,20;67:1;
209:25;210:15;
211:10;212:6,10
**Avon (2)**
191:24;192:3
**aware (8)**
55:9;92:11;94:24;
127:19;229:15;
230:5;235:17;242:12
**away (12)**
22:16;65:16;
98:20;99:3,5;100:4,
4,5;131:10;232:7;
239:14,17
**awkward (1)**
225:19

**B**

**back (38)**
22:22;28:22;
32:12;44:2;47:6;
51:11,12,24;54:18;
65:14;73:19;87:7;
98:2;100:12;115:20;
120:6,11;130:11;
135:20;153:10;
158:5;160:24;
165:18;169:11;

184:4;190:2,8;192:1;
196:13;207:17;
213:7;226:14;
231:11;234:18;
239:1;242:15,17;
244:20
**background (1)**
101:8
**backlog (2)**
69:21,24
**bacterial (1)**
56:5
**bad (8)**
37:19;58:18;
100:6;119:21;
131:11,17;152:22;
237:3
**bag (1)**
139:18
**balance (9)**
36:4;41:13,15,16;
66:24,24,25;70:20;
71:3
**balances (1)**
66:22
**Baltimore (1)**
144:5
**bar (1)**
104:7
**Barrett (6)**
94:19,22,25;
128:23;129:11;
173:20
**barrier (2)**
59:13;153:13
**barriers (1)**
60:2
**Barwell (2)**
9:24;10:11
**based (13)**
8:21;49:25;92:25;
119:16;138:8,10,14;
140:6,20;148:16;
222:2;224:4,25
**basic (1)**
237:10
**Basically (47)**
17:6;21:25;23:10;
26:5,7;29:7;39:24;
42:6,7,14,23;43:15;
48:12,15;49:20;
57:13;59:22;60:1,10;
63:23;64:1;65:23;
67:24;75:24;77:24;
78:9;79:12;84:25;
88:20;92:15;97:5;
98:16;103:23;
104:13;112:8;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 251 of 274 PageID #:
6110

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

121:14;125:24;
148:8;167:21;
173:14;202:21;
211:23;220:19,22;
236:7;241:16;242:5
**basis (3)**
208:12;234:7,12
**batch (3)**
184:5;216:9,12
**batches (1)**
216:6
**Bates (1)**
85:24
**Bates- (1)**
81:11
**Bates-stamp (5)**
45:8,19;46:18;
61:15;85:20
**Bates-stamped (4)**
16:21;36:8;205:9;
209:16
**bathe (1)**
32:6
**bathing (1)**
237:14
**bathroom (2)**
33:10,18
**bathrooms (1)**
33:9
**became (3)**
80:5;127:19;
131:11
**become (4)**
26:24;36:9;110:19,
20
**becoming (2)**
80:4;100:7
**bedridden (1)**
237:4
**begging (1)**
91:5
**begin (6)**
13:13,24;15:14;
109:21;114:14;227:6
**beginning (4)**
6:15;11:22;12:10;
92:3
**behalf (4)**
6:16;28:15;96:25;
183:12
**behind (3)**
112:20;122:19;
134:22
**Belcher (1)**
16:1
**bend (1)**
23:19
**beneficial (1)**

56:22
**benefit (2)**
90:17;204:14
**benefits (2)**
204:9,12
**Benson (1)**
6:18
**besides (1)**
31:25
**best (4)**
73:22;100:7;
212:8;218:21
**better (8)**
23:22;33:21;
92:16;230:9;235:23;
240:14,19;244:22
**beyond (1)**
194:23
**bills (1)**
124:18
**birth (1)**
122:6
**bit (7)**
31:1,8;73:17;
130:11;223:7;
231:24;234:23
**blood (1)**
238:11
**body (4)**
174:18;210:23;
220:17;237:6
**boils (1)**
21:21
**book (1)**
209:16
**bookmark (1)**
19:19
**bookmarked (1)**
216:12
**bookmarks (1)**
216:22
**books (1)**
70:23
**both (5)**
59:5;66:14;96:10;
128:12;202:4
**bottom (13)**
27:18;29:2;32:13;
34:6;45:20,21;46:16;
56:11;64:21;112:3;
121:6;207:4;216:6
**box (2)**
92:22;93:3
**brain (1)**
99:15
**break (5)**
91:10,13,15;
158:12,20

**breaks (6)**
88:22;89:24,25;
154:4;155:15,17
**breasts (1)**
24:4
**brief (1)**
111:8
**briefly (1)**
124:17
**brought (3)**
65:14;100:11;
104:12
**Brown (62)**
6:2,10;12:20;13:3;
15:10,11,16,23;
20:21;34:24;36:25;
45:11;48:2;54:3;
61:6;62:9;65:7;
68:17;69:16;71:6;
72:2,5;82:2,15;83:7,
20;90:2;7;91:18,21;
92:2;103:4;108:17;
111:6,11,14;124:11;
162:5;195:19;
197:24;198:5;
200:13;205:1;212:6;
226:15;232:1,16,20,
23;233:13,23;
234:10;235:2,15,17;
236:24;238:15;
239:19;242:12,23;
244:16,18
**B-R-O-W-N (1)**
15:11
**Brown's (3)**
83:16;109:5;
240:10
**bullied (1)**
105:10
**bully (1)**
105:3
**bullying (1)**
244:24
**Burke (1)**
10:16
**business (1)**
178:15
**butchered (1)**
101:15

**C**

**C-2 (2)**
45:7,12
**C-3 (2)**
140:11,11
**C-7 (1)**
181:25

**calculate (1)**
223:20
**calculated (2)**
93:23,24
**call (10)**
113:13;131:24;
172:13;177:10,11,
17;179:6;180:21;
194:6;234:3
**called (6)**
30:4;92:11,22;
107:16;231:16;238:3
**calls (2)**
201:16;234:1
**came (19)**
28:22;33:17;
73:19;106:23;120:6;
130:14;135:20;
159:17,23;216:9;
231:5;232:11;239:1,
3,5;241:3;242:15,17;
243:21
**can (133)**
7:19;13:8,16,17;
15:24;16:17;19:25;
20:24;21:2,5;23:16;
24:5,6,11;25:8,20;
26:3,23;27:17;29:4,
21;31:8,11;34:9;
36:20,25;38:7;44:6;
45:19;46:15;47:21;
50:20;53:7;54:5;
58:19,19;65:10;66:6;
69:19;70:16;71:21;
72:2;77:9;81:20;
83:1;84:1,16;86:23;
87:4;88:9;90:2,5,11;
92:8,14,21;93:14,16,
19;101:24;102:2,24;
103:10,12;110:10,
13;111:25;112:3,19;
113:2,9,15;115:3;
116:6,25;117:17,22;
118:8,18,20;119:12;
120:19;121:5;
122:13;124:10,17;
126:8;136:20;
150:24;151:5;152:3;
154:8,9,11,21;
159:19;160:21,23;
163:9;169:22;
178:19;180:19;
182:19,25;187:12;
188:6,14,21;194:17;
198:22,25;199:3,5,
13,14;200:1,3,15;
201:13,19;203:23;
208:11;217:9;

220:24;225:15;
227:5;231:13;233:8;
234:15,17;236:22;
237:4;240:24
**cancer (6)**
98:14,20,23;99:11;
239:12;240:18
**cancers (2)**
98:4,8
**capital (1)**
240:8
**caps (6)**
44:23;45:2;48:7;
63:1;103:20;107:13
**care (5)**
28:9;174:21;
192:2;201:9;204:5
**cared (1)**
240:16
**career (3)**
40:11;42:1;146:1
**CARETHERS (164)**
6:1,19,25;8:11;
10:24;11:25;12:2,6,
13,18,23,25;13:4,12,
20;14:2,8,13,18,25;
15:6,12;16:24;19:13,
20,24;26:6,10,15;28:6;
35:12;36:11,14,19;
43:6;47:12,15,20;
49:8,13;53:1,4,7;
61:22;62:6;68:19,23;
69:4,7;71:9,12,17,21;
81:13,16,20;82:22;
83:1,18;91:12,17;
96:1,5,7,10;102:15;
109:8,12,19,25;
110:4,7,15,23;111:5;
127:9,16;128:6;
130:5;142:17;150:3,
8,10,13;156:2,16;
157:16;162:5,7,12,
15,19;165:20,22;
166:1;168:23;
180:17;182:10,16,
25;183:24;184:4,11,
19,23;185:5,11,17,
21;187:8,13,18;
188:14;189:1,10;
190:16;194:1,19;
195:12,22;196:9,25;
197:9,16;200:3,7;
211:18,23;213:22;
215:17,22;216:13,19,
25;217:3,8;219:18;
220:8;221:2,15,23;
222:14,22;223:5,12;
224:2,7,24;226:9,13,

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 252 of 274 PageID #: 1442

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

20,22,25;227:5,11,
15,20,25;228:7,14,
19;234:12,22;
245:18,22
**case (10)**
10:15;70:20;94:3,
7;99:14;105:9;127:7,
13;176:7;198:20
**cases (8)**
18:5;21:9;22:15,
25;25:15;31:7;32:2;
178:1
**cause (6)**
29:15;98:14;
99:11;117:4;203:23;
239:12
**caused (2)**
22:5;240:24
**causes (5)**
25:16;29:17,18;
56:5;121:3
**causing (1)**
42:3;118:11;
236:20
**CBC (2)**
189:16;190:7
**CC'd (6)**
55:7;58:9;59:1,6;
90:13;103:17
**Center (5)**
9:2;54:9;59:5,6;
77:12
**certain (9)**
24:10;27:5;59:23,
24;65:20;66:14;
98:13;207:24;221:25
**certification (17)**
19:20;20:1;67:5,9,
12,20;68:11,25;
90:23;91:1;145:11;
166:19;167:11,22;
168:2,11,19
**certifications (1)**
106:10
**cetera (1)**
127:12
**chain (4)**
53:22;105:12;
106:13,16
**chair (9)**
88:22;89:24,25;
155:14,16;157:18;
158:12,20,21
**challenges (2)**
56:21;204:16
**chance (6)**
17:6;44:18;99:12;
182:18;238:20;245:6

**change (2)**
14:15;17:20
**changed (4)**
134:13,15;141:6,8
**channels (1)**
29:11
**chart (1)**
134:24
**check (3)**
38:18;46:24;92:21
**checked (1)**
189:17;190:8
**checking (3)**
93:2;184:2;190:12
**children (5)**
98:23;99:4;
130:20;132:17;
238:14
**Chin (4)**
10:3,9,14,22
**choice (2)**
237:23;243:18
**choose (2)**
39:5;187:4
**chose (1)**
186:19
**chronic (11)**
20:23;22:12;40:6;
56:2;57:20;58:3,4;
112:9;171:3;173:8;
203:21
**circumstances (2)**
125:19;158:22
**claim (5)**
9:21;103:14;
121:15;162:3;193:23
**claimed (1)**
194:4
**claiming (1)**
155:8
**claims (10)**
9:20;17:9,10,15,
19,22;18:2,12,13;
69:21
**clarification (3)**
51:6;70:4;188:15
**clarify (5)**
38:25;188:21;
196:12;213:7;221:5
**CLARK (144)**
6:16,17;8:7;10:10,
21;12:1,4,11,22;
15:22;17:1;19:9,15,
21,22;20:9,20;28:3,
7;35:1,22;36:5,13,
24;43:2;45:5,10;
47:7,14,23;48:1;
49:17;52:24;53:3,11;

61:5,9,24;62:3,8;
68:16,21;69:2,12;
71:5,11,14;72:1;
81:8,15;82:1,19,24;
83:6,13,19;90:6,10;
91:9,22,23,25;92:1;
95:23;96:3,6,15;
102:12,17;108:24;
109:11,16,23;110:2,
6,12,21,25;111:11,
13;126:24;127:4,15,
18;128:9,13;130:3;
142:12;149:10,15,
23;150:1,25;154:19;
155:24;157:4,15;
168:21;169:5;
180:11;182:21;
183:20;184:1,10,13,
20;185:1,9;188:10,
23;193:17;194:11;
195:13,15;196:1,15;
197:6,15,20,23;
200:1,12;211:16,20;
212:1,5;213:20;
214:18,19;215:5;
216:4;217:6;224:3,6,
9,22;228:20;229:2;
234:2,17;235:1;
244:13,15;245:16
**Clark's (1)**
225:1
**clause (1)**
64:10
**clean (1)**
33:16
**cleaning (1)**
237:1
**clear (6)**
74:10;75:4;76:15;
93:17;185:6;224:11
**Cleocin (1)**
112:11
**Clindamycin (2)**
112:14;190:9
**clinic (10)**
101:3,5,11,16;
133:11;174:21;
191:11,14,18;192:2
**clinics (1)**
119:12
**clock (1)**
92:16
**close (4)**
49:2;56:19;
178:14;204:14
**closer (2)**
160:6;173:21
**closest (1)**

138:6
**closing (1)**
173:22
**clothes (1)**
21:13
**clothing (2)**
117:2,3
**Coach (5)**
54:10;59:3;75:11;
76:22;159:25
**colleague (2)**
191:24;192:3
**collect (1)**
17:7
**collectively (1)**
111:21
**Colleen (2)**
37:24;136:10
**combination (1)**
238:18
**comfort (1)**
21:15
**comfortable (2)**
220:23;245:7
**coming (1)**
241:16
**command (2)**
53:22;106:17
**common (1)**
192:1
**communicate (1)**
239:25
**communication (2)**
79:4;205:13
**commuting (1)**
170:18
**compare (1)**
167:16
**compassiou (1)**
103:23
**competent (1)**
241:2
**Complainant (26)**
6:15,17;7:7;8:8,20;
9:3,11,17,22;10:5,14;
11:3,25;12:10,11,20;
15:13;68:22;91:21;
128:10;217:5;229:8,
13;230:2,16;231:17
**Complainant's (16)**
7:24;8:24;9:9,14;
19:10;47:9;52:22;
71:7,10;81:9;82:20;
95:25;108:25;
140:11;181:25;
184:16
**complaint (6)**
11:4,11;107:9,23;

108:15,16
**complete (5)**
26:11;125:15;
142:13,18;163:25
**completely (4)**
126:23;127:2;
212:3;239:23
**completing (3)**
28:15;29:1;153:16
**completion (1)**
28:18
**complex (1)**
18:6
**complicate (1)**
199:5
**complicated (2)**
18:3,13
**complications (4)**
97:25;101:8;
116:7;173:4
**complies (8)**
37:2;38:8;72:4;
90:3;113:16;201:5;
209:17;217:23
**compound (1)**
233:18
**comprehend (1)**
44:1
**computated (1)**
94:9
**concentrate (6)**
21:23;151:8;
223:11;224:17;
225:7,9
**concentrating (1)**
223:22
**concerned (5)**
41:18;106:15,20;
166:25;175:14
**concerning (3)**
78:16,22;83:11
**concerns (2)**
56:12;57:2
**concluded (1)**
125:4
**concludes (2)**
226:9;245:22
**conclusion (2)**
118:5;205:24
**concurred (1)**
183:10
**condition (77)**
20:23,25;21:3,13,
17;22:12;23:17,23;
24:19;25:1;26:8;
30:14,16;31:5;33:1
40:7;42:11,16;44:10,
13,15,17;47:3;48:17;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 253 of 274 PageID #: 6152

LBOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

55:12;56:9;57:20;
58:11,15;66:10;73:9;
74:24;78:5;82:14;
83:24;88:16;98:11,
18;99:10;100:6;
101:19;106:9,21;
116:17;121:2,3,18;
131:6,11;136:21;
137:3;158:18,21;
145:25;155:19;
158:22;171:3;172:5;
174:6,19;175:16;
176:15;202:5,11,15;
203:25;206:9,13;
213:10,18;221:12;
224:1;229:16,17,19;
236:3,6
**conditions (1)**
17:4
**conducted (1)**
11:9
**conference (4)**
8:13;9:23;10:13;
149:17
**conferencing (1)**
6:6
**confirmation (3)**
84:3;85:22;86:12
**confronted (2)**
56:20;204:15
**confused (1)**
219:21
**congratulations (1)**
68:25
**connect (1)**
29:11
**connected (2)**
29:16;200:22
**connection (3)**
196:21;208:22;
209:4
**connects (1)**
29:8
**consensus (1)**
18:4
**consequently (1)**
238:7
**consider (2)**
196:23;209:23
**consideration (3)**
93:25;106:7;
157:10
**considered (5)**
13:5;42:13;
154:14;210:16;
218:10
**considering (4)**
23:13;44:25;58:9;

171:2
**consisted (1)**
68:8
**constant (4)**
23:13;25:6;
136:22;176:22
**constantly (3)**
23:11;187:2;
225:18
**constitute (1)**
9:21
**contact (1)**
56:13
**contacted (1)**
144:7
**contacting (1)**
144:8
**contagious (1)**
58:22
**contest (1)**
186:3
**continually (1)**
34:18
**continuation (1)**
11:1
**continue (7)**
43:8;73:24;91:22;
111:10,12;113:10;
122:20
**continued (1)**
246:1
**continuing (4)**
91:18,20;111:5;
226:14
**contract (2)**
146:8;148:3
**contributing (1)**
221:8
**control (15)**
56:18;105:16;
122:6;203:25;
210:19;230:10,16,
20;232:5,6,8;235:23,
25;236:3,5
**controlling (1)**
58:7
**convalescence (2)**
82:4,4
**convened (1)**
6:1
**conversation (6)**
84:17;153:21;
155:11;157:12;
164:2;217:18
**conversations (2)**
232:21,22
**convey (2)**
162:3,4

**cooking (1)**
237:1
**co-payment (1)**
125:1
**co-payments (1)**
124:14
**copied (5)**
75:10;79:13,23,24;
80:9
**copy (5)**
80:12;85:16;
127:25;182:17;198:3
**core (6)**
74:23,25;131:22,
23;141:12;177:20
**corner (1)**
216:7
**corrected (2)**
10:25;39:8
**correction (1)**
39:11
**correspond (1)**
160:21
**correspondence (4)**
79:10;86:24;
97:24;160:16
**Counsel (5)**
142:13;182:17;
186:16;187:11;
234:25
**counted (1)**
80:1
**couple (6)**
26:10;115:21;
141:23;197:24,25;
243:16
**course (10)**
11:14;23:4;24:7;
112:10;113:6,11;
151:14;152:23;
233:8;244:22
**court (10)**
11:13,17;13:8,10,
20;36:21;69:8;91:11;
96:11;227:3
**cousins (1)**
130:22
**cover (1)**
130:12
**covered (2)**
124:18;208:10
**crazy (1)**
233:19
**create (6)**
24:6,11;29:21;
199:3;229:23;235:13
**created (1)**
235:15

**creates (4)**
21:9;24:23;29:20;
229:22
**creating (1)**
235:7
**creation (1)**
187:5
**cried (1)**
240:12
**cross (3)**
149:14,18,18
**cross-examination (4)**
8:3;11:6;195:13;
196:21
**crying (3)**
88:14;161:18,23
**cube (1)**
226:1
**cubicles (1)**
225:24
**culture (5)**
119:17;120:5,6;
190:3,4
**cultures (5)**
119:15,20,22,24;
120:10
**current (6)**
11:21;13:1;122:2;
193:19;206:1;226:23
**currently (7)**
15:25;16:7;35:6;
114:7;195:4;229:5,7
**Curtsy (1)**
37:24
**cut (4)**
24:25;26:4;
142:14;193:20
**cutting (1)**
174:23
**cyst (17)**
21:9;25:2;29:10,
12,13,16,17;32:19;
33:4;101:14;115:13;
116:19;117:2;118:9;
186:12,23;190:14
**cysts (13)**
21:3,11,21;22:5;
32:14;82:11;116:25;
118:16,19;186:18;
192:15;199:6,16

**D**

**daily (1)**
23:16
**damages (1)**
8:2
**Danielle (1)**

6:23
**data (2)**
68:7;223:19
**date (27)**
61:13;63:19;84:5;
86:8;102:23;125:14;
126:9;132:11;
135:21;136:9;
137:18,21;139:15;
140:24;141:2;
144:15;145:20;
150:22;151:1,2;
159:17;179:6,6,7;
180:4,5,6
**Dated (5)**
61:13;79:7;90:7;
115:4;185:10
**dates (6)**
72:14;124:17;
132:3,10;147:8;
172:9
**date-stamped (1)**
86:9
**daughter (2)**
231:5,12
**day (33)**
10:5;44:4,5;78:24;
80:23;93:11,12;
101:15;107:8,10,11,
15;115:7,10;116:4;
118:1,3;139:17;
145:1;161:18;162:2;
173:1;175:11,12;
177:8;180:8,9,10;
190:4;237:25;
241:17;245:11;246:1
**days (21)**
74:25;92:21;
113:14;115:21;
136:23,24;142:21;
151:8,10,11,13;
166:11;175:8;
178:14,18;207:6,11,
18;223:19;238:5,25
**day-to-day (1)**
237:10
**DC (1)**
98:22
**deal (5)**
25:12,21;220:15;
230:23;236:18
**dealing (1)**
25:15
**Dean (25)**
38:14,20;51:7,10;
53:24;54:10;70:7;
74:7,21,22;75:10;
77:13;80:10,16;88:7;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 254 of 274 PageID #:
6340
EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

90:13;105:20;
145:16,18;146:20;
163:12,24;177:15;
178:7,21
**death (1)**
100:13
**debilitating (15)**
21:17;25:6,9;33:1;
55:18;56:6;202:16,
16;203:21,24;
219:24;220:4;
221:16,21;237:7
**December (5)**
35:24;37:5;72:13;
135:17,19
**decide (1)**
101:18
**decided (4)**
68:9;106:8;
130:24;192:2
**decision (8)**
17:9;41:9;90:25;
99:20;101:21;139:7,
11;143:8
**decision-makers (1)**
127:12
**declined (3)**
113:12;188:11,24
**decreasing (1)**
22:22
**deep (2)**
65:12,24
**deeper (1)**
106:3
**deeply (1)**
240:12
**Defense (1)**
182:1
**definitely (2)**
204:23,24
**degrade (1)**
242:4
**delay (1)**
192:7
**demanding (1)**
70:14
**demean (1)**
105:1
**demeaning (1)**
44:24
**demonstrate (1)**
60:8
**demoted (1)**
77:14
**denial (31)**
8:9;44:7,8,22;
47:10;48:7;54:19;
66:20;87:12;89:16;

97:5;106:25;144:11;
145:1;148:18;
153:10;169:18;
170:2,16;171:25;
206:5;208:3;221:24;
222:1;233:6,7;
239:20;240:3,5,6,7
**denials (3)**
42:20;159:16;
160:9
**denied (31)**
8:25;9:10,16;
41:12;42:8;43:11,13;
44:23;45:2;57:15;
62:25;103:16,20,20;
104:19;107:12;
108:10,15,16;
135:12;137:7;138:8,
12,14;139:24;
140:11;143:22;
148:5,8,15;240:7
**Denise (1)**
6:17
**deny (12)**
65:5;79:15;
103:14;104:2,18,21,
23;106:14,17;137:5,
19;138:16
**denying (5)**
77:20;105:25;
121:17;208:12;
221:11
**deodorant (2)**
21:15;220:16
**Department (10)**
6:3,11;16:4;75:20;
79:12;91:19;111:7;
138:1;181:7;226:15
**depending (4)**
22:1;24:14;30:3;
112:13
**depends (1)**
220:2
**depleting (1)**
136:22
**depression (9)**
25:20;26:9;65:12;
100:10;106:3;121:1,
4;122:8;223:25
**dermatological (1)**
58:2
**dermatologist (2)**
133:14;193:13
**Dermatology (4)**
27:21;28:17;
124:13;187:24
**derogatory (1)**
242:20

**describe (7)**
66:6;77:9;88:12;
118:18;202:4,8;
240:10
**described (1)**
234:25
**describing (2)**
76:16;233:2
**deserve (1)**
43:24
**designated (1)**
87:13
**designee (2)**
129:2,5
**desk (1)**
44:2
**despair (2)**
65:25;106:6
**desperate (3)**
66:2;88:17;144:9
**detailed (2)**
170:15
**details (2)**
90:24;142:3
**determination (2)**
131:9;206:17
**determine (2)**
68:9;141:24
**determined (1)**
73:22
**Detroit (1)**
6:7
**develop (1)**
30:9
**development (2)**
98:3,7
**device (1)**
154:3
**devices (3)**
151:22,23,24
**diabetic (1)**
238:10
**diagnosed (1)**
26:21
**diagnosis (1)**
97:22
**diarrhea (1)**
114:22
**difference (3)**
155:1;218:25;
225:9
**different (30)**
17:7,14,23,24;
18:11;21:4,4;24:13,
13;30:2;32:1;51:19;
67:23;89:25;101:6;
119:10;127:3,11;
138:2;141:15,17;

145:25;155:2;
158:12,13;192:17;
216:15;220:2;
227:23;234:23
**differential (2)**
189:17;190:7
**differentiate (1)**
101:12
**difficult (11)**
18:6;21:22;22:6;
23:5;33:13;99:14;
100:15,21;149:4;
203:15;238:5
**difficulty (2)**
59:24;74:22
**dire (2)**
64:20;233:17
**direct (13)**
76:4;83:16;95:24;
149:13,18,18;
178:18;180:13;
198:1;205:8;206:15;
213:8;234:21
**directed (3)**
35:17;57:4;204:22
**directing (1)**
178:13
**direction (1)**
105:8
**directly (3)**
129:22;153:24;
168:25
**Director (17)**
40:5;45:15;55:3,6;
59:3,4;87:15;105:15;
129:19,19,20,21,25;
139:10;143:24;
183:11;230:8
**disabilities (1)**
205:5
**disability (40)**
8:21;9:4;17:10,15;
25:21;42:2,2,12,16;
43:20,22;48:23;
55:21,24;56:1;59:13;
66:18;67:14,17;
88:13;99:21;104:10,
12,14;106:15;142:7,
11,24;152:13;
153:13,25;194:16;
202:2,9;206:17;
208:10,16;223:4,6,8
**disabled (1)**
194:22
**discharge (1)**
79:19
**disciplinary (2)**
134:10;135:10

**disciplined (2)**
134:6,9
**discovery (2)**
108:18,22
**discrepancy (1)**
70:21
**discriminate (1)**
79:19
**discuss (12)**
10:8;20:22;33:19;
39:25;41:8;94:25;
140:2;144:14;
155:21;196:17;
203:13;233:20
**discussed (13)**
8:14,16;18:10;
39:24;88:25;94:19;
112:8,14;121:13;
124:4,5;186:4;
223:18
**discusses (2)**
205:10;209:18
**discussing (6)**
69:14;156:6;
175:22;193:18;
234:11;235:3
**discussion (14)**
38:13,20;39:22;
40:21;52:13;83:21;
94:21;119:23;
138:10;139:2;
145:17;156:24;
157:13;200:5
**discussions (3)**
162:24;193:21;
209:2
**disease (9)**
44:14;56:18;58:7,
8,16,20;59:7;97:25;
112:16
**diseases (1)**
58:17
**dismiss (1)**
105:2
**dismissed (2)**
66:11;106:20
**disorder (3)**
55:15;58:2;112:9
**disregarded (2)**
42:15;66:11
**disregarding (1)**
44:10
**distracted (1)**
213:12
**distress (1)**
121:22
**District (1)**
6:9

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 255 of 274 PageID #: 615

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**division (1)**
17:12

**DMO (9)**
87:19;103:15;
205:14,16,20,23;
206:3,4,8

**doctor (26)**
7:13;22:19;23:8;
24:25;25:8;61:1;
89:22;101:6,11,23;
106:8,24;120:19;
133:6;148:22;
154:12;163:18,19;
167:5,18;174:15,17,
23;207:19;214:14;
245:1

**doctors (2)**
98:13;99:19

**doctors' (1)**
7:16

**doctor's (13)**
23:9;50:12;86:6,
14,21;87:2;90:22;
91:1;106:10;148:9;
193:10;219:6;222:11

**document (39)**
19:25;25:7;27:18;
28:21;34:4,6;36:20;
37:1;48:4;51:13;
53:12;54:22;55:4;
61:10,16;84:2,8;
96:21;102:5;111:16,
22;112:4,19;113:2;
114:24;121:6;122:2,
19;198:4;200:16,18,
20,22,25;201:8;
204:20;205:2,6;
217:22

**documentation (54)**
44:7;50:18;51:15;
52:6,7;64:1,8;75:21;
84:11,15,18,21,23;
85:3,5;87:5;89:6,15,
19;97:7,11;134:21;
138:13;139:13;
140:19;155:9;160:8;
163:5;164:7,11,23;
165:13;166:13,21;
167:1,10,14;168:10;
169:25;170:3,5,9;
175:14;179:10;
191:13,17;192:14;
200:17;202:24;
208:5,9,15,17,21

**documented (1)**
98:4

**documents (18)**
17:8;37:1;45:12,

17;46:2;51:25;54:16;
76:25;96:16;108:21;
109:15;147:18;
185:13;186:15;
187:9,11,17;214:17

**Donald (5)**
75:11;76:21;80:9;
84:13;168:3

**donated (6)**
38:4,17,24;39:7;
136:6;137:17

**donation (1)**
38:10

**done (10)**
44:1;155:10;
189:25;225:21;
230:11;241:13,13,
25;242:4;243:14

**donor (1)**
38:3

**door (1)**
195:18

**double (1)**
184:1

**doubly (1)**
109:2

**down (16)**
13:21;14:5;25:4;
48:12;51:24;65:20,
24;77:14;130:19;
159:17,23;206:8;
227:13;231:4,6;
245:10

**Dr (64)**
7:11,13,14;10:3,9,
14,22;23:8;26:11;
27:12;28:9;40:5,17;
41:2;52:25;54:7;
55:12;56:16;57:1;
60:7;62:1;82:8;
84:22;85:9,11;87:1;
89:8;95:8;97:19;
100:20;112:2;115:7;
116:4;119:24;
120:23,24;121:7;
123:3,12;124:3,24;
125:4,18;133:8;
146:21,25;147:9;
163:21;168:11;
171:7;173:6;191:10,
12,20,20,23;192:6;
198:15;201:13,22;
202:25;204:18;
207:21;218:4

**drag (1)**
178:2

**drain (9)**
21:11;32:15,19;

33:4,7;117:24;
188:20;190:17,19

**drainage (5)**
27:8;33:7;120:12;
188:25;199:14

**drainages (6)**
198:6,7,8,13,18,20

**drained (24)**
32:16;117:25;
118:1,3,6;186:12,23,
23;187:1,3,22;188:8,
17;189:3,15;190:24;
191:3;192:15;
198:21,24;199:1,6,9,
16

**draining (1)**
113:12

**drains (1)**
199:16

**draw (2)**
118:20,21

**drawing (1)**
20:21

**dress (1)**
32:5

**dressed (3)**
32:9,10;237:9

**drive (2)**
25:20;192:4

**drove (1)**
65:12

**due (13)**
27:7;41:12,13;
53:17;57:7;59:12;
83:24;136:23;148:5;
153:12;173:22;
222:5;245:14

**Duly (3)**
8:11;15:17;228:22

**duration (2)**
34:8;203:10

**duress (4)**
229:21,22,24;
240:24

**During (61)**
9:23;10:12;11:14;
17:2;18:7;21:14,18;
23:2;27:5;31:19;
32:9;34:11;35:11,15;
40:21;44:12;59:23;
63:10;66:3,7,12,13,
14;67:7,12,13;72:19,
22;73:15;74:14;
77:17;88:3,12;89:4;
95:9;103:4;124:15;
129:3;141:5;144:18;
149:4;151:4;155:7;
159:8;162:24;175:3,

5,9,18;176:19,21,24;
205:19;211:2,5;
219:23;221:1,13,15;
223:23;241:3

**duties (4)**
59:15;150:17,18,
19

**duty (2)**
13:5;60:9

**dying (1)**
98:22

**E**

**earlier (11)**
18:8;48:2;69:14;
76:16;98:20;111:14;
201:6;213:8;217:17;
218:8;223:18

**early (2)**
238:1;244:21

**earned (2)**
212:12,15

**eat (1)**
237:8

**eating (1)**
237:13

**EEO (5)**
107:8,23;108:15,
16;121:15

**EEOC (2)**
6:11;107:16

**effect (3)**
102:21;114:20;
122:13

**effects (1)**
239:12

**efficiently (1)**
213:10

**effort (2)**
168:20;169:13

**either (14)**
7:19;10:17;33:13;
80:15;97:11;102:5;
141:11;144:12;
158:16;203:10,16;
225:1;232:12;242:20

**elected (3)**
186:22,24;187:24

**elevate (1)**
225:15

**elevated (3)**
22:3;24:9;225:19

**else (14)**
6:8;32:3;60:25;
105:5;114:25;
143:13;145:24;
150:17;157:18;

5,9,18;176:19,21,24;
205:19;211:2,5;
219:23;221:1,13,15;
223:23;241:3

163:1,22;191:21;
199:13;239:1

**e-mail (58)**
44:3,5;47:11;48:3,
4;52:12;67:20;68:24;
70:13,19;71:6;72:3,
5;75:8,9;79:7,24;
80:2,8,13;84:13,19;
87:1,6,7;89:9;90:4,5,
7,11,12,12,21;
103:18;107:10,14,15,
18;138:23;139:6,9;
140:10;159:20,22;
160:2,19,21;163:3,
11;165:2,4;166:9;
168:3;173:19;
175:21;178:6;
179:17;214:22

**e-mails (8)**
67:22;68:2,17;
69:13;72:16;73:12;
94:24;200:21

**embarrass (2)**
58:25;242:4

**emotional (7)**
65:19;98:21;
100:12;121:22;
161:22;239:20;
240:24

**employed (3)**
229:6,7;237:21

**employee (7)**
13:2;16:4;75:16;
79:25;208:7,17;
226:23

**employees (3)**
134:15;205:4;
241:20

**employer (2)**
79:14,19

**employment (4)**
17:2;158:18;204:9,
13

**Ena (28)**
9:1;53:25,25;54:9;
55:7;57:11;77:11,19;
87:12,18;89:16;
103:11;105:4;
107:11;130:1;
138:10,25;139:12;
140:10;145:6;
146:19;148:8;
174:12;183:9,12;
205:18;222:5;233:21

**Ena's (4)**
105:8,11;183:13;
206:6

**encounter (2)**

Case 1:20-cv-01154-JPH-MJD  Document 39-4  Filed 07/02/21  Page 256 of 274 PageID #:
6160
EEOC Hearing
Volume I
Brown v. McDonald, et al.
July 20, 2015

124:19,20
**encounters (5)**
124:12;232:1,24;
233:24;235:3
**end (2)**
141:10;242:2
**ended (3)**
99:1;238:7;242:2
**enemy (1)**
21:19
**engaged (1)**
18:9
**enjoy (3)**
152:4,7;153:22
**enjoying (2)**
204:8,12
**enough (1)**
240:21
**ensure (1)**
11:8
**enter (1)**
6:14
**entered (3)**
62:4;135:14;184:5
**entertain (1)**
100:3
**entire (8)**
29:24;67:23;
100:11;105:4;
118:23;175:7;178:4;
223:20
**entitled (1)**
81:10
**environment (9)**
8:21;210:20;
220:23;221:7;
230:21;232:8;235:7,
24;243:3
**equitable (1)**
11:8
**essential (7)**
56:17;58:6;59:14;
149:8;153:14;
203:24;204:9
**essentially (12)**
109:9,11;134:8;
146:15;150:22;
153:17;157:24;
196:8;197:16;
218:12;219:24;
221:17
**establish (1)**
208:10
**estimation (2)**
34:7,9
**et (1)**
127:12
**evaluate (3)**

17:4,14,22
**evaluated (1)**
73:21
**evaluating (2)**
18:11,13
**evaluation (5)**
16:13;18:18;
41:19;141:4;241:10
**evaluations (3)**
16:14,18,23
**even (37)**
23:6,8;33:22;44:8,
16,18,19;52:16;57:1,
18;64:21,25;65:21;
70:19;91:3;104:23;
121:18;146:11;
153:2;155:21;156:3,
5;158:18;166:24;
169:4;173:4;177:19;
192:5;206:4;213:5,5;
240:4,15,15,16;
243:6,7
**events (3)**
8:22;9:19,20
**Eventually (5)**
133:23;166:12;
174:12;192:18,19
**everybody (10)**
55:8;67:10,24,25;
103:17;105:19,21;
142:25;144:8;241:6
**everybody's (1)**
105:19
**everyone (7)**
6:8;13:16;65:4;
88:15;145:24;
161:20;226:13
**evidence (22)**
17:8;20:19;36:23;
47:25;53:10;58:1;
60:19;69:11;71:25;
81:24;83:5;89:11;
96:14;111:4;157:8;
163:21;166:8;185:4;
199:8;200:11;
211:25;217:12
**evidenced (1)**
8:22
**exacerbated (2)**
233:15;240:3
**exact (6)**
30:7;70:25;126:9;
132:3,11;135:21
**exactly (9)**
68:19;72:14;
114:16;115:19;
147:8;170:11;172:9;
207:9;222:17

**examination (8)**
11:5;15:21;130:9;
197:22;214:1;224:8;
225:3;229:1
**examined (2)**
15:19;228:24
**examining (1)**
197:1
**example (1)**
240:25
**excellent (1)**
245:12
**except (1)**
162:3
**exchange (5)**
71:6;72:5;78:14,
21;90:11
**exchanges (1)**
72:3
**excluded (11)**
92:22;93:5,6,9,22;
95:5,11,14,20;234:5,
7
**excluding (1)**
93:15
**excruciating (3)**
21:21;161:18;
199:10
**Excuse (1)**
133:2
**excused (6)**
13:5;173:15;174:4,
5,7,8
**exercise (2)**
79:16,16
**exhaust (2)**
133:21;134:1
**exhausting (2)**
134:7;136:24
**Exhibit (129)**
19:10,18;20:8,13,
16,18;32:12;36:7,15,
20,22;40:2;47:9,20,
22,24;52:11,23;53:8,
9;55:1;62:4;68:22,
24;69:8,10;71:7,8,10,
15,22,24;78:14;79:4,
5;80:8;81:9,9,21,23;
82:21;83:2,4;95:25;
96:18,20,23;102:2,
12,16;107:20;108:5,
25;109:2,22;110:5,8,
18,19,19,20;
113:15;117:6,12,17;
119:9;120:15;
122:12;123:2,12,18,
22;124:10,23;182:1,
9,12,13,14,20,22;

183:4;184:8,12,12,
15,15;185:3,23;
188:6,10;189:13;
190:15,23;191:1,6;
200:8,10,14;201:3,4,
12,12;202:4,5;
203:10,11,16,16;
204:2;206:23;
209:14;215:16,18,20,
25,25,25;216:1,2,7,8,
20;217:1,4,11,15,16
**Exhibits (20)**
36:7;96:13;109:9,
13,20;110:9;111:2,8,
9,19;184:5,6;185:14;
188:2,18,22;189:9;
201:11;215:24;216:1
**exist (1)**
106:9
**expeditious (1)**
11:9
**expelling (1)**
21:12
**experience (3)**
32:18;174:20;
236:2
**experienced (1)**
34:10
**experiencing (4)**
55:18;73:15;
114:7;223:15
**experimental (1)**
98:16
**explain (20)**
20:24;31:8;42:5;
48:14;51:1;63:5;
67:16;69:19;74:5;
80:18;89:13;90:11;
97:21,24;113:9;
119:13;139:23;
161:12;162:9;198:25
**explained (20)**
41:11;42:11;49:21,
22;64:25;65:3,3,21;
77:17;78:3,5,7,9,9;
88:15;121:14;
127:23;140:6;
145:23;148:8
**explaining (4)**
47:2;62:19;74:21;
239:23
**explanation (1)**
241:7
**express (3)**
56:16;131:21;
141:8
**expressed (2)**
40:16;161:20

**expresses (1)**
82:2
**extended (3)**
130:21;152:23;
172:7
**extending (1)**
177:19
**extent (5)**
90:1;149:11;
214:20;215:6;221:25
**extra (10)**
88:22;89:24,24;
154:4,4;155:15,16;
158:12,20,20
**extreme (2)**
177:21;202:20
**extremely (4)**
22:10;34:13;
65:20;88:15

**F**

**face (1)**
45:3
**face-to-face (1)**
243:12
**facilities (2)**
119:10,13
**facility (4)**
192:17;197:5;
199:16;237:18
**fact (9)**
15:1;129:4;
152:15;157:20;
194:12;196:3;198:2;
228:9;242:11
**facts (1)**
211:24
**Fahey (11)**
28:1,5,6,8,12,14;
29:1;32:13;112:21;
113:4;191:20
**failed (2)**
60:7;203:5
**failing (1)**
59:10
**failure (1)**
178:8
**fair (2)**
11:11;125:5
**familiar (9)**
96:16,20;102:6,14;
120:17;140:12;
164:12;179:23;205:6
**family (39)**
31:24;40:13;
43:22;49:2;56:20;
99:3;100:5,8,9,19;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 257 of 274 PageID #: 617

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

101:22,25;130:19,
21;131:10;132:14;
138:7;154:11,23;
156:20,20,22;171:16,
16,23;194:7;204:4,
15;218:14,17,20;
219:3;230:22,23;
231:9;245:3,3,6

**far (13)**
23:7;25:18;30:12;
41:17;106:14,19;
125:12,19;146:11;
154:14;175:13;
186:9;225:11

**father (1)**
130:20

**February (23)**
9:8;52:25;53:19,
20;61:14;65:23;84:7;
85:23;86:4,15;108:2,
4,10;146:3;147:6;
166:17;177:1,2;
178:7,13,14,15;
244:20

**federal (2)**
13:2;226:23

**feedback (2)**
84:9,12

**feel (27)**
33:6;42:9;43:24;
50:24;58:25;60:12;
62:15;65:13,24;
84:20;103:7,21,22,
22,24;104:3;105:10,
14;106:18;121:20;
141:23;164:3,5;
166:7,12;167:7;
245:2

**feeling (2)**
34:1;104:1

**feelings (2)**
80:19;105:3

**fellow (1)**
241:20

**felt (44)**
43:18;44:15;45:3;
48:25;50:6,22;57:13;
58:13,23;60:20;
62:20,22;63:2;66:8,
9;74:1;77:18,19;
78:7;100:5;101:14;
103:18,19;104:17,
24;105:1,7,22,24;
106:1,2;107:16;
121:14,16;143:10,
12;153:20;159:5;
166:20;168:9;173:3;
186:8;218:20;235:6

**few (8)**
30:15;68:5,8;
113:14;114:15;
151:10;186:19;
238:25

**field (2)**
6:5,7

**figure (3)**
189:6;194:8;
216:14

**figured (1)**
50:2

**file (4)**
51:19;186:3;
216:14;242:13

**filed (3)**
20:2;39:14;107:8

**files (3)**
30:24,25;31:2

**fill (8)**
26:17;37:14;
60:15;144:25;
163:13,16;169:14;
207:19

**filled (7)**
34:12;37:4,4;
167:3;169:3;214:14;
218:2

**filling (2)**
76:23;167:19

**final (6)**
79:2,3;80:4,5;
123:14;158:15

**finalize (2)**
78:1;80:24

**finalized (4)**
77:2,16;78:20;
158:16

**finalizing (1)**
80:16

**finally (2)**
213:7;228:8

**financial (4)**
40:12;170:23;
212:22,25

**find (10)**
14:11;65:7;
101:23;104:1;107:5;
174:17;194:5;
202:10;227:18;
235:12

**finding (1)**
171:20

**fine (3)**
35:16;149:20;
187:14

**finish (2)**
13:24;202:17

**finished (5)**
83:21;165:19;
211:16;231:3,5

**first (32)**
12:19;13:14;
15:17;16:11;20:11,
24;21:7;27:17,22;
41:4;45:13;48:10;
53:13;64:24;78:13;
80:8;88:6;96:23;
111:19;119:15,20;
131:21;135:23;
159:16;185:22;
194:21;206:17;
222:9;227:7;228:22;
239:21;243:23

**fiscal (3)**
140:21,22;141:10,
19

**fishing (1)**
64:16

**five (3)**
198:20;204:21;
216:15

**fix (1)**
31:18

**flare (7)**
29:18;30:9,18,21;
31:19;37:18,19

**flared (2)**
29:17;233:19

**flares (13)**
22:25;27:2,7;
29:23;30:1,5;32:10;
59:23;66:12;114:7;
202:12;210:22;
221:14

**flare-up (17)**
22:22;23:24;
24:21;25:1,20;29:13;
152:9;161:19;
176:14,19;178:4;
219:23;220:2,3,14,
16;245:9

**flare-ups (38)**
21:14,18,25;25:17;
26:24;27:3;34:8;
66:3,6,16;136:23;
137:4;149:5;151:5,7;
152:16;153:25;
176:18,23;186:21;
187:2;213:11;220:6,
12;221:1,4,8,16,21;
229:23,25;230:6,11,
17;231:18;232:6;
237:3;244:19

**Florida (35)**
16:2,8;40:13;

48:16;52:17;58:6;
62:23;64:18;65:17;
89:3;98:23;130:16,
17,23;132:20;
136:16;137:24;
138:4;154:11;
156:15,22;157:22,
24;160:6;171:1;
172:4;192:20,24;
193:4;197:14;
218:13;225:8,14;
229:4;243:21

**fly (1)**
171:1

**FMLA (94)**
19:4;25:7;37:6;
39:25;40:2,7,18,22,
25;41:16;43:14;46:6,
12,23;48:13;50:5,12,
20;51:13,18;52:2;
56:25;66:22,24,25;
67:3;70:5,8,16,19,20,
22,22;71:3;72:8;
73:1,14;74:6,17,19;
75:3,6,14,17;76:8,11;
78:16,23;79:17,22;
80:1,2,21;82:16;
83:21;85:8;89:7;
92:20;93:10,20;
105:25;106:1;132:6,
22;133:4,16,22;
135:12;136:20,25;
137:9;138:14;
160:14,17;176:2,2,7,
8,12;177:7;179:7,8,
21;180:20,22,24;
181:2,9,19;195:6,25;
208:22;218:2;219:12

**folder (1)**
215:23

**folds (1)**
21:4

**folks (2)**
207:14;242:24

**follow (3)**
117:9;196:11;
236:1

**followed (2)**
127:1;194:14

**following (10)**
8:22;36:2;39:12;
44:4;115:18;197:25;
198:1;243:4;244:3,7

**follows (3)**
8:19;15:20;228:25

**follow-up (5)**
124:8;126:1;
175:15;224:4,25

**food (1)**
105:12

**forced (1)**
133:11

**foremost (1)**
45:13

**forgot (1)**
90:3

**form (59)**
26:11;28:11,12,15;
29:1;37:14,21;38:5;
46:4,7,10,16;54:21;
56:25;59:16;86:25;
103:19,21;104:25;
144:1,23,25;153:17;
163:13,24;164:12,23,
24;165:1,8,9,14;
167:2,3,13,16,19,25;
168:6,16;169:3,9,12,
13,15;200:9,14;
204:19;206:23;
207:19;214:13,15,16,
20;217:19,24,25,25;
218:6

**formal (2)**
80:3;108:13

**forms (1)**
207:5

**forth (1)**
110:20

**forward (1)**
166:9

**found (6)**
57:16;73:18;78:16,
22;235:9;242:1

**four (1)**
204:21

**frame (4)**
103:2;142:2;
165:23;194:23

**framed (1)**
8:19

**free (1)**
245:23

**freedom (1)**
210:23

**frequency (2)**
23:14;34:7

**frequent (7)**
27:2;176:17;
202:10,21;219:8,10;
221:14

**frequently (2)**
23:2;32:22

**frightening (1)**
26:3

**front (4)**
38:2;117:15;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 258 of 274 PageID #:
6180

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

241:15;242:5
**Fully (3)**
16:19;18:15;41:19
**function (4)**
11:7;22:21;211:11,
15
**functional (1)**
208:18
**functioning (1)**
23:17
**functions (11)**
26:16;27:9;149:8;
153:15;203:7;
204:10,12;211:22;
212:7;213:9;237:11
**further (16)**
45:6;52:13;58:5;
61:23,24;106:13;
130:3;167:24;169:2;
195:11;199:5;
213:20;219:17;
224:22;226:8;245:16
**future (2)**
176:13,21

## G

**gain (2)**
230:10;235:23
**Gantt (1)**
144:3
**Gatorade (2)**
237:17,20
**gave (21)**
37:23;39:25;40:1,
17,18;51:6,10,12,24;
52:1,4;53:23;64:24;
121:23;144:22,22,
25;145:15;149:1;
165:14;209:9
**generally (1)**
150:14
**Gentry (4)**
88:8;161:7,10;
162:8
**gestures (1)**
14:4
**gist (1)**
26:5
**given (9)**
14:3;17:3,6;87:20;
190:9;200:13;207:2;
227:12;233:6
**giving (5)**
40:24;43:7;50:23;
163:24;167:12
**glass (1)**
31:16

**goals (6)**
222:17,21,24;
223:2,9,13
**goes (3)**
118:24;194:10;
197:13
**good (8)**
18:23;34:1;
116:11;120:3;
175:20;225:13;
239:24;241:11
**goodbyes (1)**
99:2
**Gotcha (2)**
110:6;150:11
**grade (1)**
141:17
**graduated (1)**
231:10
**grandchildren (1)**
99:4
**granted (7)**
106:22;115:15;
133:16;135:25;
136:3;174:11;192:23
**gravity (3)**
21:19,20;23:20
**Great (10)**
12:6,23;13:12;
71:12;185:5;189:10;
217:8;226:20;
230:23;236:18
**green (1)**
241:11
**grievance (1)**
186:3
**grieved (1)**
186:5
**grounds (3)**
9:24;10:11;128:4
**grown (2)**
132:20;238:14
**growth (1)**
117:20
**GS-10 (5)**
141:13,15,21,22;
142:5
**GS-9 (2)**
141:13,20
**guarantee (1)**
153:5
**guess (17)**
53:25;69:22;
92:15;109:21;110:9,
10;131:13;134:24;
136:18;150:5;
172:12;194:9;196:5;
221:25;222:13;

224:15;244:20
**guidance (4)**
75:13;181:1,3,5
**Gwendolyn (1)**
144:3

## H

**half (1)**
238:4
**Hamilton (1)**
136:12
**Hampton (11)**
7:24;226:17,19,24;
228:17,21;229:3,5,8;
235:2;244:17
**H-A-M-P-T-O-N (1)**
228:18
**hand (5)**
165:17,18;183:4;
207:19;217:15
**handbook (2)**
205:3;244:2
**handed (1)**
54:11
**handing (1)**
200:24
**handles (1)**
229:19
**happen (6)**
32:20;99:16;
158:23;176:10,10,20
**happened (15)**
23:1;32:21,22;
65:15;72:5;101:10;
108:1,4;131:16;
135:2;141:9;174:20;
230:20;235:14;
240:23
**happening (4)**
105:11;121:8;
176:23;242:22
**happens (5)**
23:3;24:6,11;30:5;
33:2
**harass (1)**
105:2
**harassed (5)**
77:18;103:7,12;
105:24;106:1
**harassing (3)**
105:6,14,23
**harassment (5)**
9:21;103:19,21;
104:25;107:6
**hard (3)**
25:21;223:11;
225:6

**hardship (57)**
8:24;39:15;40:3,
19;41:1,4,9;42:4;
44:8;45:16;46:4;
47:10;49:24;50:1,2,
4,8,13,21;51:2,4;
52:3,20;53:13;54:20;
57:15;59:9;64:9,10;
136:15;137:22;
138:11;139:3,8,11,
24;143:2,5,6,7,12,15,
19,21,22;144:12,18,
19,23;148:15,17,19;
194:18;209:6;
221:24;222:4,15
**head (4)**
14:5;32:8;193:15;
227:13
**heal (1)**
33:5
**health (8)**
40:7;44:9,22;
83:24;201:9;204:5;
214:4,8
**hear (4)**
13:16;28:4;55:6;
183:24
**heard (5)**
8:18;11:3;58:8;
156:5,7
**hearing (13)**
6:2;8:17;10:25;
11:2,9,15;13:1;
91:18;111:6;226:14,
22;243:14;245:25
**hearsay (3)**
234:1,3,6
**held (3)**
8:13;197:3;200:5
**hell (1)**
240:9
**help (45)**
22:14;32:3;48:25;
55:20,23;60:1,23;
61:3;62:21,23;78:11;
87:23;88:18,19,19;
89:1,2,2;98:25;
107:5;143:1;144:9;
154:9,10;160:12,25;
161:1;167:13;
171:19;174:13;
203:25;212:21;
220:11,14,23;
230:13;235:25;
236:5,21;237:8,9,9,
11;240:13;243:24
**helped (7)**
25:24;26:1;

210:25;213:3;
220:15,25;245:7
**helpful (3)**
62:18;65:8;165:2...
**helping (2)**
59:21;105:7
**helps (1)**
230:23
**hepatic (2)**
189:17;190:7
**herself (9)**
12:20;51:20;
87:13;103:13,15;
104:20;205:18;
230:9;236:17
**Hidradenitis (3)**
21:1;56:22;112:17
**high (4)**
231:4,5;238:11;
240:1
**higher (2)**
129:13,16
**highest (1)**
242:7
**highlighted (1)**
140:13
**himself (1)**
129:22
**hired (2)**
16:11;131:21
**history (2)**
101:7;112:8
**Hold (7)**
19:17;27:19;
68:23;156:2,3;
202:17;216:19
**home (9)**
32:2;43:22;65:17;
99:1;195:7,9;196:4;
210:22;212:21
**honest (1)**
65:13
**Honor (64)**
8:7;10:7;11:24;
19:9,11;20:14;28:3;
34:23;36:5,13,18;
42:24;43:2;45:5;
47:8,18,23;49:5;
52:24;61:6;62:5;
64:16;65:19;68:16;
69:3,6;71:5,11,20;
81:8,19;82:19;83:15;
90:6;91:9;95:24;
102:13;108:24;
110:12;127:3;128:?
130:8;142:12,16;
149:21;162:22;
165:21;180:16;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 259 of 274 PageID #:
6122

EEOC Hearing                                                    Brown v. McDonald, et al.
Volume I                                                                  July 20, 2015

183:20;184:2,17;
185:9;195:2,11,15;
196:15,22;197:21;
215:15;216:5;220:1;
233:25;234:2;244:9
hopefully (1)
197:25
hopeless (2)
65:13,24
horrible (1)
173:7
hostile (1)
8:21
hour (3)
91:13,23;107:25
hours (40)
15:15;70:2,8,15,
17,19,22,23;71:1;
73:6,7;74:6,12,23,25;
75:6,15,18;76:8,11,
17;79:25;92:25;
133:19,21,22;134:11,
14;153:6;176:2,4,16,
21;179:2;181:10;
183:18;237:19
house (1)
219:4
HR (8)
28:18;230:8;232:2,
9,17,20,25;235:11
Huff (38)
7:11;23:8;26:11;
27:12;52:25;54:7;
55:12;56:16;57:1;
60:7;82:8;84:22;
85:9,11;89:8;95:8;
97:19;100:20;112:2;
115:7;116:4;119:24;
133:8;146:21,25;
163:21;168:11;
171:7;191:10,12,20;
192:6;198:15;
201:13,22;202:25;
204:18;218:4
Huff's (6)
28:9;62:1;147:9;
173:6;191:23;207:21
Human (4)
9:6;28:22;45:4;
240:16
humiliate (4)
58:14,24;104:2;
241:15
humiliating (3)
33:9;44:25;68:4
humiliation (1)
103:19

hundred (2)
94:6,8
Hurley (3)
26:21,22;112:17
hurt (2)
240:12,22
hurtful (2)
242:8;243:20
hurting (1)
223:17
hurts (4)
25:4,4,5,5
husband (3)
7:24;31:25;132:15

I

idea (3)
42:25;49:6;211:13
ideal (1)
31:17
identification (13)
20:19;36:23;
47:25;53:10;69:11;
71:25;81:24;83:5;
96:14;111:3;185:4;
200:11;217:12
identified (4)
147:2,5,7;216:22
identify (3)
148:13;188:2,6
identifying (1)
26:15
II (3)
26:22,22;112:17
ill (1)
231:17
illness (3)
112:23;235:25;
236:10
illustrations (1)
118:14
images (1)
113:21
immediate (5)
100:21;101:24;
136:15;174:21;192:2
immobile (1)
25:3
impact (15)
24:19;25:19;32:5;
67:14;68:3;78:7;
98:21;99:8,22,24;
151:8,11;204:3;
224:12;233:13
impacted (9)
30:13,14;65:11;
66:18;116:18,21,23;

151:14;224:20
impacting (6)
40:10,12;67:17;
116:16;206:10,13
impacts (2)
56:9;202:9
impairment (1)
203:10
impartial (1)
11:12
implement (2)
69:24,25
importance (2)
31:21;64:19
important (11)
39:1,4;40:14;45:1;
65:1,2;102:1;171:15;
202:25;230:15;245:2
impressions (1)
234:10
improvement (1)
92:9
inability (1)
23:18
inadequate (3)
148:10;168:2;
170:8
inappropriate (4)
42:9;153:18,19;
186:8
Inc (4)
27:21;28:17;
124:13;187:24
incident (5)
100:14,16;159:14;
160:14;161:4
incidents (2)
24:5;101:17
incise (1)
33:1
incised (1)
30:10
incision (3)
116:8;189:19;
199:2
incisions (5)
29:19,20;30:11;
187:5;191:11
include (4)
29:3;151:12;
187:23;191:10
included (2)
40:4;184:21
including (2)
29:3;93:4
income (3)
211:8;212:12,15
increase (1)

23:20
increased (9)
24:22;25:15;30:5;
34:18;66:12;73:16;
116:9;121:23;223:23
increases (1)
32:25
increasing (2)
137:4;230:6
indefinitely (1)
25:12
independent (1)
9:20
Indiana (2)
171:21;212:17
Indianapolis (29)
6:5,9;128:15;
130:14,25;131:10;
132:14;133:8;138:3;
171:12;175:6;
191:21;197:2,12,17;
205:17;210:1,8;
212:19;213:15,16;
218:11;221:3,7;
230:1,14;231:1,15;
237:15
indicate (27)
15:2;52:5;54:15;
55:14;56:1,4,8,11;
112:4,7,23;113:6;
147:17;151:21;
159:2;170:12;
189:14;201:21;
202:2,24;203:5,9;
204:2;207:22;
209:10,21;228:10
indicated (10)
48:6;58:1;135:5;
149:3;150:21;165:6;
190:23;214:11;
216:6;217:17
indicates (6)
29:1;32:14;79:5;
150:16,18;214:21
individual (4)
79:20;184:22;
232:24;233:20
individually (2)
110:13,17
individuals (1)
7:8
Indy (6)
31:22;125:25;
127:23;131:12;
175:4;218:20
infected (1)
199:11
infection (1)

199:3
infections (1)
56:5
inflammation (2)
116:10;119:2
inform (1)
89:5
information (44)
50:8,23;51:22;
52:15;58:10,13;
62:16,18,22;64:2;
75:19;80:20;84:24;
85:1;90:9,25;91:5,6,
7;97:16,18;141:2;
146:14;147:22,23;
160:24;161:25;
163:7,8;164:3,4,20;
165:7;167:7,25;
168:5;170:8;201:8;
206:16;207:3,12;
209:4;214:12;218:1
informed (3)
93:7;148:14;
210:14
initial (3)
17:2;148:17,18
Initially (5)
41:6;51:9;172:7;
231:3;240:4
inkling (1)
24:21
inquiries (1)
160:3
inquiring (1)
90:8
inside (1)
21:12
instance (3)
190:16,18;192:8
instances (4)
22:24;188:16;
189:4;192:10
instead (4)
76:10,13;107:4;
141:3;218:4
instruct (2)
11:17;14:22
instructions (4)
13:13;123:23;
124:2;227:7
insufficient (7)
147:10,15;155:9;
167:1;203:4;208:4;
222:18
insurance (2)
214:4,8
intention (2)
103:24;104:1

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 260 of 274 PageID #: 6200

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**intentionally (2)**
104:7;235:6
**intentions (1)**
104:3
**interaction (1)**
159:6
**interactive (7)**
86:18;88:3,6;95:1;
128:22,25;205:11
**interest (2)**
100:8;104:18
**interested (2)**
156:5;174:22
**interfere (2)**
79:15;80:21
**interference (1)**
78:16
**interim (10)**
89:23;155:12,22;
156:6;157:1,6,7,9,14;
158:9
**intermittent (3)**
20:24;37:12;176:8
**internal (1)**
107:8
**interpreted (2)**
60:14,14
**interrupt (3)**
10:8;20:7;61:23
**intervention (9)**
21:10;22:17;
32:23;57:21,24;95:8,
21;100:25;101:5
**into (32)**
20:19;22:18;
24:24;25:20;36:23;
47:25;53:10;65:12;
69:11;71:25;77:22;
81:24;83:5;89:20;
92:20;93:25;96:14;
99:16;100:23;
102:21;106:2,7;
111:3;147:13,18;
172:3;185:4;200:11;
217:12;235:9,12;
244:10
**Investigation (2)**
16:21;149:6
**investigative (1)**
11:5
**investigatory (1)**
11:1
**inviting (1)**
57:1
**invoice (1)**
124:24
**involved (3)**
22:14;145:24;

225:11
**involvement (1)**
79:21
**irrelevant (2)**
126:23;197:3
**irritation (3)**
21:8;29:18;176:22
**issue (15)**
8:16;11:20;29:14;
33:13;41:15;76:6;
98:10;107:25;
127:13;154:10;
157:23;177:7;
194:12;215:9;234:5
**issued (2)**
9:18;45:25
**issues (25)**
8:17,19;23:2;24:6,
12;42:2;48:22;65:14;
66:21,23;83:10;92:5;
98:10;100:12;
145:18;151:16;
152:10;156:21;
172:23;173:8;
175:19;177:5;
186:11;199:5;221:1
**items (1)**
30:16

**J**

**jacket (1)**
139:19
**James (1)**
38:13
**January (33)**
8:23;9:1;36:1;
38:16;39:19;46:1;
64:22;73:18;86:4,17,
18;92:3,6,7;107:14,
15,18,23;135:18;
136:14;138:22;
140:25;141:1,6;
144:12,17;145:9,21;
148:14;177:1,3;
230:4;244:20
**jeopardy (1)**
238:10
**Jerome (1)**
228:17
**J-E-R-O-M-E (1)**
228:17
**Jim (15)**
53:23;54:10;70:7;
74:7;75:10;77:13;
80:9;88:7;90:13;
145:16;146:20;
163:12,24;177:15;

178:6
**job (47)**
40:11;48:23;59:19,
22;60:5,12,13,15,21;
65:1;67:17;124:4;
148:12,23;149:3;
151:6;152:4,4,7,8,12;
153:22,22,23;154:2,
6,8,9;203:1,6,7;
204:10,11,12;211:11,
14,22;212:7;213:9;
221:20;222:12;
224:13;230:7;
233:16;236:19;
238:9;243:22
**JUDGE (175)**
6:1,7,19,25;8:11;
10:24;11:25;12:2,6,
13,18,23,25;13:4,12,
20;14:2,8,13,18,25;
15:6,12;16:24;19:13,
16;20:6,10,15;28:6;
35:12;36:11,14,19;
43:6;44:11;47:12,15,
20;49:8,13;53:1,4,7;
59:17;60:14;61:22;
62:6,24;64:17;68:19,
23;69:4,7;71:9,12,17,
21;81:13,16,20;
82:22;83:1,18;85:20;
91:12,17;96:1,5,7,10;
102:15;109:8,12,19,
25;110:4,7,15,23;
111:5;127:9,16;
128:6;130:5;142:17;
150:3,8,10,13;156:2,
16;157:16;162:5,7,
12,15,19;165:20,22;
166:1;168:23;
180:17;182:10,16,
25;183:2,24;184:4,
11,19,23;185:5,11,
17,21;187:8,13,18;
188:3,14;189:1,10;
190:16;194:1,19;
195:12,22;196:9,25;
197:9,16;200:3,7;
211:18,23;213:22;
215:17,22;216:13,19,
25;217:3,8,13;
219:18;220:8;221:2,
15,23;222:14,22;
223:5,12;224:2,7,11,
24;226:9,13,20,21,
25;227:5,11,15,20,
25;228:7,14,19;
234:12,22;245:18,22
**judgment (1)**

206:21
**Julie (6)**
94:19,22,24;
128:23;129:10;
173:19
**July (7)**
6:4;72:12;117:8,
18;124:19,22;191:5
**June (13)**
8:14;19:7,7;37:10;
72:12;115:23;116:2,
14;124:21,21;132:7,
11,12

**K**

**KALIVODA (2)**
6:23,24
**keep (5)**
110:1,1,3;125:24;
160:22
**Keflex (1)**
113:10
**kids (1)**
171:18
**killed (1)**
106:5
**kind (11)**
20:4;72:16;77:6;
84:9;99:24;219:20;
221:16;236:13;
237:19;238:6;245:13
**Kinder (11)**
77:10,11,16,18,24;
78:12;80:12,15,19;
105:20;175:22
**kinds (1)**
17:14
**Kirksey (1)**
136:11
**knew (14)**
37:15;55:9;71:3;
73:24;143:4,9;
145:22;158:21;
179:3;181:23;
205:25;230:24;
240:13,21
**knowing (1)**
238:6
**knowledge (8)**
26:23;49:25;
136:10;138:8;201:1;
210:12,13;223:16
**knows (9)**
57:22,23;58:4,22;
99:17,18;106:4;
174:18,18

**L**

**Labor (3)**
75:20;79:12;181:7
**lack (2)**
33:20;92:15
**lanced (1)**
114:9
**language (1)**
27:6
**large (6)**
21:9,21;22:2,5;
25:2;66:24
**laser (1)**
112:14
**Last (27)**
15:10;18:18;
32:24;56:15;97:5;
101:10,15;117:9,11,
12;127:22;140:23;
141:3;163:14,23;
170:12,14,15;
174:21;182:12;
191:23;195:16;
198:20,21;199:14;
215:10,14
**late (1)**
141:11
**later (8)**
64:6;70:13;136:9;
137:18,21;139:17;
173:5,20
**Lauren (6)**
28:1,1,5,6;112:21;
113:3
**lay (1)**
25:4
**lead (1)**
118:5
**leading (6)**
58:24;149:12;
153:20;157:4;
180:12,13
**leads (1)**
205:23
**leakage (1)**
220:22
**learn (1)**
17:3,6;142:2
**least (11)**
63:4,4;66:8,9;
70:18;166:1;177:1;
211:3;213:4;220:18;
238:13
**leave (81)**
34:19,20;35:24,25;
36:2,4,9,10;37:12,15;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 261 of 274 PageID #: 621

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

38:4,11,15,17,24;
39:2,3,7;41:13,15,16;
66:25;67:1;73:16,19,
20,25;74:17,19;75:3,
6,25;80:2;81:3,10;
93:20,21;134:1,2,4,7,
11,12;135:13,15;
136:4,5,6,22;137:2,
11,13,15,17;152:17,
18,19,24;153:3,4,6;
170:19,20;171:4;
177:4,22,24,25;
180:1,2;181:20,22;
182:3;183:8;185:7;
201:18,23,24;211:7;
219:13,15

**leaving (1)**
125:22

**led (1)**
104:5

**left (4)**
91:14;117:23;
231:10;238:14

**leg (2)**
225:16;226:1

**Legionaires (1)**
58:19

**legs (1)**
24:4

**lesion (1)**
101:13

**lesions (3)**
98:3;113:13,23

**less (5)**
27:1;153:8;238:15,
15,18

**letter (63)**
40:4,10,17;41:1;
45:14,15,24,25;
48:13;50:5;52:25;
54:7,8,25;55:10,11;
56:24;57:1,18;59:1,
7;60:17;62:1;64:21,
23,24;85:9,11;86:2,4,
6,14,21;87:3,9;89:9,
22;96:17,24;97:2,13,
15,19,21;98:5;
140:24;146:20;
148:9;163:21;
165:16;167:6;
168:13;175:23;
203:9;204:1;207:21,
24;216:8,23,24;
218:5;222:12;239:22

**letters (11)**
89:7;129:18,20,24;
201:13;202:13;
203:4,5;216:8;219:7;

240:8

**level (6)**
21:15;230:21;
240:1;243:19;
244:19;245:9

**levels (1)**
24:13

**Levora (1)**
122:4

**liberal (1)**
152:17

**lieu (4)**
7:17,21;70:8;75:18

**life (5)**
99:1;146:1;
202:20;203:14,14

**lift (3)**
30:16,18,22

**Lima (52)**
9:1;41:7,14;42:25;
43:4,10;44:3,5,6,22;
48:3;52:13;53:25;
54:1,9,12;55:7;
57:11,13;61:11;
62:12;63:14;65:7;
78:2;87:18,22;89:16;
103:11;105:4;
107:11;129:13;
130:1;138:10,25;
153:11;171:25;
174:12;183:9;
233:21,24;234:9,11;
235:4,6,8,11;240:3;
241:4,19;242:1,21;
243:16

**Lima's (2)**
77:11;233:24

**limb (4)**
21:6,7;22:3;24:16

**limbs (2)**
21:5;210:23

**limitation (1)**
208:19

**limits (1)**
196:14

**line (7)**
44:24;48:8;
149:11;152:11;
170:12,14,15

**lines (5)**
150:7,15;151:18,
21;152:1

**lip (1)**
160:4

**list (4)**
7:3;184:16,22;
241:18

**little (17)**

31:1,8;35:25;
103:1;118:14;
130:11;132:2;
181:23;192:4;223:7;
229:12,14;231:24;
234:23;240:19;
243:9,24

**live (3)**
130:15;193:7;
230:1

**lived (1)**
130:16

**liver (1)**
190:12

**living (3)**
191:7;231:1,15

**local (1)**
129:1,5;132:13

**locate (1)**
150:5

**located (3)**
16:23;138:7;
193:16

**location (3)**
61:25;118:9;154:6

**locations (1)**
66:17

**lodge (1)**
8:9

**long (11)**
22:9;24:8;39:10;
74:1,1;100:5;115:17;
132:1;193:3;229:11;
244:10

**longer (1)**
77:15

**long-standing (1)**
98:3

**long-term (1)**
213:6

**look (32)**
33:14;36:25;38:7;
43:21;57:14;77:22;
104:14;106:25;
108:5;112:3;116:11;
117:17;119:15;
124:17;149:6;
151:17;153:10;
164:24;165:9,18;
166:15;168:15;
169:4;171:11;
178:19;182:12;
189:13;199:11;
207:21;215:23;
216:21;217:20

**looked (2)**
159:10;172:3

**looking (11)**

85:18;107:3;117:1,
13;147:4;187:15;
194:24;198:4;
201:11,17;244:5

**looks (17)**
37:4;110:8;120:4;
123:20;124:12,19;
138:22;143:24;
145:9;183:9;187:23,
25;188:9,11,12;
191:5;202:21

**lost (1)**
62:10

**lot (14)**
74:15,17;213:1;
229:22;236:11,11;
238:4;239:7,9;
240:21,23;243:23;
245:10,15

**lotion (1)**
112:11

**loud (1)**
13:16

**loved (1)**
171:19

**low (1)**
66:2

**lunches (1)**
154:4

## M

**Ma'am (1)**
158:4

**main (4)**
31:22;33:11;
156:21;157:21

**Mainly (4)**
26:8;114:20;
116:24,24

**maintain (2)**
13:15;227:8

**makes (3)**
22:6;243:8,9

**making (8)**
45:15;50:11;74:9;
99:20;131:9;152:6;
156:12;235:17

**man (3)**
232:10;240:15;
243:16

**management (2)**
55:8;87:13

**Manager (4)**
9:2;54:9;59:5;
77:12

**managers (1)**
59:6

**mandatory (25)**
69:16,25;70:8,15;
71:4;72:11,17,22;
73:1,10;74:19;75:2,
7,14,18;172:15,16;
175:22,24;177:2;
178:8,12,21;179:22,
25

**maneuvering (1)**
220:20

**manner (2)**
11:12;63:3

**many (11)**
25:23;33:22;
58:17;105:7;134:11;
135:3;149:4;186:18;
187:6;198:18;230:11

**March (10)**
9:11;70:14;72:6;
75:12;79:7;90:7;
108:6,7;168:4,14

**mark (6)**
19:1;110:13,21;
111:8;182:8;185:6

**marked (41)**
20:16,18;27:22;
36:6,21,22;47:10,21,
24;53:8,9;69:8,10;
71:22,24;81:21,23;
83:2,4;96:10,13,18;
109:21;110:10,13;
111:3,23;119:9;
123:2,11,22;183:1,4;
184:24;185:2,3;
200:10,13;217:9,11,
15

**marking (3)**
110:16;183:21;
215:16

**married (1)**
229:11

**matching (1)**
110:18

**material (1)**
11:10

**matter (13)**
6:10;12:12;15:19;
42:16,18;106:11;
108:18;109:7;
176:20;177:23,24;
228:24;229:9

**may (65)**
11:15,16;12:7;
14:25;15:14;27:8;
29:14;30:10;34:19,
21,22;35:25;37:17;
39:12;43:8;44:4;
46:23;57:24;58:20;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 262 of 274 PageID #:
6220

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

59:15;75:8;80:1;
81:4,10;83:13;91:22;
101:9;111:11;114:2;
115:4;121:12;
124:20;144:2,4;
153:15;156:17;
157:25;158:14;
161:22;170:19;
175:3;176:23;177:7;
178:1;181:14;184:3;
185:10;186:5;
187:20,23,25;
189:11;191:1;197:9,
9;202:11;207:11;
210:20,21;211:18;
224:20;228:8;
234:14,24;240:18

**maybe (23)**
30:20;62:20;
64:13;68:15;97:13,
14,15;102:25;103:1,
2;126:10;147:21;
159:20;161:22,23;
176:18;178:19;
194:21;198:20;
207:7;220:23;
240:17;243:10

**meal (1)**
31:18

**mean (75)**
25:12,21;31:23;
32:20,23;33:10,15,
20;34:2,14,18;40:5,
16;41:2;50:8;58:12,
19;60:3,21;63:24;
64:14,16;65:19;
67:23;74:10,11;
95:19;98:16;99:17;
104:11;105:18,22;
116:8;118:21;120:4;
129:17;150:21;
152:22,23;154:13,
17;158:17;169:12;
175:4,9,12;179:20;
180:12;186:24;
190:3;192:13;
210:25;212:22,25;
215:7;218:16,16;
220:19;221:22;
224:15,20;236:15,
25;237:10,14;238:1;
240:12;241:23;
242:10,16;243:1,8,
17,19;244:25

**means (6)**
104:15;119:21;
123:15;152:18;
170:23;218:19

**meant (3)**
45:3;58:24;105:2

**meantime (1)**
155:3

**measures (1)**
92:14

**med (2)**
121:24;122:10

**medical (106)**
17:4,8;21:10;
22:17;26:25;29:8;
47:5;48:17,22;50:18;
51:15,21;52:6;53:14,
17;54:16;55:12;
56:21;57:7,20,21;
58:1;60:19;63:25;
64:9;82:3;84:14,18,
21,22;85:2;89:5,11,
15,18;90:9;95:8,15,
21;97:7,11;101:7;
106:9;108:10,21;
109:4,5;111:15;
120:17,20;122:14;
123:2;146:6,12,17,
18,24;147:10;148:4,
24;163:2,5,20;164:6,
10,23;165:7,13;
166:8,13,19,21;
167:1,14,17,22;
168:10,11,18;170:3,
5,9,17;174:6;175:14;
177:5;186:9,13,15;
187:11,17,19;198:8;
199:8;200:17;
204:16;206:16;
207:3,12;208:4,9,15;
209:7;216:1;222:10;
229:15

**medicate (1)**
239:14

**medication (4)**
23:11;114:21;
121:21,25

**medications (4)**
98:14;114:16;
239:9,11

**medicine (6)**
22:11,13;23:7,9,
15;114:22

**meds (4)**
65:25;122:2,25;
124:7

**meet (9)**
41:8;59:10;67:15;
139:14;145:3,5,6;
171:24;223:9

**meeting (27)**
19:1;63:9;64:6;

68:10;77:6,17;88:1,
7,12;89:4;95:1;
128:22,25;139:20;
140:9;142:4,9;159:9;
161:7;172:1;222:7,
17,21,23;223:1,2,13

**meetings (1)**
232:17

**meltdown (1)**
9:6

**members (2)**
130:19;132:14

**memo (2)**
47:2;82:2

**memorandum (6)**
54:6;81:11;86:10;
89:8;146:19;167:17

**memories (1)**
65:14

**memory (1)**
165:18

**mental (2)**
204:5;236:11

**mentally (2)**
66:19;99:23

**mention (3)**
87:16;155:18;
232:23

**mentioned (7)**
18:8;31:5;40:9;
50:9;98:20;216:2;
220:10

**mentions (3)**
44:13,15;89:18

**mere (2)**
15:1;228:9

**mess (2)**
238:12,13

**met (5)**
41:9;77:10;78:12;
80:23;122:16

**Michael (5)**
7:24;54:1;183:10;
228:16,21

**M-I-C-H-A-E-L (1)**
228:17

**mid (3)**
119:4;223:19;
237:24

**middle (2)**
122:1;207:10

**might (18)**
24:21,24;25:2;
33:24,25;44:14;
45:14;71:2;119:17,
18;124:8;160:14;
173:20;176:20;
186:14;209:22;

220:25;230:5

**MILLER (108)**
6:21,21;10:7,19;
11:23;12:16;20:14;
34:23;35:5,9,21;
36:17;42:24;47:18;
49:5,11;53:6;69:6;
71:19;81:18;82:25;
96:9;109:14,18;
126:22;127:2;128:3;
130:7,10;142:16,19,
20;149:14,20,25;
150:6,9,12,15,20;
154:24;156:1,11,23;
157:11;158:4;159:1;
162:21,23;165:20,21,
25;166:4,14;169:7;
180:15,18;182:8,15,
23;183:2,3;185:12,
16,19,24;186:1;
187:8,10,16;188:1,
21;189:7,12;190:18,
22;193:24;194:3;
195:1,3,10,17,24;
196:5;211:12;
213:23,24;214:2,17;
215:3,15,19;216:5,
11,17,24;217:1,13,
14;219:17;225:2,4;
226:7;233:25;
234:21;244:9;
245:18,20

**Miller's (1)**
213:8

**mind (6)**
83:13;85:18;98:2;
99:15;139:10;158:4

**mindset (1)**
106:4

**minimized (1)**
230:22

**minute (2)**
194:1;200:2

**minutes (3)**
91:14,24;159:20

**mirror (2)**
33:11,15

**mischaracterizes (1)**
155:25

**miss (2)**
93:11,12

**missed (4)**
136:22;175:8;
177:3;242:17

**missing (9)**
60:19;63:25;74:15,
25;84:25;89:21;
90:25;163:9;238:7

**mistaken (4)**
25:10;39:13;
68:15;87:11

**mistreated (1)**
66:8

**misunderstood (2)**
64:19;161:24

**modify (2)**
7:3;10:6

**moment (6)**
38:7;55:11;72:2;
102:2;111:8;206:7

**money (1)**
98:24

**month (6)**
70:2;151:12;
173:21;176:5,16;
178:4

**months (8)**
68:5,8,15;126:10,
11;127:22;141:23;
176:25

**moody (1)**
236:14

**morbidity (1)**
202:19

**more (37)**
18:2,5,6;21:6,6;
22:25;23:4,5,6,25
24:16;26:9,24,25;
27:3;29:10;31:1;
66:14;89:5;108:14;
134:14;135:6;165:7;
186:14;210:19;
221:14;223:8;
229:22,23;230:10;
235:13,15;236:9;
238:5,19;245:1,7

**morning (2)**
8:13;238:1

**mornings (1)**
237:25

**most (9)**
25:15;118:25;
160:20;171:15;
175:9;204:23,24;
216:22;233:17

**mostly (1)**
231:19

**mother (4)**
65:15;98:19,22;
99:7;100:4;231:22

**mother's (1)**
100:13

**motion (5)**
7:2,3;8:6,8;10:6

**motive (3)**
194:10,12,15

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 263 of 274 PageID #:
6223

IDOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**move (11)**
17:17;22:6;23:19;
31:3,18;131:9;
137:23;192:20,23;
194:5;218:13
**moved (5)**
9:7;68:6,13;231:4;
243:22
**moving (2)**
18:12;22:10
**much (18)**
6:20;7:1;15:13;
63:23;73:3;92:17;
105:11;114:23;
133:10,15;207:2;
228:20;236:7,20;
237:3,10;238:21;
245:8
**multiple (3)**
66:16,17;114:7
**must (6)**
11:19;13:15;14:3;
166:6;227:8,12
**myself (8)**
31:13;33:16;
59:18;101:20;106:5;
177:19;178:2;220:20

**N**

**uagging (1)**
220:5
**name (18)**
7:14;15:7,11,23;
27:15,21;114:16;
120:22;139:12;
144:3;193:10,15;
206:6;226:21;
228:15,16;241:7,18
**named (1)**
233:20
**narrative (1)**
244:10
**nasty (3)**
33:20;236:15;
243:17
**nature (1)**
58:3
**nearly (1)**
245:8
**necessarily (3)**
153:3,5;185:15
**necessary (16)**
11:10;14:11;50:7;
57:14,16,24;73:19;
97:16;106:19;
113:14;143:18;
147:19,20,24;

227:18;242:1
**necessitates (1)**
57:21
**necessity (2)**
40:14,15
**neck (3)**
24:7,12;225:17
**need (28)**
32:15;43:22,23;
58:10;63:5;64:13;
82:3,13;88:21,22,23;
97:14;101:18;
136:24;137:3;
147:19;151:22;
153:12;160:22;
165:6,16;170:17;
177:8;204:4;208:10;
233:17;237:22;
243:24
**needed (44)**
31:17;37:19;
48:24;49:23;51:14;
52:5;54:15;58:12;
59:12;76:12;78:6;
82:16;88:18;89:5,20;
91:7;97:9;98:25;
118:6;135:5;143:13;
147:14;154:10;
156:22;160:7;
165:12;171:16,17,17,
18,18;174:14;
179:10;204:23;
206:17;209:12;
210:24;218:14,17;
219:7;235:23;238:1,
21;240:13
**needs (4)**
21:9;194:4;230:20,
21
**negative (6)**
114:20;119:25;
120:1,7,11;239:20
**negatively (1)**
92:24
**network (1)**
204:4
**new (13)**
68:6,14;117:20;
121:24,25;122:25;
142:1,2,3;165:13;
182:14;193:6,14
**next (20)**
27:21;38:18;
49:10;61:18;112:19;
113:2,15;114:24;
115:3;126:1;127:17;
128:8;137:1;162:19;
224:18;226:16;

233:8;243:19,19;
246:1
**Nicholas (1)**
6:21
**night (2)**
237:24;245:11
**nobody (10)**
9:4;52:18;64:15;
89:1;99:18;207:8;
240:15,15,16;244:6
**non (2)**
196:7,10
**none (1)**
99:19
**nonetheless (1)**
10:1
**Nor (2)**
10:15;240:1
**normal (5)**
22:21,23;24:8;
205:20,23
**normally (3)**
118:19;150:17;
238:2
**notation (1)**
93:15
**Note (15)**
11:16;28:25;
85:19;113:3,17,22;
115:4,22;116:1;
117:18;121:5,10;
122:14;128:10;
185:12
**noted (3)**
8:12;112:16;114:1
**notes (9)**
34:24;35:2,2,5,7,
10,15;119:10;185:6
**notice (2)**
145:9;239:19
**noticed (2)**
244:16,18
**noting (1)**
93:8
**November (5)**
16:15;18:9;34:15;
103:6;141:11
**Nowhere (1)**
60:17
**number (26)**
11:16;19:10;30:5,
7;45:19,21;53:9;
70:6;25;74:7;81:21;
85:24;92:25;117:13;
134:3;153:1;169:22;
182:13,14;183:22;
184:14;188:11,12;
198:6;207:18;215:20

**numbering (1)**
184:13
**numbers (9)**
45:8;46:18;61:15;
85:20;182:12;184:2,
17;188:6;224:21
**numerous (3)**
67:16;75:17;178:3

**O**

**object (13)**
35:10;42:24;49:5;
126:22;128:4;
149:10;150:25;
154:20;194:11;
214:19,25;215:5,13
**objected (1)**
9:24
**objection (55)**
8:9;10:11;14:19;
35:14;36:15,17;43:7;
47:16,17,19;49:9,12,
14;53:5,6;69:5;
71:18,19;81:17,18;
82:25;96:7,9;109:18;
127:10;128:7;
155:24;156:7,8,10,
17;157:4,25;168:21;
169:1;180:11;
182:20,21;193:17,
18;194:21,25;
196:13;211:12;
215:4,10,11,12,12,
14;217:4;228:1,3;
234:13,24
**objections (4)**
20:12;109:13;
128:12;215:1
**obtain (1)**
168:5
**obtained (2)**
132:23;192:18
**obvious (2)**
208:16;244:6
**Obviously (12)**
12:24;134:3;
206:20;218:17;
229:22;230:23;
233:14;236:17;
243:2;244:25;245:5,
9
**occasion (3)**
153:8;231:19,21
**occasions (9)**
70:6;74:8;75:17;
76:9;101:2,4;134:3;
178:3;235:10

**occur (3)**
22:1;24:5;30:10
**occurred (6)**
19:6;39:18;
107:19;117:22;
140:23;194:9
**occurring (2)**
73:13;165:24
**o'clock (1)**
139:14
**October (10)**
41:21;102:24;
125:13,13;126:3;
140:24;141:1,11;
142:21;193:5
**off (43)**
7:5;11:15,17,18;
37:20;73:16,17,23;
79:13;91:15;92:20,
21;93:3,21;94:4.10;
110:24;115:15;
135:5;137:3,5;
142:14;153:9;
163:18,19;177:8;
181:18;188:18;
193:15,20;196:14;
200:1,4,5;202:10,22;
219:8,11;226:10;
238:3,25;243:23;
245:24
**offended (1)**
43:16
**offense (1)**
42:18
**offer (5)**
156:9;157:18;
194:2;211:19,20
**offered (3)**
89:2;157:18;
210:14
**offering (1)**
240:4
**office (47)**
6:5,8,9;16:6,8;
23:9;31:1,3;38:2;
41:10,11;43:10;
48:12;49:1;56:13;
100:23;104:9;
105:15;107:11;
108:18;118:2,3;
124:24;127:3,22,23;
138:3,6,11;139:18,
21;144:13,22;
147:13,18;159:23;
173:6;175:2,24;
192:12;193:11;
205:17;210:1,9;
213:15,16;238:23

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 264 of 274 PageID #: 6826

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**officer (1)**
129:7

**offices (3)**
196:20;198:16,17

**official (3)**
11:7;13:5;87:13

**often (1)**
27:3

**omitted (1)**
241:7

**once (16)**
26:23;38:15;
42:18;44:2;57:6;
64:7;93:22;131:12;
134:14;136:23;
140:18;142:1;
182:18;205:25;
233:5;237:21

**one (110)**
14:19;17:17;
18:12;21:6,6;22:25;
23:4,24;24:16;29:10,
11,13,14;30:1,9;
31:21;32:3;52:11;
54:10,18;56:15;
57:15;59:2;66:14;
68:13,17;69:1,13,22,
22;82:9,10;88:3,24;
95:2;97:6;98:10;
99:10;100:17,19;
101:17;102:5;
103:18;106:21;
108:14;109:21;
114:10,13;117:9,11;
120:4,4,9;122:19;
125:23;127:17,23;
129:18;134:13,16,
19;142:14;146:1;
147:5;148:7;153:8;
156:11,12,21;
159:14;171:13,13,
14;176:24;178:23;
183:20;185:10;
186:20;189:5;190:6;
193:14;204:20;
207:4,5;209:21;
212:24;214:25;
215:5,6,8,11,11,12,
13,13,14,24;220:9;
221:20;222:9,10;
227:8;228:1;236:16;
239:3,4,13;241:24;
242:7,14

**ones (8)**
58:18;114:1;
186:24;188:4;189:2,
3;215:10;244:8

**ongoing (3)**

116:17;229:17;
230:7

**only (57)**
8:1;11:16;14:13;
44:20;49:21;50:16;
52:19;68:8,12,14;
70:12;76:1;84:12;
86:24;87:10,20;88:3,
6;89:9,9,14,23;
93:10;97:12;100:22;
104:1,18,22;106:9,
12;114:20;127:22;
141:22;143:4,9;
147:23;152:8;
156:12;158:11;
159:14;160:1;161:4;
165:11,11;166:18;
167:21;171:13,20;
184:14;194:15;
220:24;224:5;
227:20;236:10;
238:18,20;244:7

**onto (1)**
21:13

**open (4)**
33:2;199:2;216:14,
21

**opened (1)**
195:17

**opening (5)**
12:7,9,12,14;
206:18

**opens (1)**
199:1

**opinion (1)**
56:16

**opportunity (4)**
11:3;168:5,15;
192:23

**opposing (2)**
79:20;182:16

**opposition (1)**
7:4

**option (9)**
87:21;155:6;
170:24,25;198:21;
199:15;210:2,4;
226:6

**options (8)**
52:17;112:10;
140:4;154:13;159:3,
4;160:10;216:16

**orally (1)**
14:3

**order (14)**
22:4,19;41:8;
51:21;68:9;75:25;
91:8;106:13,17;

149:16;160:17;
189:19,21;210:24

**organization (1)**
106:25

**original (2)**
168:2;215:8

**originally (5)**
86:16;110:16;
120:25;121:1;173:24

**OT (2)**
75:25;178:14

**others (5)**
18:3;30:15;73:25;
105:7;134:18

**otherwise (3)**
148:2;166:23;
215:1

**out (57)**
16:7;26:17;34:12,
19;36:3;37:4,5,14;
60:15;63:10;64:5,8,
12;67:22;68:2;76:24;
78:16,22;95:4;114:2;
115:1;119:6,17,20;
120:11;139:18;
144:25;146:24;
149:21;153:2;156:4;
159:10,23;163:13,
16;167:4,19;169:3,
14;173:22;175:23;
181:16,23;183:22;
189:6,22;194:8;
207:19;212:4;213:4;
214:14;216:14;
217:7;218:2;219:7;
225:24;242:15

**outside (2)**
170:18;191:20

**over (24)**
12:25;32:8;39:6;
71:1,2;87:14;105:16,
21;132:2;141:12;
159:10;197:11,13,
17;198:7;210:20;
226:22;229:14;
230:11,12,16,20;
232:5;235:23

**overall (4)**
92:24;151:9,15;
224:21

**overarching (1)**
127:5

**overrule (3)**
156:17;157:25;
168:25

**overruled (1)**
234:14

**overtime (34)**

69:17;70:1,9,15;
71:4;72:11,17,22;
73:1,3,10;74:6,20;
75:2,7,15,19;76:6;
79:24;107:25;
175:22,24;176:4;
177:3;178:9,12,21;
179:2,6,22,25;180:8,
24;181:2

**Owen (2)**
9:24;10:11

**owes (1)**
9:4

**own (3)**
21:12;117:24;
132:21

**P**

**page (43)**
20:5,21,22;26:11;
27:17,22,22;28:11;
29:2;32:13;34:3;
38:3;45:15;46:16;
54:5;61:18;78:13;
79:5;80:8;113:22;
150:7,8,9,10;151:17,
17,19;152:1,1,11,11;
169:22;205:1,9;
206:15;207:11;
208:2;209:15;217:2,
2,2,2,16

**pages (1)**
113:21

**paid (1)**
177:25

**pain (66)**
21:17,24;22:5,7,
11,13,16,20;23:7,8,
11,15,18;24:12,12;
25:7,8;26:7,8,9;27:7;
29:4;31:10,11;32:25;
55:18;56:6;106:6;
116:9,24,24;117:4;
118:7,11;151:5,10;
161:19,23;177:21;
178:2;187:4;199:10;
202:17,19,20,22;
203:21,24;213:12;
219:8,11,23;220:5,
19,24;223:10,11,15,
21;224:17;225:7,10;
229:20,23;236:9;
238:6

**painful (3)**
22:10;23:6;88:16

**painkillers (1)**
239:16

**panel (3)**
189:17,22;190:7

**paper (3)**
30:25;31:2;243:1

**paperwork (20)**
40:1,2,18,22,25;
46:6,12,22,23;48:13;
50:12,21;51:18;52:2;
63:24;85:8,15;89:7;
218:3;243:5

**paragraph (2)**
90:20;154:1

**Park (3)**
16:2;193:8;229:4

**part (21)**
29:25;46:23;47:4;
80:2;85:13;90:20;
118:25;119:1,4,5,5;
130:13,17;161:7;
193:22;212:23;
222:1;225:5;236:10;
237:22;244:21

**particular (17)**
24:1,17;25:2;
26:15;31:14,19;
51:23;58:13;98:18;
114:1;116:19;117:1;
121:5;160:13;167:2;
204:1;237:6

**Particularly (1)**
7:7

**parties (6)**
6:14;8:14;11:22;
12:7,8,9

**parts (1)**
203:1

**pass (1)**
142:21

**passed (7)**
65:16;68:1,1;
98:19;99:5,7;100:4

**passers (1)**
69:1

**past (8)**
25:24;26:2;29:15,
21;34:11;77:25;
180:20;208:18

**Patel (10)**
7:13,14;120:23,24;
121:7;123:3,12;
124:3;125:4,18

**Patel's (1)**
124:24

**patient (6)**
27:8;123:22;
189:16;190:6,9;
204:3

**pay (14)**

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 265 of 274 PageID #: 625

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

38:21;39:3,5,6;
73:16,23;93:20;
137:11;152:19;
153:4;171:4;177:22;
211:7;212:24
**paycheck (1)**
39:13
**paying (1)**
21:24
**peers (4)**
67:10;241:15,16;
242:5
**people (20)**
13:22;21:16;33:22,
23;58:9;59:1,2;
67:16;98:17;99:19;
134:17,25;171:18;
183:7;232:8;233:16;
236:20;241:5;
243:25;244:1
**Pepsico (1)**
237:17
**per (3)**
70:2;169:9;176:4
**percent (2)**
94:7,8
**perform (16)**
26:17;27:9;60:8;
149:8;150:16,18,19,
22;152:3;203:1,7,16;
211:11,14,22;213:9
**performance (52)**
9:13;16:14;18:25;
41:12,18,19;42:22;
43:12;59:11;65:6;
67:18;92:4,9,24;
138:9,13,18,21;
139:25;140:7,17,20;
141:2,4,15,17,25;
142:5,8,9,11,24;
145:13,18;148:6,16,
20;151:9,11,14,15;
152:10,14;153:24;
222:2,6,9,16,19,21,
24;224:21
**performed (1)**
212:7
**performing (6)**
59:14;65:1;
138:17;153:14;
204:11;212:11
**period (18)**
17:3;18:7;34:11,
14;39:4;66:4;67:8;
72:19,22;82:5;94:5;
103:4;124:15;141:5;
152:23;172:7;211:5;
239:7

**periods (3)**
66:7;74:18;211:6
**permitted (4)**
7:8;8:4,5;152:16
**persistent (1)**
26:25
**person (4)**
15:14;49:15;
87:19;105:13;144:5,
6;179:18;232:25;
233:1;235:11;239:15
**personal (2)**
103:25;105:3
**personally (1)**
58:11;169:8;
236:23
**personnel (2)**
102:7;242:13
**pertinent (1)**
50:7
**Pete (5)**
125:14;157:3,22;
158:16;192:21
**Petersburg (19)**
16:7,8;49:1;102:4,
20,23;126:6,14;
127:8;128:2;136:16;
137:23;138:4;
146:23;147:3;
193:19,22;194:5;
197:14
**phonetic (1)**
37:24
**physical (3)**
99:23;203:23;
236:9
**physically (2)**
66:19;239:15
**physician (4)**
27:12;112:21;
193:9;194:7
**physician's (1)**
111:25
**pick (2)**
13:17;179:1
**Pinellas (3)**
16:2;193:8;229:4
**pinpoints (1)**
118:15
**place (5)**
6:6;66:2;86:19;
104:20;126:2
**placed (4)**
24:2;126:14;
225:17;242:13
**placing (1)**
103:13
**plan (7)**

92:9;112:5,25;
122:21,24;123:8;
190:5
**planning (4)**
20:7;71:13;81:13;
96:2
**play (1)**
22:18
**played (1)**
106:8
**playing (1)**
244:8
**pleading (2)**
91:4;144:9
**please (39)**
6:14;13:23;14:9;
15:7;16:5;44:6;
55:22;61:16,25;66:6;
70:16,18;75:3,21;
77:9;84:24;86:13,20;
87:3;88:19;89:13;
90:11,15,22,24;
160:2,16;163:4,7;
168:13;169:1,22;
170:14;198:11;
207:18;227:16;
228:8,14;241:1
**Plus (1)**
141:25
**pm (1)**
246:1
**point (42)**
16:20;27:17;
30:24;36:3;37:3;
42:1;47:8;74:4;
78:13;87:14;88:24;
94:11;95:9;104:17;
115:1;121:15;125:5;
126:19;132:13;
142:15,22;147:3,5;
150:14;158:18;
159:8;160:4;162:16;
166:20;168:15;
172:25;176:17;
177:5,19;178:23;
197:7;199:9;206:2,
24;213:2;217:22;
233:12
**pointed (6)**
63:10;64:5,8,12;
114:2;219:7
**pointless (1)**
218:12
**points (2)**
65:20;177:21
**policies (3)**
63:13,16,20
**policy (1)**

233:9
**poor (2)**
18:25;202:20
**poorly (2)**
15:3;228:11
**posing (1)**
13:24
**position (26)**
16:9;17:7;22:7,8;
59:15;77:11;105:11;
126:13,16,18;
130:25;131:20;
138:2;140:21;141:7,
20,21;149:9;150:23;
153:15;195:4;206:1;
210:5;221:3;225:19;
230:10
**positioning (1)**
23:21
**positive (1)**
120:9
**possessed (1)**
10:1
**possibility (3)**
8:15;23:12;131:14
**possible (11)**
22:9,21;25:19;
52:16;101:14;
103:13;112:14;
159:3;199:15;204:5;
236:8
**possibly (8)**
61:3;91:10;
101:23;105:9;
142:23;155:3;
174:23;211:2
**posted (2)**
125:24;241:4
**potential (2)**
98:14;99:11
**potentially (1)**
10:1
**power (2)**
198:23
**practically (3)**
29:24;34:19;
118:23
**practice (1)**
79:21
**pre-approved (3)**
7:12,15;8:1
**precludes (2)**
59:14;153:14
**pregnant (1)**
236:14
**prehearing (3)**
8:13;9:23;10:13
**pre-hearing (1)**

149:17
**preliminary (1)**
227:7
**prepare (1)**
108:18
**prepared (2)**
97:2,19
**prescribe (1)**
239:10
**prescribed (2)**
121:25;122:25
**presence (1)**
43:8
**present (4)**
19:23;111:19,21;
120:14
**presented (4)**
10:17;157:8,9;
158:13
**presenting (1)**
71:15
**presiding (3)**
11:7;12:25;226:22
**pressure (12)**
22:5,14,15,20;
23:21;24:1;31:11;
82:10;118:7;225:16;
238:11;244:23
**pretty (10)**
37:19;58:18;
114:23;119:21;
133:10,15;179:23;
237:3,10;244:10
**prevent (2)**
24:1;198:23
**prevented (1)**
75:6
**preventing (2)**
60:5;223:21
**previous (4)**
41:21;72:8;
141:19;241:10
**previously (5)**
7:9;8:1;31:14;
146:15;219:22
**pride (1)**
242:9
**Prior (8)**
8:12;68:5;72:23,
25;73:8;80:3;87:24;
125:12
**private (1)**
220:21
**probably (11)**
58:21;130:12;
132:2;135:6;175:18;
206:8;216:17;
220:13;225:12,12;
probably

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 266 of 274 PageID #: 6760

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

243:14

**problem (12)**
24:23;49:22;
72:24;78:2;98:9;
152:7;160:19;197:1;
214:23;218:3;225:5;
240:2

**Problematic (2)**
114:4,5

**problems (13)**
25:16;41:25;
48:22;57:23;60:3;
65:16;72:21;121:16;
152:8;153:23;213:1;
239:8;245:13

**procedure (16)**
82:3,5,7;95:16;
115:10,12,14,18;
173:9;179:8;181:16;
189:21,25;191:2,6;
233:9

**procedures (20)**
62:13;63:8,13,16,
21;82:9;98:15;128:1,
19;170:20;194:13;
196:18,19;197:1,4,8,
11,12,13,17

**proceed (4)**
12:7;52:16;91:8;
189:11

**proceeded (1)**
42:17

**proceeding (1)**
196:24

**proceedings (2)**
44:12;79:22

**process (23)**
11:1;51:3;65:8;
86:19;88:3,6;95:1;
97:13;105:4;126:25;
127:24;130:13;
131:8;159:6;161:13;
162:9;174:2;180:3,6,
19;186:5;205:11;
221:14

**processing (1)**
205:3

**produced (1)**
109:16

**produces (1)**
11:10

**production (7)**
151:6;222:17;
223:2,9,13,20;225:6

**professional (3)**
63:2;160:20;243:3

**program (6)**
81:3;135:15;

181:21;183:18;
212:12;219:15

**progress (1)**
112:12

**progressed (1)**
131:15

**progressing (1)**
100:6

**promoted (4)**
41:20,22,24;43:12

**promotion (2)**
140:23;241:4

**prompted (2)**
136:18,19

**proof (4)**
156:9;194:2;
211:19,20

**propose (1)**
90:17

**proposed (26)**
10:4;20:13;76:14,
18,21;78:19,24;79:6,
8,9;80:4,5,17,25;
107:19;108:1,3,4;
109:9;178:20,25;
179:12,16;181:4,5;
185:14

**protected (1)**
41:16

**protections (1)**
78:22

**prove (2)**
44:19;50:3

**proves (1)**
104:12

**provide (31)**
28:19;44:6;50:24;
63:15;70:15;80:20;
90:14,15,24;97:17;
104:21;124:23;
128:15;158:19;
159:2;160:8;162:1;
163:2,8,9;164:22;
169:13;198:2;
202:23;208:8,9,11,
21,24,24;232:14

**provided (28)**
28:17,20;64:7;
79:17;89:24;90:23;
109:15;136:3;
137:20;143:11;
147:23;154:3;155:5;
158:10,11;165:3;
166:20;170:4,5;
179:11;186:13,16;
187:11;191:15;
194:17;213:16;
217:20;221:19

**provider (6)**
27:21;163:25;
165:8;167:17;
169:14;201:9

**providing (3)**
62:22;214:17;
219:10

**psychiatrist (1)**
120:21

**psychological (5)**
24:18;25:18;56:9;
203:22;204:3

**pull (1)**
21:20

**pulling (1)**
232:14

**purpose (1)**
11:2

**purposes (4)**
11:16;61:5;74:9;
118:13

**puss (1)**
119:3

**put (22)**
7:1,6;19:19;31:13;
32:8;44:8;45:2;
64:21;86:15,19;
92:22;93:22;121:21;
140:14,19;145:8;
176:4;197:10;223:1;
230:9;238:8;243:13

**putting (1)**
226:1

## Q

**qualifications (1)**
10:3

**qualified (1)**
67:24

**qualifying (1)**
80:1

**quality (1)**
202:20

**questioner (2)**
13:23;227:17

**Quick (1)**
215:22

**quickly (1)**
224:10

**quite (5)**
23:1;26:2;73:17;
131:13;191:25

## R

**Rachel (4)**
88:8;161:7;

179:19;186:4

**racing (1)**
99:16

**raised (1)**
66:22

**random (2)**
174:23

**randomly (1)**
177:18

**rarely (1)**
98:2

**rated (2)**
16:17;18:15

**rater (1)**
17:8

**reach (2)**
8:16;205:24

**reaction (4)**
43:3;65:10;
239:20;240:11

**read (10)**
27:20;58:8;59:20;
140:13;146:11;
158:6;170:13;
188:18;234:17,19

**reading (6)**
43:4;61:7;114:6;
158:5;201:19;202:18

**reads (1)**
208:7

**real (2)**
236:15;241:7

**realized (1)**
136:23

**really (28)**
22:11,13;25:23,25;
26:1;33:23;75:1;
98:16;105:22;124:9;
148:7;169:9;175:18;
179:13;194:23,24;
200:19;217:24;
220:6;232:13;233:6,
10;237:3,4,8;240:22;
241:21;245:12

**reason (22)**
10:10;42:3,19,21;
57:17;60:19;73:13;
80:1;86:20;95:19;
100:18;119:22;
134:22;140:15;
143:11;171:13;
174:7;193:25;194:4;
205:22;222:5;236:15

**reasonable (47)**
9:15;49:16;54:22;
62:13;63:11;86:17;
88:5,21;89:17;90:14;
94:17;95:12;97:4;

106:17;107:1;
128:16,20;129:1,5,
15;132:5;140:3;
144:4;153:16;
154:18;156:25;
159:5;161:12,16;
162:25;169:18;
173:11,13,18,22;
174:2;192:19;
194:13;195:8;205:4,
19;208:3,11,12;
209:5,22;217:19

**reasoning (2)**
50:25;197:13

**reasons (19)**
31:22;41:25;42:9;
44:21,22;53:18;57:8;
90:16;100:17,20;
107:4,5;108:10;
170:2,15;171:14,15;
209:7;235:20

**reassignment (17)**
9:9;47:5;53:15,17;
57:7;66:21;108:9,13,
14;146:6,12,17,18;
148:4,24;209:7;
221:25

**recall (75)**
26:23;27:16;
35:23;37:8,21;51:
66:20;73:2;78:20;
82:5,17,18;83:10;
86:23;92:2,3,8;93:2;
96:24;102:21,24;
107:7;108:20;114:5,
18;115:17;116:13,
23;119:23;120:6;
121:12;122:23;
124:2;139:20;144:3;
145:15;152:6;
155:11;161:10,14;
162:8,10;163:11,24;
164:1;165:10,15;
168:3,8;169:17,21,
25;172:21;173:17;
175:21;176:6,11;
181:19;183:5,17;
193:12;198:18;
200:18,19,21,24;
205:13;206:14;
207:2,8;214:15,15;
216:11;217:21;218:7

**receive (20)**
16:13;38:10;39:5,
6;57:6,10;62:17;
67:19;72:16;75:23,
76:5,20;84:9;87:5;
99:9;127:25;134:10;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 267 of 274 PageID #: 627

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**received (37)**
9:12;20:19;36:23;
38:17;41:6;47:25;
52:12,19;53:10;
69:11;71:25;75:4,13,
20;76:18;79:6,9;
80:12;81:24;83:5;
86:25;96:14;98:11;
111:3;120:8;144:11;
162:2;163:3;178:12;
179:16;183:18;
185:4;186:2;200:11;
207:22;217:12;240:7

**receiving (21)**
38:1;39:3;62:16;
70:13;76:13;84:12;
152:19;163:11;
168:3;169:17,25;
171:4;173:19;
175:21;178:6;
181:12;200:18,19;
211:7;214:16;217:21

**recent (1)**
173:9

**recently (5)**
41:18,24;43:12;
244:16,18

**recertification (1)**
83:11

**recertify (1)**
82:16

**recess (3)**
91:16;111:1;
226:12

**recipient (1)**
36:9

**recollection (3)**
83:8;107:21;
187:21

**recommended (3)**
112:10;114:11;
146:24

**reconsideration (1)**
196:16

**record (36)**
7:2,5,6;8:12;11:5,
15,18,18;15:8,24;
16:3,20,21;20:8;
61:6;74:10;85:13,19;
110:24;112:1;115:1;
118:18;120:17,20;
123:3,9,19;128:11;
158:6;200:2,4,6;
226:11;228:15;
234:19;245:24

**records (5)**
109:4;111:16;

**recourse (1)**
104:22

**recuperate (1)**
115:18

**redacted (2)**
216:1,2

**reduce (2)**
60:1;69:24

**reduced (1)**
37:16

**re-evaluate (1)**
101:19

**refer (4)**
86:13;20;90:22;
160:23

**reference (5)**
45:7;46:15;
149:24;176:1;186:20

**referenced (7)**
25:7;40:6;57:22;
151:2;185:13;
188:23;199:7

**references (1)**
201:14

**referencing (6)**
34:25;35:2,10,18;
54:2;97:5

**referred (1)**
169:11

**referring (9)**
35:13,15,16;
166:18;187:9;188:4,
19;189:5;195:23

**reflect (1)**
151:15

**reflecting (1)**
48:4

**reflects (3)**
19:11;123:9;
188:24

**reformulate (1)**
227:22

**refresh (3)**
83:7;107:20;
165:17

**refuse (1)**
159:9

**refused (3)**
59:9;155:7;162:4

**refusing (2)**
160:7,10

**regard (13)**
8:8;18:16;52:10;
55:10;76:6;82:10;
116:25;128:14;
140:3;162:24;
214:12;225:5;229:18

**regarding (28)**
8:6;10:2;38:14;
39:23;48:2;51:2;
54:12;66:22;67:20;
72:17;75:16;77:6;
80:20;100:12;
117:20;127:5;139:7;
145:7;168:18;173:4;
194:2;196:3,17;
197:2;211:19,21;
217:18;222:16

**regardless (1)**
192:11

**regards (3)**
111:22;234:4,4

**Regional (8)**
16:8;49:1;127:3;
138:3,6;175:1,23,24

**regular (6)**
33:10;57:21;
74:12;180:9,10;
237:25

**reiterated (2)**
148:17;151:4

**rejected (1)**
157:19

**relate (1)**
240:20

**related (11)**
48:17;79:22;82:12,
14;95:2;153:24;
173:9;222:25;
223:14,14;236:18

**relates (2)**
221:3;222:14

**relating (2)**
15:19;228:24

**relation (1)**
166:2

**relay (1)**
139:7

**release (1)**
209:3

**relevance (2)**
9:25;10:12

**Relevancy (2)**
193:17;234:6

**relevant (9)**
10:2;11:10;44:11;
50:25;64:4;126:24;
127:7,14;128:11

**relieve (1)**
220:18

**relocated (2)**
231:7,9

**relocation (2)**
56:17;58:6

**rely (1)**

**73:24**

**remain (1)**
184:9

**remainder (1)**
113:11

**remained (1)**
123:8

**remaining (1)**
215:9

**remember (50)**
39:17;40:21;
48:20;49:20;50:14;
51:16;53:16;63:19;
66:13;70:13;72:14;
74:21;84:12;97:9;
98:5;114:15;115:19;
120:8;135:20,21;
139:8,16;144:21,23;
159:12,15,16;
163:10;165:10,12,
14;166:6,16;169:6,8,
9,10,12,15,16;
173:19;178:17;
181:12;183:6;205:7;
207:9;216:9;217:23,
24;218:6

**remote (1)**
127:11

**removal (5)**
115:21;116:8,9;
173:5;175:16

**removed (6)**
95:7;115:13,24;
173:1;175:11;184:9

**rep (1)**
232:9

**Repeat (4)**
55:22;88:9;
144:15;201:20

**rephrase (1)**
227:17

**rephrased (1)**
14:10

**replied (1)**
168:1

**report (9)**
92:11,12,19;93:14,
19;112:12;123:15;
149:6;160:24

**reporter (10)**
11:13,17;13:8,11,
21;36:21;69:8;91:11;
96:11;227:4

**representative (3)**
16:10;35:17;88:2

**representing (1)**
6:22

**reprimand (30)**

**9:18;76:6,14,18;**
77:2,7,16;78:1,19,25;
79:6,9,10;80:3,4,5,
17,25;107:19;108:1,
3,4;178:25;179:12,
16;181:4;6;186:2;
242:12,18

**reprisal (1)**
13:6

**request (141)**
8:24;9:9,15;38:14;
40:3;41:4,9,11;
45:16;47:4,11;48:9,
11,24;49:4;50:11,12,
13,15;51:2,8,9,22,23;
52:3,20;53:13,15,17,
21;54:13,22;55:20,
23;56:23;57:7,16;
59:15;62:2;63:6,8,
12,13;74:11;77:20;
83:23,23;84:3;85:22;
86:7,12,20;87:14,17,
20;88:5;90:12;94:12,
17;103:17;106:14;
108:9,13,14;111:17;
126:8,19;127:7;
128:1,17,20;129:3,
14;132:5,6,25;133:3,
17;136:19;137:22;
138:12;139:3,8,11,
24;140:3;143:6,8,9,
15,21;146:4,12;
148:3,15,22;153:15;
156:12,25;158:15;
160:3;162:25;163:2,
14,19,23;170:19;
172:8;173:13,23;
174:1,3,9;180:21,23,
25;181:5,15;183:8;
185:8;192:25;
194:10,17;195:18,
19;196:8;200:17;
205:19;206:20;
208:13,22;209:5,6,6;
233:5;235:17,21,22;
239:21,23;240:6

**requested (38)**
36:2;41:7;42:4;
44:21;53:24;63:7;
70:7;73:4,20;75:17;
77:22;86:16;90:15;
95:5,11,19;115:14;
126:5,21;135:22;
136:15;140:15,18;
145:5,6;146:11;
155:14;158:7;168:6;
173:11;174:3;
191:16;204:7;

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 268 of 274 PageID #:
6290
EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

206:19;208:8,15;
214:13;234:20
**requesting (6)**
49:19;88:25;
108:20;145:22;
164:25;170:20
**requests (20)**
11:18;62:16;63:1;
75:16;86:23;94:14,
15;108:22;127:6,20;
128:14;136:20;
161:5;164:19;166:2;
197:3;205:3;221:11;
233:3;243:6
**require (3)**
26:25;82:4;119:19
**required (16)**
17:22;22:18;23:14,
25;30:22;31:3;69:16;
70:1;72:11;73:11;
79:24;101:2;173:6;
176:4;202:11;244:4
**requirement (2)**
69:19;100:24
**requirements (1)**
59:10
**requires (2)**
201:8;204:3
**requiring (1)**
202:21
**researched (1)**
172:3
**reside (2)**
15:25;229:3
**resolve (1)**
11:11
**Resources (2)**
9:6;28:23
**respond (5)**
63:3;70:24;
129:21;160:2;196:2
**responded (14)**
44:23;55:7;57:13;
70:11,16,17;84:19;
87:1;89:11;129:24;
163:6;166:11;
179:18;196:1
**responding (2)**
160:19;162:15
**response (40)**
38:1;41:5,6;48:3,4;
52:19;57:6,19;60:18;
62:24;70:10;75:4,22,
23;76:3,10,13,16;
86:22;87:6,24;
108:21;111:16;
112:13;138:11;
148:9,17,19,24,25;

156:9;164:10;167:9;
168:8,9,17;181:12;
196:2;222:8;243:7
**responses (2)**
14:3;232:20
**responsibilities (1)**
203:6
**responsibility (2)**
75:15;129:11
**responsive (2)**
196:8,10
**rest (2)**
151:12;196:23
**restate (1)**
107:22
**restrain (1)**
79:15
**restroom (1)**
220:21
**resubmitted (2)**
86:4;163:23
**result (1)**
224:18
**resulted (1)**
107:25
**results (7)**
119:24;120:11;
189:18,20,23;190:8;
202:19
**retaliated (1)**
78:8
**retaliation (1)**
78:17
**returned (2)**
38:15;116:14
**review (6)**
19:25;63:20;72:2;
141:19;182:19;
186:16
**reviewing (1)**
17:20
**revisit (1)**
173:6
**rhyme (1)**
134:22
**Richard (1)**
6:18
**Rifampin (1)**
112:15
**right (90)**
6:19,25;17:2;18:7;
27:6,21;28:8,25;
35:23;37:3,8;39:14;
40:2,20;46:2,17;
47:1,6;52:9,21;
61:20;72:9;79:17;
85:10;91:4;95:6,18,
22;103:4;107:7;

108:17;110:21;
112:19;113:15,17,
20;115:22;116:1;
117:6,12,15;118:8;
120:14;122:11,19;
123:1,11;124:10;
125:3,16;128:9;
131:1;132:22;
133:21,24;135:18;
136:2;139:23;
144:19;145:8;147:6;
148:13;156:16;
176:12;177:16;
178:22;180:4;
182:23,25;183:15,
17;184:10;187:9;
189:1;190:6;191:7;
195:7,7,12;201:6;
206:15;209:14;
210:13;216:24;
224:24;226:25;
230:4;231:24;233:1;
245:11
**right-hand (1)**
216:7
**rights (4)**
60:25;63:4;
106:22;160:9
**risk (1)**
243:23
**RO (3)**
67:23;68:2;193:6
**Road (1)**
16:1
**Robert (1)**
7:11
**ROI (20)**
35:16;45:7,9;54:2;
61:7;83:14,16;84:1;
85:20;90:2;138:15;
149:22,24;150:4,8;
151:17;169:23;
178:19;198:3;204:25
**room (4)**
11:14;43:5;88:16;
161:20
**rotation (1)**
134:24
**Roughly (2)**
144:17;145:21
**route (2)**
143:3,4
**rubbing (1)**
117:3
**rule (1)**
244:2
**ruled (3)**
7:18;8:4;196:14

**rules (8)**
127:5,20;128:16;
234:2;243:4;244:6,7,
8
**ruling (4)**
7:16;14:21;128:5;
228:3
**rulings (1)**
7:5
**run (2)**
93:14,19

---

**S**

**same (33)**
13:23;17:25;18:1;
44:4;65:18;73:5,6;
123:17;128:4;
130:12;133:13;
146:13,14;151:17,
19;173:5;175:15,16;
186:15;187:10;
188:20;189:5;190:4;
197:6,7,11;208:18;
209:14;218:1;
230:18;241:17;
244:19
**satisfaction (1)**
171:8
**satisfied (1)**
218:18
**saw (10)**
55:4;59:17;115:7;
116:4;117:16;
123:18;175:25;
191:22;206:25;
235:14
**saying (26)**
48:20;50:14;
51:11;58:14;59:18;
60:10;70:11,14;
79:13;87:2,7;89:10,
12;90:22;139:6;
162:8;163:6;165:1,
16;166:12;170:6;
176:20;178:11;
179:17;210:5;211:24
**scan (1)**
31:3
**scar (2)**
101:13;199:4
**scared (2)**
24:24,25
**scarring (2)**
29:20;56:5
**scenarios (2)**
99:15;237:6
**schedule (2)**

75:24,25
**scheduled (2)**
180:3,6
**scheduling (3)**
72:21;176:12;
180:5
**Scheibel (1)**
183:11
**school (2)**
231:4,5
**scores (1)**
242:7
**scrape (1)**
98:24
**se (1)**
169:9
**second (20)**
19:17;29:2;32:12,
13;38:3;47:4;56:23;
68:24;76:5;83:14;
90:20;120:4;132:16;
148:22;156:3,3;
183:21;215:12;
216:20;222:10
**secondary (3)**
56:4;98:4,7
**Section (3)**
45:7,12;204:20
**secure (2)**
108:20;207:12
**secured (1)**
109:5
**securing (1)**
111:15
**seeing (4)**
133:6,8;183:5;
205:7
**seek (6)**
43:23;146:23;
164:8;181:1;213:14;
218:9
**seeking (6)**
84:18;201:15,22,
23,24;212:23
**seem (3)**
114:6;243:9,10
**seemed (4)**
107:3;235:9,12;
241:14
**seems (1)**
149:12
**selection (1)**
10:2
**send (6)**
79:10;106:2;
119:17,22;129:18;
189:22
**sending (1)**

Case 1:20-cv-01154-JPH-MJD  Document 39-4  Filed 07/02/21  Page 269 of 274 PageID #: 629

22OC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

160:15
sends (1)
138:22
sense (1)
65:6
sensitive (3)
24:3;45:1;119:1
sent (23)
25:8;44:2,5;47:2;
67:22;68:2;70:19;
75:8,9;87:6;90:12,
21;95:4;107:12;
119:16,20;120:11;
129:20;139:6;
146:18;159:20,22;
175:23
sentence (1)
56:16
separate (4)
17:11;18:11;47:1;
63:11
September (9)
16:12,14;18:8,19,
21,24;41:20;131:18;
132:4
serious (1)
57:20
Sertraline (1)
122:7
Service (7)
9:2;16:10;54:9;
59:5,6;77:12;160:4
session (1)
95:4
set (1)
127:5
settlement (2)
8:15,16
several (9)
30:11;39:3;58:9;
59:1;73:23;76:9;
161:5;199:15;235:8
severe (2)
29:4;55:17
severity (2)
203:9;220:6
SF-52 (1)
102:3
shake (1)
227:12
shaking (1)
14:5
shape (1)
116:12
share (1)
33:22
shift (4)
237:24,24;238:2,4

shifts (4)
132:16,16;237:20;
238:17
shortly (1)
66:20
short-term (1)
213:5
shoulder (1)
24:12
shoulders (1)
225:18
show (4)
93:19;118:14;
173:2;192:14
showing (3)
134:21;138:14;
191:17
shows (2)
175:14;215:8
shut (1)
65:20
shutting (1)
65:23
sic (2)
183:5;244:16
sick (8)
35:24,25;134:2,11;
136:4;137:13;153:2;
238:12
side (2)
99:4;239:11
sign (3)
163:18,19;178:8
signature (1)
183:13
signed (4)
76:25;144:1;
183:12,15
significant (4)
98:6;202:19;
203:21,23
signs (1)
28:12
similar (4)
64:3;65:15,18;
88:23
simple (2)
21:19;27:1
simply (1)
162:8
single (4)
232:11;238:24;
239:6;242:16
sinks (1)
33:12
sinus (5)
29:4,5,15;187:5;
199:3

sister (1)
130:21
sit (6)
22:2;23:25;24:8;
25:4;145:10;206:8
site (1)
75:20
sitting (2)
21:20;239:4
situation (42)
24:1;25:6;29:24;
31:14;33:24,25;
40:10,12;42:14;
44:20;45:1;64:3,4,
11,20;65:18;66:9;
73:21;88:17;100:11;
103:14;104:20;
144:10;154:7;
158:23;173:7;
174:19;212:22;
230:7,24;232:4;
233:15;235:10,13,
24;238:9,22;239:23;
240:4,16;243:20;
245:8
situations (5)
59:23;152:20;
232:9;236:16;241:24
six (1)
8:22
size (3)
24:15;118:15,19
skills (2)
67:15,20
skin (10)
44:13,14,15;55:15;
58:15,17;59:7;98:4,
7;240:17
slight (1)
21:8
slightest (1)
24:20
social (1)
171:17
solely (1)
242:4
solution (5)
74:1,2;213:5,6;
225:13
somebody (11)
31:15,17;33:17,25;
58:20;147:21;168:1;
174:14;183:12;
207:7;238:3
someone (13)
10:16;33:1;38:4;
88:19;134:23;136:6;
143:7;148:1;150:17;

166:22;167:23;
188:21;192:5
sometime (2)
67:13;173:20
sometimes (16)
21:5,11,12,13;
22:2;29:11,19,23;
30:24;31:11;100:22;
114:22;119:16;
152:22;220:3;238:25
somewhere (4)
125:23;132:10;
135:24;207:6
son (2)
231:3,10
Sonya (37)
39:21;40:18;
48:10;49:6;51:12,25;
63:9;75:9,23;76:17;
79:11;80:3;88:8;
90:13;129:3,4,11,13;
144:13,24;145:2,3,3,
6;155:12,22;158:18;
159:20,22;160:18;
161:8;179:17;209:1,
3,10;232:23;242:20
soon (2)
231:9,11
sorry (38)
10:7;16:12;19:15;
20:6;27:19,19,24;
41:3;46:19,21;49:11;
55:22;61:23;64:22;
88:9;97:8;107:22;
114:17;132:6;
138:25;142:16;
144:15;147:1;
150:12,24;158:2;
162:14,18;165:5;
169:24;180:5,16;
188:5;201:19;
203:17;209:15;
218:6;244:17
sort (3)
176:15;189:23;
201:15
sought (2)
7:7;70:3
sounds (1)
237:7
Spark (11)
95:4,10,20;172:10,
11,12;173:3,16;
175:5,13,18
speak (12)
13:16,22;28:14;
82:13;159:13,19,24;
194:14,15;195:18;

198:11;232:1
speakers (1)
13:17
speaking (3)
62:11;64:23;92:4
spearheading (1)
242:21
special (1)
88:22
specialist (11)
147:7,11;170:18;
171:2,12,20,21;
212:17,19,23;218:10
specialists (3)
146:24;147:2;
172:4
specific (3)
164:19;204:18,21
specifically (8)
103:5;113:20;
137:23;138:4;
153:11;176:25;
220:11;223:5
specifics (1)
121:12
specify (1)
223:7
speculate (1)
154:20
speculating (1)
156:8
speculative (1)
211:13
spell (2)
15:7;228:15
spelled (1)
15:10
spiral (1)
106:3
spit (1)
45:3
spoke (4)
51:7;80:15;
107:11;235:8
spoken (1)
10:14
spontaneously (2)
32:15,19
St (24)
16:7,8;49:1;102:4,
20,23;125:14;126:6,
14;127:8;128:2;
136:16;137:23;
138:4;146:23;147:3;
157:3,22;158:16;
192:21;193:19,22;
194:5;197:14
Stage (4)

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 270 of 274 PageID #:
6830

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

26:21,22;27:1;
112:17
**stalls (1)**
33:11
**stamped (1)**
81:12
**stand (1)**
10:24
**standards (9)**
17:5,23,25;18:1;
59:11;141:16,18;
142:5,10
**start (7)**
29:13;93:8;
102:23;110:8;
120:24;125:13;212:2
**started (15)**
37:9;67:11;68:7;
73:18;117:24;126:3;
131:18;133:8;
134:14;172:8;193:5;
221:11;231:6;238:9,
11
**starting (2)**
34:14;122:12
**starts (3)**
21:8;109:1;205:1
**state (18)**
15:7;55:12,17;
57:14;60:6,18;64:13;
95:5;98:1;148:10,11;
152:12;153:18;
157:1;166:10;
202:18;222:12;
228:15
**stated (21)**
7:18;15:23;16:3;
56:19;57:17,18,19,
25;58:5;59:9;75:12;
84:20;113:12;140:8;
148:18;166:7;
167:17;168:12;
173:15;222:10;
225:12
**statement (10)**
12:12,14;27:10;
43:19;152:6;157:5;
166:7;206:18,20,21
**statements (5)**
12:7,9;43:1;104:5;
149:21
**states (2)**
25:10;153:11
**stating (8)**
59:7;79:11;84:14;
161:10;163:3;166:9;
197:19;222:23
**stay (2)**

22:8;238:3
**staying (1)**
132:19
**step (4)**
54:18;78:2;137:1;
243:19
**Stephens (18)**
40:6,9;41:2,3;
48:14;54:1;55:3,6;
59:2;64:25;86:3;
129:19,20,21,25;
139:10;143:24;
146:19
**Stephen's (1)**
139:7
**stepped (1)**
77:14
**steroid (1)**
114:12
**steroids (1)**
114:14
**Sticking (1)**
209:14
**still (35)**
19:13,16;22:22;
30:25;33:2;35:23;
67:1;73:9;87:22;
88:24;89:10,19;95:9;
97:3;110:5;116:11;
122:20;124:5;
125:17,18,21,25,25;
126:16;162:1;
172:25;175:4,18,19;
184:9;192:7;209:11;
217:23;219:1;242:2
**stipulations (4)**
11:20,21;12:3,5
**stitch (1)**
175:16
**stomach (1)**
114:21
**stoop (1)**
23:19
**stop (1)**
91:14
**straight (1)**
157:23
**stress (14)**
25:16;66:18;
221:12;230:21;
233:18;235:13,15;
236:8,18,20;238:19;
245:9,14,15
**stressful (2)**
233:14;235:7
**strictly (1)**
8:2
**stub (1)**

38:21
**stuff (4)**
130:12;221:5;
236:12;240:23
**subject (3)**
8:3;44:24;48:8
**subjected (1)**
8:20
**submission (1)**
87:25
**submit (21)**
28:22;39:20;
40:25;50:18,20;
51:16,17;52:2,5;
53:21;54:21,25;
84:14;86:6;146:13;
164:3;165:1,13;
178:20;179:1;216:5
**submitted (53)**
46:3,13;48:9;50:7;
51:9,10;53:12,14,16;
54:7,19;57:6,25;
63:22;84:5,8,11,21,
22;85:4,7,15,16,17;
86:2,3,10,14,25;87:2;
88:4;89:6,11;97:12;
146:14,15,20;163:1,
4,6,20,22;164:4,6,11;
165:2;166:8,13;
167:21;168:10;
208:17;222:7;239:22
**submitting (2)**
243:5,5
**sub-par (1)**
138:17
**successful (3)**
16:19;18:15;41:20
**successfully (1)**
65:2
**suffer (1)**
58:1
**suffering (3)**
121:19;202:6;
244:19
**suffers (1)**
229:16
**suffice (5)**
51:14;91:2;
155:20;160:5;163:7
**sufficed (1)**
171:22
**sufficient (12)**
71:3;84:24;85:4;
87:4;97:12,14;
143:10;166:21;
167:8;207:12,15;
208:9
**suggest (1)**

196:19
**suggested (2)**
22:12;100:2
**suggestions (2)**
98:12;114:13
**summer (1)**
72:9
**supervisor (11)**
37:23;53:23;70:7;
75:10;76:24;77:13,
15;105:19;177:12,
13;181:9
**supplementiug (1)**
11:4
**support (20)**
30:19;31:23;32:1;
56:20;99:1;100:9,19;
101:22,25;156:22;
171:16,17;204:15;
206:19;238:15,16,
19;239:15;240:14;
244:22
**supporting (1)**
102:7
**supportive (1)**
204:4
**suppose (3)**
76:2;147:14;
153:20
**supposed (12)**
76:11;92:23,25;
93:23,24;95:10;
173:2;175:11,12;
180:12;235:10;244:3
**suppurativa (2)**
21:1;112:17
**Sure (31)**
15:9;74:9;80:7;
91:15;93:17;94:7,8;
104:18;109:2;
110:25;122:1;124:9;
142:19;144:5;147:4,
8;150:6;156:3;
162:12;166:4;
175:19;176:13;
178:17,22;183:22;
186:25;193:20;
214:24;216:3;
219:19;224:10
**surgery (3)**
173:16;174:10;
191:9
**surgical (10)**
32:23;82:7,9;
100:15,24;101:5;
173:9;181:16;
189:21;191:2
**surgically (9)**

32:15;186:18,22,
23;187:1,3;188:7,17;
189:14
**Susan (2)**
10:15,16
**snstain (9)**
35:14;43:7;49:8;
127:10:128:7:
194:20,24;196:12;
234:23
**sustained (2)**
49:12,14
**Suture (4)**
115:20;116:7,9;
173:5
**sutures (6)**
95:7,9;115:23;
172:25;173:1;175:11
**swelling (1)**
119:2
**swollen (2)**
29:25;119:6
**swolling (1)**
119:1
**sworn (6)**
13:9,10;15:17;
227:2,3;228:22
**symptoms (2)**
29:3;88:13
**sync (1)**
183:23
**system (2)**
240:14;244:23

**T**

**talk (16)**
19:3;26:10;30:15;
48:10;54:12;83:22;
96:23;121:7;149:2;
159:9,17,25;172:10;
202:13;231:24;232:3
**talked (3)**
10:6;130:13;
206:23
**talking (8)**
55:1;118:22,23;
145:1;166:2;180:8;
189:25;193:21
**talks (2)**
122:2;215:6
**Tampa (3)**
31:23;130:18;
231:11
**targeted (1)**
121:17
**task (1)**
21:23

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 271 of 274 PageID #: 6821

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**team (15)**
17:17;18:12;68:6,
13,14;131:21,25;
134:13,16,19;141:8,
12;142:1,3;237:22

**teams (5)**
17:11;18:4,5,11;
134:18

**teeth (1)**
232:15

**telephone (1)**
7:20

**telework (15)**
209:21,25;210:8,
14,15;211:10,15;
212:6,10,11;213:3;
218:23;220:10,11;
225:8

**tele-work (5)**
155:5,7,10;159:7;
209:19

**teleworking (2)**
219:5;225:11

**telling (8)**
41:24;64:15;
67:24;104:13;
142:25;160:11,25;
167:9

**temporary (3)**
25:14;218:24;
225:13

**tend (1)**
220:21

**term (5)**
24:8;29:9;74:1,2;
206:4

**terms (10)**
8:17;127:7;151:1;
180:11;183:21;
196:13;219:22;
221:23;222:15;
223:12

**test (15)**
67:12,21,25;68:1,
1,11,25;145:11;
241:4,6,8;242:3,6,6,7

**tested (1)**
242:6

**testified (9)**
30:12;48:2;
111:17;157:17,20;
206:24;218:8;
219:21,23

**testifies (2)**
15:20;228:25

**testify (5)**
7:8,15,19;8:5;
234:8

**testifying (5)**
15:3;35:19;43:3;
68:18;228:11

**testimony (17)**
7:18,22;10:2;13:7,
14;35:11,15;45:6;
91:20;111:11;
155:25;198:2;
226:10;227:6;234:5,
7;245:23

**testing (3)**
67:5,15;120:12

**therapist (1)**
65:22

**thereby (1)**
11:4

**third (5)**
7:23;120:4;129:3;
132:16;163:14

**though (5)**
94:1;121:18;
144:5;153:2;216:10

**thought (15)**
49:7,25;62:10;
70:22;97:13;129:10;
131:8;143:5;147:23;
152:21;153:17;
162:10;173:24;
194:21;227:1

**three (18)**
7:8;15:15;30:1,1;
68:15;94:14,15;
113:21;126:10,11;
127:22;131:12;
188:13,18,18;189:4;
204:21;237:20

**three-month (1)**
239:7

**throughout (1)**
172:6

**throwing (1)**
239:1

**timer (1)**
91:14

**times (21)**
21:18;27:5;66:15;
74:14,15;133:10;
149:4;153:1;176:24;
187:6;188:7,19;
211:2;220:4,5;
230:12;235:8;238:4;
242:14;243:10,17

**tired (1)**
203:17

**tissue (2)**
101:13;199:4

**today (12)**
6:18;7:10,12,15,

19;8:3,5;13:1,7;
113:13;166:10;
245:24

**today's (1)**
8:17

**toes (1)**
78:3

**together (1)**
230:19

**told (21)**
9:2;38:17,23;39:1;
40:23;50:10;51:13,
14;52:18;64:2;70:18;
80:22;88:20,24;
89:14;125:21;148:1;
155:15;160:1;207:8;
222:5

**toll (1)**
203:22

**tomorrow (2)**
7:19;178:15

**took (12)**
42:6,18,23,25;
51:25;59:20;111:7;
126:2;129:11;167:6;
242:6;243:22

**top (10)**
20:22;33:3;54:8;
55:8;105:12;123:14,
23;193:15;200:15;
209:18

**tops (1)**
242:6

**total (4)**
94:14,15;105:16;
107:5

**totally (2)**
66:10;107:1

**touch (1)**
29:4

**towards (3)**
34:6;71:4;74:6

**tracks (1)**
187:5

**tract (1)**
29:15

**tracts (4)**
29:4,5;30:3;199:4

**train (1)**
62:10

**training (17)**
95:4,11,15;131:24;
172:10,13,14,14,15,
19,24;173:3,16;
174:4,5,24;175:6

**trans (2)**
97:6;125:14

**transcript (1)**

151:3

**transfer (113)**
8:24;34:20;36:3,
10;39:15;40:3,19;
41:1,5;42:4;45:16;
46:4,7,10,16;47:10;
48:16,25;49:24;50:3,
21;51:2;52:3,20;
53:13;54:20;55:20,
23;63:7,13,16,20;
64:2,9,10;73:20,22;
74:2;77:20;78:6;
81:3,11;83:24;88:25;
94:13;97:3,10;
100:14,18;102:3,8;
103:6;104:3,8;
106:23;107:1,2,4;
124:6;125:6,10,15,
20,22;126:2;132:25;
133:3;134:5;135:12,
15;136:15;137:22;
138:1,2,12;143:3,6,8,
21,22;144:13,18,19;
145:23;146:4,22;
153:6;155:8;156:14;
158:15,16;171:14;
173:22;174:1;177:4;
181:20;182:3;183:8;
185:7;192:25;211:4;
213:14,15;219:1;
221:11,24;222:5,15;
225:8;235:18,21,22;
239:21

**transferred (8)**
97:18;102:18;
134:19,23;135:1;
141:12;142:1;225:14

**transferring (4)**
99:21;101:21;
103:25;104:4

**transfers (1)**
121:18

**treat (3)**
55:20,23;172:4

**treated (4)**
44:17;103:23;
171:6;173:18

**treating (2)**
101:19,20;193:9;
194:6

**treatment (31)**
26:25;43:24;
98:10;99:8;101:24;
112:10,25;113:3,7;
114:8,12;115:4,22;
116:1,19;117:8;
119:19;122:21,23;
123:8;125:3,18;

147:16;154:12;
187:23;190:11,20;
191:22;193:22;
218:19,21

**treatments (7)**
25:23;99:10;
100:2;114:10,15;
122:12;125:23

**Trek (2)**
12:25;226:21

**Trevenia (10)**
6:2,10;12:20;13:3;
15:9,16;91:18;111:6;
226:15;235:11

**T-R-E-V-E-N-I-A (1)**
15:10

**trial (1)**
112:11

**tried (3)**
114:15;143:6;
213:4

**trouble (2)**
74:24;239:8

**true (2)**
31:6;142:23

**trust (2)**
242:25;243:25

**trusted (1)**
242:24

**truth (6)**
15:18,18,19;
228:23,23,24

**try (7)**
64:13;69:23;
139:23;220:9;
236:23;239:10;
241:14

**trying (27)**
42:7;48:14,15;
49:23;64:17;65:17;
67:7;97:3;104:7;
106:2;107:4;114:8,9;
115:19;124:6;
125:22;154:10;
162:1,3;174:17;
189:6;194:8;216:13;
232:7;236:21;
240:13;243:11

**tunneling (1)**
29:7

**tunnels (1)**
29:21

**turn (8)**
24:22;45:14;90:2;
118:8;201:3;204:25;
208:2;209:15

**turned (1)**
37:21

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 272 of 274 PageID #:
6820

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

**Two (34)**
7:9;13:22;37:1;
42:8;59:5;77:21;
100:23;102:25;
103:2;108:16;
119:15,20;125:12;
126:10,11;129:20;
135:6;159:15,16;
169:5;176:25;177:4;
186:11,14;187:21,
25;188:16,19;189:4;
192:15;201:11;
204:21;231:2;239:6
**type (24)**
17:7;22:9;23:17;
24:2;43:23;50:3;
52:14;57:23;60:24;
62:18,24;70:21;92:9,
17;99:8,22;119:19;
134:21;189:19,21;
190:10;201:18;
213:17;238:10
**types (2)**
17:19;18:11
**typically (1)**
234:4

**U**

**ultimately (1)**
102:18
**unable (6)**
26:16;27:8;60:8;
90:14;151:8;152:3
**unacceptable (2)**
9:12;192:8
**uncles (1)**
130:22
**uncomfort (1)**
24:13
**under (36)**
17:23,24;21:5;
23:3,24;24:3,4;28:9;
30:2;36:9;64:10;
66:14;68:21;71:7;
78:23;92:8;105:8;
108:25;117:23;
118:24;119:5;
125:17;146:7;148:3;
170:15;184:15;
204:19;208:3;210:7;
212:11;229:21,21,
24;236:17;245:14,15
**underarm (2)**
29:25;117:23
**underhanded (1)**
243:9
**underneath (1)**

119:4
**understandable (1)**
131:14
**understands (1)**
239:25
**understood (9)**
49:3,15;148:25;
149:19;157:20;
160:20;189:3;
197:20;232:19
**undue (1)**
194:18
**Unfortunately (2)**
36:7;241:25
**Unhelpful (1)**
233:4
**union (2)**
88:1;146:9
**unit (1)**
231:8
**unlawful (3)**
79:14,18;80:21
**unless (3)**
12:8;40:23;114:25
**unnatural (1)**
24:10
**unnecessary (1)**
103:18
**unpredictable (7)**
25:10,14;56:2;
58:3,5;112:9;171:3
**unwilling (2)**
43:25;161:24
**up (33)**
13:17;14:5;24:3,4;
33:16;67:6,9;82:13;
83:21;98:24;99:1;
104:12;105:20;
106:13;110:18;
117:9;118:24;173:2;
178:8;183:15;
195:14;196:11;
197:25;198:1,11;
216:14;226:1;
227:13;233:19;
236:1;238:7;241:16;
242:2
**upcoming (1)**
95:16
**upon (8)**
22:1;24:14;30:3;
51:20;112:13;140:7;
148:16;231:16
**upper (2)**
118:24;237:6
**upset (4)**
88:15;114:21;
159:8;235:5

**use (28)**
14:4;30:19;38:24;
39:2;40:22;51:18,21;
68:9;70:8,12,16,18;
71:3;76:11;106:1;
133:19;136:8;137:9;
138:15;160:17;
176:2;177:17;179:7;
180:21,23;181:1,9,19
**used (7)**
75:18;95:12;
130:15;176:7;
180:19;197:4;223:19
**using (12)**
68:7;134:7,11,14;
137:2;141:3;164:23;
165:8;167:25;
179:21,24;219:12
**usually (4)**
30:4,4;120:10;
192:10

**V**

**VA (22)**
54:21;62:13;
91:19;103:8;106:13;
127:4,20;163:13;
164:12;165:8;167:2;
168:6,16;194:14;
197:2;200:14;205:2;
208:18;214:3,5,13;
232:2
**valid (1)**
42:21
**vantage (1)**
233:12
**varies (1)**
220:7
**various (2)**
21:5;132:16
**VA's (3)**
128:1,16;196:20
**vendors (1)**
109:5
**verbal (1)**
41:7
**verbally (10)**
14:3;44:1;70:18;
78:18;140:17;
160:11,25;165:15;
227:12;232:13
**verbatim (3)**
24:14;94:9;119:1
**versus (5)**
6:2,10;91:19;
111:6;226:15
**Veterans (6)**

6:3,11;16:5,10;
111:7;226:16
**via (2)**
6:6;7:19
**video (1)**
6:6
**violated (1)**
107:17
**Virginia (3)**
172:22;173:8;
174:14
**virtual (1)**
31:1
**visit (10)**
113:17;114:2,3;
123:17,23,25;
170:17;175:15;
186:21;191:23
**visited (1)**
181:7
**voice (2)**
13:16;227:9
**volume (2)**
13:15;227:8
**voluntary (17)**
34:20;36:2,9;39:6;
73:20,25;81:3,10;
134:4;135:15;
152:24;153:6;177:4;
181:20,22;182:3;
219:15
**VSR (5)**
126:15,16;131:21;
140:21;195:4
**VSRs (1)**
210:2

**W**

**wait (3)**
39:10;100:23;
192:10
**waiting (8)**
164:9;167:9,22;
168:17;170:7,7;
239:4;242:18
**waive (2)**
12:8,16
**waives (1)**
12:11
**waiving (1)**
12:15
**walk (4)**
23:19;25:5;31:6,12
**walked (2)**
159:10,23
**walk-in (9)**
101:3,4,11,16;

119:12;133:11;
191:11,14,18
**wants (2)**
128:10;139:2
**warning (1)**
9:12
**water (2)**
31:16;33:12
**way (27)**
24:10;25:22;
65:25;75:1;76:1;
92:20;93:19;104:2;
110:10;119:5,6;
139:18;153:8;
160:21;197:10;
199:12;209:9;223:1;
232:7;234:25;235:9,
12;236:19;237:20;
241:13,25;243:21
**wear (1)**
21:14
**wearing (2)**
117:2;220:16
**website (3)**
79:12,13;181:7
**week (4)**
74:13;151:9;
238:25;242:15
**weeks (10)**
73:23;100:23;
102:25;103:2;
112:13;115:21;
125:12;135:6;177:4;
233:19
**weight (1)**
30:19
**well-being (1)**
105:16
**Wellbutrin (2)**
121:24;122:9
**weren't (16)**
18:25;62:21;
65:25;142:4,9;
145:10;156:5;171:6;
176:13;179:20,20;
184:6;219:3;222:25;
223:2;243:12
**whatever's (1)**
21:12
**what's (12)**
61:13,18;84:5;
87:3;92:22;123:11,
21;183:4;194:2;
199:7;200:13;
217:15;241:18
**wherein (1)**
163:12
**Whereupon (2)**

DEF000664

EEOC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

158:6;234:19

whichever (1)
77:14

whole (9)
15:18;133:9;
156:4;193:24;194:3;
214:8;228:23;231:8,
9

wife (2)
229:10;239:24

wife's (1)
241:6

willing (8)
99:9,12;100:3;
148:1;158:14,17;
166:22;243:13

Wilson (28)
39:21,22;48:10;
49:6,18,21;64:5;
71:7;76:17;78:15,21;
88:8,20;144:24;
145:4;155:12,22;
156:24;157:13,17;
159:10,17;160:2;
161:8,11;163:1;
206:12;232:23

Wilson's (1)
144:13

wind (1)
243:15

window (1)
159:11

wishes (1)
8:8

withdraw (3)
102:12;180:15;
212:2

withdrawn (3)
10:20;102:16;
110:4

withdrew (2)
10:21;109:24

within (11)
17:11;103:1,2;
106:24;127:22,23;
138:1;141:25;
207:18;213:14,15

without (14)
21:23;39:3;73:16,
23;93:20;137:11;
152:19;153:4;171:4;
177:22;194:17;
211:7;220:19;222:13

witness (75)
7:3,23,25;9:25;
10:15,23;12:19;13:9,
10,19;14:1,7,12,17,
24;15:5,9,13;28:5;

35:7,20;37:2;38:8;
43:9;61:8;72:4;90:3;
102:13;113:16;
130:6;142:13;
154:22;156:19;
157:5;158:2,8;162:6,
11,14,17;166:5;
187:20;189:9;
190:20;201:5,19;
209:17;213:23;
217:23;220:1,13;
221:10,22;222:4,20;
223:3,10,16;226:10,
16;227:2,3,10,14,19,
24;228:6,13,16,20;
234:15;240:11;
245:19,21,23

witnessed (2)
229:18;236:4

witnesses (3)
7:11;10:4;11:6

witnessing (1)
231:25

witness's (1)
95:24

word (3)
33:21;92:16;240:7

work (47)
8:21;16:7;27:9;
30:22;67:5;70:4;
73:4,9,17;74:12,15;
75:2;92:16,17,17;
108:17;114:19;
116:14,16,21,23;
121:8,17;158:24;
175:1;179:4;180:4,7;
202:9,11,22;203:14;
206:10,13;210:21,
24;211:2;212:11;
224:19;225:20,22;
236:19;237:23;
238:6,8,16;239:17

worked (9)
79:25;93:1;126:13,
18;217:6;237:24,24,
25;238:2

worker (1)
241:2

working (20)
16:6;32:21;65:25;
74:23,24;75:18;94:4;
131:12;132:15;
175:5;195:7,9;196:3;
210:7;212:21;
225:24;231:6;
237:15,17,19

workplace (2)
59:13;153:13

works (4)
94:1,8;98:17;
237:21

worse (5)
34:13;99:14;
136:21;238:23;
241:23

worst (1)
66:15

wound (3)
33:3,3;199:2

write (1)
167:6

writer (1)
239:24

write-up (1)
239:4

writing (17)
44:7,21;62:17;
63:2;105:20;140:14,
19,19;160:4,13;
161:2;162:4;218:5;
222:8;232:12;240:6;
243:8

written (15)
75:13,21;84:3;
85:22;86:12;88:4;
96:24;140:15;160:8,
23;167:10;179:9;
232:20;240:5;243:7

wrong (12)
87:3,8;89:13;
164:10;167:10,23;
168:13,18;186:11;
199:12;221:18;
222:11

wrongly (1)
77:19

wrote (3)
86:11,16;103:20

Y

year (10)
34:21;36:1,2;
41:21;132:2;134:20;
135:23;141:10,19;
231:13

years (5)
131:13;134:18;
229:14;230:12,19

year-to-date (2)
140:21,22

Young (19)
75:11;76:21;77:1;
80:9,16;84:13,17;
85:2;87:1,25;89:10;
90:21;105:21;

159:18,18,24;160:1;
163:3;168:4

Young's (2)
84:19;165:16

Yvonne (1)
136:12

0

00048 (1)
118:8

00083 (1)
121:6

00203 (1)
61:17

00204 (1)
61:19

00205 (1)
45:23

00207 (2)
46:21,22

00233 (1)
16:22

00234 (1)
16:22

00247 (1)
90:2

00248 (4)
83:17;84:1;85:24,
25

00249 (1)
86:5

00294 (1)
16:22

0202 (1)
54:6

0857 (1)
54:21

08578 (1)
59:16

0857a (1)
60:16

0857e (7)
163:13,25;164:13;
165:8;168:16;200:9,
15

1

1 (8)
8:23;9:14,20;
20:16,18;32:12;40:2;
139:14

10 (26)
9:8;96:5,11,13,20;
102:2,13,16;109:23,
24;110:1,5,5;117:18;
124:19;146:3;150:7,

7,9,11,15;151:18,21;
159:20;184:8,9

10:37 (1)
6:4

100 (1)
71:1

106 (1)
16:1

10-day (1)
113:11

10-hour (1)
238:2

10th (4)
61:14;117:8;
124:22;191:5

11 (12)
109:22;110:8,14,
17,19;111:2,9,20,23;
184:8,8,12

12 (12)
110:20,22;111:20;
151:18;178:7;188:9,
10,22,23;189:1,13;
190:15

126 (4)
150:7,8,12;151:17

129 (1)
152:1

12-A (1)
207:11

12-hour (1)
238:5

13 (12)
34:22;71:8,10;
110:22;111:20;
146:4,7;178:15;
188:11,23,24;190:23

133 (1)
152:11

13th (3)
19:7;37:10;132:11

14 (4)
81:9;111:20;
115:21;152:11

15 (8)
111:20;166:11;
188:12,22,24;189:2;
191:1;207:7

150 (1)
71:2

16 (5)
82:21;109:20;
110:9;111:20;184:6

17 (7)
9:11;95:25;
111:20;117:7,14,14;
136:14

17th (5)

Case 1:20-cv-01154-JPH-MJD   Document 39-4   Filed 07/02/21   Page 274 of 274 PageID #: 684

OC Hearing
Volume I

Brown v. McDonald, et al.
July 20, 2015

39:19;46:1;79:7;
86:4,17;108:6,7
**18 (10)**
8:14;95:25;117:15,
16,17;188:12,22,24;
189:2;191:6
**19 (2)**
119:9;132:7
**19th (3)**
19:7;37:10;132:12
**1st (2)**
87:11;206:5

**2**

**2 (10)**
9:1;20:22,22;
26:11;36:20,22;79:5;
169:19;215:25;
216:18
**20 (22)**
6:4;70:2;73:5,6,7;
91:14,24;108:25;
109:1,2,9;110:19;
120:15;123:6,18;
152:1;176:4,16;
177:17;181:14;
184:18,19
**200j-0326-2014101376 (1)**
6:13
**2011 (8)**
16:12,15;18:8;
131:18;132:4;
136:19;191:8;192:13
**2013 (19)**
16:15;18:9,19,24;
19:8;34:15;35:24;
37:5;72:12,13;73:4;
103:6;132:7;135:17,
19;198:13,19;
199:17;231:14
**2014 (49)**
8:23;9:1,8,11,14,
17;52:25;67:8;72:6,
23,25;73:8,12;81:4,
10;92:3,7;113:18;
115:4,23;116:2,14;
117:18;122:16;
123:6,18;124:20;
126:3;136:14,19;
140:25;141:6;
144:17;145:9;146:3;
147:6;166:17;168:4,
14;169:19;178:7,16;
181:14;185:10;
198:9;230:4;231:14,
25;244:21
**2015 (3)**

6:4;8:14;126:11
**202 (1)**
45:8
**20th (4)**
123:25;125:4,8,16
**21 (8)**
81:10;109:2;
110:20;122:12;
141:6;152:2;185:10;
208:3
**21st (4)**
16:12;144:2,12,17
**22 (8)**
8:23;9:1;109:2;
115:4;123:2,18;
191:1;230:19
**22nd (3)**
124:21;144:12,17
**23 (5)**
109:2;123:12;
131:18;132:4;140:25
**23rd (3)**
86:18;141:1;
148:14
**24 (5)**
109:3;116:2,14;
123:22;152:1
**241 (1)**
45:8
**245 (1)**
169:23
**246 (1)**
169:23
**24th (4)**
84:7;85:23;86:5,8
**25 (3)**
109:3;124:10;
168:4
**25th (6)**
16:12;75:12;90:7;
131:19,19;168:14
**26 (4)**
109:3;124:23;
184:14,24
**27 (16)**
109:3;110:10,17;
111:2,10;145:9;
166:17;182:13;
184:3,12,25;185:2,3,
7,19,21
**27th (1)**
145:21
**28 (9)**
109:3;182:14;
183:1,4;184:24;
200:8,10,14;206:23
**29 (7)**
109:3;113:18;

215:16,18;217:9,11,
15
**29th (2)**
124:20,22
**2nd (1)**
138:22

**3**

**3 (15)**
9:8,19;19:10,18;
26:15;34:3;47:20,22,
24;52:11;113:22;
215:20,25;217:2,16
**30 (3)**
18:24;37:5;109:3
**30th (1)**
18:21
**31 (4)**
109:3;135:19;
209:15,16
**32 (2)**
109:3;184:18
**320 (2)**
205:1,1
**33 (1)**
109:3
**33781 (1)**
16:2
**339 (1)**
205:9
**34 (2)**
184:16,21
**341 (2)**
206:16;207:11
**349 (1)**
209:16
**35 (1)**
109:3
**351 (1)**
208:2
**36 (4)**
109:4,9;184:19,20
**39 (1)**
152:11

**4**

**4 (17)**
9:11;28:11;36:7;
53:8,9;55:1;62:4;
201:4,12;202:5;
203:10,16;204:2;
215:20,25;217:2,16
**40 (2)**
74:12,25
**470-2015-00017X (1)**
6:12

**4th (1)**
124:21

**5**

**5 (12)**
9:14,19;47:9;69:8,
10;115:23;150:7,15;
215:20;216:2;217:2,
16
**5:16 (1)**
245:25
**5th (1)**
124:21

**6**

**6 (13)**
9:17,19,20;71:22,
24;78:14;79:5;80:8;
86:15;107:20;108:5;
112:12;147:6
**60 (1)**
142:21
**60-day (1)**
142:2
**64 (1)**
110:22
**65 (1)**
110:21
**6th (4)**
102:24;125:13,13;
193:5

**7**

**7 (5)**
52:23,25;81:21,23;
182:1
**7th (2)**
53:19,20

**8**

**8 (8)**
83:2,4;112:12;
215:21;217:2,17;
229:14;238:2
**8500 (1)**
16:1

**9**

**9 (16)**
9:17;68:22,24;
96:5,11,13,18,23;
151:18,21;201:3,12;
202:4;203:11,16;

204:20
**90 (1)**
207:11