# In The Matter Of:

*Brown v.*
*McDonald, et al.*

---

*Brown v. McDonald, et al.*
*July 21, 2015*
*EEOC Hearing - Volume II*

---

*Smith Reporting*
*400 North High Street - Suite 200*
*Muncie, Indiana  47305*
*1-800-700-3566 / 765.284.7836*
*www.smithreporting.net*



SMITHREPORTING
INDIANA COURT REPORTERS

Min-U-Script® with Word Index

DEF000667

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 2 of 406 PageID #: 636
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

248

UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
DETROIT FIELD OFFICE

EEOC Case No.   470-2015-00017X

Agency No.     200j-0326-2014101376

TREK K. CARETHERS
ADMINISTRATIVE JUDGE

TREVENIA BROWN,                    )
                                   )
      Complainant,                 )
                                   )
      -vs-                         )
                                   )
ROBERT A. MCDONALD,                )
SECRETARY DEPARTMENT OF            )
VETERANS AFFAIRS,                  )
                                   )
      Respondent Agency.           )

VOLUME II

REPORT OF PROCEEDINGS had at the hearing of

the above-entitled cause before TREK K.

CARETHERS, Administrative Law Judge,

commencing on the 21st day of July, 2015, at

the hour of 9:30 a.m., at 101 W. Ohio Street,

Indianapolis, Indiana.

Reported by:  Joyce E. Shinault, RPR, CPE

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

249

A P P E A R A N C E S

ON BEHALF OF THE COMPLAINANT:

    Denise M. Clark, Esq.
    CLARK LAW GROUP, PLLC
    1250 Connecticut Ave. NW, Suite 200
    Washington, DC  20036
    dmclark@benefitcounsel.com


ON BEHALF OF THE AGENCY:

    Nicholas Miller, Esq.
    Danielle Kalivoda, Esq.
    DEPARTMENT OF VETERANS AFFAIRS
    REGIONAL COUNSEL
    575 N. Pennsylvania Ave,   Rm. 644
    Indianapolis, IN  46204
    Nicholas.Miller6@va.gov



ALSO PRESENT:  Richard Benson,
               Legal Assistant

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

250

I N D E X

WITNESS:                                    PAGE:

RACHEL GENTRY
    Examination by Ms. Clark...............257
    Examination by Mr. Miller.............302
    Examination by Ms. Clark..............324

ADAM KINDER
    Examination by Mr. Miller.............348
    Examination by Ms. Clark..............355
    Examination by Mr. Miller.............361

SONYA WILSON
    Examination by Mr. Miller.............365
    Examination by Ms. Clark..............410

ENA LIMA
    Examination by Mr. Miller.............453
    Examination by Ms. Clark..............479
    Examination by Mr. Miller.............518

JAMES DEAN
    Examination by Mr. Miller.............524
    Examination by Ms. Clark..............537
    Examination by Mr. Miller.............560

MICHAEL STEPHENS
    Examination by Mr. Miller.............567
    Examination by Ms. Clark..............577

TREVENIA BROWN (Rebuttal)
    Examination by Ms. Clark..............601

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

251

```
        I N D E X   O F   E X H I B I T S
```

ADMITTED

EXHIBIT NO.

30 -Guidance for Hardship Transfers.......325

31 -Guidance for Transfers Between
      Offices............................327

32 -Article 13 - Reassignment, Shift
      Changes, and Relocations.............333

33 -VA Form 0239 Leave Transfer
      Authorization........................373

34 -E-mail chain, 5-21-14 (Agency Exh. G).386

35 -Memorandum, 1-27-14 (Brown00006)......549

DEF000671

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

252

1          JUDGE CARETHERS:  We're continuing

2     the hearing of Trevenia Brown versus

3     Department of Veterans Affairs.  This is the

4     second day.  One thing before we begin taking

5     the testimony of Rachel Gentry.

6          Off the record, I readdressed the

7     issue regarding particularly Dr. Patel,

8     Dr. Robert Huff.  I was informed by the

9     Complainant that Dr. Robert Huff was not

10    available today.  I was advised, as I was

11    yesterday from the Complainant, that

12    Dr. Patel is available the 27th, although not

13    available today.

14          I previously made a ruling, and I'm

15    just reiterating the ruling, that I was not

16    going to accept the affidavit from Dr. Patel.

17    And also, I had previously made the ruling

18    that if he was available to testify yesterday

19    or today, I was going to accept his testimony

20    via telephone if that was going to work for

21    the parties.  Essentially, he's not available

22    via telephone either.

23          The Complainant has based an

24    objection to essentially the affidavits not

25    being admitted, as well as not leaving the

**DEF000672**

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

253

1    record open for taking the testimony at a

2    later date.  As I noted yesterday, I believed

3    that this hearing date, the 20th and 21st,

4    were known at least four months ago during

5    the scheduling order.  The only thing that

6    was not known was whether the location of the

7    hearing was going to be at the Indianapolis

8    District Office or if it was going to be

9    provided by the VA.  It was essentially

10   verified previously that it was going to be

11   at the Indianapolis District Office, but

12   these dates were always known.

13        My understanding is, from the

14   Complainant, that because the location of the

15   hearing was uncertain for a period of time

16   that that hindered their ability to make the

17   two doctors available.  Essentially, I

18   rejected that explanation, and indicated that

19   I was going to take their testimony via

20   telephone, again.

21        If there's anything you'd like to add

22   to that objection, Complainant, you may do so

23   for purposes of the record.  I'm not sure if

24   we went into as much detail yesterday, but we

25   are going to look at it more in detail today

DEF000673

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

254

1   regarding that ruling.  Is there anything

2   you'd like to add, Complainant?

3           MS. CLARK:  No.  I mean, we've

4   already briefed the issue, we've briefed the

5   legal standard, and that's all.

6           JUDGE CARETHERS:  Okay.  And I

7   assume the Agency -- is there anything you'd

8   like to add regarding this issue?

9           MR. MILLER:  No, Your Honor.

10  Thank you.

11          JUDGE CARETHERS:  All right.

12  Thank you.  We're going to go to Miss Rachel

13  Gentry.  Hello.  Good day.  How are you?

14          MS. GENTRY:  I've been better,

15  but -- sorry.  I had a tragedy in the family

16  over the weekend.

17          JUDGE CARETHERS:  Yeah, I heard

18  that you were at a funeral.  I'm sorry, and I

19  definitely thank you for appearing today.  My

20  name is Administrative Judge Trek Carethers.

21  I'm presiding over this matter.  Are you a

22  current federal employee?

23          MS. GENTRY:  Yes, I am.

24          JUDGE CARETHERS:  Your time here

25  will be considered official duty time, and

255

 1    there will be no reprisal from your testimony

 2    provided today.  Can we have this witness

 3    sworn.

 4            (The witness is sworn by the court

 5    reporter.)

 6            JUDGE CARETHERS:  Excellent.

 7    Before we begin taking some of your

 8    testimony, I have to give you some

 9    preliminary instructions I give to all the

10    witnesses.  The first one is that you must

11    maintain the volume of your voice so that

12    everyone can hear you, and particularly so

13    that the microphone can pick you up and I can

14    hear you.  Do you understand?

15            THE WITNESS:  Yes.  Can you hear

16    me now?  Or is that --

17            JUDGE CARETHERS:  Yes, I can hear

18    you fine.  The next thing is that we have a

19    court reporter that is taking everything

20    down.  As a consequence, two people cannot

21    speak at the same time.  So please allow the

22    questioner to finish their question before

23    you begin answering.  Do you understand?

24            THE WITNESS:  Yes, I do.

25            JUDGE CARETHERS:  All of your

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

256

1    responses must be verbally given.  You cannot

2    use body language to indicate your answer,

3    such as shaking your head up and down.  Do

4    you understand?

5             THE WITNESS:  Yes, I do.

6             JUDGE CARETHERS:  Great.  If you

7    don't understand a question, let us know, and

8    I will have the question rephrased if I find

9    it necessary.  Do you understand?

10             THE WITNESS:  Yes, I do.

11             JUDGE CARETHERS:  Only answer the

12    question that's addressed to you.  Do you

13    understand?

14             THE WITNESS:  Yes.

15             JUDGE CARETHERS:  If there's an

16    objection by one of the attorneys to a

17    question, do not answer the question.  I will

18    make a ruling on that objection, and then I

19    will let you know whether you should answer

20    the question.  Do you understand?

21             THE WITNESS:  Yes.

22             JUDGE CARETHERS:  And finally, I

23    may ask you some questions.  The mere fact

24    that I'm asking you questions should not

25    indicate to you that you're testifying poorly

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

257

1      or well.  Do you understand?

2                  THE WITNESS:  Yes.

3                  JUDGE CARETHERS:  Great.  Could

4      you please state and spell your name for the

5      record.

6                  THE WITNESS:  Rachel Gentry.

7      R-A-C-H-E-L, G-E-N-T-R-Y.

8                  JUDGE CARETHERS:  This is the

9      Complainant's witness, so Ms. Clark, you may

10     begin.

11                 RACHEL GENTRY,

12     having been first duly sworn to tell the

13     truth, the whole truth, and nothing but the

14     truth relating to said matter, is examined

15     and testifies as follows:

16     EXAMINATION,

17         QUESTIONS BY MS. CLARK:

18  Q.  Good morning, Ms. Gentry, and thank you for

19     being here in light of the circumstances.

20     Can you please tell me -- you're currently an

21     employee of the VA, correct?

22  A.  Yes.

23  Q.  And can you tell me what your position is?

24  A.  Right now I'm Rating Veteran Service

25     Representative, RVSR.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

258

1   Q.   RVSR?

2   A.   Uh-huh.

3   Q.   And are you also a member of the local union

4        that represents employees at the VA?

5   A.   Yes, I am a member of the local union.  I was

6        previously a steward.  I was also the

7        vice-president of local.  Unfortunately, I

8        just resigned fairly recently due to family

9        issues and health concerns.  So right now I'm

10       only just a member at this point.

11  Q.   And were you a steward in 2013/2014?

12  A.   Yes.

13  Q.   And that's AFGE Local?

14  A.   Yes.

15  Q.   609?

16  A.   Yes, 609.

17  Q.   All right.  And the bargaining unit would

18       cover Miss Brown, is that correct?

19  A.   Yes.

20  Q.   At any point in time were you an officer for

21       the Local?

22  A.   Yes.

23  Q.   Can you tell me what position that was?

24  A.   It was vice-president.

25  Q.   And were you vice-president at the time that

DEF000678

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

259

1        you met with Ms. Brown regarding her issues?

2    A.  I'm having trouble remembering the dates now.

3        Honestly, just because of the stress of the

4        weekend, but I don't believe I --

5    Q.  Let me rephrase it.  Let me rephrase it and

6        see if that will help you.  January, 2014,

7        were you vice-president?

8    A.  I'm sorry, it's just been a really rough few

9        days.  I don't know.  Because we had so many

10       issues -- we had some issues with our

11       nomination process during the elections, so

12       it was postponed for a really long time.  And

13       I honestly -- I don't believe that I was an

14       officer at that time.

15   Q.  That's fine.  But you do believe you were the

16       steward in 2014?

17   A.  Yes, I was at least definitely a steward.

18   Q.  Okay.  Can you tell me if you're familiar

19       with the VA's reasonable accommodations

20       procedures?

21   A.  I am.

22   Q.  If you could, I believe that the record is in

23       front of you.  If you could go to

24       document 320.  At the bottom of each page,

25       there's a number.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

260

1           Now, as a union steward, were you

2      trained about what a reasonable accommodation

3      request was?

4   A.  I never received the official training from

5      AFGE, but I had been -- I had researched the

6      matter.  I had pulled all the local policies,

7      circulars, all the different laws regarding

8      it, and researched it prior to Trevenia's

9      case.  So I had worked on several reasonable

10     accommodation requests prior to.

11  Q.  Prior to Ms. Brown's?

12  A.  Uh-huh.

13  Q.  And what is your understanding about the

14     ability to seek a transfer as a reasonable

15     accommodation?

16  A.  Well, I know that transfers, and what people

17     often refer to as hardship transfers as well,

18     seem to be kind of a gray area in VA policy.

19     I know that it didn't really spell out the

20     transfer, but as far as reasonable

21     accommodations, as long as it was something

22     that would aid in accommodating that employee

23     in their particular disability, you know, we

24     kind of went that route.

25           Because with Trevenia, you know,

DEF000680

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

261

1      she's trying to maintain her employment with

2      the Department of Veterans Affairs, and

3      accommodate for her disability, and make sure

4      that she's of good health.  So I had actually

5      conferred with another one of our active

6      stewards, Christina Clark, and also with the

7      President, Terry James, and Executive

8      Vice-President, Mary Jean Burke.  And it was

9      thought that that was the best process to

10     kind of follow to try to help Trevenia in her

11     condition, and try to help her to work

12     successfully within the Agency.

13            Because hardship transfers, as far as

14     a transfer in itself, is such a gray area.

15     And due to the fact that she wasn't just

16     trying to transfer because she wanted to be

17     in a different location, just because she

18     wanted sunshine or anything like that, it was

19     because of her health.  It was because of her

20     disability.  So we felt that it was an

21     applicable procedure to follow.

22  Q.  Okay.  And in your research and in your

23     consultation, you say it's a gray area.  Is

24     it a gray area because the policy does not

25     explicitly exclude it?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

262

1   A.   It does not exclude it, nor does it

2        specifically seem to address it.

3   Q.   You've testified that you assisted Ms. Brown

4        in helping her get care for her disability.

5        Can you tell me how that process started?

6   A.   As far as help for the reasonable

7        accommodation?

8   Q.   Well, at what point did you -- did you assist

9        her with her first hardship transfer?

10  A.   With her first hardship transfer.  I'm trying

11       to remember the point at which I had stepped

12       in.  Because she requested assistance, and we

13       kind of sought her out as well, I believe,

14       because we knew that she was having issues

15       with management.  A lot of people in our

16       office have had issues with leadership as far

17       as addressing it, especially when it comes to

18       any type of requests regarding a disability

19       or reasonable accommodation.  It's been a

20       history with our --

21              MR. MILLER:  Your Honor, I object

22       to this as far as relevance to this case.

23              JUDGE CARETHERS:  Any offer of

24       proof from the Complainant?

25              MS. CLARK:  I will rephrase the

DEF000682

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

263

1    question so that she understands what I'm

2    asking her.

3              JUDGE CARETHERS:  Okay.  You may

4    do so.

5    BY MS. CLARK:

6    Q.  On January 17, 2014, Ms. Brown submitted a

7        hardship transfer request.  Did she contact

8        you regarding that hardship transfer request?

9    A.  Yes.

10   Q.  She did, okay.  And did you speak to her

11       about what she needed to complete in order to

12       submit the request?

13   A.  Yes.

14   Q.  Can you tell me what that was?

15   A.  Well, being that I had not been officially

16       trained, I did my best to provide Ms. Brown

17       with every resource that I had, every

18       resource that I could possibly think of in

19       order to get additional knowledge on the

20       matter, so that we could try to best

21       accommodate her and help her get what she was

22       asking from management.

23              We also -- I cannot think of the name

24       of the form offhand right now, but the forms

25       that were necessary to apply for reasonable

264

1    accommodation, I think it's the 0857, but

2    there's a specific form that you fill out.

3    And I have it all referenced on my computer.

4    I don't recall the exact names at this time.

5    But there is the initial written application

6    that, you know, for reasonable accomodation

7    that asks for your transfer.

8         I think there was a memo.  And again,

9    I apologize, because I've not had a lot of

10   sleep the last few days, so I wish I was in a

11   better state.  But I know that we had a

12   memorandum at one point, and there was the

13   0857.  And I know that she had submitted

14   medical documentation.  So was that answering

15   your question?

16  Q.  And so you actually saw those documents

17      before they were submitted?

18  A.  I believe I've seen the memorandum.  I've

19      seen medical documentation.  I'm trying to

20      recall -- I believe I've seen the form.  But

21      also, when I read the Americans With

22      Disabilities Act and legal requirements for

23      filing for reasonable accomodation, it did

24      state that anything in writing would be

25      sufficient to initiate the process.  And at

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

265

```
1        that point it was, you know, that HR would
2        kind of help and jump in, and you had that
3        legal obligation to assist at that point, is
4        the way I understood it.
5             So I did see the majority of the
6        paperwork, and I believe we had files in the
7        union office.  But like I said, I just
8        recently resigned from that position, so I
9        resigned and provided them with the keys
10       and --
11  Q.   I appreciate your answer.  Speaking of HR,
12       who in HR would have been the contact for
13       this request?
14  A.   Unfortunately, at that particular time, it
15       was uncertain because we didn't have a
16       particular point of contact that was named as
17       the EEOC -- or I'm sorry, as the reasonable
18       accomodation person.  I can't think of what
19       the official term is.  But it seemed as
20       though, and in my processes with others at
21       the same time, they would just kind of bounce
22       it back and forth from different individuals.
23            At one point it was Julie Barrett.
24       At one point Laurie Kirk was taking
25       information.  At one point it was Sonya.  And
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

266

1   there were other times that it wasn't even an

2   HR personnel, it might have been a management

3   official.  So it wasn't anything that was --

4   you know, it was, excuse me, a crap shoot.

5   You just didn't know.

6   Q.  Had the union raised any issues with

7   management about the lack of a reasonable

8   accommodations person?

9   A.  Yes.

10  Q.  You have?

11  A.  It was not me.  It was Terry James or M.J.

12  Burke that took that issue up.

13  Q.  And when was that, if you remember when that

14  concern was addressed?

15          MR. MILLER:  Again, Your Honor, I

16  object to this.  This is outside the scope of

17  this hearing.

18          MS. CLARK:  My offer of proof is

19  one of the claims in this matter is -- there

20  are two different claims.  One is

21  retaliation, and the other is harassment.

22          MR. MILLER:  There is no

23  retaliation.

24          MS. CLARK:  There is retaliation.

25          JUDGE CARETHERS:  There's no

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

267

1          retaliation in this case.  So what was your

2          first offer of proof?

3                    MS. CLARK:  Harassment is one of

4          the claims in this case.  And so

5          understanding whether or not there's a point

6          person, whether there's an organized system

7          consistent with these rules, I think goes

8          towards the proof of how difficult the

9          situation was, and whether Ms. Brown was

10         suffering from any harassment during this

11         period.

12                   JUDGE CARETHERS:  So you're saying

13         whether or not there was a point of contact

14         person makes it more or less likely that she

15         suffered harassment?  Is that essentially

16         what you're arguing?

17                   MS. CLARK:  Whether or not the

18         policies were being followed, yes.  The point

19         of contact person --

20                   JUDGE CARETHERS:  I'll allow

21         you -- I'll give you some leeway to establish

22         whether there was a point of contact person

23         at this point in time.  The objection is

24         overruled.  You may answer the question.

25                   THE WITNESS:  Could you repeat it

DEF000687

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

268

1     again?

2     BY MS. CLARK:

3  Q.  I'd asked about whether or not the union had

4     raised this issue of a lack of a contact

5     person as a reasonable accommodations point

6     person, and you were testifying about the

7     union.

8  A.  Yes.  It was not me personally, but it was

9     either Terry James, the President, or Mary

10    Jean Burke, the Executive Vice-President who

11    took the matter up with them.  Because

12    shortly thereafter, they did establish a

13    person as the contact.

14 Q.  And who did they establish as the contact?

15 A.  For a short time, it was Sonya Wilson.  And

16    then they had hired an additional Human

17    Resources personnel, John Atkinson.  And

18    later John Atkinson was the person that was

19    overseeing the reasonable accommodations.

20 Q.  And do you know what year that would have

21    been?

22 A.  '14, '15.

23 Q.  And was Miss Wilson the contact person in

24    2014?

25 A.  She was.

DEF000688

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

269

1    Q.   At any time do you recall whether Ms. Ena
2         Lima was the contact person?
3    A.   She had been previously, yes.
4    Q.   And what period of time was that?
5    A.   I'm trying to think, because I remember at
6         one point when they had implemented mandatory
7         overtime, they required that if anyone wanted
8         to be exempt from overtime they had to issue
9         a request for reasonable accommodations.  And
10        at that point, Ena Lima was overseeing the
11        requests.  And I'm trying to remember the
12        date of which that was implemented.  It would
13        have been 2013.
14   Q.   Was Ms. Lima a member of the HR department?
15   A.   No.
16   Q.   Okay.  So she was simply a management person?
17   A.   Yes.
18   Q.   Are you aware of whether she had any HR
19        training?
20   A.   No, not aware.
21   Q.   Do you recall speaking to Ms. Lima about
22        Ms. Brown's transfer request?
23   A.   Yes.
24   Q.   And I'll direct your attention to ROI 00253.
25   A.   (Witness complies.)

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

270

1   Q.   Could you review that.  Does that refresh

2        your recollection about what your

3        conversations were with Ms. Lima?

4   A.   Yes.  This meeting was with Jim Dean, though.

5   Q.   What's the date of that meeting?

6   A.   The 2/27/14?

7   Q.   Yes.  So this was a meeting that you

8        attended?

9   A.   Yes.

10  Q.   And who was in the room?

11  A.   Jim Dean, Sonya Wilson, myself, and Trevenia.

12  Q.   Okay.  So at that time you had not -- by

13       February 27th, you had not spoken with

14       Ms. Lima?  Or had you spoken with her before

15       that meeting?

16  A.   And I apologize, again, just the dates.  I do

17       know that at one point I did speak with

18       Ms. Lima.  I don't recall offhand if it was

19       prior to or after the meeting with Jim Dean.

20       But I do recall the meeting with Jim Dean.

21  Q.   Okay.  Did you speak with Ms. Lima after the

22       hardship request was denied?

23  A.   Yes.  I believe I did.

24  Q.   Do you recall what you spoke to her about

25       regarding the denial of the hardship

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

271

1    transfer?

2  A.  I just remember that Ms. Lima made comments

3     along the lines of she can't just get

4     whatever she wants, that type of comment,

5     because she just thinks that, you know, she

6     can cry about something and get what she

7     wants.

8  Q.  And did you explain to her what the

9     disability was?

10  A.  Well, I just know that Trevenia had

11     sufficient medical documentation to, you

12     know, cover the disability.  Because I

13     remember the diagnosis and things.  And in

14     all honesty, you know, I'm not a medical

15     personnel.  I have no full understanding of

16     Trevenia's condition either.  But if the

17     doctor and medical evidence says that, you

18     know, she needs such and such therapy, such

19     and such accommodations, that that would be

20     sufficient evidence to warrant it.

21  Q.  Did you think Ms. Lima had taken seriously

22     the diagnosis and the medical records --

23          MR. MILLER:  Objection, Your

24     Honor.  She has no idea how Ms. Lima felt at

25     that time --

DEF000691

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

272

1          MS. CLARK:  I didn't say she --

2     Your Honor, this is about her impressions

3     during a meeting with Ms. Lima.  I'm not

4     asking about whether she understands

5     Ms. Lima's emotions.  I'm asking whether or

6     not, in her opinion, if she thought she was

7     taking it seriously.

8          JUDGE CARETHERS:  Okay.  I'm going

9     to sustain the objection.  You may ask your

10    question the way you just asked in terms of

11    what her opinion was.

12    BY MS. CLARK:

13  Q.  In your opinion, do you think that Ms. Lima

14    was taking the documentation received

15    seriously?

16  A.  I would definitely say no.

17  Q.  In your opinion, do you believe that Ms. Lima

18    was taking seriously the reasonable

19    accommodations request that was being made?

20  A.  Not at all.

21  Q.  In your opinion, do you believe that Ms. Lima

22    understood what the ADA requires an employer

23    to do when a reasonable accommodation is

24    requested?

25  A.  No.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

273

1          MR. MILLER:  Your Honor, I

2     object -- well...

3          THE WITNESS:  I'm not at all.

4     BY MS. CLARK:

5  Q.  All right.  Now, I'm going to go back to the

6     meeting in February that we were talking

7     about here.  Was this a meeting that took

8     place on February 27, 2014?

9  A.  (Witness nods head.)

10 Q.  Okay.  What do you recall about that meeting?

11 A.  I recall that Jim Dean -- he didn't really

12    seem to understand the process of requesting

13    reasonable accommodation either.  Sonya

14    Wilson essentially had to kind of take over

15    the meeting and in trying to explain what was

16    needed.

17         They really weren't very receptive to

18    Trevenia's discussion of anything, really.

19    And it seemed like a flat out -- it already

20    seemed like she was denied before anything

21    really ever was submitted, almost.  And as I

22    said before, Jim Dean just did not seem

23    familiar with the process.  He seemed very

24    uncomfortable in the meeting.

25         Sonya, at one point, you could say,

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

274

1        was somewhat hostile toward Trevenia, and

2        frustrated in the fact that what she was

3        saying, you know, wasn't just accepted by

4        Trevenia.  Because Trevenia was unsure of

5        what she needed to do.  Because she wanted to

6        submit whatever was necessary.  She wanted to

7        follow the process.  And nobody was giving

8        her clear direction.  Nobody was explaining

9        that, hey, maybe we can't go this route, but

10       maybe you should try a different route.  It

11       was just a cut and dry -- you know, it almost

12       seemed that they just wanted her to accept

13       the fact that they weren't going to be

14       reasonable, or that they weren't going to

15       accommodate her at that point.

16            And she didn't ask for an interim

17       accommodation at that point, because they

18       really didn't explain -- they didn't seem

19       like she had any other choice, in all

20       honesty.  And I believe at that point, she

21       was even trying to be excluded from the

22       overtime.  I don't know if that's an issue

23       that you want to address or not.

24  Q.   I'll come back to that.  Just sticking with

25       this meeting, did Jim Dean raise any issue

**DEF000694**

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

275

1      about Ms. Brown's production?

2   A.  He did.

3   Q.  What exactly did he say?

4   A.  That she wasn't there, that she wasn't

5      meeting her production.

6   Q.  Did you understand that Ms. Brown was on FMLA

7      at that time?

8   A.  Yes.

9   Q.  Did you understand that production was a

10     factor that goes into whether or not a

11     hardship transfer would be provided?

12  A.  Could you repeat the question?

13  Q.  Yeah, I'll repeat the question.  Do you

14     understand whether or not production is a

15     factor that should be taken into account

16     regarding a hardship transfer?

17  A.  Well, as far as reasonable accommodations, as

18     I understood it, production was not a factor

19     in whether or not you would be accommodating

20     to the individual.  Because the whole idea

21     behind the accommodation is to help that

22     individual be able to work successfully, and

23     in our office meaning making your production.

24  Q.  Do you remember at any point in time whether

25     Ms. Wilson or Mr. Dean, whether they were

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

276

1    specific about what additional medical

2    information they were looking for?

3  A. They really didn't spell it out for her, no.

4    They just kept saying that she needed the

5    additional medical documentation.  They

6    didn't state that -- you know, because

7    Trevenia had medical documentation on file

8    from her FMLA request.  And they didn't

9    explain to her that maybe that wasn't

10   sufficient for a reasonable accommodation

11   request.

12        So Trevenia, you know, here she

13   submitted medical information, a lot of

14   medical information that's very sensitive,

15   and they're telling her that they need more,

16   they just need more.  They didn't really

17   clearly explain what it needed to say, or why

18   the other evidence was not sufficient for

19   that program.  So it just -- they provided

20   her no assistance in that matter.

21  Q. Did they indicate whether or not it would be

22   helpful for them to speak directly to her

23   medical providers?

24  A. I don't recall that.  I know that at one

25   point it seemed as though Sonya just

**DEF000696**

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

277

1      wasn't -- I'll tell you, the way she was

2      talking, it was almost like she didn't have a

3      real problem.  It was almost, you know, like

4      because we don't know what's wrong with

5      you -- you know, even though she's had this

6      medical information on file, the way Sonya

7      was talking to her, and forgive me I can't

8      remember exactly what was said, but it was as

9      though --

10             MR. MILLER:  Your Honor, I would

11     object to this testimony.  If she can't

12     remember exactly what was said, I mean, how

13     could she have this impression?

14             MS. CLARK:  She can have an

15     impression by being in the room, Your Honor.

16     I think that the testimony is reasonable in

17     light of the question that was asked, and I

18     don't --

19             MR. MILLER:  She's saying she

20     doesn't recall --

21             MS. CLARK:  She doesn't recall the

22     specifics of what was said.  She has an

23     impression about Ms. Wilson's behavior during

24     the meeting.

25             JUDGE CARETHERS:  I will sustain

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

278

1   the objection.  She can have an impression

2   regardless if she remembers the details of

3   exactly what was said.  You may continue your

4   answer.

5  A.  Because at that point is kind of when the

6   hostility in the room kind of picked up,

7   because Trevenia felt as though she was being

8   badgered.  And she was.  I mean, she was

9   being treated in a very dehumanizing manner

10   in the fact that she, Sonya, had continued to

11   question her, and stating that she doesn't

12   understand why Trevenia would need an

13   accommodation, essentially.

14  Q.  Did Ms. Brown try to explain to Ms. Wilson

15   the particulars about her condition during

16   this meeting?

17  A.  Ms. Brown said she's in a lot of pain.  She

18   said she's in a lot of pain, I hurt all the

19   time.  And I mean, at this point Ms. Brown

20   was getting emotional.  And I believe

21   understandably so.  And when Ms. Brown got

22   emotional, it seemed that it set off

23   Ms. Wilson.  And eventually -- I mean, we had

24   to stay in the room after the meeting, just

25   to kind of, you know, get everybody calmed

DEF000698

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

279

```
 1        down.  But I mean, Trevenia was emotional

 2        because Sonya was essentially badgering her.

 3        Like I said, I don't remember what was said,

 4        but I remember the questioning and the

 5        interrogation.

 6    Q.  Is there anything else about the meeting that

 7        you have an impression of, that you haven't

 8        already testified to?

 9    A.  Well, I don't know -- you know, it just

10        seemed as though Jim Dean was following an

11        order of how to proceed, and wasn't really

12        trained in what he -- you know, what to do in

13        such circumstances.  So he was just following

14        an order.

15    Q.  Thank you for that.  Ms. Gentry, do you

16        recall Ms. Brown receiving a warning of

17        unacceptable performance?

18    A.  Yes, I do.

19    Q.  Okay.  And what can you tell me about that?

20    A.  It seemed very unjustified, given the

21        circumstances that she had been on FMLA.  If

22        you're on a production environment, they say,

23        it's in the master agreement, FMLA is not to

24        be used against you.  But given the way that

25        the cumulative production was averaged,
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

280

1      essentially, production is hurt very much so

2      by any use of FMLA over extended periods or

3      intermittently.

4  Q.  So production is averaged to include even the

5      days that one takes off for their

6      intermittent leave?

7  A.  Well, in a sense, because -- it's hard to

8      just pick up where you left off in our

9      environment.  It's hard to just miss a day

10     and then come back and jump right in to

11     making your three points or however many

12     points you need to do.  And if you miss some

13     time -- say if you work for four hours and

14     you miss four hours.  Perhaps you make some

15     credit in that first four hours, but if you

16     miss the last four hours, it still averages

17     your daily number as a full eight hours.  It

18     doesn't take into consideration maybe you

19     were absent half of that day or, you know,

20     three hours of that day, or whatever it may

21     be.

22          So that daily average really doesn't

23     accommodate for such intermittent FMLA usage,

24     or also extended period of time of FMLA

25     usage, because then if you've missed

DEF000700

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

281

1       three weeks, you have one week to make up

2       your production elements for that month.  And

3       if you're just getting in the office, it's

4       hard to jump back into analytical work that

5       do.  It's just hard to pick up and make your

6       production from that point.

7    Q. Do you know if there were other union members

8       who were on FMLA who suffered the same

9       circumstance?

10   A. Let me see.  I was on FMLA, and I was put on

11      a PIP.

12   Q. You were placed on a PIP?

13   A. Yeah.

14   Q. During your FMLA period?

15   A. Oh, yeah.

16   Q. And was that because the production had

17      dropped?

18   A. Uh-huh.

19   Q. And how long did it take you to get your

20      production back to where it was supposed to

21      be.

22   A. Well, I went on maternity leave, and I came

23      back, and I think because --

24              MR. MILLER:  Your Honor, I'm going

25      to object to this.  We're not talking

282

1  about -- this is completely out of the scope

2  of this particular case.  What's happened to

3  Ms. Gentry is not relevant at all.

4          MS. CLARK:  Your Honor, I think

5  it's relevant to the FMLA issue that's being

6  raised by the Agency as a failure of

7  production on behalf of Ms. Brown.  My

8  question was whether any other union member

9  had suffered this situation where their

10  production drops because of the way the FMLA

11  hours are averaged overall.

12         She has indicated she personally --

13  she is a union member -- she personally

14  suffered this.  And I'm asking her to explain

15  how she went from a PIP, to getting her hours

16  back up.  And my follow-up question to that

17  will be, how long it took her to do that.  I

18  think it's relevant in order to understand

19  what Ms. Brown was facing, if in fact this

20  production issue was an issue that was being

21  held against her.

22         JUDGE CARETHERS:  Well, I think

23  that the only way this is going to be

24  relevant, is if somehow you're going to a

25  point of showing that production was somehow

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

283

1    linked -- the use of production was somehow

2    linked to someone using the FMLA leave, if

3    there's an adverse relationship between using

4    FMLA leave and your production numbers going

5    down.

6          So in terms of how many people who

7    may have suffered this fate, that's not

8    really the issue.  The issue is whether

9    production and the fact she's being -- the

10   person is being hindered or somehow being

11   disciplined for their numbers going down

12   because they're using FMLA.  Not the number

13   of people.  That's the point that you should

14   be going after --

15         MS. CLARK:  And that's the point I

16   am going after, Your Honor.  And she's

17   talking exactly about that very point.  She's

18   talking about the fact she was placed on a

19   PIP during the time that she was on FMLA,

20   and she is explaining that circumstance.

21         JUDGE CARETHERS:  Okay.  I

22   understand.  Okay, I'm going to sustain the

23   objection.  But what I'm instructing you to

24   do -- or you can ask whatever questions you

25   want as long as they're relevant.  I'm

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

284

1    telling you that what I think is relevant in

2    terms of this particular witness on this

3    particular topic, is if you're establishing

4    that somehow production numbers are somehow

5    related to or adversely affected by the use

6    of FMLA or some kind of leave.  Because

7    that's the issue that they used to deny -- or

8    at least partially deny her hardship request.

9    The number of people is not relevant.  The

10   fact that she was placed on a PIP is not

11   relevant.  It's only relevant if, in fact,

12   production is tied to FMLA use.  So that's

13   what I'm ruling.

14         So you can explore that area if you'd

15   like.  But I'll sustain the objection in

16   terms of where you were going at this

17   particular point in time.  You may ask your

18   next question.

19   BY MS. CLARK:

20   Q.  Ms. Gentry, you had indicated that you had

21       been on FMLA at one point?

22   A.  Yes.

23   Q.  Did your FMLA leave affect your production?

24   A.  Very much.

25   Q.  Can you tell me how it affected your

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

285

1    production?

2    A.   I was assigned to the Spec Ops team, which

3         handles complex issue cases, which generally

4         it takes you longer to make your points.

5         When I was on FMLA, it was due to

6         complications with pregnancy.  My medical

7         provider wanted me to work part-time.  They

8         wouldn't give me the option to work

9         part-time, only if I took the time as FMLA,

10        to go to physical therapy, because I had

11        severe sciatica.

12             So I would come to the office only

13        half a day.  I went to physical therapy in

14        the morning, and I would only be in the

15        office about four hours.  In that four hours,

16        it was nearly impossible for me to make the

17        production necessary to average out for that

18        one day.  And as I said before, due to the

19        complexity of the work, at times I would have

20        to start a case one day, and finish it on the

21        next.  Therefore, I would only be able to

22        take credit on the next day and not the first

23        day.

24             So in the system, it would appear as

25        though that day before would be a zero.  It

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

286

```
 1        would appear as though I had done no work

 2        whatsoever.  And in that way, when that daily

 3        average comes up for the month, that's how it

 4        negatively impacts your production criteria.

 5        I was placed on -- I guess that's not

 6        relevant.  But it did definitely and

 7        detrimentally impact my production average

 8        very far.  And I have records of it.  It

 9        devastated my production.

10   Q.   Were you disciplined because your production

11        dropped during this time period that you were

12        on FMLA?

13   A.   Well, as far as discipline goes -- I know

14        they say that the Performance Improvement

15        Plan is not in the form of discipline.  But I

16        was placed -- I was given a warning of

17        unacceptable performance, and I was placed on

18        a Performance Improvement Plan.  Which I was

19        not successful on.

20             But they actually allowed me a

21        different circumstance because of returning

22        from maternity leave.  And they gave me a

23        60-day period to revamp my skills, and then

24        they placed me back on a PIP, which was not

25        necessarily how they did things.  And they
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

287

```
 1        restarted my PIP and ran it for an additional
 2        60 days.  Because when I was on maternity
 3        leave, I cried because I thought I didn't
 4        have a job to go back to.
 5   Q.   Thank you.  You mentioned earlier that the
 6        union contract says that FMLA is not to be
 7        used against an employee?
 8   A.   Correct.
 9   Q.   Have there been any union grievances about
10        the way production is measured while an
11        individual is on FMLA?
12             MR. MILLER:  Your Honor, again,
13        I'm not sure how this is relevant.
14             MS. CLARK:  Again, the Agency is
15        holding -- has held and reprimanded Ms. Brown
16        because her production went down during her
17        FMLA period.
18             MR. MILLER:  That's not correct.
19        She wasn't reprimanded for production.  She
20        was reprimanded for not signing up for
21        overtime.
22             MS. CLARK:  Okay.  What was being
23        held against her was her production as it
24        relates to the hardship transfer.  Here, the
25        question is whether or not this is an
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

288

1    across-the-board way that FMLA is being

2    applied, and whether Ms. Brown is being

3    caught in a system where the measurement of

4    FMLA, as it relates to production, is unfair,

5    because the days that you may be working

6    won't be credited because you don't finish

7    the job you start on day one until day two.

8    So it's not an accurate measurement of work.

9    And my question is just whether or not the

10   union has grieved this issue.

11            JUDGE CARETHERS:  Okay.  I will

12   permit the question.  However, I will say

13   that the materiality of it is really small.

14   The root issue is not how many grievances

15   there were regarding this issue.  It's

16   whether, in fact, production, in fact, is

17   being tied to FMLA as a negative impact,

18   particularly as it relates to disability,

19   etc.  But I will allow the question.  You may

20   answer the question.

21  A.  Ms. Mary Jean Burke, the local Executive

22   Vice-President, is a member of the National

23   VA Council for AFGE.  And she took the issue

24   to the President, Alma Lee, because of the

25   alarming rate of people that were suffering.

DEF000708

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

289

1      And the issue was not brought up as a

2      grievance, I don't believe, but they ended up

3      pulling the standard.  After Trevenia had

4      suffered everything, they pulled the standard

5      temporarily, and essentially replaced it with

6      an old one at some point.  And they are

7      still, to this day, trying to create a new

8      performance measure that has not been

9      released.  That does not take into -- that is

10     more performance based, that doesn't penalize

11     you, and it's not point based, necessarily.

12     So it's an issue that's essentially still up

13     in the air.

14  Q.  So there was an agreement -- let me make sure

15     I understand your testimony.  There was an

16     agreement between union and management to

17     reevaluate the standard --

18  A.  Right, on a national level.

19  Q.  -- on a national level, of production, for

20     individuals who were on FMLA?

21  A.  Right.

22  Q.  And this occurred after Ms. Brown's FMLA

23     situation?

24  A.  Yes.  And it is due to the fact that we are

25     lucky in the fact that our local Executive

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

290

1     Vice-President is a member that is able to

2     address these issues on the national level.

3  Q.  So Ms. Brown's measurement of production

4     while on FMLA was being held against her.

5     But if she had been measured after the

6     standard had been pulled, it would have been

7     a different standard that would have been

8     applied to her?

9  A.  Most likely.

10  Q.  Do you know what that standard is?

11  A.  As far as the actual points, I don't recall

12     offhand.  The documents are in my computer,

13     or are accessible through the union office as

14     far as the different standards that were in

15     place at that time.  Before and after.

16          MS. CLARK:  Your Honor, I'd like

17     to ask that the Complainant be permitted to

18     seek the standards that were being applied

19     while Ms. Brown was under review, or at the

20     time that Ms. Brown had made her hardship

21     request, and what the new standard is that

22     Ms. Gentry has testified to that's being

23     used, so that we understand how performance

24     was being measured.

25          JUDGE CARETHERS:  Hold on, let me

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

291

1    pause the timer.  Before I get a statement

2    from the Agency, I think that maybe this

3    particular issue has to be briefed.  Because

4    what I'm concerned about is if in fact there

5    was a problem and this a corrective action --

6    because typically, corrective actions are

7    admissible to show liability.  You want

8    people to correct the problem.  So I'm not

9    sure whether it would be admissible anyway if

10   it is, in fact, a corrective action.  So, I

11   mean, I guess what I would say is, if we are

12   going to explore getting the two standards,

13   at least I would want a brief to say that

14   that would even be admissible.  Because if

15   it's, in fact, a corrective action, typically

16   corrective actions are admissible to show

17   liability, because you want to encourage

18   companies to do the right thing, to correct

19   the problem.

20        So we can address that at the closing

21   of the hearing, but before we get that

22   information, I would need a brief saying

23   that's even admissible.  I will rely on you

24   when we close this hearing to re- bring up

25   that issue so we can address that.  Okay?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

292

1      Ms. Clark?

2                  MS. CLARK:  Yes, Your Honor.

3                  JUDGE CARETHERS:   You may

4      continue.

5                  MS. CLARK:  Thank you.

6      BY MS. CLARK:

7   Q.  Before we leave --

8                  JUDGE CARETHERS:  Just to let you

9      know, you still have 20 minutes left,

10     Ms. Clark.

11                 MS. CLARK:  All right.

12     BY MS. CLARK:

13  Q.  So Ms. Gentry, do you recall Ms. Brown

14     receiving a warning of unacceptable

15     performance?

16  A.  Yes.

17  Q.  How did Ms. Brown respond?

18  A.  She didn't understand how she could be given

19     such a warning.  I mean, she didn't think it

20     was fair.

21  Q.  Do you have any reason to believe that it was

22     retaliatory?

23                 MR. MILLER:  Objection.  How would

24     she know whether or not it was retaliatory,

25     Your Honor?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

293

```
 1              MS. CLARK:  It's an opinion.  I'm
 2       asking.  I'm not asking --
 3              JUDGE CARETHERS:  Okay, I'm going
 4       to sustain the objection because retaliation
 5       isn't even an issue in this case.  So next
 6       question.
 7       BY MS. CLARK:
 8   Q.  Do you know if Mr. Dean issued this warning?
 9   A.  Mr. Dean did.
10   Q.  Did you speak to him at all?
11   A.  Yes.
12   Q.  And did he indicate why he issued the
13       warning?
14   A.  Again, it seemed as though he was just doing
15       what he had to do.
16   Q.  Did he seem at all familiar with Ms. Brown's
17       production?
18   A.  No.  He --
19   Q.  I don't mean to cut you off.
20   A.  No, he just did not seem aware of the actual
21       numbers.  Again, it just seemed as though he
22       was following an order from above.
23   Q.  Do you recall Ms. Brown receiving a proposed
24       reprimand?
25   A.  Yes.
```

DEF000713

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

294

1  Q.  And do you know the reason for the proposed

2      reprimand?

3  A.  That was the reprimand that had to do with

4      her not working overtime, I believe.

5  Q.  Do you know what the process is for the

6      mandatory overtime?

7  A.  At that point, it was unclear.  Because they

8      hadn't really issued -- when we had overtime

9      in the past, there were different methods of

10     how to request to be exempt from overtime.

11     And we had overtime implemented on several

12     different occasions.  Each occasion, there

13     was a different method to which you had to

14     follow to request such an exemption.  So it

15     was not spelled out in a clear policy at that

16     point.

17 Q.  Are you familiar with any procedures that

18     were supposed to be followed for providing

19     the days that you would work mandatory

20     overtime?

21 A.  They would say that you just need to let your

22     coach know.  They would tell you to talk to

23     your coach.  E-mail your coach if you can't

24     work, and just to talk to your coach.

25 Q.  And if you wanted an exemption from the

DEF000714

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

295

1    overtime, were you also just supposed to

2    e-mail your coach?

3  A.  Well, and that had been the past practice,

4    essentially, that you would provide a

5    statement of some sort.  And depending on

6    whether it be disability related or just

7    personal issues, you know, you just had to

8    give a statement and they would consider it.

9    And then they continued -- down the road they

10    essentially -- or they said that you needed

11    to provide medical documentation.  And then

12    later on they wanted you to treat it as a

13    reasonable accommodation, and wanted you to

14    go through the full process of requesting a

15    reasonable accommodation.

16        So it wasn't very clear what you

17    needed to do.  Trevenia had contacted

18    Mr. Dean, and she had told management that

19    she was not able to work.  She said it was

20    due to her condition.  Nobody said that you

21    have to go through a different route.  Nobody

22    explained to her that the medical

23    documentation, again, from her FMLA, may or

24    may not be sufficient to say that she

25    couldn't get out of her overtime.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

296

1      Because Trevenia had submitted

2    medical documentation, and she couldn't

3    understand, and we couldn't understand, why,

4    at that point, you know, they would not

5    accept such medical documentation.  Nor did

6    they explain any other course of action to

7    take.  Because she requested that time and

8    said it was due to her disability, you know,

9    she essentially did everything that they

10   stated she needed to do.  It was beyond her

11   knowledge to think that she would have to

12   provide any additional documentation since it

13   was never stated so.

14  Q.  Was there a time period within which an

15   individual had to respond to a request to

16   provide the overtime hours that you would

17   work?

18  A.  No, nobody said -- there's no standard

19   operating procedure, no policy that says you

20   have to give your days within such and such a

21   time.  And honestly, it varied month by

22   month, and it still does.

23  Q.  When you say it varies month by month, you

24   mean it varies as to when the overtime hours

25   are requested?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

297

1    A.   Right.  When you have to let them know what
2         you're going to work.  And even now we'll get
3         an e-mail saying if you're going to work this
4         weekend, let us know.  And there are a lot of
5         last minute opportunities as well.
6    Q.   Did you dispute the reprimand?
7    A.   We did.
8    Q.   Meaning the union?
9    A.   Uh-huh.
10   Q.   So it was grieved under the contract?
11   A.   I believe we did.  I'm sorry, I can't recall
12        at this time.  I'm thinking.  Yes, we did.
13        We did.
14   Q.   And do you recall the result of that
15        grievance?
16   A.   It was not receptive.
17   Q.   Isn't it true that the proposed reprimand
18        became final?
19   A.   Yes.
20   Q.   Are you aware of any other union member who
21        has been reprimanded because they failed to
22        give their overtime hours?
23   A.   No.
24   Q.   And this incident occurred after Ms. Brown
25        was requesting her hardship transfer and I

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

298

1      believe her medical transfer?

2   A.   Yes.

3   Q.   Ms. Gentry, have you had any other

4      experiences with the reasonable accomodation

5      request at the Agency?

6   A.   Yes.

7   Q.   Can you tell me about those?

8           MR. MILLER:   Objection, Your

9      Honor.   Generic experiences with regards to

10      the reasonable accommodation process is not

11      relevant at all in this hearing.

12           JUDGE CARETHERS:   Complainant,

13      Ms. Clark, what's your offer of proof?

14           MS. CLARK:   Yeah, I believe it is

15      reasonable, because our primary challenge

16      here is that the Agency failed to follow its

17      procedures.   And we believe it's relevant to

18      understand how the Agency is treating

19      disability; whether they recognize what a

20      disability is, whether they recognize what is

21      sufficient medical documentation to support a

22      reasonable accommodation request, and whether

23      they understand what an interactive process

24      is.

25           JUDGE CARETHERS:   Okay.   Given

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

299

1          that offer of proof, I'm going to sustain the

2          objection.   I think what's relevant in this

3          particular case is that they didn't follow it

4          in this particular instance, not what they

5          did in other instances.   You may ask your

6          next question, Ms. Clark.

7          BY MS. CLARK:

8    Q.    Are you aware of any training that the VA

9          provides to anyone concerning the reasonable

10         accommodations procedure?

11   A.    I'm not aware of any that they offer.

12         Employees, half the time, don't know what

13         they need to do to request it as well.

14   Q.    Are you, yourself, familiar with whether or

15         not management is given training on the

16         reasonable accommodations procedure?

17   A.    I'm not aware.

18   Q.    Do you believe that the Agency properly

19         followed the reasonable accommodations

20         procedure as it relates to Ms. Brown?

21   A.    No.

22   Q.    And can you identify what aspects of the

23         procedure were not followed?  I can point you

24         back to 320, which is the handbook.

25   A.    I'm sorry, could you repeat the question?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

300

1    Q.   Sure.  My question is whether or not you

2         believe that the Agency properly followed the

3         reasonable accommodations procedure as

4         relates to Ms. Brown's request for the

5         hardship transfer, the transfer for medical

6         reasons, and the reasonable accommodations

7         request?

8    A.   I don't believe they did.  I believe that

9         the -- the initial meeting, that I can't

10        think of the name right now, interactive

11        process, was not carried out effectively, and

12        was more or less an interrogation process.

13        And it was not explained to her what evidence

14        was needed to essentially support her

15        request.  And I believe that it seemed that

16        medical evidence was not weighed in light of

17        the request.

18   Q.   Focusing specifically on the interactive

19        process, do you recall whether the

20        individuals who were in the meeting

21        specifically asked Ms. Brown what parts of

22        her job she couldn't perform because of her

23        disability?

24   A.   They did ask what -- yes.

25   Q.   They did?  And did Ms. Brown respond?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

301

1    A.   Ms. Brown did respond.

2    Q.   Do you recall whether they offered her any

3         other type of accommodation?  And I'm going

4         to point you at this point to the section on

5         telework.  It's 31 of the book, but 00349.

6    A.   They did not offer her any other accommodation.

7              JUDGE CARETHERS:  Ms. Clark, I'm

8         just letting you know that you're down to

9         your last nine minutes.

10             MS. CLARK:  Thank you.

11   BY MS. CLARK:

12   Q.   Do you know if telework was something that

13        was available to others who were in

14        Ms. Brown's position?

15   A.   Telework was being offered to RVSRs at that

16        point in time, which is not the exact same

17        position, but it is very comparable.  And at

18        this point in time, we do have VSRs that do

19        telework.  And it was approved shortly after

20        Ms. Brown was gone.  Six months or more.

21   Q.   Six months or more after she left?

22   A.   Six to nine months, maybe.  And it was at a

23        time when it was a different HR person in the

24        office, as well.

25             MS. CLARK:  I have no further

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume ll**

302

1       questions.

2                    JUDGE CARETHERS:  Okay.  Agency,

3       your witness.

4                    MR. MILLER:  Thank you, Judge.

5       EXAMINATION,

6          QUESTIONS BY MR. MILLER:

7    Q.  Ms. Gentry, when did you first become

8       involved working with Ms. Brown?  Did you --

9       was it the original hardship transfer

10      request?

11   A.  It's difficult for me to remember, but yes, I

12      believe it was.

13   Q.  Okay.  And did you assist her with that

14      request?

15   A.  With collaboration with Christina Clark and

16      other union members.

17   Q.  And so it was your opinion and other union

18      members to go forward with making a hardship

19      request?

20   A.  Yes.

21   Q.  Did you discuss the possibility of a

22      reasonable accommodation request instead?

23   A.  Well, at that point, I think is when

24      Christina Clark essentially worked together

25      with M.J. Burke and Terry Jane.  And I

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

303

1       believe they also spoke with District on the

2       matter, that it was more prudent to follow

3       the means of reasonable accommodation.

4   Q.  So what was your advice?  Was it a hardship

5       request or was it the reasonable

6       accommodation?

7   A.  Oh, it was a reasonable accommodation.  I'm

8       sorry.  It's just been a rough four days.

9       Can you rephrase your question, or repeat

10      your question again?

11  Q.  Well, she requested a hardship transfer --

12  A.  Right.

13  Q.  -- under the hardship transfer process?

14  A.  Right.

15  Q.  Then she made another request under Article

16      13 of the contract --

17  A.  Uh-huh.

18  Q.  -- for relocation.  Then she submitted a

19      request for reasonable accommodation.  Which

20      one of these were you involved in?

21  A.  Reasonable accommodation.

22  Q.  So you weren't involved in the hardship

23      request?

24  A.  Well, they're so closely aligned, because at

25      that point in time, we were all working

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

304

```
 1        together, and you know, there was a very, I
 2        guess you would say, blurred line, and the
 3        fact of how we were interacting with one
 4        another.  But I was more involved with the
 5        reasonable accommodation process as opposed
 6        to the Article 13.
 7   Q.   Under Article 13, can you be denied a
 8        relocation based on performance?
 9   A.   In all honesty, I would have to look at the
10        master agreement.  But I believe in Article
11        13, under that agenda, I think you can.
12   Q.   You think what?
13   A.   I can't remember.  But I don't want to quote
14        it without -- in all honesty, I'll always
15        refer to my master agreement.
16   Q.   The hardship transfer, can that be denied due
17        to performance as well?
18   A.   The hardship transfer?
19   Q.   Yeah.
20   A.   I'd have to refer to my master.
21   Q.   So you don't know?
22   A.   I can't recall right now.
23   Q.   When was your first meeting with management
24        with regard to Trevenia Brown?
25   A.   As far as a date?
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

305

1   Q.  Yeah.

2   A.  I honestly can't recall a date right now.

3   Q.  Who was it?

4   A.  Let's see, my first meeting with management

5       with Trevenia?

6   Q.  Management or HR.

7   A.  I can't recall right now.  I don't remember

8       which came first in the progression.

9   Q.  Do you know who you spoke with first?

10  A.  Well, Trevenia.

11  Q.  Well, obviously.  Who in management or HR did

12      you speak with first?

13  A.  I honestly can't recall who was the first,

14      because sometimes you'd have conversations,

15      you know, regarding a meeting prior to that

16      meeting, and vice-a-versa.

17  Q.  But you do recall a meeting that you had with

18      Ena Lima?

19  A.  Yes, do I recall meeting with Ena.

20  Q.  And you had another meeting with Sonya Wilson

21      and Jim Dean, yourself, and Ms. Brown?

22  A.  Right.

23  Q.  During that meeting with Sonya Wilson and

24      Mr. Dean, what was the subject of that

25      meeting?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

306

1   A.   With Sonya Wilson and Mr. Dean?

2   Q.   Yes.

3   A.   At that meeting, that was the meeting -- the

4        process for the reasonable accommodation

5        for -- and then there was the issue of the --

6        not the reprimand, but the warning of

7        unacceptable performance.  I was in that

8        meeting.  That was the same.  It was Jim Dean

9        and Sonya Wilson.

10  Q.   Let's just go back to the reasonable

11       accommodation meeting, then.  So yourself,

12       Jim Dean, Sonya Wilson, and Ms. Brown.

13       Anybody else?

14  A.   No.

15  Q.   And this was in regard to a reasonable

16       accomodation that she had submitted?

17  A.   (Witness nods head.)

18  Q.   Was this the first meeting you had?

19  A.   Regarding the reasonable accommodation?

20  Q.   Well, the first discussion you had with Sonya

21       Wilson and Jim Dean about the reasonable

22       accommodation?

23  A.   Most likely, yes.

24  Q.   And did you sit and review the documentation

25       that was provided to HR and Ms. Wilson?

**DEF000726**

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

307

1   A.   I reviewed the documentation that Trevenia

2        provided.  They did not review the

3        documentation -- I cannot recall them

4        reviewing the documentation together with us,

5        no.

6   Q.   But they could have reviewed it before the

7        meeting?

8             MS. CLARK:  Objection.  Requires

9        her to speculate.  She wasn't there before

10       the meeting.

11       BY MR. MILLER:

12  Q.   So you don't know whether or not they

13       reviewed the documentation?

14  A.   No.

15  Q.   During the meeting, did you discuss an

16       interim accomodation at all?

17  A.   They asked her if she had any request for

18       interim accommodation.

19  Q.   Did she?

20  A.   She just wanted to be able to get her

21       request.  I don't believe at the time we

22       could think of any interim request, and they

23       had no suggestion for how to best accommodate

24       for Trevenia at that point.

25  Q.   Well, this is an interactive process.  So

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

308

1    that means -- I assume Trevenia is the person

2    that knows her limitations?

3  A.   Right.  Well, and that's what she had in

4    her -- I mean, she had the FMLA in play at

5    this time, so essentially, and this is what I

6    understood and believed, but that she, you

7    know, felt that that's what her FMLA usage

8    was for until she could hopefully get this

9    transfer approved.

10        That was really what she would need.

11   Because she would be in pain -- because

12   telework wasn't anything that you -- it

13   wasn't something that was granted in our

14   office.

15  Q.   Did you mention telework at the meeting?

16  A.   I did not.

17  Q.   Did Ms. Brown?

18  A.   No.

19  Q.   During the meeting, do you recall whether or

20   not Ms. Brown said that she had no limitation

21   at work?

22  A.   Oh, no.

23  Q.   You don't recall that?

24  A.   No.

25  Q.   Okay.  Have you ever seen -- I'll hand you

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

309

1      what's marked as Exhibit 28.

2  A.  Yes.

3  Q.  Have you seen that before?

4  A.  Yes.

5  Q.  And describe what that is.

6  A.  This is a request for medical documentation.

7  Q.  And you're familiar with all those -- I

8      assume you're familiar all those --

9  A.  I'm more familiar now than --

10 Q.  Okay.  Now, during this meeting, did someone

11     suggest or provide this document to you and

12     Ms. Brown?

13 A.  I don't recall if it was given to her at that

14     the time.

15 Q.  Okay.  You don't recall that?

16 A.  No.  Because in all honesty, I learned more

17     about the reasonable accommodation process

18     following Trevenia's experiences.

19 Q.  You said there was interrogating.  What did

20     you mean by that?

21 A.  Interrogation in a way that -- well, for one,

22     her voice was raised.

23 Q.  Well, what questions was she asking?

24         MS. CLARK:  I'd ask that the

25     witness be allowed to complete her answer,

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

310

1    before she's cut off.

2              JUDGE CARETHERS:  Yeah, I will

3    sustain that.  Did you have a -- did you want

4    to complete your answer?  You said her voice

5    was raised.  Please continue.

6  A.  Well, her voice was raised, and she was

7    almost leaning in and upward when she was --

8    she was getting agitated when she was asking

9    her questions.  So, I mean, as far as human

10   communication, she was -- it was becoming

11   uncomfortable at that point.  So I know when

12   you say what questions were interrogating, I

13   know she was giving an interrogative type of

14   approach to the question, and asking, you

15   know, what is it that you can't do, or why

16   can't you do certain things, and not

17   understanding of how Trevenia's specific

18   condition inhibits her work.

19              And in all honesty, I don't remember

20   exactly what was said, but I just remember

21   the nature of the conversation.

22  Q.  Okay.  So she's asking questions to determine

23   what her limitations are?

24  A.  Yes, but not so clearly -- I'm trying to

25   think of how to explain it.  She would say

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

311

1       she didn't understand, and she would ask

2       Trevenia, you know, what is it that she

3       needs, essentially.  So she was asking, I

4       guess, about limitations.  But she wasn't

5       specific, you know, in the way that you

6       phrase the question.  You know, how do these

7       limitations impact your ability to do your

8       job.  How does your condition keep you from

9       analyzing evidence, you know.  And in regards

10      to being very specific.  It was more vague,

11      and it wasn't very helpful to Trevenia in the

12      way that she was asking.  It wasn't guiding

13      Trevenia through the process.

14  Q.  Well, she was requesting what her limitations

15      are, and I assume only Trevenia knows what

16      those are, is that right?

17  A.  Right.

18  Q.  So do you think it was inappropriate that

19      Ms. Wilson was asking questions with regards

20      to her limitations in the reasonable

21      accommodation process?

22  A.  It was not inappropriate for her to ask what

23      the limitations were.

24  Q.  Did she indicate what her limitations were,

25      Ms. Brown?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

312

1   A.   Ms. Brown indicated that she was in a lot of

2        pain, and that it was difficult for her to

3        function on days.

4   Q.   Okay.  And did she say what she wanted as far

5        as either an interim accommodation, or what

6        she would accept as a reasonable

7        accommodation in the end?

8   A.   The reasonable accommodation she was seeking

9        was only the transfer.

10  Q.   Okay.  So there was nothing --

11  A.   There was really nothing else in the meantime

12       as far as an interim accommodation that I

13       recall that was desirable.

14  Q.   Did she ever indicate during this meeting

15       that there aren't any doctors located in the

16       Indianapolis area that could treat her

17       condition?

18            MS. CLARK:  Objection.  Assumes

19       the question was asked.  It assumes that

20       there was a question asked by Ms. Wilson

21       about treating doctors.

22            JUDGE CARETHERS:  Okay, and what's

23       your offer of proof regarding that?

24            MR. MILLER:  Offer of proof would

25       be that's part of what her limitations would

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

313

1    be as to why she had to transfer, the reason

2    behind the reasonable accommodation.

3              MS. CLARK:  Ms. Gentry is not the

4    person that would be most knowledgeable about

5    what Ms. Wilson asked her.

6              MR. MILLER:  She was in the

7    meeting.

8              JUDGE CARETHERS:  Okay, this is

9    what I'm going to do.  I'm going to not

10   sustain the objection.  He's asking her

11   whether or not Ms. Brown indicated during

12   that February reasonable accommodation

13   meeting whether there were people who were

14   treating physicians in the Indianapolis area.

15   I find that relevant.  You may answer the

16   question.

17             THE WITNESS:  And I'm sorry, could

18   you ask it again.

19   BY MR. MILLER:

20   Q.  Did Ms. Brown, during this interactive

21   process, did she discuss -- did she tell

22   Sonya Wilson that there aren't any physicians

23   here in Indianapolis area that can treat my

24   condition?

25             MS. CLARK:  I'm going to raise the

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

314

1   objection again, because he's not raising it

2   as Ms. Sonya Wilson asking if -- did she ask

3   Ms. Brown if there were treating physicians.

4   He's assuming Ms. Brown is automatically

5   saying whether or not there were doctors who

6   could treat, and that is not anything that is

7   required on any of the documentation here.

8   So my objection goes to whether or not --

9   Your Honor, my objection goes to the phrasing

10   of the question.  If he's asking whether or

11   not Ms. Wilson inquired of Ms. Brown about

12   treating physicians in Indianapolis, I have

13   no objection.  The phrasing of the question

14   is, did Ms. Brown offer that information, and

15   that's what I'm objecting to.

16           MR. MILLER:  To support her

17   request for reasonable accommodation.

18           MS. CLARK:  And my objection is

19   it's not required under Exhibit 28.

20           JUDGE CARETHERS:  Hold on for a

21   second.  I'm about to make my ruling.  The

22   objection is not sustained.  The question

23   that I understand he's asking is whether or

24   not Ms. Brown communicated during this

25   meeting whether there were physicians

315

1      available in Indianapolis to treat her

2      disability.  I find that's a relevant

3      question, so you may answer the question.

4   A. So the question is whether or not Ms.

5      Brown --

6   Q. During this meeting, did Ms. Brown ever state

7      that there are no physicians in the

8      Indianapolis area that can treat my

9      condition?

10  A. Ms. Brown did not necessarily state that

11     there were not physicians.  But she stated

12     that the physician -- the only physician that

13     would best treat her condition is a physician

14     that was in the other area.  I believe it was

15     Florida.

16  Q. Okay.

17  A. I don't recall -- I'm sorry, go ahead.

18  Q. Would it surprise you that Ms. Brown had not

19     identified a physician in Florida by the time

20     that she had transferred?

21            MS. CLARK:  Objection as to form.

22     This is direct testimony, and that's a

23     leading question.

24            JUDGE CARETHERS:  Hold it a

25     second.  Hold it a second.  Hold it a second.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

316

1    I don't believe this was an Agency witness,

2    so this is cross.  Wait, let me make sure

3    that's correct.

4              MR. MILLER:  You're correct, Your

5    Honor.

6              JUDGE CARETHERS:  Yeah.  So I do

7    not sustain the objection.  He is on cross

8    now.  This is not a joint Agency and

9    Complainant witness.  This is strictly a

10   Complainant witness.  So he is on cross at

11   this point in time.

12             MS. CLARK:  Okay, I will just mark

13   for the record that during the pre-hearing

14   conference, Your Honor, you specifically

15   stated that all testimony would be direct,

16   direct, then cross, and cross.  And you never

17   differentiated between whether it was joint

18   witnesses or not.  And that's all I'll say.

19             JUDGE CARETHERS:  I will clarify

20   again that during the joint pre-hearing

21   meeting, I stated that for joint witnesses,

22   the procedure would be direct, direct, cross,

23   cross.  If they were not a joint witness,

24   then they would go direct, cross, and then

25   the person presenting the witness would go

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

317

 1          again on recross.  That was the procedure
 2          that was outlined.  This is a witness that is
 3          not a joint witness.  So it's going to go the
 4          typical way that we take testimony from a
 5          witness that's only one of the witnesses --
 6          that's not a joint witness here.  So you may
 7          continue with your question.  I put your
 8          objection on the record.  I'm putting the
 9          response.  Agency, you may ask your question.
10          BY MR. MILLER:
11     Q.   And during this meeting, did Ms. Brown, I
12          guess, offer up any interim accommodations at
13          all or suggestions?
14     A.   Did Ms. Brown offer suggestions on interim
15          accommodations?  I cannot recall, other than
16          trying to get the process done for the
17          transfer.
18     Q.   Okay.  Now, you said as far as the interim
19          accommodation that -- I think you previously
20          testified that her leave and FMLA would be
21          her interim accommodation?
22     A.   It wasn't really -- I don't know that it was
23          clearly stated that.  But I know that it was
24          addressed that she already had FMLA.  You
25          know, she already had that in place.  So I

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

318

1    think it was almost to the fact that it might

2    have been more implied.

3  Q.  Okay.  And you had no involvement in the

4    Article 13 transfer request?

5  A.  No.

6  Q.  Now, during this meeting, was there a point

7    that Ms. Brown just would not communicate

8    with Ms. Wilson or Mr. Dean?

9  A.  I wouldn't say that there was a point of no

10    communication, because throughout the entire

11    meeting we were trying to -- we were trying

12    to communicate effectively.  And I would jump

13    in, Jim Dean would jump in and try to

14    clarify any barriers that existed between

15    what Sonya was trying to communicate and

16    Trevenia.  But Sonya, the way that she was

17    explaining things, was not processing well on

18    both ends.  It's almost as though there's two

19    different types of communication on both

20    ends.  So there was hostility, but both

21    members continued to try to communicate.

22  Q.  Okay.  And you said Jim Dean was attempting

23    to come up with ideas as to accommodations

24    that would be effective?

25  A.  The only thing that was brought up as far as

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

319

1     interim accommodations were examples of what

2     an interim accommodation is, I guess.  It

3     wasn't really anything that was specific to

4     Trevenia that would be specific to her

5     condition.  But like, for instance, if you

6     have a bad wrist and you need a different

7     keyboard.  You know, or for instance if your

8     back is bad, maybe you need a different

9     chair.  These were the types of things that

10    were brought when it was discussed what an

11    interim accommodation really is.  Is there

12    anything like that we can do for you.  So

13    Trevenia is, you know, no, I don't need a

14    chair.  I don't need a keyboard.

15  Q.  But they were trying to explain what an

16      interim accommodation is?

17  A.  Yeah.

18  Q.  Okay.  All right.  And do you recall them

19      asking for more medical documentation, more

20      specific medical documentation?

21  A.  They did ask for more medical documentation,

22      yes.

23  Q.  And do you know if shortly after that whether

24      or not Ms. Brown provided that?

25  A.  I believe she did, yes.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

320

1    Q.   You think so?

2    A.   I can't recall right now.  I wish I could.

3    Q.   Did Ms. Brown make you aware that her -- this

4         request for accommodation was denied for lack

5         of appropriate medical documentation?

6    A.   Yes.

7    Q.   Do you recall that part of the denial they

8         informed Ms. Brown that she could use FMLA,

9         sick leave, annual leave, liberal leave?

10   A.   I don't recall that.

11   Q.   Okay.  Once she received the denial, who did

12        you meet with in management?  Was it with HR

13        or --

14   A.   I recall we met with at Adam Kinder at one

15        point, but I think that was in relation to

16        the grievance.

17   Q.   Okay.  You don't recall?

18   A.   I'm sorry.

19   Q.   That's okay.  Now, we talked about

20        production.  Warning of unacceptable

21        performance, that's not considered to be a

22        disciplinary action?

23   A.   By management and by the master agreement,

24        no.

25   Q.   Okay.  And that doesn't go into your EOPF?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

321

1   A.   A warning does not.

2   Q.   Okay.  So essentially, a warning is just to

3        tell you that you're not meeting your

4        production numbers?

5   A.   Right.

6   Q.   Okay.

7   A.   And it gives you a time frame that you have

8        to get your numbers up before you're

9        implemented on the Performance Improvement

10       Plan.

11  Q.   Now, you talked about some problems you

12       perceived when you had to take -- when you

13       were off with your pregnancy.  So you were

14       allowed to use FMLA?

15  A.   I was.

16  Q.   Sick leave?  Annual leave?

17  A.   All leave without pay.

18  Q.   Had you exhausted sick leave and annual

19       leave?

20  A.   At that point.  I had a very rough pregnancy.

21  Q.   So you were on leave without pay?

22  A.   Yes.

23  Q.   And you were able to return to work?

24  A.   Yes.

25  Q.   You said that they put you on a -- they also

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

322

1          gave you notice of unacceptable performance?

2    A.   Yes.

3    Q.   And after that time, were you able to raise

4          your performance numbers?

5    A.   I was not after the warning.  I was placed on

6          a Performance Improvement Plan.

7    Q.   And that went on for how long?

8    A.   The initial Performance Improvement Plan, I

9          believe was 90 days.  I was put on bed rest

10         just after the 90 days, and was not

11         successful in that time frame.  And

12         essentially, due to my FMLA, I was on

13         maternity leave for approximately, I think

14         14 weeks, perhaps.  I know the contract

15         allows 16.  I don't recall if I was gone that

16         long.  And I was telephoned, asking me to

17         come in for a meeting.  But I said, no, I was

18         still on FMLA.  But they wanted me to come in

19         to discuss my PIP.  So I told them to wait

20         until I returned to work.  I returned to

21         work, and they met with me, and they said

22         that I had 60 days without production being

23         measured.

24   Q.   So they gave you 60 days to get back into --

25   A.   To ramp up.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

323

1    Q.   Back into the groove?

2    A.   And then they started my PIP over,

3         essentially, and they gave me a 60-day

4         performance plan.

5    Q.   And did you pass that plan?

6    A.   I did at that point.

7    Q.   So you weren't terminated?

8    A.   No.

9    Q.   And you weren't disciplined for that?

10   A.   No.

11   Q.   Does a PIP go into your EOPF?

12   A.   That, I'm not sure of.  But I know that

13        certain things, like if you try to apply for

14        other positions, it will say that you can't

15        have been on a Performance Improvement Plan

16        within the last 12 months.  So I'm not sure

17        if it's in your EOPF or not.

18   Q.   All right.  But you were successful after you

19        came back?

20   A.   Yes.  Again, the measurements changed in that

21        time frame, though.

22             MR. MILLER:  Okay.  I don't have

23        any other questions.  Thank you.

24             JUDGE CARETHERS:  Your witness,

25        Ms. Clark.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

324

1    EXAMINATION,

2         QUESTIONS BY MS. CLARK:

3   Q.   You were asked earlier about the hardship

4        transfer, and I think the question was

5        whether or not a hardship transfer could be

6        denied for performance reasons.

7   A.   Uh-huh.

8   Q.   Is that your understanding?

9   A.   That was the question?

10  Q.   That was the question.

11  A.   Right.

12  Q.   And was that your understanding that it could

13       be?

14  A.   I believe so, but in all honesty I always

15       have to refer to the master agreement.

16  Q.   If you could take a look at what is marked as

17       the Agency's Exhibit H.  Can you read at the

18       top there, does it indicate whether or not

19       performance is a reason why a hardship

20       transfer could be denied?

21  A.   I don't see it.

22  Q.   And in looking at this, do you understand

23       this to be the same standard that's set forth

24       in the collective bargaining agreement?

25  A.   Again, I'd have to refer to the bargaining

325

1    agreement right now.

2              JUDGE CARETHERS:  Ms. Clark, are

3    you seeking to admit this as an exhibit?

4              MS. CLARK:  Yes, I am.

5              JUDGE CARETHERS:  Okay.  Any

6    Agency objections while I look up what number

7    we're on?

8              MR. MILLER:  No objection.

9              JUDGE CARETHERS:  Okay.  Let me go

10   back.  I believe we're on Exhibit 30 now.  Is

11   that correct, parties?

12             MS. CLARK:  Yes.

13             JUDGE CARETHERS:  Can we have this

14   marked as Exhibit 30, and it's admitted.

15             (Exhibit 30 was marked for

16   identification and received into evidence.)

17   BY MS. CLARK:

18   Q.  Let me ask you this.  Do you understand

19       hardship transfers to be different from

20       accommodation requests?

21   A.  I would.

22   Q.  Speak up, please.

23   A.  Yes.

24   Q.  And do you consider hardship transfers to be

25       a method of seeking a reasonable

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

326

1      accommodation?

2   A.   I believe them to be two separate programs,

3      as far as requesting hardship transfers is

4      different from requesting a reasonable

5      accommodation.

6   Q.   And in this document, do you see where it

7      indicates that having a serious illness could

8      be a reason for a hardship transfer?

9   A.   It's number 1.

10   Q.   Okay.  And when Ms. Brown submitted her

11      request for a hardship transfer, which I

12      believe was on January 17, 2014, she was

13      already on FMLA, correct?

14   A.   Yes.

15   Q.   And is it your understanding that under FMLA

16      you have to submit documentation

17      demonstrating a serious illness?

18   A.   Yes.

19   Q.   And, therefore, when she made the hardship

20      transfer request, she submitted the FMLA

21      documentation -- is it your understanding

22      that she submitted the FMLA documentation or

23      medical documentation that was submitted in

24      support of her FMLA?

25   A.   That was my understanding.

DEF000746

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

327

1   Q.   Okay.  I'd like for you to look at this, what

2        is entitled as guidance for transfers between

3        offices.

4   A.   (Witness complies.)

5   Q.   Is that the guidance that's used for

6        reassignment for medical reasons, to your

7        knowledge?

8   A.   This states that if it's a medical reason or

9        a hardship, you should follow the hardship

10       request policy.

11  Q.   All right.

12                 MS. CLARK:  Your Honor, I'd like

13       to submit this into evidence.

14                 JUDGE CARETHERS:  Okay.  Could you

15       tell me -- well, we're on Exhibit 31.  Could

16       you tell me what that proposed exhibit was,

17       because I don't know.

18                 MS. CLARK:  It's the Agency's

19       proposed exhibit --

20                 MR. MILLER:  Exhibit Y.  No

21       objection.

22                 JUDGE CARETHERS:  Okay.  It's

23       marked as Exhibit 31, and it's accepted.

24                 (Exhibit 31 was marked for

25       identification and received into evidence.)

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

328

```
 1        BY MS. CLARK:
 2    Q.  And do you see here anywhere where it
 3        indicates that performance is an issue that
 4        would result in there being no transfer?
 5    A.  I don't see anything that says that
 6        performance is an issue.  It says if they're
 7        under a PIP.  But at that point in time,
 8        Trevenia was not under a Performance
 9        Improvement Plan, which we also refer to as
10        PIP.
11    Q.  Thank you.  Now, with regard to the
12        reasonable accommodations procedures, under
13        320, are transfers something that are
14        available as a reasonable accommodation?
15    A.  In regards to being spelled out in the actual
16        handbook?  Is that what --
17    Q.  I'm asking whether a reasonable accommodation
18        can include a transfer?
19    A.  Yes.
20    Q.  And in your understanding of the reasonable
21        accommodations procedures, is it necessary
22        for an employee to actually say I'm seeking a
23        reasonable accommodation in order for these
24        procedures to apply, or is it your
25        understanding that they just need to say I
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

329

```
 1        have a disability and I need an

 2        accommodation, or I seek a transfer, or I

 3        seek some other --

 4   A.   In my understanding, as long as you say you

 5        have a disability and what you're seeking --

 6        I mean, when I read the Americans With

 7        Disabilities Act, that was enough for

 8        management to initiate the process.

 9   Q.   And under these procedures, is that enough

10        for the VA to initiate these procedures?

11   A.   The VA will always issue the 0857 requiring

12        that you submit the 0857e, I believe.  But it

13        is enough to initiate.

14   Q.   Do the procedures actually require the

15        completion of the 0857e, or that the

16        individual provide information that is set

17        forth in the 0857e?

18   A.   Let me look again.  Again, I also refer to

19        the documents, because I can't remember

20        everything by heart.  It does not require the

21        0857a.  It just states that you provide your

22        chain of command with the request, may it be

23        verbal, or written, or directly entered into

24        an automated system.

25   Q.   In your understanding of the interactive
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

330

1    process, is it incumbent upon the employee to

2    provide alternative accommodations when the

3    one that's requested is denied, or does the

4    interactive process require the Agency to

5    offer alternatives when they can't provide

6    the one that's requested?

7  A.  It has been under my understanding that it is

8    incumbent upon both -- I mean, and again, I

9    have to read through the manual, because I

10    always refer to the handbook prior to any

11    meeting.  But the Agency -- if requested and

12    if feasible, that the Agency is to provide

13    them, but that they would offer suggestions

14    for -- if they are unable to approve the

15    pending request.

16  Q.  All right.  And during the period of the

17    requests that I've identified, the hardship

18    transfer, the medical reassignment, and the

19    reasonable accommodation, do you understand

20    Ms. Brown to have been under any disciplinary

21    action at any time for either one of these

22    three periods?

23  A.  I'm sorry.

24  Q.  I'll repeat.  Do you recall whether Ms. Brown

25    was under any disciplinary action when she

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

331

1        made the hardship transfer request?

2    A.  It wasn't until after.

3    Q.  And when did that occur?

4    A.  It was -- I don't remember the exact date,

5        but it was after she had initially requested

6        transfer.

7    Q.  So when she made the request for medical

8        reassignment, do you recall whether or not

9        she was under any disciplinary action at that

10       point in time?

11   A.  I don't recall her being under any

12       disciplinary action.

13   Q.  Okay.

14   A.  No, she was not, because it seemed as though

15       once she had submitted that request, then all

16       of a sudden they proposed the disciplinary

17       reprimand.  And we were concerned, because

18       then it would be on her file.

19   Q.  And so when she finally made the August -- I

20       think it's the August 21st request for

21       reasonable accommodation, that would have

22       been the time when she was under a

23       disciplinary action, is that correct?

24   A.  I'm trying to get my dates.  She had made her

25       request for reasonable accommodation to be

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

332

1      transferred, and then after that was when she

2      was given the reprimand for the overtime

3      issue.  I'm sorry, is that what you're

4      asking?

5  Q.   That's okay.  I'm going to provide you with

6      Exhibit 29.  See if this will refresh your

7      recollection.  Sorry, it's actually

8      Exhibit 6.

9  A.   What was the question?

10  Q.   Does this information refresh your

11      recollection as to when Ms. Brown was under

12      disciplinary action?

13  A.   In my memory, as far as the date goes -- you

14      know, I'm sorry.  I haven't slept much in

15      four days.

16  Q.   Let me withdraw the question and just ask, do

17      you understand whether she had any

18      disciplinary action other than the reprimand

19      associated with the FMLA overtime?

20  A.   Not that I was aware of.

21          MS. CLARK:  Your Honor, there's

22      been reference in this case to Article 13 of

23      the collective bargaining agreement.  Is

24      there -- the Complainant would request, if at

25      all possible, to have the collective

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

333

1    bargaining agreement entered as an exhibit

2    since it's been referenced.

3             JUDGE CARETHERS:  Do we have a

4    copy of that somewhere?

5             MR. MILLER:  It's under Agency

6    Exhibit K.

7             JUDGE CARETHERS:  Okay, hold on.

8             MS. CLARK:  Thank you.  Do you

9    have an objection to this?

10            MR. MILLER:  No.

11            MS. CLARK:  Your Honor, I'd like

12   to submit this to the witness.

13            JUDGE CARETHERS:  Well, let's get

14   this admitted, first of all.  Is there any

15   objection to having this admitted as an

16   exhibit, Agency?

17            MR. MILLER:  No, Your Honor.

18            JUDGE CARETHERS:  Can we have this

19   marked.  I believe we're on 32 now.

20            (Exhibit 32 was marked for

21   identification and received into evidence.)

22   BY MS. CLARK:

23   Q.  Ms. Gentry, if you could take a look that

24   document, please.

25   A.  (Witness complies.)

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

334

1    Q.   Ms. Gentry, is that the procedure by which a

2         reassignment could be made by a union member?

3    A.   Yes.

4    Q.   And is it your understanding that Ms. Brown

5         had filed her request for reassignment

6         pursuant to Article 13?

7    A.   Yes.

8    Q.   And does that include reassignment for

9         medical reasons?

10   A.   In Section 9.

11   Q.   In Section 9 of the document.  And does that

12        require a showing of -- or does it identify

13        any specific medical information that has to

14        be provided?

15   A.   It only states that there's medical

16        certification.  It doesn't give specifics as

17        far as what the medical documentation must

18        spell out.

19   Q.   And is there a specific form that has to be

20        filed for this?

21   A.   No.

22   Q.   So the submission of medical documentation

23        from a physician explaining what the

24        condition is, and the recommendation

25        concerning what accommodation or the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

335

1          transfer, in this case, being necessary to

2          address that condition is considered medical

3          certification?

4      A.  Under Section 9.

5      Q.  Under Section 9 of Article 13?

6      A.  Yes.

7      Q.  Thank you.  Ms. Gentry, do you have an

8          opinion about how Ms. Brown was being treated

9          by the Agency during her requests?

10     A.  Yes, I do.

11     Q.  Can you please tell me what your opinion is?

12     A.  I believe it was very unprofessionally

13         handled.  I believe she was treated in a very

14         dehumanizing manner, and belittled, and

15         almost treated like a child for asking her --

16         just for asking for a simple request, you

17         know, even just submitting the initial

18         paperwork.

19     Q.  Do you have an opinion as to whether or not

20         the reprimand concerning the FMLA hours was

21         in direct response to her request for the

22         transfer, either under the hardship transfer

23         procedures or under Article 13?

24     A.  I believe it was directly related to it.

25     Q.  And why is that?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

336

1   A.   I believe that if you pull the reports of

2        productivity station-wide, that Trevenia

3        would not be the only one that was suffering

4        from her production at that point --

5             MR. MILLER:   Your Honor, we're

6        speculating here as to what may or may not be

7        in existence as far as performance.

8        BY MS. CLARK:

9   Q.   Could you keep your answer to the question

10       that I'm asking.   What is your opinion about

11       why you think the FMLA reprimand was a direct

12       response to Ms. Brown having filed the

13       request for the hardship transfer and the

14       transfer for medical reasons under Article 9?

15  A.   I believe it was directly related because of

16       the way she had been treated throughout the

17       whole process, and the comments that had been

18       made to her throughout the process.   And how

19       she can't just cry and get what she wants,

20       that she can't just expect to get whatever

21       she wants, you know, just by asking

22       questions.   Because I would see the hostility

23       in the way that she was treated by these

24       professional management officials.

25            And then asking my opinion, my

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

337

1      opinion is based on historic personal events

2      related to other people other than Trevenia.

3      So in my opinion being based on that, I can't

4      help but draw in from that the past

5      experiences on the station.

6  Q.  But is your opinion also formed on what you

7      witnessed Ms. Brown to have gone through?

8  A.  Oh, yes.  Yes.

9              MS. CLARK:  I have no further

10     questions.

11             JUDGE CARETHERS:  All right.  Let

12     me make sure I don't have questions for this

13     witness.  You were asked previously whether

14     or not you were aware of any other union

15     officials who were disciplined or given a

16     warning of unacceptable performance when they

17     failed to signed up for OT hours, and I

18     believe your answer was that you're not aware

19     of any other union official.  I guess my

20     question to follow-up was are you aware of

21     any officials or union members who failed to

22     give their OT hours, failed to sign up for

23     mandatory overtime?

24             THE WITNESS:  It seems that I

25     recall that there were a few people that did

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

338

1    not provide their dates, but they were not

2    issued warnings.

3              JUDGE CARETHERS:  Okay.  Who were

4    those individuals that failed to sign up for

5    mandatory overtime?

6              THE WITNESS:  I hope I'm recalling

7    correctly, but I want to say Kelly Jones.

8              JUDGE CARETHERS:  And who is Kelly

9    Jones?

10             THE WITNESS:  She's an RVSR.  And

11   again, I would feel more comfortable

12   referring to my records to be able to say for

13   sure.  And I believe possibly Jesse

14   Quenichet.  Jessica.

15             JUDGE CARETHERS:  Spell the last

16   name?

17             THE WITNESS:  I want to say

18   Q-U-E-N-I-C-H-E-T.

19             JUDGE CARETHERS:  And what's that

20   person's position?

21             THE WITNESS:  An RVSR.

22             JUDGE CARETHERS:  And so those are

23   two people that you believe did not sign up

24   for mandatory overtime?

25             THE WITNESS:  From what I can

339

1    recall.  And again, I want to say that I'd

2    feel more concern with being able to research

3    my personal records, but I do remember there

4    being other individuals, yes.

5              JUDGE CARETHERS:  Okay.  Well, I

6    guess I'm trying to be precise here.  Are you

7    saying that you believe these two individuals

8    did not sign up for mandatory overtime?

9              THE WITNESS:  I believe those are

10   the two individuals.

11             JUDGE CARETHERS:  Okay.  In

12   addition to them not signing up for mandatory

13   overtime, is it your belief that they also

14   were not issued a warning of unacceptable

15   performance?

16             THE WITNESS:  No.

17             JUDGE CARETHERS:  They were not

18   issued a --

19             THE WITNESS:  They were not

20   issued, no.

21             JUDGE CARETHERS:  Okay.  Were

22   these two individuals, Kelly Jones and

23   Jessica -- I can't say her last name -- that

24   you've identified, were those two people

25   supervised by the same individual as

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

340

1    Complainant?

2              THE WITNESS:  I cannot recall.

3              JUDGE CARETHERS:  Let's start with

4    Kelly Jones.  Do you know if Kelly Jones was

5    suffering from any impairment or considered

6    disabled at that point in time when she

7    failed to sign up for mandatory overtime?

8              THE WITNESS:  I'm reluctant to

9    answer that question, due to Kelly's personal

10   privacy.  Does she have a disability?  Yes,

11   she does.  But has she asked for

12   accommodation for that disability, I'm not

13   sure.  But Kelly is also a personal friend,

14   so I am personally aware of her disability.

15             JUDGE CARETHERS:  I'm not asking

16   whether she signed up for reasonable

17   accommodation.  I just want to know if she

18   had a disability at the time that you

19   believed she was to sign up for mandatory

20   overtime.

21             THE WITNESS:  Okay.

22             JUDGE CARETHERS:  And your answer

23   was that she did have a disability at the

24   time that she did not sign up for mandatory

25   overtime?

DEF000760

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

341

1              THE WITNESS:  Right.

2              JUDGE CARETHERS:  Next, for

3    Jessica, do you know whether or not Jessica

4    had a disability when she failed to sign up

5    for mandatory overtime?

6              THE WITNESS:  Jessica did have a

7    disability.

8              JUDGE CARETHERS:  Could you go to

9    page 253 in the ROI.  And what you should see

10   is, I believe, an e-mail from Jim Dean dated

11   February 27, 2014.

12             THE WITNESS:  Oh, okay.  It's from

13   Jim Dean, but the top says Sonya Wilson.

14             JUDGE CARETHERS:  Yes.  And this

15   supposedly is a recap of some of the

16   highlights of that February meeting for a

17   request for accommodation.  Do you see that?

18             THE WITNESS:  Yes.

19             JUDGE CARETHERS:  I'll give you a

20   few minutes briefly to read that over real

21   quick, and just let me know when you're done.

22             THE WITNESS:  Okay.

23             JUDGE CARETHERS:  Okay.  I just

24   want to know, because you were at this

25   meeting, correct?  You testified to that, is

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

342

1     that correct?

2                    THE WITNESS:  Yes.

3                    JUDGE CARETHERS:  I just want to

4     know whether or not there's anything that

5     you're stating that is incorrect about this

6     e-mail, this supposed recap.  I'm not asking

7     you whether it's missing information.  I'm

8     just asking if the things that are actually

9     stated in there are accurate or not.  So the

10    first thing is, he says I acknowledge receipt

11    of the request for reasonable accommodation.

12    Did he do that?

13                    THE WITNESS:  He did acknowledge

14    the receipt of the request, yes.

15                    JUDGE CARETHERS:  And then he says

16    he clarified the hardship transfer process.

17    Did he do that?

18                    THE WITNESS:  I would say no.

19                    JUDGE CARETHERS:  Okay.  Then he

20    says that for the reasonable accommodation

21    you stated that you have no limitation.  Do

22    you recall if Ms. Brown stated that?

23                    THE WITNESS:  I do not recall her

24    saying she had no limitation.  No, that's

25    incorrect.

343

1          JUDGE CARETHERS:  So you're saying
2     that she did not say that, is that correct?
3          THE WITNESS:  That's correct.
4          JUDGE CARETHERS:  Then he says,
5     you stated that you had no interim
6     accommodation.  Did Ms. Brown state that she
7     didn't have any interim accommodation?
8          THE WITNESS:  Right, there was no
9     interim that was felt that would be
10    beneficial.
11         JUDGE CARETHERS:  Okay.  Then next
12    thing it says, I gave you VA Form 0857e,
13    Request for Medical Documentation.  I think
14    you previously testified that you're not sure
15    whether that occurred or not, is that
16    correct?
17         THE WITNESS:  I can't recall that
18    part, right.
19         JUDGE CARETHERS:  So you can't
20    dispute it, and you can't confirm it, is that
21    pretty much correct?
22         THE WITNESS:  Correct.
23         JUDGE CARETHERS:  Okay.
24    Complainant, is there any follow-up that you
25    have to any of the questions, and my

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

344

1    questions only, regarding this witness?

2                    MS. CLARK:  No, I have no

3    follow-up questions.

4                    JUDGE CARETHERS:  Agency, do you

5    have any follow-up questions based on the

6    questions that I asked, and my questions

7    only?

8                    MR. MILLER:  I think just two.

9                    JUDGE CARETHERS:  You may go.

10   EXAMINATION,

11      QUESTIONS BY MR. MILLER:

12   Q.  Let's look at page 253.  You're stating now

13       that that's incorrect.  Did you respond by

14       e-mail that this recap was incorrect?

15   A.  I do not recall if I responded or not.

16   Q.  Do you recall if Ms. Brown did?

17   A.  I do not recall.

18                    MR. MILLER:  Thank you.  Nothing

19       further.

20                    JUDGE CARETHERS:  Okay.  This

21       concludes the testimony of this witness.

22       You're free to.  You should not communicate

23       with any other witness of what you testified

24       to or the questions you were asked.  Do you

25       understand?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

345

1             THE WITNESS:  Yes.

2             JUDGE CARETHERS:  Thank you.

3     Let's go off the record.

4             (A recess was taken.)

5             JUDGE CARETHERS:  We're continuing

6     the hearing of Trevenia Brown versus the

7     Department of Human Affairs.  We have our

8     next witness here, who I believe is Mr. Adam

9     Kinder, is that correct?

10            MR. KINDER:  Yes, Your Honor.

11            JUDGE CARETHERS:  Okay.  Great.

12    How are you doing today?

13            MR. KINDER:  I'm doing good.

14    Thank you.

15            JUDGE CARETHERS:  I'm

16    Administrative Judge Trek Carethers.  I'm

17    presiding over this hearing.  Are you a

18    current federal employee?

19            MR. KINDER:  I am.

20            JUDGE CARETHERS:  Your time here

21    is considered official duty time, and there

22    will be no reprisal for your testimony here

23    today.  Do you understand?

24            THE WITNESS:  Yes.

25            JUDGE CARETHERS:  Can we have this

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

346

1    witness sworn in.

2             (The witness is sworn by the court

3    reporter.)

4             JUDGE CARETHERS:  Before we begin

5    taking your testimony, I'm going to give you

6    some preliminary instructions that I give all

7    the witnesses.  The first one is that you

8    must maintain the volume of your voice so I

9    can hear you and everyone else can hear you.

10   Do you understand?

11            THE WITNESS:  Yes.

12            JUDGE CARETHERS:  Secondly, you

13   only should answer the question that is

14   addressed to you.  Do you understand?

15            THE WITNESS:  Yes.

16            JUDGE CARETHERS:  If you don't

17   understand a question, let us know, and I

18   will have the question rephrased if I find it

19   necessary.  Do you understand?

20            THE WITNESS:  Yes.

21            JUDGE CARETHERS:  Two people

22   cannot speak at the same time, so please

23   allow the questioner to finish posing the

24   question before you begin answering.  Do you

25   understand?

DEF000766

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

347

1              THE WITNESS:  Yes.

2              JUDGE CARETHERS:  If there's an

3    objection by one of the attorneys to a

4    question that's posed to you, don't answer

5    the question.  I'll make a ruling, and then

6    I'll instruct you on whether you should

7    answer the question or not.  Do you

8    understand?

9              THE WITNESS:  Yes.

10             JUDGE CARETHERS:  Finally, I may

11   ask you some questions.  The mere fact that

12   I'm asking you questions should not indicate

13   to you that you're testifying poorly or well.

14   Do you understand?

15             THE WITNESS:  Yes.

16             JUDGE CARETHERS:  Could you please

17   state and spell your name for the record?

18             THE WITNESS:  It's Adam Brian

19   Kinder.

20             JUDGE CARETHERS:  Can you spell

21   your name for the record?

22             THE WITNESS:  Yes.  A-D-A-M,

23   B-R-I-A-N, K-I-N-D-E-R.

24             JUDGE CARETHERS:  All right.

25   Thank you very much.  This was an Agency

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

348

1    witness, and he's approved for 30 minutes, so

2    you may begin, Agency.

3                    MR. MILLER:  Thank you, Your

4    Honor.

5                    ADAM KINDER,

6    having been first duly sworn to tell the

7    truth, the whole truth, and nothing but the

8    truth relating to said matter, is examined

9    and testifies as follows:

10   EXAMINATION,

11        QUESTIONS BY MR. MILLER:

12   Q.  Mr. Kinder, can you please tell us where you

13       currently work?

14   A.  I currently work in the Salt Lake City

15       Regional Office.

16   Q.  And before that, where did you work?

17   A.  I was at the Phoenix West Area Office.

18   Q.  And have you ever held a position here at the

19       regional office here in Indianapolis?

20   A.  I have, yes.

21   Q.  What was that position?

22   A.  Assistant service center manager.

23   Q.  And approximately what time period?

24   A.  It would have been May 2013 through December

25       2014.

DEF000768

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

349

 1   Q.   And in your position, did you review requests
 2        for hardship transfers?
 3   A.   Pretty rarely.  I was acting service center
 4        manager for two months, and during that time
 5        I didn't have any hardships that were given
 6        to me.  So no, I didn't.
 7   Q.   Any requests for relocation under Article 13
 8        of the contract?
 9   A.   No.
10   Q.   And who was your supervisor at that time?
11   A.   Ms. Ena Lima, service center manager.
12   Q.   Was there a point in time where overtime was
13        required in your -- like for VSRs?
14   A.   Where it wasn't required?
15   Q.   Where it was required, when it came into
16        effect?
17   A.   Yeah, mandatory overtime was in place for
18        some time.  I don't know the exact dates.  I
19        can't recall.
20   Q.   If you could just look at page 269 of the
21        ROI.
22   A.   (Witness complies.)
23   Q.   Does that look familiar?
24   A.   Yes, it does.
25   Q.   And you issued this to your staff?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

350

1   A.   I did.

2   Q.   And what composed of your staff at that time?

3   A.   That would have been the service center.

4   Q.   The VSRs?

5   A.   Correct.

6   Q.   And the RVSRs?

7   A.   Yes.

8   Q.   At that time, did you know Ms. Brown?

9   A.   I knew of her.  I would say hello in passing.

10       I knew she was a VSR.

11  Q.   So as a VSR in her position under this

12       overtime guidance, how many hours a month was

13       she required to work overtime?

14  A.   It was 20 hours per month.

15  Q.   And that applied to everyone that was a VSR?

16  A.   Yes.  As it states in there, there were a few

17       exceptions, but for the most part it was

18       mostly VSRs.

19  Q.   And to your knowledge, they would have to

20       sign up for 20 hours every month for their

21       overtime period?

22  A.   Yes.

23  Q.   And who would they submit that to?

24  A.   Usually their frontline supervisor.

25  Q.   In her case it was Jim Dean?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

351

```
 1   A.  Yes.

 2   Q.  Did he ever contact you with regard to

 3       Ms. Brown not signing up for overtime?

 4   A.  I wasn't -- Deb Street was his immediate

 5       supervisor, but as I was acting during those

 6       two months, I had the whole evidence file, if

 7       you will.  So I saw the communications

 8       between her and her supervisor, Jim Dean.

 9   Q.  So you were acting at that time.  Do you

10       recall where Ms. Lima was?

11   A.  She was detailed to the assistant director

12       position.

13   Q.  And when it came to your attention that

14       Ms. Brown wasn't signing up for the mandatory

15       overtime, did you have any conversations with

16       her supervisors?

17   A.  I did, yeah.  Like I said, I saw the evidence

18       he submitted, and briefly touched base with

19       him.  It was pretty clear to me that -- there

20       wasn't a whole lot of questions I had.  She

21       just wasn't signing up for it.

22   Q.  And now, do you recall what that process was,

23       what the employee would have to do in

24       compliance with this mandatory overtime?

25       Was there a policy -- was there instruction
```

DEF000771

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

352

1      that they need to submit so many hours a

2      month to their supervisor that they can do

3      overtime?

4   A.  Yes.  Basically it's laid out in this

5      memorandum, but it is 20 hours per month, and

6      they work with their supervisors to

7      coordinate their shifts accordingly.

8   Q.  And it came to your attention that Ms. Brown

9      wasn't doing that?

10  A.  Correct.

11  Q.  And so you looked at the evidence file, page

12     268 through 279?

13  A.  Yes, I did.

14  Q.  And you also looked at the proposed reprimand

15     on page 266 as well, and 267?

16  A.  Yes, I did.

17  Q.  And having reviewed that, did you have an

18     opportunity to talk to Ms. Brown?

19  A.  I did.  Actually, my conversation with her

20     was when we issued the reprimand.  So the

21     conversation composed of going over the

22     actual reprimand.

23  Q.  And you explained why?

24  A.  Yes.

25  Q.  And do you recall what her response was?

DEF000772

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

353

1   A.   She had a few incidents where she had

2        mentioned some dealings Ena.  But again, I

3        referenced her back to the reason why we were

4        meeting for the reprimand, and not working

5        mandatory overtime.  And she didn't have any

6        questions and signed the document.

7   Q.   Okay.  And to your knowledge during this

8        time, were there any other employees that

9        were refusing to sign up for mandatory

10       overtime that came to your attention?

11  A.   Not that I was aware of.

12  Q.   So Ms. Brown was the only one during this

13       period of time that you were acting?

14  A.   Yes.

15  Q.   And do you know whether or not she ultimately

16       complied with the mandatory overtime

17       requirement?

18  A.   During my time as acting, no, I don't recall

19       that she did.  Like I said, Ena came back

20       into the place.  I'm not sure.  I transferred

21       right after that.

22  Q.   Did you have a discussion with Ena Lima about

23       issuing this reprimand?

24  A.   I did, yes.

25  Q.   And what was her advice, if you recall?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

354

1    A.   Her advice was to go ahead and proceed.

2    Q.   Okay.  But it was initially brought to your

3         attention by Jim Dean?

4    A.   Yes.

5    Q.   Any other discussions you may have had with

6         Ms. Brown following the reprimand?

7    A.   No.

8    Q.   Okay.  Did you work with her or see her very

9         often?

10   A.   I would frequently go around the service

11        center and say hello to individuals, how is

12        it going.  So it was just basically in

13        passing, just asking how she was doing and so

14        forth.

15   Q.   Okay.  If someone who signed up for overtime,

16        if they were sick and couldn't come in on

17        that date, could they use their sick leave

18        for that overtime period?  Do you remember?

19   A.   Use sick leave for their mandatory overtime?

20   Q.   Yeah.  If they signed up for overtime say, on

21        Saturday, and they wake up on Saturday and

22        say have a stomachache --

23   A.   Yeah, the same process would apply.  They

24        could either, you know, work with their

25        supervisor to reschedule that.  And I don't

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

355

 1      know if they would have to use leave

 2      accordingly during that time.  They would

 3      either reschedule it or work with their

 4      supervisors.

 5   Q.  But could they use leave?

 6   A.  For the mandatory overtime part?

 7   Q.  Yeah, if were sick on a day they signed up

 8      for mandatory overtime.

 9   A.  I'm not -- because I didn't deal with the

10      internal workings of how they request that, I

11      don't know exactly if they could use leave

12      during that time or not.

13          MR. MILLER:  I don't have anything

14      else.  Thank you.

15   EXAMINATION,

16          QUESTIONS BY MS. CLARK:

17   Q.  Mr. Kinder, can you tell me again during what

18      time period you were working in the

19      Indianapolis office?

20   A.  It would have been May, 2013 through December

21      of 2014.

22   Q.  Okay.  And I just want to make sure I

23      understand, the mandatory overtime was

24      20 hours per month.  Was there a specific

25      time period when an e-mail would go out

DEF000775

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

356

1      informing the employees how much time they

2      had to sign up for, the overtime?

3   A. Yeah, so frequently headquarters would give

4      us guidance.  And that e-mail that's on page

5      269 was something that was distributed down

6      from headquarters down to us to give out to

7      all employees, and that's what we did.

8   Q. Does it give a specific date by which the

9      employee is supposed to sign up for the

10     overtime?

11  A. Let me take a look.  It's been a while since

12     I've seen this.  Yeah, it's pretty specific

13     on when it begins.  October 17, 2013, and

14     that they were supposed to give 20 hours per

15     month, and to work with their supervisors

16     accordingly.

17  Q. It says on October 17th they were supposed to

18     sign up for it?

19  A. It doesn't say specifically sign up on

20     October 17, 2013.  It just says management

21     will continue to comply with the Memorandum

22     of Understanding with the union dated

23     June 30, 2011.  And then FYI, overtime for

24     C&P began on October 17, 2013, and then goes

25     into further dates.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

357

1   Q.   Okay.  So there was no specific time period

2        in that memo by which an employee needed to

3        inform the supervisor what dates they would

4        be doing the 20 hours, is that correct?

5   A.   Let me take another look at it.  No, it

6        doesn't give a specific date.  It does say

7        questions should be directed to your

8        supervisor.

9   Q.   Understood.

10  A.   Yeah.

11  Q.   What's the date of that memo?

12  A.   It was sent out on January 8, 2014.

13  Q.   Okay.  And are these memos sent out on a

14       monthly basis?

15  A.   It varies, depending on when headquarters

16       gives us guidance.

17  Q.   Okay.  So are you aware if there was another

18       memo that went out after January of 2014?

19  A.   Off the top of my head?  No, I don't -- I'm

20       sure there was, but I don't recall exactly

21       what date.  We quite frequently sent out

22       guidance to all our employees on various

23       things.

24  Q.   Okay.  Are you familiar with any kind of

25       memorandum that went out on or around March

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

358

1    or before -- yeah, either the end of February

2    or beginning of March, 2014, reminding

3    employees to sign up for mandatory overtime?

4  A. It's been a while since I've looked through

5    those e-mails.  Off the top of my head, I

6    don't recall a specific e-mail that went out.

7  Q. Okay.  How much time does an employee

8    normally have to sign up, to provide that

9    information to their supervisor?

10 A. Usually it's a fair amount of time to give

11   them to work out accordingly their leave

12   schedules and everything.  And if I could

13   reference back, when the memorandum comes

14   out -- came out, I know we had instructed our

15   supervisors to work with their employees

16   accordingly, work on leave and other things

17   of that nature.

18 Q. In the period of May 2013 through December of

19   2014, was there any other time that you

20   became aware that Ms. Brown had failed to

21   sign up for mandatory overtime other than the

22   time period of March, 2014?

23 A. In my role as the AVSCM, I wouldn't be privy

24   to that.  Her -- Jimmy Dean's supervisor was

25   another AVSCM, so I wouldn't be privy to

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

359

1          those conversations.

2    Q.   Okay.  But no one informed you -- I guess,

3         let me take a step back.  How did you become

4         informed of this particular incident?

5    A.   I was the acting service center manager.

6    Q.   Because you were acting service center

7         manager, okay.  Thank you.  And you were in

8         that position for the entire period of May,

9         2013 to December, 2014?

10   A.   No.

11   Q.   When did that end?

12   A.   The acting service center manager?

13   Q.   Yes.

14   A.   It was only for 60 days.  But I don't have

15        exact dates in front of me.

16   Q.   Okay.  Was that 60 days in 2014?

17   A.   Yes.

18   Q.   Okay.

19   A.   It would have been close -- if I recall,

20        around March time frame.

21   Q.   Okay.  Your testimony earlier was that you

22        had not been -- was your earlier testimony

23        that you did not receive a hardship transfer

24        while you were in the Indianapolis office?

25        Did I understand that correctly?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

360

```
 1   A.   I didn't deal with hardship transfers and I

 2        don't recall receiving one during my acting

 3        role.

 4   Q.   Okay.  Do you remember receiving a request

 5        for reassignment for medical reasons?

 6   A.   I do not.

 7   Q.   Okay.  Did you issue the formal reprimand to

 8        Ms. Brown associated with the mandatory FMLA

 9        overtime?

10   A.   I did, yes.

11   Q.   And did Ms. Brown talk to you directly about

12        what procedures she was supposed to follow to

13        apply her FMLA hours to the mandatory

14        overtime?

15   A.   No, I don't recall that.

16   Q.   So you don't recall talking to her about

17        that?

18   A.   No.

19   Q.   Did you speak with Sonya Wilson at all about

20        the application of FMLA hours to mandatory

21        overtime?

22   A.   I remember talking to Sonya before the

23        reprimand, but I don't recall that being

24        brought up.

25   Q.   Were you aware that Ms. Brown was on FMLA?
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

361

1   A.   No, I wasn't.

2               MS. CLARK:   I have no further

3        questions.

4               JUDGE CARETHERS:   Your witness,

5        Agency, if you have any follow-up.

6               MR. MILLER:   Thank you.

7   EXAMINATION,

8        QUESTIONS BY MR. MILLER:

9   Q.   If you could look at page 272.

10  A.   (Witness complies.)

11  Q.   This is the e-mail from Jim Dean to Ms. Brown

12       regarding the overtime.  And it appears that

13       as of February 12th she hadn't received any

14       dates that she would be able to provide her

15       overtime.  Is 12 days a sufficient enough

16       time to provide -- an employee to provide

17       dates for mandatory overtime?

18  A.   I'd say that's fair, yes.

19  Q.   Okay.  And in your mind, that'd be

20       reasonable?

21  A.   Uh-huh.

22  Q.   And by handing it to the supervisor by close

23       of business the next day, was that reasonable

24       in your mind?

25  A.   Yes.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

362

1       MR. MILLER:  No further questions.

2       JUDGE CARETHERS:  Okay.  This

3  concludes the testimony of this witness.  You

4  are free to go.  Do not discuss your

5  testimony or any of the questions that were

6  asked of you with any other witness.  Do you

7  understand?

8       THE WITNESS:  Yes.

9       JUDGE CARETHERS:  All right.

10  Let's go off the record.

11       (A recess was taken.)

12       JUDGE CARETHERS:  We're continuing

13  the hearing of Ms. Trevenia Brown versus

14  Department of Veterans Affairs.  We have our

15  next witness who is Ms. Sonya Wilson.  How

16  are you doing today?

17       MS. WILSON:  I am well, thank you.

18       JUDGE CARETHERS:  Good.  My name

19  is Administrative Judge Trek Carethers.  I'm

20  presiding over the hearing.  Are you a

21  current federal employee?

22       MS. WILSON:  I am.

23       JUDGE CARETHERS:  Your time here

24  will be considered official duty time and

25  there will be no reprisal for any testimony

DEF000782

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

363

1      you give today.  Do you understand?

2                  MS. WILSON:  Yes, sir.

3                  JUDGE CARETHERS:  Can we have this

4      witness sworn in, please.

5                  (The witness is sworn by the court

6      reporter.)

7                  JUDGE CARETHERS:  Before we begin

8      taking your testimony, I have to give you the

9      instructions I give all the witnesses.  The

10     first one is that you must maintain the

11     volume of your voice.  Do you understand?

12                 THE WITNESS:  Yes, sir.

13                 JUDGE CARETHERS:  If you don't

14     understand a question, let us know and I will

15     have the question rephrased if necessary.  Do

16     you understand?

17                 THE WITNESS:  Yes, sir.

18                 JUDGE CARETHERS:  Two people

19     cannot speak at the same time.  Please allow

20     the questioner to finish posing their

21     question before you begun answering.  Do you

22     understand?

23                 THE WITNESS:  Yes, sir.

24                 JUDGE CARETHERS:  If there is an

25     objection by one of the attorneys to a

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

364

1    question, do not answer.  I will rule on the

2    objection and then I'll instruct you on

3    whether you should answer the question or

4    not.  Do you understand?

5              THE WITNESS:  Yes, sir.

6              JUDGE CARETHERS:  I may ask you

7    some questions.  The mere fact I'm asking

8    questions should not imply to you or suggest

9    to you that you're testifying poorly or well.

10   Do you understand?

11             THE WITNESS:  Yes, sir.

12             JUDGE CARETHERS:  You should only

13   answer the question that's addressed to you.

14   Do you understand?

15             THE WITNESS:  Yes, sir.

16             JUDGE CARETHERS:  Great.  Could

17   you please state and spell your name for the

18   record?

19             THE WITNESS:  My name is Sonya

20   Wilson.  S-O-N-Y-A, W-I-L-S-O-N.

21             JUDGE CARETHERS:  This is an

22   Agency witness approved for an hour and a

23   half.  You may begin.

24             MR. MILLER:  Thank you, Your

25   Honor.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

365

1                    SONYA WILSON,

2        having been first duly sworn to tell the

3        truth, the whole truth, and nothing but the

4        truth relating to said matter, is examined

5        and testifies as follows:

6        EXAMINATION,

7            QUESTIONS BY MR. MILLER:

8    Q.   Good afternoon, Ms. Wilson.

9    A.   Good afternoon.

10   Q.   What is your current position with the VA?

11   A.   I'm currently a human resource specialist

12        with the VA regional office in Indianapolis.

13   Q.   Okay.  And how long have you held that

14        position?

15   A.   For three years in November.

16   Q.   Okay.  And what did you do before that?

17   A.   Prior to that I worked at the VA Medical

18        Center in Marion, Indiana.  I worked as a

19        labor employee relations specialist in the

20        human resource department and also a student

21        intern in the Equal Employment Opportunity

22        office.

23   Q.   Okay.  And have you ever served as

24        essentially an LRAC?

25   A.   I have, yes, sir.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

366

1   Q.   And what period of time was that?

2   A.   As the local reasonable accommodation

3        coordinator at the VA regional office in

4        Indianapolis?

5   Q.   Yes.

6   A.   It was approximately maybe January of 2013 to

7        the end of January, 2014.

8   Q.   Okay.  And do you currently hold that

9        position?

10  A.   No.  Currently we have another human resource

11       specialist who was able to assume those

12       duties.

13  Q.   Okay.  Do you know Ms. Brown?

14  A.   I do.

15  Q.   Okay.  And, I guess, in what capacity do you

16       know her?

17  A.   I first met Ms. Trevenia Brown when she was a

18       VSR in the veterans service center.

19  Q.   Okay.  And that was just in passing?

20  A.   Yes.

21  Q.   Okay.  Do you do orientation as well?

22  A.   I do do orientation, however, Ms. Brown was

23       already present when I arrived at the VARO.

24  Q.   What's part of the orientation process for a

25       new employee?

**DEF000786**

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

367

```
 1   A.   So we do a briefing on the equal employment
 2        opportunity program.  We talk about employee
 3        benefits.  We help answer questions, just
 4        about the regional office in general, about
 5        the VA regional office, and all the business
 6        lines that we support.  We talk about
 7        reasonable accommodations and how a person
 8        would apply for reasonable accommodations.
 9             We talk about -- I'm trying to think
10        of everything else that we -- a briefing on
11        security and privacy.  So we schedule several
12        briefings from different people in the
13        department who have a specialty in the area
14        that would be important for new employees to
15        know coming on.
16   Q.   Okay.  And have you presented one of these
17        trainings before?
18   A.   Yes.
19   Q.   Okay.  And how long do they last, usually?
20   A.   For the entire training?
21   Q.   Yeah.
22   A.   Two to three days.
23   Q.   Okay.
24   A.   Depends on how big the class is and how many
25        questions that the new employees have
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

368

1     throughout the process.

2  Q.  Okay.  And you said you specifically discuss

3     EEO and reasonable accommodation issues?

4  A.  Yes.  I do that myself.

5  Q.  Okay.  And how in-depth do you go?

6  A.  So the equal employment opportunity

7     presentation covers all of the federal laws

8     and regulations that govern acceptable

9     workplace practices.  We identify what the

10    protected classes are.  We identify the

11    process, the EEO process in which an employee

12    would file a complaint.  We talk about

13    mediation being an option if there are some

14    concerns, and we also talk about the VA

15    policy on harassment and sexual harassment,

16    and essentially identify how to report some

17    issues or concerns that an employee has.

18  Q.  Okay.  And specifically the reasonable

19    accommodation process, do you identify who

20    you need to go to if you have an issue with a

21    reasonable accommodation, the process itself?

22  A.  Yes.  This is what we tell new employees, in

23    reasonable accommodations if they feel like

24    they need a reasonable accommodation, that

25    they would come to talk -- come to the Human

DEF000788

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

369

1      Resources to speak to the local reasonable

2      accommodation coordinator.

3   Q.   Okay.  And at that point do you identify who

4      that is?

5   A.   At that point?

6   Q.   During the training?

7   A.   Yes.  We identified that Octavia Fitzgerald

8      is the local reasonable accommodation

9      coordinator.

10  Q.   Okay.  And she's --

11  A.   Previous to that, it would have been me.  I

12     would have been the reasonable accommodation

13     coordinator.

14  Q.   Okay.  And during these trainings, that would

15     have been -- they would have been notified of

16     that?

17  A.   Correct.

18  Q.   If someone comes to the Human Resources

19     office as instructed during the training, and

20     they say hey, I need to speak with an LRAC,

21     do you tell them who that is?

22  A.   Yes, absolutely.

23  Q.   Okay.  So you're not trying to hide any

24     information?

25  A.   Oh, no, not at all.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

370

1    Q.   All right.   If someone has an issue with a

2         reasonable accommodation, do you provide the

3         necessary forms that they need to fill out?

4    A.   Correct.

5    Q.   And what are those forms, if you can recall

6         off the top of your head?

7    A.   I can.   VA Form 0857, and it goes -- ranges

8         from A all the way to E, I believe.

9    Q.   And that's the process essentially of going

10        through a reasonable accommodation?

11   A.   Correct.

12   Q.   And I assume there's a form specifically made

13        out for obtaining medical documentation?

14   A.   Yes.   That's the VA Form 0857e.

15   Q.   And are those readily handed out if someone

16        needs a reasonable accommodation?

17   A.   They are, and they're available online as

18        well.

19   Q.   Okay.   And is this something that you advise

20        employees during their training when they

21        first come on?

22   A.   Of the forms?

23   Q.   Yes.

24   A.   That would probably be more covered when the

25        employee comes to speak with the local

DEF000790

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

371

```
 1        reasonable accommodation coordinator about

 2        the possibility of a reasonable

 3        accommodation.

 4   Q.   Okay.  Do you also process requests for FMLA?

 5   A.   Yes.

 6   Q.   Do you recall processing a request for

 7        Ms. Brown?

 8   A.   I recall Ms. Brown having an FMLA request,

 9        yes.

10   Q.   Okay.  And do you recall whether or not that

11        was approved?

12   A.   Yes, it was approved.

13   Q.   Okay.  And do you approve those or who does

14        that go to usually?

15   A.   It's signed by the director.  The director

16        has the ultimate approval, so our

17        responsibility in Human Resources is to make

18        a recommendation based on the laws, rules,

19        and regulations that govern the FMLA process.

20   Q.   Okay.  And I assume since she was approved,

21        that someone in HR, whether it be you or

22        someone else, said, yes, this is appropriate,

23        let's provide it?

24   A.   Correct.

25   Q.   Okay.  And who maintains the leave balances
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

372

1          that are being used for FMLA?

2    A.    So the leave approving official would be

3          responsible ultimately.  But whenever we get

4          an FMLA request that comes into Human

5          Resources, we try to do the -- or we pull the

6          time card and do research to see how much of

7          the FMLA hours the employee has used so that

8          when we let them know that they have FMLA

9          hours available, the entitlement is

10         available, we let them know how much so that

11         they are apprised of their leave balances as

12         well.

13   Q.    Are you aware that Ms. Brown back in

14         December 31, 2013, requested to be involved

15         in a voluntary leave transfer program?

16   A.    I believe I did see documentation to support

17         that, yes.

18   Q.    Okay.  And was that something that you would

19         have authorized?

20   A.    Yes.

21   Q.    And do recall authorizing that?

22   A.    Specifically do I recall it?

23   Q.    If you don't recall, that's --

24   A.    Yeah, I'm sorry.  I don't recall.  I could

25         have.  We have a lot of -- several of those

DEF000792

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

373

1    requests that come in and then we're

2    responsible for identifying whether or not

3    that meets the criteria.

4  Q.   Okay.

5              MR. MILLER:  What exhibit number

6    are we on, 33?

7              JUDGE CARETHERS:  I'm sorry.  We

8    are on -- I have to go back and check.  I

9    know we did 31, 32, and, yes, 33.

10             MR. MILLER:  And, Judge, this is

11   at Agency Exhibit D, and it starts on page 2.

12             JUDGE CARETHERS:  Let me get that.

13   While we're doing that, Complainant, do you

14   have any objection to it?

15             MS. CLARK:  No, I have no

16   objection to it.

17             JUDGE CARETHERS:  Okay, the

18   application for voluntary leave program.

19   Okay, that is accepted and admitted.  Please

20   have it marked as 33.

21             (Exhibit 33 was marked for

22   identification and received into evidence.)

23   BY MR. MILLER:

24  Q.   I'm going to hand you what's marked as

25   Exhibit 33, and it's three pages.  See if you

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 128 of 406 PageID #:
762
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

374

1      recognize those.

2  A.  I do.

3  Q.  Okay.  And it appears to be an e-mail, and a

4      request that has come in for FMLA?

5  A.  This is for the voluntary leave transfer

6      program.

7  Q.  I'm sorry, you're right.

8  A.  Yeah, so an application came in for Ms. Brown

9      to participate in the voluntary leave

10     transfer program.  It looks like I sent out

11     an e-mail to all of the regional office to

12     let them know that she was a participant and

13     that they could donate and how they could

14     donate.

15         And then I also have in my hand, it

16     looks like one -- at least one employee did

17     donate leave to Ms. Brown while she

18     participated in that program.

19 Q.  Is this something that you approve or does

20     the voluntary leave program, is that

21     something someone else has to approve?

22 A.  So it comes with the director's signature as

23     well.  We make a recommendation based on the

24     regulations, the VA handbook that governs the

25     voluntary leave transfer process.  And if

DEF000794

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

375

1      they have the medical -- they provide the

2      appropriate information, which would include

3      medical documentation, then yes, they are

4      approved to participate in the program.

5  Q.  Okay.  And so she was approved, I assume you

6      recommended it?

7  A.  Correct.

8  Q.  Okay.  Do you recall ever receiving a request

9      for an immediate hardship transfer to

10     St. Petersburg, Florida for Ms. Brown?

11 A.  I do.

12 Q.  Do you recall when that might have been?

13 A.  I'm sorry?

14 Q.  Do you recall the approximate date that may

15     have been?

16 A.  Maybe January.

17 Q.  Of 2014?

18 A.  Yes, sir.

19 Q.  And how does that process work as far as who

20     does it come from, where does it go, who has

21     the authority to approve it?

22 A.  So the process, the employee who was

23     requesting the hardship transfer to another

24     office would submit their request to their

25     coach.  And then once they submit it to their

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

376

1    coach, the coach then will send it up through

2    the division management, who would make a

3    recommendation in support or not of the

4    transfer, based on the employee's longevity

5    with the station, their performance, their

6    current performance.  And then they type up a

7    memorandum with all that information and send

8    it to the director's office for consideration

9    through Human Resources.

10   Q.  Okay.  So ultimately do you make that

11       determination whether or not that should be

12       granted or not?

13   A.  No.  What I do is take the information that

14       is submitted, which would be the employee's

15       information and their explanation of their

16       hardship, and any supporting documentation

17       they provide, and then the division

18       management memorandum with their performance

19       information.  And then I give it to the

20       director for his consideration.

21   Q.  Okay.  And in this case the division

22       management would have been Ena Lima?

23   A.  Correct.

24   Q.  Okay.  And so you just gather this

25       information and provide it to the director

DEF000796

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

377

1       for a decision?

2    A.  Correct.

3    Q.  And you don't make a recommendation on it?

4    A.  No, I don't make a recommendation for or

5        against a hardship transfer.

6    Q.  Okay.  Do you recall whether or not this was

7        granted or denied?

8    A.  The request for hardship transfer was denied

9        based on performance issues.

10   Q.  Okay.  And the performance issues were

11       obtained from Jim Dean and Ena Lima?

12   A.  Correct.  It would have been information that

13       was submitted, ASPEN data, which is their

14       current system that records performance.

15       She, being Ena Lima, submitted ASPEN data.

16   Q.  Okay.  And I assume that data said she was

17       under performing?

18   A.  Yes, sir.

19   Q.  All right.  And --

20   A.  That she was not meeting the --

21   Q.  Performance data?

22   A.  Correct.

23   Q.  And in your mind, was that the only reason

24       why she was denied the hardship transfer?

25   A.  Yes.  That was the reason for the denial and

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

378

1    it was so noted on the denial form, which

2    then when I received it from the director,

3    provided it to the division to communicate.

4  Q.  Okay.  And that would have been Ena Lima to

5    have communicated it?

6  A.  Correct.

7  Q.  And do you not usually communicate those?

8  A.  No.  The hardship transfer would not be

9    communicated by Human Resources.

10 Q.  Okay.

11 A.  It would be communicated by the division.

12 Q.  Okay.  So you're kind of a funnel of

13    information?

14 A.  Correct.  So I track it, and then if the

15    hardship transfer is granted, I assist with

16    the process of the transfer to the other

17    station.

18 Q.  Did you ever have a discussion with Ms. Brown

19    about this particular hardship transfer?

20 A.  I did.  The discussion initially started,

21    Jimmy Dean which would have been her coach at

22    the time, came to Human Resources and said he

23    had an employee who wanted a hardship

24    transfer.  And he said it was Ms. Brown.  And

25    I say okay, and I explained to him the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

379

1      process and provided him with the documents

2      that she could complete to identify her

3      hardship, and that she could add any

4      supporting documentation -- if it's a medical

5      hardship, that she can provide any supporting

6      documentation to support that.

7              Mr. Dean came back to me and said

8      that she didn't -- she didn't want to provide

9      any medical documentation because we already

10     had it in her FMLA file.

11             MS. CLARK:  I'll object, hearsay,

12     as to what Jim Dean said to her.

13             JUDGE CARETHERS:  Okay.  Agency,

14     any response?

15             MR. MILLER:  I think we've already

16     discussed that the FMLA file was requested to

17     be used by Ms. Brown herself.

18             MS. CLARK:  As to what Mr. Dean

19     said?  He is going to testify, I understand,

20     so...

21             JUDGE CARETHERS:  Okay.  It's kind

22     of hard, she's already stated it.  But I'll

23     sustain the objection, but she's already

24     stated it, so I'm not sure what you can do at

25     this point.  So continue with your answer.

DEF000799

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

380

1    Please don't indicate what other people

2    stated to you, okay?

3              THE WITNESS:  Don't?  I'm sorry --

4              MR. MILLER:  We'll start again.

5              THE WITNESS:  Okay.

6    BY MR. MILLER:

7    Q.   It came to your knowledge that Ms. Brown

8         wanted to use an FMLA form?

9    A.   Correct.

10   Q.   Okay.  And did you provide the FMLA form as

11        part of the hardship transfer request?

12   A.   I did, after she had insisted that I provide

13        that as part of the documentation, yes.

14   Q.   Okay.  Tell me how -- did you have a meeting

15        with Ms. Brown about this?

16   A.   Yes.  She came down to my office.  She was

17        very upset and angry because she didn't want

18        to have to provide any additional medical

19        documentation.  I began to explain to

20        Ms. Brown at that time, we can include your

21        FMLA paperwork.  It's just a little more

22        involved than it needs to be for a hardship

23        transfer.  And I explained to her the process

24        of people who would see this information as

25        they make a determination.  She insisted that

DEF000800

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

381

```
 1        I use the FMLA paperwork, and at that time I
 2        did.  So I went and made a copy of the FMLA
 3        paperwork and attached it to the hardship
 4        transfer information and submitted it for
 5        consideration.
 6   Q.   So did she essentially demand that you follow
 7        through with the hardship process?
 8   A.   Yes.  She was very angry about that.
 9   Q.   Was there any other discussion as to any
10        other avenue that she should or shouldn't be
11        using?
12   A.   I'm sorry?
13   Q.   Was there any discussion as to any other
14        venue that she should or shouldn't use?
15   A.   No, not at that time.
16   Q.   Okay.  Now, in your mind, had there not been
17        these underlying performance issues, would
18        she likely have been granted the hardship
19        transfer under their guidance?
20             MS. CLARK:  Objection, because the
21        witness has stated that she doesn't deal with
22        performance issues.  She's just a funnel, I
23        believe is what Counsel has already
24        identified her as being.  So I don't know
25        that she is the one that's make -- and she's
```

DEF000801

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

382

1      not the one that's making the determination

2      about the hardship transfer.

3                MR. MILLER:  I'll withdraw the

4      question.

5                JUDGE CARETHERS:  Okay.  Thank

6      you.

7      BY MR. MILLER:

8   Q.  So once the determination was made as to the

9      hardship transfer, again, you said you sent

10     it out to Ena Lima to distribute?

11  A.  Correct.

12  Q.  And your involvement at that point, you were

13     finished?

14  A.  Correct.

15  Q.  Did you have any follow-up discussions

16     outside of the one where she requested that

17     she use the FMLA regarding this particular

18     hardship transfer?

19  A.  That conversation was pretty detailed and

20     entailed and encompassed several other things

21     as well.  But it boiled down to she wanted me

22     to use the FMLA paperwork to support -- as

23     the medical to support the transfer, and

24     which I complied.

25  Q.  Okay.  Do you recall ever receiving a

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

383

1      question from Gwendolyn Gantt regarding the

2      guidance on hardship transfers?

3  A.   I did.  I do.

4  Q.   And was it an e-mail?  Was it a phone call?

5  A.   It was an e-mail.

6  Q.   Okay.  And what was she requesting in

7      particular?

8  A.   She was requesting information concerning a

9      reasonable accommodation, information that

10      was -- sounded like she may have gotten a

11      note from -- if I recall correctly, from

12      Trevenia Brown, or central office would have

13      gotten information from Ms. Brown, concerned

14      for her reasonable accommodation, wasn't

15      treated fairly, I believe.  And she asked me

16      to provide the information.

17  Q.   Okay.

18           MS. CLARK:  Generally, I don't

19      have -- this is a very difficult e-mail to

20      read.  The highlighted sections almost block

21      out the language in a good chunk of this

22      e-mail.  I'm not opposed to it coming in, I

23      just -- is there any way of getting a clearer

24      version of this?  I mean, there's no version

25      I've received so far in document exchanges or

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

384

1    in production for this hearing that allows

2    anyone to it read clearly.

3            MR. MILLER:  I can read it out to

4    you, what it says.

5            JUDGE CARETHERS:  I'm not sure

6    what's going on.  I don't even know what the

7    document is, but I understand that

8    Complainant is saying she's requesting a

9    clearer copy although she's not specifically

10   objecting to the document coming in.  That's

11   what I understood.

12           MR. MILLER:  Okay.  And it's

13   Agency Exhibit G.  And I don't know if it's

14   clearer on the e-mail version or not.  The

15   PDF version.

16           JUDGE CARETHERS:  Yeah, I'm

17   looking at it.  When she's saying it's

18   blocked out, is she talking about like for

19   instance on my version, like there's a table

20   that is dated 2/24/2014, and it's

21   highlighted -- I assume that's highlighted,

22   "Brown requests a reasonable accommodation."

23   Is that what she's referring to?

24           MS. CLARK:  Yeah, that's what I'm

25   referring to.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

385

1          MR. MILLER:  Yeah, I suppose so.

2          JUDGE CARETHERS:  At least on my

3     version, I can read what it says.  I'm not

4     sure what your version looks like.

5          MS. CLARK:  The printed version is

6     very cloudy.

7          JUDGE CARETHERS:  Well, I'm going

8     to accept it as an exhibit.  If there's any

9     question what it is, I'm not sure who

10    produced this document.  Who produced this

11    document?

12         MR. MILLER:  The Agency.

13         JUDGE CARETHERS:  Okay.  I guess

14    what we'll do is, I guess -- this is how

15    we'll handle it.  We'll admit the exhibit.

16    If any part of it is questioned by the

17    Complainant, when she goes on cross she can

18    have the person clarify the missing

19    information if the witness is able to.

20    That's how we'll handle it.

21         MS. CLARK:  Thank you.

22         MR. MILLER:  Okay.  Thank you,

23    Judge.

24         JUDGE CARETHERS:  This is

25    Exhibit 34, admitted.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

386

1          (Exhibit 34 was marked for

2     identification and received into evidence.)

3     BY MR. MILLER:

4  Q.  I'll hand you what's marked as Exhibit 34.

5     It's four pages.  Could you review that.

6  A.  (Witness complies.)  Okay.

7  Q.  Could you just briefly describe what your

8     response was to her request?

9  A.  And so Ms. Gantt in the EEO office, the

10    central offices, she was asking me to give

11    her information concerning Ms. Brown's

12    request.  I explained to Ms. Gantt that there

13    was a hardship transfer request that was

14    submitted by Ms. Brown to the director of the

15    division leadership for consideration, and

16    that a brief explanation of the hardship, I

17    was explaining to the employee what was

18    needed in order to request a hardship

19    transfer.

20         Ms. Brown initiated the request, and

21    insisted on using her FMLA documents.  And I

22    explained the hardship transfer process to

23    Ms. Brown, including who would have access to

24    review all of the information that she

25    submitted in making a determination.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

387

1       Ms. Brown insisted that I use her FMLA

2       documents.  She was offended that I had

3       invited her to provide a less detailed

4       medical statement, since it was going through

5       that process.  And she perceived -- she,

6       being Ms. Brown, perceived that invitation as

7       lack of support, that I didn't support her

8       hardship transfer, which -- so I was

9       explaining that to Ms. Gantt.

10          Then the division provided the

11      director with the performance information and

12      all the other information that the director

13      would use in considering the transfer and

14      make a final determination.  And then the

15      decision was sent to eastern area for final

16      approval.

17   Q.  Okay.

18   A.  And then I gave her a timeline of events.

19   Q.  Now, what's necessary for a hardship

20      transfer?  Is that similar to what's

21      necessary, for medical information

22      documentation, for a reasonable

23      accommodation, as far as how specific the

24      information needs to be?

25   A.  No.  So for a hardship transfer there just

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

388

1    needs to be general information to support --

2    that just kind of supports the employee's

3    hardship story, whatever they're saying is

4    their hardship.  And for a reasonable

5    accommodation, the 0857E clearly identifies

6    what information is needed to determine

7    whether or not an employee is eligible for a

8    reasonable accommodation and qualifies under

9    the Rehab Act.

10   Q.  Okay.  And that information was provided, and

11       was there any further correspondence with

12       regard to this?

13   A.  No, not that I recall.

14   Q.  Okay.  Do you recall Ms. Brown requesting a

15       reassignment for medical reasons under

16       Article 13 of the contract?

17   A.  I do.

18   Q.  All right.  And what was your involvement in

19       that process?

20   A.  So the only -- my only involvement was to

21       identify the reference, which would be in the

22       AFGE Master Agreement 2011, the reassignment

23       request criteria, and advise management on

24       that criteria that they would use to make a

25       determination.

DEF000808

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

389

1    Q.   Okay.  So you don't make the determination,

2         you just provide, here is the criteria?

3    A.   Correct.

4    Q.   And does the request come to you?

5    A.   No, it goes to the division.

6    Q.   Well, I mean, how is it initiated?

7    A.   Okay.  So based on the master agreement, what

8         an employee -- again, this is the same thing.

9         What the employee would do, was let their

10        coach know that they were requesting a

11        reassignment, and whatever the reassignment

12        is; within the RO, outside the RO, to another

13        position, to a downgraded position.  Whatever

14        the reassignment request is, they would make

15        it to their coach who would then send it to

16        the division management, who would make the

17        determination.

18   Q.   Okay.  And you've seen it before?

19   A.   I have.

20   Q.   I'm going to hand you what's marked as

21        Exhibit 32.  And if you look at Section 9,

22        just review that just briefly, if you can.

23   A.   (Witness complies.)  Okay.

24   Q.   Now, when talking about reassignment, they're

25        talking about within that particular regional

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

390

1    office?

2  A.   Correct.  According to Article 13, Section 9,

3       it identifies that the request will be

4       accompanied by medical certification, and

5       that we would look for reassignment duties

6       commensurate for the medical condition, and

7       within -- I'm sorry.  I just read it.

8            "The department will, to the extent

9       that it is operationally feasible, reassign

10      the employee to an appropriate vacancy or

11      duties and responsibilities within his or her

12      own service or section."

13 Q.   Okay.  Thank you.  Did you have a discussion

14      with Ms. Brown about this Article 13 transfer

15      request?

16 A.   I did not.

17 Q.   All right.  And so again, on this action,

18      you're funneling the information to the

19      appropriate people?

20 A.   Correct.

21 Q.   Okay.  With contract guidance or whatever it

22      may take?

23 A.   Correct.

24 Q.   Okay.  Do you know what the decision on that

25      one was?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

391

```
 1   A.   It was denied.
 2   Q.   Okay.  Now, do you recall that Ms. Brown, on
 3        February 24, 2014, submitted a request for a
 4        reasonable accommodation?
 5   A.   I do.
 6   Q.   Okay.  And how does that process work?  Does
 7        it go directly to you?  Does go to a coach?
 8        Just describe what that process is.
 9   A.   So an employee can identify to anyone in
10        management that they are requesting an
11        accommodation.  In this situation, she had
12        identified or she had submitted the request
13        for a reasonable accommodation to -- I don't
14        recall if it was her coach directly or me
15        directly.  Once we receive the request,
16        however it's received, then what we do is we
17        have an interactive conversation, or we meet
18        with the employee to try to see if we can
19        determine what it is that they need.  And --
20   Q.   And this is after they submit the request?
21   A.   Correct.
22   Q.   And who participates in that meeting?
23   A.   At that time, it would be the coach and the
24        reasonable accommodation coordinator, which
25        would have been me.
```

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 146 of 406 PageID #:
280
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

392

1   Q.   Okay.  And did she have any questions as to
2        who the reasonable accommodation coordinator
3        was?
4   A.   No, not that I know of.
5   Q.   To your knowledge, she knew it was you?
6   A.   Correct.
7   Q.   And do you recall having a meeting with
8        Ms. Brown, Ms. Gentry, and Mr. Dean regarding
9        this reasonable accommodation request?
10  A.   I do.
11  Q.   What was the purpose of that meeting?
12  A.   It was to try to ascertain what her
13       limitations were.  We were unable to identify
14       what limitations were needing to be
15       accommodated.
16  Q.   You were trying to find out what her actual
17       workplace limitations were?
18  A.   Correct.
19  Q.   Were you trying to find out what the
20       possibility -- what realm of possibility an
21       accommodation would be?
22  A.   Correct.
23  Q.   And how did you go about trying to obtain
24       that information?
25  A.   So I started off by trying to explain the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

393

1    reasonable accommodation process.  I don't

2    remember the reasoning why, but I thought she

3    had misunderstood the process.  And so I

4    started off trying to explain the reasonable

5    accommodation process, and that the purpose

6    of a reasonable accommodation is to try to

7    accommodate the individual in the position

8    they're in, if we can.

9          And in the event that we're unable to

10   accommodate them in the position that they're

11   in, that we would look for other positions

12   for which they qualified and to assist them

13   in another position if necessary.

14   Q.  So overall guidance for a reasonable

15   accommodation is -- what you're trying to

16   convey, is that you try to accommodate them

17   in the position?

18   A.  Uh-huh.

19   Q.  At whatever means.  Then if you can't, you

20   look outside of their position, within the

21   locality?

22   A.  Correct.

23   Q.  And if that doesn't work, you look into other

24   offices?

25   A.  Correct.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

394

1   Q.   Okay.  And this is the information you

2        provided to Ms. Brown?

3   A.   Yes, I tried to provide that, yes.

4   Q.   When you say you tried, was there a push

5        back, was she unhappy to hear that?

6   A.   Ms. Brown was very upset even at the onset of

7        the meeting.  When I began to explain the

8        process, she continually interrupted me and

9        tried to explain to me what the process was.

10       And I would let her talk and let her finish,

11       and then the second I would start talking

12       again to try to explain the process, she

13       would then talk over me again.

14  Q.   When she was talking over you, do you recall

15       what she was -- what she stated?

16  A.   I don't remember specifically everything she

17       said.  I remember her being very angry and

18       her continually interrupting me.  And even to

19       the point where when I started again -- I

20       would let her talk, when she would start

21       talking, I would let her finish, and then I

22       would try to come back on and explain the

23       process again.  And at that point she had sat

24       down in a chair and turned her back to me,

25       indicating to me that she was not listening

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

395

1          or interested in listening to me explain the

2          process.

3                    And so at that time -- she had a

4          representative in the room which was Rachel

5          Gentry.  And so I just turned to Rachel

6          Gentry and explained the process to her.

7     Q.   Okay.  And what did Ms. Gentry say to you, do

8          you remember?

9     A.   I remember Ms. Gentry telling me that she

10         would try to talk to Trevenia later, after

11         she had calmed down.

12    Q.   Were you able to identify any more specific

13         limitations or --

14    A.   No.  Mr. Dean, who was her coach at the time,

15         was also in the room.  And he asked what

16         limitations that she had, so that we -- we

17         were trying -- we let her know that we were

18         trying to help her work through the

19         reasonable accommodation process.  But in

20         order to even begin to talk about an

21         accommodation that would be appropriate, we

22         would have to know her limitations.  And so

23         Mr. Dean asked her what her limitations were,

24         and she stated she didn't have any.

25    Q.   So from your standpoint as the LRAC, you're

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

396

1       not as familiar with her condition as she is.

2    A.  Correct.

3    Q.  And did you know what her limitations were?

4    A.  I did not.

5    Q.  Did you have any idea what they may have

6        been?

7    A.  I did not, which is why the interactive

8        meeting is very important for that part of

9        the process.

10   Q.  And did she provide you with any information

11       at that meeting with regard to her

12       limitations?

13   A.  No.  She stated specifically, I don't have

14       any limitations.  And we asked her if there

15       were any accommodations we could provide in

16       the interim until we can get through this

17       process.  And she said no, that there's

18       nothing -- there's no interim accommodation

19       we could provide and she had no limitations.

20       She wanted to be transferred.

21   Q.  Was that the only thing she stated as far as

22       what her request was for a reasonable

23       accommodation?

24   A.  Yes.

25   Q.  And that she would only be satisfied with the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

397

```
 1        transfer?

 2   A.   Correct.  That was very clear.

 3   Q.   Did she ever mention that she would be

 4        interested in telework at that time?

 5   A.   No.  Was not even part of the discussion.

 6   Q.   Did you have enough information before you as

 7        to her limitations as to whether or not

 8        telework would have been appropriate or not?

 9   A.   I did not.  I didn't understand what she -- I

10        knew she wanted to be transferred, but when

11        we were working through the reasonable

12        accommodation process, our responsibility in

13        order to identify an accommodation is to know

14        what the limitations are.  You can't even

15        start looking for an accommodation if you

16        can't identify the limitation.

17   Q.   Okay.  And do you recall whether or not you

18        provided her with that medical request form?

19   A.   We provided it with her actually twice.

20   Q.   Okay.  On what dates or times, if you can

21        remember?

22   A.   So during the interactive meeting that day we

23        provided her with the 0857e, identifying the

24        kind of information that we would need to

25        help make a determination, or the appropriate
```

DEF000817

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

398

1   determination for her reasonable

2   accommodation.

3           Again, we asked if she can -- at the

4   time, I don't think she was speaking.  She

5   had her back towards me.  She sat in the

6   chair looking out the window with her back

7   towards me.  So I handed the form to her

8   representative who said she would relay the

9   information later.

10          And then we asked if she could

11  provide it in 15 days, if she could.  If she

12  needed more time, she could let us know, we

13  could give her that time.  At the 15-day mark

14  or thereafter, I'm not sure of the date, I

15  reached out to the coach for a follow-up.  I

16  said, hey, we haven't received the medical

17  information for the reasonable accommodation.

18  Can you reach out to Ms. Brown, provide her

19  with the form 0857e, which was attached, and

20  see if she can get that information back to

21  us.

22  Q.  Okay.  And the coach at that time, was it Jim

23      Dean or was it Donald Young?

24  A.  Donald Young.  Jimmy Dean was out of the

25      office at that time, and so Donald Young was

DEF000818

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

399

1      the one who was trying to help.

2  Q.  Okay.  With regard to this particular request

3      for reasonable accommodation, did she ever

4      provide you with that form that you had

5      requested she fill out?

6  A.  No.  She actually responded with an e-mail

7      stating that she wasn't providing any more

8      additional medical documentation and to make

9      a decision based on what we had available.

10  Q.  Okay.  And you as the LRAC, did you have to

11      make a determination as to whether or not you

12      had enough information?

13  A.  I did.

14  Q.  And in your mind, did you feel that you knew

15      what her limitations were with her condition?

16  A.  Well, we went back to the medical statement

17      that we had.  And the medical statement

18      identified she was pain, which was already

19      being accommodated with FMLA, leave without

20      pay, voluntary leave transfer program.  So

21      other than that, there was no other

22      limitation identified.  So there was nothing

23      else to accommodate.

24  Q.  Okay.  And other than a transfer, Ms. Brown

25      didn't identify any appropriate

DEF000819

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

400

1       accommodation?

2    A.   No.

3    Q.   And ultimately it was your determination that

4        the request should be denied for lack of

5        medical evidence?

6    A.   Yeah -- yes.  She was saying she was able to

7        perform the essential functions of her

8        position.  That's what she was telling us.

9    Q.   And was this during the inactive meeting?

10   A.   Yes, during the interactive meeting she was

11       saying she was able to perform the essential

12       functions of her position.  So again, we were

13       back to what are we accommodating.

14   Q.   And the denial -- the recommendation for

15       denial came from you?

16   A.   Correct.

17   Q.   And the person that issued the denial, do you

18       recall who that was?

19   A.   The deciding management official at that time

20       may have been Ena Lima.  She may have been

21       the acting director or acting assistant

22       director at that time.

23   Q.   Okay.  And as part of the denial of the

24       request, do you recall whether or not -- you

25       reiterated again that, did you have liberal

401

1      leave that you could use --

2  A.  Yes.

3  Q.  -- do you have any medical --

4  A.  Yes.

5  Q.  And do you recall what verbiage you used?

6  A.  I don't recall.

7  Q.  Your don't, okay.  That's fine.

8  A.  I'm sorry.

9  Q.  It's in the evidence.

10 A.  Okay.

11 Q.  And upon this denial, did Ms. Brown come

12     speak with you?

13 A.  After the --

14 Q.  After she received the denial of this

15     reasonable accommodation request?

16 A.  I don't recall specifically if we had

17     conversations after that.  She was very -- it

18     was obvious she was very angry with me

19     specifically, which is why I was

20     communicating through her coach.

21 Q.  Okay.

22 A.  For the additional medical documentation.  It

23     was just obvious that a lot of her emotion

24     was directed towards me.  And so we were just

25     trying to get the information we needed

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

402

1      without causing all the extra unnecessary

2      emotional trauma.

3   Q.  Okay.  Now, was there a point in time to your

4      knowledge, whether or not Ms. Brown requested

5      a meeting with the director, Mr. Stephens?

6   A.  I did know that there was a meeting

7      requested, yes.  And I know because he needed

8      the information.

9   Q.  Did he ask that you and Ena Lima be in

10      attendance?

11   A.  Yes.

12   Q.  Okay.  And to your knowledge, was that

13      meeting ever held?

14   A.  I have no idea.  I was not in a meeting, I

15      should say.

16   Q.  Do you know whether or not Ms. Brown declined

17      to have a meeting with the director?

18   A.  That, I don't know.

19   Q.  Okay.  Do you recall at some point the VSRs

20      and other employees in that particular area

21      had to perform 20 hours of mandatory

22      overtime?

23   A.  Yes.

24   Q.  Okay.  Now, how did that -- I mean, was that

25      general knowledge and you knew about that?

DEF000822

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

403

1   A.   Yes.   So there's -- when the mandate came

2        down that VSRs and RVSRs were required to

3        work a specific amount of overtime a month,

4        then that information was shared with the

5        division.   And they would determine how that

6        overtime was going to be assigned.   And they

7        had given the employees an option, which I

8        thought was a great idea, gave the employees

9        the option of picking the hours.   Just give

10       them, you know, you have to work this many;

11       you get to pick when you work the overtime

12       based on your schedule.

13   Q.   So to make it, I guess, easier for the

14       employee, they allowed them to say, I can

15       work this date, this date, this day, to get

16       my 20 hours in, as opposed to management just

17       kind of imposing dates and times that you

18       will be here?

19   A.   Correct.

20   Q.   And do you know how that process worked?

21   A.   Yes.   So the coach for each team would

22       basically send out notification to their

23       employees and let them know that -- when they

24       needed them to sign up for mandatory

25       overtime.   And that way they could have a

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

404

```
 1        schedule and they would know how much

 2        coaching staff they would need -- how many

 3        coaches we needed to have on staff for those

 4        overtime hours.  So each coach -- and I don't

 5        know how they did it in each specific team --

 6        but they would identify their own dates that

 7        they would need the employees to sign up.

 8        And then the employees would need to be

 9        signed up for their mandatory overtime by

10        that date.

11   Q.   Okay.  Did it come to your attention that

12        Ms. Brown wasn't signing up for the mandatory

13        overtime?

14   A.   Yes.

15   Q.   And who did you receive that information

16        from?

17   A.   Jimmy Dean.

18   Q.   Okay.

19   A.   Who would have been her coach at the time.

20   Q.   And do you recall -- and you provided him

21        advice in that regard?

22   A.   I did.  I did.  I explained to him -- he was

23        confused.  He was under the -- he came to me

24        to ask me what was the process for mandatory

25        overtime if an employee is on FMLA.  I
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

405

1          explained to him that FMLA does not exclude

2          employees from mandatory overtime unless the

3          FMLA information clearly identifies that they

4          can't work overtime, and then at that time

5          they would be excused.  I said, well -- he

6          explained to me -- I said well, tell me the

7          situation and let's not speak in

8          generalities.  Who are you talking about.  He

9          said Trevenia Brown.

10               So I went and got her FMLA paperwork,

11          looked through her paperwork, and determined

12          that there was nothing indicating in her FMLA

13          paperwork that she couldn't work overtime.

14          It just indicated that during flare-ups she

15          would need time off.  And so I explained to

16          him that, well, then what you need to

17          explain, tell her to do, go ahead and sign

18          up.  And if for any reason that she signs up

19          on one of the hours she's having an episodic

20          flare-up, she can then call in FMLA for the

21          hours that she signed up.

22     Q.   Okay.  Because, I mean, your understanding of

23          FMLA is that you can use your leave, but it

24          has to be for a specific purpose?

25     A.   Correct.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

406

```
 1   Q.  Okay.  Can't be just for a bulk period of
 2       time whether or not you know you're going to
 3       be sick?
 4   A.  No.
 5   Q.  So it's not like a vacation --
 6   A.  Correct.
 7   Q.  -- where you forecast in the future that I'm
 8       going to be sick on these days.
 9   A.  Correct.
10   Q.  Or I'm sorry, I'm going to be on leave today.
11   A.  Correct.
12   Q.  So the instruction was that she sign up for
13       the mandatory overtime at her election,
14       whatever dates?
15   A.  Correct.
16   Q.  And if she had an episode on that particular
17       date and time, that she could call in.  I
18       mean, would it be the standard procedure for
19       sick leave?
20   A.  Yes.
21   Q.  And what's that?
22   A.  That if an employee is scheduled to work and
23       they are not able to come to work or
24       incapacitated for duty, they would call in
25       and request the appropriate leave for that
```

DEF000826

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

407

1    period.

2  Q.  Okay.  And sick leave, annual leave, and FMLA

3    leave would have been an appropriate request?

4  A.  Correct.

5  Q.  And do you know whether or not that

6    information was conveyed to Ms. Brown?

7  A.  I again, because she -- my face -- I felt

8    like my face was attached to a lot of her

9    anger -- I communicated it to her

10    representative.  And explained to her coach,

11    who still had lines of communication with

12    her, you need to tell her this is how it

13    works.  You need to tell her this is what she

14    needs to do.  And then also followed up with

15    an e-mail to her representative with the same

16    information.

17  Q.  Okay.  And what was your advice to Mr. Dean

18    in regard to her refusal to sign up for

19    overtime?

20  A.  I explained to him his options like you would

21    do with any other employee; here are your

22    options.

23  Q.  And you ultimately proposed a reprimand?

24  A.  We did.

25  Q.  And was that at your request, his request, or

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

408

1      your suggestion?

2   A.  No.  It was one of the options that was made

3      available to him.

4   Q.  Okay.  But you didn't necessarily recommend

5      that option, you're just saying these are

6      your options?

7   A.  Correct.  That's my responsibility is to

8      advise management.

9   Q.  Okay.  And Mr. Dean selected a reprimand?

10  A.  Correct.

11  Q.  How long do those stay in your EOPF?  Do you

12     know off the top of your head?

13  A.  I believe it's three years.

14  Q.  And ultimately it was sustained and issued by

15     Adam Kinder.  Did you have a discussion with

16     Mr. Kinder about this reprimand?

17  A.  No.  The only thing that we do is once an

18     action has been proposed, then what we do, we

19     being HR, my responsibility within Human

20     Resources, is to review the evidence in the

21     file and the action that's being proposed,

22     and then provide the information and the

23     evidence to the deciding management official.

24  Q.  Okay.  Did Ms. Brown ever discuss this

25     reprimand with you?

DEF000828

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

409

1   A.   No.

2   Q.   I'm going to hand you what's marked as

3        Exhibit 11 through Exhibit 26.  Do you recall

4        ever seeing this medical information, or was

5        it ever provided to you by Ms. Brown?

6                JUDGE CARETHERS:  While she's

7        reading, Mr. Miller, I'm letting you know

8        that you're down to 39 minutes.

9                MR. MILLER:  Okay.  Thank you, Judge.

10  A.   This is not any information that I would have

11       received.  When we receive information like

12       this in Human Resources, we date stamp it so

13       that we can identify when we receive the

14       information.  And so none of these have date

15       stamps, and I don't recall seeing any of

16       these papers.

17       BY MR. MILLER:

18  Q.   Okay.  You don't recall Ms. Brown providing

19       any of those documents to you or anyone else?

20  A.   Not to me.  Certainly not to me.  And no one

21       else -- we've trained our management staff to

22       not receive medical documentation.

23  Q.   Okay.

24  A.   That if an employee tries to provide them

25       with medical documentation, that they direct

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

410

1    them to take it to Human Resources.

2  Q.  Okay.  And only the LRAC --

3  A.  Correct.

4  Q.  -- would need to know?

5  A.  Correct.

6  Q.  Okay.

7            MR. MILLER:  Thank you,

8    Ms. Wilson.

9            JUDGE CARETHERS:  Okay.  What

10   we're going to do now is go to Ms. Clark,

11   cross.

12           MS. CLARK:  Okay.

13   EXAMINATION,

14     QUESTIONS BY MS. CLARK:

15  Q.  Ms. Wilson, I just want to clarify.  I

16     thought at the beginning of your testimony

17     you indicated that you were the LRAC from

18     June -- January 2013 -- sometime January 2013

19     to January 31, 2014.  Is that correct?

20  A.  Correct.

21  Q.  So you were not the LRAC on February 24,

22     2014?

23  A.  That would have been Julie Barrett, and I

24     would have been the assistant.  Like I would

25     have been the -- the alternate, they call it.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

411

1   Q.   The alternate?

2   A.   Yes.

3   Q.   And going to the ROI, page 320, which is the

4        beginning of the reasonable accommodations

5        handbook, can you point out to me where

6        there's the role of the alternate described?

7   A.   In where?

8   Q.   Bates-stamp number 00320.  It's the bottom

9        middle of each page.

10  A.   Okay.  So the local regional accommodations

11       coordinator's duties are described on -- I

12       believe the document number would be 00332.

13       And the alternate would assume that role in

14       the absence of the reasonable accommodations

15       coordinator.

16  Q.   And does it state that on 00332?

17  A.   No.  So at the -- on 00329, under F(1), the

18       facility director will ensure that the

19       organization or facility has a local

20       reasonable accommodations coordinator and an

21       alternate.

22  Q.   Okay.  So you were the alternate on

23       February 24, 2014?

24  A.   Yes.

25  Q.   And as the alternate, did you report directly

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

412

1      to Ms. Barrett about reasonable accommodation

2      requests?

3   A.  So we worked in tandem, and in her absence

4      then I would have been responsible, yes.  Are

5      you saying do I report to her as like a

6      subordinate --

7   Q.  Yes.

8   A.  -- supervisor relationship?

9   Q.  Yes.

10  A.  No.

11  Q.  All right.  So if she's not available then

12      you would be the person who would handle the

13      reasonable accommodation requests?

14  A.  Correct.

15  Q.  Okay.  You've testified here today about your

16      perception of Ms. Brown's being upset with

17      you.  At any time did you consider going to

18      Ms. Barrett to see if she may be in a better

19      position to handle this request, given what

20      you were experiencing?

21  A.  No.  At that time, once we got a case, we

22      seen it to the end.

23  Q.  Is there something in the rules that

24      specifically state that you must do that?

25  A.  No.

DEF000832

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

413

1   Q.   Okay.  So that was a judgment, an exercise of

2        discretion by you?

3   A.   Correct.

4   Q.   Okay.  Did you ever think to yourself that

5        maybe Ms. Barrett might be in a better

6        position to handle it given what you were

7        experiencing with Ms. Brown?

8   A.   I believe towards the end of the process that

9        Ms. Barrett did indeed step in to fill the

10       role as the coordinator.

11  Q.   At what point in the process?

12  A.   That, I'm not sure.  It would be toward the

13       end.  I was in and out.  I had a very ill

14       husband.  So when I was gone, she would

15       continue with the case.

16  Q.   So in actuality, both of you worked on this

17       case?

18  A.   I would say yes.

19  Q.   When did Ms. Barrett meet with Ms. Brown?

20  A.   The meetings had already occurred, and so

21       there was no need.  It would be something as

22       simple as, here is the file, this is what

23       I've got going, and I'm going to be absent.

24       Then she would take the file and then do any

25       follow-up that needed to be done from there.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

414

1    Q.   Well, isn't the interactive process one that

2         doesn't necessarily have an end to it?  Could

3         Ms. Barrett have continued to have a

4         conversation with Ms. Brown?

5    A.   Yes, she could have.

6    Q.   But she did not, isn't that correct?

7    A.   Not that I know of.

8    Q.   Okay.  I'd like to go to page 332.  Actually,

9         before we go there, let me go to the

10        beginning of this document, 00320.

11   A.   (Witness complies.)

12   Q.   And you talked about so far today your

13        training in EEO.  And you'll see at the top

14        of this document it says, this handbook was

15        adopted November 27, 2013, which was shortly

16        before this scenario that's the subject of

17        this case started to occur.

18             Did you have any specific training on

19        this handbook before you got engaged in the

20        reasonable accommodation process for

21        Ms. Brown?

22   A.   No, I had no formal training.  Is that what

23        you're asking?

24   Q.   That's what I'm asking.

25   A.   No, I had no formal training.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

415

1    Q.   Was there any formal training that was

2         conducted by the VA with anyone in HR about

3         the new procedures -- because this is under

4         the -- this was modified to take into account

5         Congress's change to the ADA -- the ADA

6         Amendments Act.

7             And so was there any formal training of

8         anyone in the VA regarding these changes?

9    A.   And that, I wouldn't have any knowledge of

10        other training outside of my personal

11        training.

12   Q.   Okay.  So let me ask about your personal

13        training.  You've already testified you had

14        no personal training regarding the changes in

15        this handbook.

16   A.   Correct.

17   Q.   All right.  Did you have any personal

18        training regarding the changes that the EEOC

19        adopted after the passage of the ADA,

20        specifically the regulations that were

21        adopted?

22   A.   Did I have formal training?

23   Q.   Yes.

24   A.   No, I can't say that.

25   Q.   So you've not had any formal training

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

416

1      concerning the changes that the EEOC adopted

2      in connection with reasonable accommodation

3      requests under the ADAAA, is that correct?

4   A.  That would be incorrect.

5   Q.  So that's what I'm asking you.

6   A.  Okay.

7   Q.  With regards to regulations that were adopted

8      by the EEOC, what formal training did you

9      have?

10  A.  Okay.  So my formal training mostly occurred

11      when I was a student intern at the VA

12      Hospital in Marion --

13  Q.  In what year?

14  A.  -- and working in the EEO program.

15  Q.  In what year?

16  A.  That would have been 2009 until the time that

17      I transferred here, which was 2012.

18  Q.  Okay.  So that would have been before the

19      adoption of the EEOC's regulations under this

20      Act, correct?

21  A.  That would have been before the handbook.

22  Q.  Which was also --

23  A.  Yes.

24  Q.  Do you recall training under -- the EEOC

25      adopted regulations in 2010, I believe.  So

DEF000836

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

417

1      did you have -- actually, I shouldn't say

2      that.  Hold on a second.

3                  JUDGE CARETHERS:  It was 2010.

4                  MS. CLARK:  It was 2010?

5                  THE WITNESS:  2010.

6                  JUDGE CARETHERS:  Yes.

7      BY MS. CLARK:

8   Q.  So did you have training under those

9      regulations?

10  A.  I did.

11  Q.  And you had those trainings with whom?

12  A.  I would have had training -- actually, my

13      whole tenure as an intern for the EEO program

14      which is 2007 to 2012, and then also training

15      that we recently had with regional counsel

16      which was in 2015.

17  Q.  Okay.  But I'm talking in connection with

18      just prior to this scenario in 2014.  So the

19      2015 training, I'm glad that you had the

20      training, but it's not relevant to our case

21      here.

22          All right.  And so my first question

23      to you is, in connection with your training,

24      did you understand that the reasonable

25      accommodation process is one that did not

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

418

1     require an employee to file the request in

2     writing?

3  A.  Yeah.  Yes.

4  Q.  Okay.  And did you understand that the

5     employee does not need to document in writing

6     in a particular form what the issues are that

7     they're facing?

8  A.  Yes.

9  Q.  Okay.  So if I direct your attention to

10     00332, you see here in the handbook where the

11     local reasonable accommodation coordinator

12     will explain what the Form VA 0857a form is,

13     and that the written confirmation or request

14     for accommodation, that form can be used, but

15     it's optional?

16  A.  But encouraged, yes.

17  Q.  But encouraged.  So then let me just go down

18     to, with regards to the information that the

19     LRAC can request medical documentation by use

20     of VA Form 0857e.  So did you personally hand

21     Ms. Brown a copy of the VA Form 0857e?

22  A.  And no, because she was -- at that time had

23     her back towards me, and therefore I handed

24     it to her representative instead.

25  Q.  Okay.  But did she authorize you to hand it

DEF000838

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

419

1      to her representative?

2   A.  With the representative being in the room,

3      once I lost contact and communication with

4      Ms. Brown, then it would have been

5      appropriate for me to communicate with the

6      representative.

7   Q.  Did you specifically ask Ms. Brown to take

8      the form and she said that she would not?

9   A.  No.

10  Q.  So you did not specifically ask her to take

11     the form?

12  A.  No.

13  Q.  Okay.  All right.

14  A.  I would like to add, it was highlighted of

15     what we needed to make the -- the medical

16     information that we were needing, we

17     highlighted it.  And I was explaining the

18     form to the representative, pointing to the

19     highlights.  At any point in time Ms. Brown

20     could have turned around and participated

21     with us in that conversation.

22  Q.  I understand.  That's fine.  Sticking with

23     00332, requests from the Agency to the

24     employee for medical information, you have to

25     use that form.  But there's nothing here that

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

420

1       indicates that the employee cannot provide

2       you medical information in a different

3       format, isn't that correct?

4   A.  Correct.

5   Q.  All right.  So I'd like to direct your

6       attention to Exhibit 1.  Now, at any time did

7       Ms. Brown provide you with this record, which

8       is her FMLA form?  Did you have that already

9       as part of Ms. Brown's record?

10  A.  Yes.

11  Q.  Okay.  Now, I'd like to point you to page 2

12      of Ms. Brown's record.  And do you see

13      towards the -- not the very bottom, but just

14      above Question 4, where it indicates the

15      condition and what stage it's in.  And that

16      there are flare-ups that cause pain and

17      drainage.  And in that, it specifically

18      states that she would be unable to perform

19      all work functions.  Do you see that?

20  A.  Yes.

21  Q.  All right.  So didn't you understand from

22      this that if she was having these flare-ups

23      and she was having drainage, that all work

24      functions were being limited from this

25      condition?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

421

1    A.    Yes.   It indicates right after that during

2          times of flare-ups.

3    Q.    I understand that.  But that all work

4          functions, all work functions, would be

5          impacted by this condition?

6    A.    Yes.

7    Q.    You understood that?

8    A.    Yes.

9    Q.    All right.

10                JUDGE CARETHERS:  Hold on a

11         second.  I want to say before we go any

12         further, I just want to make sure the record

13         is clear.  It -- you're slightly -- you're

14         slightly mischaracterizing what it says.  So

15         just for the record, I want to make sure the

16         record is clear.

17              It says the patient may be unable to

18         perform all work functions during time of

19         flare.  That's what it actually states.  So I

20         just want to make sure that the record is

21         clear in terms of what's being cited here.

22              You may continue.

23         BY MS. CLARK:

24    Q.   When you saw that all work functions may be

25         impacted by this condition, did you ask

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

422

1       Ms. Brown any follow-up questions concerning

2       this statement that all work functions may be

3       impacted?

4   A.  No, I did not.

5   Q.  All right.  What specific functions did you

6       need to know about that would be impacted,

7       having already read that all work functions

8       may be impacted by this condition?

9   A.  I'm sorry.  I don't understand.

10  Q.  Well, you're saying that you didn't have

11      enough medical information, and that's the

12      reason why these requests were being denied.

13      Or at least one of the reasons, that there

14      was not enough medical information, isn't

15      that correct?

16  A.  No.  So with her, with Ms. Brown's case, she

17      was already being accommodated during those

18      flare-ups with leave.  And so --

19  Q.  You considered her --

20              MR. MILLER:  Let her answer the

21      question.

22              MS. CLARK:  I'm sorry.  Go right

23      ahead.

24  A.  She was being accommodated during times of

25      these flare-ups with leave.  So in the time

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

423

1      when she's having the pain and drainage and

2      that her performance is being interrupted or

3      all work functions during these flare-ups, it

4      was already being accommodated with leave.

5             And so what we didn't understand in

6      the reasonable accommodation process was

7      what -- okay, we are accommodating the pain

8      and episodic flare-ups with leave, what other

9      limitations are we not accommodating that you

10     have that we are not accommodating.

11  Q.  Okay.  Did you understand her to be saying

12     that the leave was no longer accommodating

13     these flare-ups?

14  A.  No, I did not understand that.

15  Q.  Okay.  And at what point did you as the LRAC

16     indicate to Ms. Brown that the FMLA leave was

17     an accommodation?

18  A.  When we communicated the decision to her.

19  Q.  On what date?

20  A.  I don't have that offhand.

21             MR. MILLER:  Is that page 245?

22             THE WITNESS:  Yes.  It says your

23     medical documentation did not show a

24     substantial limitation.  If you need to visit

25     a medical specialist outside of the commuting

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

424

1      area, you may request leave in accordance

2      with the appropriate leave requesting

3      procedures.

4   Q.  When you had the interactive process --

5      let's see, 245.  This was the denial of the

6      accommodation dated April 2, 2014?

7   A.  Correct.

8   Q.  Well, let me ask you a couple questions

9      about this.  The first thing it says that you

10      check off is, you do not have a disability

11      covered by the Rehabilitation Act.

12   A.  Yes.  So and then I identified in detail at

13      the bottom, that the medical information that

14      she provided was not sufficient to show she

15      that she had a disability covered under the

16      Rehab Act.  And specifically, I stated that

17      she didn't show a substantial limitation.  So

18      the medical information did not identify a

19      substantial limitation, and during our

20      interactive process she did not identify a

21      substantial limitation.

22   Q.  What's a substantial limitation?

23   A.  It could be any limitation at all at this

24      point, according to how --

25   Q.  Okay.  So, in fact, the FMLA form indicated

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

425

1        that she had a limitation -- that she would

2        have a limitation when these flare-ups

3        occurred.

4    A.  During episodic flare-ups, correct.

5    Q.  That's right, which would make it a

6        disability under the Rehab Act, correct?  An

7        intermittent and episodic --

8    A.  Condition.

9    Q.  -- condition that limits one's ability to do

10       their work, is a disability, isn't that

11       correct?

12   A.  Yes, I would say that it can be a disability.

13   Q.  Isn't it, in fact, a disability as defined by

14       the EEOC?  I'll just go to -- yes, on page

15       00325, doesn't it say impairments include

16       conditions that are episodic in nature?  And

17       while it references cancer and epilepsy, it's

18       not -- it doesn't say that those are the only

19       ones, correct?

20   A.  I'm sorry.  Where are you reading?

21   Q.  00325, at the top of the page, second to last

22       sentence.  I guess it's not the first full

23       paragraph, it's the paragraph that was

24       carrying over from 00324.

25           It reads, impairments include

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

426

1       conditions that are episodic in nature or in

2       remission, such as cancer or epilepsy.   An

3       impairment of a single organ is now covered

4       under the ADAAA.

5   A.  Correct.  And prior to that it lists several

6       other --

7   Q.  Right.

8   A.  -- impairments.

9   Q.  And impairment actually does include -- we

10      can go back to -- an impairment that affects

11      the skin or the endocrine system also is a

12      disability.  Did you understand that?

13  A.  I'm sorry.  Where are you reading?

14  Q.  I'm looking now on 00324, I believe.

15  A.  And I'm not seeing -- I'm sorry.  Are you

16      referring specifically to a skin condition?

17      I'm not seeing that reference in this one.

18  Q.  No, it's -- just a second.  It appears that

19      in the handbook they're listing part of what

20      the regulations state, which includes the

21      function of the endocrine system, which it is

22      our position that this disease does affect.

23      Just one second.

24          MS. CLARK:  I assume that Your

25      Honor will take judicial notice of the

DEF000846

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

427

1          regulations that exist under the ADAAA?

2                    JUDGE CARETHERS:   I mean, if

3          that's -- yes, I will take judicial --

4                    MS. CLARK:   Okay.

5                    JUDGE CARETHERS:   In fact, I will

6          follow what the law is regarding that ADAAA.

7                    MS. CLARK:   Yeah, the point that

8          I'm trying to make is that under those

9          regulations they specifically do mention the

10         skin as an area of major life activity that's

11         affected.  And I'm --

12                   JUDGE CARETHERS:   I'm quite

13         familiar with that.  I just was waiting, do

14         you have a question for the witness here?

15                   MS. CLARK:   I'm asking her if she

16         understood that Ms. Brown's skin condition

17         was a disability.

18                   JUDGE CARETHERS:   Okay.  You may

19         answer that question, Witness.

20                   THE WITNESS:   Based on my

21         knowledge and experience, I didn't feel like

22         I had enough information to make that

23         determination.  It says as to the duration of

24         the disability or functional limitation, if

25         the disability has effects that are not both

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

428

1    transitory and minor, it's not covered.  I

2    would concede that she has a disability.  I

3    would not argue that fact.

4    BY MS. CLARK:

5    Q.  Okay.  So she had a disability.  So would you

6        agree that the denial, then, was incorrect in

7        identifying that she did not have a

8        disability under the Rehab Act?

9    A.  Yes, I would concede and say that based on

10       your argument.  I would have worded it

11       differently.

12   Q.  Okay.  Do you know if Ms. Brown had a job

13       description?

14   A.  Yes.

15   Q.  Okay.  And did you consult her job

16       description when you were reviewing the

17       circumstances with Ms. Brown?

18   A.  Absolutely.  That would have been a part of

19       her file.

20   Q.  So did you look at those -- does the job

21       description include job tasks that she had to

22       carry out?

23   A.  Do I have it in front of me?  It identifies

24       what the nature of the work is, if that's

25       what you're asking.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

429

1   Q.   Well, does it actually describe the

2        day-to-day tasks that she would have to carry

3        out, or does it just describe the goals that

4        she's supposed to obtain?

5                 MR. MILLER:   I believe the job

6        description is on page 281, C-5.

7                 THE WITNESS:   Thank you.

8   A.   So according to the job description for a

9        veteran service representative, it identifies

10       the duties and the responsibilities which

11       would include some of the tasks they are

12       responsible for.

13  Q.   And when you spoke with -- or when you looked

14       at Exhibit 1, and you could see that when the

15       flare-ups occurred that she could not perform

16       some of her job duties, did you ask Ms. Brown

17       specifically, based on what you have in front

18       of you, the job tasks that you have in front

19       of you, whether those were some of the things

20       she could not do when her skin condition

21       flared up?

22  A.   So did I ask that specific question?

23  Q.   Yes, ma'am.

24  A.   No.   I asked her what her limitations were so

25       that I can then look at this job description

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

430

1   and determine which one of these tasks she

2   can do, or she can help me do that, if she

3   were -- if we were participating in a

4   conversation as I hoped it would go.

5   Q.   Well, but you didn't try to maybe change it

6        so that you could understand which tasks --

7        you didn't ask her like the specific tasks,

8        is that correct?

9   A.   I didn't ask for specific tasks.

10  Q.   All right.

11              JUDGE CARETHERS:   You have an hour

12       remaining, Ms. Clark.

13              MS. CLARK:   Yes, I understand.

14  BY MS. CLARK:

15  Q.   Would you look at Exhibit 4, which I've just

16       handed you.

17  A.   (Witness complies.)

18  Q.   Was this part of the medical documentation

19       that Ms. Brown submitted with her reasonable

20       accommodation request?

21  A.   Yes.

22  Q.   Thank you.  Do you see where the doctor

23       explains what hidradenitis suppurativa

24       creates on Ms. Brown's body?

25  A.   Yes.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

431

1   Q.   Okay.  Did you feel like you needed to know

2        more medical information after you received

3        this letter?

4   A.   I just needed to know the limitations.

5   Q.   Okay.  And so you just needed to know what

6        job tasks she could not perform because of

7        this medical condition, is that correct?

8   A.   That -- no, ma'am.

9   Q.   When you say limitations, I'm just trying to

10       understand what you're saying when you use

11       that word.

12  A.   Okay.  So during episodic flare-ups or when

13       she's experiencing this condition or having a

14       flare-up with this condition, then she's not

15       able to work.  And that's accommodated with

16       leave.  We understood that.  When she put in

17       and requested a reasonable accommodation in

18       addition to, we were trying to figure out

19       what else were we accommodating.

20           So based on the medical information

21       that I had, which was this form, we were

22       trying to ascertain what is it -- during

23       episodic flare-ups she takes leave; we've got

24       that covered.  So when you're here, what is

25       it that you're not able to do.  What part of

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

432

1      your position are you not able to do.  What

2      are your limitations, and what part of the

3      position are you not able to do that we can

4      accommodate to help you to be able to do

5      that.

6  Q.  And did you ask Ms. Brown whether the leave

7      was enough of an accommodation?

8  A.  Well, that would have been the purpose of the

9      interactive conversation.

10 Q.  And so did you ask that question, if the FMLA

11     leave was enough of an accommodation?

12 A.  No.  At this point, no.

13 Q.  You did not?

14 A.  I did not.

15 Q.  And so did you understand -- okay, so you did

16     not ask her that question.

17 A.  I did not have an opportunity to.

18 Q.  You didn't have an opportunity to ask her

19     that while you were in the meeting with her

20     and Ms. Gentry?

21 A.  Correct.  Every time I began to talk to try

22     to lead her through the conversation like we

23     do with everyone else, she would begin to

24     talk over me.  And then I would be quiet to

25     allow her to talk, and then when I would

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

433

1       start talking again, she would talk over me.

2       The conversation --

3   Q.  Well, what did you --

4                   MR. MILLER:  Please let her finish

5       the answer.

6                   MS. CLARK:  I thought she was

7       finished.  Go ahead.

8                   JUDGE CARETHERS:  Please let her

9       finish her answer.  You may continue your

10      answer.

11                  THE WITNESS:  So when I would try

12      to lead her through the interactive process

13      like we do with any other employee, she would

14      talk over me.  And so then I would be quiet

15      to allow her to say what she needed to say.

16      And then I would starting again, and then she

17      would talk over me again in a very loud

18      voice.

19          And so we weren't communicating in a

20      productive manner, is what I was trying to

21      get at.  And so then I began to talk --

22      that's when I had to talk her rep -- I didn't

23      have to.  I chose to talk to her

24      representative.  I knew she still could hear

25      me and be able to gain the information that

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

434

1    we needed -- this is what we need to be able

2    to determine and make a good decision on what

3    would be the appropriate accommodation

4    according to her request.

5    BY MS. CLARK:

6    Q.   Okay.  So when you heard Ms. Brown talk to

7         you, what was she saying?

8    A.   I don't remember all of the specifics.  I

9         remember that she said I had to transfer her,

10        that the law required me to transfer her.

11        And I was explaining to her, no, that's not

12        how it works.  That -- you know, trying to

13        talk to her about the accommodation process

14        and how it works.  And she kept saying, no,

15        that's not.  You have to do this.  And I

16        don't remember all the specifics.  I know she

17        was very angry and, then she was making other

18        comments.  Like she took it personal -- it

19        was obvious she was taking it personally.

20   Q.   And that's been your testimony so far.  I'm

21        really trying to understand what you heard

22        Ms. Brown say to you.  And I think so far

23        what you've said to me is she told you that

24        you had to transfer her.  What else did she

25        say to you?

DEF000854

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

435

1    A.   I don't recall exactly what she said to me.

2    Q.   Okay.  So if I understand how the interactive

3         process occurred, you had some medical

4         information, but you did not specifically ask

5         which job functions or which job tasks

6         Ms. Brown couldn't do, and Ms. Brown was very

7         direct with you about the fact that she had

8         to be transferred.  Is that how I understand?

9    A.   That was -- that is some representation of

10        how the conversation went, yes.

11   Q.   Okay.  And that at some point this broke down

12        and you started to speak to -- you chose to

13        speak to Ms. Gentry?

14   A.   Yes, after Trevenia -- or Ms. Brown, sat down

15        in the chair and turned her back to me to

16        look out the window.  I just kept

17        communicating the process and how this works

18        and what our goals were in the process, was

19        just to accommodate her in the position she's

20        in if we can.  And if we can't accommodate

21        her in the position that she's in, then we do

22        look elsewhere within her division, within

23        regional office, and even outside if we need

24        to, to be able to accommodation her.

25   Q.   Okay.  And what did you think were

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

436

1    appropriate accommodations based on the

2    information you had?

3 A. That's what I couldn't determine.  I was

4    hoping to ascertain during the interactive

5    conversation.

6 Q. Did you think that there were -- there was

7    medical equipment that you could give

8    Ms. Brown that would accommodate her?

9            MR. MILLER:  Objection.  Asked and

10   answered.  She said she didn't know.

11           JUDGE CARETHERS:  I sustain the

12   objection.  She said she was trying to

13   determine what accommodations she could

14   provide, but she could not ascertain that.

15   BY MS. CLARK:

16 Q. Is there anything in the regulations that

17   prohibit you from speaking directly to the

18   physician who has provided information?

19 A. The employee would have to sign a request

20   form.

21 Q. Did you ask Ms. Brown if she would authorize

22   you to contact her physician to get more

23   information about what was happening?

24 A. She was very adamant.  She made it very clear

25   to me and was very adamant that she had --

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

437

1       she wanted us to make a decision based on the

2       medical we had.

3    Q.  That's nonresponsive.  I'll ask my question

4       again.  Did you ask Ms. Brown whether she

5       would authorize you to speak directly to her

6       physician so you could understand what was

7       happening?

8    A.  No.

9    Q.  Okay.  In the medical, in particular

10      Exhibit 1, and I guess also Exhibit 4.

11      Exhibit 1 is the FMLA documentation.  Did you

12      understand how much pain Ms. Brown was in due

13      to her condition, from those documents?

14   A.  I understood from these documents that she

15      did experience pain during episodic

16      flare-ups.

17   Q.  Did you understand how frequently her

18      episodic flare-ups were occurring?

19   A.  I didn't have her leave record and I wasn't

20      her leave approving official, so I wouldn't

21      know exactly.  But I could guess from the

22      documentation in front of me that it was up

23      to -- it was one time every three months, is

24      the estimated flare-up.

25   Q.  Okay.  Is there any reason why -- you had

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

438

1    access to her leave record though, didn't

2    you?

3  A.  I do have access, yes, if I request it.

4  Q.  Okay.  Is there any reason why you didn't

5    look at her leave record in advance of that

6    interactive meeting?

7  A.  I'm not sure -- the leave record would just

8    tell me when she was here and not here.

9  Q.  Right.  How much time she was taking the

10   accommodation of leave, correct?

11 A.  Correct.

12 Q.  That would have helped inform your

13   understanding of what was happening, correct?

14 A.  Not necessarily.

15 Q.  Okay.  Why is that?

16 A.  Because her being on leave, when she took

17   leave whether she took it under FMLA or not,

18   the only thing that I would take into -- or

19   that I would be -- that would be important

20   during the process is what can I do while

21   you're here at work.  Does that make sense?

22   Like my job is to accommodate you here at

23   work.  And so if you're here and you're not

24   able to perform the essential functions of

25   your position, what is it that I can provide

DEF000858

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

439

1          you.  So her leave record indicates when
2          she's not at work.
3     Q.   But you previously testified that the
4          accommodation you were providing her for work
5          was the leave.
6     A.   To accommodate the episodic flare-ups.
7     Q.   That's correct.
8     A.   Yes.
9     Q.   And so can you point to me in the handbook
10         where it says that the local reasonable
11         accommodation coordinator is only -- is
12         limited to just providing accommodations of
13         while the employee is at work?
14    A.   So the goal is to accommodate the employee to
15         assist them in performing the essential
16         functions of their position.
17    Q.   Correct.
18    A.   So if they're not at work, then they're not
19         functioning in their position.
20    Q.   Well, that doesn't mean -- is it your opinion
21         that it means that functioning at work was
22         limited to the Indianapolis office, or could
23         functioning at work include a transfer to
24         another office where she would be able to get
25         the care so that she wouldn't have to take as

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

440

1      much FMLA leave as she was taking?

2  A.   Okay.  Ask that again, I'm sorry.

3  Q.   Sure.

4  A.   I want to make sure I answer your question.

5  Q.   Sure.  The goal is to accommodate the

6      individual so that they can continue to work.

7  A.   Right.

8  Q.   Correct?

9  A.   Correct.

10 Q.   So accommodating Ms. Brown so she could

11      continue to work, it was not limited to work

12      in the Indianapolis office, is that correct?

13 A.   That's where she was employed.

14 Q.   I understand.  But this handbook isn't just

15      limited to the Indianapolis office, correct?

16      It's the VA's --

17 A.   Policy.

18 Q.   Yes, their policy.  So wouldn't that include

19      an accommodation that would remove the

20      employee from the Indianapolis office to an

21      office where they can function and be taking

22      less of the FMLA leave which was also the

23      accommodation that you were providing her?

24          Because you wouldn't want her to

25      continue FMLA leave, right?  Isn't the goal

DEF000860

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

441

```
 1        also to take someone, put them in a position
 2        where the FMLA leave is no longer needed,
 3        too?
 4   A.   That's not my function.  Not my role.
 5   Q.   Well, you said it was an accommodation,
 6        though.  That's what I'm trying to
 7        understand.  You've already testified that
 8        the FMLA leave was an accommodation for her
 9        condition.
10   A.   Yes.
11   Q.   All right.
12   A.   She was getting leave, correct.
13   Q.   All right.  And so if the goal is to get the
14        employee back to work, wouldn't that include
15        putting them in a position so they would not
16        have to take as much leave as the person was
17        already taking?
18   A.   Not necessarily.
19   Q.   Why?
20   A.   I don't know what you're -- not necessarily.
21        So my job is not to preserve her leave.  My
22        job is to assist her in performing the
23        essential functions of her position.
24   Q.   Correct.
25   A.   If you're asking me, having her at work, is
```

DEF000861

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

442

1          that more beneficial and is that helpful to

2          the employee to be able to perform essential

3          functions?  Yes.  I would answer yes to that.

4    Q.   All right.  So an accommodation that would

5          transfer her to another office and allow her

6          to perform her function, would that be a

7          reasonable accommodation?

8    A.   That could be a reasonable accommodation.

9          And according to the VA handbook, it's the

10         accommodation of last resort.

11   Q.   Correct.  And so having already given

12         Ms. Brown the reasonable accommodation of

13         leave, wouldn't the transfer necessarily be

14         her last resort?

15   A.   Not necessarily.

16   Q.   Why?  What information leads you to believe

17         that there might have been something else?

18   A.   Because we still don't -- we hadn't

19         identified what the limitations were, and the

20         same duties she was requesting, it would be

21         the same position with the same duties.  And

22         we still don't know what the limitations are.

23         What duties are you not able to complete.

24         So...

25   Q.   Well, let's go back to Exhibits 1 and

443

1      Exhibit 4.

2   A.   (Witness complies).   Okay.

3   Q.   Do you see where Exhibit 4, the doctor talks

4        about the fact that this is a disorder that

5        continues to wax and wane indefinitely?

6   A.   Yes.

7   Q.   Okay.  So he does not indicate that these

8        flare-ups are going to stop anytime soon,

9        correct?

10  A.   Correct.

11  Q.   All right.  But he says that he believes that

12       appropriate care and also family support

13       would be helpful to her and getting control

14       of her condition, isn't that correct?

15  A.   It states, I believe transfer of care to an

16       appropriate dermatologist in the

17       St. Petersburg, Florida area upon relocation

18       is essential to control her disease.

19  Q.   Right.

20  A.   So it didn't say that the transfer was

21       essential.   It was -- I read that to -- I

22       understood that to say that in the event that

23       she goes to St. Petersburg, Florida, she's

24       going to need to connect with a dermatologist

25       to assist her.

444

1   Q.   Okay.  So is it possible at this point when

2        you read this, that you may have considered

3        contacting Dr. Huff to get clarification of

4        this letter?

5   A.   No.  Rarely do we reach out to the medical

6        provider ourselves.

7   Q.   I understand.  But there's nothing that

8        prohibits you from doing it, correct?

9   A.   Correct.

10  Q.   The only thing that would have prohibited you

11       is if Ms. Brown said she refused to let you

12       talk to Dr. Huff.

13  A.   Correct.

14  Q.   And then I think finally, I just want to go

15       back to the discussion you had before with

16       Mr. Miller about the FMLA.  The mandatory

17       overtime, do I understand that you were only

18       consulted by Mr. Dean as to what the

19       requirements were for mandatory overtime when

20       someone was on FMLA?

21  A.   Yes.  So he was explaining -- according to

22       Mr. Dean, or Jimmy Dean, he was explaining

23       that Ms. Brown kept telling him that she

24       didn't have to sign up for mandatory overtime

25       because she was on FMLA.  And he was asking

DEF000864

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

445

1    if that was true.  And I explained, no, this
2    is how it works.
3  Q.  Let me make sure I understand that.  You
4      advised him to inform Ms. Brown that she
5      should give the dates that she would perform
6      her overtime hours?
7  A.  I explained to Mr. Dean that employees that
8      are required to work mandatory overtime would
9      have to sign up just like everyone else.  And
10     in the event that they're having an episodic
11     flare-up or they need to take leave for FMLA,
12     that they could call in and request the
13     leave.
14 Q.  Okay.  And do I understand your testimony
15     earlier was that you informed him that that's
16     what he should advise Ms. Brown or whomever
17     was asking about the situation?
18 A.  Yeah, that was my advice to him as a coach.
19 Q.  Do you know if he, in fact, informed
20     Ms. Brown if that's what she should do?
21 A.  That, I wouldn't know.  I can only speak that
22     I informed her representative.
23 Q.  Do you recall having an e-mail exchange with
24     Ms. Brown about the FMLA requirements?
25 A.  Did I e-mail Ms. Brown?

DEF000865

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

446

1   Q.   An exchange.  Not that you started the

2        e-mail.

3   A.   About the overtime?

4   Q.   Yeah.

5   A.   I don't remember if I did or not.  I'm sorry.

6        I don't recall having a conversation.

7   Q.   Let me show you what is marked as Exhibit 6.

8        Do these e-mails refresh your recollection?

9   A.   Yes.  Yes.

10  Q.   Did the VA maintain a written set of rules

11       about how overtime should be scheduled --

12       mandatory overtime should be scheduled, when

13       an individual was on FMLA?

14  A.   There was no specific guidance released

15       specifically for employees on FMLA.  It was

16       mandatory overtime guidance and -- which I

17       think included a memorandum of understanding

18       that employees with medical reasons can be

19       excluded from overtime.

20  Q.   A memorandum of understanding with the union?

21  A.   I think so.  I think that's -- or certainly

22       from -- it would have been part of the

23       guidance.  That would not have been -- that

24       would have been given directly to the

25       division, which would be the veterans service

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

447

 1        center.
 2    Q.  Well, did you actually see that guidance?
 3    A.  I would have seen it.  I would have had
 4        access to it.  Is that what you're asking?
 5    Q.  I'm asking if you recall that that was, in
 6        fact, the guidance?
 7    A.  That employees are required to work mandatory
 8        overtime?  Yes.
 9    Q.  No.  How individuals with FMLA leave are to
10        sign up for mandatory overtime?
11    A.  There is no guidance specifically for that
12        specific situation.
13    Q.  Okay.  And therefore, is it fair to say that
14        this exchange that occurred in March of 2014,
15        was maybe the first time that this issue had
16        been brought to your attention?
17    A.  Yes, probably.
18    Q.  Okay.  And then it would have been the first
19        time that Mr. Dean would have received any
20        guidance on this issue, is that correct?
21    A.  Yes.
22    Q.  And given the fact that there's some
23        confusion within the Agency about what to do
24        under these circumstances, do you think it's
25        appropriate to reprimand an employee when

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

448

1        there's no guidance in advance about how to

2        sign up under these circumstances?

3    A.  Sorry.  Can you repeat that again?

4    Q.  Sure.  Do you think it's appropriate for the

5        Agency to reprimand an employee who is making

6        an inquiry about how to sign up for FMLA

7        leave when there's no guidance in advance

8        about how to do it when they have FMLA leave?

9    A.  I would say that when an employee -- that as

10       far as the reprimand for asking a question,

11       the answer would be no.  Employees should be

12       able to inquire and get information.  It's my

13       understanding that that was not the charge in

14       her reprimand.

15   Q.  I understand that.  Do you think that if she

16       doesn't know how to follow -- how she should

17       proceed when there's no guidance, that she

18       should be reprimanded?  That's my question.

19   A.  Yes, there was guidance.  According to this

20       she was told what she needed to do.

21   Q.  On what date?

22   A.  And that, I wouldn't know.  I'd have to see

23       the reprimand evidence.

24   Q.  Well, no, I'm asking, from this exchange, on

25       what date did you first provide anyone any

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 203 of 406 PageID #:
837
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

449

1       information about how overtime should be

2       dealt with when an employee is on FMLA leave?

3       Is that when you communicated with Ms. Gentry

4       on March 17th?

5   A.  I would have had a conversation with Mr. Dean

6       first.  That's when this issue was first

7       brought up.

8   Q.  Okay.  And do you think that was before

9       March 17th?

10  A.  I would say it was before the reprimand.

11  Q.  Well, I understand that.  Do you know if it

12      was before or after your exchange with

13      Ms. Gentry?

14  A.  Well, I just need to see the date of the

15      reprimand and then the date of the e-mails.

16          MR. MILLER:  It's page 257 is the

17      actual reprimand.

18          THE WITNESS:  So she was

19      reprimanded on April the 9th, and the e-mails

20      are dated March 25th.  So she had that

21      information based on the date of the

22      reprimand and the date of the e-mails.

23  BY MS. CLARK:

24  Q.  Do you know how soon after your e-mails

25      Ms. Brown signed up for overtime?

DEF000869

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

450

1   A.   I don't know that.

2   Q.   Do you know if Ms. Brown signed up for

3        overtime before the reprimand?

4   A.   I don't know that.

5            MS. CLARK:  I have no further

6        questions.

7            MR. MILLER:  The Agency has

8        nothing further, Your Honor.  Thank you.

9            JUDGE CARETHERS:  All right.  This

10       concludes the testimony of this witness.

11       You're free to go.  Do not discuss any of the

12       questions or any of your testimony with any

13       other witness.  Do you understand?

14           THE WITNESS:  Yes, sir.

15           JUDGE CARETHERS:  Thank you.

16       Let's go off the record.

17           (A recess was taken.)

18           JUDGE CARETHERS:  This is the

19       continuation of the hearing of Ms. Trevenia

20       Brown versus the Department of VA.  We have

21       our next witness here, who I believe is

22       Ms. Ena Lima.  Is that correct?

23           MS. LIMA:  Yes.

24           JUDGE CARETHERS:  Great.  And you

25       are a federal employee?

DEF000870

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

451

1          MS. LIMA:  I am.

2          JUDGE CARETHERS:  Okay.  Your time

3     here is considered official duty time.  There

4     will be no reprisal for any of the testimony

5     that you give today.  Do you understand?

6          MS. LIMA:  Yes.

7          JUDGE CARETHERS:  And by the way,

8     my name is Administrative Judge Trek

9     Carethers.  I'm presiding over this hearing.

10    Do you understand that?

11         MS. LIMA:  Yes.

12         JUDGE CARETHERS:  Great.  Can we

13    have this witness sworn in.

14              (The witness is sworn by the court

15    reporter.)

16         JUDGE CARETHERS:  Okay.  Before we

17    begin taking your testimony, there's some

18    preliminary instructions that I must give

19    you.  The first thing is you must speak

20    loudly so everyone can hear you.  Do you

21    understand?

22         THE WITNESS:  Yes.

23         JUDGE CARETHERS:  All of your

24    responses must be orally or verbally given.

25    You cannot shake your head up and down or do

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

452

1    any other body language to indicate your

2    answer.  Do you understand?

3              THE WITNESS:  Yes.

4              JUDGE CARETHERS:  If you don't

5    understand a question, let me know and I will

6    have the question rephrased if I find it

7    necessary.  Do you understand?

8              THE WITNESS:  Yes.

9              JUDGE CARETHERS:  Only answer the

10   question that's addressed to you.  Do you

11   understand?

12             THE WITNESS:  Yes.

13             JUDGE CARETHERS:  If there's an

14   objection by one of the attorneys to a

15   question, do not answer the question.  I'll

16   make a ruling on the objection and then I'll

17   instruct you on whether you should answer

18   the question or not.  Do you understand?

19             THE WITNESS:  Yes.

20             JUDGE CARETHERS:  Two people

21   cannot talk at the same time, so please allow

22   the questioner to pose their question before

23   you begin answering.  Do you understand?

24             THE WITNESS:  Yes.

25             JUDGE CARETHERS:  Finally, I may

DEF000872

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

453

1       ask you some questions.  The mere fact that I

2       am asking questions should not indicate to

3       you that you're testifying poorly or well.

4       Do you understand?

5                   THE WITNESS:  Yes.

6                   JUDGE CARETHERS:  Can you please

7       state and spell your name for the record.

8                   THE WITNESS:  My name is Ena Lima.

9       First name is spelled E-N-A.  Last name,

10      L-I-M-A.

11                  JUDGE CARETHERS:  Okay.  Great.

12      This is the Agency's witness.  You've been

13      approved for an hour.  You may commence.

14                  MR. MILLER:  Thank you, Judge.

15                       ENA LIMA,

16      having been first duly sworn to tell the

17      truth, the whole truth, and nothing but the

18      truth relating to said matter, is examined

19      and testifies as follows:

20      EXAMINATION,

21          QUESTIONS BY MR. MILLER:

22      Q.  Ms. Lima, where do you currently work?

23      A.  I work at the Indianapolis VA Regional

24          Office.

25      Q.  And what's your position there?

DEF000873

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

454

1   A.   I am a veterans service center manager.

2   Q.   Okay.  And how long have you held that

3        position?

4   A.   I've been in Indianapolis for five years.

5   Q.   Okay.  In that position?

6   A.   Yes.

7   Q.   Where were you before that?

8   A.   I was the service center manager at the

9        Hartford Regional Office.

10  Q.   Okay.  And how long did you hold that

11       position?

12  A.   About three years.

13  Q.   Okay.  How many employees do you currently

14       supervise?

15  A.   176.

16  Q.   Okay.  And that includes coaches?

17  A.   Yes.

18  Q.   All the way down to like your VSRs and RVSRs?

19  A.   That's correct.

20  Q.   And could you just tell us what your role is

21       there as the service center manager?

22  A.   As the service center manager, I am

23       responsible for direction of the employees

24       that provide support for over 540,000

25       veterans in the State of Indiana.  We provide

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

455

```
1       over $75 million in benefits every month to
2       veterans in the State of Indiana.  We process
3       compensation claims, and also other types of
4       ancillary benefits as well.
5   Q.  Okay.  And that's just within the State of
6       Indiana?
7   A.  Yes.
8   Q.  Okay.  Did you come to know an employee by
9       the name of Trevenia Brown?
10  A.  Yes.
11  Q.  All right.  And what kind of work
12      relationship did you have?
13  A.  She was a veterans service representative in
14      the division.
15  Q.  And do you recall who her supervisor was?
16  A.  She had several supervisors while she was
17      there.
18  Q.  Okay.
19  A.  She had Susan Burke who was one of her first
20      coaches.  Two assistant coaches in that
21      particular pairing.  She had Donald Young as
22      well as Kimberly Salazar.  She also had Jim
23      Dean as a supervisor.  After that, she had
24      Tamika Grace as a supervisor.  And these were
25      all first-line supervisors.
```

DEF000875

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

456

1   Q.   Okay.  Have you ever been involved in the

2        past with a request for a hardship transfer?

3   A.   Yes.

4   Q.   Okay.  And can you just describe generally

5        what the process is and how that works?

6   A.   Hardship transfers are -- there's guidance

7        provided by the office of field operations,

8        which is in central office.  That guidance is

9        issued out to stations in the event that

10       employees request hardship transfers.

11            As part of the hardship criteria, the

12       employee must demonstrate that they meet part

13       of that criteria.  And that includes not only

14       having a need, for example, of a transfer for

15       a spouse, let's say, that's relocating to

16       another location.  Elder care, for example,

17       might be another reason.  They also require

18       that the employee be willing to take a

19       downgrade if they are putting forward such a

20       request, and that the employee be in good

21       standing with their performance.  They are

22       meeting their performance standards as well

23       as have no prior disciplinary.  They also

24       review -- their leave balances as well are

25       taken into consideration.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

457

1           The employee is given a form in which

2       to provide their information, such as the

3       grade that they're currently holding, the

4       position they're holding, and a description

5       of why it is that they're requesting the

6       hardship transfer.  If there's any supporting

7       documentation, they can submit that at that

8       time.  Those requests are submitted to the

9       office director for consideration.

10          As a service center manager, I am

11      required to provide with any documentation an

12      employee provides, their performance data,

13      leave balance information, and any

14      information on prior discipline as part of my

15      recommendation to the director's office.

16          And the director would have the final

17      discretion as to whether to approve that or

18      not.  It does require a concurrence level at

19      the area director level, which would be my

20      director's supervisor, as well as concurrence

21      with the receiving station as well.  And

22      their leadership would have to review and

23      determine whether that would be appropriate

24      as well.

25   Q.  Okay.  Do you recall receiving a hardship

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

458

1    request from Ms. Brown?

2    A.   Yes.

3    Q.   How did you become aware of that?

4    A.   The HR office reported it to me and let me

5         know she had submitted a request to her

6         first-line supervisor for a hardship transfer

7         request.

8    Q.   And part of your duties would be to go obtain

9         performance and leave data?

10   A.   Yes.

11   Q.   And did you do the same thing in Ms. Brown's

12        instance?

13   A.   Yes.

14   Q.   Do you recall at this time what Ms. Brown's

15        position was?

16   A.   She was a service representative.

17   Q.   Okay.  Was she a GS-9 or GS-10?  At that

18        time.

19   A.   I do not recall.

20   Q.   Okay.  And you gathered the information, and

21        did you provide that to someone in HR or did

22        you provide it to the director?

23   A.   I would provide that information to my

24        supervisor, which would be the director.

25   Q.   Okay.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

459

1  A.  And I would normally copy HR probably on that

2      as well.

3  Q.  Okay.  And having done that, do you recall

4      what your recommendation was with regard to

5      the hardship transfer?

6  A.  Yes.  My recommendation was to not approve

7      the request for hardship transfer due to her

8      performance not being where it needed to be.

9  Q.  Okay.  And if you could look at the ROI

10     starting at approximately 210.

11 A.  (Witness complies.)

12 Q.  Do you recall receiving this e-mail from

13     Ms. Brown dated January 22, 2014?

14 A.  Yes.

15 Q.  All right.  And did you issue the decision to

16     Ms. Brown, the denial?

17 A.  I did.

18 Q.  All right.  And did you guys have a meeting

19     or discussion about this at that time?

20 A.  Yes.  I was asked by the director to explain

21     the -- or communicate the denial to

22     Ms. Brown, and we did meet.

23 Q.  In your understanding, was it denied just

24     based on performance?

25 A.  Yes.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

460

1  Q.  And her numbers were, I guess, sub-par?

2  A.  Yes.

3  Q.  And that was information you provided to the

4      director?

5  A.  Correct.

6  Q.  Did you meet face-to-face or over the

7      telephone?

8  A.  Face-to-face.

9  Q.  Okay.  Was it just you and Ms. Brown or

10     somebody else in the office?

11 A.  Just myself and Ms. Brown.

12 Q.  All right.  Can you kind of tell me how the

13     conversation went?

14 A.  Sure.  I asked her to come to my office to

15     give her the decision.  I communicated to her

16     that the decision was to deny the request

17     based on her performance, and that she was

18     welcome to re-submit her request should she

19     meet the performance criteria.

20         She because very upset, agitated.

21     She actually, during the course of the

22     discussion, turned her body away from me so

23     that she's not making eye contact, and she's

24     slamming her hands on the desk as she gets

25     more and more upset.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

461

1      She said that she believed that the

2   director could not have possibly considered

3   her information that was submitted with her

4   packet, that I didn't have any idea as to

5   what it was like to have the condition that

6   she had.  But she wasn't going to leave the

7   office without having a job, and wanted to

8   know what was it that it would take for her

9   to be able to get her hardship request

10  granted.  And would it take her saying that

11  her grandmother was ill or that her child was

12  residing in another state, Florida, or that

13  her husband was there.

14      She said that she was going to

15  contact her attorney, and her representative,

16  her AFGE union representative, because the

17  director had to give her that hardship

18  transfer.  As the conversation escalated, I

19  told her her behavior was unacceptable.  And

20  I told her that I had received notice from

21  the HR office earlier that day about her

22  behavior and that was not going to be

23  tolerated in the office.  She was still

24  behaving very upset and erratic at that point

25  in time.  And I had also -- as she was

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

462

1      demanding to have her hardship transfer, I

2      told her that the director did not owe her a

3      hardship transfer, that that was totally at

4      his discretion.

5           I also tried to explain the

6      difference between a hardship transfer and a

7      reasonable accommodation at the time.  But

8      she was so frustrated and upset at that

9      point, that I could not get a word in

10     edgewise to try to explain that to her.

11 Q.  Okay.  And during this conversation, did you

12     ever state:  "Just because you have a

13     disability nobody owes you anything.  They

14     don't have to do anything and you can't go

15     have a meltdown in Human Resources to get

16     moved"?

17 A.  No, I did not.  Like I said, I reiterated to

18     her after she said Mr. Stephens had to give

19     her her hardship transfer, that this was not

20     something that was owed to her.  That this

21     was something that was at the discretion of

22     the director and that she needed to meet the

23     policy guidelines and meet her performance

24     standards, basically, in order for that to

25     happen.  But that is not what I said to her.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

463

1   Q.   Okay.  And you brought up reasonable
2        accommodation during that conversation, that
3        that's a different avenue that you should
4        likely pursue?
5   A.   I was trying to explain the difference to her
6        between the two.  She was of the opinion that
7        she had in essence requested that earlier on
8        at the time that she requested the hardship
9        transfer and therefore it should have been
10       considered as such at the time.  I was trying
11       to explain to her that for our purposes
12       they're two different processes.  There's the
13       hardship transfer and the reasonable
14       accommodation process.  But like I said, I
15       did not get very far in that conversation
16       with her.
17  Q.   Okay.  Did she say she would pursue a
18       reasonable accommodation?  Did she -- any
19       future action that she'd say other than
20       contacting --
21  A.   No.  No.  The last words that she said was
22       that she was going to contact her attorney on
23       it, and they would help her from there.  But
24       she did not at any time say that she was
25       going to ask for reasonable accommodation or

464

1        try and pursue anything further.

2   Q.   And did you have any discussions with regard

3        to the hardship transfer after this meeting?

4   A.   No.

5   Q.   Did you propose any discipline for her

6        actions during the meeting?

7   A.   No.

8   Q.   Any counseling?

9   A.   No.

10  Q.   Okay.  Do you recall on February 10, 2014,

11       between February 7 and February 10th, that

12       Ms. Brown submitted a request for medical

13       reassignment under Article 13 under the

14       contract?

15  A.   Yes.

16  Q.   All right.  And how did that come to your

17       attention?

18  A.   I don't recall.  More than likely would have

19       been submitted through the HR office for that

20       request and then referred over to me.

21  Q.   Okay.  And you would have reviewed that

22       yourself?

23  A.   Yes, because of my position I would have had

24       to weigh in on that.

25  Q.   At this time were you serving as the acting,

465

1       either director or associate director?

2   A.  No, not until March or April that I was

3       serving as acting director.

4   Q.  Okay.  And again, you looked through -- I

5       assume you looked through the documentation

6       as to her performance?

7   A.  Uh-huh.

8   Q.  And see if she met her requirements under

9       Article 13?

10  A.  Uh-huh.

11  Q.  And in your opinion, she didn't?

12  A.  Right.  After reviewing the information that

13      she provided -- Article 13 talks about

14      medical reassignment, and also that chapter

15      overall talks about requests from employees

16      for voluntary transfers or involuntary

17      transfers and reassignment.

18          Part of the requirement under Article

19      13 includes making sure the employee is

20      meeting performance.  They have to meet basic

21      criteria and eligibility criteria for their

22      grade and position.  And for the medical

23      portion, making sure that there is sufficient

24      medical evidence that explains why it is that

25      the employee is requesting the transfer.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

466

1          The information that was provided at

2     the time by the employee did not support that

3     type of a transfer/reassignment, if you

4     would, to another office.  The doctor was

5     very vague in his description of why it was

6     that this would benefit her.  But the other

7     thing was that she was not meeting her

8     performance standards at that time.  And that

9     is one of the primary criteria in order for

10    that to be considered.

11 Q.  Okay.  I want to hand you what's marked as

12    Exhibit 32.  If you look at the bottom on the

13    second page, it talks about the conditions.

14    And is that what you are referring to?

15 A.  Yes.

16 Q.  Okay.  And if you flip the page, under

17    medical reassignment -- yeah, Section 9.  If

18    you could, read B and C and kind of talk

19    about what the parameters are as far as the

20    transfers in this article.

21          JUDGE CARETHERS:  I'm sorry,

22    Mr. Miller.  Which exhibit are we on again?

23          MR. MILLER:  It is Exhibit 32.

24          JUDGE CARETHERS:  Thank you.

25          MR. MILLER:  It's Article 13 out

DEF000886

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

467

1          of the contract.

2     A.   Okay.  It reads:  "The department will to the

3          extent that it's operationally feasible,

4          reassign the employee to an appropriate

5          vacancy or duties and responsibilities in his

6          or her own service/section.  Such

7          reassignment will be commensurate with the

8          employee's limitations and qualifications.

9          Employees will continue to be considered for

10         promotional opportunities for which they are

11         otherwise qualified."

12              "This section does not provide the

13         procedures for employees affected by

14         job-related injuries or who request

15         reasonable accommodation.  Those subjects are

16         addressed in other articles of this

17         agreement."

18    Q.   And so really her request to be transferred

19         from the Indianapolis location to Florida

20         location wouldn't really fall under this

21         Article 13.

22    A.   No.  And in the notice or decision letter

23         that I gave her, I invited her at that time

24         to request a reasonable accommodation so that

25         it was in the appropriate venue, or process,

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

468

 1       because it didn't really meet the

 2       requirements of this article.

 3   Q.  And you provided her reasonable accommodation

 4       information in that decision denial?

 5   A.  I referred her over to the reasonable

 6       accommodation coordinator in the office if

 7       she needed the information.

 8   Q.  Okay.  And if you could look at page 203 of

 9       the ROI.

10   A.  (Witness complies.)

11   Q.  Does that document look familiar?

12   A.  Yes.

13   Q.  Okay.  And you issued this as opposed to Mike

14       Stephens?

15   A.  Uh-huh.

16   Q.  Is that standard?

17   A.  Yes.  I mean, something at this level would

18       be handled by the division chief or service

19       center manager, which is the position that I

20       hold.

21   Q.  Okay.  And to your knowledge, did the union

22       or the Complainant agree with this decision

23       under the contract?

24   A.  They did not.

25   Q.  Okay.  And did you have a meeting to discuss

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

469

1      this with Ms. Brown?

2  A.  No.  I just sent her the response.

3  Q.  Okay.  Did she respond to you in any way?

4  A.  No.

5  Q.  Let's talk about the accommodation requests.

6  A.  Uh-huh.

7  Q.  As the service center manager, or if you are

8      serving as the acting associate director,

9      what would your role be in that process?

10  A.  The deciding management official or DMO.

11  Q.  Okay.  Are you aware that Ms. Brown submitted

12      a request for a reasonable accommodation on

13      February 24, 2014?

14  A.  Yes.

15  Q.  And that information goes to someone in HR,

16      the LRAC.  And who was the LRAC at that time?

17  A.  Sonya Wilson.

18  Q.  And she obtains all the written medical

19      documentation?

20  A.  Yes.

21  Q.  And does she provide a recommendation after

22      she obtains whatever information she needs in

23      the interactive process?

24  A.  Yes.  They hold the interactive process with

25      the employee, and once they have that meeting

DEF000889

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

470

1    and gather the information, they will then

2    make a recommendation based on their findings

3    to the DMO.  I review that information,

4    whether I be service center manager or in the

5    acting director position, review the

6    information provided based on the interactive

7    process and then make a decision from there.

8  Q.  Okay.  Look at page 245.

9  A.  (Witness complies.)

10 Q.  Is this a document that you had issued in

11     response to a reasonable accommodation?

12 A.  Yes.

13 Q.  And did you have any discussions with

14     Ms. Brown in response to this denial?

15 A.  I did not.

16 Q.  Do you know if was there ever a request made

17     to Director Stephens to meet with the

18     director about her request to be transferred

19     to Florida?

20 A.  Yes.  I believe that the employee did make

21     that request to meet with the director.

22 Q.  Okay.  And then would you have been part of

23     that meeting?

24 A.  I was asked by the director to be present at

25     that meeting along with Sonya Wilson, the HR

DEF000890

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

471

1     specialist.

2  Q.  And did that meeting take place?

3  A.  It did not.

4  Q.  Do you know why?

5  A.  I don't know if it was the employee did not

6     want to have it --

7  Q.  Okay.

8  A.  -- but we just did not convene.

9  Q.  Okay.  I assume you're familiar with the

10    mandatory overtime 20 hours a month?

11 A.  Yes.

12 Q.  And that you know somebody by the name of

13    Adam Kinder?

14 A.  Yes.  He was my assistant service center

15    manager at the time.

16 Q.  And are you aware that in February of 2014,

17    they sent out a -- essentially a memorandum

18    discussing the mandatory overtime?

19 A.  Yes.

20 Q.  Okay.  That it was required?

21 A.  Yes.

22 Q.  Okay.  And that was done by Adam as opposed

23    to you?

24 A.  Yes.

25 Q.  Did you ever become aware of any employees

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 226 of 406 PageID #:
860
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

472

1   refusing to sign up for mandatory overtime?

2   A.   Not until Ms. Brown refused to sign up for

3        mandatory overtime.  This is something that

4        is required nationwide of all the employees

5        as we try to work down the backlog of claims.

6        It was mandated at the central office level

7        that employees work up to 20 hours per month

8        per person.  Employees were allowed as part

9        of the criteria, if they had some medical

10       reasons for which they could not work, to

11       submit a request.  Ms. Brown did not do that.

12            But they were required each to

13       provide 20 hours of mandatory overtime, and

14       we're still actually going through the

15       mandatory overtime as we speak.

16   Q.   Was there any confusion as to how FMLA could

17        be applied to the mandatory overtime

18        requirement?

19   A.   I think that Ms. Brown was confused as to how

20        that would work.  Based on what I was

21        notified by her first-line supervisor, she

22        had been advised by her representative at the

23        time that she did not have to work the

24        mandatory overtime because of the FMLA that

25        she had filed previously in that year.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

473

1          Unfortunately, the supervisor was

2     trying to explain to her how that worked, but

3     she was just not -- I don't think she was

4     understanding exactly how that would work in

5     terms of the mandatory hours that were worked

6     over the 40 hours that she had already worked

7     during that workweek, and how absences from

8     work during mandatory overtime hours would be

9     applied towards those balances.

10          Anybody that is working overtime,

11     whether they have FMLA or not, or medical

12     conditions, can call a supervisor and say I'm

13     not feeling well today or something has come

14     up and I can't come to work.  They have the

15     ability to notify their supervisor.  All we

16     were asking her to do was to provide us, like

17     everyone else, a schedule basically of when

18     were you going to work overtime for the

19     month.  And we required that on a monthly

20     basis from every employee.  The beginning of

21     the month they submit what hours they can

22     work.  And she would not do that.

23  Q.  What's your understanding of the use of FMLA

24     and, I guess, sporadic use where you're not

25     sure what day you're going to feel bad or

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

474

1    what day you're not.  Can you tell us what

2    your understanding is of that process?

3  A.  Well, once the employee has been approved for

4    FMLA, let's say it's intermittent use, for

5    example.  Depending on the amount of hours

6    that doctor might detail in terms of

7    flare-ups and other things, we would ask the

8    employee to request leave like anybody else

9    would if they needed to utilize that and

10   invoke FMLA.

11       Typically employees will call their

12   supervisor and say, I'm invoking FMLA and

13   need, let's say three hours of annual, or

14   three of sick leave.  In some cases the

15   employees have exhausted their leave and may

16   ask for leave without pay under FMLA.  And it

17   follows very similar leave procedures except

18   for the fact that it is FMLA, and any time

19   that they invoke, those hours are counted

20   against overall balances for FMLA for that

21   year which are 480 hours for a particular

22   year.

23       But typically the procedure, if

24   they're working overtime and they have FMLA,

25   they would just need to notify us that that's

DEF000894

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

475

1          what they're doing, and we would apply that.

2   Q.   So just like it was sick leave or annual --

3   A.   Right.  Right.

4   Q.   Now, to invoke FMLA on a particular day, is

5          it your understanding that you actually have

6          to be having some sort of medical episode

7          that's covered by your FMLA request?

8   A.   Yes.

9   Q.   Okay.  And if it's sporadic, in your opinion,

10         is that hard to see two weeks into the future

11         that you're going to have an episode?

12  A.   Absolutely.  I mean, if it's something that

13         is like a flare-up and you just don't know

14         when you're going to have one, it would be I

15         think difficult to project out when you're

16         going to be absent from work, for example.

17  Q.   Did she ever discuss the issue with regard to

18         her FMLA and the overtime mandatory hours

19         with you directly?

20  A.   No.

21  Q.   All right.  When was the schedule usually

22         due?  Was it different for each supervisor?

23  A.   No.  When the mandatory overtime guidance

24         came out, we gave employees sufficient time

25         to submit the FMLA requests or any kind of

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

476

1    medical, et cetera.  This is very hard on our

2    work force when they have to do mandatory

3    overtime.  So they asked us to be flexible

4    and give the employees about a two-week

5    window to make sure that they can go ahead

6    and make arrangements if they needed to

7    because they all -- a lot of them have small

8    children and other responsibilities as well

9    that have to be adjusted.

10           So we, as early as we were notified,

11   we gave employees that time frame to be able

12   to submit it.  It began shortly thereafter,

13   about two weeks after that notification

14   started, they started providing hours.  As

15   employees started to make arrangements for

16   childcare, eldercare, et cetera, we prorated

17   hours for that first initial month when it

18   kicked in, because there was no way for them

19   to work a full 20 hours at that point, with

20   the understanding that the following month

21   they were responsible for working the full

22   20 hours.

23   Q.  So if they received an e-mail on January 8,

24       2014, and again, you know, mandatory overtime

25       is going to be invoked again, when should

DEF000896

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

477

1      they have had their overtime submitted to

2      their supervisor for the February month?

3  A.  I would say at least by the end of that pay

4      period they should have already submitted

5      that, with the understanding, you know, most

6      people will have communicated and say, I'm

7      still having trouble making arrangements for

8      childcare or whatever the situation might be.

9  Q.  So by mid January something should have been

10     submitted to the supervisor?

11 A.  Yes.

12 Q.  Now, had you received any other information

13     from other supervisors that some of the

14     employees were not signing up for mandatory

15     overtime?

16 A.  No.

17 Q.  No one else?

18 A.  No.

19 Q.  That you're aware of?

20 A.  That's correct.

21 Q.  If you could look at page 272.

22 A.  (Witness complies.)

23 Q.  Were you aware that this e-mail was sent out?

24 A.  Yes.

25 Q.  Okay.  And it's dated February 12, 2014?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

478

1   A.  Uh-huh.

2   Q.  And so essentially it would appear that she

3       had from January 8th until February 13th to

4       submit her overtime hours?

5   A.  Uh-huh.  Yes.

6   Q.  Okay.  And do you believe that was a

7       sufficient enough time?

8   A.  I believe so, yes.

9   Q.  And were you aware that the reprimand was

10      going to be issued?

11  A.  I was briefed by my assistant service center

12      manager that that's the direction we were

13      going in.

14  Q.  Okay.  And that was Adam Kinder?

15  A.  Uh-huh.

16  Q.  And was it his decision to issue the

17      reprimand?

18  A.  Yes.

19  Q.  Did you ever have a meeting with Ms. Brown

20      and Ms. Gentry, Rachel Gentry?

21  A.  No.  I don't recall that.

22  Q.  Okay.  So there wasn't a meeting between --

23      with you, Ms. Gentry, and Ms. Brown

24      discussing any of the hardship requests or

25      reasonable accommodation?

DEF000898

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

479

1    A.    No.

2                MR. MILLER:  Nothing else.  Thank

3        you, Judge.

4                JUDGE CARETHERS:  Okay.

5        Ms. Clark, your witness.

6        EXAMINATION,

7          QUESTIONS BY MS. CLARK:

8    Q.    Ms. Lima, I understand that your testimony is

9        that you were presented the hardship transfer

10       for review?

11   A.    Yes.

12   Q.    Did you make a final decision about the

13       hardship transfer?

14   A.    I did not.

15   Q.    You did not.  But you reviewed the criteria?

16   A.    Yes.

17   Q.    And who made the final decision?

18   A.    Mr. Stephens, our director.

19   Q.    Okay.  Was that based on your recommendation?

20   A.    Yes, ma'am.

21   Q.    And your recommendation was based on

22       Ms. Brown's performance?

23   A.    That's correct.

24   Q.    And only her performance?

25   A.    That's correct.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

480

1   Q.   I'm going to show you what's marked as

2        Exhibit 30, and can you point out to me where

3        the performance is a factor to be considered?

4   A.   Item number 2, where it says it will not be

5        considered if the employee is on a

6        Performance Improvement Plan, leave

7        restriction, or disciplinary action.

8   Q.   Okay.  So Ms. Brown was not on a Performance

9        Improvement Plan or any restriction or

10       disciplinary action, correct?

11  A.   That is correct.

12  Q.   Thank you.

13  A.   However we do look at --

14  Q.   Thank you.

15  A.   -- the performance.

16  Q.   Thank you.  But those are the only

17       performance criteria that's set forth in this

18       document, correct?

19  A.   That's correct.

20  Q.   Thank you.  And at the time that you

21       considered Ms. Brown's hardship transfer, had

22       she been provided any warning by her direct

23       line supervisor about her performance?

24  A.   I do not know.

25  Q.   Did you inquire before you made the

DEF000900

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 235 of 406 PageID #:
869
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

481

1     recommendation to deny the transfer?

2  A.  I inquired about her performance, yes.

3  Q.  Did you ask her first-line supervisor about

4     her performance?

5  A.  Yes.

6  Q.  Okay.  And did the first-line supervisor say

7     that she had been warned about her

8     performance?

9  A.  No.

10  Q.  Thank you.  I'm providing you what is marked

11     as Exhibit 32, which is Article 13,

12     reassignment, shift changes, and relocations.

13     And specifically Section 9, which is

14     addressing relocations for medical reasons.

15     Can you point out to me specifically where in

16     this section it discusses performance being a

17     factor to be considered?

18  A.  It does not.

19  Q.  Thank you.  You testified about Ms. Brown's

20     reaction during your advising her about the

21     hardship, the results of the hardship

22     transfer request.  What did you know about

23     Ms. Brown's condition?

24  A.  At that point, nothing.

25  Q.  Did you make any inquiry when you were

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

482

1  reviewing the hardship transfer about the

2  medical information you received?

3  A.  That medical information, when the hardship

4  transfers are submitted, they are submitted

5  to our HR office for our own protection.  I

6  did not inquire as to the nature of her

7  disability or type of disability at that

8  time, or the condition.

9  Q.  So did you get a recommendation from

10  Ms. Wilson about the hardship transfer?

11  A.  I got notified in an e-mail by Ms. Wilson

12  that she had submitted a request for

13  immediate hardship transfer.  And she

14  forwarded to me the written request that she

15  sent on that form.

16  Q.  Okay.  And so as part of the procedure, did

17  Ms. Wilson discuss with you what the medical

18  condition was?

19  A.  No.

20  Q.  So that is not -- you would never know what

21  the medical condition would be?

22  A.  No.

23  Q.  So I'm trying to understand, and let me hand

24  back Exhibit 30 to you.  One reason that an

25  employee can get a hardship transfer is

DEF000902

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

483

```
 1        serious illness.  So if you're not reviewing
 2        medical information, do you just get a
 3        statement that there is a serious illness?
 4   A.   Yes.  If there is a serious health condition,
 5        they would tell me.  HR would say this
 6        employee has presented with a serious health
 7        condition, et cetera.
 8   Q.   Do you recall if Ms. Wilson indicated to you
 9        that Ms. Brown had presented with a serious
10        health condition?
11   A.   No.
12   Q.   So she did not?
13   A.   No.
14   Q.   And you're familiar with the FMLA, correct?
15   A.   Yes, ma'am.
16   Q.   Okay.  And so I'm going to give you what is
17        marked as Exhibit 1.  Did you ever see this
18        document as part of your consideration of the
19        hardship transfer?
20   A.   No, ma'am.
21   Q.   Okay.  You're familiar what the FMLA is
22        supposed to provide, correct?
23   A.   Uh-huh.
24   Q.   That an individual can seek leave when they
25        have a serious health condition, correct?
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

484

1   A.   Yes.

2   Q.   Were you aware that Ms. Brown was on FMLA at

3        the time you considered the hardship

4        transfer?

5   A.   No.

6   Q.   So when you met with Ms. Brown to let her

7        know the results of the hardship transfer

8        denial, it had not been brought to your

9        attention that her condition caused her

10       serious pain?

11  A.   No.

12  Q.   And it had not been brought to your attention

13       that she suffered from various cysts and

14       sores and drainage during times when she was

15       at work?

16  A.   No.

17  Q.   So you wouldn't know whether at the time that

18       she was coming in to meet with you, whether

19       she had -- it was painful for her to even

20       come and walk to your office to talk to you?

21  A.   No.

22  Q.   You would not be aware of that?

23  A.   No.

24  Q.   So is it possible that her -- to your

25       knowledge, that the behavior you were seeing

DEF000904

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

485

```
 1        was somebody -- when she's not making direct
 2        eye contact with you, that that's somebody
 3        who is upset and didn't want you to see that
 4        she -- how upset she was?
 5   A.   No.  Her demeanor was extremely
 6        disrespectful.  I understand what you're
 7        getting at.  However --
 8   Q.   How was it disrespectful?
 9   A.   It was the talking over me, the slamming on
10        the desk, the body language, not making eye
11        contact.  She seemed very agitated even
12        walking into the room.  And I don't know, you
13        know, obviously what occurred prior to her
14        coming to the meeting.  But the way that I
15        perceived it at that time was that her
16        behavior was inappropriate for a business
17        setting.
18   Q.   Okay.  So if she were in pain during that
19        day, walking to your office just simply for
20        here's something that I guess could have been
21        told by an e-mail or by phone, that could
22        have been exacerbating for her, correct?
23   A.   I don't know how to even answer that
24        question.  I mean, you're asking me to assume
25        that she would have been in pain.  I
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

486

1     couldn't --

2   Q.   Do you know if she was in pain that day?

3   A.   I do not, no.

4   Q.   All right.  Do you know if she was trying to

5        avoid eye contact because she was on the

6        verge of crying?

7   A.   I do not know.

8   Q.   Okay.  Did you ask for her to meet with you

9        in your office?

10  A.   Yes, ma'am.

11  Q.   Okay.  So it was not something you felt that

12       you could just tell her over the telephone?

13  A.   Something like that I would never tell

14       anybody over the phone or in an e-mail.

15       That's something that I would want to let her

16       know in person.  And I would do the same for

17       any other employee.

18  Q.   Okay.  Did you offer to come to her cubicle

19       to speak to her about it?

20  A.   No, and I would never --

21  Q.   And you would not do that?

22  A.   -- discuss that in her cubicle.  Our cubicles

23       are in an open space.  For her privacy, I

24       would never do that.

25  Q.   Understood.  Was there a room that was closer

DEF000906

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

487

```
1         to where she sat where you would have a
2         closed door that you could sit down and speak
3         to her about this?
4    A.   No, ma'am.
5    Q.   Okay.  Did you discuss her performance with
6         her?
7    A.   I only mentioned to her that she was not
8         meeting the requirements for her performance
9         standard.  I did not get into details about
10        the numbers or anything like that.
11   Q.   Okay.  So you were saying she wasn't meeting
12        her performance, and this was at a time when
13        you did not understand she was on FMLA,
14        correct?
15   A.   Yes.
16   Q.   All right.  Are you aware that there are --
17        that there have been some disagreements
18        between the union and management about how
19        production should be looked at when an
20        individual is on FMLA?
21   A.   Not particular to FMLA.  There have just been
22        disagreements between the AFGE and management
23        as far as performance standards just in
24        general.
25   Q.   But you're not aware of how it should be --
```

DEF000907

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

488

1     any kind of discussions raised in connection

2     with when an individual's leave is being

3     taken, and they may start to work on one day,

4     but not finish the work until the next day,

5     or the next day that they're in, because of

6     the leave that they're taking?

7  A.  Well, if you're trying to drive at the

8     performance and how it's measured, employees

9     self-report the work that they do.  And we

10    give employees -- there's a software program

11    that they utilize to self-report the work

12    that's performed.  And it's a program based

13    on the employee's grade, et cetera.  And it

14    only accounts for the work that the employee

15    is actually doing.

16         So if an employee came in for that

17    day and had to leave early or resumed their

18    work the next day, it would capture that

19    information based on what the employee is

20    reporting.

21  Q.  So if an individual worked just a half day,

22    would it be averaged out as a full day?

23  A.  It's cumulative for the month.  That's how

24    it's counted.

25  Q.  So there is no apportionment for time periods

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

489

1          when the individual is not working a full

2          day?

3     A.   The program will account for -- based on an

4          average day, how much work the employee has

5          performed, based on what they're reporting,

6          as well as any what they call excluded time

7          for meetings, training.  Leave of any kind

8          that they're taking is also something the

9          employee would report on that.  And it would

10         take a cumulative based on the number of

11         hours the employee is available to work and

12         the number of items, is what it calls them,

13         or cases, if you would, that an employee will

14         review or complete during that month.

15    Q.   But on a daily basis, is that correct?

16    A.   Yes, it's a daily cumulative, and then an

17         overall monthly cumulative as well.

18    Q.   So if an individual only worked 10 days in

19         the month, would they get a score based on

20         the work completed in 10 days, or is it based

21         on the amount of work -- would it be averaged

22         over a 20-day --

23    A.   It would reflect the work that the employee

24         reported being done during that 10-day time

25         frame.  So if I'm only looking, let's say, at

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 244 of 406 PageID #:
878
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

490

1      a snapshot of a pay period of 10 work days in

2      a pay period, it would look at what work was

3      actually performed by the employee in that

4      time frame.

5   Q. Okay.  And so when you're determining whether

6      or not someone is meeting their goals, do you

7      take into account that some of the days that

8      are in that time period are days taken for

9      leave, and just measure the time that they

10      actually are there for a full day to do work?

11   A. Yeah.  It measures everything, yes.

12   Q. I guess, what I'm asking is whether you -- in

13      determining whether or not someone is meeting

14      their goals, do you discount the days that

15      they are not there to work?

16   A. No, because it's counting -- let's say for

17      ASPEN purposes, we look at it on a monthly

18      basis.  The supervisors will give the

19      employees a monthly evaluation, if you would,

20      of how they're doing.  We're looking at all

21      the days that are worked during that month

22      and their actual counts of the work that they

23      perform during that time frame.

24          We're not allowed to back out, so to

25      speak, the times that employees are maybe on

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

491

```
 1        leave or at a meeting or training, et cetera.
 2   Q.   During the meeting with Ms. Brown, did she
 3        raise her voice with you?
 4   A.   Yes.
 5   Q.   So did she have an elevated voice or was she
 6        yelling?
 7   A.   Elevated voice.
 8   Q.   Okay.  Did she stay in your office the entire
 9        time of the meeting?
10   A.   Yes.
11   Q.   In response to Ms. Brown's advising you that
12        she needed this transfer, did you indicate to
13        her that no one owed her a transfer?
14   A.   I did tell her that, yes.  And I told her
15        that the director did not owe her that
16        transfer.  At that point she kept saying it
17        was her hardship transfer and he had to give
18        her that hardship transfer.  But I told her
19        that he did not owe her an automatic approval
20        of that transfer, that it was at his
21        discretion based on her performance.
22   Q.   But the hardship transfer rules don't discuss
23        performance, correct?
24   A.   They discuss an employee being on a
25        performance improvement plan, although
```

DEF000911

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

492

1    that --

2  Q.   Which Ms. Brown was not on, correct?

3  A.   That's correct.

4            JUDGE CARETHERS:   Hold on a

5    second.   You have to let her finish her

6    statement.   I'm not sure -- what were you

7    going to say?   Finish your answer.

8            THE WITNESS:   Even though the

9    document, the guideline document that you're

10   describing says that part of what is looked

11   at is whether or not an employee is on a

12   Performance Improvement Plan, part of the

13   custom and process is for me to also provide

14   my leadership with information on their

15   current performance as well.

16        And that has always been the case.

17   That's not something that I just came up with

18   out of the blue.   That is part of the process

19   is to provide current leave balances,

20   information on past discipline, in her case,

21   looking at performance, as well as whether or

22   not the employee was on a PIP.

23        And you are correct, she was not on a

24   Performance Improvement Plan at that point.

25   We were in the process down the road of

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

493

1      looking at placing her on one, but she was

2      not at the time that she submitted the

3      hardship transfer request.

4   Q.   Can you tell me where these additional

5      procedures you've just testified about are

6      documented?

7   A.   They're not documented in that guidance.

8      That's just the procedures in --

9   Q.   Are they documented anywhere?

10  A.   No, ma'am.

11  Q.   Okay.  And do you know whether other people

12     who consider hardship transfers do the same

13     things that you just described?

14  A.   Yes, ma'am.

15  Q.   And who would those people be?

16  A.   In terms of in my office, or --

17  Q.   Yes.  Who else would have conducted a review

18     of a hardship transfer and considered items

19     that are not documented in this policy?

20  A.   Any other division chief in our --

21  Q.   Can you give me names --

22  A.   -- office.

23  Q.   Can you give me names of those individuals,

24     please?

25  A.   Dean Slicer.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

494

1   Q.   Who?

2   A.   Dean Slicer.

3   Q.   Okay.  Who else?

4   A.   Michael Busher.

5   Q.   Who else?

6   A.   Those are the only other division chiefs in

7        our regional office.

8   Q.   And are these the people who taught you how

9        to do this?

10  A.   No, ma'am.

11  Q.   Who taught you how to do this?

12  A.   Our director.

13  Q.   Mr.?

14  A.   Michael Stephens.

15  Q.   Mr. Stephens is the one who taught you how to

16       consider other items that are not in the

17       written procedures?

18  A.   Uh-huh.

19  Q.   And who were you talking to about Ms. Brown

20       being on a PIP in the future?

21  A.   Her supervisor, her first-line supervisor.

22  Q.   And who is that?

23  A.   Jim Dean.

24  Q.   Okay.  And when did you have that discussion?

25  A.   Had to be April or so.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

495

1    Q.   Well, that's after.

2    A.   That's correct.

3    Q.   So you did not have a discussion with Jim

4         Dean at the time -- before or at the time

5         that you had informed Ms. Brown that the

6         hardship transfer was denied, correct?

7    A.   Can you repeat that question?

8    Q.   Yeah.  My question is, in January of 2014,

9         had you already had a discussion with Jim

10        Dean about Ms. Brown going on a PIP?

11   A.   No, ma'am.

12   Q.   Okay.

13   A.   I'm saying in the future is -- what I mean

14        is, at that time in April when she was not

15        meeting, he came and briefed us on where she

16        was with performance.

17   Q.   Okay.  Well, I was just asking you about the

18        hardship transfer, which is before April.

19        We'll get to April.  Okay.  Thank you.

20        You testified that the HR director said

21        something about Ms. Brown's behavior.

22   A.   Uh-huh.

23   Q.   What exactly did the HR director say to you

24        about Ms. Brown's behavior?

25   A.   Well, she's not the HR director.  She's just

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

496

```
 1        an HR specialist.  It was Ms. Wilson.  And
 2        she reported that Ms. Brown had been
 3        disrespectful in her office earlier that
 4        week.
 5   Q.   How was she disrespectful?
 6   A.   Talking over her, also -- slamming on the
 7        desk and talking over her.
 8   Q.   You knew that Ms. Brown had a disability?
 9   A.   Not until she told me.
10   Q.   And when did she tell you?
11   A.   The day of the meeting for the hardship
12        transfer.
13   Q.   And is that the time when you told her that
14        no one owed her anything because she had a
15        disability?
16   A.   I did not say that no one owed her anything
17        because of her disability.  I told her that
18        she was not owed automatic approval of the
19        hardship transfer request and that that was
20        at the discretion of the director.
21   Q.   Did you tell her she wasn't owed the
22        automatic --
23             MR. MILLER:  Asked and answered.
24   Q.   -- approval because of the disability?
25             MR. MILLER:  She answered that.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

497

1          JUDGE CARETHERS:  She answered,

2     but I'll let her answer again.

3     What is your answer?

4  A.  I told her that she was not owed an automatic

5     approval of the hardship transfer request,

6     because that was at the discretion of the

7     director.

8  Q.  Okay.  I want to talk about the request for

9     reassignment for medical reasons.  Now, did

10     that request come through Ms. Wilson also?

11  A.  It probably had, yes.

12  Q.  Did you have a conversation with Ms. Wilson

13     about what information had been presented to

14     her in support of this request?

15  A.  Not to my recollection.  She would have just

16     packaged whatever it was she submitted and

17     sent it to me.

18  Q.  Would that include medical information?

19  A.  Yes, it would have.

20  Q.  Okay.  So what medical information did you

21     receive?

22  A.  It was just a very brief note from her

23     doctor that she had submitted.  It was a

24     one-page document.

25  Q.  Is this the document you're referring to?

DEF000917

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

498

1   A.   It looks like it, yes.

2   Q.   And what medical information do you see in

3        that letter?

4   A.   It talks about her skin condition.

5                JUDGE CARETHERS:  Ms. Clark, can

6        you just -- I'm sorry.  Could you just

7        identify it for the record?

8                MS. CLARK:  Exhibit 4.  I'm sorry,

9        Your Honor.  Exhibit 4.

10  BY MS. CLARK:

11  Q.   It discusses the skin condition?

12  A.   Uh-huh.

13  Q.   And you call it the skin condition because?

14  A.   That's what it says on the letter.

15  Q.   Okay.  And did you look up that skin

16       condition when you were reviewing this

17       letter?

18  A.   No.

19  Q.   So did you understand any of the particulars

20       about the skin condition?

21  A.   Just based on what he's describing in the

22       letter.

23  Q.   Is there something about this letter that did

24       not explain the condition sufficient enough

25       for you?

DEF000918

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

499

```
 1   A.   Yes.  I would say that he's very -- although
 2        descriptive about the condition itself, he
 3        was very general in terms of the impact to
 4        the actual performance of her job and what
 5        the requirements are.  That is what led me to
 6        the denial of that request.
 7   Q.   Well, with the package that you received, did
 8        you also receive Ms. Brown's FMLA
 9        documentation?
10   A.   I don't believe so.
11   Q.   So you did not receive Exhibit Number 1 when
12        you received the request for the medical --
13   A.   No, ma'am.
14   Q.   -- reassignment?
15   A.   No.
16   Q.   Did you make a request to have Ms. Brown's
17        transfer request reviewed by a federal
18        medical officer?
19   A.   No.
20   Q.   Is there a reason why?
21   A.   Just that it's a request.  We don't normally
22        do that.
23   Q.   Well, you see here where it says that such a
24        request can be made?
25   A.   It says it may be, yeah.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

500

1   Q.   Yeah.  All right.

2   A.   But I did not.

3   Q.   And is there a reason why you didn't submit

4        it?

5   A.   As I said, that is not typically something

6        that we do routinely on these.

7   Q.   At the time you were reviewing this request,

8        you did understand Ms. Brown was on FMLA,

9        correct?

10  A.   Yes.

11  Q.   Okay.  So you understood that the Agency had

12       already approved her as having had a serious

13       illness, correct?

14  A.   Uh-huh.

15  Q.   If there was something that you didn't

16       understand from the letter, is there a reason

17       why you wouldn't seek additional information

18       from the physician?

19  A.   It's not that I didn't understand what he was

20       saying in the letter.  It just did not meet

21       that threshold based on what's in that

22       article.

23  Q.   And what part of the threshold did it not

24       meet?

25  A.   It's an explanation of the employee's

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

501

1     limitations in the position, which is covered

2     in Section 9(b).  All that he describes here

3     is a description of the different things that

4     occur with that particular medical condition.

5     And he makes a recommendation that she seek

6     care upon a transfer to Florida.  But it

7     doesn't really explain to us impact on the

8     essential functions of the job and why would

9     it be appropriate or better for -- suited for

10    her to have this transfer to Florida.

11         But the other thing that I will bring

12    you back to is that earlier in that

13    article -- because we're only focusing, for

14    your purposes, on Section 9 -- is that part

15    of the conditions that have to be met for

16    part of this.  And part that is performance

17    as well.

18  Q.  Are you talking about Section 1 of this

19    article?

20  A.  Uh-huh.

21  Q.  Can you tell me which part?

22  A.  Sure.  On Section 4(b), under conditions, it

23    talks about there having to be an available

24    vacancy, the employee has to be meeting basic

25    qualifications for the position, which

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

502

1    include the grade, the title, and physical

2    requirements, and they also have to be

3    performing at an acceptable level of

4    performance.

5  Q.  And then this is the section addressing

6    voluntary requests for reassignments.  It's

7    not under the general section.  The general

8    section -- can you tell me, under the general

9    section, where it talks about performance?

10  A.  It does not.

11  Q.  Thank you.  So in reading Dr. Huff's letter

12    where he specifically says that -- after

13    describing what hidradenitis suppurativa

14    does, he specifically says that the disorder

15    can cause significant physical and sometimes

16    debilitating pain.

17         Did you understand that that -- he

18    did not qualify this to be debilitating pain

19    when she's not at work.  He's saying that

20    it's debilitating pain that can happen, and

21    that there's frequent need for medical and

22    sometimes surgical intervention.

23  A.  I'm not understanding --

24  Q.  So with debilitating pain being the issue

25    here that's impacting her job, what

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

503

1          additional information did you need to know?

2     A.   He does not say here that it's on the job,

3          though.  He says, based on these factors, the

4          disorder can cause significant physical and

5          sometimes debilitating pain with frequent

6          need for medical and depending on the stage,

7          surgical intervention.

8               I can't make that leap, based on

9          this, that it's also -- make the assumption

10         that it's impacting the essential functions

11         of her performance on the job.

12    Q.   Well, it has to impact -- she has to be able

13         to perform the essential functions of her

14         job.  That's what the law requires.  For this

15         to be a disability, it has to impact major

16         functions of -- either major life activities

17         or major functions of her body.

18              And as you said, this is a skin

19         condition.  And because it's a skin

20         condition, the EEOC has said that that's a

21         major function.  And therefore, he is giving

22         you the medical information and saying that

23         her skin condition, which is a major

24         function, is causing her debilitating pain.

25         And he doesn't qualify it.  He doesn't say

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

504

1       it -- basically he's saying it's happening

2       all the time and can happen at any time,

3       including when she's at work.

4              So why did he need to say -- since he

5       didn't limit it to only in the morning hours

6       or only in the evening hours, he's saying

7       that this could frequently happen pretty much

8       at any time, and it's affecting a major

9       function of her body.  So there's no question

10      it's a disability.

11             I'm trying to understand why he

12      needed to use the phrase "at work."

13   A.  Because I need to know what her limitations

14      on the job are and have an idea of where can

15      we look for that appropriate setting in a

16      transfer setting.  And that was just not

17      there.

18   Q.  Okay.  And the debilitating pain -- before we

19      get to the actual accomodation, I just want

20      to make sure that we understand here that it

21      was affecting her at work.  And what I'm

22      hearing from you is that you didn't think

23      this letter said that.  And I'm trying to

24      understand, what language was missing here

25      for it to have been a letter you would have

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

505

1    thought of differently?

2  A.   Well, I think that it would have been better

3       for me, or clearer for me, if there was a

4       description of how do these conditions impact

5       her ability to perform her job.  Because

6       based on what I was seeing at the time in

7       terms of her coming to work and the job that

8       she did when she was coming to work, the

9       feedback that I was getting from her

10      supervisor is that she was trying very hard

11      and she was doing the best that she could

12      while she was at work.

13          There weren't any known limitations,

14      if you would, while she was on the job based

15      on these disabilities.  It just happened to

16      be she may have needed to take, you know,

17      some time off as she needed it.  But when she

18      was at work, she was giving it a hundred

19      percent when she was there.

20          So I did not feel comfortable making

21      that type of assumption based on what was

22      here.  It would have helped me if the

23      doctor could have provided more detail about

24      what is happening while she's at work and

25      what the impact is overall.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

506

```
1    Q.   Okay.  Well, let's follow up, because what

2         you're telling me now is really important, I

3         think.  You had feedback from somebody who

4         was working with her.

5    A.   Her supervisor.

6    Q.   And was that Mr. Dean?

7    A.   Mr. Dean, Mr. Young.

8    Q.   Okay.  And they were telling you that she was

9         trying her best and giving a hundred percent?

10   A.   Uh-huh.

11   Q.   Okay.  Did they ever ask her whether she was

12        in pain?

13   A.   I don't know that.

14   Q.   Did they ever tell you, even though she was

15        working a hundred percent and trying her

16        best, that she was in pain?

17   A.   No.

18   Q.   Okay.  So is it fair to say that they could

19        have made that inquiry, or you could have

20        made that inquiry as to whether or not she

21        was in pain, given the letter you received

22        from the doctor?

23   A.   I think they could have, yes.

24   Q.   Okay.  I'm going to give you what is marked

25        as Exhibit 28.  And I believe Exhibit 28 is
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

507

1    the VA's -- VA Form 0857e.  Okay.

2            And I'd like, as we're going

3    through -- the top section is to be filled

4    out either -- I think by either the employee

5    or their supervisor.  The doctor's section is

6    the lower section where the GINA discussion

7    begins.  Okay?

8    A.  Uh-huh.

9    Q.  And the doctor's section goes over on to

10   page 2.  And it locks like there's very

11   discrete things that the doctor is asked.

12   So I want to go through that.  And I'd like

13   for you to look at Dr. Huff's letter as we do

14   that.

15   A.  (Witness complies.)

16   Q.  Great.

17           JUDGE CARETHERS:  Just to let you

18   know, you have 24 minutes.

19           MS. CLARK:  Thank you.

20   BY MS. CLARK:

21   Q.  So VA Form 0857e, the first thing it asks for

22   is the nature, severity, and duration of the

23   impairment.

24           Does Dr. Huff's letter of February --

25   I think it's 7th, maybe -- talk about the

SMITH REPORTING
www.smithreporting.net                              DEF000927

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

508

1       nature, severity, and duration of the

2       impairment when he discusses that the

3       disorder is chronic, unpredictable, and

4       inflammatory?

5   A.  I think it talks about the nature of the

6       condition and the severity.  As far as

7       duration of the impairment, talking about a

8       chronic condition, I don't know that that

9       talks about duration of the impairment.

10  Q.  Okay.  Well, that's fair.  Then Section (b)

11      of the form, it requests one or more of the

12      activities the impairment limits.  And it

13      gives examples of walking, reaching,

14      breathing.  Okay.

15          And looking at the letter, doesn't it

16      discuss the fact that the disorder causes

17      significant physical and sometimes

18      debilitating pain?

19  A.  Yes, it talks about pain, but it doesn't talk

20      about limitations in terms of walking,

21      reaching, breathing, et cetera.

22  Q.  Did you talk to Ms. Wilson about what the VA

23      definitions of major life activities

24      includes?

25  A.  No.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

509

1   Q.  All right.  And did she offer that to you?

2   A.  No.

3   Q.  Okay.  Do you know Ms. Wilson's training to

4       include an understanding of the EEOC's

5       regulations under the ADAAA?

6   A.  No.

7   Q.  You don't, okay.  And would you have had any

8       reason -- is it part of your process to look

9       at the VA handbook to determine whether or

10      not what was in the doctor's letter discussed

11      one or more of the activities the impairment

12      limits?

13  A.  We typically follow the guidelines that are

14      included in -- there's a series of documents

15      that go along with this, is what we review.

16      I don't typically refer back and forth to the

17      VA handbook.

18  Q.  Are those documents part of the VA handbook

19      or no?

20  A.  They're part of the procedure for a request

21      for reasonable accommodation.  Each of these

22      series of different documents walks you

23      through from the beginning of the process

24      when an employee notifies you of the

25      reasonable accommodation; the interactive

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

510

1    process, denials and approvals, procedures,

2    and all of that.

3 Q.  Okay.  If a major life activity includes a

4    sensory organ, such as the skin, and the

5    doctor has indicated that this is a disorder

6    of the skin, is it fair to say that this

7    letter then reflects the activity the

8    impairment limits?

9 A.  I don't think so.

10 Q.  Okay.  Let's see.  The extent or degree to

11    which the impairment limits the activity.

12    I think we've talked about the fact that he

13    indicates that the disorder is chronic and

14    often unpredictable.  Do you see that?  Would

15    you say that he is informing you of the

16    extent or degree the impairment limits an

17    activity?

18 A.  I don't think so.  I'm sorry, no.

19 Q.  And that's because you don't think that the

20    skin is one of the activities that is listed

21    as an activity that could be limited by --

22 A.  Well, skin in and of itself isn't an

23    activity.  I mean, we're looking for limits

24    of impairment.

25 Q.  Well, these are major life activities that

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

511

1       this form is supposed to be referencing,

2       correct?

3   A.  Uh-huh.

4   Q.  All right.  And if the EEOC has, in fact,

5       stated that the sensory organ of the skin

6       is -- or a condition that affects the

7       functions of a sensory organ, such as the

8       skin, is in fact a major life activity, would

9       you agree he's identified the major life

10      activity in this letter, if, in fact, the

11      EEOC has said that?

12  A.  I don't think so.

13  Q.  Okay.  Then the form that you're looking at

14      requires that there's a reason the individual

15      requires the accommodation or particular

16      accommodation requested.

17          And do you see that he talks about

18      his belief that she would benefit from close

19      support of her family as she's confronting

20      the medical challenges associated with her

21      condition?

22  A.  Uh-huh.

23  Q.  Okay.  Would you agree, then, he's responded

24      to (d)?

25  A.  No.  He's saying here that, "I believe that

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

512

```
 1        she will benefit from having close support of
 2        her family as she is confronted with medical
 3        challenges associated with hidradenitis."
 4        I don't think that that tells me the reason
 5        why she requires an accommodation or a
 6        particular accommodation request.  He's
 7        saying that it would help her to have support
 8        from her family, but that's not sufficient
 9        reason to require an accommodation in the
10        workplace.
11   Q.   But the accommodation isn't limited to a --
12        all right.  I've got your answer.
13        Then (e) of the form requests how the
14        accommodation will assist the individual in
15        applying for a job, which wouldn't apply to
16        her, or performing the essential functions of
17        the job, or to enjoy the benefits of her
18        employment.
19             And do you think that he's indicated
20        in this letter how the transfer would at
21        least help her either in the performance of
22        the job or in the enjoyment of the benefits
23        of employment?
24   A.   No.
25   Q.   Either/or.  So you don't see that in this
```

DEF000932

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

513

1      letter?

2   A.  No, I don't.

3   Q.  So you don't believe that he has indicated to

4       you by -- okay.  Thank you.

5              MS. CLARK:  How much time do I

6       have left, Your Honor?

7              JUDGE CARETHERS:  You have

8       17 minutes and 12 seconds.

9              MS. CLARK:  Thank you, Your Honor.

10      BY MS. CLARK:

11  Q.  All right.  Now, did you also receive

12      Ms. Brown's request for a reasonable

13      accommodation?

14  A.  She submitted a request for reasonable

15      accommodation that went through the HR

16      office.

17  Q.  Okay.  And were you the deciding official

18      regarding that reasonable accommodation, or

19      was Ms. Wilson?

20  A.  No, I was the deciding management official.

21      I was in the acting director capacity at the

22      time.

23  Q.  Okay.  And did you rely on Ms. Wilson to

24      provide you with the assessment of the

25      medical information?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

514

1    A.   She provided me with a briefing on the

2         interactive process.

3    Q.   She did not provide you with any kind of

4         assessment of the medical information that

5         was provided?

6    A.   She discussed with me the medical information

7         that was discussed as part of that

8         interactive process.  She did not disclose

9         the documents to me.

10   Q.   So you never saw any additional medical

11        information?

12   A.   Outside of this letter, no.

13   Q.   And at that time you did not receive a copy

14        of the FMLA documentation?

15   A.   No, ma'am.

16   Q.   Okay.  So what did she tell you about the

17        medical information?

18   A.   She just summarized that she had an

19        interactive process with the employee, and

20        that the employee did not indicate that there

21        was a limitation.  They had asked her if

22        there was a limitation based on her

23        condition, and she said she had not.  She did

24        not get into details as to the type of

25        conditions like described in this letter, you

DEF000934

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

515

```
 1        know, like the symptoms and all that.
 2    Q.  What was the reason for denying the
 3        accommodation request?
 4    A.  Can I see the -- it was denied for medical
 5        information not being sufficient to show you
 6        have a disability covered by the Rehab Act.
 7    Q.  Okay.  So that's not anything that you wrote,
 8        correct?
 9    A.  No.
10    Q.  That's what Ms. Wilson entered on the form,
11        correct?
12    A.  Right.
13    Q.  And so you relied entirely on Ms. Wilson's
14        assessment of the medical information?
15    A.  Uh-huh.
16    Q.  And you did not consider any medical
17        information?
18    A.  No.
19    Q.  Okay.  All right.  I want to go to the FMLA
20        issue, and specifically the reprimand.  And
21        I'm curious.  Generally speaking, are
22        employees -- is it important to give
23        employees guidance about how to address
24        circumstances and address rules when they may
25        be facing different challenges?
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

516

1   A.   I'm not understanding.

2   Q.   If an employee is on FMLA, is it important to

3        give them guidance about how to comply with

4        the Agency's rules when they're facing a

5        challenge like FMLA?

6   A.   Sure.

7   Q.   Okay.  And would you agree that in the

8        absence of guidance, that it may be unfair to

9        penalize an employee until they've had enough

10       time to understand what the guidance is and

11       then comply?

12  A.   Well, I would say that in this situation,

13       based on my recollection of everything that

14       was going on -- like I said earlier, she, I

15       believe, sincerely was confused on what that

16       process was.  But once the first-line

17       supervisor explained to her what the

18       expectation was, that supervisor was asking

19       her to comply with a mandatory requirement

20       for overtime.

21            So whether it was Trevenia or anybody

22       else in that situation, we're expected to

23       hold the employee accountable for making sure

24       that they comply with the mandatory overtime

25       hours.

517

1  Q.  Okay.  So if Mr. Dean didn't understand how

2      to address the circumstance when the employee

3      is on FMLA and sought guidance from

4      Ms. Wilson, is it fair that once he's gotten

5      the guidance and he has explained it to

6      Ms. Brown, that she be given time to comply

7      after that guidance is given to her?

8  A.  Sure.

9  Q.  Okay.  And so if the guidance is not

10     provided, would it be fair to reprimand her

11     until after the guidance is provided?

12 A.  So we provided the guidance to her on what

13     was necessary, and she still did not comply.

14     So the supervisor then reprimanded her --

15 Q.  Right.

16 A.  -- for that.  I think that that's fair.

17 Q.  Okay.  So if the procedure is that he gets

18     guidance on a particular issue, he then tells

19     Ms. Brown, here is what I expect you to do,

20     she's given some reasonable time to comply,

21     then that should be the procedure, and there

22     should be no reprimand until after that

23     reasonable period of time, whatever that

24     reasonable period might be.  I'm not trying

25     to hold you to what that time period would

518

1    be.

2  A.  Yes.

3  Q.  Okay.  Were you aware that Mr. Dean had asked

4      Ms. Wilson to give him guidance about how to

5      apply the mandatory overtime rules when

6      someone has FMLA leave?

7  A.  No.

8              MS. CLARK:  I have no further

9      questions.

10             JUDGE CARETHERS:  Agency?

11             MR. MILLER:  Thank you, Judge.

12     EXAMINATION,

13       QUESTIONS BY MR. MILLER:

14 Q.  If could you turn to page 341.

15 A.  (Witness complies.)  341?

16 Q.  Yes.

17 A.  Sorry.

18 Q.  That's okay.  And if you could, go to

19     number 12 where it states, "When medical

20     information is needed for a disability

21     determination."

22 A.  Yes.

23 Q.  Okay.  There's been a lot stated that you

24     hadn't seen any medical documentation.  Could

25     you read that first paragraph?

DEF000938

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

519

1   A.   "Medical documentation should not be

2        requested to support every accommodation

3        request.  Medical documentation goes only to

4        the LRAC and is not shared with the DMO or

5        the reasonable accommodation committee which

6        is present in some VHA facilities."

7   Q.   It that likely why you didn't receive any of

8        the medical documentation?

9   A.   Yes.

10  Q.   Okay.  You discussed Article 13 a lot under

11       that request.  Under Article 13, she was,

12       again, requesting a transfer outside of the

13       regional office here in Indianapolis?

14  A.   Yes.

15  Q.   Okay.  Under Article 13, Section 9,

16       page 361 -- if you look at Section 9(b), "The

17       department will, to the extent that it is

18       operationally feasible, reassign the employee

19       to an appropriate vacancy or duties and

20       responsibilities within his or her own

21       service/section."

22            In your mind, does that mean that she

23       would have been reassigned to some other

24       position here at the Indianapolis RO?

25  A.   Yes.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

520

1   Q.  And it doesn't apply to a transfer to some

2        other regional office than Indianapolis?

3   A.  No.

4   Q.  All right.  So in your mind, does Article 13

5        necessarily apply, under Section 9, with

6        regard to transfer from the Indianapolis

7        office to a Tampa office or a St. Pete

8        office?

9   A.  No.

10  Q.  Did she even at any point to you indicate

11       that there were open funded positions at that

12       facility that she could transfer to?

13  A.  No.

14  Q.  Okay.  She made no effort to say that to you?

15  A.  No.

16  Q.  And if you look under Section 9(a), it says,

17       "Employees who are unable to perform their

18       assigned duties as certified by a health care

19       provider..."

20           Had Ms. Brown been performing her

21       assigned duties?

22  A.  Yes.

23  Q.  Has she ever indicated that she wasn't able

24       to perform her assigned duties?

25  A.  No.

DEF000940

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

521

1   Q.  Was she provided with days off where she

2       couldn't come into work due to her illness?

3   A.  Yes.

4   Q.  Did she take advantage of that?

5   A.  Yes.

6   Q.  Did you ever discipline her for doing that?

7   A.  No.

8   Q.  It also indicates that, "Submit a written

9       request to the department for assignment to

10      duties commensurate with the serious injury

11      or illness and the employee's

12      qualifications."

13          Did she ever identify to you what her

14      limitations were here at work that would

15      assist her in performing the functions of

16      her -- essential functions of her job?

17  A.  No, she did not.

18          MR. MILLER:  All right.  Thank

19      you.

20          JUDGE CARETHERS:  Okay.  This

21      concludes the testimony of this witness.

22      You're free to go.  Do not discuss any of the

23      testimony or any of the questions that were

24      asked of you with any other witness.  Do you

25      understand?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

522

 1              THE WITNESS:  Yes, sir.

 2              JUDGE CARETHERS:  Thank you.

 3    Let's go off the record.

 4              (A recess was taken.)

 5              JUDGE CARETHERS:  This is the

 6    continuation of the hearing between Trevenia

 7    Brown versus the VA.  We have our next

 8    witness, Mr. Jim Dean.  How are you doing

 9    today?

10              MR. DEAN:  Good.  Thank you, sir.

11              JUDGE CARETHERS:  My name is

12    Administrative Judge Trek Carethers.  I'm

13    presiding over this hearing.  Are you a

14    current federal employee?

15              MR. DEAN:  Yes.

16              JUDGE CARETHERS:  Your time here

17    will be considered official duty time and

18    there will be no reprisal for any of the

19    testimony you give today.  Do you understand?

20              MR. DEAN:  Yes.

21              JUDGE CARETHERS:  Can we have the

22    witness sworn in, please.

23              (The witness is sworn by the court

24    reporter.)

25              JUDGE CARETHERS:  Great.  Before

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

523

1    we begin taking your testimony, I have to

2    give you some instructions I give all the

3    witnesses.  The first one is that you must

4    maintain the volume of your voice.  You must

5    speak loudly.  Do you understand?

6            THE WITNESS:  Yes.

7            JUDGE CARETHERS:  If you don't

8    understand a question, please let us know and

9    I will have the question rephrased if I find

10   it necessary.  Do you understand?

11           THE WITNESS:  Yes, sir.

12           JUDGE CARETHERS:  Two people can't

13   speak at the same time.  Please allow the

14   questioner to pose his or her question before

15   you begin answering.  Do you understand?

16           THE WITNESS:  Yes.

17           JUDGE CARETHERS:  Only answer the

18   question that's addressed to you.  Do you

19   understand?

20           THE WITNESS:  Yes.

21           JUDGE CARETHERS:  If there is an

22   objection to a question that's been posed to

23   you, do not answer the question.  I will make

24   a ruling on the objection, and then I will

25   let you know whether you should answer the

1    question or not.  Do you understand?

2                THE WITNESS:  Yes.

3                JUDGE CARETHERS:  Finally, I may

4    ask you some questions.  The mere fact that I

5    am asking you questions should not indicate

6    to you that you are testifying poorly or

7    well.  Do you understand?

8                THE WITNESS:  Yes.

9                JUDGE CARETHERS:  Please state and

10   spell your name for the record.

11               THE WITNESS:  James Dean.

12   J-A-M-E-S, D-E-A-N.

13               JUDGE CARETHERS:  Okay.  Great.

14   This is an Agency witness, been approved for

15   45 minutes.  You may begin.

16               MR. MILLER:  Thank you, Judge.

17                    JAMES DEAN,

18   having been first duly sworn to tell the

19   truth, the whole truth, and nothing but the

20   truth relating to said matter, is examined

21   and testifies as follows:

22   EXAMINATION,

23     QUESTIONS BY MR. MILLER:

24   Q.  Mr. Dean, can you please tell me what your

25       current position is at the regional office?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

525

1    A.   My current position is the private attorney

2         fee coordinator for the regional office.

3    Q.   And before that position, what --

4    A.   I was an authorizer for the non-rating team

5         prior to that.

6    Q.   Okay.  Were you ever a supervisor?

7    A.   Yes.

8    Q.   Okay.  And during what period of time was

9         that?

10   A.   I was a supervisor for about six years.

11        April 6th of 2014 I stepped down for some

12        personal reasons.

13   Q.   Okay.  And were you ever Ms. Brown's

14        supervisor?

15   A.   Yes.

16   Q.   Okay.  And what was your work relationship

17        like with Ms. Brown?

18   A.   It was good.

19   Q.   You got along well?

20   A.   Yes.

21   Q.   As far as you can remember, did you ever have

22        any negative interactions with her?

23   A.   No.

24   Q.   Was there a time where it was required that

25        people put in for 20 hours of mandatory

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

526

```
 1      overtime?
 2   A. Yes, and it's still required.
 3   Q. And how did that come to your attention?
 4   A. There was a memo that came down from the
 5      service center manager's office.
 6   Q. Okay.
 7   A. It was a nationwide thing, if I recall.
 8   Q. And did you discuss this with your
 9      subordinates, your -- the people that you
10      were supervising?
11   A. Yes.
12   Q. Okay.  And how would this information be
13      transferred to them?  Would it be a meeting?
14      Would it be, like, a huddle sometimes people
15      have, or...
16   A. I believe that it came out in an e-mail to
17      the whole division, and then I would address
18      it in a team huddle --
19   Q. Okay.
20   A. -- or an e-mail.
21   Q. And do you recall doing that in this
22      instance?
23   A. Yes.
24   Q. Okay.  After you had indicated that it was
25      required to put in 20 hours of overtime a
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

527

```
 1         month, how did you track that as far as who
 2         put in when and how much?
 3    A.   We had a spreadsheet that we put in the
 4         system.  And it would calculate how many
 5         hours the employee had.
 6    Q.   And did you maintain that spreadsheet or did
 7         somebody else?
 8    A.   Myself or my assistant coach would have.
 9    Q.   Okay.  And the assistant coach was Donald
10         Young?
11    A.   Yes.
12    Q.   And how would the employees transmit to you
13         the hours and times that they want to work
14         this overtime?
15    A.   They'd normally send an e-mail to myself or
16         Mr. Young.
17    Q.   Okay.  And was that standard?
18    A.   Yes.
19    Q.   Did some people tell you in person?
20    A.   Normally we'd ask for it in writing, I
21         believe.
22    Q.   Okay.  Just to be able to track it?
23    A.   Yes.
24    Q.   Okay.  And to your knowledge, was everybody
25         compliant with that requirement?
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

528

1   A.   To my knowledge, yes.

2   Q.   Okay.  Was Ms. Brown ever submitting times

3        that she would be available to work her

4        20 hours?

5   A.   I did not receive her hours.

6   Q.   Did you ever talk with her in person about --

7   A.   I mentioned it in a team huddle and in an

8        e-mail I sent to her.

9   Q.   Okay.  And you'd send an e-mail to her saying

10       I need --

11  A.   -- these hours.

12  Q.   Okay.  And do you recall whether or not you

13       gave her to the close of business the next

14       day to do that?

15  A.   Yes.

16  Q.   And was that enough time, in your mind, to

17       provide dates that she'd be available for --

18  A.   At that time, yes.

19  Q.   Okay.  As of -- if you could look at page 272

20       of the report.  The numbers are at the very

21       bottom in the middle.

22  A.   (Witness complies.)

23  Q.   Do you recall that document?

24  A.   Yes.

25  Q.   And is this the e-mail you sent to Ms. Brown?

529

1    A.   Yes.

2    Q.   All right.  And if you could turn to

3         page 269.

4    A.   (Witness complies.)

5    Q.   Is that the notice that you received with

6         respect to the mandatory overtime?

7    A.   Yes.

8    Q.   Okay.  And what's that dated?

9    A.   January 8, 2014.

10   Q.   And what's the date on your e-mail that you

11        sent to Ms. Brown?

12   A.   February 12, 2014.

13   Q.   Okay.  And so during that period of time she

14        had never submitted the times that she could

15        work over, the 20 hours?

16   A.   Yes.

17   Q.   And you discussed it during your team

18        huddles?

19   A.   Team huddles and in an e-mail.

20   Q.   Okay.  And did you have any discussion face

21        to face specifically about her failing to

22        sign up for mandatory overtime?

23   A.   I cannot recall that.

24   Q.   Okay.  But when she failed to respond to your

25        request that she sign up for overtime, what

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

530

```
 1        did you do at that point?  Did you discuss

 2        that with any upper management as to what

 3        should be done?

 4   A.   I can't really recall on that.

 5   Q.   Okay.  But at some point you drafted a

 6        reprimand, a proposed reprimand that was sent

 7        up to, I believe, Adam Kinder?

 8   A.   Yes.

 9   Q.   Okay.  And that's on page 266.

10        And that was for failure to essentially

11        comply with your request that she sign up for

12        mandatory overtime?

13   A.   Yes.

14   Q.   All right.  In the meantime, from March 17th

15        to the time that the -- I guess the final

16        decision was issued by Mr. Kinder, had

17        Ms. Brown come to you and said, I can work

18        this overtime on these days this month, and

19        if I need to I'll call in and use either sick

20        leave or annual leave or FMLA, would you have

21        likely withdrawn this proposed reprimand?

22   A.   Yes.

23   Q.   Okay.  And did she ever do that?

24   A.   No.

25   Q.   I'll ask you to turn to page 256.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

531

1    A.   (Witness complies.)

2              JUDGE CARETHERS:   What page was

3    that again?

4              MR. MILLER:   256.

5              JUDGE CARETHERS:   Thank you.

6    BY MR. MILLER:

7    Q.   It's dated March 17, 2014.  Do you recall

8    this document?

9    A.   Yes.  I typed it up.

10   Q.   Okay.  You drafted the document?

11   A.   I drafted it, yes.

12   Q.   Okay.  And what does this document indicate?

13   A.   We're having issues with her performance of

14   duties.

15   Q.   Okay.  And in your mind, is this a

16   disciplinary action?

17   A.   This is a warning.

18   Q.   It's a warning?

19   A.   For unacceptable performance.

20   Q.   Okay.  And it doesn't look as if you -- you

21   didn't sign it.  It looks like Donald Young

22   signed it?

23   A.   Yes, that's correct.  The assistant coach.

24   Q.   I assume you were out of the office at this

25   point?

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 286 of 406 PageID #:
920
Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

532

1  A.  I was out of the office.

2  Q.  Did you ever have any discussion with

3      Ms. Brown regarding this warning of

4      unacceptable performance?

5  A.  We had some discussion, like in our monthly

6      meetings, I believe, as is documented on

7      here, on December 12, 2013, and in January,

8      of her performance standards.

9  Q.  Okay.  So this wasn't the first time that she

10     heard she was having some performance issues?

11 A.  Yes.  That's correct.

12 Q.  All right.  And do you recall a time wherein

13     she had requested a reasonable accommodation?

14 A.  Yes.

15 Q.  Did you assist her in that process?

16 A.  Yes, I did.

17 Q.  Okay.  And who did you work with?

18 A.  I went to HR and asked what the requirements

19     were and what I had to do.  And they gave me

20     the proper forms, and I gave them to

21     Ms. Brown.

22 Q.  Do you recall what forms you gave to her?  If

23     you don't recall, that's fine.

24 A.  I don't recall.

25 Q.  Okay.  So you provided the information to

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

533

1        Ms. Brown.  And she submitted a -- at some
2        point did she submit it back to you?
3   A.   I believe she submitted it back to HR.
4   Q.   Okay.  All right.  And then at that point did
5        you have any other input as to her reasonable
6        accommodation request?
7   A.   Not at that point, no.
8   Q.   All right.  Do you recall having a meeting --
9        an interactive meeting with Ms. Brown,
10       Ms. Wilson, and Ms. Gentry?
11  A.   Yes.
12  Q.   Okay.  And what was the purpose of that
13       meeting?
14  A.   Just to go over the health -- the medical
15       evidence that she needed to supply, you know,
16       for that request.
17  Q.   Okay.  Were you attempting to identify what
18       types of accommodations she needed as a VSR?
19  A.   Yes.
20  Q.   Okay.  Do you recall her ever stating that I
21       don't have -- or I don't need an interim
22       accommodation?
23  A.   Yes.
24  Q.   I'll refer you to page 253.  You can read
25       through that just to kind of refresh your

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

534

1       memory.

2               So during this meeting you indicated

3       that you clarified the hardship transfer

4       process?

5   A.  Yes.

6   Q.  Okay.  And then do you recall her stating

7       that she has no limitations at work?

8   A.  She did state that she had no limitations,

9       and I documented on this in there where she

10      would have got a copy of that.

11  Q.  Okay.  Did she ever indicate that she either

12      didn't want an interim accommodation or

13      didn't need an interim accommodation?

14  A.  I believe she stated she had no interim

15      accommodation.

16  Q.  Okay.

17              MS. CLARK:  I'm sorry.  I didn't

18      hear the answer.

19              THE WITNESS:  She had no interim

20      accommodation.

21              MS. CLARK:  That she had no

22      interim --

23              THE WITNESS:  Yeah.  Stated

24      that you had no interim accommodation.

25

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

535

1      BY MR. MILLER:

2    Q.   Do you recall whether or not she indicated

3         that she wanted an interim accommodation?

4    A.   I'm sorry.  Can you repeat that, please?

5    Q.   Did she ever deny an interim accommodation?

6    A.   I don't recall that.

7    Q.   Okay.  You indicated that you provided --

8         well, back up.  During the meeting with

9         Ms. Brown, what did she indicate that the

10        goal of her request for reasonable

11        accommodation was?  Did she want anything

12        other than transferring to Tampa or St. Pete?

13   A.   She wanted -- the accommodation, I believe,

14        was a transfer to St. Pete.

15   Q.   Okay.  Do you recall whether or not she was

16        willing to accept any other type of

17        accommodation outside of the transfer?

18   A.   I do not recall that.

19   Q.   It indicates that you provided her VA Form

20        0857e.  Did you do that after or during the

21        meeting, or who provided that?

22   A.   I believe Ms. Wilson brought that, and we

23        gave that during the meeting --

24   Q.   Okay.

25   A.   -- to her during this meeting.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

536

1    Q.   When Ms. Brown would come to you with either
2         a hardship request or a reasonable
3         accommodation request, did you make every
4         effort to assist her in providing her
5         whatever information she needed?
6    A.   Yes.
7    Q.   And would you generally obtain that
8         information from Human Resources?
9    A.   If I didn't know the answer, I would go to HR
10        and try to find, you know, what information
11        or reference she needed.
12   Q.   Did you ever discipline Ms. Brown for using
13        all of her sick leave, all of her annual
14        leave, and LWOP under FMLA?
15   A.   No.
16   Q.   The only disciplinary action that you had
17        taken with regard to Ms. Brown was her
18        failure to sign up for overtime?
19   A.   Yes.
20   Q.   On page 253, you had outlined kind of the
21        discussion that was had here.  Did you ever
22        get a response from either Ms. Brown or
23        Ms. Gentry that this recap was incorrect?
24   A.   No.
25             MR. MILLER:  Nothing further.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

537

1      Thank you.

2              JUDGE CARETHERS:  Okay.  Your

3      witness, Ms. Clark.

4              MS. CLARK:  Can I have Exhibit 6,

5      please.

6      EXAMINATION,

7        QUESTIONS BY MS. CLARK:

8   Q.  Previously you were asked about a performance

9       issue for Ms. Brown.  Did you -- you gave her

10      a warning that she was underperforming, is

11      that correct?

12  A.  What page was that?  That is correct, ma'am.

13      On March 17, 2014, she got a warning of

14      unacceptable performance.  I wrote this up,

15      and my assistant coach actually issued it.  I

16      was out of the office.

17  Q.  Oh, this is page --

18  A.  256.

19  Q.  256.  Thank you.  All right.  So did you do

20      Ms. Brown's performance review for the period

21      of October 1, 2013 to April 5, 2014?

22  A.  Just based on this, I did sign this on

23      12/12/13.  2013.

24  Q.  Sorry.  I've got a signature on April 9,

25      2014, at page 298.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

538

1   A.   Okay.  Yes.  That is my signature.

2   Q.   That is your signature?

3   A.   Yes, ma'am.

4   Q.   And is this the evaluation of Ms. Brown for

5        the period of October 13th through April 5,

6        2014?

7   A.   Yes, it is.

8   Q.   Okay.  And on page 297, did you indicate that

9        Ms. Brown was fully successful with regards

10       to the quality of work?

11  A.   Yes.

12  Q.   And did you indicate that she was fully

13       successful as to the output of work?

14  A.   Yes.

15  Q.   And did you indicate she was fully successful

16       as to the training?

17  A.   Yes.

18  Q.   And did you indicate she was fully successful

19       as to the organizational support?

20  A.   Yes.

21  Q.   Okay.  These pages are not mixed up.  This is

22       what you remember filling out, is that

23       correct?

24  A.   Yes.

25  Q.   So despite the fact that on March 17, 2014,

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

539

1     which is where we were looking at page 256,

2     and you gave Ms. Brown a warning of

3     unsuccessful performance, by April 9, 2014,

4     you had concluded that she was fully

5     successful for the period of October 1, 2013

6     through April 9th -- at least through

7     April 9, 2014, is that correct?

8            The overall rating on page 298, I

9     think -- there's kind of like a blank spot,

10    and then it says -- this looks like it's a

11    summary rating that you did.  It wasn't an

12    annual rating.

13  A.   Right.   This is a mid-term --

14  Q.   A mid-term rating, okay.  And that mid-term

15    rating was October 1, 2013 through April 9,

16    2014.   Is that a correct time period?

17  A.   I believe so.   Yes.

18  Q.   Okay.   So whatever poor ratings you had given

19    her for her performance in 2014, by the time

20    that you performed her overall review and

21    signed it on April 9th, she had overcome them

22    to be fully successful with regards to those

23    critical elements I outlined, correct, which

24    is outlined on page 297?

25  A.   Because April 5th was when -- the last day

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

540

1     before I became -- stepped down from

2     management.

3  Q.  Very good.  Thank you.  If you don't mind,

4     can I look at that record for a second?  I

5     apologize.  I don't have all the pages in

6     front of me.  I actually will be very quick

7     with you, Mr. Dean.

8         Okay.  Thank you, Mr. Dean.  I have a

9     couple of questions with regards to the

10    document on page 272.  This is an e-mail

11    that's dated February 12, 2014?

12 A.  Yes.

13 Q.  All right.  Do you know when you first

14    requested from Ms. Brown her overtime hours?

15 A.  Could you repeat the question?

16 Q.  Do you remember when you first asked

17    Ms. Brown to provide you with her overtime

18    hours?

19 A.  The exact dates, I cannot recall that.  But I

20    do know I had team huddles when I announced

21    it to the whole team.  This is the document

22    that I forwarded asking on a time frame to

23    turn them in.

24 Q.  Okay.  And what was the time frame you were

25    giving them there?

DEF000960

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

541

1   A.   The e-mail is dated February 12th, and I

2        asked to have it by COB, close of business,

3        by February 13th.

4   Q.   Okay.  Between June 2013 and February 2014,

5        were you Ms. Brown's direct-line supervisor

6        during that entire period?

7   A.   I don't recall if I was the direct-line for

8        that whole period.

9   Q.   Okay.  Do you know which time periods --

10       well, during the time period you recall being

11       her direct-line supervisor, had you asked for

12       overtime hours in the past from Ms. Brown?

13  A.   I would send out an e-mail to the team.

14       To actually her, I don't recall.

15  Q.   Okay.  Prior to this incident, did you ever

16       have to ask Ms. Brown to provide her overtime

17       hours?

18  A.   I can't recall that, ma'am.

19  Q.   Okay.  Now, do you recall Ms. Brown asking or

20       inquiring about how the mandatory overtime

21       hours worked when someone is under an FMLA

22       leave procedure?

23  A.   Repeat that.

24  Q.   Yeah.  Have you ever had the issue arise

25       where someone is asked to provide mandatory

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

542

```
 1        overtime, and that person is under an FMLA
 2        leave policy?
 3   A.   Have I ever been asked?
 4   Q.   Yeah.  Have you ever had someone who has been
 5        on FMLA leave who is also supposed to
 6        provide -- who is also supposed to do
 7        mandatory overtime?
 8   A.   I can't recall.
 9   Q.   You can't recall.  So is it fair to say that
10        Ms. Brown was the first person that you
11        supervised who was required to do mandatory
12        overtime and was also on FMLA?
13   A.   That had not turned in the mandatory
14        overtime?
15   Q.   No, just who had -- yeah, let me try to
16        rephrase it.  It's late in the day already
17        for me, so I apologize.
18             Was Ms. Brown the first employee you
19        supervised who was on FMLA?
20   A.   Not the first employee that I had that was on
21        FMLA.
22   Q.   Okay.
23   A.   That's correct.
24   Q.   All right.  And employees who you've had on
25        FMLA, have they just provided you with
```

DEF000962

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

543

1      overtime hours when asked?

2   A.  From what I recall, yes.

3   Q.  Okay.  And did Ms. Brown inquire of you

4       directly about whether there was a procedure

5       or written policy about how her mandatory

6       overtime was supposed to work since she was

7       on FMLA?

8   A.  I can't recall.

9   Q.  You don't recall.  Do you recall having a

10      discussion or having an inquiry with Sonya

11      Wilson about how people who are on FMLA are

12      supposed to sign up for mandatory overtime?

13  A.  I can't recall.

14  Q.  You can't recall?

15  A.  No.

16  Q.  All right.  Do you recall, after the proposed

17      reprimand was issued, whether Ms. Brown

18      signed up for -- or provided you with her

19      overtime hours?

20  A.  Could you repeat that, please?

21  Q.  Yeah, sure.  After you issued the proposed

22      reprimand, did Ms. Brown provide you with the

23      overtime hours?

24  A.  I don't recall that, because that's about the

25      time frame I was stepping down from

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

544

1     supervision.

2     Q.   So you're not really sure of the timing of

3          when she gave the overtime hours?

4     A.   Correct.

5     Q.   Who would be knowledgeable about that?

6     A.   I don't know.  I can't recall who -- the

7          supervisor that took over me.

8     Q.   Do you recall if Donald Young was part of

9          that process?

10    A.   He was the assistant at the time when I

11         stepped down, but I don't know if he was part

12         of that process.

13    Q.   Mr. Dean, did you provide Mr. Kinder the

14         proposed reprimand?

15    A.   I don't recall I did, no.

16    Q.   Do you remember who you gave the proposed

17         reprimand to?

18    A.   Well, the proposed reprimand -- Mr. Young is

19         the one that issued it and signed it.

20    Q.   So you did not --

21    A.   I typed it up.

22    Q.   You typed the proposed reprimand?

23    A.   And Mr. Young is one that issued it.

24    Q.   So you did not issue the proposed reprimand.

25         Mr. Young issued the proposed reprimand?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

545

1   A.   Yes.

2                   MR. MILLER:  266.

3                   THE WITNESS:  Like I said, I typed

4        it up.  And if you look on 267, it has my

5        name, but it's from Don, the assistant coach.

6        Page 267 is the signature.

7        BY MS. CLARK:

8   Q.   So that's signed by Mr. Young or by

9        Mr. Kinder?

10  A.   Yeah -- well, it's signed by Mr. Young.  This

11       is the proposed reprimand.

12  Q.   Proposed reprimand?

13  A.   Yes.

14  Q.   Okay.  So you typed it up, and Mr. Young --

15  A.   Issued it, because I was out of the office.

16  Q.   All right.  So you don't know if Ms. Brown

17       submitted her hours before he signed that?

18  A.   I cannot recall that, no.

19  Q.   Is his signature dated?

20  A.   This memo is dated March -- looks like it was

21       13/17 with an initial on it.  And beside his

22       name, no, it does not have a date, but

23       Ms. Brown signed it on 3/17/14.

24  Q.   Okay.  And if Ms. Brown had submitted her

25       hours after receiving the proposed reprimand

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

546

1       but before it was finalized, would you have

2       withdrawn the proposed reprimand?

3   A.  At this time frame, I had a lot going on

4       personally, so I don't -- you know, I was

5       still in the --

6   Q.  I understand.

7   A.  -- process of stepping down.

8   Q.  I understand.

9   A.  You know, I'm not sure on that.

10  Q.  So you were preparing that at a time when you

11      were stepping down?

12  A.  I was in the process of going through some

13      personal issues, and I was in and out of the

14      office a lot.

15  Q.  Okay.  Did you consult with anyone while you

16      were preparing this proposed reprimand?

17  A.  Normally it was HR and, of course, my

18      assistant coach, because I knew I was going

19      to be out of the office on this.

20  Q.  So you did consult with Ms. Wilson?

21  A.  I had talked to her when I went to get -- not

22      on this -- recommended forms for the

23      accommodation, medical information, on that

24      part of it.  Not on that.

25  Q.  But you didn't talk to her about the FMLA?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

547

1   A.   Again, I can't recall if I did on that part

2        of it.

3   Q.   And what do you recall discussing with

4        Mr. Young concerning the proposed reprimand?

5   A.   Just -- I typed this up, and it's what it

6        says here, and that she had to -- when she

7        was in, that he had to meet with her and, you

8        know, go over it and have her sign it.

9   Q.   Mr. Dean, do you recall when Ms. Brown was

10       eligible to take the VSR certification?

11  A.   I don't recall that, ma'am.

12            MS. CLARK:  Your Honor, we'd like

13       to admit this memorandum dated -- it's

14       Complainant's Exhibit Brown00006.  It's a

15       January 27th memo from Mr. Dean regarding the

16       eligibility for certification testing.

17            JUDGE CARETHERS:  Hold on for a

18       second.  Is this on your exhibit list?

19            MS. CLARK:  Yeah.  It's Exhibit 6.

20       There might be a typo on that exhibit list.

21       The document you're looking at, does it say

22       that it's a January 27, 2014 memo?

23            JUDGE CARETHERS:  Let me pull up

24       the document.  Let me get to Exhibit 6.  When

25       I go to that, it looks like it's a document

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

548

1    dated January 27, 2014 from Jim Dean,

2    eligibility for certification, and through

3    certification test administrator, to division

4    chief.  It's signed by Jim Dean, and there's

5    some other signature spot for employee, I

6    assume.  It's so light, I can't see it.

7           MS. CLARK:  Yeah, it's light on

8    our paper also.

9           JUDGE CARETHERS:  So is this the

10   right document?

11          MS. CLARK:  It's the right

12   document, but the actual Bates-stamped number

13   is 6 and not 8.  You can probably see it as

14   you look at the document.

15          JUDGE CARETHERS:  Yes, it does say

16   6 here.  Okay, so that's the document you're

17   trying to admit?

18          MS. CLARK:  Yeah, that we're

19   trying to admit now as Exhibit Number 35.

20          JUDGE CARETHERS:  Okay.  Agency,

21   is there any objection to this document?

22          MR. MILLER:  No objection.

23          JUDGE CARETHERS:  So it should be

24   marked as 35, and it's admitted.

25

DEF000968

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

549

```
 1                 (Exhibit 35 was marked for

 2        identification and received into evidence.)

 3        BY MS. CLARK:

 4   Q.   What was the poor performance related to

 5        Ms. Brown's availability for this testing?

 6   A.   She had to be meeting her performance

 7        standards to be eligible to certify for that

 8        test at the time.

 9   Q.   So her performance standards as of what date?

10   A.   At this time I cannot recall the dates on

11        that.

12   Q.   But ultimately, though, you found her to be

13        fully successful during this same period that

14        encompasses the VSR.  Was she given the

15        opportunity to go through the certification

16        testing after you found her to be fully

17        successful?

18   A.   That would have been after the time I stepped

19        down, so I cannot answer that.  I don't know.

20   Q.   Well, when you signed the mid-term review,

21        did you at all consider whether or not she

22        should be provided the opportunity to do the

23        certification testing?

24   A.   I cannot recall that.

25   Q.   Is that something that you would normally do
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

550

1        if you had -- after denying it in January,

2        and then in April seeing that there had been

3        at least enough improvement to call her fully

4        successful, would she have been eligible for

5        the VSR certification testing?

6  A.  If she was fully successful on the next test

7        that came up, I'd say yes.

8  Q.  Do you know -- I understand that you were in

9        the process of stepping down.  Do you know

10       when the next VSR certification testing was

11       occurring after April, 2014?

12  A.  I don't know.

13  Q.  Thank you.  I appreciate that.  Did you

14       explain to Ms. Brown what about her

15       performance prohibited her from taking the

16       testing in January?

17  A.  I cannot recall.

18  Q.  And since this was the end of January, she

19       had just completed a fully successful annual

20       review that ended September 30th of 2013.  So

21       you were only reviewing her performance

22       between October and -- I guess that would be

23       what, the end of December or end of January?

24  A.  This is dated --

25  Q.  January 27th.

DEF000970

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

551

 1   A.   So it would be from October to that date.

 2   Q.   And so is it true, did she move from a GS-9

 3        to a GS-10 after she became fully successful?

 4        Did she increase a grade, are you aware?

 5   A.   I'm not aware.

 6   Q.   Are you aware of whether employees are given

 7        a time period to -- take a step back.  You

 8        are aware that depending on what your grade

 9        is, that the percentage of completion of

10        productivity increases?  If you go from a 7

11        to a 9, or a 9 to a 12, that you're expected

12        to increase your productivity?

13   A.   Yeah.  Each GS grade has a higher production.

14   Q.   And when someone moves from one GS grade to

15        another GS grade, are they given additional

16        time to ramp up to come up to -- to figure

17        out how they're going to meet that increased

18        production?

19   A.   I do not believe so.

20   Q.   You don't believe so?

21   A.   I believe they have to be at that break

22        before they get that promotion.

23   Q.   So if Ms. Brown, then, had become fully

24        successful as of September 30, 2013, and had

25        an increase from a 9 to a 10, based on your

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

552

```
 1        understanding, she already had to be meeting

 2        that standard in order to get the GS-10, is

 3        that correct?

 4   A.   Yes.

 5   Q.   Okay.  And so she would have been performing

 6        at that stage in October of 2013, correct?

 7   A.   To get her GS-10, yes.

 8   Q.   And do you know what her productivity was

 9        that resulted in you determining that she was

10        not eligible for the testing?

11   A.   No.  Not with this in front of me, no.

12   Q.   Okay.  Do you know if the leave she was

13        taking affected her ability to meet the

14        productivity standard that she was required

15        to meet at GS-10?

16   A.   I'm sorry.  Would you repeat that, please?

17   Q.   Sure.  I'll take a step back.  You knew that

18        Ms. Brown was taking FMLA leave on an

19        intermittent basis?

20   A.   Yes, ma'am.

21   Q.   In your opinion, do you believe that the

22        intermittent leave may have impacted her

23        ability to continue the productivity level

24        that she was required at GS-10?

25   A.   Well, our ASPEN calculates the productivity.
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

553

```
 1        It's based on how many cases you put in the
 2        system.
 3   Q.   But it doesn't disregard time off work for
 4        FMLA, correct?
 5   A.   It does consider downtime leave and, you
 6        know, training.
 7   Q.   So it does take those days off the table in
 8        terms of determining productivity?
 9   A.   Yes.  But if you're borderline, if you're
10        right at the minimum, and you have a lot of
11        downtime, I don't know the theory behind
12        that, but it will hurt an individual that is
13        not producing high enough and takes a lot of
14        downtime.  So if you're borderline or not
15        meeting production, downtime does hurt an
16        individual.  I don't know the formula, but it
17        does.
18   Q.   So without understanding the formula that
19        ASPEN applies, it's been your experience that
20        you've seen people who take leave or have
21        downtime --
22   A.   And if they're borderline --
23   Q.   -- and if they're borderline, it can hurt
24        them?
25   A.   Yes, ma'am.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

554

1    Q.   So borderline productivity could still have

2         you just meeting your mark, but if you're

3         taking a lot of downtime, it's going to hurt

4         you?

5    A.   It could, yes.

6    Q.   When you made this determination that

7         Ms. Brown was not eligible to take the

8         certification testing, did you analyze her

9         ASPEN score to see if she was borderline or

10        not?  Did you review it that closely?

11   A.   I cannot recall what I reviewed.

12   Q.   Okay.  Did you ever tell Ms. Brown that she

13        should refrain from using her FMLA hours?

14   A.   I do not ever recall telling her to refrain

15        from that.

16   Q.   Did you ever tell Ms. Brown she wasn't using

17        the FMLA procedures properly?

18   A.   I don't recall saying that.

19   Q.   Did you ever say she wasn't using the FMLA

20        procedures properly as it related to

21        mandatory overtime?

22   A.   I don't recall.

23   Q.   Did you ever tell Ms. Brown that her output

24        levels were -- I think we've already

25        discussed this.  Hang on.  Did you ever ask

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

555

1      Ms. Brown if her output levels that we've
2      talked about -- you've testified that her
3      output levels in December and January were
4      low, correct?
5   A.  Right.
6   Q.  Did you ever discuss with her whether or not
7      those output levels were affected by her
8      medical condition?
9   A.  I don't recall.
10  Q.  Were you aware of her medical condition, the
11     specifics of it?
12  A.  No.
13  Q.  So you weren't aware of how it affected her
14     at work?
15  A.  No.
16  Q.  Did you ever ask Ms. Brown -- in the
17     accommodations meeting with Ms. Wilson,
18     Ms. Gentry, Ms. Brown, and yourself, did you
19     ask for any additional medical documentation
20     to support her accommodation request?
21  A.  Could you repeat that, please?
22  Q.  Sure.  When you were in this -- I think you
23     answered the question about medical
24     documentation requested during the meeting?
25  A.  Yes.  I gave her a 0857e request for medical

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

556

1       documentation during that meeting.

2   Q.  You gave it to her during that meeting?

3   A.  Yes.  And I also stated to her that if you

4       feel like you have submitted medical

5       evidence, to forward me an e-mail stating

6       that, and I would forward it to HR.

7   Q.  And did you receive an e-mail from Ms. Brown

8       asking what additional information you

9       needed?

10  A.  I don't recall getting an e-mail from

11      Ms. Brown.

12  Q.  Can you look at 00247.

13  A.  (Witness complies.)

14  Q.  After Mr. Young had sent an e-mail recapping

15      the meeting, and about the VA Form 0857e, do

16      you read where Ms. Brown responded, and I

17      believe you're on the e-mail also:  "As I

18      stated previously, I have requested a

19      reasonable accommodation beginning

20      January 17, 2014.  Please refer to the

21      doctor's certification that has already been

22      provided.  Please provide me the details of

23      your decision and information missing from my

24      doctor's certification if it does not

25      suffice, and my right to appeal.  Thank you."

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

557

 1              And then I think she sent an

 2     additional e-mail shortly thereafter, about

 3     four minutes later, stating:   "Also, if

 4     you're unable to provide the reasonable

 5     accommodation requested, please provide the

 6     reasons and what accommodation that you (the

 7     Agency) propose would benefit me."

 8              Do you remember receiving this

 9     e-mail?

10     A.   I remember receiving this e-mail.

11     Q.   Did you respond to this e-mail?

12     A.   This e-mail, if you look at the March 25th,

13     had went to Sonya Wilson.   In my position, I

14     wouldn't have made a decision on reasonable

15     accommodation.   I would just forward the

16     information.

17     Q.   Yes, but you were reminding her previously

18     through Donald Young that there was

19     additional documentation that was needed,

20     right?   Or to provide any additional

21     documentation through the form, right?

22              And then she responds to you and

23     Mr. Young indicating that she believes she

24     has submitted all the information, but asks

25     you specifically what you're looking for.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

558

1      What's missing.

2   A.  Again, I believe that would have been HR to

3       make that.  I could not make that decision.

4   Q.  So did you pass this e-mail along to HR?

5   A.  This is the time frame I wasn't in the

6       office, I believe.

7   Q.  So you were not in the office on March 25th?

8   A.  I believe so, because it went to Don Young.

9       And the reason I say that is, below Don Young

10      had sent it to Trevenia Brown and CC'd me.

11      That's why I believe I was still out of the

12      office or else I would have responded.

13  Q.  So you were out of the office, but were you

14      still Ms. Brown's supervisor?

15  A.  At that time, yes.

16  Q.  Did you ever respond to this e-mail exchange?

17  A.  I cannot recall.

18  Q.  Did you ever follow up to see if everything

19      had been resolved since you were still her

20      supervisor?

21  A.  I cannot recall.

22              JUDGE CARETHERS:  You have

23      9 minutes left.

24              MS. CLARK:  Thank you, Your Honor.

25

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

559

```
 1        BY MS. CLARK:
 2    Q.  I just have one final question regarding the
 3        FMLA matter.  Did you ever approach Ms. Brown
 4        to find out what her concerns were regarding
 5        the mandatory overtime and her FMLA, and how
 6        the FMLA impacted her ability to do the
 7        mandatory overtime?
 8    A.  I cannot recall.
 9    Q.  You don't recall?
10    A.  No.
11    Q.  So the only exchange you had with her was
12        with regard to getting the overtime hours
13        from her?
14    A.  Yes.
15    Q.  Did you ever discuss with Ms. Wilson whether
16        the mandatory overtime in any way interfered
17        with the ability of an employee to exercise
18        their rights under the FMLA?
19              MR. MILLER:  I think that's been
20        asked and answered previously.
21              MS. CLARK:  By him?  I didn't
22        think it was asked and answered by him.
23              JUDGE CARETHERS:  We'll take the
24        answer.  I will sustain that objection.  Go
25        ahead.  What's your answer.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

560

1   A.   Can you repeat it again?

2   Q.   Sure.  Did you ever have a conversation with

3        Ms. Wilson as to whether or not the mandatory

4        overtime interfered with an employee's

5        ability to exercise their rights under the

6        FMLA?

7   A.   I don't recall.

8   Q.   You don't recall having that conversation

9        with her?

10  A.   No.

11  Q.   Had you ever disciplined any other employee

12       for failing to provide mandatory overtime

13       hours on a timely basis?  Timely, as you've

14       determined.

15  A.   No.

16  Q.   No.  And have there been other employees who

17       have been a little bit late in terms of

18       providing you their overtime hours?

19  A.   I cannot recall that.

20  Q.   You can't recall that?

21  A.   No.

22             MS. CLARK:  I have no further

23       questions.

24             JUDGE CARETHERS:  Agency, your

25       witness.

DEF000980

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

561

1    EXAMINATION,

2      QUESTIONS BY MR. MILLER:

3  Q.  If you'd turn to page 297.  If you look at

4      the output, you indicated that cumulative

5      output at the mid-year is 4.34, and that's

6      below standard.  Do you recall that?

7  A.  Yes.

8  Q.  So as of the date that she filled this

9      document out, she was informed and put on

10     notice that her output was below standard?

11  A.  I'm sorry.  Repeat that, please.

12  Q.  So as of the date that you filled this out,

13     she was put on notice that her output was

14     substandard, below standard?

15  A.  Yes.

16  Q.  But regardless, she was put on notice, but

17     she was provided with a fully successful

18     mid-term?

19  A.  Yes.  Because if you go further and read, it

20     says that it was 4.35, although this is below

21     your standard, your contribution of

22     meeting/exceeding 90 percent or more of daily

23     team output goals during the Surge project is

24     recognized and you are deemed fully

25     successful.  So she was within 90 percent of

DEF000981

562

1     her goal of 5.5.

2  Q.  But she was below standard at this point?

3           MS. CLARK:  Objection.  Asked and

4     answered.

5  A.  Yes, she's below the standard.

6  Q.  That's okay.  Sorry.  Now, you had a lot of

7     questions about whether or not you had looked

8     at or obtained or requested and reviewed

9     medical documentation.  As a supervisor,

10    isn't it true that you're not supposed to

11    look at those documents?

12  A.  Yes.

13  Q.  And that's just for the LRAC?

14  A.  Yes, I believe so.

15  Q.  So you received information from Sonya Wilson

16    that she's still planning on providing

17    additional medical, and it was an e-mail sent

18    out, do you intend to provide that.  So when

19    she asked, you know, could you let me know

20    what's insufficient, you wouldn't know that

21    because you wouldn't have seen the medical.

22  A.  That's correct.

23  Q.  So you couldn't have responded.

24  A.  That's correct.

25  Q.  And you talked about other discipline with

DEF000982

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

563

1    regard to whether or not somebody provided

2    you with dates of overtime.  Do you recall if

3    anybody had refused to provide dates of

4    overtime?

5    A.  I do not recall.

6    Q.  And I understand why you're having recall

7    issues.  You don't have to get into detail,

8    but during this period of time you were

9    experiencing severe issues in your family

10   life?

11   A.  Yes.

12   Q.  And that period of time lasted from -- can

13   you approximate?

14   A.  It started probably around the first of the

15   year until about May when my wife actually

16   left me after 30 years.

17   Q.  Okay.  So your recall here, would that have

18   anything to do with your being focused on

19   other issues?

20   A.  Yes.

21   Q.  Okay.  I appreciate that.

22          MR. MILLER:  Thank you, Mr. Dean.

23   Nothing else.

24          JUDGE CARETHERS:  Okay.  This

25   concludes the testimony of this witness.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

564

1    You're free to go.  Do not discuss your

2    testimony with any other witness.  Do you

3    understand?

4              THE WITNESS:  Yes, sir.

5              JUDGE CARETHERS:  Let's go off the

6    record.

7              (A discussion was held off the

8    record.)

9              JUDGE CARETHERS:  The Complainant

10   has brought an issue to my attention that

11   they would like to put on the record.  There

12   was a witness that was approved during the

13   pre-hearing.  It was a witness that the

14   Agency put on their witness list.  His name

15   is Donald Young.  He was not on the

16   Complainant's witness list so he was only

17   approved as an Agency witness.  The Agency

18   has decided not to call Mr. Young.  At this

19   point in time, I believe the Complainant is

20   seeking a negative inference because the

21   Agency is not producing Mr. Young.

22             I have stated that I am denying to

23   provide a negative inference because the

24   Agency is not refusing to produce a witness

25   that they had a duty to produce.  This

DEF000984

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

565

1    witness was not on the Complainant's witness

2    list.  However, I will allow the Complainant

3    to place whatever objection they want to

4    regarding my ruling.  You may begin.

5              MS. CLARK:  I object to the

6    ruling.  That's my objection.

7              JUDGE CARETHERS:  Okay.  Agency,

8    is there anything you would like to add

9    regarding the issue?

10             MR. MILLER:  Any of the discussion

11   and documents provided only show that Donald

12   Young essentially handed documents for

13   Ms. Brown to sign, and that's why he was

14   withdrawn from the witness list.

15             JUDGE CARETHERS:  Okay.  Well,

16   let's go off the record.

17             (A recess was taken.)

18             JUDGE CARETHERS:  We're continuing

19   the hearing of Ms. Trevenia Brown versus the

20   Department of Veterans Affairs.  We have our

21   next and final witness, who I believe is

22   Mr. Michael Stephens.  How are you doing

23   today?

24             MR. STEPHENS:  Good.  Thank you.

25             JUDGE CARETHERS:  Are you a

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

566

1    current federal employee?

2              MR. STEPHENS:  I am.

3              JUDGE CARETHERS:  Your time here

4    will be considered official duty time, and

5    there will be no reprisal for any testimony

6    you provide today.  My name is Administrative

7    Judge Trek Carethers.  I'm presiding over

8    this hearing.  Can we have this witness sworn

9    in, please.

10             (The witness is sworn by the court

11   reporter.)

12             JUDGE CARETHERS:  Could you please

13   state and spell your name for the record.

14             THE WITNESS:  Michael R. Stephens.

15   Last name is spelled S-T-E-P-H-E-N-S.

16             JUDGE CARETHERS:  Thank you very

17   much.  This is an Agency witness approved for

18   an hour.  You may begin, Agency.

19             MR. MILLER:  Thank you.

20             MICHAEL R. STEPHENS,

21   having been first duly sworn to tell the

22   truth, the whole truth, and nothing but the

23   truth relating to said matter, is examined

24   and testifies as follows:

25

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

567

1      EXAMINATION,

2         QUESTIONS BY MR. MILLER:

3   Q.  Director Stephens -- I assume your current

4       position is the director of the regional

5       office here in Indianapolis?

6   A.  I am.

7   Q.  And how long have you held that position?

8   A.  Just over six years.

9   Q.  And so what are some of your duties in that

10      position?

11  A.  I'm responsible for the oversight of the

12      administration of federal benefits to

13      veterans and their families primarily in the

14      State of Indiana, but also part of our

15      mission covers 14 northeastern United States.

16      To do that, we have not quite five hundred

17      employees on the payroll, and certainly

18      responsible for the administration of

19      employees and the leadership team that

20      supervises them.

21  Q.  And as your role, do you have an opportunity

22      to review requests for hardship transfers?

23  A.  I do.

24  Q.  And how many do you see usually a year?

25  A.  You know, I can give an estimate.  I don't

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

568

1          have off the top of my head an exact number.

2          But, oh, a dozen to two dozen a year.

3     Q.   Now, did you have an opportunity to review a

4          hardship request from Ms. Trevenia Brown?

5     A.   I did.

6     Q.   And tell me part of the process that you go

7          through.  Where does the information come

8          from or who fills out the request?  Does it

9          come from Ms. Brown directly, or does it come

10         from HR?  Ena Lima?  If you can recall this

11         particular instance.

12    A.   I don't remember exactly the path that hers

13         took, but normally the employee requests a

14         hardship transfer, it goes normally through a

15         supervisor and through HR to us up in the

16         director's office.  When I say us, the

17         assistant director and I.

18    Q.   Okay.  I'll ask you if you could take a look

19         at page 205 of the ROI.

20    A.   Sure.

21    Q.   Does that look familiar to you, dated

22         January 17, 2014?

23    A.   It does.  It's a letter from Trevenia asking

24         for a hardship transfer.  And if my memory

25         serves me, there was also a -- we have a

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

569

1      specific form, and I believe that Trevenia

2      submitted one of those as well.

3   Q.   And in reviewing these types of requests --

4      the form you're speaking about is on page

5      208.

6   A.   Yes, 207 and 208.  Yes, I remember that.

7   Q.   As part of the process, do you request any

8      information as to performance during the

9      hardship process?

10  A.   I do, to the criteria of performance, and we

11     also request employee leave balances.  In

12     this case I got information -- if I remember,

13     I recall that I got information on both.  And

14     based on the employee -- well, I'll answer

15     your question directly.  Yes, I got

16     information on leave and also performance

17     from the veterans service center manager.

18  Q.   And I'll hand you what's marked as

19     Exhibit 30.  Are you familiar with this

20     document?

21  A.   I am.  That's the written guidance that we

22     have to follow for hardship transfers.  The

23     hardship transfers then go through the area

24     offices once they're approved by the

25     directors involved.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

570

1    Q.   And if you can, if you look under the process

2         at paragraph 2.

3    A.   Sure.  "If the transfer request is considered

4         a hardship, the employee's current division

5         chief will determine whether the issues in

6         the following sentence apply:  Transfers will

7         not be considered if the employee is under a

8         PIP, leave restriction, or disciplinary

9         action."

10   Q.   And is that what you take into consideration

11        when you make a determination as to whether

12        or not a person can transfer under this

13        particular policy?

14   A.   I do.  Performance and leave abuse are two

15        things that we look at.  In fact, the area

16        director requires leave balances and also

17        performance data.  And if an employee is not

18        meeting the applicable performance standards,

19        that's a disqualifier.

20   Q.   So now it indicates specifically is under a

21        PIP.  How has that been interpreted from

22        across, I guess, the VA and individuals in

23        your particular position?

24             MS. CLARK:  Objection.  PIP is a

25        defined term across the agencies of the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

571

1    federal government.  It's well-defined.  So I

2    don't know that -- I mean, the witness will

3    testify, but I think that this is a defined

4    term that would be across the board with

5    regard to disciplinary actions taken against

6    federal employees.

7            MR. MILLER:  A PIP is not a

8    disciplinary action.

9            JUDGE CARETHERS:  I'm not quite

10   sure what the objection is.  You're saying

11   it's a well-defined term.  What exactly is

12   the objection?

13           MS. CLARK:  The objection is that

14   he's asking him to describe what a PIP is,

15   and he's about to testify to his own opinion

16   about what a PIP is.  And it is a defined

17   term that is used by MSPB, the EEOC.  And so

18   that's the reason why I'm objecting to any

19   definition that is not consistent with what

20   is followed by the federal government.

21   That's all.

22           MR. MILLER:  Your Honor --

23           JUDGE CARETHERS:  Go ahead.

24   What's your offer of proof.

25           MR. MILLER:  I'm just asking how

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

572

1      this particular one has been implemented in

2      this regional office as well as other

3      directors' offices.

4                   JUDGE CARETHERS:   Thank you.  I do

5      not sustain that objection.   You may answer

6      the question.

7   A.   The way that it's interpreted, the way that

8      that is applied, is that if an employee is

9      not meeting their appropriate performance

10     standards, that disqualifies an employee in

11     terms of hardship transfer.

12                 And I can say that beyond that, there

13     were a couple of hardship transfers right

14     around the same time that Trevenia Brown

15     requested transfer.  I recommended at the

16     local level that they go through because the

17     employee was meeting their performance

18     standards.  And their leave balances, there

19     was no reason to question those.  At that

20     point in time, I recommended the hardship

21     transfer to the St. Pete regional office.

22     Both of those were denied because the

23     director wouldn't accept on the other end.

24                 So in this case, I had an employee

25     that was not meeting the performance

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

573

1     standard, which is normally a disqualifier.

2  Q.  And to your knowledge, is this how regional

3     office directors are, I guess, putting to

4     practice with regard to transfers?

5          MS. CLARK:  Objection as to form.

6          MR. MILLER:  Okay.

7     BY MR. MILLER:

8  Q.  Do you ever have any discussions with other

9     directors about how transfers are being

10    implemented with regard to performance

11    standards and PIPs?

12  A.  Absolutely.  And if an employee is not

13    meeting their performance standard, we don't

14    support the transfer.

15  Q.  And you've had other discussions, and is it

16    your opinion -- or have you received

17    information that other directors are

18    interpreting it the same way?

19  A.  Absolutely.  Could I look at, just to remind

20    myself, the policy.

21        So I wanted to point out that the

22    directors normally interpret this document in

23    its entirety and consistent with the intent

24    of the policy.  And the first couple

25    sentences in this policy read that hardship

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

574

```
 1          transfer requests will be decided at the area
 2          office level and considered on a case-by-case
 3          basis by applying the guidance outlined
 4          below.  However, the importance of
 5          effectively accomplishing the work in
 6          relation to achieving VBA's mission is
 7          paramount.
 8                 So in this case, you know,
 9          universally, to my knowledge, directors do
10          not support transfer requests if, in fact, an
11          employee is not meeting their performance
12          standard in an effort to make decisions
13          consistent with the intent.
14    Q.    Okay.  Now, have you in the past denied
15          hardship transfer requests for employees that
16          weren't meeting their performance?
17    A.    Yes.
18    Q.    So that's not a new issue?
19    A.    No.
20    Q.    And if their performance is adequate, and
21          they meet all the other requirements, you
22          would approve the request.  And then at that
23          point, you have to determine whether or not
24          the other regional office would accept that
25          individual?
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

575

1   A.   Correct.

2   Q.   And you'd indicated that you'd had two or

3        three individuals trying to transfer to

4        St. Pete?

5   A.   I did.

6   Q.   And were they meeting their performance

7        requirements?

8   A.   They were.

9   Q.   But they were denied by the St. Pete area?

10  A.   They were denied.

11  Q.   Did you ever discuss this specific transfer

12       request with Ms. Brown?

13  A.   No, not to my knowledge, other than in

14       mediation.

15  Q.   Before the mediation, did she ever make a

16       request to meet with you?

17  A.   She did request to meet with me.

18  Q.   And was that through e-mail, or discussion in

19       the hall, or over the phone?

20  A.   It was an e-mail request, if I remember

21       right, from her union representative.

22  Q.   Was Ms. Brown copied on that?

23  A.   To my knowledge, yes.

24  Q.   Did you respond to that request?

25  A.   I did.  I asked my secretary to set up a

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

576

```
 1       meeting.  And I also asked that someone,

 2       Sonya, I believe, from HR, and also might

 3       have been somebody from the service center,

 4       probably the division chief, accompany me.

 5   Q.  Do you recall what the meeting was going to

 6       be in regards to?

 7   A.  Hardship transfer.

 8   Q.  Now, was the meeting ever held?

 9   A.  No.  To my knowledge, Trevenia cancelled the

10       meeting.

11   Q.  Okay.

12   A.  Or refused it after my secretary went to set

13       it up.

14   Q.  Did she indicate why she didn't want to meet

15       after it had been scheduled?

16   A.  Not to my recollection.  It may have been --

17       I think if I remember right, she cancelled

18       the meeting because she didn't want the

19       others present.

20   Q.  Okay.  And the others being Ena Lima and --

21   A.  I think Ena Lima and Sonya from HR.

22   Q.  Did she ever reach out again to you to talk

23       or to set up a meeting?

24   A.  Just mediation.

25   Q.  And I assume you discussed these matters in
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

577

1       mediation as far as her transfer?

2   A.  I did.  I explained that --

3   Q.  But these were issues addressed at mediation?

4   A.  They were.

5   Q.  Okay.  So we won't get into the specifics of

6       what was discussed --

7   A.  No, just hardship transfer, yeah.

8   Q.  Okay.  Ultimately, was her request for

9       hardship transfer granted?  Or, I'm sorry,

10      her request for reasonable accommodation to

11      transfer to St. Pete granted?

12  A.  It was.  It was.

13              MR. MILLER:  Thank you.

14              JUDGE CARETHERS:  Okay.  Your

15      witness, Ms. Clark.

16      EXAMINATION,

17          QUESTIONS BY MS. CLARK:

18  Q.  It's true that Ms. Brown was not under any

19      disciplinary action at the time that she

20      filed her hardship transfer, isn't that

21      correct?

22  A.  I believe that to be true.

23  Q.  And is it true also that she was not on leave

24      restriction?

25  A.  Also I believe that to be true.  I didn't

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

578

1    find any issues with her leave.

2  Q.  And isn't it also true that she had no

3      outstanding disciplinary action at the time

4      she made the hardship transfer request?

5  A.  I believe that to be true.

6  Q.  The process in this document says that the

7      individual requesting consideration for a

8      hardship transfer is to complete a hardship

9      transfer request form, and Ms. Brown did

10     that, correct?

11 A.  That's correct.

12 Q.  And that requests the employee's name, title,

13     grade, current position, length of time on

14     station, length of time at VA, an

15     acknowledgment that the relocation expenses

16     incurred, if approved, would be at the

17     employee's own expense and not reimbursable,

18     transfer request details as described on the

19     enclosed form to include a statement

20     indicating whether or not the employee is

21     willing to accept a downgrade to another

22     position, and a prioritized list of

23     alternative transfer locations, if

24     applicable.

25           Did Ms. Brown indicate on the form

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

579

 1      whether or not she would accept a downgrade

 2      to another position for the transfer?

 3  A.  I don't remember.

 4  Q.  Yeah, if you could look at the form, I'd

 5      appreciate it.

 6              MR. MILLER:  It's page 208.

 7  A.  It does not appear that she provided that.

 8  Q.  So she did not answer that question?

 9  A.  Correct.

10  Q.  And do you know if anyone went back to her to

11      request an answer, or does it say that she

12      would not accept a downgrade?

13  A.  It's blank.

14  Q.  It's just blank.  Do you know if anyone went

15      back to her to ask her for a response to that

16      question before providing it to you?

17  A.  I don't know.  I don't know.

18  Q.  Was that ever discussed with you when this

19      was presented to you?

20  A.  Whether or not that was --

21  Q.  Whether or not she agreed to a downgrade if

22      necessary?

23  A.  No, it wasn't discussed.  Unless it's in her

24      letter.

25  Q.  Okay.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

580

1    A.   I don't remember discussing her willingness

2         to accept a downgrade, or not to.

3    Q.   All right.  And you've testified that this

4         was an area director decision as to whether

5         or not to grant a hardship transfer?

6    A.   Yeah.  The way that works is that ultimately

7         area directors ask for performance data and

8         leave analysis.  Once the two directors

9         agree, then it goes to the areas for

10        concurrence.  In this case, I did not --

11        could not concur with the request because

12        Trevenia wasn't meeting her performance

13        standards, which I did advise the area on,

14        and they did not change that decision.

15   Q.   I've got a couple questions regarding this.

16        First of all, there's no procedures that are

17        written with regard to this guidance,

18        correct?

19   A.   That's what I have there.

20   Q.   So there's no written procedures that talk

21        about this pulling of leave balances and

22        checking out performance, correct?  There's

23        nothing in writing, isn't that correct?

24   A.   I would have to check to be sure.  There may

25        be from the area office a directive to send

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

581

1      these requests forward with leave balances.

2   Q.  Well, you've testified now that you've looked

3      at approximately 12 to 24 requests per year?

4   A.  Yes.

5   Q.  So in looking at 12 to 24 requests per year,

6      have you ever reviewed procedures that talk

7      about what you're supposed to do when you

8      look at these requests?

9   A.  Yeah, I think that you're holding those.

10  Q.  Okay.  So these are the only procedures

11     you're aware of?

12  A.  In addition, there could be information

13     directed from the area office.  Each area

14     director is a little bit different that way

15     in terms of specifically what they want to

16     accompany a hardship transfer request.  But

17     everyone requires leave balances and also

18     performance data.

19  Q.  But you've not produced the area-wide

20     procedures, correct?

21          MR. MILLER:  Asked and answered,

22     Your Honor.

23          THE WITNESS:  No.

24          MS. CLARK:  He's not.  Okay.

25     Thank you.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

582

1    BY MS. CLARK:

2    Q.  For individuals who are -- that you approved

3         in the past -- I guess, at the same time

4         period -- you indicated that there were at

5         least two other individuals, is that correct,

6         that Ms. Brown had made her request for a

7         hardship transfer?

8    A.  What I said was one or two.  Yes.

9    Q.  Were either of those individuals on FMLA?

10   A.  I don't know.  That's not a factor I normally

11        consider.

12   Q.  Well, it's a factor you would know in terms

13        of determining what their leave balances

14        were, correct?

15   A.  That's incorrect.

16   Q.  So you don't understand whether or not the

17        leave balance has been depleted because of

18        whether or not the person is on FMLA?

19   A.  No, I don't.  Not automatically.

20   Q.  Well, wouldn't that be something that you

21        would look at?

22   A.  It would be if their leave balances were in

23        question, and it was something that acted as

24        a disqualifier.  In this case, it didn't.

25   Q.  How does FMLA protection act as a

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

583

1      disqualifier for a hardship transfer?

2  A.  It does not.  Being on leave restriction

3      would.

4  Q.  So being on FMLA does not act as a

5      restriction for a hardship transfer, correct?

6  A.  That's correct.

7  Q.  But if the person's leave balances are being

8      depleted because of FMLA, and you don't look

9      into it, wouldn't that result in the FMLA

10     leave being a negative towards their getting

11     a transfer?

12 A.  It might be.  That's not this case.  And if

13     someone's leave balance was so low, I would

14     normally look into it if it looked like it

15     would be a disqualifier.

16 Q.  Are you saying that Ms. Brown's leave balance

17     was not the ultimate disqualifier for the

18     hardship transfer?

19 A.  I'm saying her leave balance wasn't at all a

20     disqualifier.  And I think I indicated on the

21     denial that it was purely performance based.

22 Q.  So it was purely performance based?

23 A.  Correct.

24 Q.  And do you know what period the performance

25     was that you were looking at?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

584

1   A.   I don't know that for sure.  I would have to

2        remind myself by looking at communication

3        from the service center manager to me.

4   Q.   So from Ms. Lima to you?

5   A.   Correct.

6   Q.   And do you know if that was provided to you

7        as part of the review package?

8   A.   It was.  I don't know where it is in this

9        book.

10                  MR. MILLER:  Page 210.

11  A.   It's not 210.  Here.  Yeah, it's 212.  I see

12       it.  This print gets smaller and smaller on

13       me all the time.  This appears to be for the

14       fiscal year-to-date.  So from October 1, 2013

15       through looks like the date of the hardship

16       transfer request.

17  Q.   Can you see what date that was?

18  A.   Looks like January 17, 2014.

19  Q.   January 17, 2014?

20  A.   January 17th.  Yes, ma'am.

21  Q.   And in evaluating performance, this is the

22       ASPEN report that you're looking at?

23  A.   I am.  It's what accompanied an e-mail or

24       letter dated January 21, 2014 from Ena Lima.

25  Q.   And the ASPEN report, do you know if it takes

585

1    into account or discounts days that an

2    individual takes protected leave before

3    calculating whether or not they're meeting a

4    quality or production mark?

5  A.  Our productivity data that's used for

6    employee performance standard purposes, it

7    only counts the amount of time that they're

8    at work, and the work that they do while

9    they're on duty.

10        So in other words, if out of a month

11    an employee works 8 hours, that's one day.

12    If they got five points or five cases, their

13    production would be that five cases for

14    one day.

15  Q.  So that would be a hundred percent?

16  A.  No, I didn't say that.  What I said --

17  Q.  That's what I'm asking.

18  A.  It would be five cases for a day, and then we

19    would compare that to the appropriate

20    performance standard.  So if an employee was

21    gone 19 work days in a month and only there

22    one day, their production for that month is

23    based on what they did that one day.

24  Q.  Okay.  So then how are the number of cases

25    that they work on given points?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

586

1    A.   That's part of their national performance

2         standard, and it's based on the type of work

3         that it is and the action required.  And so

4         that's spelled out in their performance

5         standard.  And programmed into the ASPEN

6         tool.

7    Q.   Do you know offhand how many cases an

8         individual has to work in order to have a

9         performance standard of 80 percent?

10   A.   I'm sorry.  I don't understand your question.

11   Q.   Let me rephrase it.  Ms. Brown was a VSR?

12   A.   Yes.

13   Q.   So do you know how many cases she would have

14        to complete in a single day in order to have

15        an 80 percent accuracy rate?

16   A.   Accuracy rate is not -- accuracy is the

17        quality critical element.  It isn't based on

18        a number of cases that are required.

19   Q.   Okay.

20   A.   It's based on a number of errors over the

21        amount of work done.

22   Q.   Okay.

23   A.   So in order -- I guess it would depend.  To

24        get 80 percent, you know, that's 4 out of 5,

25        right?  Or 8 out of 10.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

587

1    Q.   So was quality considered when determining

2         whether or not performance -- what was the

3         performance measure you were looking at for

4         purposes of determining whether or not

5         Ms. Brown could have a hardship transfer?

6         Was it quality or production?

7    A.   I do believe that it was both.  At the time,

8         I would have looked at both.  And I see

9         that -- I'm trying to read this print.  So

10        her daily production rate was 4 point

11        something, the goal is 5.5.  So she was under

12        on production.  And when I look at quality

13        accuracy, it looks like her goal is 92

14        percent, and she came in at 78.33, based on

15        this report.  So quality and production --

16   Q.   And what time period was this for?

17   A.   October 1, 2013 through January 17, 2014.  So

18        quality and production.

19   Q.   During this time period, do you know if there

20        was an old claims review project, or Surge

21        project, or the national directive that

22        suspended local quality reviews?

23   A.   I don't -- not to my knowledge.  We have had,

24        you know, in the past.  I don't remember the

25        dates.

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

588

```
 1    Q.   Would you be surprised to know that during
 2         the time period of Ms. Brown's mid-year
 3         review that in fact there was an old claims
 4         review project, a Surge project, and national
 5         directive of February 18, 2014, suspending
 6         local quality reviews and the local quality
 7         review procedures?  Were you aware of that?
 8    A.   I'd have to verify the dates.  What I can
 9         tell you is performance standards were not
10         waived.
11    Q.   Well, could you turn to page 00297.
12    A.   Sure.
13    Q.   And do you see that Ms. Brown was rated as
14         fully successful during this period?
15    A.   Looking at this page, I don't know what
16         period this is.
17    Q.   It's the very next page over.  On the other
18         side of the grid.  It's 298.  The time period
19         is October 3, 2013 through April 9, 2014.
20    A.   I see an October 10th (sic) through
21         April 5th.
22    Q.   I'm sorry.  April 5, 2014, yes.
23    A.   And --
24              JUDGE CARETHERS:  It's actually
25         October 1st, I believe.  Did you say
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

589

1       October 10th or did you say October 1st?

2                    THE WITNESS:  October 1st.

3                    JUDGE CARETHERS:  I thought you

4       said October 10th.

5   A.  Where is the mid-year?  Is this the final

6       rating or the --

7   Q.  This is the mid-year.

8   A.  Well, my point is, what date was it given on?

9       What date was this done?

10  Q.  I'm assuming it was done -- I'm not sure what

11      date it was done.

12  A.  It appears April 9th.

13  Q.  That's the date it was signed, yes.

14  A.  Is that --

15  Q.  Jimmy Dean.

16  A.  Okay.  Evidently this was prepared on April

17      9th, and the decision that I made was on

18      January 17 or thereabouts, based on the

19      performance data through the 17th of January.

20  Q.  I understand.  And so my question now is, are

21      you aware of whether any of these standards

22      were suspended during any part of the period

23      that you reviewed Ms. Brown's production?

24  A.  I'm not aware.

25  Q.  Is it possible that these standards were

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

590

1      suspended during this period?

2   A.  No.  These standards were not suspended

3       during that period.

4   Q.  I guess I'm confused by the two answers.  You

5       said you're not sure, but then you say that

6       they weren't suspended.

7   A.  No, I've always said that I'm certain that

8       the performance standards were not suspended.

9       You asked me if the quality reviews were

10      suspended.  And I said that quality reviews

11      may have been suspended.

12  Q.  All right.  Thank you.

13  A.  But not the standards.

14  Q.  Well, quality reviews and production went

15      into your review of whether or not Ms. Brown

16      met performance for the hardship transfer,

17      correct?

18  A.  Accuracy rate, which would include the

19      quality reviews that had been done up to that

20      point, and production, which would include

21      the work done divided by the amount of

22      available time that she had from October 1st

23      through January 17th.  I know it can be

24      confusing.

25  Q.  And therefore the only thing that you're not

DEF001010

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

591

1     sure of at this point is whether the quality

2     review standard was suspended during the

3     period of time that you reviewed Ms. Brown's

4     work, is that correct?

5  A.  No, that's not true.  I am absolutely certain

6     that the quality review standard was not

7     waived.

8  Q.  Okay.

9  A.  What may have been waived -- for a short time

10     we may have suspended the quality reviews

11     that we used to determine the accuracy rate.

12     It's not the same thing.

13         So in other words, you know, whatever

14     your required accuracy rate is, if we didn't

15     do any quality reviews at all, then in the

16     end we would have to essentially mitigate

17     that performance element.  Or if there were

18     fewer quality reviews done, the accuracy rate

19     would be based on those fewer quality

20     reviews.

21         So I don't even know that they were

22     waived during that period, so we're kind of

23     speaking hypothetically.  But my point is

24     that waiving a quality review and waiving the

25     standard are two different things.  And we

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

592

1      did not waive the standard.  We based her

2      accuracy rate only on the reviews that were

3      done.

4  Q.  Can you tell me under the ASPEN program how

5      half days are measured?

6  A.  They would be measured exactly as that, as a

7      half day.  We would use the work done during

8      that day divided by the amount of time.

9  Q.  And how many hours are involved in half days?

10 A.  You know, to take it on its face, it would be

11     half a normal workday, which is 8 hours.

12 Q.  So it's always 4 hours?

13 A.  It depends.  If an employee is there 3 hours,

14     we would count 3 hours.  If an employee is

15     there 5 hours, we would count 5 hours, in 15

16     hour (sic) increments, exactly the amount of

17     time that employee works.  Goes into the

18     ASPEN record.

19              MR. MILLER:  You mean 15 minutes?

20              THE WITNESS:  Yeah.  Did I say

21     hours?  Quarter hours.  So every 15 minutes.

22     We don't get more detailed than that.

23 BY MS. CLARK:

24 Q.  Is there any documentation regarding the

25     ASPEN program, any written documentation?

DEF001012

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

593

```
 1   A.   I believe there's an ASPEN user guide or

 2        program guide.

 3   Q.   Mr. Stephens, did you rely entirely on Ena

 4        Lima's evaluation of Ms. Brown's

 5        recommendation concerning the hardship

 6        transfer?

 7   A.   That, and the ASPEN data that was provided,

 8        yes.

 9   Q.   Did you talk to her in any detail about what

10        Ms. Brown's medical condition is?

11   A.   No.

12   Q.   Did you ever find out what Ms. Brown's

13        medical -- her disability was?

14   A.   I did.

15   Q.   And from whom did you find that out?

16   A.   From her.

17   Q.   And when did you find that out?

18   A.   During mediation.

19   Q.   But not before mediation?

20   A.   No.

21   Q.   The two individuals whose hardship transfers

22        that you approved, I think you testified that

23        neither one of them had FMLA or were on FMLA

24        leave?

25   A.   No.  I said I didn't know.
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

594

1    Q.   You didn't know, okay.  Were you aware if

2         either one of them were disabled?

3    A.   I'm not aware.

4    Q.   Mr. Stephens, were you consulted at all

5         regarding Ms. Brown's Article 13 transfer

6         request?

7    A.   Could you remind me what Article 13 is?

8    Q.   This is your Collective Bargaining Agreement

9         with AFGE, Article 13, reassignment, shift

10        changes, and relocations.

11   A.   I believe that's part of the hardship

12        consideration.  If so, I'm aware of it.

13   Q.   We've had testimony pretty consistently

14        throughout the last two days that these are

15        different, that the transfer pursuant to this

16        procedure is different from the hardship

17        transfer.  So are you certain as to whether

18        or not you would be consulted regarding an

19        Article 13 transfer?

20   A.   I remember getting a hardship transfer

21        request, and then later ultimately I approved

22        her reasonable accommodation to go to

23        Florida.

24   Q.   Did you get a reassignment due to medical

25        conditions?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

595

```
 1   A.   Unless it was part of the reasonable
 2        accommodation or the hardship transfer
 3        request.  Not to my recollection.
 4   Q.   I'm going to give you what is marked as
 5        Exhibit 32, which is Article 13, Section 9.
 6        Do you know if this is something that would
 7        come to you routinely?
 8   A.   I suppose.  I don't remember seeing a written
 9        request from Trevenia under Article 13,
10        Section 9.
11   Q.   Okay.  Thank you.  If you could turn in the
12        ROI to 00255?
13   A.   (Witness complies.)  Okay.
14   Q.   And is this Ms. Brown's reasonable
15        accommodation request?
16   A.   I don't know.
17              JUDGE CARETHERS:  Are we on page
18        255?
19              MR. MILLER:  We are.
20              JUDGE CARETHERS:  I'm looking at a
21        request for reassignment for medical reasons.
22              MS. CLARK:  That's correct.
23              MR. MILLER:  That's the Article 13
24        request.
25
```

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

596

1     BY MS. MILLER:

2  Q.  Do you remember that one coming to you?

3  A.  I don't.  I don't remember this one coming

4       directly to me.  I don't remember giving a

5       response.  It came through Ena Lima, and I

6       know that -- if I remember right, Ena Lima,

7       during that time period, was acting assistant

8       director, or some time in there.  It's

9       possible that one of my assistants, either

10      Ena or Yvonne Hamilton, responded on my

11      behalf.

12 Q.  So it was directed to you, but Ms. Lima is

13      the one -- she is the sole person that made

14      that decision, is that correct?

15 A.  Well, I don't know who made the decision.  If

16      you could show me the decision.

17 Q.  Well, let me ask it this way.  You did not

18      make the decision, correct?

19 A.  Not unless it was part of my response to a

20      reasonable accommodation.  And I don't

21      remember seeing a reasonable accommodation

22      request until I signed off and approved her

23      transfer to Florida.

24           So I remember a hardship transfer

25      request, and then later I approved her

DEF001016

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

597

1       reasonable accommodation to go to Florida.

2   Q.  Okay.  And what changed that you decided that

3       the reasonable accommodation would be

4       approved?

5   A.  I had a recommendation from the LRAC, or our

6       EEO person that reviews the medical evidence,

7       that the requirements had been met, and they

8       recommended transfer, so I signed off on it.

9   Q.  Who was the LRAC at the time?

10  A.  I believe it was Sonya Wilson.  I would have

11      to remind myself.  I don't know.  And we've

12      had some turnover in HR.  The other thing is

13      I want to point out, I don't have sole

14      authority to transfer an employee from one

15      office to another.  So I had to work with

16      Terry Witty, who is the director down in

17      St. Petersburg, and she signed as well and

18      then that locked in the hardship transfer.

19      I'm sorry.  Not hardship transfer.

20      Reasonable accommodation.

21  Q.  The reasonable accommodation?

22  A.  Yes, ma'am.

23  Q.  Do you know whether or not Ms. Wilson was the

24      LRAC or if there was someone else who was?

25  A.  I don't know at the time.  I don't remember.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

598

1      I remember being -- that there be a

2      recommendation that the transfer be approved

3      because she met the requisite threshold.  And

4      then I went to working with that other

5      director.

6                  MS. CLARK:  Your Honor, the record

7      does not include -- the ROI does not include

8      the approved reasonable accommodation

9      request.  It only reflects all the ones that

10     were denied.

11                 MR. MILLER:  Well, because it's

12     not part of the complaint, I would guess.

13                 JUDGE CARETHERS:  Yeah, that

14     actually makes sense that it wouldn't be part

15     because it was not part of the complaint.  It

16     was subsequent to that time period.  So I can

17     see why it wouldn't be in there.

18     BY MS. CLARK:

19  Q.  Mr. Stephens, do you know when Ms. Wilson

20      stepped down from the LRAC position?

21  A.  I don't know.

22  Q.  She's previously testified that she stepped

23      down from the LRAC position effectively

24      January 31, 2014, but was still in an

25      alternate position on February 24, 2014.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

599

1          She's also testified that there was an

2          individual who followed her named Octavia.

3          And that's all I can remember, the first

4          name.  Fitzgerald, maybe?

5     A.   Yeah, that sounds right.

6     Q.   So do you recall receiving a recommendation

7          from Ms. Fitzgerald that Ms. Brown met the

8          conditions for reasonable accommodation?

9     A.   I don't know who -- I can't remember who the

10         recommendation was from.  What I can tell you

11         is that I received a recommendation from the

12         LRAC at the time that that reasonable

13         accommodation threshold had been met, and

14         that in fact the requested accommodation was

15         reasonable, and so I signed off on it.

16    Q.   Do you know if there was anything different

17         presented to the LRAC then from the previous

18         request for reasonable accommodation or for

19         transfer for medical reasons?

20    A.   To my knowledge, based on general

21         discussions, there had been updated medical,

22         or new medical.

23    Q.   New medical or updated medical?

24    A.   I don't know.  One or the other.

25    Q.   Do you know what --

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

600

1    A.   Additional evidence.

2    Q.   Was it medical evidence or just general

3         evidence?

4    A.   I think it was medical evidence.

5    Q.   And do you know what that medical evidence

6         was?

7    A.   No.

8    Q.   Do you know if they were treating records

9         that were given to --

10                  MR. MILLER:  Objection.  Asked and

11        answered.  He just --

12   BY MS. CLARK:

13   Q.   Okay.  You don't know.  When you denied the

14        request for reassignment for medical reasons,

15        did you --

16                  MR. MILLER:  Your Honor, she's

17        mischaracterizing the evidence and testimony.

18        He denied the hardship transfer, not the

19        Article 13.

20                  MS. CLARK:  He never denied the

21        Article 13?

22                  MR. MILLER:  No.

23                  JUDGE CARETHERS:  In fact, I think

24        he said he doesn't really remember it.  He

25        doesn't recall.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

601

1              THE WITNESS:  Yeah, I don't

2      remember the request, and I don't remember

3      denying it.

4              MS. CLARK:  All right.  I have no

5      further questions for this witness.

6              JUDGE CARETHERS:  Okay.  Agency?

7              MR. MILLER:  I have nothing

8      further.  Thank you, Your Honor.

9              JUDGE CARETHERS:  This concludes

10     the testimony of this witness.  You're free

11     to go.  Have a good day.  Let's go off the

12     record.

13              (A recess was taken.)

14              JUDGE CARETHERS:  We're continuing

15     the hearing of Trevenia Brown versus the

16     Department of Veterans Affairs.  We have

17     Ms. Brown to give rebuttal testimony.  You

18     may begin.  You're still under oath,

19     Ms. Brown.

20     EXAMINATION,

21       QUESTIONS BY MS. CLARK:

22  Q.  Ms. Brown, there's been some testimony today

23     regarding how you communicated with various

24     individuals, officials who were involved in

25     one or more of your requests for transfer.  I

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

602

1    want to first ask regarding your meeting with

2    Sonya Wilson.  Did you turn your back to her?

3  A.  No, I did not turn my back to Ms. Wilson.  I

4    do remember explicitly during that meeting

5    that I had a flare-up.  At that exact moment

6    during that meeting, I was experiencing a

7    flare-up or an episodic flare-up.  And I was

8    in extreme pain.  I expressed that to

9    everyone in the room, even to Ms. Wilson.  I

10   was crying.  I was almost -- I mean, I was

11   very emotional.

12       That's why Rachel stated that when

13   they left the room, I didn't want to come out

14   of the room because I was crying.  I was in

15   really bad shape, and I didn't want the rest

16   of my peers and the people on the floor to

17   see me that way.

18       So basically, I think it was -- I

19   stated exactly how much pain I was in, and

20   all I wanted was help.  And then maybe in the

21   process of me cleaning my tears, or trying to

22   maybe hide my, you know, face, I don't know.

23   Maybe she interpreted it that way.  But I in

24   no way shut off communication with anyone.  I

25   was trying to get just help.

DEF001022

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

603

1   Q.   Did you refuse to speak to Ms. Wilson?

2   A.   No.

3   Q.   Did you refuse take any information from

4        Ms. Wilson?

5   A.   No.

6   Q.   Did you speak over Ms. Wilson when she was

7        talking to you?

8   A.   No.  For some reason, any time I questioned

9        their responses to me, they felt offended

10       like I was -- like they stated I was being

11       disrespectful.  So to them, a person

12       questioning their decision was me being

13       disrespectful.  And me making it to where I

14       could be heard -- if there was an issue with

15       my professionalism, I would assume that it

16       would have been notated somewhere in my

17       record.  From the time that I've been

18       employed with the VA, I have never -- if you

19       notice, there is something in there about my

20       performance where my last supervisor stated

21       how professional I am.  Colleen Kirksey.

22            So I don't understand.  I think they

23       were just -- they didn't want to provide me

24       the help, and didn't want to hear what I had

25       to say.  And when I tried to speak up, they

DEF001023

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

604

1    took that as me being disrespectful.  They

2    treated me like a child.  And any time I said

3    anything, they basically treated me like how

4    dare you, go sit down and be quiet.

5                JUDGE CARETHERS:  Ms. Clark,

6    before you go to your next question.

7    Ms. Brown?

8                THE WITNESS:  Yes.

9                JUDGE CARETHERS:  You were asked a

10   very simple question, whether you out-spoke

11   Ms. Wilson.  It was a very simple question.

12   It was a yes or no, and you went on a slight

13   narrative.  I will instruct you not to do

14   that again.  Listen to the question, answer

15   the question.

16               THE WITNESS:  Okay.

17               JUDGE CARETHERS:  You may

18   continue, Ms. Clark.

19               MS. CLARK:  Thank you, Your Honor.

20   BY MS. CLARK:

21   Q.  Ms. Brown, Ms. Lima testified that you had an

22       elevated voice.  She did say you were not

23       yelling.  Do you recall having an elevated

24       voice when you spoke to her regarding the

25       denial of the hardship transfer?

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

605

1   A.   I don't recall.  I don't recall in any way --

2        if it was, it wasn't in any way intentional.

3        Like in most cases, I was emotional.  And in

4        most cases, I was in pain.

5   Q.   Okay.  Do you recall refusing to make eye

6        contact with Ms. Lima?

7   A.   I'm very professional.  I make eye contact

8        with anyone and everyone I have conversations

9        with.

10  Q.   Do you recall banging on Ms. Lima's desk?  I

11       think that was one of her statements during

12       her testimony.

13  A.   I don't even think I was in distance of her

14       desk from where her chairs were located in

15       her room.  No, I did not bang on her desk.

16  Q.   Do you agree with the statement that Ms. Lima

17       made, that she did not say because of your

18       disability you were not entitled to a

19       transfer?

20  A.   No.

21  Q.   Can you state for the record exactly what you

22       recall Ms. Lima stating to you the day you

23       had the meeting regarding the hardship

24       transfer?

25  A.   When I explained to Ms. Lima that I was

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

606

```
 1       trying to transfer for medical reasons and

 2       due to my disability -- I'm sorry.  Repeat

 3       that.

 4   Q.  Yeah.  Do you recall exactly what Ms. Lima

 5       said regarding your entitlement to a

 6       transfer?

 7   A.  Yes.  She said just because you have a

 8       disability, we don't owe you anything.  We

 9       don't have to do anything for you.  And I

10       remember that, and it was so devastating.

11       I'm sorry.

12   Q.  Thank you.  Do you recall, regarding

13       Mr. Dean's testimony, and I think it may also

14       be related somewhat to Ms. Wilson's

15       testimony, after Mr. Dean sent the proposed

16       reprimand, do you recall how long after that

17       you provided your overtime hours?

18   A.  I'm sorry.  After he issued the proposed

19       reprimand?

20   Q.  Yes.

21   A.  No, I don't recall.

22   Q.  Do you recall if you provided them before the

23       proposed reprimand came out?

24   A.  The mandatory overtime hours?  No, I don't

25       remember.  I don't think I did.  Oh, you mean
```

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

607

1    for the following one?  Well, I had to

2    because -- I don't know.  I can't --

3  Q.  You don't recall?

4  A.  No.

5  Q.  Do you know if you provided them before the

6    proposed reprimand went final?

7         MR. MILLER:  That was asked and

8    answered.

9  A.  I believe I did.  I can't be one hundred

10    percent sure.  I'm sorry.

11  Q.  Ms. Brown, you heard the testimony of

12    Mr. Stephens that he ultimately signed off on

13    your transfer to St. Petersburg.  And do you

14    recall whether you submitted anything new in

15    terms of medical information to HR, anything

16    that was different from the submissions you

17    had made before?

18         MR. MILLER:  Objection as to

19    relevance.

20         JUDGE CARETHERS:  Yeah, what is

21    the relevance?

22         MS. CLARK:  The relevance is that

23    there was a change with regard to the LRAC

24    between the time the first request was made

25    and the second request was made.  And what

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

608

1    Mr. Stephens has testified to is that there

2    was a change in information.  And I'm asking

3    Ms. Brown whether there was, in fact, a

4    change in information.  He could not testify

5    as to what it was.  He just was told that

6    there was.

7            JUDGE CARETHERS:  Okay.  And I'm

8    going to sustain the objection.  I don't see

9    the relevance of whether -- it was a

10   different decision-maker, a different

11   recommender anyway.  So I'm going to sustain

12   that objection.  Next question.

13           MS. CLARK:  Okay, just for the

14   record, I object to not allowing the

15   admission of this evidence, in as much as

16   there was testimony given that there was

17   somebody new making the recommendation.  So I

18   don't know why what information was given to

19   the new person wouldn't be relevant since

20   Mr. Stephens has already testified to it.

21           JUDGE CARETHERS:  Okay, you've

22   placed your objection.  Now I'm going to tell

23   you the reason why it's not relevant.

24   Because the recommendation that actually went

25   through is not her issue to this case.  It's

DEF001028

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

609

1    a different decision-maker who made the

2    recommendation, it's after the offense in

3    this case, so that's why I'm ruling that it's

4    not relevant.  But you put your objection on

5    the record.  You may ask your next question.

6         And I'd like to also add as an

7    additional basis, that this is a rebuttal

8    witness and she's not rebutting his previous

9    testimony on that particular fact.  You may

10   ask your next question.

11        MS. CLARK:  Your Honor, I have a

12   question.  Are you saying that time

13   periods -- is there a time period

14   specifically that you're saying is not

15   covered by this ROI?

16        JUDGE CARETHERS:  What I'm saying

17   to you is that -- okay, there's several

18   things.  One, the acceptance or the eventual

19   approval of the reasonable accommodation is

20   not an issue in this case.  It's not part of

21   the harassment.  It's not an independent

22   claim.

23        Secondly, the testifier or the

24   witness indicated that there was a change or

25   a possible change in the person who made the

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

610

1    recommendation.  So again, that's another

2    reason why I do not think it's relevant.

3         Lastly, the witness testified that he

4    thought something was different.  He wasn't

5    sure if it was new, he didn't know if it was

6    different, he didn't know if it was

7    additional.  So I'm not really sure what

8    you're going to rebut.  And I think the issue

9    is irrelevant in the first place.  So that's

10   the basis for not permitting this information

11   coming in.

12        MS. CLARK:  Notwithstanding the

13   fact that the ROI discusses the reasonable

14   accommodation request dated August 21, 2014?

15        JUDGE CARETHERS:  It's not one of

16   the issues in this claim.  Now if you can

17   point to one of the issues here, 1 through 6,

18   then we will discuss it.  But I don't see --

19   I don't see as part of a harassment or

20   independent claim the acceptance or the

21   approval of the reasonable accommodation.

22        MS. CLARK:  Mr. Stephens'

23   testimony was that he understood that

24   something was different, not exactly what was

25   different.

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

611

1           JUDGE CARETHERS:  Right.  That's

2       my point.  He said it was something new or

3       something additional, but he wasn't really

4       sure.  But then again, my point is that this

5       is not a relevant accepted issue.  You're

6       certainly not grieving or you certainly don't

7       have a cause of action that the reasonable

8       accommodation that was granted was somehow a

9       form of harassment or an independent basis

10      for action.

11          MS. CLARK:  I think my question is

12      relevant if, in fact, the answer is there was

13      nothing new, because one of the accepted

14      issues here is whether or not the Complainant

15      was subjected to a hostile work environment

16      based on disability as evidenced by the

17      April 1st denial of her reasonable

18      accommodation request.

19          JUDGE CARETHERS:  Okay.  And did

20      the grant -- okay.  Here is what I'm going to

21      say to you.  When it was eventually granted,

22      that played no role in the denial that

23      occurred prior to that.  The eventual

24      granting of it is not an accepted issue in

25      this case.  You've already placed your

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

612

1    objection on the record.  You've already

2    given your basis for it.  I've already given

3    you my ruling.  So I'm asking you to move on.

4                  MS. CLARK:  It goes to the hostile

5    work environment.  If nothing changed, it

6    demonstrates that in fact there was a hostile

7    work environment.

8                  JUDGE CARETHERS:  Ms. Clark, are

9    you really arguing with me about my ruling?

10   You've placed your objection on it.  I've

11   said I don't agree with your objection.  It's

12   on the record for public purposes.  I'm

13   asking you to move on to your next question.

14                 MS. CLARK:  I also thought you

15   asked me to identify where in the accepted

16   issues it would fall, and that's what I was

17   just doing.  But if that's not what you were

18   asking, I apologize.

19   BY MS. CLARK:

20   Q.  Ms. Brown, during the testimony of

21       Ms. Wilson, she indicated that you did not

22       provide any alternatives to the request that

23       you were making to be transferred.  And my

24       question to you is, did she ask you to

25       provide any alternatives?

Brown v. McDonald, et al. - July 21, 2015
EEOC Hearing - Volume II

613

1   A.   Not that I recall, no.  She did mention
2        something about a chair and extra breaks, but
3        that's it.
4                   MS. CLARK:  I have no further
5        questions.
6                   JUDGE CARETHERS:  Okay.  Agency,
7        do you have anything?
8                   MR. MILLER:  No, Your Honor.
9        Thank you.
10                  JUDGE CARETHERS:  This concludes
11       the rebuttal testimony of this witness.
12       Let's go off the record.
13                  (A discussion was held off the
14       record.)
15                  JUDGE CARETHERS:  We've had a
16       discussion about closing.  The parties have
17       opted to go with written briefs.  There was
18       no objection by either party.  What's going
19       to occur is that the written briefs will be
20       due 30 days after receipt of the transcript
21       from the court reporter.  The court reporter
22       is going to send electronic versions of the
23       transcript to each of the parties.  I also
24       ask that I be copied on that e-mail so I'll
25       know the date that they receive the

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

614

1    transcript.  Is that accurate, parties?

2              MR. MILLER:  From the Agency, yes,

3    Your Honor.

4              JUDGE CARETHERS:  Complainant?

5              MS. CLARK:  Yes, Your Honor.

6              JUDGE CARETHERS:  Okay.  Great.

7    Let's go off the record.

8              (The hearing was concluded at 6:45

9    p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Brown v. McDonald, et al. - July 21, 2015**
**EEOC Hearing - Volume II**

615

```
STATE OF INDIANA      )
                      )  SS:
COUNTY OF SHELBY      )


            CERTIFICATE OF COURT REPORTER
```

I, Joyce E. Shinault, the undersigned Court Reporter and Notary Public, residing in the County of Shelby, State of Indiana, do hereby certify:

That I reported to the best of my ability in machine shorthand all of the words spoken by all parties in attendance during the course of the ensuing proceedings, including objections, if any, made by all counsel present;

That I later reduced my stenographic notes into the foregoing typewritten transcript form, which typewritten transcript is a true record of the testimony given by this witness as stated above;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney or employee of any of the parties; that I am not a relative of an employee of such attorney or counsel; and that I am not financially interested in this action.

IN WITNESS HERETO, I have affixed my Notarial Seal and subscribed my signature below this _____ day of August, 2015.


                    _____
                    Joyce E. Shinault, RPR, Notary Public


My Commission Expires:
September 8, 2023

County of Residence:
Shelby

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 370 of 406 PageID #:
10624

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

**$**

**$75 (1)**
455:1

**A**

**ability (11)**
253:16;260:14;
311:7;425:9;473:15;
505:5;552:13,23;
559:6,17;560:5

**able (34)**
275:22;285:21;
290:1;295:19;
307:20;321:23;
322:3;338:12;339:2;
361:14;366:11;
385:19;395:12;
400:6,11;406:23;
431:15,25;432:1,3,4;
433:25;434:1;
435:24;438:24;
439:24;442:2,23;
448:12;461:9;
476:11;503:12;
520:23;527:22

**above (2)**
293:22;420:14

**absence (3)**
411:14;412:3;
516:8

**absences (1)**
473:7

**absent (3)**
280:19;413:23;
475:16

**absolutely (6)**
369:22;428:18;
475:12;573:12,19;
591:5

**abuse (1)**
570:14

**accept (13)**
252:16,19;274:12;
296:5;312:6;385:8;
535:16;572:23;
574:24;578:21;
579:1,12;580:22

**acceptable (2)**
368:8;502:3

**acceptance (1)**
609:18;610:20

**accepted (7)**
274:3;327:23;
373:19;611:5,13,24;
612:15

**access (4)**
386:23;438:1,3;
447:4

**accessible (1)**
290:13

**accommodate (17)**
261:3;263:21;
274:15;280:23;
307:23;393:7,10,16;
399:23;432:4;
435:19,20;436:8;
438:22;439:6,14;
440:5

**accommodated (6)**
392:15;399:19;
422:17,24;423:4;
431:15

**accommodating (9)**
260:22;275:19;
400:13;423:7,9,10,
12;431:19;440:10

**accommodation (202)**
260:2,10,15;262:7,
19;264:1;272:23;
273:13;274:17;
275:21;276:10;
278:13;295:13,15;
298:10,22;301:3,6;
302:22;303:3,6,7,19,
21;304:5;306:4,11,
19,22;307:18;
309:17;311:21;
312:5,7,8,12;313:2,
12;314:17;317:19,
21;319:2,11,16;
320:4;325:20;326:1,
5;328:14,17,23;
329:2;330:19;
331:21,25;334:25;
340:12,17;341:17;
342:11,20;343:6,7;
366:2;368:3,19,21,
24;369:2,8,12;370:2,
10,16;371:1,3;383:9,
14;384:22;387:23;
388:5,8;391:4,11,13,
24;392:2,9,21;393:1,
5,6,15;395:19,21;
396:18,23;397:12,13,
15;398:2,17;399:3;
400:1;401:15;412:1,
13;414:20;416:2;
417:25;418:11,14;
423:6,17;424:6;
430:20;431:17;
432:7,11;434:3,13;
435:24;438:10;
439:4,11;440:19,23;
441:5,8;442:4,7,8,10,
12;462:7;463:2,14,
18,25;467:15,24;
468:3,6;469:5,12;
470:11;478:25;
509:21,25;511:15,
16;512:5,6,9,11,14;
513:13,15,18;515:3;
519:2,5;532:13;
533:6,22;534:12,13,
15,20,24;535:3,5,11,
13,17;536:3;546:23;
555:20;556:19;
557:5,6,15;577:10;
594:22;595:2,15;
596:20,21;597:1,3,
20,21;598:8;599:8,
13,14,18;609:19;
610:14,21;611:8,18

**accommodations (34)**
259:19;260:21;
266:8;268:5,19;
269:9;271:19;
272:19;275:17;
299:10,16,19;300:3,
6;317:12,15;318:23;
319:1;328:12,21;
330:2;367:7,8;
368:23;396:15;
411:4,10,14,20;
436:1,13;439:12;
533:18;555:17

**accomodation (7)**
264:6,23;265:18;
298:4;306:16;
307:16;504:19

**accompanied (2)**
390:4;584:23

**accompany (2)**
576:4;581:16

**accomplishing (1)**
574:5

**accordance (1)**
424:1

**According (7)**
390:2;424:24;
429:8;434:4;442:9;
444:21;448:19

**accordingly (5)**
352:7;355:2;
356:16;358:11,16

**account (5)**
275:15;415:4;
489:3;490:7;585:1

**accountable (1)**
516:23

**accounts (1)**
488:14

**accuracy (9)**
586:15,16,16;
587:13;590:18;
591:11,14,18;592:2

**accurate (3)**
288:8;342:9;614:1

**achieving (1)**
574:6

**acknowledge (2)**
342:10,13

**acknowledgment (1)**
578:15

**across (3)**
570:22,25;571:4

**across-the-board (1)**
288:1

**Act (12)**
264:22;329:7;
388:9;415:6;416:20;
424:11,16;425:6;
428:8;515:6;582:25;
583:4

**acted (1)**
582:23

**acting (17)**
349:3;351:5,9;
353:13,18;359:5,6,
12;360:2;400:21,21;
464:25;465:3;469:8;
470:5;513:21;596:7

**action (27)**
291:5,10,15;296:6;
320:22;330:21,25;
331:9,12,23;332:12,
18;390:17;408:18,
21;463:19;480:7,10;
531:16;536:16;
570:9;571:8;577:19;
578:3;586:3;611:7,
10

**actions (4)**
291:6,16;464:6;
571:5

**active (1)**
261:5

**activities (6)**
503:16;508:12,23;
509:11;510:20,25

**activity (9)**
427:10;510:3,7,11,
17,21,23;511:8,10

**actual (10)**
290:11;293:20;
328:15;352:22;
392:16;449:17;
490:22;499:4;
504:19;548:12

**actuality (1)**

**413:16**

**actually (30)**
261:4;264:16;
286:20;328:22;
329:14;332:7;342:8;
352:19;397:19;
399:6;414:8;417:1,
12;421:19;426:9;
429:1;447:2;460:21,
472:14;475:5;
488:15;490:3,10;
537:15;540:6;
541:14;563:15;
588:24;598:14;
608:24

**ADA (4)**
272:22;415:5,5,19

**ADAAA (5)**
416:3;426:4;427:1,
6;509:5

**Adam (9)**
320:14;345:8;
347:18;348:5;
408:15;471:13,22;
478:14;530:7

**A-D-A-M (1)**
347:22

**adamant (2)**
436:24,25

**add (7)**
253:21;254:2,8;
379:3;419:14;565:8;
609:6

**addition (3)**
339:12;431:18;
581:12

**additional (24)**
263:19;268:16;
276:1,5;287:1;
296:12;380:18;
399:8;401:22;493:4;
500:17;503:1;
514:10;551:15;
555:19;556:8;557:2,
19,20;562:17;600:1;
609:7;610:7;611:3

**address (10)**
262:2;274:23;
290:2;291:20,25;
335:2;515:23,24;
517:2;526:17

**addressed (9)**
256:12;266:14;
317:24;346:14;
364:13;452:10;
467:16;523:18;57..

**addressing (3)**
262:17;481:14;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 371 of 406 PageID #:
1665

EEOC Hearing                                      Brown v. McDonald, et al.
Volume II                                               July 21, 2015

502:5

**adequate (1)**
574:20

**adjusted (1)**
476:9

**administration (2)**
567:12,18

**Administrative (6)**
254:20;345:16;
362:19;451:8;
522:12;566:6

**administrator (1)**
548:3

**admissible (5)**
291:7,9,14,16,23

**admission (1)**
608:15

**admit (5)**
325:3;385:15;
547:13;548:17,19

**admitted (7)**
252:25;325:14;
333:14,15;373:19;
385:25;548:24

**adopted (6)**
414:15;415:19,21;
416:1,7,25

**adoption (1)**
416:19

**advance (3)**
438:5;448:1,7

**advantage (1)**
521:4

**adverse (1)**
283:3

**adversely (1)**
284:5

**advice (6)**
303:4;353:25;
354:1;404:21;
407:17;445:18

**advise (5)**
370:19;388:23;
408:8;445:16;580:13

**advised (3)**
252:10;445:4;
472:22

**advising (2)**
481:20;491:11

**Affairs (6)**
252:3;261:2;
345:7;362:14;
565:20;601:16

**affect (2)**
284:23;426:22

**affected (6)**
284:5,25;427:11;
467:13;552:13;

555:7,13

**affecting (2)**
504:8,21

**affects (2)**
426:10;511:6

**affidavit (1)**
252:16

**affidavits (1)**
252:24

**AFGE (7)**
258:13;260:5;
288:23;388:22;
461:16;487:22;594:9

**afternoon (2)**
365:8,9

**again (56)**
253:20;264:8;
266:15;268:1;
270:16;287:12,14;
293:14,21;295:23;
303:10;313:18;
314:1;316:20;317:1;
323:20;324:25;
329:18,18;330:8;
338:11;339:1;353:2;
355:17;380:4;382:9;
389:8;390:17;
394:12,13,19,23;
398:3;400:12,25;
407:7;433:1,16,17;
437:4;440:2;448:3;
465:4;466:22;
476:24,25;497:2;
519:12;531:3;547:1;
558:2;560:1;576:22;
604:14;610:1;611:4

**against (8)**
279:24;282:21;
287:7,23;290:4;
377:5;474:20;571:5

**agencies (1)**
570:25

**Agency (51)**
254:7;261:12;
282:6;287:14;291:2;
298:5,16,18;299:18;
300:2;302:2;316:1,8;
317:9;325:6;330:4,
11,12;333:5,16;
335:9;344:4;347:25;
348:2;361:5;364:22;
373:11;379:13;
384:13;385:12;
419:23;447:23;
448:5;450:7;500:11;
518:10;524:14;
548:20;557:7;
560:24;564:14,17,17,

21,24;565:7;566:17,
18;601:6;613:6;
614:2

**Agency's (4)**
324:17;327:18;
453:12;516:4

**agenda (1)**
304:11

**agitated (3)**
310:8;460:20;
485:11

**ago (1)**
253:4

**agree (8)**
428:6;468:22;
511:9,23;516:7;
580:9;605:16;612:11

**agreed (1)**
579:21

**agreement (15)**
279:23;289:14,16;
304:10,15;320:23;
324:15,24;325:1;
332:23;333:1;
388:22;389:7;
467:17;594:8

**ahead (8)**
315:17;354:1;
405:17;422:23;
433:7;476:5;559:25;
571:23

**aid (1)**
260:22

**air (1)**
289:13

**alarming (1)**
288:25

**aligned (1)**
303:24

**allow (11)**
255:21;267:20;
288:19;346:23;
363:19;432:25;
433:15;442:5;
452:21;523:13;565:2

**allowed (6)**
286:20;309:25;
321:14;403:14;
472:8;490:24

**allowing (1)**
608:14

**allows (2)**
322:15;384:1

**Alma (1)**
288:24

**almost (10)**
273:21;274:11;
277:2,3;310:7;318:1,

18;335:15;383:20;
602:10

**along (5)**
271:3;470:25;
509:15;525:19;558:4

**alternate (8)**
410:25;411:1,6,13,
21,22,25;598:25

**alternative (2)**
330:2;578:23

**alternatives (3)**
330:5;612:22,25

**although (5)**
252:12;384:9;
491:25;499:1;561:20

**always (8)**
253:12;304:14;
324:14;329:11;
330:10;492:16;
590:7;592:12

**Amendments (1)**
415:6

**Americus (2)**
264:21;329:6

**amount (9)**
358:10;403:3;
474:5;489:21;585:7;
586:21;590:21;
592:8,16

**analysis (1)**
580:8

**analytical (1)**
281:4

**analyze (1)**
554:8

**analyzing (1)**
311:9

**ancillary (1)**
455:4

**anger (1)**
407:9

**angry (5)**
380:17;381:8;
394:17;401:18;
434:17

**announced (1)**
540:20

**annual (10)**
320:9;321:16,18;
407:2;474:13;475:2;
530:20;536:13;
539:12;550:19

**answered (11)**
436:10;496:23,25;
497:1;555:23;
559:20,22;562:4;
581:21;600:11;607:8

**apologize (5)**

18;335:15;383:20;
602:10

264:9;270:16;
540:5;542:17;612:18

**appeal (1)**
556:25

**appear (4)**
285:24;286:1;
478:2;579:7

**appearing (1)**
254:19

**appears (5)**
361:12;374:3;
426:18;584:13;
589:12

**applicable (3)**
261:21;570:18;
578:24

**application (4)**
264:5;360:20;
373:18;374:8

**applied (7)**
288:2;290:8,18;
350:15;472:17;
473:9;572:8

**applies (1)**
553:19

**apply (12)**
263:25;323:13;
328:24;354:23;
360:13;367:8;475:1;
512:15;518:5;520:1,
5;570:6

**applying (2)**
512:15;574:3

**apportionment (1)**
488:25

**appreciate (4)**
265:11;550:13;
563:21;579:5

**apprised (1)**
372:11

**approach (2)**
310:14;559:3

**appropriate (27)**
320:5;371:22;
375:2;390:10,19;
395:21;397:8,25;
399:25;406:25;
407:3;419:5;424:2;
434:3;436:1;443:12,
16;447:25;448:4;
457:23;467:4,25;
501:9;504:15;
519:19;572:9;585:19

**approval (8)**
371:16;387:16;
491:19;496:18,24;
497:5;609:19;610:21

**approvals (1)**

DEF001037

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 372 of 406 PageID #: 1005

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

510:1

**approve (8)**
330:14;371:13;
374:19,21;375:21;
457:17;459:6;574:22

**approved (26)**
301:19;308:9;
348:1;364:22;
371:11,12,20;375:4,
5;453:13;474:3;
500:12;524:14;
564:12,17;566:17;
569:24;578:16;
582:2;593:22;
594:21;596:22,25;
597:4;598:2,8

**approving (2)**
372:2;437:20

**approximate (2)**
375:14;563:13

**approximately (5)**
322:13;348:23;
366:6;459:10;581:3

**April (25)**
424:6;449:19;
465:2;494:25;
495:14,18,19;
525:11;537:21,24;
538:5;539:3,6,7,15,
21,25;550:2,11;
588:19,21,22;589:12,
16;611:17

**area (28)**
260:18;261:14,23,
24;284:14;312:16;
313:14,23;315:8,14;
348:17;367:13;
387:15;402:20;
424:1;427:10;
443:17;457:19;
569:23;570:15;
574:1;575:9;580:4,7,
13,25;581:13,13

**areas (1)**
580:9

**area-wide (1)**
581:19

**argue (1)**
428:3

**arguing (2)**
267:16;612:9

**argument (1)**
428:10

**arise (1)**
541:24

**around (6)**
354:10;357:25;
359:20;419:20;

563:14;572:14

**arrangements (3)**
476:6,15;477:7

**arrived (1)**
366:23

**Article (39)**
303:15;304:6,7,10;
318:4;332:22;334:6;
335:5,23;336:14;
349:7;388:16;390:2,
14;464:13;465:9,13,
18;466:20,25;
467:21;468:2;
481:11;500:22;
501:13,19;519:10,11,
15;520:4;594:5,7,9,
19;595:5,9,23;
600:19,21

**articles (1)**
467:16

**ascertain (4)**
392:12;431:22;
436:4,14

**aspects (1)**
299:22

**ASPEN (14)**
377:13,15;490:17;
552:25;553:19;
554:9;584:22,25;
586:5;592:4,18,25;
593:1,7

**assessment (3)**
513:24;514:4;
515:14

**assigned (5)**
285:2;403:6;
520:18,21,24

**assignment (1)**
521:9

**assist (12)**
262:8;265:3;
302:13;378:15;
393:12;439:15;
441:22;443:25;
512:14;521:15;
532:15;536:4

**assistance (2)**
262:12;276:20

**Assistant (16)**
348:22;351:11;
400:21;410:24;
455:20;471:14;
478:11;527:8,9;
531:23;537:15;
544:10;545:5;
546:18;568:17;596:7

**assistants (1)**
596:9

**assisted (1)**
262:3

**associate (2)**
465:1;469:8

**associated (4)**
332:19;360:8;
511:20;512:3

**assume (20)**
254:7;308:1;
309:8;311:15;
366:11;370:12;
371:20;375:5;
377:16;384:21;
411:13;426:24;
465:5;471:9;485:24;
531:24;548:6;567:3;
576:25;603:15

**Assumes (2)**
312:18,19

**assuming (2)**
314:4;589:10

**assumption (2)**
503:9;505:21

**Atkinson (2)**
268:17,18

**attached (3)**
381:3;398:19;
407:8

**attempting (2)**
318:22;533:17

**attendance (1)**
402:10

**attended (1)**
270:8

**attention (14)**
269:24;351:13;
352:8;353:10;354:3;
404:11;418:9;420:6;
447:16;464:17;
484:9,12;526:3;
564:10

**attorney (3)**
461:15;463:22;
525:1

**attorneys (4)**
256:16;347:3;
363:25;452:14

**August (3)**
331:19,20;610:14

**authority (2)**
375:21;597:14

**authorize (3)**
418:25;436:21;
437:5

**authorized (1)**
372:19

**authorizer (1)**
525:4

**authorizing (1)**
372:21

**automated (1)**
329:24

**automatic (4)**
491:19;496:18,22;
497:4

**automatically (2)**
314:4;582:19

**availability (1)**
549:5

**available (20)**
252:10,12,13,18,
21;253:17;301:13;
315:1;328:14;
370:17;372:9,10;
399:9;408:3;412:11;
489:11;501:23;
528:3,17;590:22

**avenue (2)**
381:10;463:3

**average (5)**
280:22;285:17;
286:3,7;489:4

**averaged (5)**
279:25;280:4;
282:11;488:22;
489:21

**averages (1)**
280:16

**avoid (1)**
486:5

**AVSCM (2)**
358:23,25

**aware (43)**
269:18,20;293:20;
297:20;299:8,11,17;
320:3;332:20;
337:14,18,20;
340:14;353:11;
357:17;358:20;
360:25;372:13;
458:3;469:11;
471:16,25;477:19,
23;478:9;484:2,22;
487:16,25;518:3;
551:4,5,6,8;555:10,
13;581:11;588:7;
589:21,24;594:1,3,12

**away (1)**
460:22

---

**B**

**back (51)**
265:22;273:5;
274:24;280:10;
281:4,20,23;282:16;

286:24;287:4;
299:24;306:10;
319:8;322:24;323:
19;325:10;353:3,1
358:13;359:3;
372:13;373:8;379:7;
394:5,22,24;398:5,6,
20;399:16;400:13;
418:23;426:10;
435:15;441:14;
442:25;444:15;
482:24;490:24;
501:12;509:16;
533:2,3;535:8;551:7;
552:17;579:10,15;
602:2,3

**backlog (1)**
472:5

**bad (4)**
319:6,8;473:25;
602:15

**badgered (1)**
278:8

**badgering (1)**
279:2

**balance (5)**
457:15;582:17;
583:13,16,19

**balances (15)**
371:25;372:11;
456:24;473:9;
474:20;492:19;
569:11;570:16;
572:18;580:21;
581:1,17;582:13,22;
583:7

**bang (1)**
605:15

**banging (1)**
605:10

**bargaining (6)**
258:17;324:24,25;
332:23;333:1;594:8

**Barrett (8)**
265:23;410:23;
412:1,18;413:5,9,19;
414:3

**barriers (1)**
318:14

**base (1)**
351:18

**based (61)**
252:23;289:10,11;
304:8;337:1,3;344:5;
371:18;374:23;
376:4;377:9;389:7
399:9;403:12;
427:20;428:9;

429:17;431:20;
436:1;437:1;449:21;
459:24;460:17;
470:2,6;472:20;
479:19,21;488:12,
19;489:3,5,10,19,20;
491:21;498:21;
500:21;503:3,8;
505:6,14,21;514:22;
516:13;537:22;
551:25;553:1;
569:14;583:21,22;
585:23;586:2,17,20;
587:14;589:18;
591:19;592:1;
599:20;611:16
**basic (2)**
465:20;501:24
**Basically (8)**
352:4;354:12;
403:22;462:24;
473:17;504:1;
602:18;604:3
**basis (11)**
357:14;473:20;
489:15;490:18;
552:19;560:13;
574:3;609:7;610:10;
611:9;612:2
**Bates-stamp (1)**
411:8
**Bates-stamped (1)**
548:12
**became (4)**
297:18;358:20;
540:1;551:3
**become (5)**
302:7;359:3;
458:3;471:25;551:23
**becoming (1)**
310:10
**bed (1)**
322:9
**began (6)**
356:24;380:19;
394:7;432:21;
433:21;476:12
**begin (19)**
252:4;255:7,23;
257:10;346:4,24;
348:2;363:7;364:23;
395:20;432:23;
523:1,15;524:15;
565:4;566:18;601:18
**beginning (7)**
358:2;410:16;
411:4;414:10;

473:20;509:23;
556:19
**begins (2)**
356:13;507:7
**begun (1)**
363:21
**behalf (2)**
282:7;596:11
**behaving (1)**
461:24
**behavior (7)**
277:23;461:19,22;
484:25;485:16;
495:21,24
**behind (3)**
275:21;313:2;
553:11
**belief (2)**
339:13;511:18
**believes (2)**
443:11;557:23
**belittled (1)**
335:14
**below (8)**
558:9;561:6,10,14,
20;562:2,5;574:4
**beneficial (2)**
343:10;442:1
**benefit (4)**
466:6;511:18;
512:1;557:7
**benefits (6)**
367:3;455:1,4;
512:17,22;567:12
**beside (1)**
545:21
**best (8)**
261:9;263:16,20;
307:23;315:13;
505:11;506:9,16
**better (6)**
254:14;264:11;
412:18;413:5;501:9;
505:2
**beyond (2)**
296:10;572:12
**big (1)**
367:24
**bit (2)**
560:17;581:14
**blank (3)**
539:9;579:13,14
**block (1)**
383:20
**blocked (1)**
384:18
**blue (1)**
492:18

**blurred (1)**
304:2
**board (1)**
571:4
**body (7)**
256:2;430:24;
452:1;460:22;
485:10;503:17;504:9
**boiled (1)**
382:21
**book (2)**
301:5;584:9
**borderline (6)**
553:9,14,22,23;
554:1,9
**both (10)**
318:18,19,20;
330:8;413:16;
427:25;569:13;
572:22;587:7,8
**bottom (6)**
259:24;411:8;
420:13;424:13;
466:12;528:21
**bounce (1)**
265:21
**break (1)**
551:21
**breaks (1)**
613:2
**breathing (2)**
508:14,21
**Brian (1)**
347:18
**B-R-I-A-N (1)**
347:23
**brief (4)**
291:13,22;386:16;
497:22
**briefed (5)**
254:4,4;291:3;
478:11;495:15
**briefing (3)**
367:1,10;514:1
**briefings (1)**
367:12
**briefly (4)**
341:20;351:18;
386:7;389:22
**briefs (2)**
613:17,19
**bring (2)**
291:24;501:11
**broke (1)**
435:11
**brought (12)**
289:1;318:25;
319:10;354:2;

360:24;447:16;
449:7;463:1;484:8,
12;535:22;564:10
**Brown (260)**
252:2;258:18;
259:1;262:3;263:6,
16;267:9;275:6;
278:14,17,19,21;
279:16;282:7,19;
287:15;288:2;
290:19,20;292:13,
17;293:23;297:24;
299:20;300:21,25;
301:1,20;302:8;
304:24;305:21;
306:12;308:17,20;
309:12;311:25;
312:1;313:11,20;
314:3,4,11,14,24;
315:5,6,10,18;
317:11,14;318:7;
319:24;320:3,8;
326:10;330:20,24;
332:11;334:4;335:8;
336:12;337:7;
342:22;343:6;
344:16;345:6;350:8;
351:3,14;352:8,18;
353:12;354:6;
358:20;360:8,11,25;
361:11;362:13;
366:13,17,22;371:7,
8;372:13;374:8,17;
375:10;378:18,24;
379:17;380:7,15,20;
383:12,13;384:22;
386:14,20,23;387:1,
6;388:14;390:14;
391:2;392:8;394:2,6;
398:18;399:24;
401:11;402:4,16;
404:12;405:9;407:6;
408:24;409:5,18;
413:7,19;414:4,21;
418:21;419:4,7,19;
420:7;422:1;423:16;
428:12,17;429:16;
430:19;432:6;434:6,
22;435:6,6,14;436:8,
21;437:4,12;440:10;
442:12;444:11,23;
445:4,16,20,24,25;
449:25;450:2,20;
455:9;458:1;459:13,
16,22;460:9,11;
464:12;469:1,11;
470:14;472:2,11,19;
478:19,23;480:8;

483:9;484:2,6;491:2;
492:2;494:19;495:5,
10;496:2,8;500:8;
517:6,19;520:20;
522:7;525:17;528:2,
25;529:11;530:17;
532:3,21;533:1,9;
535:9;536:1,12,17,
22;537:9;538:4,9;
539:2;540:14,17;
541:12,16,19;542:10,
18;543:3,17,22;
545:16,23,24;547:9;
550:14;551:23;
552:18;554:7,12,16,
23;555:1,16,18;
556:7,11,16;558:10;
559:3;565:13,19;
568:4,9;572:14;
575:12,22;577:18;
578:9,25;582:6;
586:11;587:5;
588:13;590:15;
599:7;601:15,17,19,
22;604:7,21;607:11;
608:3;612:20
**Brown00006 (1)**
547:14
**Brown's (41)**
260:11;269:22;
275:1;289:22;290:3;
293:16;300:4;
301:14;386:11;
412:16;420:9,12;
422:16;427:16;
430:24;458:11,14;
479:22;480:21;
481:19,23;491:11;
495:21,24;499:8,16;
513:12;525:13;
537:20;541:5;549:5;
558:14;583:16;
588:2;589:23;591:3;
593:4,10,12;594:5;
595:14
**bulk (1)**
406:1
**Burke (6)**
261:8;266:12;
268:10;288:21;
302:25;455:19
**Busher (1)**
494:4
**business (5)**
361:23;367:5;
485:16;528:13;541:2

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

# C

**C&P (1)**
356:24

**C-5 (1)**
429:6

**calculate (1)**
527:4

**calculates (1)**
552:25

**calculating (1)**
585:3

**call (13)**
383:4;405:20;
406:17,24;410:25;
445:12;473:12;
474:11;489:6;
498:13;530:19;
550:3;564:18

**calls (1)**
489:12

**calmed (2)**
278:25;395:11

**came (27)**
281:22;305:8;
323:19;349:15;
351:13;352:8;
353:10,19;358:14;
374:8;378:22;379:7;
380:7,16;400:15;
403:1;404:23;
475:24;488:16;
492:17;495:15;
526:4,16;550:7;
587:14;596:5;606:23

**Can (140)**
255:2,12,13,13,15,
17;257:20,23;
258:23;259:18;
262:5;263:14;271:6;
277:14;278:1;
279:19;283:24;
284:14,25;291:20,
25;298:7;299:22,23;
303:9;304:7,11,16;
313:23;315:8;
319:12;324:17;
325:13;328:18;
333:18;335:11;
338:25;345:25;
346:9,9;347:20;
348:12;352:2;
355:17;363:3;370:5,
7;379:5,24;380:20;
384:3;385:3,17;
389:22;391:9,18;
393:8;396:16;

397:20;398:3,18,20;
403:14;405:20,23;
409:13;411:5;
418:14,19;425:12;
426:10;429:25;
430:2,2;432:3;
435:20;438:20,25;
439:9;440:6,21;
445:21;446:18;
448:3;451:12,20;
453:6;456:4;457:7;
460:12;473:12,21;
474:1;476:5;480:2;
481:15;482:25;
483:24;493:4,21,23;
495:7;498:5;499:24;
501:21;502:8,15,20;
503:4;504:2,14;
515:4;522:21;
524:24;525:21;
530:17;533:24;
535:4;537:4;540:4;
548:13;553:23;
556:12;560:1;
563:12;566:8;
567:25;568:10;
570:1,12;572:12;
584:17;588:8;
590:23;592:4;
598:16;599:3,10;
605:21;610:16

**cancelled (2)**
576:9,17

**cancer (2)**
425:17;426:2

**capacity (2)**
366:15;513:21

**capture (1)**
488:18

**card (1)**
372:6

**care (7)**
262:4;439:25;
443:12,15;456:16;
501:6;520:18

**CARETHERS (229)**
252:1;254:6,11,17,
20,24;255:6,17,25;
256:6,11,15,22;
257:3,8;262:23;
263:3;266:25;
267:12,20;272:8;
277:25;282:22;
283:21;288:11;
290:25;292:3,8;
293:3;298:12,25;
301:7;302:2;310:2;
312:22;313:8;

314:20;315:24;
316:6,19;323:24;
325:2,5,9,13;327:14,
22;333:3,7,13,18;
337:11;338:3,8,15,
19,22;339:5,11,17,
21;340:3,15,22;
341:2,8,14,19,23;
342:3,15,19;343:1,4,
11,19,23;344:4,9,20;
345:2,5,11,15,16,20,
25;346:4,12,16,21;
347:2,10,16,20,24;
361:4;362:2,9,12,18,
19,23;363:3,7,13,18,
24;364:6,12,16,21;
373:7,12,17;379:13,
21;382:5;384:5,16;
385:2,7,13,24;409:6;
410:9;417:3,6;
421:10;427:2,5,12,
18;430:11;433:8;
436:11;450:9,15,18,
24;451:2,7,9,12,16,
23;452:4,9,13,20,25;
453:6,11;466:21,24;
479:4;492:4;497:1;
498:5;507:17;513:7;
518:10;521:20;
522:2,5,11,12,16,21,
25;523:7,12,17,21;
524:3,9,13;531:2,5;
537:2;547:17,23;
548:9,15,20,23;
558:22;559:23;
560:24;563:24;
564:5,9;565:7,15,18,
25;566:3,7,12,16;
571:9,23;572:4;
577:14;588:24;
589:3;595:17,20;
598:13;600:23;
601:6,9,14;604:5,9,
17;607:20;608:7,21;
609:16;610:15;
611:1,19;612:8;
613:6,10,15;614:4,6

**carried (1)**
300:11

**carry (2)**
428:22;429:2

**carrying (1)**
425:24

**case (30)**
260:9;262:22;
267:1,4;282:2;
285:20;293:5;299:3;
332:22;335:1;

350:25;376:21;
412:21;413:15,17;
414:17;417:20;
422:16;492:16,20;
569:12;572:24;
574:8;580:10;
582:24;583:12;
608:25;609:3,20;
611:25

**case-by-case (1)**
574:2

**cases (13)**
285:3;474:14;
489:13;553:1;
585:12,13,18,24;
586:7,13,18;605:3,4

**caught (1)**
288:3

**cause (4)**
420:16;502:15;
503:4;611:7

**caused (1)**
484:9

**causes (1)**
508:16

**causing (2)**
402:1;503:24

**CC'd (1)**
558:10

**center (25)**
348:22;349:3,11;
350:3;354:11;359:5,
6,12;365:18;366:18;
447:1;454:1,8,21,22;
457:10;468:19;
469:7;470:4;471:14;
478:11;526:5;
569:17;576:3;584:3

**central (4)**
383:12;386:10;
456:8;472:6

**certain (5)**
310:16;323:13;
590:7;591:5;594:17

**Certainly (5)**
409:20;446:21;
567:17;611:6,6

**certification (14)**
334:16;335:3;
390:4;547:10,16;
548:2,3;549:15,23;
550:5,10;554:8;
556:21,24

**certified (1)**
520:18

**certify (1)**
549:7

**cetera (6)**

476:1,16;483:7;
488:13;491:1;508:21

**chain (1)**
329:22

**chair (6)**
319:9,14;394:24;
398:6;435:15;613:2

**chairs (1)**
605:14

**challenge (2)**
298:15;516:5

**challenges (3)**
511:20;512:3;
515:25

**change (8)**
415:5;430:5;
580:14;607:23;
608:2,4;609:24,25

**changed (3)**
323:20;597:2;
612:5

**changes (6)**
415:8,14,18;416:1;
481:12;594:10

**chapter (1)**
465:14

**charge (1)**
448:13

**check (3)**
373:8;424:10;
580:24

**checking (1)**
580:22

**chief (5)**
468:18;493:20;
548:4;570:5;576:4

**chiefs (1)**
494:6

**child (3)**
335:15;461:11;
604:2

**childcare (2)**
476:16;477:8

**children (1)**
476:8

**choice (1)**
274:19

**chose (2)**
433:23;435:12

**Christina (3)**
261:6;302:15,24

**chronic (3)**
508:3,8;510:13

**chunk (1)**
383:21

**circulars (1)**
260:7

**circumstance (4)**

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 375 of 406 PageID #:
1009

OC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

281:9;283:20;
286:21;517:2
**circumstances (7)**
257:19;279:13,21;
428:17;447:24;
448:2;515:24
**cited (1)**
421:21
**City (1)**
348:14
**claim (3)**
609:22;610:16,20
**claims (7)**
266:19,20;267:4;
455:3;472:5;587:20;
588:3
**clarification (1)**
444:3
**clarified (2)**
342:16;534:3
**clarify (4)**
316:19;318:14;
385:18;410:15
**CLARK (155)**
254:3;257:9,17;
261:6;262:25;263:5;
266:18,24;267:3,17;
268:2;272:1,12;
273:4;277:14,21;
282:4;283:15;
284:19;287:14,22;
290:16;292:1,2,5,6,
10,11,12;293:1,7;
298:13,14;299:6,7;
301:7,10,11,25;
302:15,24;307:8;
309:24;312:18;
313:3,25;314:18;
315:21;316:12;
323:25;324:2;325:2,
4,12,17;327:12,18;
328:1;332:21;333:8,
11,22;336:8;337:9;
344:2;355:16;361:2;
373:15;379:11,18;
381:20;383:18;
384:24;385:5,21;
410:10,12,14;417:4,
7;421:23;422:22;
426:24;427:4,7,15;
428:4;430:12,13,14;
433:6;434:5;436:15;
449:23;450:5;479:5,
7;498:5,8,10;507:19,
20;513:5,9,10;518:8;
534:17,21;537:3,4,7;
545:7;547:12,19;
548:7,11,18;549:3;

558:24;559:1,21;
560:22;562:3;565:5;
570:24;571:13;
573:5;577:15,17;
581:24;582:1;
592:23;595:22;
598:6,18;600:12,20;
601:4,21;604:5,18,
19,20;607:22;
608:13;609:11;
610:12,22;611:11;
612:4,8,14,19;613:4;
614:5
**class (1)**
367:24
**classes (1)**
368:10
**cleaning (1)**
602:21
**clear (9)**
274:8;294:15;
295:16;351:19;
397:2;421:13,16,21;
436:24
**clearer (4)**
383:23;384:9,14;
505:3
**clearly (6)**
276:17;310:24;
317:23;384:2;388:5;
405:3
**close (7)**
291:24;359:19;
361:22;511:18;
512:1;528:13;541:2
**closed (1)**
487:2
**closely (2)**
303:24;554:10
**closer (1)**
486:25
**closing (2)**
291:20;613:16
**cloudy (1)**
385:6
**coach (29)**
294:22,23,23,24;
295:2;375:25;376:1,
1;378:21;389:10,15;
391:7,14,23;395:14;
398:15,22;401:20;
403:21;404:4,19;
407:10;445:18;
527:8,9;531:23;
537:15;545:5;546:18
**coaches (4)**
404:3;454:16;
455:20,20

**coaching (1)**
404:2
**COB (1)**
541:2
**collaboration (1)**
302:15
**collective (4)**
324:24;332:23,25;
594:8
**Colleen (1)**
603:21
**comfortable (2)**
338:11;505:20
**coming (10)**
367:15;383:22;
384:10;484:18;
485:14;505:7,8;
596:2,3;610:11
**command (1)**
329:22
**commence (1)**
453:13
**commensurate (3)**
390:6;467:7;
521:13
**comment (1)**
271:4
**comments (3)**
271:2;336:17;
434:18
**committee (1)**
519:5
**communicate (9)**
318:7,12,15,21;
344:22;378:3,7;
419:5;459:21
**communicated (10)**
314:24;378:5,9,11;
407:9;423:18;449:3;
460:15;477:6;601:23
**communicating (3)**
401:20;433:19;
435:17
**communication (7)**
310:10;318:10,19;
407:11;419:3;584:2;
602:24
**communications (1)**
351:7
**commuting (1)**
423:25
**companies (1)**
291:18
**comparable (1)**
301:17
**compare (1)**
585:19
**compensation (1)**

455:3
**Complainant (23)**
252:9,11,23;
253:14,22;254:2;
262:24;290:17;
298:12;316:9,10;
332:24;340:1;
343:24;373:13;
384:8;385:17;
468:22;564:9,19;
565:2;611:14;614:4
**Complainant's (4)**
257:9;547:14;
564:16;565:1
**complaint (3)**
368:12;598:12,15
**complete (8)**
263:11;309:25;
310:4;379:2;442:23;
489:14;578:8;586:14
**completed (2)**
489:20;550:19
**completely (1)**
282:1
**completion (2)**
329:15;551:9
**complex (1)**
285:3
**complexity (1)**
285:19
**compliance (1)**
351:24
**compliant (1)**
527:25
**complications (1)**
285:6
**complied (2)**
353:16;382:24
**complies (21)**
269:25;327:4;
333:25;349:22;
361:10;386:6;
389:23;414:11;
430:17;443:2;
459:11;468:10;
470:9;477:22;
507:15;518:15;
528:22;529:4;531:1;
556:13;595:13
**comply (9)**
356:21;516:3,11,
19,24;517:6,13,20;
530:11
**composed (2)**
350:2;352:21
**computer (2)**
264:3;290:12
**concede (2)**

428:2,9
**concern (2)**
266:14;339:2
**concerned (3)**
291:4;331:17;
383:13
**concerning (9)**
299:9;334:25;
335:20,383:8;
386:11;416:1;422:1;
547:4;593:5
**concerns (4)**
258:9;368:14,17;
559:4
**concluded (2)**
539:4;614:8
**concludes (7)**
344:21;362:3;
450:10;521:21;
563:25;601:9;613:10
**concur (1)**
580:11
**concurrence (3)**
457:18,20;580:10
**condition (61)**
261:11;271:16;
278:15;295:20;
310:18;311:8;
312:17;313:24;
315:9,13;319:5;
334:24;335:2;390:6;
396:1;399:15;
420:15,25;421:5,25;
422:8;425:8,9;
426:16;427:16;
429:20;431:7,13,14;
437:13;441:9;
443:14;461:5;
481:23;482:8,18,21;
483:4,7,10,25;484:9;
498:4,11,13,16,20,
24;499:2;501:4;
503:19,20,23;508:6,
8;511:6,21;514:23;
555:8,10;593:10
**conditions (10)**
425:16;426:1;
466:13;473:12;
501:15,22;505:4;
514:25;594:25;599:8
**conducted (2)**
415:2;493:17
**conference (1)**
316:14
**conferred (1)**
261:5
**confirm (1)**
343:20

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 376 of 406 PageID #: 1610

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

**confirmation (1)**
418:13
**confronted (1)**
512:2
**confronting (1)**
511:19
**confused (4)**
404:23;472:19;
516:15;590:4
**confusing (1)**
590:24
**confusion (2)**
447:23;472:16
**Congress's (1)**
415:5
**connect (1)**
443:24
**connection (4)**
416:2;417:17,23;
488:1
**consequence (1)**
255:20
**consider (9)**
295:8;325:24;
412:17;493:12;
494:16;515:16;
549:21;553:5;582:11
**consideration (11)**
280:18;376:8,20;
381:5;386:15;
456:25;457:9;
483:18;570:10;
578:7;594:12
**considered (25)**
254:25;320:21;
335:2;340:5;345:21;
362:24;422:19;
444:2;451:3;461:2;
463:10;466:10;
467:9;480:3,5,21;
481:17;484:3;
493:18;522:17;
566:4;570:3,7;574:2;
587:1
**considering (1)**
387:13
**consistent (4)**
267:7;571:19;
573:23;574:13
**consistently (1)**
594:13
**consult (3)**
428:15;546:15,20
**consultation (1)**
261:23
**consulted (3)**
444:18;594:4,18
**contact (22)**

263:7;265:12,16;
267:13,19,22;268:4,
13,14,23;269:2;
351:2;419:3;436:22;
460:23;461:15;
463:22;485:2,11;
486:5;605:6,7
**contacted (1)**
295:17
**contacting (2)**
444:3;463:20
**continually (2)**
394:8,18
**continuation (2)**
450:19;522:6
**continue (15)**
278:3;292:4;
310:5;317:7;356:21;
379:25;413:15;
421:22;433:9;440:6,
11,25;467:9;552:23;
604:18
**continued (4)**
278:10;295:9;
318:21;414:3
**continues (1)**
443:5
**continuing (5)**
252:1;345:5;
362:12;565:18;
601:14
**contract (10)**
287:6;297:10;
303:16;322:14;
349:8;388:16;
390:21;464:14;
467:1;468:23
**contribution (1)**
561:21
**control (2)**
443:13,18
**convene (1)**
471:8
**conversation (23)**
310:21;352:19,21;
382:19;391:17;
414:4;419:21;430:4;
432:9;22;433:2;
435:10;436:5;446:6;
449:5;460:13;
461:18;462:11;
463:2,15;497:12;
560:2,8
**conversations (6)**
270:3;305:14;
351:15;359:1;
401:17;605:8
**convey (1)**

393:16
**conveyed (1)**
407:6
**coordinate (1)**
352:7
**coordinator (14)**
366:3;369:2,9,13;
371:1;391:24;392:2;
411:15,20;413:10;
418:11;439:11;
468:6;525:2
**coordinator's (1)**
411:11
**copied (2)**
575:22;613:24
**copy (7)**
333:4;381:2;
384:9;418:21;459:1;
514:13;534:10
**corrective (5)**
291:5,6,10,15,16
**correctly (3)**
338:7;359:25;
383:11
**correspondence (1)**
388:11
**Council (1)**
288:23
**Counsel (2)**
381:23;417:15
**counseling (1)**
464:8
**count (2)**
592:14,15
**counted (2)**
474:19;488:24
**counting (1)**
490:16
**counts (2)**
490:22;585:7
**couple (5)**
424:8;540:9;
572:13;573:24;
580:15
**course (3)**
296:6;460:21;
546:17
**court (9)**
255:4,19;346:2;
363:5;451:14;
522:23;566:10;
613:21,21
**cover (2)**
258:18;271:12
**covered (10)**
370:24;424:11,15;
426:3;428:1;431:24;
475:7;501:1;515:6;

609:15
**covers (2)**
368:7;567:15
**crap (1)**
266:4
**create (1)**
289:7
**creates (1)**
430:24
**credit (2)**
280:15;285:22
**credited (1)**
288:6
**cried (1)**
287:3
**criteria (15)**
286:4;373:3;
388:23,24;389:2;
456:11,13;460:19;
465:21,21;466:9;
472:9;479:15;
480:17;569:10
**critical (2)**
539:23;586:17
**cross (10)**
316:2,7,10,16,16,
22,23,24;385:17;
410:11
**cry (2)**
271:6;336:19
**crying (3)**
486:6;602:10,14
**cubicle (2)**
486:18,22
**cubicles (1)**
486:22
**cumulative (6)**
279:25;488:23;
489:10,16,17;561:4
**curious (1)**
515:21
**current (15)**
254:22;345:18;
362:21;365:10;
376:6;377:14;
492:15,19;522:14;
524:25;525:1;566:1;
567:3;570:4;578:13
**currently (9)**
257:20;348:13,14;
365:11;366:8,10;
453:22;454:13;457:3
**custom (1)**
492:13
**cut (2)**
274:11;293:19;
310:1
**cysts (1)**

484:13

## D

**daily (7)**
280:17,22;286:2;
489:15,16;561:22;
587:10
**dare (1)**
604:4
**data (12)**
377:13,15,16,21;
457:12;458:9;
570:17;580:7;
581:18;585:5;
589:19;593:7
**date (41)**
253:2,3;269:12;
270:5;304:25;305:2;
331:4;332:13;
354:17;356:8;357:6,
11,21;375:14;
398:14;403:15,15;
404:10;406:17;
409:12,14;423:19;
448:21,25;449:14,15,
21,22;529:10;
545:22;549:9;551:1;
561:8,12;584:15,17
589:8,9,11,13;613:
**dated (19)**
341:10;356:22;
384:20;424:6;
449:20;459:13;
477:25;529:8;531:7;
540:11;541:1;
545:19,20;547:13;
548:1;550:24;
568:21;584:24;
610:14
**dates (23)**
253:12;259:2;
270:16;331:24;
338:1;349:18;
356:25;357:3;
359:15;361:14,17;
397:20;403:17;
404:6;406:14;445:5;
528:17;540:19;
549:10;563:2,3;
587:25;588:8
**day (48)**
252:4;254:13;
280:9,19,20;285:13,
18,20,22,23,25;
288:7,7;289:7;355
361:23;397:22;
403:15;461:21;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 377 of 406 PageID #:
10220

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

473:25;474:1;475:4;
485:19;486:2;488:3,
4,5,17,18,21,22;
489:2,4;490:10;
496:11;528:14;
539:25;542:16;
585:11,14,18,22,23;
586:14;592:7,8;
601:11;605:22
**days (36)**
259:9;264:10;
280:5;287:2;288:5;
294:19;296:20;
303:8;312:3;322:9,
10,22,24;332:15;
359:14,16;361:15;
367:22;398:11;
406:8;489:18,20;
490:1,7,8,14,21;
521:1;530:18;553:7;
585:1,21;592:5,9;
594:14;613:20
**day-to-day (1)**
429:2
**deal (3)**
355:9;360:1;
381:21
**dealings (1)**
353:2
**dealt (1)**
449:2
**Dean (73)**
270:4,11,19,20;
273:11,22;274:25;
275:25;279:10;
293:8,9;295:18;
305:21,24;306:1,8,
12,21;318:8,13,22;
341:10,13;350:25;
351:8;354:3;361:11;
377:11;378:21;
379:7,12,18;392:8;
395:14,23;398:23,
24;404:17;407:17;
408:9;444:18,22,22;
445:7;447:19;449:5;
455:23;493:25;
494:2,23;495:4,10;
506:6,7;517:1;518:3;
522:8,10,15,20;
524:11,17,24;540:7,
8;544:13;547:9,15;
548:1,4;563:22;
589:15;606:15
**D-E-A-N (1)**
524:12
**Dean's (2)**
358:24;606:13

**Deb (1)**
351:4
**debilitating (8)**
502:16,18,20,24;
503:5,24;504:18;
508:18
**December (8)**
348:24;355:20;
358:18;359:9;
372:14;532:7;
550:23;555:3
**decided (3)**
564:18;574:1;
597:2
**deciding (5)**
400:19;408:23;
469:10;513:17,20
**decision (29)**
377:1;387:15;
390:24;399:9;
423:18;434:2;437:1;
459:15;460:15,16;
467:22;468:4,22;
470:7;478:16;
479:12,17;530:16;
556:23;557:14;
558:3;580:4,14;
589:17;596:14,15,16,
18;603:12
**decision-maker (2)**
608:10;609:1
**decisions (1)**
574:12
**declined (1)**
402:16
**deemed (1)**
561:24
**defined (4)**
425:13;570:25;
571:3,16
**definitely (4)**
254:19;259:17;
272:16;286:6
**definition (1)**
571:19
**definitions (1)**
508:23
**degree (2)**
510:10,16
**dehumanizing (2)**
278:9;335:14
**demand (1)**
381:6
**demanding (1)**
462:1
**demeanor (1)**
485:5
**demonstrate (1)**

456:12
**demonstrates (1)**
612:6
**demonstrating (1)**
326:17
**denial (23)**
270:25;320:7,11;
377:25;378:1;
400:14,15,17,23;
401:11,14;424:5;
428:6;459:16,21;
468:4;470:14;484:8;
499:6;583:21;
604:25;611:17,22
**denials (1)**
510:1
**denied (25)**
270:22;273:20;
304:7,16;320:4;
324:6,20;330:3;
377:7,8,24;391:1;
400:4;422:12;
459:23;495:6;515:4;
572:22;574:14;
575:9,10;598:10;
600:13,18,20
**deny (5)**
284:7,8;460:16;
481:1;535:5
**denying (4)**
515:2;550:1;
564:22;601:3
**Department (14)**
252:3;261:2;
269:14;345:7;
362:14;365:20;
367:13;390:8;
450:20;467:2;
519:17;521:9;
565:20;601:16
**depend (1)**
586:23
**depending (5)**
295:5;357:15;
474:5;503:6;551:8
**Depends (2)**
367:24;592:13
**depleted (2)**
582:17;583:8
**dermatologist (2)**
443:16,24
**describe (7)**
309:5;386:7;
391:8;429:1,3;456:4;
571:14
**described (2)**
411:6,11;493:13;
514:25;578:18

**describes (1)**
501:2
**describing (3)**
492:10;498:21;
502:13
**description (10)**
428:13,16,21;
429:6,8,25;457:4;
466:5;501:3;505:4
**descriptive (1)**
499:2
**desirable (1)**
312:13
**desk (6)**
460:24;485:10;
496:7;605:10,14,15
**despite (1)**
538:25
**detail (7)**
253:24,25;424:12;
474:6;505:23;563:7;
593:9
**detailed (4)**
351:11;382:19;
387:3;592:22
**details (5)**
278:2;487:9;
514:24;556:22;
578:18
**determination (17)**
376:11;380:25;
382:1,8;386:25;
387:14;388:25;
389:1,17;397:25;
398:1;399:11;400:3;
427:23;518:21;
554:6;570:11
**determine (13)**
310:22;388:6;
391:19;403:5;430:1;
434:2;436:3,13;
457:23;509:9;570:5;
574:23;591:11
**determined (2)**
405:11;560:14
**determining (7)**
490:5,13;552:9;
553:8;582:13;587:1,
4
**detrimentally (1)**
286:7
**devastated (1)**
286:9
**devastating (1)**
606:10
**diagnosis (2)**
271:13,22
**difference (2)**

462:6;463:5
**different (39)**
260:7;261:17;
265:22;266:20;
274:10;286:21;
290:7,14;294:9,12,
13;295:21;301:23;
318:19;319:6,8;
325:19;326:4;
367:12;420:2;463:3,
12;475:22;501:3;
509:22;515:25;
581:14;591:25;
594:15,16;599:16;
607:16;608:10,10;
609:1;610:4,6,24,25
**differentiated (1)**
316:17
**differently (2)**
428:11;505:1
**difficult (5)**
267:8;302:11;
312:2;383:19;475:15
**direct (15)**
269:24;315:22;
316:15,16,22,22,24;
335:21;336:11;
409:25;418:9;420:5;
435:7;480:22;485:1
**directed (4)**
357:7;401:24;
581:13;596:12
**direction (3)**
274:8;454:23;
478:12
**directive (3)**
580:25;587:21;
588:5
**direct-line (1)**
541:5,7,11
**directly (17)**
276:22;329:23;
335:24;336:15;
360:11;391:7,14,15;
411:25;436:17;
437:5;446:24;
475:19;543:4;568:9;
569:15;596:4
**director (53)**
351:11;371:15,15;
376:20,25;378:2;
386:14;387:11,12;
400:21,22;402:5,17;
411:18;457:9,16,19;
458:22,24;459:20;
460:4;461:2,17;
462:2,22;465:1,1,3;
469:8;470:5,17,18,

Case 1:20-cv-01154-JPH-MJD    Document 39-5    Filed 07/02/21    Page 378 of 406 PageID #: 1042

EEOC Hearing                                          Brown v. McDonald, et al.
Volume II                                            July 21, 2015

21,24;479:18;
491:15;494:12;
495:20,23,25;
496:20;497:7;
513:21;567:3,4;
568:17;570:16;
572:23;580:4;
581:14;596:8;
597:16;598:5

**directors (8)**
569:25;573:3,9,17,
22;574:9;580:7,8

**directors' (1)**
572:3

**director's (5)**
374:22;376:8;
457:15,20;568:16

**Disabilities (3)**
264:22;329:7;
505:15

**disability (52)**
260:23;261:3,20;
262:4,18;271:9,12;
288:18;295:6;296:8;
298:19,20;300:23;
315:2;329:1,5;
340:10,12,14,18,23;
341:4,7;424:10,15;
425:6,10,12,13;
426:12;427:17,24,
25;428:2,5,8;462:13;
482:7,7;496:8,15,17,
24;503:15;504:10;
515:6;518:20;
593:13;605:18;
606:2,8;611:16

**disabled (2)**
340:6;594:2

**disagreements (2)**
487:17,22

**disciplinary (19)**
320:22;330:20,25;
331:9,12,16,23;
332:12,18;456:23;
480:7,10;531:16;
536:16;570:8;571:5,
8;577:19;578:3

**discipline (8)**
286:13,15;457:14;
464:5;492:20;521:6;
536:12;562:25

**disciplined (5)**
283:11;286:10;
323:9;337:15;560:11

**disclose (1)**
514:8

**discount (1)**
490:14

**discounts (1)**
585:1

**discrete (1)**
507:11

**discretion (7)**
413:2;457:17;
462:4,21;491:21;
496:20;497:6

**discuss (24)**
302:21;307:15;
313:21;322:19;
362:4;368:2;408:24;
450:11;468:25;
475:17;482:17;
486:22;487:5;
491:22,24;508:16;
521:22;526:8;530:1;
555:6;559:15;564:1;
575:11;610:18

**discussed (12)**
319:10;379:16;
509:10;514:6,7;
519:10;529:17;
554:25;576:25;
577:6;579:18,23

**discusses (4)**
481:16;498:11;
508:2;610:13

**discussing (4)**
471:18;478:24;
547:3;580:1

**discussion (27)**
273:18;306:20;
353:22;378:18,20;
381:9,13;390:13;
397:5;408:15;
444:15;459:19;
460:22;494:24;
495:3,9;507:6;
529:20;532:2,5;
536:21;543:10;
564:7;565:10;
575:18;613:13,16

**discussions (8)**
354:5;382:15;
464:2;470:13;488:1;
573:8,15;599:21

**disease (2)**
426:22;443:18

**disorder (7)**
443:4;502:14;
503:4;508:3,16;
510:5,13

**dispute (2)**
297:6;343:20

**disqualifier (1)**
570:19;573:1;
582:24;583:1,15,17,

20

**disqualifies (1)**
572:10

**disregard (1)**
553:3

**disrespectful (7)**
485:6,8;496:3,5;
603:11,13;604:1

**distance (1)**
605:13

**distribute (1)**
382:10

**distributed (1)**
356:5

**District (3)**
253:8,11;303:1

**divided (2)**
590:21;592:8

**division (20)**
376:2,17,21;378:3,
11;386:15;387:10;
389:5,16;403:5;
435:22;446:25;
455:14;468:18;
493:20;494:6;
526:17;548:3;570:4;
576:4

**DMO (3)**
469:10;470:3;
519:4

**doctor (10)**
271:17;430:22;
443:3;466:4;474:6;
497:23;505:23;
506:22;507:11;510:5

**doctors (4)**
253:17;312:15,21;
314:5

**doctor's (5)**
507:5,9;509:10;
556:21,24

**document (41)**
259:24;309:11;
326:6;333:24;
334:11;353:6;
383:25;384:7,10;
385:10,11;411:12;
414:10,14;418:5;
468:11;470:10;
480:18;483:18;
492:9,9;497:24,25;
528:23;531:8,10,12;
540:10,21;547:21,24,
25;548:10,12,14,16,
21;561:9;569:20;
573:22;578:6

**documentation (67)**
264:14,19;271:11;

272:14;276:5,7;
295:11,23;296:2,5,
12;298:21;306:24;
307:1,3,4,13;309:6;
314:7;319:19,20,21;
320:5;326:16,21,22,
23;334:17,22;
343:13;370:13;
372:16;375:3;
376:16;379:4,6,9;
380:13,19;387:22;
399:8;401:22;
409:22,25;418:19;
423:23;430:18;
437:11,22;457:7,11;
465:5;469:19;499:9;
514:14;518:24;
519:1,3,8;555:19,24;
556:1;557:19,21;
562:9;592:24,25

**documented (6)**
493:6,7,9,19;
532:6;534:9

**documents (16)**
264:16;290:12;
329:19;379:1;
386:21;387:2;
409:19;437:13,14;
509:14,18,22;514:9;
562:11;565:11,12

**Don (3)**
545:5;558:8,9

**Donald (10)**
398:23,24,25;
455:21;527:9;
531:21;544:8;
557:18;564:15;
565:11

**donate (3)**
374:13,14,17

**done (17)**
286:1;317:16;
341:21;413:25;
459:3;471:22;
489:24;530:3;
586:21;589:9,10,11;
590:19,21;591:18;
592:3,7

**door (1)**
487:2

**down (37)**
255:20;256:3;
279:1;283:5,11;
287:16;295:9;301:8;
356:5,6;380:16;
382:21;394:24;
395:11;403:2;409:8;
418:17;435:11,14;

**451:25;454:18;**
472:5;487:2;492:25;
525:11;526:4;540
543:25;544:11;
546:7,11;549:19;
550:9;597:16;
598:20,23;604:4

**downgrade (6)**
456:19;578:21;
579:1,12,21;580:2

**downgraded (1)**
389:13

**downtime (6)**
553:5,11,14,15,21;
554:3

**dozen (2)**
568:2,2

**Dr (10)**
252:7,8,9,12,16;
444:3,12;502:11;
507:13,24

**drafted (3)**
530:5;531:10,11

**drainage (4)**
420:17,23;423:1;
484:14

**draw (1)**
337:4

**drive (1)**
488:7

**dropped (2)**
281:17;286:11

**drops (1)**
282:10

**dry (1)**
274:11

**due (17)**
258:8;261:15;
285:5,18;289:24;
295:20;296:8;
304:16;322:12;
340:9;437:12;459:7;
475:22;521:2;
594:24;606:2;613:20

**duly (6)**
257:12;348:6;
365:2;453:16;
524:18;566:21

**duration (5)**
427:23;507:22;
508:1,7,9

**during (101)**
253:4;259:11;
267:10;272:3;
277:23;278:15;
281:14;283:19;
286:11;287:16;
305:23;307:15;

Min U-Script®                          SMITH REPORTING              (9) directors – during
                                      www.smithreporting.net
                                                                    DEF001044

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 379 of 406 PageID #:
10120

EEOC Hearing                                                    Brown v. McDonald, et al.
Volume II                                                              July 21, 2015

308:19;309:10;
312:14;313:11,20;
314:24;315:6;
316:13,20;317:11;
318:6;330:16;335:9;
349:4;351:5;353:7,
12,18;355:2,12,17;
360:2;369:6,14,19;
370:20;397:22;
400:9,10;405:14;
421:1,18;422:17,24;
423:3;424:19;425:4;
431:12,22;436:4;
437:15;438:20;
460:21;462:11;
463:2;464:6;473:7,8;
481:20;484:14;
485:18;489:14,24;
490:21,23;491:2;
525:8;529:13,17;
534:2;535:8,20,23,
25;541:6,10;549:13;
555:24;556:1,2;
561:23;563:8;
564:12;569:8;
587:19;588:1,14;
589:22;590:1,3;
591:2,22;592:7;
593:18;596:7;602:4,
6;605:11;612:20
**duties (18)**
366:12;390:5,11;
411:11;429:10,16;
442:20,21,23;458:8;
467:5;519:19;
520:18,21,24;
521:10;531:14;567:9
**duty (9)**
254:25;345:21;
362:24;406:24;
451:3;522:17;
564:25;566:4;585:9

## E

**earlier (10)**
287:5;324:3;
359:21,22;445:15;
461:21;463:7;496:3;
501:12;516:14
**early (2)**
476:10;488:17
**easier (1)**
403:13
**eastern (1)**
387:15
**edgewise (1)**
462:10

**EEO (7)**
368:3,11;386:9;
414:13;416:14;
417:13;597:6
**EEOC (10)**
265:17;415:18;
416:1,8,24;425:14;
503:20;511:4,11;
571:17
**EEOC's (2)**
416:19;509:4
**effect (1)**
349:16
**effective (1)**
318:24
**effectively (4)**
300:11;318:12;
574:5;598:23
**effects (1)**
427:25
**effort (3)**
520:14;536:4;
574:12
**eight (1)**
280:17
**either (23)**
252:22;268:9;
271:16;273:13;
312:5;330:21;
335:22;354:24;
355:3;358:1;465:1;
503:16;507:4,4;
512:21;530:19;
534:11;536:1,22;
582:9;594:2;596:9;
613:18
**Either/or (1)**
512:25
**Elder (1)**
456:16
**eldercare (1)**
476:16
**election (1)**
406:13
**elections (1)**
259:11
**electronic (1)**
613:22
**element (2)**
586:17;591:17
**elements (2)**
281:2;539:23
**elevated (2)**
491:5,7;604:22,23
**eligibility (3)**
465:21;547:16;
548:2
**eligible (6)**

388:7;547:10;
549:7;550:4;552:10;
554:7
**else (29)**
279:6;306:13;
312:11;346:9;
355:14;367:10;
371:22;374:21;
399:23;409:19,21;
431:19;432:23;
434:24;442:17;
445:9;460:10;
473:17;474:8;
477:17;479:2;
493:17;494:3,5;
516:22;527:7;
558:12;563:23;
597:24
**elsewhere (1)**
435:22
**E-mail (56)**
294:23;295:2;
297:3;341:10;342:6;
344:14;355:25;
356:4;358:6;361:11;
374:3,11;383:4,5,19,
22;384:14;399:6;
407:15;445:23,25;
446:2;459:12;
476:23;477:23;
482:11;485:21;
486:14;526:16,20;
527:15;528:8,9,25;
529:10,19;540:10;
541:1,13;556:5,7,10,
14,17;557:2,9,10,11,
12;558:4,16;562:17;
575:18,20;584:23;
613:24
**e-mails (6)**
358:5;446:8;
449:15,19,22,24
**emotion (1)**
401:23
**emotional (6)**
278:20,22;279:1;
402:2;602:11;605:3
**emotions (1)**
272:5
**employed (2)**
440:13;603:18
**employee (120)**
254:22;257:21;
260:22;287:7;
328:22;330:1;
345:18;351:23;
356:9;357:2;358:7;
361:16;362:21;

365:19;366:25;
367:2;368:11,17;
370:25;372:7;
374:16;375:22;
378:23;386:17;
388:7;389:8,9;
390:10;391:9,18;
403:14;404:25;
406:22;407:21;
409:24;418:1,5;
419:24;420:1;
433:13;436:19;
439:13,14;440:20;
441:14;442:2;
447:25;448:5,9;
449:2;450:25;455:8;
456:12,18,20;457:1,
12;465:19,25;466:2;
467:4;469:25;
470:20;471:5;
473:20;474:4,3,8;
480:5;482:25;483:6;
486:17;488:14,16,
19;489:4,9,11,13,23;
490:3;491:24;
492:11,22;501:24;
507:4;509:24;
514:19,20;516:2,9,
23;517:2;519:18;
522:14;527:5;
542:18,20;548:5;
559:17;560:11;
566:1;568:13;
569:11,14;570:7,17;
572:8,10,17,24;
573:12;574:11;
578:20;585:6,11,20;
592:13,14,17;597:14
**employees (56)**
258:4;299:12;
353:8;356:1,7;
357:22;358:3,15;
367:14,25;368:22;
370:20;402:20;
403:7,8,23;404:7,8;
405:2;445:7;446:15,
18;447:7;448:11;
454:13,23;456:10;
465:15;467:9,13;
471:25;472:4,7,8;
474:11,15;475:24;
476:4,11,15;477:14;
488:8,10;490:19,25;
515:22,23;520:17;
527:12;542:24;
551:6;560:16;
567:17,19;571:6;
574:15

**employee's (11)**
376:4,14;388:2;
467:8;488:13;
500:25;521:11;
560:4;570:4;578:12,
17
**employer (1)**
272:22
**employment (6)**
261:1;365:21;
367:1;368:6;512:18,
23
**Ena (26)**
269:1,10;305:18.
19;349:11;353:2,19,
22;376:22;377:11,
15;378:4;382:10;
400:20;402:9;
450:22;453:8,15;
568:10;576:20,21;
584:24;593:3;596:5,
6,10
**E-N-A (1)**
453:9
**enclosed (1)**
578:19
**encompassed (1)**
382:20
**encompasses (1)**
549:14
**encourage (1)**
291:17
**encouraged (2)**
418:16,17
**end (14)**
312:7;358:1;
359:11;366:7;
412:22;413:8,13;
414:2;477:3;550:18,
23,23;572:23;591:16
**ended (2)**
289:2;550:20
**endocrine (2)**
426:11,21
**ends (2)**
318:18,20
**engaged (1)**
414:19
**enjoy (1)**
512:17
**enjoyment (1)**
512:22
**enough (17)**
329:7,9,13;361:15;
397:6;399:12;
422:11,14;427:22;
432:7,11;478:7;
498:24;516:9;

Min-U-Script®                    SMITH REPORTING              (10) duties - enough
                                  www.smithreporting.net
                                                              DEF001045

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 380 of 406 PageID #: 1014

ELOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

528:16;550:3;553:13

**ensure (1)**
411:18

**entailed (1)**
382:20

**entered (3)**
329:23;333:1;
515:10

**entire (5)**
318:10;359:8;
367:20;491:8;541:6

**entirely (2)**
515:13;593:3

**entirety (1)**
573:23

**entitled (2)**
327:2;605:18

**entitlement (2)**
372:9;606:5

**environment (5)**
279:22;280:9;
611:15;612:5.7

**EOPF (4)**
320:25;323:11,17;
408:11

**epilepsy (2)**
425:17;426:2

**episode (3)**
406:16;475:6,11

**episodic (13)**
405:19;423:8;
425:4,7,16;426:1;
431:12,23;437:15,
18;439:6;445:10;
602:7

**Equal (3)**
365:21;367:1;
368:6

**equipment (1)**
436:7

**erratic (1)**
461:24

**errors (1)**
586:20

**escalated (1)**
461:18

**especially (1)**
262:17

**essence (1)**
463:7

**essential (13)**
400:7,11;438:24;
439:15;441:23;
442:2;443:18,21;
501:8;503:10,13;
512:16;521:16

**Essentially (30)**
252:21,24;253:9,

17;267:15;273:14;
278:13;279:2;280:1;
289:5,12;295:4,10;
296:9;300:14;
302:24;308:5;311:3;
321:2;322:12;323:3;
365:24;368:16;
370:9;381:6;471:17;
478:2;530:10;
565:12;591:16

**establish (3)**
267:21;268:12,14

**establishing (1)**
284:3

**estimate (1)**
567:25

**estimated (1)**
437:24

**et (6)**
476:1,16;483:7;
488:13;491:1;508:21

**etc (1)**
288:19

**evaluating (1)**
584:21

**evaluation (3)**
490:19;538:4;
593:4

**even (25)**
266:1;274:21;
277:5;280:4;291:14,
23;293:5;297:2;
335:17;384:6;394:6,
18;395:20;397:5,14;
435:23;484:19;
485:11,23;492:8;
506:14;520:10;
591:21;602:9;605:13

**evening (1)**
504:6

**event (4)**
393:9;443:22;
445:10;456:9

**events (2)**
337:1;387:18

**eventual (2)**
609:18;611:23

**eventually (2)**
278:23;611:21

**everybody (2)**
278:25;527:24

**everyone (10)**
255:12;346:9;
350:15;432:23;
445:9;451:20;
473:17;581:17;
602:9;605:8

**evidence (32)**

271:17,20;276:18;
300:13,16;311:9;
325:16;327:13,25;
333:21;351:6,17;
352:11;373:22;
386:2;400:5;401:9;
408:20,23;448:23;
465:24;533:15;
549:2;556:5;597:6;
600:1,2,3,4,5,17;
608:15

**evidenced (1)**
611:16

**Evidently (1)**
589:16

**exacerbating (1)**
485:22

**exact (8)**
264:4;301:16;
331:4;349:18;
359:15;540:19;
568:1;602:5

**exactly (20)**
275:3;277:8,12;
278:3;283:17;
310:20;355:11;
357:20;435:1;
437:21;473:4;
495:23;568:12;
571:11;592:6,16;
602:19;605:21;
606:4;610:24

**EXAMINATION (18)**
257:16;302:5;
324:1;344:10;
348:10;355:15;
361:7;365:6;410:13;
453:20;479:6;
518:12;524:22;
537:6;561:1;567:1;
577:16;601:20

**examined (6)**
257:14;348:8;
365:4;453:18;
524:20;566:23

**example (4)**
456:14,16;474:5;
475:16

**examples (2)**
319:1;508:13

**Excellent (1)**
255:6

**except (1)**
474:17

**exceptions (1)**
350:17

**exchange (7)**
445:23;446:1;

447:14;448:24;
449:12;558:16;
559:11

**exchanges (1)**
383:25

**exclude (3)**
261:25;262:1;
405:1

**excluded (3)**
274:21;446:19;
489:6

**excuse (1)**
266:4

**excused (1)**
405:5

**Executive (4)**
261:7;268:10;
288:21;289:25

**exempt (2)**
269:8;294:10

**exemption (2)**
294:14,25

**exercise (3)**
413:1;559:17;
560:5

**exhausted (2)**
321:18;474:15

**Exhibit (63)**
309:1;314:19;
324:17;325:3,10,14,
15;327:15,16,19,20,
23,24;332:6,8;333:1,
6,16,20;373:5,11,21,
25;384:13;385:8,15,
25;386:1,4;389:21;
409:3,3;420:6;
429:14;430:15;
437:10,10,11;443:1,
3;446:7;466:12,22,
23;480:2;481:11;
482:24;483:17;
498:8,9;499:11;
506:25,25;537:4;
547:14,18,19,20,24;
548:19;549:1;
569:19;595:5

**Exhibits (1)**
442:25

**exist (1)**
427:1

**existed (1)**
318:14

**existence (1)**
336:7

**expect (2)**
336:20;517:19

**expectation (1)**
516:18

**expected (2)**
516:22;551:11

**expense (1)**
578:17

**expenses (1)**
578:15

**experience (3)**
427:21;437:15;
553:19

**experiences (4)**
298:4,9;309:18;
337:5

**experiencing (5)**
412:20;413:7;
431:13;563:9;602:6

**explain (29)**
271:8;273:15;
274:18;276:9,17;
278:14;282:14;
296:6;310:25;
319:15;380:19;
392:25;393:4;394:7,
9,12,22;395:1;
405:17;418:12;
459:20;462:5,10;
463:5,11;473:2;
498:24;501:7;550:14

**explained (20)**
295:22;300:13;
352:23;378:25;
380:23;386:12,22;
395:6;404:22;405:1,
6,15;407:10,20;
445:1,7;516:17;
517:5;577:2;605:25

**explaining (10)**
274:8;283:20;
318:17;334:23;
386:17;387:9;
419:17;434:11;
444:21,22

**explains (2)**
430:23;465:24

**explanation (4)**
253:18;376:15;
386:16;500:25

**explicitly (2)**
261:25;602:4

**explore (2)**
284:14;291:12

**expressed (1)**
602:8

**extended (2)**
280:2,24

**extent (5)**
390:8;467:3;
510:10,16;519:17

**extra (2)**

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 381 of 406 PageID #: 1010

EEOC Hearing                                                    Brown v. McDonald, et al.
Volume II                                                              July 21, 2015

402:1;613:2
**extreme (1)**
602:8
**extremely (1)**
485:5
**eye (6)**
460:23;485:2,10;
486:5;605:5,7

---

**F**

**F1 (1)**
411:17
**face (6)**
407:7,8;529:20,21;
592:10;602:22
**face-to-face (2)**
460:6,8
**facilities (1)**
519:6
**facility (3)**
411:18,19;520:12
**facing (4)**
282:19;418:7;
515:25;516:4
**fact (49)**
256:23;261:15;
274:2,13;278:10;
282:19;283:9,18;
284:10,11;288:16,
16;289:24,25;291:4,
10,15;304:3;318:1;
347:11;364:7;
424:25;425:13;
427:5;428:3;435:7;
443:4;445:19;447:6,
22;453:1;474:18;
508:16;510:12;
511:4,8,10;524:4;
538:25;570:15;
574:10;588:3;
599:14;600:23;
608:3;609:9;610:13;
611:12;612:6
**factor (7)**
275:10,15,18;
480:3;481:17;
582:10,12
**factors (1)**
503:3
**failed (10)**
297:21;298:16;
337:17,21,22;338:4;
340:7;341:4;358:20;
529:24
**failing (2)**
529:21;560:12
**failure (3)**

282:6;530:10;
536:18
**fair (11)**
292:20;358:10;
361:18;447:13;
506:18;508:10;
510:6;517:4,10,16;
542:9
**fairly (2)**
258:8;383:15
**fall (2)**
467:20;612:16
**familiar (18)**
259:18;273:23;
293:16;294:17;
299:14;309:7,8,9;
349:23;357:24;
396:1;427:13;
468:11;471:9;
483:14,21;568:21;
569:19
**families (1)**
567:13
**family (7)**
254:15;258:8;
443:12;511:19;
512:2,8;563:9
**far (35)**
260:20;261:13;
262:6,16,22;275:17;
286:8,13;290:11,14;
304:25;310:9;312:4,
12;317:18;318:25;
326:3;332:13;
334:17;336:7;
375:19;383:25;
387:23;396:21;
414:12;434:20,22;
448:10;463:15;
466:19;487:23;
508:6;525:21;527:1;
577:1
**fate (1)**
283:7
**feasible (4)**
330:12;390:9;
467:3;519:18
**February (27)**
270:13;273:6,8;
313:12;341:11,16;
358:1;361:13;393:1;
410:21;411:23;
464:10,11,11;
469:13;471:16;
477:2,25;478:3;
507:24;529:12;
540:11;541:1,3,4;
588:5;598:25

**federal (12)**
254:22;345:18;
362:21;368:7;
450:25;499:17;
522:14;566:1;
567:12;571:1,6,20
**fee (1)**
525:2
**feedback (2)**
505:9;506:3
**feel (9)**
338:11;339:2;
368:23;399:14;
427:21;431:1;
473:25;505:20;556:4
**feeling (1)**
473:13
**felt (8)**
261:20;271:24;
278:7;308:7;343:9;
407:7;486:11;603:9
**few (6)**
259:8;264:10;
337:25;341:20;
350:16;353:1
**fewer (2)**
591:18,19
**field (1)**
456:7
**figure (2)**
431:18;551:16
**file (13)**
276:7;277:6;
331:18;351:6;
352:11;368:12;
379:10,16;408:21;
413:22,24;418:1;
428:19
**filed (5)**
334:5,20;336:12;
472:25;577:20
**files (1)**
265:6
**filing (1)**
264:23
**fill (4)**
264:2;370:3;
399:5;413:9
**filled (3)**
507:3;561:8,12
**filling (1)**
538:22
**fills (1)**
568:8
**final (11)**
297:18;387:14,15;
457:16;479:12,17;
530:15;559:2;

565:21;589:5;607:6
**finalized (1)**
546:1
**finally (6)**
256:22;331:19;
347:10;444:14;
452:25;524:3
**find (14)**
256:8;313:15;
315:2;346:18;
392:16,19;452:6;
523:9;536:10;559:4;
578:1;593:12,15,17
**findings (1)**
470:2
**fine (5)**
255:18;259:15;
401:7;419:22;532:23
**finish (5)**
255:22;285:20;
288:6;346:23;
363:20;394:10,21;
433:4,9;488:4;492:5,
7
**finished (2)**
382:13;433:7
**first (55)**
255:10;257:12;
262:9,10;267:2;
280:15;285:22;
302:7;304:23;305:4,
8,9,12,13;306:18,20;
333:14;342:10;
346:7;348:6;363:10;
365:2;366:17;
370:21;417:22;
424:9;425:22;
447:15,18;448:25;
449:6,6;451:19;
453:9,16;455:19;
476:17;507:21;
518:25;523:3;
524:18;532:9;
540:13,16;542:10,18,
20;563:14;566:21;
573:24;580:16;
599:3;602:1;607:24;
610:9
**first-line (7)**
455:25;458:6;
472:21;481:3,6;
494:21;516:16
**fiscal (1)**
584:14
**Fitzgerald (3)**
369:7;599:4,7
**five (6)**
454:4;567:16;

585:12,13,13,18
**flare (1)**
421:19
**flared (1)**
429:21
**flare-up (8)**
405:20;431:14;
437:24;445:11;
475:13;602:5,7,7
**flare-ups (19)**
405:14;420:16,22;
421:2;422:18,25;
423:3,8,13;425:2,4;
429:15;431:12,23;
437:16,18;439:6;
443:8;474:7
**flat (1)**
273:19
**flexible (1)**
476:3
**flip (1)**
466:16
**floor (1)**
602:16
**Florida (13)**
315:15,19;375:10;
443:17,23;461:12;
467:19;470:19;
501:6,10;594:23;
596:23;597:1
**FMLA (162)**
275:6;276:8;
279:21,23;280:2,23,
24;281:8,10,14;
282:5,10;283:2,4,12,
19;284:6,12,21,23;
285:5,9;286:12;
287:6,11,17;288:1,4,
17;289:20,22;290:4;
295:23;308:4,7;
317:20,24;320:8;
321:14;322:12,18;
326:13,15,20,22,24;
332:19;335:20;
336:11;360:8,13,20,
25;371:4,8,19;372:1,
4,7,8;374:4;379:10,
16;380:8,10,21;
381:1,2;382:17,22;
386:21;387:1;
399:19;404:25;
405:1,3,10,12,20,23;
407:2;420:8;423:16;
424:25;432:10;
437:11;438:17;
440:1,22,25;441:2,8;
444:16,20,25;445:11,
24;446:13,15;447:9;

Case 1:20-cv-01154-JPH-MJD Document 39-5 Filed 07/02/21 Page 382 of 406 PageID #: 1010

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

448:6,8;449:2;
472:16,24;473:11,
23;474:4,10,12,16,
18,20,24;475:4,7,18,
25;483:14,21;484:2;
487:13,20,21;499:8;
500:8;514:14;
515:19;516:2,5;
517:3;518:6;530:20;
536:14;541:21;
542:1,5,12,19,21,25;
543:7,11;546:25;
552:18;553:4;
554:13,17,19;559:3,
5,6,18;560:6;582:9,
18,25;583:4,8,9;
593:23,23

**focused (1)**
563:18
**Focusing (2)**
300:18;501:13
**follow (16)**
261:10,21;274:7;
294:14;298:16;
299:3;303:2;327:9;
360:12;381:6;427:6;
448:16;506:1;
509:13;558:18;
569:22
**followed (8)**
267:18;294:18;
299:19,23;300:2;
407:14;571:20;599:2
**following (8)**
279:10,13;293:22;
309:18;354:6;
476:20;570:6;607:1
**follows (7)**
257:15;348:9;
365:5;453:19;
474:17;524:21;
566:24
**follow-up (10)**
282:16;337:20;
343:24;344:3,5;
361:5;382:15;
398:15;413:25;422:1
**force (1)**
476:2
**forecast (1)**
406:7
**forgive (1)**
277:7
**form (51)**
263:24;264:2,20;
286:15;315:21;
334:19;343:12;
370:7,12,14;378:1;

380:8,10;397:18;
398:7,19;399:4;
418:6,12,12,14,20,
21;419:8,11,18,25;
420:8;424:25;
431:21;436:20;
457:1;482:15;507:1,
21;508:11;511:1,13;
512:13;515:10;
535:19;556:15;
557:21;569:1,4;
573:5;578:9,19,25;
579:4;611:9
**formal (9)**
360:7;414:22,25;
415:1,7,22,25;416:8,
10
**format (1)**
420:3
**formed (1)**
337:6
**forms (7)**
263:24;370:3,5,22;
532:20,22;546:22
**formula (2)**
553:16,18
**forth (6)**
265:22;324:23;
329:17;354:14;
480:17;509:16
**forward (6)**
302:18;456:19;
556:5,6;557:15;
581:1
**forwarded (2)**
482:14;540:22
**found (2)**
549:12,16
**four (11)**
253:4;280:13,14,
15,16;285:15,15;
303:8;332:15;386:5;
557:3
**frame (13)**
321:7;322:11;
323:21;359:20;
476:11;489:25;
490:4,23;540:22,24;
543:25;546:3;558:5
**free (6)**
344:22;362:4;
450:11;521:22;
564:1;601:10
**frequent (2)**
502:21;503:5
**frequently (6)**
354:10;356:3;
357:21;437:17;504:7

**friend (1)**
340:13
**front (8)**
259:23;359:15;
428:23;429:17,18;
437:22;540:6;552:11
**frontline (1)**
350:24
**frustrated (2)**
274:2;462:8
**full (9)**
271:15;280:17;
295:14;425:22;
476:19,21;488:22;
489:1;490:10
**fully (16)**
538:9,12,15,18;
539:4,22;549:13,16;
550:3,6,19;551:3,23;
561:17,24;588:14
**function (8)**
312:3;426:21;
440:21;441:4;442:6;
503:21,24;504:9
**functional (1)**
427:24
**functioning (3)**
439:19,21,23
**functions (26)**
400:7,12;420:19,
24;421:4,4,18,24;
422:2,5,7;423:3;
435:5;438:24;
439:16;441:23;
442:3;501:8;503:10,
13,16,17;511:7;
512:16;521:15,16
**funded (1)**
520:11
**funeral (1)**
254:18
**funnel (2)**
378:12;381:22
**funneling (1)**
390:18
**further (18)**
301:25;337:9;
344:19;356:25;
361:2;362:1;388:11;
421:12;450:5,8;
464:1;518:8;536:25;
560:22;561:19;
601:5,8;613:4
**future (5)**
406:7;463:19;
475:10;494:20;
495:13
**FYI (1)**

356:23

## G

**gain (1)**
433:25
**Gantt (4)**
383:1;386:9,12;
387:9
**gather (2)**
376:24;470:1
**gathered (1)**
458:20
**gave (21)**
286:22;322:1,24;
323:3;343:12;
387:18;403:8;
467:23;475:24;
476:11;528:13;
532:19,20,22;
535:23;537:9;539:2;
544:3,16;555:25;
556:2
**general (10)**
367:4;388:1;
402:25;487:24;
499:3;502:7,7,8;
599:20;600:2
**generalities (1)**
405:8
**generally (5)**
285:3;383:18;
456:4;515:21;536:7
**Generic (1)**
298:9
**Gentry (33)**
252:5;254:13,14,
23;257:6,11,18;
279:15;282:3;
284:20;290:22;
292:13;298:3;302:7;
313:3;333:23;334:1;
335:7;392:8;395:5,6,
7,9;432:20;435:13;
449:3,13;478:20,20,
23;533:10;536:23;
555:18
**G-E-N-T-R-Y (1)**
257:7
**gets (3)**
460:24;517:17;
584:12
**GINA (1)**
507:6
**given (34)**
256:1;279:20,24;
286:16;292:18;
298:25;299:15;

309:13;332:2;
337:15;349:5;403:7;
412:19;413:6;
442:11;446:24;
447:22;451:24;
457:1;506:21;517:6,
7,20;539:18;549:14;
551:6,15;585:25;
589:8;600:9;608:16,
18;612:2,2
**gives (3)**
321:7;357:16;
508:13
**giving (7)**
274:7;310:13;
503:21;505:18;
506:9;540:25;596:4
**glad (1)**
417:19
**goal (8)**
439:14;440:5,25;
441:13;535:10;
562:1;587:11,13
**goals (5)**
429:3;435:18;
490:6,14;561:23
**goes (18)**
267:7;275:10;
286:13;314:8,9;
332:13;356:24;
370:7;385:17;389:5;
443:23;469:15;
507:9;519:3;568:14;
580:9;592:17;612:4
**Good (15)**
254:13;257:18;
261:4;345:13;
362:18;365:8,9;
383:21;434:2;
456:20;522:10;
525:18;540:3;
565:24;601:11
**govern (2)**
368:8;371:19
**government (2)**
571:1,20
**governs (1)**
374:24
**Grace (1)**
455:24
**grade (10)**
457:3;465:22;
488:13;502:1;551:4,
8,13,14,15;578:13
**grandmother (1)**
461:11
**grant (2)**
580:5;611:20

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 383 of 406 PageID #: 1015

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

**granted (10)**
308:13;376:12;
377:7;378:15;
381:18;461:10;
577:9,11;611:8,21

**granting (1)**
611:24

**gray (4)**
260:18;261:14,23,
24

**Great (12)**
256:6;257:3;
345:11;364:16;
403:8;450:24;
451:12;453:11;
507:16;522:25;
524:13;614:6

**grid (1)**
588:18

**grievance (3)**
289:2;297:15;
320:16

**grievances (2)**
287:9;288:14

**grieved (2)**
288:10;297:10

**grieving (1)**
611:6

**groove (1)**
323:1

**GS (3)**
551:13,14,15

**GS-10 (6)**
458:17;551:3;
552:2,7,15,24

**GS-9 (2)**
458:17;551:2

**guess (28)**
286:5;291:11;
304:2;311:4;317:12;
319:2;337:19;339:6;
359:2;366:15;
385:13,14;403:13;
425:22;437:10,21;
460:1;473:24;
485:20;490:12;
530:15;550:22;
570:22;573:3;582:3;
586:23;590:4;598:12

**guidance (40)**
327:2,5;350:12;
356:4;357:16,22;
381:19;383:2;
390:21;393:14;
446:14,16,23;447:2,
6,11,20;448:1,7,17,
19;456:6,8;475:23;
493:7;515:23;516:3,

8,10;517:3,5,7,9,11,
12,18;518:4;569:21;
574:3;580:17

**guide (1)**
593:1,2

**guideline (1)**
492:9

**guidelines (2)**
462:23;509:13

**guiding (1)**
311:12

**guys (1)**
459:18

**Gwendolyn (1)**
383:1

## H

**half (9)**
280:19;285:13;
299:12;364:23;
488:21;592:5,7,9,11

**hall (1)**
575:19

**Hamilton (1)**
596:10

**hand (11)**
308:25;373:24;
374:15;386:4;
389:20;409:2;
418:20,25;466:11;
482:23;569:18

**handbook (17)**
299:24;328:16;
330:10;374:24;
411:5;414:14,19;
415:15;416:21;
418:10;426:19;
439:9;440:14;442:9;
509:9,17,18

**handed (5)**
370:15;398:7;
418:23;430:16;
565:12

**handing (1)**
361:22

**handle (5)**
385:15,20;412:12,
19;413:6

**handled (2)**
335:13;468:18

**handles (1)**
285:3

**hands (1)**
460:24

**Hang (1)**
554:25

**happen (4)**

462:25;502:20;
504:2,7

**happened (2)**
282:2;505:15

**happening (5)**
436:23;437:7;
438:13;504:1;505:24

**harassment (9)**
266:21;267:3,10,
15;368:15,15;
609:21;610:19;611:9

**hard (8)**
280:7,9;281:4,5;
379:22;475:10;
476:1;505:10

**hardship (158)**
260:17;261:13;
262:9,10;263:7,8;
270:22,25;275:11,
16;284:8;287:24;
290:20;297:25;
300:5;302:9,18;
303:4,11,13,22;
304:16,18;324:3,5,
19;325:19,24;326:3,
8,11,19;327:9,9;
330:17;331:1;
335:22;336:13;
342:16;349:2;
359:23;360:1;375:9,
23;376:16;377:5,8,
24;378:8,15,19,23;
379:3,5;380:11,22;
381:3,7,18;382:2,9,
18;383:2;386:13,16,
18,22;387:8,19,25;
388:3,4;456:2,6,10,
11;457:6,25;458:6;
459:5,7;461:9,17;
462:1,3,6,19;463:8,
13;464:3;478:24;
479:9,13;480:21;
481:21,21;482:1,3,
10,13,25;483:19;
484:3,7;491:17,18,
22;493:3,12,18;
495:6,18;496:11,19;
497:5;534:3;536:2;
567:22;568:4,14,24;
569:9,22,23;570:4;
572:11,13,20;
573:25;574:15;
576:7;577:7,9,20;
578:4,8,8;580:5;
581:16;582:7;583:1,
5,18;584:15;587:5;
590:16;593:5,21;
594:11,16,20;595:2;

596:24;597:18,19;
600:18;604:25;
605:23

**hardships (1)**
349:5

**Hartford (1)**
454:9

**head (9)**
256:3;273:9;
306:17;357:19;
358:5;370:6;408:12;
451:25;568:1

**headquarters (3)**
356:3,6;357:15

**health (9)**
258:9;261:4,19;
483:4,6,10,25;
520:18;533:14

**hear (11)**
255:12,14,15,17;
346:9,9;394:5;
433:24;451:20;
534:18;603:24

**heard (6)**
254:17;434:6,21;
532:10;603:14;
607:11

**hearing (22)**
252:2;253:3,7,15;
266:17;291:21,24;
298:11;345:6,17;
362:13,20;384:1;
450:19;451:9;
504:22;522:6,13;
565:19;566:8;
601:15;614:8

**hearsay (1)**
379:11

**heart (1)**
329:20

**held (12)**
282:21;287:15,23;
290:4;348:18;
365:13;402:13;
454:2;564:7;567:7;
576:8;613:13

**Hellu (3)**
254:13;350:9;
354:11

**help (20)**
259:6;261:10,11;
262:6;263:21;265:2;
275:21;337:4;367:3;
395:18;397:25;
399:1;430:2;432:4;
463:23;512:7,21;
602:20,25;603:24

**helped (2)**

438:12;505:22

**helpful (4)**
276:22;311:11;
442:1;443:13

**helping (1)**
262:4

**here's (1)**
485:20

**herself (1)**
379:17

**hey (3)**
274:9;369:20;
398:16

**hide (2)**
369:23;602:22

**hidradenitis (3)**
430:23;502:13;
512:3

**high (1)**
553:13

**higher (1)**
551:13

**highlighted (5)**
383:20;384:21,21;
419:14,17

**highlights (2)**
341:16;419:19

**hindered (2)**
253:16;283:10

**hired (1)**
268:16

**historic (1)**
337:1

**history (1)**
262:20

**Hold (16)**
290:25;314:20;
315:24,25,25;333:7;
366:8;417:2;421:10;
454:10;468:20;
469:24;492:4;
516:23;517:25;
547:17

**holding (4)**
287:15;457:3,4;
581:9

**Honestly (5)**
259:3,13;296:21;
305:2,13

**honesty (7)**
271:14;274:20;
304:9,14;309:16;
310:19;324:14

**Honor (44)**
254:9;262:21;
266:15;271:24;
272:2;273:1;277:10,
15;281:24;282:4;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 384 of 406 PageID #: 1049

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

283:16;287:12;
290:16;292:2,25;
298:9;314:9;316:5,
14;327:12;332:21;
333:11,17;336:5;
345:10;348:4;
364:25;426:25;
450:8;498:9;513:6,9;
547:12;558:24;
571:22;581:22;
598:6;600:16;601:8;
604:19;609:11;
613:8;614:3,5
**hope (1)**
338:6
**hoped (1)**
430:4
**hopefully (1)**
308:8
**hoping (1)**
436:4
**Hospital (1)**
416:12
**hostile (4)**
274:1;611:15;
612:4,6
**hostility (3)**
278:6;318:20;
336:22
**hour (5)**
364:22;430:11;
453:13;566:18;
592:16
**hours (91)**
280:13,14,15,16,
17,20;282:11,15;
285:15,15;296:16,
24;297:22;335:20;
337:17,22;350:12,14,
20;352:1,5;355:24;
356:14;357:4;
360:13,20;372:7,9;
402:21;403:9,16;
404:4;405:19,21;
445:6;471:10;472:7,
13;473:5,6,8,21;
474:5,13,19,21;
475:18;476:14,17,19,
22;478:4;489:11;
504:5,6;516:25;
525:25;526:25;
527:5,13;528:4,5,11;
529:15;540:14,18;
541:12,17,21;543:1,
19,23;544:3;545:17,
25;554:13;559:12;
560:13,18;585:11;
592:9,11,12,13,14,

15,15,21,21;606:17,
24
**HR (41)**
265:1,11,12;266:2;
269:14,18;301:23;
305:6,11;306:25;
320:12;371:21;
408:19;415:2;458:4,
21;459:1;461:21;
464:19;469:15;
470:25;482:5;483:5;
495:20,23,25;496:1;
513:15;532:18;
533:3;536:9;546:17;
556:6;558:2,4;
568:10,15;576:2,21;
597:12;607:15
**huddle (1)**
526:14,18;528:7
**huddles (3)**
529:18,19;540:20
**Huff (4)**
252:8,9;444:3,12
**Huff's (3)**
502:11;507:13,24
**Human (18)**
268:16;310:9;
345:7;365:11,20;
366:10;368:25;
369:18;371:17;
372:4;376:9;378:9,
22;408:19;409:12;
410:1;462:15;536:8
**hundred (6)**
505:18;506:9,15;
567:16;585:15;607:9
**hurt (6)**
278:18;280:1;
553:12,15,23;554:3
**husband (2)**
413:14;461:13
**hypothetically (1)**
591:23

### I

**idea (7)**
271:24;275:20;
396:5;402:14;403:8;
461:4;504:14
**ideas (1)**
318:23
**identification (6)**
325:16;327:25;
333:21;373:22;
386:2;549:2
**identified (11)**
315:19;330:17;

339:24;369:7;
381:24;391:12;
399:18,22;424:12;
442:19;511:9
**identifies (5)**
388:5;390:3;
405:3;428:23;429:9
**identify (23)**
299:22;334:12;
368:9,10,16,19;
369:3;379:2;388:21;
391:9;392:13;
395:12;397:13,16;
399:25;404:6;
408:13;424:18,20;
498:7;521:13;
533:17;612:15
**identifying (3)**
373:2;397:23;
428:7
**ill (2)**
413:13;461:11
**illness (7)**
326:7,17;483:1,3;
500:13;521:2,11
**immediate (3)**
351:4;375:9;
482:13
**impact (9)**
286:7;288:17;
311:7;499:3;501:7;
503:12,15;505:4,25
**impacted (7)**
421:5,25;422:3,6,
8;552:22;559:6
**impacting (2)**
502:25;503:10
**impacts (1)**
286:4
**impairment (14)**
340:5;426:3,9,10;
507:23;508:2,7,9,12;
509:11;510:8,11,16,
24
**impairments (3)**
425:15,25;426:8
**implemented (6)**
269:6,12;294:11;
321:9;572:1;573:10
**implied (1)**
318:2
**imply (1)**
364:8
**importance (1)**
574:4
**important (6)**
367:14;396:8;
438:19;506:2;

515:22;516:2
**imposing (1)**
403:17
**impossible (1)**
285:16
**impression (5)**
277:13,15,23;
278:1;279:7
**impressions (1)**
272:2
**Improvement (13)**
286:14,18;321:9;
322:6,8;323:15;
328:9;480:6,9;
491:25;492:12,24;
550:3
**inactive (1)**
400:9
**inappropriate (3)**
311:18,22;485:16
**incapacitated (1)**
406:24
**incident (3)**
297:24;359:4;
541:15
**incidents (1)**
353:1
**include (21)**
280:4;328:18;
334:8;375:2;380:20;
425:15,25;426:9;
428:21;429:11;
439:23;440:18;
441:14;497:18;
502:1;509:4;578:19;
590:18,20;598:7,7
**included (2)**
446:17;509:14
**includes (6)**
426:20;454:16;
456:13;465:19;
508:24;510:3
**including (2)**
386:23;504:3
**incorrect (8)**
342:5,25;344:13,
14;416:4;428:6;
536:23;582:15
**increase (3)**
551:4,12,25
**increased (1)**
551:17
**increases (1)**
551:10
**increments (1)**
592:16
**incumbent (2)**
330:1,8

**incurred (1)**
578:16
**indeed (1)**
413:9
**indefinitely (1)**
443:5
**independent (3)**
609:21;610:20;
611:9
**in-depth (1)**
368:5
**Indiana (5)**
365:18;454:25;
455:2,6;567:14
**Indianapolis (25)**
253:7,11;312:16;
313:14,23;314:12;
315:1,8;348:19;
355:19;359:24;
365:12;366:4;
439:22;440:12,15,
20;453:23;454:4;
467:19;519:13,24;
520:2,6;567:5
**indicate (26)**
256:2,25;276:21;
293:12;311:24;
312:14;324:18;
347:12;380:1;
423:16;443:7;452.
453:2;491:12;
514:20;520:10;
524:5;531:12;
534:11;535:9;538:8,
12,15,18;576:14;
578:25
**indicated (23)**
253:18;282:12;
284:20;312:1;
313:11;405:14;
410:17;424:25;
483:8;510:5;512:19;
513:3;520:23:
526:24;534:2;535:2,
7;561:4;575:2;582:4;
583:20;609:24;
612:21
**indicates (10)**
326:7;328:3;420:1,
14;421:1;439:1;
510:13;521:8;
535:19;570:20
**indicating (4)**
394:25;405:12;
557:23;578:20
**individual (23)**
275:20,22;287:11;
296:15;329:16;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 385 of 406 PageID #:
1019
PMOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

339:25;393:7;440:6;
446:13;483:24;
487:20;488:21;
489:1,18;511:14;
512:14;553:12,16;
574:25;578:7;585:2;
586:8;599:2
**individuals (18)**
265:22;289:20;
300:20;338:4;339:4,
7,10,22;354:11;
447:9;493:23;
570:22;575:3;582:2,
5,9;593:21;601:24
**individual's (1)**
488:2
**inference (2)**
564:20,23
**inflammatory (1)**
508:4
**inform (3)**
357:3;438:12;
445:4
**information (142)**
265:25;276:2,13,
14;277:6;291:22;
314:14;329:16;
332:10;334:13;
342:7;358:9;369:24;
375:2;376:7,13,15,
19,25;377:12;
378:13;380:24;
381:4;383:8,9,13,16;
385:19;386:11,24;
387:11,12,21,24;
388:1,6,10;390:18;
392:24;394:1;
396:10;397:6,24;
398:9,17,20;399:12;
401:25;402:8;403:4;
404:15;405:3;407:6,
16;408:22;409:4,10,
11,14;418:18;
419:16,24;420:2;
422:11,14;424:13,
18;427:22;431:2,20;
433:25;435:4;436:2,
18,23;442:16;
448:12;449:1,21;
457:2,13,14;458:20,
23;460:3;461:3;
465:12;466:1;468:4,
7;469:15,22;470:1,3,
6;477:12;482:2,3;
483:2;488:19;
492:14,20;497:13,18,
20;498:2;500:17;
503:1,22;513:25;

514:4,6,11,17;515:5,
14,17;518:20;
526:12;532:25;
536:5,8,10;546:23;
556:8,23;557:16,24;
562:15;568:7;569:8,
12,13,16;573:17;
581:12;603:3;
607:15;608:2,4,18;
610:10
**informed (9)**
252:8;320:8;359:2,
4;445:15,19,22;
495:5;561:9
**informing (2)**
356:1;510:15
**inhibits (1)**
310:18
**initial (6)**
264:5;300:9;
322:8;335:17;
476:17;545:21
**initially (3)**
331:5;354:2;
378:20
**initiate (4)**
264:25;329:8,10,
13
**initiated (2)**
386:20;389:6
**injuries (1)**
467:14
**injury (1)**
521:10
**input (1)**
533:5
**inquire (4)**
448:12;480:25;
482:6;543:3
**inquired (2)**
314:11;481:2
**inquiring (1)**
541:20
**inquiry (5)**
448:6;481:25;
506:19,20;543:10
**insisted (4)**
380:12,25;386:21;
387:1
**instance (7)**
299:4;319:5,7;
384:19;458:12;
526:22;568:11
**instancees (1)**
299:5
**instead (2)**
302:22;418:24
**instruct (4)**

347:6;364:2;
452:17;604:13
**instructed (2)**
358:14;369:19
**instructing (1)**
283:23
**instruction (2)**
351:25;406:12
**instructions (5)**
255:9;346:6;
363:9;451:18;523:2
**insufficient (1)**
562:20
**intend (1)**
562:18
**intent (2)**
573:23;574:13
**intentional (1)**
605:2
**interacting (1)**
304:3
**interactions (1)**
525:22
**interactive (27)**
298:23;300:10,18;
307:25;313:20;
329:25;330:4;
391:17;396:7;
397:22;400:10;
414:1;424:4,20;
432:9;433:12;435:2;
436:4;438:6;469:23,
24;470:6;509:25;
514:2,8,19;533:9
**interested (2)**
395:1;397:4
**interfered (2)**
559:16;560:4
**interim (28)**
274:16;307:16,18,
22;312:5,12;317:12,
14,18,21;319:1,2,11,
16;343:5,7,9;396:16,
18;533:21;534:12,
13,14,19,22,24;
535:3,5
**intermittent (6)**
280:6,23;425:7;
474:4;552:19,22
**intermittently (1)**
280:3
**intern (3)**
365:21;416:11;
417:13
**internal (1)**
355:10
**interpret (1)**
573:22

**interpreted (3)**
570:21;572:7;
602:23
**interpreting (1)**
573:18
**interrogating (2)**
309:19;310:12
**interrogation (3)**
279:5;300:12;
309:21
**interrogative (1)**
310:13
**interrupted (2)**
394:8;423:2
**interrupting (1)**
394:18
**intervention (2)**
502:22;503:7
**into (41)**
253:24;275:10,15;
280:18;281:4;289:9;
320:25;322:24;
323:1,11;325:16;
327:13,25;329:23;
333:21;349:15;
353:20;356:25;
372:4;373:22;386:2;
393:23;415:4;
438:18;456:25;
475:10;485:12;
487:9;490:7;514:24;
521:2;549:2;563:7;
570:10;577:5;583:9,
14;585:1;586:5;
590:15;592:17
**invitation (1)**
387:6
**invited (2)**
387:3;467:23
**invoke (3)**
474:10,19;475:4
**invoked (1)**
476:25
**invoking (1)**
474:12
**involuntary (1)**
465:16
**involved (10)**
302:8;303:20,22;
304:4;372:14;
380:22;456:1;
569:25;592:9;601:24
**involvement (4)**
318:3;382:12;
388:18,20
**irrelevant (1)**
610:9
**issue (53)**

252:7;254:4,8;
266:12;268:4;269:8;
274:22,25;282:5,20,
20;283:8,8;284:7;
285:3;288:10,14,15,
23;289:1,12;291:3,
25;293:5;306:5;
328:3,6;329:11;
332:3;360:7;368:20;
370:1;447:15,20;
449:6;459:15;
475:17;478:16;
502:24;515:20;
517:18;537:9;
541:24;544:24;
564:10;565:9;
574:18;603:14;
608:25;609:20;
610:8;611:5,24
**issued (24)**
293:8,12;294:8;
338:2;339:14,18,20;
349:25;352:20;
400:17;408:14;
456:9;468:13;
470:10;478:10;
530:16;537:15;
543:17,21;544:19,23,
25;545:15;606:18
**issues (29)**
258:9;259:1,10,10;
262:14,16;266:6;
290:2;295:7;368:3,
17;377:9,10;381:17,
22;418:6;531:13;
532:10;546:13;
563:7,9,19;570:5;
577:3;578:1;610:16,
17;611:14;612:16
**issuing (1)**
353:23
**Item (1)**
480:4
**items (3)**
489:12;493:18;
494:16

**J**

**James (5)**
261:7;266:11;
268:9;524:11,17
**J-A-M-E-S (1)**
524:12
**Jane (1)**
302:25
**January (38)**
259:6;263:6;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 386 of 406 PageID #:
1020

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

326:12;357:12,18;
366:6,7;375:16;
410:18,18,19;
459:13;476:23;
477:9;478:3;495:8;
529:9;532:7;547:15,
22;548:1;550:1,16,
18,23,25;555:3;
556:20;568:22;
584:18,19,20,24;
587:17;589:18,19;
590:23;598:24
**Jean (3)**
261:8;268:10;
288:21
**Jesse (1)**
338:13
**Jessica (5)**
338:14;339:23;
341:3,3,6
**Jim (30)**
270:4,11,19,20;
273:11,22;274:25;
279:10;305:21;
306:8,12,21;318:13,
22;341:10,13;
350:25;351:8;354:3;
361:11;377:11;
379:12;398:22;
455:22;494:23;
495:3,9;522:8;548:1,
4
**Jimmy (6)**
358:24;378:21;
398:24;404:17;
444:22;589:15
**job (34)**
287:4;288:7;
300:22;311:8;
428:12,15,20,21;
429:5,8,16,18,25;
431:6;435:5,5;
438:22;441:21,22;
461:7;499:4;501:8;
502:25;503:2,11,14;
504:14;505:5,7,14;
512:15,17,22;521:16
**job-related (1)**
467:14
**John (2)**
268:17,18
**joint (7)**
316:8,17,20,21,23;
317:3,6
**Jones (5)**
338:7,9;339:22;
340:4,4
**JUDGE (237)**

252:1;254:6,11,17,
20,24;255:6,17,25;
256:6,11,15,22;
257:3,8;262:23;
263:3;266:25;
267:12,20;272:8;
277:25;282:22;
283:21;288:11;
290:25;292:3,8;
293:3;298:12,25;
301:7;302:2,4;310:2;
312:22;313:8;
314:20;315:24;
316:6,19;323:24;
325:2,5,9,13;327:14,
22;333:3,7,13,18;
337:11;338:3,8,15,
19,22;339:5,11,17,
21;340:3,15,22;
341:2,8,14,19,23;
342:3,15,19;343:1,4,
11,19,23;344:4,9,20;
345:2,5,11,15,16,20,
25;346:4,12,16,21;
347:2,10,16,20,24;
361:4;362:2,9,12,18,
19,23;363:3,7,13,18,
24;364:6,12,16,21;
373:7,10,12,17;
379:13,21;382:5;
384:5,16;385:2,7,13,
23,24;409:6,9;410:9;
417:3,6;421:10;
427:2,5,12,18;
430:11;433:8;
436:11;450:9,15,18,
24;451:2,7,8,12,16,
23;452:4,9,13,20,25;
453:6,11,14;466:21,
24;479:3,4;492:4;
497:1;498:5;507:17;
513:7;518:10,11;
521:20;522:2,5,11,
12,16,21,25;523:7,
12,17,21;524:3,9,13,
16;531:2,5;537:2;
547:17,23;548:9,15,
20,23;558:22;
559:23;560:24;
563:24;564:5,9;
565:7,15,18,25;
566:3,7,12,16;571:9,
23;572:4;577:14;
588:24;589:3;
595:17,20;598:13;
600:23;601:6,9,14;
604:5,9,17;607:20;
608:7,21;609:16;

610:15;611:1,19;
612:8;613:6,10,15;
614:4,6
**judgment (1)**
413:1
**judicial (2)**
426:25;427:3
**Julie (2)**
265:23;410:23
**jump (5)**
265:2;280:10;
281:4;318:12,13
**June (3)**
356:23;410:18;
541:4

**K**

**keep (2)**
311:8;336:9
**Kelly (6)**
338:7,8;339:22;
340:4,4,13
**Kelly's (1)**
340:9
**kept (5)**
276:4;434:14;
435:16;444:23;
491:16
**keyboard (2)**
319:7,14
**keys (1)**
265:9
**kicked (1)**
476:18
**Kimberly (1)**
455:22
**kind (28)**
260:18,24;261:10;
262:13;265:2,21;
273:14;278:5,6,25;
284:6;357:24;
378:12;379:21;
388:2;397:24;
403:17;455:11;
460:12;466:18;
475:25;488:1;489:7;
514:3;533:25;
536:20;539:9;591:22
**Kinder (17)**
320:14;345:9,10,
13,19;347:19;348:5,
12;355:17;408:15,
16;471:13;478:14;
530:7,16;544:13;
545:9
**K-I-N-D-E-R (1)**
347:23

**Kirk (1)**
265:24
**Kirksey (1)**
603:21
**knew (11)**
262:14;350:9,10;
392:5;397:10;
399:14;402:25;
433:24;496:8;
546:18;552:17
**knowledge (23)**
263:19;296:11;
327:7;350:19;353:7;
380:7;392:5;402:4,
12,25;415:9;427:21;
468:21;484:25;
527:24;528:1;573:2;
574:9;575:13,23;
576:9;587:23;599:20
**knowledgeable (2)**
313:4;544:5
**known (4)**
253:4,6,12;505:13
**knows (2)**
308:2;311:15

**L**

**labor (1)**
365:19
**lack (5)**
266:7;268:4;
320:4;387:7;400:4
**laid (1)**
352:4
**Lake (1)**
348:14
**language (5)**
256:2;383:21;
452:1;485:10;504:24
**last (17)**
264:10;280:16;
297:5;301:9;323:16;
338:15;339:23;
367:19;425:21;
442:10,14;453:9;
463:21;539:25;
566:15;594:14;
603:20
**lasted (1)**
563:12
**Lastly (1)**
610:3
**late (2)**
542:16;560:17
**later (8)**
253:2;268:18;
295:12;395:10;

398:9;557:3;594:21;
596:25
**Laurie (1)**
265:24
**law (3)**
427:6;434:10;
503:14
**laws (3)**
260:7;368:7;
371:18
**lead (2)**
432:22;433:12
**leadership (5)**
262:16;386:15;
457:22;492:14;
567:19
**leading (1)**
315:23
**leads (1)**
442:16
**leaning (1)**
310:7
**leap (1)**
503:8
**learned (1)**
309:16
**least (12)**
253:4;259:17;
284:8;291:13;
374:16;385:2;
422:13;477:3;
512:21;539:6;550:3;
582:5
**leave (139)**
280:6;281:22;
283:2,4;284:6,23;
286:22;287:3;292:7;
317:20;320:9,9,9;
321:16,16,17,18,19,
21;322:13;354:17,
19;355:1,5,11;
358:11,16;371:25;
372:2,11,15;373:18;
374:5,9,17,20,25;
399:19,20;401:1;
405:23;406:10,19,
25;407:2,2,3;422:18,
25;423:4,8,12,16;
424:1,2;431:16,23;
432:6,11;437:19,20;
438:1,5,7,10,16,17;
439:1,5;440:1,22,25;
441:2,8,12,16,21;
442:13;445:11,13;
447:9;448:7,8;449:~
456:24;457:13;
458:9;461:6;474:8,
14,15,16,17;475:2;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 387 of 406 PageID #: 10220

RPOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

480:6;483:24;488:2,
6,17;489:7;490:9;
491:1;492:19;518:6;
530:20,20;536:13,
14;541:22;542:2,5;
552:12,18,22;553:5,
20;569:11,16;570:8,
14,16;572:18;
577:23;578:1;580:8,
21;581:1,17;582:13,
17,22;583:2,7,10,13,
16,19;585:2;593:24
**leaving (1)**
　252:25
**led (1)**
　499:5
**Lee (1)**
　288:24
**leeway (1)**
　267:21
**left (7)**
　280:8;292:9;
　301:21;513:6;
　558:23;563:16;
　602:13
**legal (3)**
　254:5;264:22;
　265:3
**length (2)**
　578:13,14
**less (4)**
　267:14;300:12;
　387:3;440:22
**letter (27)**
　431:3;444:4;
　467:22;498:3,14,17,
　22,23;500:16,20;
　502:11;504:23,25;
　506:21;507:13,24;
　508:15;509:10;
　510:7;511:10;
　512:20;513:1;
　514:12,25;568:23;
　579:24;584:24
**letting (2)**
　301:8;409:7
**level (11)**
　289:18,19;290:2;
　457:18,19;468:17;
　472:6;502:3;552:23;
　572:16;574:2
**levels (4)**
　554:24;555:1,3,7
**liability (2)**
　291:7,17
**liberal (2)**
　320:9;400:25
**life (8)**

427:10;503:16;
508:23;510:3,25;
511:8,9;563:10
**light (5)**
　257:19;277:17;
　300:16;548:6,7
**likely (8)**
　267:14;290:9;
　306:23;381:18;
　463:4;464:18;519:7;
　530:21
**Lima (49)**
　269:2,10,14,21;
　270:3,14,18,21;
　271:2,21,24;272:3,
　13,17,21;305:18;
　349:11;351:10;
　353:22;376:22;
　377:11,15;378:4;
　382:10;400:20;
　402:9;450:22,23;
　451:1,6,11;453:8,15,
　22;479:8;568:10;
　576:20,21;584:4,24;
　596:5,6,12;604:21;
　605:6,16,22,25;606:4
**L-I-M-A (1)**
　453:10
**Lima's (3)**
　272:5;593:4;
　605:10
**limit (1)**
　504:5
**limitation (16)**
　308:20;342:21,24;
　397:16;399:22;
　423:24;424:17,19,21,
　22,23;425:1,2;
　427:24;514:21,22
**limitations (38)**
　308:2;310:23;
　311:4,7,14,20,23,24;
　312:25;392:13,14,
　17;395:13,16,22,23;
　396:3,12,14,19;
　397:7,14;399:15;
　423:9;429:24;431:4,
　9;432:2;442:19,22;
　467:8;501:1;504:13;
　505:13;508:20;
　521:14;534:7,8
**limited (7)**
　420:24;439:12,22;
　440:11,15;510:21;
　512:11
**limits (7)**
　425:9;508:12;
　509:12;510:8,11,16,

23
**line (2)**
　304:2;480:23
**lines (3)**
　271:3;367:6;
　407:11
**linked (2)**
　283:1,2
**list (7)**
　547:18,20;564:14,
　16;565:2,14;578:22
**listed (1)**
　510:20
**Listen (1)**
　604:14
**listening (2)**
　394:25;395:1
**listing (1)**
　426:19
**lists (1)**
　426:5
**little (3)**
　380:21;560:17;
　581:14
**local (20)**
　258:3,5,7,13,21;
　260:6;288:21;
　289:25;366:2;369:1,
　8;370:25;411:10,19;
　418:11;439:10;
　572:16;587:22;
　588:6,6
**locality (1)**
　393:21
**located (2)**
　312:15;605:14
**location (6)**
　253:6,14;261:17;
　456:16;467:19,20
**locations (1)**
　578:23
**locked (1)**
　597:18
**long (15)**
　259:12;260:21;
　281:19;282:17;
　283:25;322:7,16;
　329:4;365:13;
　367:19;408:11;
　454:2,10;567:7;
　606:16
**longer (3)**
　285:4;423:12;
　441:2
**longevity (1)**
　376:4
**look (59)**
　253:25;304:9;

324:16;325:6;327:1;
329:18;333:23;
344:12;349:20,23;
356:11;357:5;361:9;
389:21;390:5;
393:11,20,23;
428:20;429:25;
430:15;435:16,22;
438:5;459:9;466:12;
468:8,11;470:8;
477:21;480:13;
490:2,17;498:15;
504:15;507:13;
509:8;519:16;
520:16;528:19;
531:20;540:4;545:4;
548:14;556:12;
557:12;561:3;
562:11;568:18,21;
570:1,15;573:19;
579:4;581:8;582:21;
583:8,14;587:12
**looked (13)**
　352:11,14;358:4;
　405:11;429:13;
　465:4,5;487:19;
　492:10;562:7;581:2;
　583:14;587:8
**looking (23)**
　276:2;324:22;
　384:17;397:15;
　398:6;426:14;
　489:25;490:20;
　492:21;493:1;
　508:15;510:23;
　511:13;539:1;
　547:21;557:25;
　581:5;583:25;584:2,
　22;587:3;588:15;
　595:20
**looks (12)**
　374:10,16;385:4;
　498:1;507:10;
　531:21;539:10;
　545:20;547:25;
　584:15,18;587:13
**lost (1)**
　419:3
**lot (20)**
　262:15;264:9;
　276:13;278:17,18;
　297:4;312:1;351:20;
　372:25;401:23;
　407:8;476:7;518:23;
　519:10;546:3,14;
　553:10,13;554:3;
　562:6
**loud (1)**

433:17
**loudly (2)**
　451:20;523:5
**low (2)**
　555:4;583:15
**lower (1)**
　507:6
**LRAC (21)**
　365:24;369:20;
　395:25;399:10;
　410:2,17,21;418:19;
　423:15;469:16,16;
　519:4;562:13;597:5,
　9,24;598:20,23;
　599:12,17;607:23
**lucky (1)**
　289:25
**LWOP (1)**
　536:14

# M

**ma'am (21)**
　429:23;431:8;
　479:20;483:15,20;
　486:10;487:4;
　493:10,14;494:10;
　495:11;499:13;
　514:15;537:12;
　538:3;541:18;
　547:11;552:20;
　553:25;584:20;
　597:22
**maintain (7)**
　255:11;261:1;
　346:8;363:10;
　446:10;523:4;527:6
**maintains (1)**
　371:25
**major (12)**
　427:10;503:15,16,
　17,21,23;504:8;
　508:23;510:3,25;
　511:8,9
**majority (1)**
　265:5
**makes (3)**
　267:14;501:5;
　598:14
**making (18)**
　275:23;280:11;
　302:18;382:1;
　386:25;434:17;
　448:5;460:23;
　465:19,23;477:7;
　485:1,10;505:20;
　516:23;603:13;
　608:17;612:23

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 388 of 406 PageID #: 1627

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

management (34)
262:15;263:22;
266:2,7;269:16;
289:16;295:18;
299:15;304:23;
305:4,6,11;320:12,
23;329:8;336:24;
356:20;376:2,18,22;
388:23;389:16;
391:10;400:19;
403:16;408:8,23;
409:21;469:10;
487:18,22;513:20;
530:2;540:2
manager (18)
348:22;349:4,11;
359:5,7,12;454:1,8,
21,22;457:10;
468:19;469:7;470:4;
471:15;478:12;
569:17;584:3
manager's (1)
526:5
mandate (1)
403:1
mandated (1)
472:6
mandatory (79)
269:6;294:6,19;
337:23;338:5,24;
339:8,12;340:7,19,
24;341:5;349:17;
351:14,24;353:5,9,
16;354:19;355:6,8,
23;358:3,21;360:8,
13,20;361:17;
402:21;403:24;
404:9,12,24;405:2;
406:13;444:16,19,
24;445:8;446:12,16;
447:7,10;471:10,18;
472:1,3,13,15,17,24;
473:5,8;475:18,23;
476:2,24;477:14;
516:19,24;518:5;
525:25;529:6,22;
530:12;541:20,25;
542:7,11,13;543:5,
12;554:21;559:5,7,
16;560:3,12;606:24
manner (3)
278:9;335:14;
433:20
mannal (1)
330:9
many (16)
259:9;280:11;
283:6;288:14;

350:12;352:1;
367:24;403:10;
404:2;454:13;527:4;
553:1;567:24;586:7,
13;592:9
March (16)
357:25;358:2,22;
359:20;447:14;
449:4,9,20;465:2;
530:14;531:7;
537:13;538:25;
545:20;557:12;558:7
Marion (2)
365:18;416:12
mark (4)
316:12;398:13;
554:2;585:4
marked (25)
309:1;324:16;
325:14,15;327:23,
24;333:19,20;
373:20,21,24;386:1,
4;389:20;409:2;
446:7;466:11;480:1;
481:10;483:17;
506:24;548:24;
549:1;569:18;595:4
Mary (3)
261:8;268:9;
288:21
master (8)
279:23;304:10,15,
20;320:23;324:15;
388:22;389:7
materiality (1)
288:13
maternity (4)
281:22;286:22;
287:2;322:13
matter (14)
254:21;257:14;
260:6;263:20;
266:19;268:11;
276:20;303:2;348:8;
365:4;453:18;
524:20;559:3;566:23
matters (1)
576:25
may (74)
253:22;256:23;
257:9;263:3;267:24;
272:9;278:3;280:20;
283:7;284:17;288:5,
19;292:3;295:23,24;
299:5;313:15;315:3;
317:6,9;329:22;
336:6,6;344:9;
347:10;348:2,24;

354:5;355:20;
358:18;359:8;364:6,
23;375:14;383:10;
390:22;396:5;
400:20,20;412:18;
421:17,22,24;422:2,
8;424:1;427:18;
433:9;444:2;452:25;
453:13;474:15;
488:3;499:25;
505:16;515:24;
516:8;524:3,15;
552:22;563:15;
565:4;566:18;572:5;
576:16;580:24;
590:11;591:9,10;
601:18;604:17;
606:13;609:5,9
maybe (18)
274:9,10;276:9;
280:18;291:2;
301:22;319:8;366:6;
375:16;413:5;430:5;
447:15;490:25;
507:25;599:4;
602:20,22,23
mean (32)
254:3;277:12;
278:8,19,23;279:1;
291:11;292:19;
293:19;296:24;
308:4;309:20;310:9;
329:6;330:8;383:24;
389:6;402:24;
405:22;406:18;
427:2;439:20;
468:17;475:12;
485:24;495:13;
510:23;519:22;
571:2;592:19;
602:10;606:25
meaning (2)
275:23;297:8
means (4)
303:3;308:1;
393:19;439:21
meantime (2)
312:11;530:14
measure (3)
289:8;490:9;587:3
measured (7)
287:10;290:5,24;
322:23;488:8;592:5,
6
measurement (3)
288:3,8;290:3
measurements (1)
323:20

measures (1)
490:11
mediatiou (8)
368:13;575:14,15;
576:24;577:1,3;
593:18,19
medical (153)
264:14,19;271:11,
14,17,22;276:1,5,7,
13,14,23;277:6;
285:6;295:11,22;
296:2,5;298:1,21;
300:5,16;309:6;
319:19,20,21;320:5;
326:23;327:6,8;
330:18;331:7;334:9,
13,15,17,22;335:2;
336:14;343:13;
360:5;365:17;
370:13;375:1,3;
379:4,9;380:18;
382:23;387:4,21;
388:15;390:4,6;
397:18;398:16;
399:8,16,17;400:5;
401:3,22;409:4,22,
25;418:19;419:15,
24;420:2;422:11,14;
423:23,25;424:13,
18;430:18;431:2,7,
20;435:3;436:7;
437:2,9;444:5;
446:18;464:12;
465:14,22,24;
466:17;469:18;
472:9;473:11;475:6;
476:1;481:14;482:2,
3,17,21;483:2;497:9,
18,20;498:2;499:12,
18;501:4;502:21;
503:6,22;511:20;
512:2;513:25;514:4,
6,10,17;515:4,14,16;
518:19,24;519:1,3,8;
533:14;546:23;
555:8,10,19,23,25;
556:4;562:9,17,21;
593:10,13;594:24;
595:21;597:6;
599:19,21,22,23,23;
600:2,4,5,14;606:1;
607:15
meet (25)
320:12;391:17;
413:19;456:12;
459:22;460:6,19;
462:22,23;465:20;
468:1;470:17,21;

484:18;486:8;
500:20,24;547:7;
551:17;552:13,15
574:21;575:16,17,
576:14
meeting (135)
270:4,5,7,15,19,20;
272:3;273:6,7,10,15,
24;274:25;275:5;
277:24;278:16,24;
279:6;300:9,20;
304:23;305:4,15,16,
17,19,20,23,25;
306:3,3,8,11,18;
307:7,10,15;308:15,
19;309:10;312:14;
313:7,13;314:25;
315:6;316:21;
317:11;318:6,11;
321:3;322:17;
330:11;341:16,25;
353:4;377:20;
380:14;391:22;
392:7,11;394:7;
396:8,11;397:22;
400:9,10;402:5,6,13,
14,17;432:19;438:6;
456:22;459:18;
464:3,6;465:20;
468:25;470:23,25;
471:2;478:19,22;
485:14;487:8,11;
490:6,13;491:1,2,9;
495:15;496:11;
501:24;526:13;
533:8,9,13;534:2;
535:8,21,23,25;
549:6;552:1;553:15;
554:2;555:17,24;
556:1,2,15;570:18;
572:9,17,25;573:13;
574:11,16;575:6;
576:1,5,8,10,18,23;
580:12;585:3;602:1,
4,6;605:23
meeting/exceeding (1)
561:22
meetings (3)
413:20;489:7;
532:6
meets (1)
373:3
meltdown (1)
462:15
member (10)
258:3,5,10;269:14;
282:8,13;288:22;

Case 1:20-cv-01154-JPH-MJD    Document 39-5    Filed 07/02/21    Page 389 of 406 PageID #:
10280

EEOC Hearing                                                          Brown v. McDonald, et al.
Volume II                                                                        July 21, 2015

290:1;297:20;334:2

**members (5)**
281:7;302:16,18;
318:21;337:21

**memo (8)**
264:8;357:2,11,18;
526:4;545:20;
547:15,22

**memorandum (12)**
264:12,18;352:5;
356:21;357:25;
358:13;376:7,18;
446:17,20;471:17;
547:13

**memory (3)**
332:13;534:1;
568:24

**memos (1)**
357:13

**mention (4)**
308:15;397:3;
427:9;613:1

**mentioned (4)**
287:5;353:2;
487:7;528:7

**mere (5)**
256:23;347:11;
364:7;453:1;524:4

**met (12)**
259:1;320:14;
322:21;366:17;
465:8;484:6;501:15;
590:16;597:7;598:3;
599:7,13

**method (2)**
294:13;325:25

**methods (1)**
294:9

**Michael (5)**
494:4,14;565:22;
566:14,20

**microphone (1)**
255:13

**mid (1)**
477:9

**middle (2)**
411:9;528:21

**mid-term (5)**
539:13,14,14;
549:20;561:18

**mid-year (4)**
561:5;588:2;589:5,
7

**might (12)**
266:2;318:1;
375:12;413:5;
442:17;456:17;
474:6;477:8;517:24;

547:20;576:2;583:12

**Mike (1)**
468:13

**MILLER (113)**
254:9;262:21;
266:15,22;271:23;
273:1;277:10,19;
281:24;287:12,18;
292:23;298:8;302:4,
6;307:11;312:24;
313:6,19;314:16;
316:4;317:10;
323:22;325:8;
327:20;333:5,10,17;
336:5;344:8,11,18;
348:3,11;355:13;
361:6,8;362:1;
364:24;365:7;373:5,
10,23;379:15;380:4,
6;382:3,7;384:3,12;
385:1,12,22;386:3;
409:7,9,17;410:7;
422:20;423:21;
429:5;433:4;436:9;
444:16;449:16;
450:7;453:14,21;
466:22,23,25;479:2;
496:23,25;518:11,
13;521:18;524:16,
23;531:4,6;535:1;
536:25;545:2;
548:22;559:19;
561:2;563:22;
565:10;566:19;
567:2;571:7,22,25;
573:6,7;577:13;
579:6;581:21;
584:10;592:19;
595:19,23;596:1;
598:11;600:10,16,
22;601:7;607:7,18;
613:8;614:2

**million (1)**
455:1

**mind (10)**
361:19,24;377:23;
381:16;399:14;
519:22;520:4;
528:16;531:15;540:3

**minimum (1)**
553:10

**minor (1)**
428:1

**minute (1)**
297:5

**minutes (12)**
292:9;301:9;
341:20;348:1;409:8;

507:18;513:8;
524:15;557:3;
558:23;592:19,21

**mischaracterizing (2)**
421:14;600:17

**Miss (7)**
254:12;258:18;
268:23;280:9,12,14,
16

**missed (1)**
280:25

**missing (5)**
342:7;385:18;
504:24;556:23;558:1

**mission (2)**
567:15;574:6

**misunderstood (1)**
393:3

**mitigate (1)**
591:16

**mixed (1)**
538:21

**MJ (2)**
266:11;302:25

**modified (1)**
415:4

**moment (1)**
602:5

**month (31)**
281:2;286:3;
296:21,22,23,23;
350:12,14,20;352:2,
5;355:24;356:15;
403:3;455:1;471:10;
472:7;473:19,21;
476:17,20;477:2;
488:23;489:14,19;
490:21;527:1;
530:18;585:10,21,22

**monthly (6)**
357:14;473:19;
489:17;490:17,19;
532:5

**months (8)**
253:4;301:20,21,
22;323:16;349:4;
351:6;437:23

**more (36)**
253:25;267:14;
276:15,16;289:10;
300:12;301:20,21;
303:2;304:4;309:9,
16;311:10;318:2;
319:19,19,21;
338:11;339:2;
370:24;380:21;
395:12;398:12;
399:7;431:2;436:22;

442:1;460:25,25;
464:18;505:23;
508:11;509:11;
561:22;592:22;
601:25

**morning (3)**
257:18;285:14;
504:5

**Most (7)**
290:9;306:23;
313:4;350:17;477:5;
605:3,4

**mostly (2)**
350:18;416:10

**move (3)**
551:2;612:3,13

**moved (1)**
462:16

**moves (1)**
551:14

**MSPB (1)**
571:17

**much (22)**
253:24;280:1;
284:24;332:14;
343:21;347:25;
356:1;358:7;372:6,
10;404:1;437:12;
438:9;440:1;441:16;
489:4;504:7;513:5;
527:2;566:17;
602:19;608:15

**must (12)**
255:10;256:1;
334:17;346:8;
363:10;412:24;
451:18,19,24;
456:12;523:3,4

**myself (8)**
270:11;368:4;
460:11;527:8,15;
573:20;584:2;597:11

---

**N**

**name (28)**
254:20;257:4;
263:23;300:10;
338:16;339:23;
347:17,21;362:18;
364:17,19;451:8;
453:7,8,9,9;455:9;
471:12;522:11;
524:10;545:5,22;
564:14;566:6,13,15;
578:12;599:4

**named (2)**
265:16;599:2

**names (1)**
264:4;493:21,23

**narrative (1)**
604:13

**National (7)**
288:22;289:18,19;
290:2;586:1;587:21;
588:4

**nationwide (2)**
472:4;526:7

**nature (9)**
310:21;358:17;
425:16;426:1;
428:24;482:6;
507:22;508:1,5

**nearly (1)**
285:16

**necessarily (11)**
286:25;289:11;
315:10;408:4;414:2;
438:14;441:18,20;
442:13,15;520:5

**necessary (16)**
256:9;263:25;
274:6;285:17;
328:21;335:1;
346:19;363:15;
370:3;387:19,21;
393:13;452:7;
517:13;523:10;
579:22

**need (50)**
276:15,16;278:12;
280:12;291:22;
294:21;299:13;
308:10;319:6,8,13,
14;328:25;329:1;
352:1;368:20,24;
369:20;370:3;
391:19;397:24;
404:2,7,8;405:15,16;
407:12,13;410:4;
413:21;418:5;422:6;
423:24;434:1;
435:23;443:24;
445:11;449:14;
456:14;474:13,25;
502:21;503:1,6;
504:4,13;528:10;
530:19;533:21;
534:13

**needed (42)**
263:11;273:16;
274:5;276:4,17;
295:10,17;296:10;
300:14;357:2;
386:18;388:6;
398:12;401:25;

Min-U-Script®                     SMITH REPORTING                  (20) members - needed
                              www.smithreporting.net
                                                                    DEF001055

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 390 of 406 PageID #:
1024

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

402:7;403:24;404:3;
413:25;419:15;
431:1,4,5;433:15;
434:1;441:2;448:20;
459:8;462:22;468:7;
474:9;476:6;491:12;
504:12;505:16,17;
518:20;533:15,18;
536:5,11;556:9;
557:19

**needing (2)**
392:14;419:16

**needs (8)**
271:18;311:3;
370:16;380:22;
387:24;388:1;
407:14;469:22

**negative (5)**
288:17;525:22;
564:20,23;583:10

**negatively (1)**
286:4

**neither (1)**
593:23

**new (16)**
289:7;290:21;
366:25;367:14,25;
368:22;415:3;
574:18;599:22,23;
607:14;608:17,19;
610:5;611:2,13

**next (26)**
255:18;284:18;
285:21,22;293:5;
299:6;341:2;343:11;
345:8;361:23;
362:15;450:21;
488:4,5,18;522:7;
528:13;550:6,10;
565:21;588:17;
604:6;608:12;609:5,
10;612:13

**nine (2)**
301:9,22

**nobody (6)**
274:7,8;295:20,21;
296:18;462:13

**nods (2)**
273:9;306:17

**nomination (1)**
259:11

**none (1)**
409:14

**non-rating (1)**
525:4

**nonresponsive (1)**
437:3

**nor (2)**

262:1;296:5

**normal (1)**
592:11

**normally (13)**
358:8;459:1;
499:21;527:15,20;
546:17;549:25;
568:13,14;573:1,22;
582:10;583:14

**northeastern (1)**
567:15

**notated (1)**
603:16

**note (2)**
383:11;497:22

**noted (2)**
253:2;378:1

**notice (9)**
322:1;426:25;
461:20;467:22;
529:5;561:10,13,16;
603:19

**notification (2)**
403:22;476:13

**notified (4)**
369:15;472:21;
476:10;482:11

**notifies (1)**
509:24

**notify (2)**
473:15;474:25

**Notwithstanding (1)**
610:12

**November (2)**
365:15;414:15

**number (20)**
259:25;280:17;
283:12;284:9;325:6;
326:9;373:5;411:8,
12;480:4;489:10,12;
499:11;518:19;
548:12,19;568:1;
585:24;586:18,20

**numbers (10)**
283:4,11;284:4;
293:21;321:4,8;
322:4;460:1;487:10;
528:20

## O

**oath (1)**
601:18

**object (8)**
262:21;266:16;
273:2;277:11;
281:25;379:11;
565:5;608:14

**objecting (3)**
314:15;384:10;
571:18

**objection (65)**
252:24;253:22;
256:16,18;267:23;
271:23;272:9;278:1;
283:23;284:15;
292:23;293:4;298:8;
299:2;307:8;312:18;
313:10;314:1,8,9,13,
18,22;315:21;316:7;
317:8;325:8;327:21;
333:9,15;347:3;
363:25;364:2;
373:14,16;379:23;
381:20;436:9,12;
452:14,16;523:22,
24;548:21,22;
559:24;562:3;565:3,
6;570:24;571:10,12,
13;572:5;573:5;
600:10;607:18;
608:8,12,22;609:4;
612:1,10,11;613:18

**objections (1)**
325:6

**obligation (1)**
265:3

**obtain (4)**
392:23;429:4;
458:8;536:7

**obtained (2)**
377:11;562:8

**obtaining (1)**
370:13

**obtains (2)**
469:18,22

**obvious (3)**
401:18,23;434:19

**obviously (2)**
305:11;485:13

**occasion (1)**
294:12

**occasions (1)**
294:12

**occur (4)**
331:3;414:17;
501:4;613:19

**occurred (11)**
289:22;297:24;
343:15;413:20;
416:10;425:3;
429:15;435:3;
447:14;485:13;
611:23

**occurring (2)**
437:18;550:11

**Octavia (2)**
369:7;599:2

**October (21)**
356:13,17,20,24;
537:21;538:5;539:5,
15;550:22;551:1;
552:6;584:14;
587:17;588:19,20,
25;589:1,1,2,4;
590:22

**Off (36)**
252:6;278:22;
280:5,8;293:19;
310:1;321:13;345:3;
357:19;358:5;
362:10;370:6;
392:25;393:4;
405:15;408:12;
424:10;450:16;
505:17;521:1;522:3;
553:3,7;564:5,7;
565:16;568:1;
596:22;597:8;
599:15;601:11;
602:24;607:12;
613:12,13;614:7

**offended (2)**
387:2;603:9

**offense (1)**
609:2

**offer (17)**
262:23;266:18;
267:2;298:13;299:1,
11;301:6;312:23,24;
314:14;317:12,14;
330:5,13;486:18;
509:1;571:24

**offered (2)**
301:2,15

**offhand (5)**
263:24;270:18;
290:12;423:20;586:7

**Office (92)**
253:8,11;262:16;
265:7;275:23;281:3;
285:12,15;290:13;
301:24;308:14;
348:15,17,19;
355:19;359:24;
365:12,22;366:3;
367:4,5;369:19;
374:11;375:24;
376:8;380:16;
383:12;386:9;390:1;
398:25;435:23;
439:22,24;440:12,15,
20,21;442:5;453:24;
454:9;456:7,8;457:9,

15;458:4;460:10,14;
461:7,21,23;464:19;
466:4;468:6;472:6
482:5;484:20;
485:19;486:9;491:8;
493:16,22;494:7;
496:3;513:16;
519:13;520:2,7,7,8;
524:25;525:2;526:5;
531:24;532:1;
537:16;545:15;
546:14,19;558:6,7,
12,13;567:5;568:16;
572:2,21;573:3;
574:2,24;580:25;
581:13;597:15

**officer (3)**
258:20;259:14;
499:18

**offices (5)**
327:3;386:10;
393:24;569:24;572:3

**official (17)**
254:25;260:4;
265:19;266:3;
337:19;345:21;
362:24;372:2;
400:19;408:23;
437:20;451:3;
469:10;513:17,20,
522:17;566:4

**officially (1)**
263:15

**officials (4)**
336:24;337:15,21;
601:24

**often (3)**
260:17;354:9;
510:14

**old (3)**
289:6;587:20;
588:3

**Once (14)**
320:11;331:15;
375:25;382:8;
391:15;408:17;
412:21;419:3;
469:25;474:3;
516:16;517:4;
569:24;580:8

**One (99)**
252:4;255:10;
256:16;261:5;
264:12;265:23,24,
25;266:19,20;267:?
269:6;270:17;
273:25;276:24;
280:5;281:1;284:21;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 391 of 406 PageID #:
1025

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

285:18,20;288:7;
289:6;303:20;304:3;
309:21;317:5;
320:14;330:3,6,21;
336:3;346:7;347:3;
353:12;359:2;360:2;
363:10,25;367:16;
374:16,16;381:25;
382:1,16;390:25;
399:1;405:19;408:2;
409:20;414:1;
417:25;422:13;
426:17,23;430:1;
437:23;452:14;
455:19;466:9;
475:14;477:17;
482:24;488:3;
491:13;493:1;
494:15;496:14,16;
508:11;509:11;
510:20;523:3;
544:19,23;551:14;
559:2;569:2;572:1;
582:8;585:11,14,22,
23;593:23;594:2;
596:2,3,9,13;597:14;
599:24;601:25;
605:11;607:1,9;
609:18;610:15,17;
611:13

**one-page (1)**
497:24

**ones (2)**
425:19;598:9

**one's (1)**
425:9

**online (1)**
370:17

**only (60)**
253:5;256:11;
258:10;282:23;
284:11;285:9,12,14,
21;311:15;312:9;
315:12;317:5;
318:25;334:15;
336:3;344:1,7;
346:13;353:12;
359:14;364:12;
377:23;388:20,20;
396:21,25;408:17;
410:2;425:18;
438:18;439:11;
444:10,17;445:21;
452:9;456:13;
479:24;480:16;
487:7;488:14;
489:18,25;494:6;
501:13;504:5,6;

519:3;523:17;
536:16;550:21;
559:11;564:16;
565:11;581:10;
585:7,21;590:25;
592:2;598:9

**onset (1)**
394:6

**open (3)**
253:1;486:23;
520:11

**operating (1)**
296:19

**operationally (3)**
390:9;467:3;
519:18

**operations (1)**
456:7

**opinion (22)**
272:6,11,13,17,21;
293:1;302:17;335:8,
11,19;336:10,25;
337:1,3,6;439:20;
463:6;465:11;475:9;
552:21;571:15;
573:16

**opportunities (2)**
297:5;467:10

**opportunity (10)**
352:18;365:21;
367:2;368:6;432:17,
18;549:15,22;
567:21;568:3

**opposed (5)**
304:5;383:22;
403:16;468:13;
471:22

**Ops (1)**
285:2

**opted (1)**
613:17

**option (5)**
285:8;368:13;
403:7,9;408:5

**optional (1)**
418:15

**options (4)**
407:20,22;408:2,6

**orally (1)**
451:24

**order (17)**
253:5;263:11,19;
279:11,14;282:18;
293:22;328:23;
386:18;395:20;
397:13;462:24;
466:9;552:2;586:8,
14,23

**organ (4)**
426:3;510:4;511:5,
7

**organization (1)**
411:19

**organizational (1)**
538:19

**organized (1)**
267:6

**orientation (3)**
366:21,22,24

**original (1)**
302:9

**OT (2)**
337:17,22

**others (4)**
265:20;301:13;
576:19,20

**otherwise (1)**
467:11

**ourselves (1)**
444:6

**out (89)**
260:19;262:13;
264:2;273:19;276:3;
282:1;285:17;
294:15;295:25;
300:11;328:15;
334:18;352:4;
355:25;356:6;
357:12,13,18,21,25;
358:6,11,14,14;
370:3,13,15;374:10;
382:10;383:21;
384:3,18;392:16,19;
398:6,15,18,24;
399:5;403:22;411:5;
413:13;428:22;
429:3;431:18;
435:16;444:5;456:9;
466:25;471:17;
475:15,24;477:23;
480:2;481:15;
488:22;490:24;
492:18;507:4;
526:16;531:24;
532:1;537:16;
538:22;541:13;
545:15;546:13,19;
551:17;558:11,13;
559:4;561:9,12;
562:18;568:8;
573:21;576:22;
580:22;585:10;
586:4,24,25;593:12,
15,17;597:13;
602:13;606:23

**outlined (1)**

317:2;536:20;
539:23,24;574:3

**output (10)**
538:13;554:23;
555:1,3,7;561:4,5,10,
13,23

**outside (10)**
266:16;382:16;
389:12;393:20;
415:10;423:25;
435:23;514:12;
519:12;535:17

**out-spoke (1)**
604:10

**outstanding (1)**
578:3

**over (41)**
254:16,21;273:14;
280:2;323:2;341:20;
345:17;352:21;
362:20;394:13,14;
425:24;432:24;
433:1,14,17;451:9;
454:24;455:1;460:6;
464:20;468:5;473:6;
485:9;486:12,14;
489:22;496:6,7;
507:9;522:13;
529:15;533:14;
544:7;547:8;566:7;
567:8;575:19;
586:20;588:17;603:6

**overall (8)**
282:11;393:14;
465:15;474:20;
489:17;505:25;
539:8,20

**overcome (1)**
539:21

**overruled (1)**
267:24

**overseeing (2)**
268:19;269:10

**oversight (1)**
567:11

**overtime (143)**
269:7,8;274:22;
287:21;294:4,6,8,10,
11,20;295:1,25;
296:16,24;297:22;
332:2,19;337:23;
338:5,24;339:8,13;
340:7,20,25;341:5;
349:12,17;350:12,13,
21;351:3,15,24;
352:3;353:5,10,16;
354:15,18,19,20;
355:6,8,23;356:2,10,

23;358:3,21;360:9,
14,21;361:12,15,17;
402:22;403:3,6,11,
25;404:4,9,13,25;
405:2,4,13;406:13;
407:19;444:17,19,
24;445:6,8;446:3,11,
12,16,19;447:8,10;
449:1,25;450:3;
471:10,18;472:1,3,
13,15,17,24;473:8,
10,18;474:24;
475:18,23;476:3,24;
477:1,15;478:4;
516:20,24;518:5;
526:1,25;527:14;
529:6,22,25;530:12,
18;536:18;540:14,
17;541:12,16,20;
542:1,7,12,14;543:1,
6,12,19,23;544:3;
554:21;559:5,7,12,
16;560:4,12,18;
563:2,4;606:17,24

**nwe (4)**
462:2;491:15,19;
606:8

**owed (7)**
462:20;491:13;
496:14,16,18,21;
497:4

**owes (1)**
462:13

**own (7)**
390:12;404:6;
467:6;482:5;519:20;
571:15;578:17

---

## P

**package (2)**
499:7;584:7

**packaged (1)**
497:16

**packet (1)**
461:4

**page (51)**
259:24;341:9;
344:12;349:20;
352:11,15;356:4;
361:9;373:11;411:3,
9;414:8;420:11;
423:21;425:14,21;
429:6;449:16;
466:13,16;468:8;
470:8;477:21;
507:10;518:14;
519:16;528:19;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 392 of 406 PageID #:
1024

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

529:3;530:9,25;
531:2;533:24;
536:20;537:12,17,
25;538:8;539:1,8,24;
540:10;545:6;561:3;
568:19;569:4;579:6;
584:10;588:11,15,
17;595:17

**pages (4)**
373:25;386:5;
538:21;540:5

**pain (29)**
278:17,18;308:11;
312:2;399:18;
420:16;423:1,7;
437:12,15;484:10;
485:18,25;486:2;
502:16,18,20,24;
503:5,24;504:18;
506:12,16,21;508:18,
19;602:8,19;605:4

**painful (1)**
484:19

**pairing (1)**
455:21

**paper (1)**
548:8

**papers (1)**
409:16

**paperwork (9)**
265:6;335:18;
380:21;381:1,3;
382:22;405:10,11,13

**paragraph (4)**
425:23,23;518:25;
570:2

**parameters (1)**
466:19

**paramount (1)**
574:7

**part (58)**
312:25;320:7;
343:18;350:17;
355:6;366:24;
380:11,13;385:16;
396:8;397:5;400:23;
420:9;426:19;
428:18;430:18;
431:25;432:2;
446:22;456:11,12;
457:14;458:8;
465:18;470:22;
472:8;482:16;
483:18;492:10,12,
18;500:23;501:14,
16,16,21;509:8,18,
20;514:7;544:8,11;
546:24;547:1;

567:14;568:6;569:7;
584:7;586:1;589:22;
594:11;595:1;
596:19;598:12,14,
15;609:20;610:19

**partially (1)**
284:8

**participant (1)**
374:12

**participate (2)**
374:9;375:4

**participated (2)**
374:18;419:20

**participates (1)**
391:22

**participating (1)**
430:3

**particular (33)**
260:23;265:14,16;
282:2;284:2,3,17;
291:3;299:3,4;359:4;
378:19;382:17;
383:7;389:25;399:2;
402:20;406:16;
418:6;437:9;455:21;
474:21;475:4;
487:21;501:4;
511:15;512:6;
517:18;568:11;
570:13,23;572:1;
609:9

**particularly (3)**
252:7;255:12;
288:18

**particulars (2)**
278:15;498:19

**parties (5)**
252:21;325:11;
613:16,23;614:1

**parts (1)**
300:21

**part-time (2)**
285:7,9

**party (1)**
613:18

**pass (2)**
323:5;558:4

**passage (1)**
415:19

**passing (3)**
350:9;354:13;
366:19

**past (9)**
294:9;295:3;
337:4;456:2;492:20;
541:12;574:14;
582:3;587:24

**Patel (3)**

252:7,12,16

**path (1)**
568:12

**patient (1)**
421:17

**pause (1)**
291:1

**pay (7)**
321:17,21;399:20;
474:16;477:3;490:1,
2

**payroll (1)**
567:17

**PDF (1)**
384:15

**peers (1)**
602:16

**penalize (2)**
289:10;516:9

**pending (1)**
330:15

**people (32)**
255:20;260:16;
262:15;283:6,13;
284:9;288:25;291:8;
313:13;337:2,25;
338:23;339:24;
346:21;363:18;
367:12;380:1,24;
390:19;452:20;
477:6;493:11,15;
494:8;523:12;
525:25;526:9,14;
527:19;543:11;
553:20;602:16

**per (8)**
350:14;352:5;
355:24;356:14;
472:7,8;581:3,5

**perceived (4)**
321:12;387:5,6;
485:15

**percent (11)**
505:19;506:9,15;
561:22,25;585:15;
586:9,15,24;587:14;
607:10

**percentage (1)**
551:9

**perception (1)**
412:16

**perform (17)**
300:22;400:7,11;
402:21;420:18;
421:18;429:15;
431:6;438:24;442:2,
6;445:5;490:23;
503:13;505:5;

520:17,24

**performance (132)**
279:17;286:14,17,
18;289:8,10;290:23;
292:15;304:8,17;
306:7;320:21;321:9;
322:1,4,6,8;323:4,15;
324:6,19;328:3,6,8;
336:7;337:16;
339:15;376:5,6,18;
377:9,10,14,21;
381:17,22;387:11;
423:2;456:21,22;
457:12;458:9;459:8,
24;460:17,19;
462:23;465:6,20;
466:8;479:22,24;
480:3,6,8,15,17,23;
481:2,4,8,16;487:5,8,
12,23;488:8;491:21,
23,25;492:12,15,21,
24;495:16;499:4;
501:16;502:4,9;
503:11;512:21;
531:13,19;532:4,8,
10;537:8,14,20;
539:3,19;549:4,6,9;
550:15,21;569:8,10,
16;570:14,17,18;
572:9,17,25;573:10,
13;574:11,16,20;
575:6;580:7,12,22;
581:18;583:21,22,
24;584:21;585:6,20;
586:1,4,9;587:2,3;
588:9;589:19;590:8,
16;591:17;603:20

**performed (4)**
488:12;489:5;
490:3;539:20

**performing (8)**
377:17;439:15;
441:22;502:3;
512:16;520:20;
521:15;552:5

**Perhaps (2)**
280:14;322:14

**period (59)**
253:15;267:11;
269:4;280:24;
281:14;286:11,23;
287:17;296:14;
330:16;348:23;
350:21;353:13;
354:18;355:18,25;
357:1;358:18,22;
359:8;366:1;406:1;
407:1;477:4;490:1,2,

8;517:23,24,25;
525:8;529:13;
537:20;538:5;539·
16;541:6,8,10;
549:13;551:7;563:8,
12;582:4;583:24;
587:16,19;588:2,14,
16,18;589:22;590:1,
3;591:3,22;596:7;
598:16;609:13

**periods (5)**
280:2;330:22;
488:25;541:9;609:13

**permit (1)**
288:12

**permitted (1)**
290:17

**permitting (1)**
610:10

**person (36)**
265:18;266:8;
267:6,14,19,22;
268:5,6,13,18,23;
269:2,16;283:10;
301:23;308:1;313:4;
316:25;367:7;
385:18;400:17;
412:12;441:16;
472:8;486:16;
527:19;528:6;542.
10;570:12;582:18;
596:13;597:6;
603:11;608:19;
609:25

**personal (12)**
295:7;337:1;
339:3;340:9,13;
415:10,12,14,17;
434:18;525:12;
546:13

**personally (6)**
268:8;282:12,13;
340:14;418:20;
434:19;546:4

**personnel (3)**
266:2;268:17;
271:15

**person's (2)**
338:20;583:7

**Pete (7)**
520:7;535:12,14;
572:21;575:4,9;
577:11

**Petersburg (5)**
375:10;443:17,23;
597:17;607:13

**Phoenix (1)**
348:17

8;517:23,24,25;
525:8;529:13;
537:20;538:5;539·
16;541:6,8,10;
549:13;551:7;563:8,
12;582:4;583:24;
587:16,19;588:2,14,
16,18;589:22;590:1,
3;591:3,22;596:7;
598:16;609:13

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 393 of 406 PageID #:
10270

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

phone (4)
383:4;485:21;
486:14;575:19
phrase (2)
311:6;504:12
phrasiug (2)
314:9,13
physical (6)
285:10,13;502:1,
15;503:4;508:17
physician (9)
315:12,12,13,19;
334:23;436:18,22;
437:6;500:18
physicians (7)
313:14,22;314:3,
12,25;315:7,11
pick (4)
255:13;280:8;
281:5;403:11
picked (1)
278:6
picking (1)
403:9
PIP (21)
281:11,12;282:15;
283:19;284:10;
286:24;287:1;
322:19;323:2,11;
328:7,10;492:22;
494:20;495:10;
570:8,21,24;571:7,
14,16
PIPs (1)
573:11
place (8)
273:8;290:15;
317:25;349:17;
353:20;471:2;565:3;
610:9
placed (11)
281:12;283:18;
284:10;286:5,16,17,
24;322:5;608:22;
611:25;612:10
placing (1)
493:1
Plan (14)
286:15,18;321:10;
322:6,8;323:4,5,15;
328:9;480:6,9;
491:25;492:12,24
planning (1)
562:16
play (1)
308:4
played (1)
611:22

please (36)
255:21;257:4,20;
310:5;325:22;
333:24;335:11;
346:22;347:16;
348:12;363:4,19;
364:17;373:19;
380:1;433:4,8;
452:21;453:6;
493:24;522:22;
523:8,13;524:9,24;
535:4;537:5;543:20;
552:16;555:21;
556:20,22;557:5;
561:11;566:9,12
pm (1)
614:9
point (108)
258:10,20;262:8,
11;264:12;265:1,3,
16,23,24,25;267:5,
13,18,22,23;268:5;
269:6,10;270:17;
273:25;274:15,17,
20;275:24;276:25;
278:5,19;281:6;
282:25;283:13,15,
17;284:17,21;289:6,
11;294:7,16;296:4;
299:23;301:4,4,16,
18;302:23;303:25;
307:24;310:11;
316:11;318:6,9;
320:15;321:20;
323:6;328:7;331:10;
336:4;340:6;349:12;
369:3,5;379:25;
382:12;394:19,23;
402:3,19;411:5;
413:11;419:19;
420:11;423:15;
424:24;427:7;
432:12;435:11;
439:9;444:1;461:24;
462:9;476:19;480:2;
481:15,24;491:16;
492:24;520:10;
530:1,5;531:25;
533:2,4,7;562:2;
564:19;572:20;
573:21;574:23;
587:10;589:8;
590:20;591:1,23;
597:13;610:17;
611:2,4
pointing (1)
419:18
points (6)

280:11,12;285:4;
290:11;585:12,25
policies (2)
260:6;267:18
policy (17)
260:18;261:24;
294:15;296:19;
327:10;351:25;
368:15;440:17,18;
462:23;493:19;
542:2;543:5;570:13;
573:20,24,25
poor (2)
539:18;549:4
poorly (5)
256:25;347:13;
364:9;453:3;524:6
portion (1)
465:23
pose (2)
452:22;523:14
posed (2)
347:4;523:22
posing (2)
346:23;363:20
position (65)
257:23;258:23;
265:8;301:14,17;
338:20;348:18,21;
349:1;350:11;
351:12;359:8;
365:10,14;366:9;
389:13,13;397:7,10,
13,17,20;400:8,12;
412:19;413:6;
426:22;432:1,3;
435:19,21;438:25;
439:16,19;441:1,15,
23;442:21;453:25;
454:3,5,11;457:4;
458:15;464:23;
465:22;468:19;
470:5;501:1,25;
519:24;524:25;
525:1,3;557:13;
567:4,7,10;570:23;
578:13,22;579:2;
598:20,23,25
positions (3)
323:14;393:11;
520:11
possibility (4)
302:21;371:2;
392:20,20
possible (6)
332:25;444:1;
484:24;589:25;
596:9;609:25

possibly (3)
263:18;338:13;
461:2
postponed (1)
259:12
practice (2)
295:3;573:4
practices (1)
368:9
precise (1)
339:6
preguancy (3)
285:6;321:13,20
pre-hearing (3)
316:13,20;564:13
preliminary (3)
255:9;346:6;
451:18
prepared (1)
589:16
preparing (2)
546:10,16
present (4)
366:23;470:24;
519:6;576:19
presentation (1)
368:7
presented (7)
367:16;479:9;
483:6,9;497:13;
579:19;599:17
presenting (1)
316:25
preserve (1)
441:21
President (3)
261:7;268:9;
288:24
presiding (6)
254:21;345:17;
362:20;451:9;
522:13;566:7
pretty (7)
343:21;349:3;
351:19;356:12;
382:19;504:7;594:13
Previous (3)
369:11;599:17;
609:8
previously (15)
252:14,17;253:10;
258:6;269:3;317:19;
337:13;343:14;
439:3;472:25;537:8;
556:18;557:17;
559:20;598:22
primarily (1)
567:13

primary (2)
298:15;466:9
print (2)
584:12;587:9
printed (1)
385:5
prior (15)
260:8,10,11;
270:19;305:15;
330:10;365:17;
417:18;426:5;
456:23;457:14;
485:13;525:5;
541:15;611:23
prioritized (1)
578:22
privacy (3)
340:10;367:11;
486:23
private (1)
525:1
privy (2)
358:23,25
probably (7)
370:24;447:17;
459:1;497:11;
548:13;563:14;576:4
problem (4)
277:3;291:5,8,19
problems (1)
321:11
procedure (19)
261:21;296:19;
299:10,16,20,23;
300:3;316:22;317:1;
334:1;406:18;
474:23;482:16;
509:20;517:17,21;
541:22;543:4;594:16
procedures (27)
259:20;294:17;
298:17;328:12,21,
24;329:9,10,14;
335:23;360:12;
415:3;424:3;467:13;
474:17;493:5,8;
494:17;510:1;
554:17,20;580:16,
20;581:6,10,20;
588:7
proceed (3)
279:11;354:1;
448:17
process (113)
259:11;261:9;
262:5;264:25;
273:12,23;274:7;
294:5;295:14;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 394 of 406 PageID #:
1020
EEOC Hearing
Volume II
Brown v. McDonald, et al.
July 21, 2015

298:10,23;300:11,12,
19;303:13;304:5;
306:4;307:25;
309:17;311:13,21;
313:21;317:16;
329:8;330:1,4;
336:17,18;342:16;
351:22;354:23;
366:24;368:1,11,11,
19,21;370:9;371:4,
19;374:25;375:19,
22;378:16;379:1;
380:23;381:7;
386:22;387:5;
388:19;391:6,8;
393:1,3,5;394:8,9,12,
23;395:2,6,19;396:9,
17;397:12;403:20;
404:24;413:8,11;
414:1,20;417:25;
423:6;424:4,20;
433:12;434:13;
435:3,17,18;438:20;
455:2;456:5;463:14;
467:25;469:9,23,24;
470:7;474:2;492:13,
18,25;509:8,23;
510:1;514:2,8,19;
516:16;532:15;
534:4;544:9,12;
546:7,12;550:9;
568:6;569:7,9;570:1;
578:6;602:21
**processes (2)**
  265:20;463:12
**processing (2)**
  318:17;371:6
**produce (2)**
  564:24,25
**produced (3)**
  385:10,10;581:19
**producing (2)**
  553:13;564:21
**production (59)**
  275:1,5,9,14,18,23;
  279:22,25;280:1,4;
  281:2,6,16,20;282:7,
  10,20,25;283:1,4,9;
  284:4,12,23;285:1,
  17;286:4,7,9,10;
  287:10,16,19,23;
  288:4,16;289:19;
  290:3;293:17;
  320:20;321:4;
  322:22;336:4;384:1;
  487:19;551:13,18;
  553:15;585:4,13,22;
  587:6,10,12,15,18;

589:23;590:14,20
**productive (1)**
  433:20
**productivity (10)**
  336:2;551:10,12;
  552:8,14,23,25;
  553:8;554:1;585:5
**professional (3)**
  336:24;603:21;
  605:7
**professionalism (1)**
  603:15
**program (18)**
  276:19;367:2;
  372:15;373:18;
  374:6,10,18,20;
  375:4;399:20;
  416:14;417:13;
  488:10,12;489:3;
  592:4,25;593:2
**programmed (1)**
  586:5
**programs (1)**
  326:2
**progression (1)**
  305:8
**prohibit (1)**
  436:17
**prohibited (2)**
  444:10;550:15
**prohibits (1)**
  444:8
**project (6)**
  475:15;561:23;
  587:20,21;588:4,4
**promotion (1)**
  551:22
**promotional (1)**
  467:10
**proof (9)**
  262:24;266:18;
  267:2,8;298:13;
  299:1;312:23,24;
  571:24
**proper (1)**
  532:20
**properly (4)**
  299:18;300:2;
  554:17,20
**propose (2)**
  464:5;557:7
**proposed (30)**
  293:23;294:1;
  297:17;327:16,19;
  331:16;352:14;
  407:23;408:18,21;
  530:6,21;543:16,21;
  544:14,16,18,22,24,

25;545:11,12,25;
546:2,16;547:4;
606:15,18,23;607:6
**prorated (1)**
  476:16
**protected (2)**
  368:10;585:2
**protection (2)**
  482:5;582:25
**provide (79)**
  263:16;295:4,11;
  296:12,16;309:11;
  329:16,21;330:2,5,
  12;332:5;338:1;
  358:8;361:14,16,16;
  370:2;371:23;375:1;
  376:17,25;379:5,8;
  380:10,12,18;
  383:16;387:3;389:2;
  394:3;396:10,15,19;
  398:11,18;399:4;
  408:22;409:24;
  420:1,7;436:14;
  438:25;448:25;
  454:24,25;457:2,11;
  458:21,22,23;
  467:12;469:21;
  472:13;473:16;
  483:22;492:13,19;
  513:24;514:3;
  528:17;540:17;
  541:16,25;542:6;
  543:22;544:13;
  556:22;557:4,5,20;
  560:12;562:18;
  563:3;564:23;566:6;
  603:23;612:22,25
**provided (52)**
  253:9;255:2;
  265:9;275:11;
  276:19;306:25;
  307:2;319:24;
  334:14;378:3;379:1;
  387:10;388:10;
  394:2;397:18,19,23;
  404:20;409:5;
  424:14;436:18;
  456:7;460:3;465:13;
  466:1;468:3;470:6;
  480:22;505:23;
  514:1,5;517:10,11,
  12;521:1;532:25;
  535:7,19,21;542:25;
  543:18;549:22;
  556:22;561:17;
  563:1;565:11;579:7;
  584:6;593:7;606:17,
  22;607:5

**provider (3)**
  285:7;444:6;
  520:19
**providers (1)**
  276:23
**provides (2)**
  299:9;457:12
**providing (12)**
  294:18;399:7;
  409:18;439:4,12;
  440:23;476:14;
  481:10;536:4;
  560:18;562:16;
  579:16
**prudent (1)**
  303:2
**public (1)**
  612:12
**pull (3)**
  336:1;372:5;
  547:23
**pulled (3)**
  260:6;289:4;290:6
**pulling (2)**
  289:3;580:21
**purely (2)**
  583:21,22
**purpose (5)**
  392:11;393:5;
  405:24;432:8;533:12
**purposes (7)**
  253:23;463:11;
  490:17;501:14;
  585:6;587:4;612:12
**pursuant (2)**
  334:6;594:15
**pursue (3)**
  463:4,17;464:1
**push (1)**
  394:4
**put (17)**
  281:10;317:7;
  321:25;322:9;
  431:16;441:1;
  525:25;526:25;
  527:2,3;553:1;561:9,
  13,16;564:11,14;
  609:4
**putting (4)**
  317:8;441:15;
  456:19;573:3

## Q

**qualifications (3)**
  467:8;501:25;
  521:12
**qualified (2)**

393:12;467:11
**qualifies (1)**
  388:8
**qualify (2)**
  502:18;503:25
**quality (22)**
  538:10;585:4;
  586:17;587:1.6,12,
  15,18,22;588:6,6;
  590:9,10,14,19;
  591:1,6,10,15,18,19,
  24
**Quarter (1)**
  592:21
**Quenichet (1)**
  338:14
**Q-U-E-N-I-C-H-E-T (1)**
  338:18
**questioner (5)**
  255:22;346:23;
  363:20;452:22;
  523:14
**quick (2)**
  341:21;540:6
**quiet (3)**
  432:24;433:14;
  604:4
**quite (4)**
  357:21;427:12;
  516:16;571:9
**quote (1)**
  304:13

## R

**Rachel (8)**
  252:5;254:12;
  257:6,11;395:4,5;
  478:20;602:12
**R-A-C-H-E-L (1)**
  257:7
**raise (4)**
  274:25;313:25;
  322:3;491:3
**raised (7)**
  266:6;268:4;
  282:6;309:22;310:5,
  6;488:1
**raising (1)**
  314:1
**ramp (2)**
  322:25;551:16
**ran (1)**
  287:1
**ranges (1)**
  370:7
**rarely (2)**
  349:3;444:5

Case 1:20-cv-01154-JPH-MJD    Document 39-5    Filed 07/02/21    Page 395 of 406 PageID #: 10290
30(b)(6) Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

**rate (9)**
288:25;586:15,16;
587:10;590:18;
591:11,14,18;592:2
**rated (1)**
588:13
**Rating (7)**
257:24;539:8,11,
12,14,15;589:6
**ratings (1)**
539:18
**re- (1)**
291:24
**reach (3)**
398:18;444:5;
576:22
**reached (1)**
398:15
**reaching (2)**
508:13,21
**reaction (1)**
481:20
**read (20)**
264:21;324:17;
329:6;330:9;341:20;
383:20;384:2,3;
385:3;390:7;422:7;
443:21;444:2;
466:18;518:25;
533:24;556:16;
561:19;573:25;587:9
**readdressed (1)**
252:6
**readily (1)**
370:15
**reading (4)**
409:7;425:20;
426:13;502:11
**reads (2)**
425:25;467:2
**real (2)**
277:3;341:20
**really (33)**
259:8,12;260:19;
273:11,17,18,21;
274:18;276:3,16;
279:11;280:22;
283:8;288:13;294:8;
308:10;312:11;
317:22;319:3,11;
434:21;467:18,20;
468:1;501:7;506:2;
530:4;544:2;600:24;
602:15;610:7;611:3;
612:9
**realm (1)**
392:20
**reason (29)**

292:21;294:1;
313:1;324:19;326:8;
327:8;353:3;377:23,
25;405:18;422:12;
437:25;438:4;
499:20;500:3,16;
509:8;511:14;512:4,
9;515:2;558:9;
571:18;572:19;
603:8;608:23;610:2
**reasonable (169)**
259:19;260:2,9,14,
20;262:6,19;263:25;
264:6,23;265:17;
266:7;268:5,19;
269:9;272:18,23;
273:13;274:14;
275:17;276:10;
277:16;295:13,15;
298:4,10,15,22;
299:9,16,19;300:3,6;
302:22;303:3,5,7,19,
21;304:5;306:4,10,
15,19,21;309:17;
311:20;312:6,8;
313:2,12;314:17;
325:25;326:4;
328:12,14,17,20,23;
330:19;331:21,25;
340:16;342:11,20;
361:20,23;366:2;
367:7,8;368:3,18,21,
23,24;369:1,8,12;
370:2,10,16;371:1,2;
383:9,14;384:22;
387:22;388:4,8;
391:4,13,24;392:2,9;
393:1,4,6,14;395:19;
396:22;397:11;
398:1,17;399:3;
401:15;411:4,14,20;
412:1,13;414:20;
416:2;417:24;
418:11;423:6;
430:19;431:17;
439:10;442:7,8,12;
462:7;463:1,13,18,
25;467:15,24;468:3,
5;469:12;470:11;
478:25;509:21,25;
513:12,14,18;517:20,
23,24;519:5;532:13;
533:5;535:10;536:2;
556:19;557:4,14;
577:10;594:22;
595:1,14;596:20,21;
597:1,3,20,21;598:8;

599:8,12,15,18;
609:19;610:13,21;
611:7,17
**reasoning (1)**
393:2
**reasons (18)**
300:6;324:6;
327:6;334:9;336:14;
360:5;388:15;
422:13;446:18;
472:10;481:14;
497:9;525:12;557:6;
595:21;599:19;
600:14;606:1
**reassign (3)**
390:9;467:4;
519:18
**reassigned (1)**
519:23
**reassignment (26)**
327:6;330:18;
331:8;334:2,5,8;
360:5;388:15,22;
389:11,11,14,24;
390:5;464:13;
465:14,17;466:17;
467:7;481:12;497:9;
499:14;594:9,24;
595:21;600:14
**reassignments (1)**
502:6
**rebut (1)**
610:8
**rebuttal (3)**
601:17;609:7;
613:11
**rebutting (1)**
609:8
**recall (195)**
264:4,20;269:1,21;
270:18,20,24;273:10,
11;276:24;277:20,
21;279:16;290:11;
292:13;293:23;
297:11,14;300:19;
301:2;304:22;305:2,
7,13,17,19;307:3;
308:19,23;309:13,
15;312:13;315:17;
317:15;319:18;
320:2,7,10,14,17;
322:15;330:24;
331:8,11;337:25;
339:1;340:2;342:22,
23;343:17;344:15,
16,17;349:19;
351:10,22;352:25;
353:18,25;357:20;

358:6;359:19;360:2,
15,16,23;370:5;
371:6,8,10;372:21,
22,23,24;375:8,12,
14;377:6;382:25;
383:11;388:13,14;
391:2,14;392:7;
394:14;397:17;
400:18,24;401:5,6,
16;402:19;404:20;
409:3,15,18;416:24;
435:1;445:23;446:6;
447:5;455:15;
457:25;458:14,19;
459:3,12;464:10,18;
478:21;483:8;526:7,
21;528:12,23;
529:23;530:4;531:7;
532:12,22,23,24;
533:8,20;534:6;
535:2,6,15,18;
540:19;541:7,10,14,
18,19;542:8,9;543:2,
8,9,9,13,14,16,24;
544:6,8,15;545:18;
547:1,3,9,11;549:10,
24;550:17;554:11,
14,18,22;555:9;
556:10;558:17,21;
559:8,9;560:7,8,19,
20;561:6;563:2,5,6,
17;568:10;569:13;
576:5;599:6;600:25;
604:23;605:1,1,5,10,
22;606:4,12,16,21,
22;607:3,14;613:1
**recalling (1)**
338:6
**recap (4)**
341:15;342:6;
344:14;536:23
**recapping (1)**
556:14
**receipt (3)**
342:10,14;613:20
**receive (15)**
359:23;391:15;
404:15;409:11,13,
22;497:21;499:8,11;
513:11;514:13;
519:7;528:5;556:7;
613:25
**received (29)**
260:4;272:14;
320:11;325:16;
327:25;333:21;
361:13;373:22;
378:2;383:25;386:2;

391:16;398:16;
401:14;409:11;
431:2;447:19;
461:20;476:23;
477:12;482:2;499:7,
12;506:21;529:5;
549:2;562:15;
573:16;599:11
**receiving (14)**
279:16;292:14;
293:23;360:2,4;
375:8;382:25;
457:21,25;459:12;
545:25;557:8,10;
599:6
**recently (3)**
258:8;265:8;
417:15
**receptive (2)**
273:17;297:16
**recess (6)**
345:4;362:11;
450:17;522:4;
565:17;601:13
**recognize (1)**
298:19,20;374:1
**recognized (1)**
561:24
**recollection (8)**
270:2;332:7,11;
446:8;497:15;
516:13;576:16;595:3
**recommend (1)**
408:4
**recommendation (27)**
334:24;371:18;
374:23;376:3;377:3,
4;400:14;457:15;
459:4,6;469:21;
470:2;479:19,21;
481:1;482:9;501:5;
593:5;597:5;598:2;
599:6,10,11;608:17,
24;609:2;610:1
**recommended (5)**
375:6;546:22;
572:15,20;597:8
**recommender (1)**
608:11
**record (47)**
252:6;253:1,23;
257:5;259:22;
316:13;317:8;345:3;
347:17,21;362:10;
364:18;420:7,9,12;
421:12,15,16,20;
437:19;438:1,5,7;
439:1;450:16;453:7;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 396 of 406 PageID #:
1050

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

498:7;522:3;524:10;
540:4;564:6,8,11;
565:16;566:13;
592:18;598:6;
601:12;603:17;
605:21;608:14;
609:5;612:1,12;
613:12,14;614:7
**records (6)**
271:22;286:8;
338:12;339:3;
377:14;600:8
**recross (1)**
317:1
**reevaluate (1)**
289:17
**refer (11)**
260:17;304:15,20;
324:15,25;328:9;
329:18;330:10;
509:16;533:24;
556:20
**reference (5)**
332:22;358:13;
388:21;426:17;
536:11
**referenced (3)**
264:3;333:2;353:3
**references (1)**
425:17
**referencing (1)**
511:1
**referred (2)**
464:20;468:5
**referring (6)**
338:12;384:23,25;
426:16;466:14;
497:25
**reflect (1)**
489:23
**reflects (2)**
510:7;598:9
**refrain (2)**
554:13,14
**refresh (5)**
270:1;332:6,10;
446:8;533:25
**refusal (1)**
407:18
**refuse (2)**
603:1,3
**refused (4)**
444:11;472:2;
563:3;576:12
**refusing (4)**
353:9;472:1;
564:24;605:5
**regard (21)**

304:24;306:15;
328:11;351:2;
388:12;396:11;
399:2;404:21;
407:18;459:4;464:2;
475:17;520:6;
536:17;559:12;
563:1;571:5;573:4,
10;580:17;607:23
**regarding (39)**
252:7;254:1,8;
259:1;260:7;262:18;
263:8;270:25;
275:16;288:15;
305:15;306:19;
312:23;344:1;
361:12;382:17;
383:1;392:8;415:8,
14,18;427:6;513:18;
532:3;547:15;559:2,
4;565:4,9;580:15;
592:24;594:5,18;
601:23;602:1;
604:24;605:23;
606:5,12
**regardless (2)**
278:2;561:16
**regards (10)**
298:9;311:9,19;
328:15;416:7;
418:18;538:9;
539:22;540:9;576:6
**Regional (23)**
348:15,19;365:12;
366:3;367:4,5;
374:11;389:25;
411:10;417:15;
435:23;453:23;
454:9;494:7;519:13;
520:2;524:25;525:2;
567:4;572:2,21;
573:2;574:24
**regulations (13)**
368:8;371:19;
374:24;415:20;
416:7,19,25;417:9;
426:20;427:1,9;
436:16;509:5
**Rehab (5)**
388:9;424:16;
425:6;428:8;515:6
**Rehabilitation (1)**
424:11
**reimbursable (1)**
578:17
**reiterated (2)**
400:25;462:17
**reiterating (1)**

252:15
**rejected (1)**
253:18
**related (8)**
284:5;295:6;
335:24;336:15;
337:2;549:4;554:20;
606:14
**relates (5)**
287:24;288:4,18;
299:20;300:4
**relating (6)**
257:14;348:8;
365:4;453:18;
524:20;566:23
**relation (2)**
320:15;574:6
**relations (1)**
365:19
**relationship (4)**
283:3;412:8;
455:12;525:16
**relay (1)**
398:8
**released (2)**
289:9;446:14
**relevance (5)**
262:22;607:19,21,
22;608:9
**relevant (23)**
282:3,5,18,24;
283:25;284:1,9,11,
11;286:6;287:13;
298:11,17;299:2;
313:15;315:2;
417:20;608:19,23;
609:4;610:2;611:5,
12
**relied (1)**
515:13
**relocating (1)**
456:15
**relocation (5)**
303:18;304:8;
349:7;443:17;578:15
**relocations (3)**
481:12,14;594:10
**reluctant (1)**
340:8
**rely (3)**
291:23;513:23;
593:3
**remaining (1)**
430:12
**remember (64)**
262:11;266:13;
269:5,11;271:2,13;
275:24;277:8,12;

279:3,4;302:11;
304:13;305:7;
310:19,20;329:19;
331:4;339:3;354:18;
360:4;422;393:2;
394:16,17;395:8,9;
397:21;434:8,9,16;
446:5;525:21;
538:22;540:16;
544:16;557:8,10;
568:12;569:6,12;
575:20;576:17;
579:3;580:1;587:24;
594:20;595:8;596:2,
3,4,6,21,24;597:25;
598:1;599:3,9;
600:24;601:2,2;
602:4;606:10,25
**remembering (1)**
259:2
**remembers (1)**
278:2
**remind (4)**
573:19;584:2;
594:7;597:11
**reminding (2)**
358:2;557:17
**remission (1)**
426:2
**remove (1)**
440:19
**rep (1)**
433:22
**repeat (17)**
267:25;275:12,13;
299:25;303:9;
330:24;448:3;495:7;
535:4;540:15;
541:23;543:20;
552:16;555:21;
560:1;561:11;606:2
**rephrase (6)**
259:5,5;262:25;
303:9;542:16;586:11
**rephrased (5)**
256:8;346:18;
363:15;452:6;523:9
**replaced (1)**
289:5
**report (8)**
368:16;411:25;
412:5;489:9;528:20;
584:22,25;587:15
**reported (3)**
458:4;489:24;
496:2
**reporter (9)**
255:5,19;346:3;

363:6;451:15;
522:24;566:11;
613:21,21
**reporting (2)**
488:20;489:5
**reports (1)**
336:1
**representation (1)**
435:9
**Representative (19)**
257:25;395:4;
398:8;407:10,15;
418:24;419:1,2,6,18;
429:9;433:24;
445:22;455:13;
458:16;461:15,16;
472:22;575:21
**represents (1)**
258:4
**reprimand (59)**
293:24;294:2,3;
297:6,17;306:6;
331:17;332:2,18;
335:20;336:11;
352:14,20,22;353:4,
23;354:6;360:7,23;
407:23;408:9,16,25;
447:25;448:5,10,14,
23;449:10,15,17,2?
450:3;478:9,17;
515:20;517:10,22;
530:6,6,21;543:17,
22;544:14,17,18,22,
24,25;545:11,12,25;
546:2,16;547:4;
606:16,19,23;607:6
**reprimanded (7)**
287:15,19,20;
297:21;448:18;
449:19;517:14
**reprisal (6)**
255:1;345:22;
362:25;451:4;
522:18;566:5
**request (196)**
260:3;263:7,8,12;
265:13;269:9,22;
270:22;272:19;
276:8,11;284:8;
290:21;294:10,14;
296:15;298:5,22;
299:13;300:4,7,15,
17;302:10,14,19,22;
303:5,15,19,23;
307:17,21,22;309:6
314:17;318:4;320.
326:11,20;327:10;
329:22;330:15;

DEF001062

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 397 of 406 PageID #:
10310

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

331:1,7,15,20,25;
332:24;334:5;
335:16,21;336:13;
341:17;342:11,14;
343:13;355:10;
360:4;371:6,8;372:4;
374:4;375:8,24;
377:8;380:11;386:8,
12,13,18,20;388:23;
389:4,14;390:3,15;
391:3,12,15,20;
392:9;396:22;
397:18;399:2;400:4,
24;401:15;406:25;
407:3,25,25;412:19;
418:1,13,19;424:1;
430:20;434:4;
436:19;438:3;
445:12;456:2,10,20;
458:1,5,7;459:7;
460:16,18;461:9;
464:12,20;467:14,18,
24;469:12;470:16,
18,21;472:11;474:8;
475:7;481:22;
482:12,14;493:3;
496:19;497:5,8,10,
14;499:6,12,16,17,
21,24;500:7;509:20;
512:6;513:12,14;
515:3;519:3,11;
521:9;529:25;
530:11;533:6,16;
535:10;536:2,3;
555:20,25;568:4,8;
569:7,11;570:3;
574:22;575:12,16,17,
20,24;577:8,10;
578:4,9,18;579:11;
580:11;581:16;
582:6;584:16;594:6,
21;595:3,9,15,21,24;
596:22,25;598:9;
599:18;600:14;
601:2;607:24,25;
610:14;611:18;
612:22

**requested (28)**
262:12;272:24;
296:7,25;303:11;
330:3,6,11;331:5;
372:14;379:16;
382:16;399:5;402:4,
7;431:17;463:7,8;
511:16;519:2;
532:13;540:14;
555:24;556:18;
557:5;562:8;572:15;

599:14
**requesting (19)**
273:12;295:14;
297:25;311:14;
326:3,4;375:23;
383:6,8;384:8;
388:14;389:10;
391:10;424:2;
442:20;457:5;
465:25;519:12;578:7
**requests (36)**
260:10;262:18;
269:11;325:20;
330:17;335:9;349:1,
7;371:4;373:1;
384:22;412:2,13;
416:3;419:23;
422:12;457:8;
465:15;469:5;
475:25;478:24;
502:6;508:11;
512:13;567:22;
568:13;569:3;574:1,
10,15;578:12;581:1,
3,5,8;601:25
**require (8)**
329:14,20;330:4;
334:12;418:1;
456:17;457:18;512:9
**required (25)**
269:7;314:7,19;
349:13,14,15;
350:13;403:2;
434:10;445:8;447:7;
457:11;471:20;
472:4,12;473:19;
525:24;526:2,25;
542:11;552:14,24;
586:3,18;591:14
**requirement (5)**
353:17;465:18;
472:18;516:19;
527:25
**requirements (12)**
264:22;444:19;
445:24;465:8;468:2;
487:8;499:5;502:2;
532:18;574:21;
575:7;597:7
**requires (8)**
272:22;307:8;
503:14;511:14,15;
512:5;570:16;581:17
**requiring (1)**
329:11
**requisite (1)**
598:3
**reschedule (2)**

354:25;355:3
**research (3)**
261:22;339:2;
372:6
**researched (2)**
260:5,8
**residing (1)**
461:12
**resigned (3)**
258:8;265:8,9
**resolved (1)**
558:19
**resort (2)**
442:10,14
**resource (5)**
263:17,18;365:11,
20;366:10
**Resources (13)**
268:17;369:1,18;
371:17;372:5;376:9;
378:9,22;408:20;
409:12;410:1;
462:15;536:8
**respect (1)**
529:6
**respond (10)**
292:17;296:15;
300:25;301:1;
344:13;469:3;
529:24;557:11;
558:16;575:24
**responded (7)**
344:15;399:6;
511:23;556:16;
558:12;562:23;
596:10
**responds (1)**
557:22
**response (14)**
317:9;335:21;
336:12;352:25;
379:14;386:8;469:2;
470:11,14;491:11;
536:22;579:15;
596:5,19
**responses (3)**
256:1;451:24;
603:9
**responsibilities (5)**
390:11;429:10;
467:5;476:8;519:20
**responsibility (4)**
371:17;397:12;
408:7,19
**responsible (8)**
372:3;373:2;
412:4;429:12;
454:23;476:21;

567:11,18
**rest (2)**
322:9;602:15
**restarted (1)**
287:1
**restriction (6)**
480:7,9;570:8;
577:24;583:2,5
**re-submit (1)**
460:18
**result (3)**
297:14;328:4;
583:9
**resulted (1)**
552:9
**results (2)**
481:21;484:7
**resumed (1)**
488:17
**retaliation (5)**
266:21,23,24;
267:1;293:4
**retaliatory (1)**
292:22,24
**return (1)**
321:23
**returned (2)**
322:20,20
**returning (1)**
286:21
**revamp (1)**
286:23
**review (33)**
270:1;290:19;
306:24;307:2;349:1;
386:5,24;389:22;
408:20;456:24;
457:22;470:3,5;
479:10;489:14;
493:17;509:15;
537:20;539:20;
549:20;550:20;
554:10;567:22;
568:3;584:7;587:20;
588:3,4,7;590:15;
591:2,6,24
**reviewed (12)**
307:1,6,13;352:17;
464:21;479:15;
499:17;554:11;
562:8;581:6;589:23;
591:3
**reviewing (9)**
307:4;428:16;
465:12;482:1;483:1;
498:16;500:7;
550:21;569:3
**reviews (12)**

587:22;588:6;
590:9,10,14,19;
591:10,15,18,20;
592:2;597:6
**right (113)**
254:11;257:24;
258:9,17;263:24;
273:5;280:10;
289:18,21;291:18;
292:11;297:1;
300:10;303:12,14;
304:22;305:2,7,22;
308:3;311:16,17;
319:18;320:2;321:5;
323:18;324:11;
325:1;327:11;
330:16;337:11;
341:1;343:8,18;
347:24;353:21;
362:9;370:1;374:7;
377:19;388:18;
390:17;412:11;
415:17;417:22;
419:13;420:5,21;
421:1,9;422:5,22;
425:5;426:7;430:10;
438:9;440:7,25;
441:11,13;442:4;
443:11,19;450:9;
455:11;459:15,18;
460:12;464:16;
465:12;475:3,3,21;
486:4;487:16;500:1;
509:1;511:4;512:12;
513:11;515:12,19;
517:15;520:4;
521:18;529:2;
530:14;532:12;
533:4,8;537:19;
539:13;540:13;
542:24;543:16;
545:16;548:10,11;
553:10;555:5;
556:25;557:20,21;
572:13;575:21;
576:17;580:3;
586:25;590:12;
596:6;599:5;601:4;
611:1
**rights (2)**
559:18;560:5
**RO (3)**
389:12,12;519:24
**road (2)**
295:9;492:25
**Robert (2)**
252:8,9
**ROI (11)**

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 398 of 406 PageID #: 10320

OC Hearing                                                                    Brown v. McDonald, et al.
Volume II                                                                            July 21, 2015

269:24;341:9;
349:21;411:3;459:9;
468:9;568:19;
595:12;598:7;
609:15;610:13
**role (10)**
358:23;360:3;
411:6,13;413:10;
441:4;454:20;469:9;
567:21;611:22
**room (13)**
270:10;277:15;
278:6,24;395:4,15;
419:2;485:12;
486:25;602:9,13,14;
605:15
**root (1)**
288:14
**rough (3)**
259:8;303:8;
321:20
**route (4)**
260:24;274:9,10;
295:21
**routinely (2)**
500:6;595:7
**rule (1)**
364:1
**rules (8)**
267:7;371:18;
412:23;446:10;
491:22;515:24;
516:4;518:5
**ruling (15)**
252:14,15,17;
254:1;256:18;
284:13;314:21;
347:5;452:16;
523:24;565:4,6;
609:3;612:3,9
**RVSR (4)**
257:25;258:1;
338:10,21
**RVSRs (4)**
301:15;350:6;
403:2;454:18

**S**

**Salazar (1)**
455:22
**Salt (1)**
348:14
**same (25)**
255:21;265:21;
281:8;301:16;306:8;
324:23;339:25;
346:22;354:23;

363:19;389:8;
407:15;442:20,21,
21;452:21;458:11;
486:16;493:12;
523:13;549:13;
572:14;573:18;
582:3;591:12
**sat (4)**
394:23;398:5;
435:14;487:1
**satisfied (1)**
396:25
**Saturday (2)**
354:21,21
**saw (5)**
264:16;351:7,17;
421:24;514:10
**saying (41)**
267:12;274:3;
276:4;277:19;
291:22;297:3;314:5;
339:7;342:24;343:1;
384:8,17;388:3;
400:6,11;408:5;
412:5;422:10;
423:11;431:10;
434:7,14;461:10;
487:11;491:16;
495:13;500:20;
502:19;503:22;
504:1,6;511:25;
512:7;528:9;554:18;
571:10;583:16,19;
609:12,14,16
**scenario (1)**
414:16;417:18
**schedule (5)**
367:11;403:12;
404:1;473:17;475:21
**scheduled (4)**
406:22;446:11,12;
576:15
**schedules (1)**
358:12
**scheduling (1)**
253:5
**sciatica (1)**
285:11
**scope (2)**
266:16;282:1
**score (2)**
489:19;554:9
**second (16)**
252:4;314:21;
315:25,25,25;
394:11;417:2;
421:11;425:21;
426:18,23;466:13;

492:5;540:4;547:18;
607:25
**Secondly (2)**
346:12;609:23
**seconds (1)**
513:8
**secretary (2)**
575:25;576:12
**section (31)**
301:4;334:10,11;
335:4,5;389:21;
390:2,12;466:17;
467:12;481:13,16;
501:2,14,18,22;
502:5,7,8,9;507:3,5,
6,9;508:10;519:15,
16;520:5,16;595:5,
10
**sections (1)**
383:20
**security (1)**
367:11
**seeing (9)**
409:4,15;426:15,
17;484:25;505:6;
550:2;595:8;596:21
**seek (7)**
260:14;290:18;
329:2,3;483:24;
500:17;501:5
**seeking (6)**
312:8;325:3,25;
328:22;329:5;564:20
**seem (7)**
260:18;262:2;
273:12,22;274:18;
293:16,20
**seemed (14)**
265:19;273:19,20,
23;274:12;276:25;
278:22;279:10,20;
293:14,21;300:15;
331:14;485:11
**seems (1)**
337:24
**selected (1)**
408:9
**self-report (2)**
488:9,11
**send (9)**
376:1,7;389:15;
403:22;527:15;
528:9;541:13;
580:25;613:22
**sense (3)**
280:7;438:21;
598:14
**sensitive (1)**

276:14
**sensory (3)**
510:4;511:5,7
**sent (20)**
357:12,13,21;
374:10;382:9;
387:15;469:2;
471:17;477:23;
482:15;497:17;
528:8,25;529:11;
530:6;556:14;557:1;
558:10;562:17;
606:15
**sentence (2)**
425:22;570:6
**sentences (1)**
573:25
**separate (1)**
326:2
**September (2)**
550:20;551:24
**series (2)**
509:14,22
**serious (11)**
326:7,17;483:1,3,
4,6,9,25;484:10;
500:12;521:10
**seriously (4)**
271:21;272:7,15,
18
**served (1)**
365:23
**serves (1)**
568:25
**Service (29)**
257:24;348:22;
349:3,11;350:3;
354:10;359:5,6,12;
366:18;390:12;
429:9;446:25;454:1,
8,21,22;455:13;
457:10;458:16;
468:18;469:7;470:4;
471:14;478:11;
526:5;569:17;576:3;
584:3
**service/section (2)**
467:6;519:21
**serving (3)**
464:25;465:3;
469:8
**set (8)**
278:22;324:23;
329:16;446:10;
480:17;575:25;
576:12,23
**setting (3)**
485:17;504:15,16

**several (8)**
260:9;294:11;
367:11;372:25;
382:20;426:5;
455:16;609:17
**severe (2)**
285:11;563:9
**severity (3)**
507:22;508:1,6
**sexual (1)**
368:15
**shake (1)**
451:25
**shaking (1)**
256:3
**shape (1)**
602:15
**shared (2)**
403:4;519:4
**shift (2)**
481:12;594:9
**shifts (1)**
352:7
**shoot (1)**
266:4
**short (2)**
268:15;591:9
**shortly (6)**
268:12;301:19;
319:23;414:15;
476:12;557:2
**show (10)**
291:7,16;423:23;
424:14,17;446:7;
480:1;515:5;565:11;
596:16
**showing (2)**
282:25;334:12
**shut (1)**
602:24
**sic (2)**
588:20;592:16
**sick (15)**
320:9;321:16,18;
354:16,17,19;355:7;
406:3,8,19;407:2;
474:14;475:2;
530:19;536:13
**side (1)**
588:18
**sign (39)**
337:22;338:4,23;
339:8;340:7,19,24;
341:4;350:20;353:9;
356:2,9,18,19;358:?
8,21;403:24;404:7
405:17;406:12;
407:18;436:19;

Min-U-Script®                          SMITH REPORTING                    (29) role - sign
                                      www.smithreporting.net
                                                                          DEF001064

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 399 of 406 PageID #:
1029
TC Hearing                                                    Brown v. McDonald, et al.
Volume II                                                                July 21, 2015

444:24;445:9;
447:10;448:2,6;
472:1,2;529:22,25;
530:11;531:21;
536:18;537:22;
543:12;547:8;565:13
**signature (7)**
374:22;537:24;
538:1,2;545:6,19;
548:5
**signed (27)**
337:17;340:16;
353:6;354:15,20;
355:7;371:15;404:9;
405:21;449:25;
450:2;531:22;
539:21;543:18;
544:19;545:8,10,17,
23;548:4;549:20;
589:13;596:22;
597:8,17;599:15;
607:12
**significant (3)**
502:15;503:4;
508:17
**signiug (7)**
287:20;339:12;
351:3,14,21;404:12;
477:14
**signs (1)**
405:18
**similar (2)**
387:20;474:17
**simple (4)**
335:16;413:22;
604:10,11
**simply (2)**
269:16;485:19
**sincerely (1)**
516:15
**single (2)**
426:3;586:14
**sit (3)**
306:24;487:2;
604:4
**situation (10)**
267:9;282:9;
289:23;391:11;
405:7;445:17;
447:12;477:8;
516:12,22
**Six (5)**
301:20,21,22;
525:10;567:8
**skills (1)**
286:23
**skin (19)**
426:11,16;427:10,

16;429:20;498:4,11,
13,15,20;503:18,19,
23;510:4,6,20,22;
511:5,8
**slamming (3)**
460:24;485:9;
496:6
**sleep (1)**
264:10
**slept (1)**
332:14
**Slicer (2)**
493:25;494:2
**slight (1)**
604:12
**slightly (1)**
421:13,14
**small (2)**
288:13;476:7
**smaller (2)**
584:12,12
**snapshot (1)**
490:1
**software (1)**
488:10
**sole (2)**
596:13;597:13
**somebody (9)**
460:10;471:12;
485:1,2;506:3;527:7;
563:1;576:3;608:17
**somehow (7)**
282:24,25;283:1,
10;284:4,4;611:8
**someone (22)**
283:2;309:10;
354:15;369:18;
370:1,15;371:21,22;
374:21;441:1;
444:20;458:21;
469:15;490:6,13;
518:6;541:21,25;
542:4;551:14;576:1;
597:24
**someone's (1)**
583:13
**sometime (1)**
410:18
**sometimes (6)**
305:14;502:15,22;
503:5;508:17;526:14
**somewhat (2)**
274:1;606:14
**somewhere (2)**
333:4;603:16
**Sonya (34)**
265:25;268:15;
270:11;273:13,25;

276:25;277:6;
278:10;279:2;
305:20,23;306:1,9,
12,20;313:22;314:2;
318:15,16;341:13;
360:19,22;362:15;
364:19;365:1;
469:17;470:25;
543:10;557:13;
562:15;576:2,21;
597:10;602:2
**S-O-N-Y-A (1)**
364:20
**soon (2)**
443:8;449:24
**sores (1)**
484:14
**sorry (50)**
254:15,18;259:8;
265:17;297:11;
299:25;303:8;
313:17;315:17;
320:18;330:23;
332:3,7,14;372:24;
373:7;374:7;375:13;
380:3;381:12;390:7;
401:8;406:10;422:9,
22;425:20;426:13,
15;440:2;446:5;
448:3;466:21;498:6,
8;510:18;518:17;
534:17;535:4;
537:24;552:16;
561:11;562:6;577:9;
586:10;588:22;
597:19;606:2,11,18;
607:10
**sort (2)**
295:5;475:6
**sought (2)**
262:13;517:3
**sounded (1)**
383:10
**sounds (1)**
599:5
**space (1)**
486:23
**speak (30)**
255:21;263:10;
270:17,21;276:22;
293:10;305:12;
325:22;346:22;
360:19;363:19;
369:1,20;370:25;
401:12;405:7;
435:12,13;437:5;
445:21;451:19;
472:15;486:19;

487:2;490:25;523:5,
13;603:1,6,25
**Speaking (7)**
265:11;269:21;
398:4;436:17;
515:21;569:4;591:23
**Spec (1)**
285:2
**specialist (6)**
365:11,19;366:11;
423:25;471:1;496:1
**specialty (1)**
367:13
**specific (30)**
264:2;276:1;
310:17;311:5,10;
319:3,4,20;334:13,
19;355:24;356:8,12;
357:1,6;358:6;
387:23;395:12;
403:3;404:5;405:24;
414:18;422:5;
429:22;430:7,9;
446:14;447:12;
569:1;575:11
**specifically (36)**
262:2;300:18,21;
316:14;356:19;
368:2,18;370:12;
372:22;384:9;
394:16;396:13;
401:16,19;412:24;
415:20;419:7,10;
420:17;424:16;
426:16;427:9;
429:17;435:4;
446:15;447:11;
481:13,15;502:12,
14;515:20;529:21;
557:25;570:20;
581:15;609:14
**specifics (6)**
277:22;334:16;
434:8,16;555:11;
577:5
**speculate (1)**
307:9
**speculating (1)**
336:6
**spell (11)**
257:4;260:19;
276:3;334:18;
338:15;347:17,20;
364:17;453:7;
524:10;566:13
**spelled (5)**
294:15;328:15;
453:9;566:15;586:4

spoke (5)
270:24;303:1;
305:9;429:13;604:24
**spoken (2)**
270:13,14
**sporadic (2)**
473:24;475:9
**spot (2)**
539:9;548:5
**spouse (1)**
456:15
**spreadsheet (2)**
527:3,6
**St (12)**
375:10;443:17,23;
520:7;535:12,14;
572:21;575:4,9;
577:11;597:17;
607:13
**staff (5)**
349:25;350:2;
404:2,3;409:21
**stage (3)**
420:15;503:6;
552:6
**stamp (1)**
409:12
**stamps (1)**
409:15
**standard (34)**
254:5;289:3,4,17;
290:6,7,10,21;
296:18;324:23;
406:18;468:16;
487:9;527:17;552:2,
14;561:6,10,14,21;
562:2,5;573:1,13;
574:12;585:6,20;
586:2,5,9;591:2,6,25;
592:1
**standards (21)**
290:14,18;291:12;
456:22;462:24;
466:8;487:23;532:8;
549:7,9;570:18;
572:10,18;573:11;
580:13;588:9;
589:21,25;590:2,8,13
**standing (1)**
456:21
**standpoint (1)**
395:25
**start (9)**
285:20;288:7;
340:3;380:4;394:11,
20;397:15;433:1;
488:3
**started (13)**

Min-U-Script®                       SMITH REPORTING                  (39) signature - started
                                    www.smithreporting.net
                                                                     DEF001065

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 400 of 406 PageID #:
1057

EEOC Hearing
Volume 11

Brown v. McDonald, et al.
July 21, 2015

262:5;323:2;
378:20;392:25;
393:4;394:19;
414:17;435:12;
446:1;476:14,14,15;
563:14
**starting (2)**
433:16;459:10
**starts (1)**
373:11
**state (23)**
257:4;264:11,24;
276:6;315:6,10;
343:6;347:17;
364:17;411:16;
412:24;426:20;
453:7;454:25;455:2,
5;461:12;462:12;
524:9;534:8;566:13;
567:14;605:21
**stated (30)**
296:10,13;315:11;
316:15,21;317:23;
342:9,21,22;343:5;
379:22,24;380:2;
381:21;394:15;
395:24;396:13,21;
424:16;511:5;
518:23;534:14,23;
556:3,18;564:22;
602:12,19;603:10,20
**statement (11)**
291:1;295:5,8;
387:4;399:16,17;
422:2;483:3;492:6;
578:19;605:16
**statements (1)**
605:11
**states (9)**
327:8;329:21;
334:15;350:16;
420:18;421:19;
443:15;518:19;
567:15
**stating (9)**
278:11;342:5;
344:12;399:7;
533:20;534:6;556:5;
557:3;605:22
**station (5)**
337:5;376:5;
378:17;457:21;
578:14
**stations (1)**
456:9
**station-wide (1)**
336:2
**stay (3)**

278:24;408:11;
491:8
**step (4)**
359:3;413:9;
551:7;552:17
**Stephens (19)**
402:5;462:18;
468:14;470:17;
479:18;494:14,15;
565:22,24;566:2,14,
20;567:3;593:3;
594:4;598:19;
607:12;608:1,20
**Stepheus' (1)**
610:22
**S-T-E-P-H-E-N-S (1)**
566:15
**stepped (7)**
262:11;525:11;
540:1;544:11;
549:18;598:20,22
**stepping (4)**
543:25;546:7,11;
550:9
**steward (5)**
258:6,11;259:16,
17;260:1
**stewards (1)**
261:6
**sticking (2)**
274:24;419:22
**still (23)**
280:16;289:7,12;
292:9;296:22;
322:18;407:11;
433:24;442:18,22;
461:23;472:14;
477:7;517:13;526:2;
546:5;554:1;558:11,
14,19;562:16;
598:24;601:18
**stomachache (1)**
354:22
**stop (1)**
443:8
**story (1)**
388:3
**Street (1)**
351:4
**stress (1)**
259:3
**strictly (1)**
316:9
**student (2)**
365:20;416:11
**subject (2)**
305:24;414:16
**subjected (1)**

611:15
**subjects (1)**
467:15
**submission (1)**
334:22
**submissions (1)**
607:16
**submit (20)**
263:12;274:6;
326:16;327:13;
329:12;333:12;
350:23;352:1;
375:24,25;391:20;
457:7;472:11;
473:21;475:25;
476:12;478:4;500:3;
521:8;533:2
**submitted (48)**
263:6;264:13,17;
273:21;276:13;
296:1;303:18;
306:16;326:10,20,22,
23;331:15;351:18;
376:14;377:13,15;
381:4;386:14,25;
391:3,12;430:19;
457:8;458:5;461:3;
464:12,19;469:11;
477:1,4,10;482:4,4,
12;493:2;497:16,23;
513:14;529:14;
533:1,3;545:17,24;
556:4;557:24;569:2;
607:14
**submitting (2)**
335:17;528:2
**subordinate (1)**
412:6
**subordinates (1)**
526:9
**sub-par (1)**
460:1
**subsequent (1)**
598:16
**substandard (1)**
561:14
**substantial (5)**
423:24;424:17,19,
21,22
**successful (19)**
286:19;322:11;
323:18;538:9,13,15,
18;539:5,22;549:13,
17;550:4,6,19;551:3,
24;561:17,25;588:14
**successfully (2)**
261:12;275:22
**sudden (1)**

331:16
**suffered (7)**
267:15;281:8;
282:9,14;283:7;
289:4;484:13
**suffering (4)**
267:10;288:25;
336:3;340:5
**suffice (1)**
556:25
**sufficient (15)**
264:25;271:11,20;
276:10,18;295:24;
298:21;361:15;
424:14;465:23;
475:24;478:7;
498:24;512:8;515:5
**suggest (2)**
309:11;364:8
**suggestion (2)**
307:23;408:1
**suggestions (3)**
317:13,14;330:13
**suited (1)**
501:9
**summarized (1)**
514:18
**summary (1)**
539:11
**sunshine (1)**
261:18
**supervise (1)**
454:14
**supervised (3)**
339:25;542:11,19
**supervises (1)**
567:20
**supervising (1)**
526:10
**supervision (1)**
544:1
**supervisur (48)**
349:10;350:24;
351:5,8;352:2;
354:25;357:3,8;
358:9,24;361:22;
412:8;455:15,23,24;
457:20;458:6,24;
472:21;473:1,12,15;
474:12;475:22;
477:2,10;480:23;
481:3,6;494:21,21;
505:10;506:5;507:5;
516:17,18;517:14;
525:6,10,14;541:5,
11;544:7;558:14,20;
562:9;568:15;603:20
**supervisors (9)**

351:16;352:6;
355:4;356:15;
358:15;455:16,25;
477:13;490:18
**supply (1)**
533:15
**support (25)**
298:21;300:14;
314:16;326:24;
367:6;372:16;376:3;
379:6;382:22,23;
387:7,7;388:1;
443:12;454:24;
466:2;497:14;
511:19;512:1,7;
519:2;538:19;
555:20;573:14;
574:10
**supporting (4)**
376:16;379:4,5;
457:6
**supports (1)**
388:2
**suppose (1)**
385:1;595:8
**supposed (17)**
281:20;294:18;
295:1;342:6;356:9,
14,17;360:12;429:'
483:22;511:1;542.
6;543:6,12;562:10;
581:7
**supposedly (1)**
341:15
**suppurativa (1)**
430:23;502:13
**sure (61)**
253:23;261:3;
287:13;289:14;
291:9;300:1;316:2;
323:12,16;337:12;
338:13;340:13;
343:14;353:20;
355:22;357:20;
379:24;384:5;385:4,
9;398:14;413:12;
421:12,15,20;438:7;
440:3,4,5;445:3;
448:4;460:14;
465:19,23;473:25;
476:5;492:6;501:22;
504:20;516:6,23;
517:8;543:21;544:2;
546:9;552:17;
555:22;560:2;
568:20;570:3;
571:10;580:24;
584:1;588:12;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 401 of 406 PageID #: 10555

OSC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

589:10;590:5;591:1;
607:10;610:5,7;
611:4
**Surge (3)**
561:23;587:20;
588:4
**surgical (2)**
502:22;503:7
**surprise (1)**
315:18
**surprised (1)**
588:1
**Susan (1)**
455:19
**suspended (10)**
587:22;589:22;
590:1,2,6,8,10,11;
591:2,10
**suspending (1)**
588:5
**sustain (15)**
272:9;277:25;
283:22;284:15;
293:4;299:1;310:3;
313:10;316:7;
379:23;436:11;
559:24;572:5;608:8,
11
**sustained (2)**
314:22;408:14
**sworn (18)**
255:3,4;257:12;
346:1,2;348:6;363:4,
5;365:2;451:13,14;
453:16;522:22,23;
524:18;566:8,10,21
**symptoms (1)**
515:1
**system (9)**
267:6;285:24;
288:3;329:24;
377:14;426:11,21;
527:4;553:2

---

**T**

---

**table (2)**
384:19;553:7
**talk (41)**
294:22,24;352:18;
360:11;367:2,6,9;
368:12,14,25;394:10,
13,20;395:10,20;
432:21,24,25;433:1,
14,17,21,22,23;
434:6,13;444:12;
452:21;466:18;
469:5;484:20;497:8;

507:25;508:19,22;
528:6;546:25;
576:22;580:20;
581:6;593:9
**talked (7)**
320:19;321:11;
414:12;510:12;
546:21;555:2;562:25
**talking (24)**
273:6;277:2,7;
281:25;283:17,18;
360:16,22;384:18;
389:24,25;394:11,14,
21;405:8;417:17;
433:1;485:9;494:19;
496:6,7;501:18;
508:7;603:7
**talks (11)**
443:3;465:13,15;
466:13;498:4;
501:23;502:9;508:5,
9,19;511:17
**Tamika (1)**
455:24
**Tampa (2)**
520:7;535:12
**tandem (1)**
412:3
**tasks (10)**
428:21;429:2,11,
18;430:1,6,7,9;
431:6;435:5
**taught (3)**
494:8,11,15
**team (13)**
285:2;403:21;
404:5;525:4;526:18;
528:7;529:17,19;
540:20,21;541:13;
561:23;567:19
**tears (1)**
602:21
**telephone (5)**
252:20,22;253:20;
460:7;486:12
**telephoned (1)**
322:16
**telework (8)**
301:5,12,15,19;
308:12,15;397:4,8
**telling (8)**
276:15;284:1;
395:9;400:8;444:23;
506:2,8;554:14
**tells (3)**
512:4;517:18
**temporarily (1)**
289:5

**tenure (1)**
417:13
**term (5)**
265:19;570:25;
571:4,11,17
**terminated (1)**
323:7
**terms (17)**
272:10;283:6;
284:2,16;421:21;
473:5;474:6;493:16;
499:3;505:7;508:20;
553:8;560:17;
572:11;581:15;
582:12;607:15
**Terry (5)**
261:7;266:11;
268:9;302:25;597:16
**test (3)**
548:3;549:8;550:6
**testified (24)**
262:3;279:8;
290:22;317:20;
341:25;343:14;
344:23;412:15;
415:13;439:3;441:7;
481:19;493:5;
495:20;555:2;580:3;
581:2;593:22;
598:22;599:1;
604:21;608:1,20;
610:3
**testifier (1)**
609:23
**testifies (6)**
257:15;348:9;
365:5;453:19;
524:21;566:24
**testify (5)**
252:18;379:19;
571:3,15;608:4
**testifying (6)**
256:25;268:6;
347:13;364:9;453:3;
524:6
**testimony (50)**
252:5,19;253:1,19;
255:1,8;277:11,16;
289:15;315:22;
316:15;317:4;
344:21;345:22;
346:5;359:21,22;
362:3,5,25;363:8;
410:16;434:20;
445:14;450:10,12;
451:4,17;479:8;
521:21,23;522:19;
523:1;563:25;564:2;

566:5;594:13;
600:17;601:10,17,
22;605:12;606:13,
15;607:11;608:16;
609:9;610:23;
612:20;613:11
**testing (9)**
547:16;549:5,16,
23;550:5,10,16;
552:10;554:8
**that'd (1)**
361:19
**theory (1)**
553:11
**therapy (3)**
271:18;285:10,13
**thereabouts (1)**
589:18
**thereafter (4)**
268:12;398:14;
476:12;557:2
**Therefore (7)**
285:21;326:19;
418:23;447:13;
463:9;503:21;590:25
**thinking (1)**
297:12
**though (20)**
265:20;270:4;
276:25;277:5,9;
278:7;279:10;
285:25;286:1;
293:14,21;318:18;
323:21;331:14;
438:1;441:6;492:8;
503:3;506:14;549:12
**thought (11)**
261:9;272:6;
287:3;393:2;403:8;
410:16;433:6;505:1;
589:3;610:4;612:14
**three (13)**
280:11,20;281:1;
330:22;365:15;
367:22;373:25;
408:13;437:23;
454:12;474:13,14;
575:3
**threshold (4)**
500:21,23;598:3;
599:13
**throughout (5)**
318:10;336:16,18;
368:1;594:14
**tied (2)**
284:12;288:17
**timeline (1)**
387:18

**timely (2)**
560:13,13
**timer (1)**
291:1
**times (11)**
266:1;285:19;
397:20;403:17;
421:2;422:24;
484:14;490:25;
527:13;528:2;529:14
**timing (1)**
544:2
**title (2)**
502:1;578:12
**today (20)**
252:10,13,19;
253:25;254:19;
255:2;345:12,23;
362:16;363:1;
406:10;412:15;
414:12;451:5;
473:13;522:9,19;
565:23;566:6;601:22
**together (3)**
302:24;304:1;
307:4
**told (15)**
295:18;322:19;
434:23;448:20;
461:19,20;462:2;
485:21;491:14,18;
496:9,13,17;497:4;
608:5
**tolerated (1)**
461:23
**took (12)**
266:12;268:11;
273:7;282:17;285:9;
288:23;434:18;
438:16,17;544:7;
568:13;604:1
**tool (1)**
586:6
**top (10)**
324:18;341:13;
357:19;358:5;370:6;
408:12;414:13;
425:21;507:3;568:1
**topic (1)**
284:3
**totally (1)**
462:3
**touched (1)**
351:18
**toward (2)**
274:1;413:12
**towards (9)**
267:8;398:5,7;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 402 of 406 PageID #:
1038

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

track (3)
378:14;527:1,22
tragedy (1)
254:15
trained (4)
260:2;263:16;
279:12;409:21
training (35)
260:4;269:19;
299:8,15;367:20;
369:6,19;370:20;
414:13,18,22,25;
415:1,7,10,11,13,14,
18,22,25;416:8,10,
24;417:8,12,14,19,
20,23;489:7;491:1;
509:3;538:16;553:6
trainings (3)
367:17;369:14;
417:11
transcript (3)
613:20,23;614:1
transfer (200)
260:14,20;261:14,
16;262:9,10;263:7,8;
264:7;269:22;271:1;
275:11,16;287:24;
297:25;298:1;300:5,
5;302:9;303:11,13;
304:16,18;308:9;
312:9;313:1;317:17;
318:4;324:4,5,20;
326:8,11,20;328:4,
18;329:2;330:18;
331:1,6;335:1,22,22;
336:13,14;342:16;
359:23;372:15;
374:5,10,25;375:9,
23;376:4;377:5,8,24;
378:8,15,16,19,24;
380:11,23;381:4,19;
382:2,9,18,23;
386:13,19,22;387:8,
13,20,25;390:14;
397:1;399:20,24;
434:9,10,24;439:23;
442:5,13;443:15,20;
456:2,14;457:6;
458:6;459:5,7;
461:18;462:1,3,6,19;
463:9,13;464:3;
465:25;479:9,13;
480:21;481:1,22;
482:1,10,13,25;
483:19;484:4,7;

491:12,13,16,17,18,
20,22;493:3,18;
495:6,18;496:12,19;
497:5;499:17;501:6,
10;504:16;512:20;
519:12;520:1,6,12;
534:3;535:14,17;
568:14,24;570:3,12;
572:11,15,21;
573:14;574:1,10,15;
575:3,11;576:7;
577:1,7,9,11,20;
578:4,8,9,18,23;
579:2;580:5;581:16;
582:7;583:1,5,11,18;
584:16;587:5;
590:16;593:6;594:5,
15,17,19,20;595:2;
596:23,24;597:8,14,
18,19;598:2;599:19;
600:18;601:25;
604:25;605:19,24;
606:1,6;607:13
transfer/reassignment (1)
466:3
transferred (11)
315:20;332:1;
353:20;396:20;
397:10;416:17;
435:8;467:18;
470:18;526:13;
612:23
transferring (1)
535:12
transfers (26)
260:16,17;261:13;
325:19,24;326:3;
327:2;328:13;349:2;
360:1;383:2;456:6,
10;465:16,17;
466:20;482:4;
493:12;567:22;
569:22,23;570:6;
572:13;573:4,9;
593:21
transitory (1)
428:1
transmit (1)
527:12
trauma (1)
402:2
treat (7)
295:12;312:16;
313:23;314:6;315:1,
8,13
treated (9)
278:9;335:8,13,15;
336:16,23;383:15;

604:2,3
treating (6)
298:18;312:21;
313:14;314:3,12;
600:8
Trek (6)
254:20;345:16;
362:19;451:8;
522:12;566:7
Trevenia (53)
252:2;260:25;
261:10;270:11;
271:10;274:1,4,4;
276:7,12;278:7,12;
279:1;289:3;295:17;
296:1;304:24;305:5,
10;307:1,24;308:1;
311:2,11,13,15;
318:16;319:4,13;
328:8;336:2;337:2;
345:6;362:13;
366:17;383:12;
395:10;405:9;
435:14;450:19;
455:9;516:21;522:6;
558:10;565:19;
568:4,23;569:1;
572:14;576:9;
580:12;595:9;601:15
Trevenia's (5)
260:8;271:16;
273:18;309:18;
310:17
tried (5)
394:3,4,9;462:5;
603:25
tries (1)
409:24
trouble (2)
259:2;477:7
true (11)
297:17;445:1;
551:2;562:10;
577:18,22,23,25;
578:2,5;591:5
truth (18)
257:13,13,14;
348:7,7,8;365:3,3,4;
453:17,17,18;524:19,
19,20;566:22,22,23
try (24)
261:10,11;263:20;
274:10;278:14;
318:13,21;323:13;
372:5;391:18;
392:12;393:6,16;
394:12,22;395:10;
430:5;432:21;

433:11;462:10;
464:1;472:5;536:10;
542:15
trying (57)
261:1,16;262:10;
264:19;269:5,11;
273:15;274:21;
289:7;310:24;
317:16;318:11,11,
15;319:15;331:24;
339:6;367:9;369:23;
392:16,19,23,25;
393:4,15;395:17,18;
399:1;401:25;427:8;
431:9,18,22;433:20;
434:12,21;436:12;
441:6;463:5,10;
473:2;482:23;486:4;
488:7;504:11,23;
505:10;506:9,15;
517:24;548:17,19;
575:3;587:9;602:21,
25;606:1
turn (9)
518:14;529:2;
530:25;540:23;
561:3;588:11;
595:11;602:2,3
turned (6)
394:24;395:5;
419:20;435:15;
460:22;542:13
turnover (1)
597:12
twice (1)
397:19
two (35)
253:17;255:20;
266:20;288:7;
291:12;318:18;
326:2;338:23;339:7,
10,22,24;344:8;
346:21;349:4;351:6;
363:18;367:22;
452:20;455:20;
463:6,12;475:10;
476:13;523:12;
568:2;570:14;575:2;
580:8;582:5,8;590:4;
591:25;593:21;
594:14
two-week (1)
476:4
type (11)
262:18;271:4;
301:3;310:13;376:6;
466:3;482:7;505:21;
514:24;535:16;586:2

typed (6)
531:9;544:21,22;
545:3,14;547:5
types (5)
318:19;319:9;
455:3;533:18;569:3
typical (1)
317:4
typically (7)
291:6,15;474:11,
23;500:5;509:13,16
typo (1)
547:20

---

# U

ultimate (2)
371:16;583:17
ultimately (11)
353:15;372:3;
376:10;400:3;
407:23;408:14;
549:12;577:8;580:6;
594:21;607:12
unable (7)
330:14;392:13;
393:9;420:18;
421:17;520:17;557:4
unacceptable (12)
279:17;286:17;
292:14;306:7;
320:20;322:1;
337:16;339:14;
461:19;531:19;
532:4;537:14
uncertain (2)
253:15;265:15
unclear (1)
294:7
uncomfortable (2)
273:24;310:11
under (78)
290:19;297:10;
303:13,15;304:7,11;
314:19;326:15;
328:7,8,12;329:9;
330:7,20,25;331:9,
11,22;332:11;333:5;
335:4,5,22,23;
336:14;349:7;
350:11;377:17;
381:19;388:8,15;
404:23;411:17;
415:3;416:3,19,24;
417:8;424:15;425:6;
426:4;427:1,8;428
438:17;447:24;
448:2;464:13,13;

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 403 of 406 PageID #:
10370

DRC Hearing                                                                  Brown v. McDonald, et al.
Volume II                                                                            July 21, 2015

465:8,18;466:16;
467:20;468:23;
474:16;501:22;
502:7,8;509:5;
519:10,11,15;520:5,
16;536:14;541:21;
542:1;559:18;560:5;
570:1,7,12,20;
577:18;587:11;
592:4;595:9;601:18
**underlying (1)**
381:17
**underperforming (1)**
537:10
**understandably (1)**
278:21
**understands (2)**
263:1;272:4
**nnderstood (14)**
265:4;272:22;
275:18;308:6;357:9;
384:11;421:7;
427:16;431:16;
437:14;443:22;
486:25;500:11;
610:23
**unfair (2)**
288:4;516:8
**Unfortunately (3)**
258:7;265:14;
473:1
**unhappy (1)**
394:5
**union (29)**
258:3,5;260:1;
265:7;266:6;268:3,7;
281:7;282:8,13;
287:6,9;288:10;
289:16;290:13;
297:8,20;302:16,17;
334:2;337:14,19,21;
356:22;446:20;
461:16;468:21;
487:18;575:21
**unit (1)**
258:17
**United (1)**
567:15
**universally (1)**
574:9
**unjustified (1)**
279:20
**unless (4)**
405:2;579:23;
595:1;596:19
**unnecessary (1)**
402:1
**nnpredictable (2)**

508:3;510:14
**unprofessionally (1)**
335:12
**unsuccessful (1)**
539:3
**unsure (1)**
274:4
**up (108)**
255:13;256:3;
266:12;268:11;
278:6;280:8;281:1,5;
282:16;286:3;
287:20;289:1,2,12;
291:24;317:12;
318:23,25;321:8;
322:25;325:6,22;
337:17,22;338:4,23;
339:8,12;340:7,16,
19,24;341:4;350:20;
351:3,14,21;353:9;
354:15,20,21;355:7;
356:2,9,18,19;358:3,
8,21;360:24;376:1,6;
403:24;404:7,9,12;
405:18,18,21;
406:12;407:14,18;
429:21;437:22;
444:24;445:9;
447:10;448:2,6;
449:7,25;450:2;
451:25;463:1;472:1,
2,7;473:14;477:14;
492:17;498:15;
506:1;529:22,25;
530:7,11;531:9;
535:8;536:18;
537:14;538:21;
543:12,18;544:21;
545:4,14;547:5,23;
550:7;551:16,16;
558:18;568:15;
575:25;576:13,23;
590:19;603:25
**updated (2)**
599:21,23
**upon (5)**
330:1,8;401:11;
443:17;501:6
**upper (1)**
530:2
**upset (9)**
380:17;394:6;
412:16;460:20,25;
461:24;462:8;485:3,
4
**upward (1)**
310:7
**usage (3)**

280:23,25;308:7
**use (31)**
256:2;280:2;
283:1;284:5,12;
320:8;321:14;
354:17,19;355:1,5,
11;380:8;381:1,14;
382:17,22;387:1,13;
388:24;401:1;
405:23;418:19;
419:25;431:10;
473:23,24;474:4;
504:12;530:19;592:7
**used (13)**
279:24;284:7;
287:7;290:23;327:5;
372:1,7;379:17;
401:5;418:14;
571:17;585:5;591:11
**user (1)**
593:1
**using (9)**
283:2,3,12;381:11;
386:21;536:12;
554:13,16,19
**Usually (7)**
350:24;358:10;
367:19;371:14;
378:7;475:21;567:24
**ntilize (2)**
474:9;488:11

---

## V

**VA (40)**
253:9;257:21;
258:4;260:18;
288:23;299:8;
329:10,11;343:12;
365:10,12,17;366:3;
367:5;368:14;370:7,
14;374:24;415:2,8;
416:11;418:12,20,
21;442:9;446:10;
450:20;453:23;
507:1,21;508:22;
509:9,17,18;522:7;
535:19;556:15;
570:22;578:14;
603:18
**vacancy (4)**
390:10;467:5;
501:24;519:19
**vacation (1)**
406:5
**vague (2)**
311:10;466:5
**varied (1)**

296:21
**varies (3)**
296:23,24;357:15
**various (3)**
357:22;484:13;
601:23
**VARO (1)**
366:23
**VA's (3)**
259:19;440:16;
507:1
**VBA's (1)**
574:6
**venue (2)**
381:14;467:25
**verbal (1)**
329:23
**verbally (2)**
256:1;451:24
**verbiage (1)**
401:5
**verge (1)**
486:6
**verified (1)**
253:10
**verify (1)**
588:8
**version (8)**
383:24,24;384:14,
15,19;385:3,4,5
**versions (1)**
613:22
**versus (3)**
252:2;345:6;
362:13;450:20;
522:7;565:19;601:15
**Veteran (2)**
257:24;429:9
**Veterans (13)**
252:3;261:2;
362:14;366:18;
446:25;454:1,25;
455:2,13;565:20;
567:13;569:17;
601:16
**VHA (1)**
519:6
**via (3)**
252:20,22;253:19
**vice-a-versa (1)**
305:16
**vice-president (8)**
258:7,24,25;259:7;
261:8;268:10;
288:22;290:1
**visit (1)**
423:24
**voice (13)**

255:11;309:22;
310:4,6;346:8;
363:11;433:18;
491:3,5,7;523:4;
604:22,24
**volume (4)**
255:11;346:8;
363:11;523:4
**voluntary (9)**
372:15;373:18;
374:5,9,20,25;
399:20;465:16;502:6
**VSR (10)**
350:10,11,15;
366:18;533:18;
547:10;549:14;
550:5,10;586:11
**VSRs (7)**
301:18;349:13;
350:4,18;402:19;
403:2;454:18

---

## W

**Wait (2)**
316:2;322:19
**waiting (1)**
427:13
**waive (1)**
592:1
**waived (4)**
588:10;591:7,9,22
**waiving (2)**
591:24,24
**wake (1)**
354:21
**walk (1)**
484:20
**walking (4)**
485:12,19;508:13,
20
**walks (1)**
509:22
**wane (1)**
443:5
**wants (4)**
271:4,7;336:19,21
**warned (1)**
481:7
**warning (20)**
279:16;286:16;
292:14,19;293:8,13;
306:6;320:20;321:1,
2;322:5;337:16;
339:14;480:22;
531:17,18;532:3;
537:10,13;539:2
**warnings (1)**

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 404 of 406 PageID #:
1039

EEOC Hearing                                                    Brown v. McDonald, et al.
Volume II                                                       July 21, 2015

338:2
**warrant (1)**
271:20
**wax (1)**
443:5
**way (37)**
265:4;272:10;
277:1,6;279:24;
282:10,23;286:2;
287:10;288:1;
309:21;311:5,12;
317:4;318:16;
336:16,23;370:8;
383:23;403:25;
451:7;454:18;469:3;
476:18;485:14;
559:16;572:7,7;
573:18;580:6;
581:14;596:17;
602:17,23,24;605:1,2
**week (2)**
281:1;496:4
**weekend (3)**
254:16;259:4;
297:4
**weeks (4)**
281:1;322:14;
475:10;476:13
**weigh (1)**
464:24
**weighed (1)**
300:16
**welcome (1)**
460:18
**well-defined (2)**
571:1,11
**weren't (11)**
273:17;274:13,14;
303:22;323:7,9;
433:19;505:13;
555:13;574:16;590:6
**West (1)**
348:17
**What's (33)**
270:5;277:4;
282:2;298:13;299:2;
309:1;312:22;
338:19;357:11;
366:24;373:24;
384:6;386:4;387:19,
20;389:20;406:21;
409:2;421:21;
424:22;453:25;
466:11;473:23;
480:1;500:21;529:8,
10;558:1;559:25;
562:20;569:18;
571:24;613:18

**whatsoever (1)**
286:2
**whenever (1)**
372:3
**wherein (1)**
532:12
**whole (14)**
257:13;275:20;
336:17;348:7;351:6,
20;365:3;417:13;
453:17;524:19;
526:17;540:21;
541:8;566:22
**whomever (1)**
445:16
**whose (1)**
593:21
**wife (1)**
563:15
**willing (3)**
456:18;535:16;
578:21
**willingness (1)**
580:1
**Wilson (67)**
268:15,23;270:11;
273:14;275:25;
278:14,23;305:20,
23;306:1,9,12,21,25;
311:19;312:20;
313:5,22;314:2,11;
318:8;341:13;
360:19;362:15,17,
22;363:2;364:20;
365:1,8;410:8,15;
469:17;470:25;
482:10,11,17;483:8;
496:1;497:10,12;
508:22;513:19,23;
515:10;517:4;518:4;
533:10;535:22;
543:11;546:20;
555:17;557:13;
559:15;560:3;
562:15;597:10,23;
598:19;602:2,3,9;
603:1,4,6;604:11;
612:21
**W-I-L-S-O-N (1)**
364:20
**Wilson's (4)**
277:23;509:3;
515:13;606:14
**window (3)**
398:6;435:16;
476:5
**wish (2)**
264:10;320:2

**withdraw (2)**
332:16;382:3
**withdrawn (3)**
530:21;546:2;
565:14
**within (16)**
261:12;296:14,20;
323:16;389:12,25;
390:7,11;393:20;
408:19;435:22,22;
447:23;455:5;
519:20;561:25
**without (9)**
304:14;321:17,21;
322:22;399:19;
402:1;461:7;474:16;
553:18
**witness (188)**
255:2,4,15,24;
256:5,10,14,21;
257:2,6,9;267:25;
269:25;273:3,9;
284:2;302:3;306:17;
309:25;313:17;
316:1,9,10,23,25;
317:2,3,5,6;323:24;
327:4;333:12,25;
337:13,24;338:6,10,
17,21,25;339:9,16,
19;340:2,8,21;341:1,
6,12,18,22;342:2,13,
18,23;343:3,8,17,22;
344:1,21,23;345:1,8,
24;346:1,2,11,15,20;
347:1,9,15,18,22;
348:1;349:22;361:4,
10;362:3,6,8,15;
363:4,5,12,17,23;
364:5,11,15,19,22;
380:3,5;381:21;
385:19;386:6;
389:23;414:11;
417:5;423:22;
427:14,19,20;429:7;
430:17;433:11;
443:2;449:18;
450:10,13,14,21;
451:13,14,22;452:3,
8,12,19,24;453:5,8,
12;459:11;468:10;
470:9;477:22;479:5;
492:8;507:15;
518:15;521:21,24;
522:1,8,22,23;523:6,
11,16,20;524:2,8,11,
14;528:22;529:4;
531:1;534:19,23;
537:3;545:3;556:13;

560:25;563:25;
564:2,4,12,13,14,16,
17,24;565:1,1,14,21;
566:8,10,14,17;
571:2;577:15;
581:23;589:2;
592:20;595:13;
601:1,5,10;604:8,16;
609:8,24;610:3;
613:11
**witnessed (1)**
337:7
**witnesses (7)**
255:10;316:18,21;
317:5;346:7;363:9;
523:3
**Witty (1)**
597:16
**word (2)**
431:11;462:9
**worded (1)**
428:10
**words (3)**
463:21;585:10;
591:13
**work (143)**
252:20;261:11;
275:22;280:13;
281:4;285:7,8,19;
286:1;288:8;294:19,
24;295:19;296:17;
297:2,3;308:21;
310:18;321:23;
322:20,21;348:13,14,
16;350:13;352:6;
354:8,24;355:3;
356:15;358:11,15,
16;375:19;391:6;
393:23;395:18;
403:3,10,11,15;
405:4,13;406:22,23;
420:19,23;421:3,4,
18,24;422:2,7;423:3;
425:10;428:24;
431:15;438:21,23;
439:2,4,13,18,21,23;
440:6,11,11;441:14,
25;445:8;447:7;
453:22,23;455:11;
472:5,7,10,20,23;
473:4,8,14,18,22;
475:16;476:2,19;
484:15;488:3,4,9,11,
14,18;489:4,11,20,
21,23;490:1,2,10,15,
22;502:19;504:3,12,
21;505:7,8,12,18,24;
521:2,14;525:16;

527:13;528:3;
529:15;530:17;
532:17;534:7;
538:10,13;543:6;
553:3;555:14;574:5;
585:8,8,21,25;586:2,
8,21;590:21;591:4;
592:7;597:15;
611:15;612:5,7
**workday (1)**
592:11
**worked (15)**
260:9;302:24;
365:17,18;403:20;
412:3;413:16;473:2,
5,6;488:21;489:18;
490:21;541:21
**working (15)**
288:5;294:4;
302:8;303:25;353:4;
355:18;397:11;
416:14;473:10;
474:24;476:21;
489:1;506:4,15;
598:4
**workings (1)**
355:10
**workplace (3)**
368:9;392:17;
512:10
**works (9)**
407:13;434:12,14;
435:17;445:2;456:5;
580:6;585:11;592:17
**workweek (1)**
473:7
**wrist (1)**
319:6
**writing (5)**
264:24;418:2,5;
527:20;580:23
**written (16)**
264:5;329:23;
418:13;446:10;
469:18;482:14;
494:17;521:8;543:5;
569:21;580:17,20;
592:25;595:8;
613:17,19
**wrong (1)**
277:4
**wrote (2)**
515:7;537:14

**Y**

**year (11)**
268:20;416:13,15;

Min-U-Script®                SMITH REPORTING          (35) warrant - year
                          www.smithreporting.net
                                                          DEF001070

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 405 of 406 PageID #:
1689

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

472:25;474:21,22;
563:15;567:24;
568:2;581:3,5
**years (7)**
365:15;408:13;
454:4,12;525:10;
563:16;567:8
**year-to-date (1)**
584:14
**yelling (2)**
491:6;604:23
**yesterday (4)**
252:11,18;253:2,
24
**Young (25)**
398:23,24,25;
455:21;506:7;
527:10,16;531:21;
544:8,18,23,25;
545:8,10,14;547:4;
556:14;557:18,23;
558:8,9;564:15,18,
21;565:12
**Yvonne (1)**
596:10

**Z**

**zero (1)**
285:25

**0**

**00247 (1)**
556:12
**00253 (1)**
269:24
**00255 (1)**
595:12
**00297 (1)**
588:11
**00320 (2)**
411:8;414:10
**00324 (2)**
425:24;426:14
**00325 (2)**
425:15,21
**00329 (1)**
411:17
**00332 (4)**
411:12,16;418:10;
419:23
**00349 (1)**
301:5
**0857 (4)**
264:1,13;329:11;
370:7
**0857a (2)**

329:21;418:12
**0857e (15)**
329:12,15,17;
343:12;370:14;
388:5;397:23;
398:19;418:20,21;
507:1,21;535:20;
555:25;556:15

**1**

**1 (15)**
326:9;420:6;
429:14;437:10,11;
442:25;483:17;
499:11;501:18;
537:21;539:5,15;
584:14;587:17;
610:17
**10 (6)**
464:10;489:18,20;
490:1;551:25;586:25
**10-day (1)**
489:24
**10th (4)**
464:11;588:20;
589:1,4
**11 (1)**
409:3
**12 (11)**
323:16;361:15;
477:25;513:8;
518:19;529:12;
532:7;540:11;
551:11;581:3,5
**12/12/13 (1)**
537:23
**12th (2)**
361:13;541:1
**13 (33)**
303:16;304:6,7,11;
318:4;332:22;334:6;
335:5,23;349:7;
388:16;390:2,14;
464:13;465:9,13,19;
466:25;467:21;
481:11;519:10,11,
15;520:4;594:5,7,9,
19;595:5,9,23;
600:19,21
**13/17 (1)**
545:21
**13th (3)**
478:3;538:5;541:3
**14 (3)**
268:22;322:14;
567:15
**15 (5)**

268:22;398:11;
592:15,19,21
**15-day (1)**
398:13
**16 (1)**
322:15
**17 (15)**
263:6;326:12;
356:13,20,24;513:8;
531:7;537:13;
538:25;556:20;
568:22;584:18,19;
587:17;589:18
**176 (1)**
454:15
**17th (7)**
356:17;449:4,9;
530:14;584:20;
589:19;590:23
**18 (1)**
588:5
**19 (1)**
585:21
**1st (5)**
588:25;589:1,2;
590:22;611:17

**2**

**2 (6)**
373:11;420:11;
424:6;480:4;507:10;
570:2
**2/24/2014 (1)**
384:20
**2/27/14 (1)**
270:6
**20 (18)**
292:9;350:14,20;
352:5;355:24;
356:14;357:4;
402:21;403:16;
471:10;472:7,13;
476:19,22;525:25;
526:25;528:4;529:15
**2007 (1)**
417:14
**2009 (1)**
416:16
**2010 (4)**
416:25;417:3,4,5
**2011 (2)**
356:23;388:22
**2012 (2)**
416:17;417:14
**2013 (25)**
269:13;348:24;
355:20;356:13,20,

24;358:18;359:9;
366:6;372:14;
410:18,18;414:15;
532:7;537:21,23;
539:5,15;541:4;
550:20;551:24;
552:6;584:14;
587:17;588:19
**2013/2014 (1)**
258:11
**2014 (62)**
259:6,16;263:6;
268:24;273:8;
326:12;341:11;
348:25;355:21;
357:12,18;358:2,19,
22;359:9,16;366:7;
375:17;391:3;
410:19,22;411:23;
417:18;424:6;
447:14;459:13;
464:10;469:13;
471:16;476:24;
477:25;495:8;
525:11;529:9,12;
531:7;537:13,21,25;
538:6,25;539:3,7,16,
19;540:11;541:4;
547:22;548:1;
550:11;556:20;
568:22;584:18,19,
24;587:17;588:5,19,
22;598:24,25;610:14
**2015 (2)**
417:16,19
**203 (1)**
468:8
**205 (1)**
568:19
**207 (1)**
569:6
**208 (3)**
569:5,6;579:6
**20-day (1)**
489:22
**20th (1)**
253:3
**21 (2)**
584:24;610:14
**210 (3)**
459:10;584:10,11
**212 (1)**
584:11
**21st (2)**
253:3;331:20
**22 (1)**
459:13
**24 (8)**

24;358:18;359:9;
366:6;372:14;
391:3;410:21;
411:23;469:13;
507:18;581:3,5;
598:25
**245 (3)**
423:21;424:5;
470:8
**253 (4)**
341:9;344:12;
533:24;536:20
**255 (1)**
595:18
**256 (5)**
530:25;531:4;
537:18,19;539:1
**257 (1)**
449:16
**25th (3)**
449:20;557:12;
558:7
**26 (1)**
409:3
**266 (3)**
352:15;530:9;
545:2
**267 (3)**
352:15;545:4,6
**268 (1)**
352:12
**269 (3)**
349:20;356:5;
529:3
**27 (5)**
273:8;341:11;
414:15;547:22;548:1
**272 (4)**
361:9;477:21;
528:19;540:10
**279 (1)**
352:12
**27th (4)**
252:12;270:13;
547:15;550:25
**28 (4)**
309:1;314:19;
506:25,25
**281 (1)**
429:6
**29 (1)**
332:6
**297 (3)**
538:8;539:24;
561:3
**298 (3)**
537:25;539:8;
588:18

SMITH REPORTING
www.smithreporting.net

(2) years - 298

Case 1:20-cv-01154-JPH-MJD   Document 39-5   Filed 07/02/21   Page 406 of 406 PageID #: 1048

EEOC Hearing
Volume II

Brown v. McDonald, et al.
July 21, 2015

## 3

**3 (3)**
588:19;592:13,14
**3/17/14 (1)**
545:23
**30 (11)**
325:10,14,15;
348:1;356:23;480:2;
482:24;551:24;
563:16;569:19;
613:20
**30th (1)**
550:20
**31 (8)**
301:5;327:15,23,
24;372:14;373:9;
410:19;598:24
**32 (8)**
333:19,20;373:9;
389:21;466:12,23;
481:11;595:5
**320 (4)**
259:24;299:24;
328:13;411:3
**33 (5)**
373:6,9,20,21,25
**332 (1)**
414:8
**34 (3)**
385:25;386:1,4
**341 (2)**
518:14,15
**35 (3)**
548:19,24;549:1
**361 (1)**
519:16
**39 (1)**
409:8

## 4

**4 (10)**
420:14;430:15;
437:10;443:1,3;
498:8,9;586:24;
587:10;592:12
**4.34 (1)**
561:5
**4.35 (1)**
561:20
**40 (1)**
473:6
**45 (1)**
524:15
**480 (1)**
474:21

**4b (1)**
501:22

## 5

**5 (6)**
537:21;538:5;
586:24;588:22;
592:15,15
**5.5 (2)**
562:1;587:11
**540,000 (1)**
454:24
**5th (2)**
539:25;588:21

## 6

**6 (8)**
332:8;446:7;
537:4;547:19,24;
548:13,16;610:17
**6:45 (1)**
614:8
**60 (5)**
287:2;322:22,24;
359:14,16
**609 (2)**
258:15,16
**60-day (2)**
286:23;323:3
**6th (1)**
525:11

## 7

**7 (2)**
464:11;551:10
**78.33 (1)**
587:14
**7th (1)**
507:25

## 8

**8 (7)**
357:12;476:23;
529:9;548:13;
585:11;586:25;
592:11
**80 (3)**
586:9,15,24
**8th (1)**
478:3

## 9

**9 (23)**

334:10,11;335:4,5;
336:14;389:21;
390:2;466:17;
481:13;501:14;
519:15;520:5;
537:24;539:3,7,15;
551:11,11,25;
558:23;588:19;
595:5,10
**90 (4)**
322:9,10;561:22,
25
**92 (1)**
587:13
**9a (1)**
520:16
**9b (2)**
501:2;519:16
**9th (5)**
449:19;539:6,21;
589:12,17