UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TREVENIA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No: 1:20-cv-01154-JPH-MJD |
| | ) | |
| ROBERT WILKIE, SECRETARY OF THE | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

From 2011 to 2014, Plaintiff Trevenia Brown worked for the Veterans Service Center, a division of the Department of Veterans Affairs, in Indianapolis. She brings this suit under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, alleging that the VA failed to accommodate her alleged disability, a skin condition known as hidradenitis suppurativa. Ms. Brown also alleges that the VA subjected her to a hostile work environment on the basis of her alleged disability and impermissibly disclosed details of her medical condition.

Ms. Brown cannot prevail on any of these claims. The VA is entitled to summary judgment.[1]

---

[1] Ms. Brown originally told the Court that she intended to affirmatively move for summary judgment in this action. [*See* Filing No. 15 at 4.] Accordingly, in the Case Management Plan, this Court set a deadline of June 4, 2021, for Ms. Brown to file any dispositive motion of her own. [Filing No. 21 at 4.] Ms. Brown did not file any motion by the deadline. She thus has waived (or, at the very least, forfeited) the opportunity to affirmatively move for summary judgment on any of her claims. Defendant submits this motion in accordance with the deadline applicable to it in the Case Management Plan. [*Id.*]

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

1.      Ms. Brown has a condition called hidradenitis suppurativa, also known as acne

inversa. [Filing No. 12 (Am. Compl. ¶ 23); https://medlineplus.gov/hidradenitissuppurativa.

html.[3]]

2.      Hidradenitis suppurativa is a skin condition that periodically flares up, causing

painful nodules and cysts on Mr. Brown's arms, breasts, and hips. [Filing No. 12 (Am. Compl.

¶ 24).]

3.      Ms. Brown is originally from the Tampa, Florida area. [Filing No. 39-1

(Transcript of Deposition of Trevenia Brown ("Pl. Dep.") at 13:5–9).]

4.      In 2011, Ms. Brown moved from Tampa to Indianapolis because her husband got

a new job. [Filing No. 39-1 (Pl. Dep. at 15:21–16:4).]

**A.      Ms. Brown Worked as a Veterans Service Representative at the Veterans Service Center in Indianapolis**

5.      In September 2011, Ms. Brown was hired to work as a Veterans Service

Representative (VSR) at the Veterans Service Center, a component of the VA's Veterans

Benefits Administration, in Indianapolis. [Filing No. 12 (Am. Compl. ¶ 18); Filing No. 39-1 (Pl.

Dep. at 16:15–25, 29:24–8, & 32:4–8).]

6.      As a VSR, Ms. Brown was responsible for explaining benefit programs, gathering

evidence, authorizing payment, and processing information for medical claims for veterans.

---

[2]      Defendant presents these facts as Plaintiff tells them for summary judgment purposes only, reserving the right to challenge all such factual assertions should the case proceed to trial.

[3]      MedlinePlus is a website maintained by the National Institutes of Health. Its contents are properly subject to judicial notice. *E.g., Frelimo v. Marchak*, No. 1:15-CV-00769-SKO-PC, 2016 WL 8731325, at *2 n.3 (E.D. Cal. Dec. 16, 2016); *Brown v. Comm'r of Soc. Sec. Admin.*, No. CA 1:14-3472-SVH, 2015 WL 4095643, at *16 n.6 (D.S.C. July 6, 2015).

[Filing No. 39-1 (Pl. Dep. at 30:9–23); Filing No. 39-2 (Telephonic Affidavit of Trevenia Brown ("Pl. Tel. Aff.") at 9:7–15); Filing No. 39-3 at p. 2 (Decision of EEOC Administrative Judge).]

7.     When she started working at the Veterans Service Center, Ms. Brown attended an orientation session, where she learned about benefits and other information relevant to her employment. [Filing No. 39-1 (Pl. Dep. at 32:12–24).]

8.     The VA maintains Equal Employment Opportunity and anti-discrimination policies, which are readily available on its website, among other places. [https://www.va.gov/ORMDI/docs/EEO_Policy.pdf.] These EEO policies address, *inter alia*, reasonable accommodations for employees with disabilities. [*Id.*] Ms. Brown does not know if she ever reviewed or attempted to locate those policies. [Filing No. 39-1 (Pl. Dep. at 32:20–24).]

### *(i)* __Supervisory Hierarchy Relevant to Ms. Brown's Employment__

9.     At the Veterans Service Center, VSRs are organized into "teams," with each team handling a particular kind of claim. [Filing No. 39-1 (Pl. Dep. at 34:5–36:20); Filing No. 39-4 (Transcript of Hearing before EEOC, Volume I ("EEOC Tr. Vol. I") at 17:11–21) (Brown's testimony).]

10.     Teams are managed by a Coach and an Assistant Coach. In early 2014, Jim Dean was the Coach for Ms. Brown's team. [Filing No. 12 (Am. Compl. ¶ 20); Filing No. 39-1 (Pl. Dep. at 53:4–7).] Donald Young was Ms. Brown's Assistant Coach. [Filing No. 39-1 (Pl. Dep. at 54:10–15).]

11.     Coaches are managed by the Assistant Veterans Service Center Managers (AVSCMs). [Filing No. 39-6 (VSC Management Organizational Chart).] In 2014, Adam Kinder and Debra Street were the AVSCMs at the Indianapolis Veterans Service Center and, thus, Ms. Brown's second-level supervisors. [*Id.*; Filing No. 39-2 (Pl. Tel. Aff. at 5:6–15).]

12.     The AVSCMs are supervised by the Veterans Service Center Manager. [Filing No. 39-6 (VSC Management Organizational Chart).] At the time, Ena Lima was the Veterans Service Center Manager. [*Id.*; Filing No. 39-1 (Pl. Dep. at 42:21–43:2).]

13.     The Director of the Regional Office oversees the Veterans Service Center Manager. Michael Stephens was the Director of the Regional Office. [Filing No. 12 (Am. Compl. ¶ 22); Filing No. 39-1 (Pl. Dep. at 41:11–13).] Yvonne Hamilton was the Assistant Director. [Filing No. 39-2 (Pl. Tel. Aff. at 27:9–13).]

*(ii)*     **Productivity and Accuracy Standards Relevant to Ms. Brown's Employment**

14.     As a VSR, Ms. Brown was responsible for meeting (i) output goals, which required her to process a certain the number of claims per day, and (ii) quality accuracy standards for the claims that she processed. [Filing No. 39-1 (Pl. Dep. at 39:21–40:14 & 88:23–89:9).]

15.     In or around June 2013, Ms. Brown was approved to take intermittent leave under the Family Medical Leave Act for her hidradenitis suppurativa. [Filing No. 12 (Am. Compl. ¶ 27).] Ms. Brown agrees that the time that she was out of the office on FMLA leave was excluded from the calculation of her output goals and quality accuracy measurements. [Filing No. 39-1 (Pl. Dep. at 94:12–95:2).]

16.     In her monthly performance review for December 2013, Mr. Dean informed Ms. Brown that she was not meeting the output goals or quality accuracy goals for her position. [Filing No. 39-7 (Monthly Performance Review, Pl. Dep. Ex. 14).]

17.     By January 2014, Ms. Brown's performance statistics showed that she had a daily productivity rate of 4.46 claims (below the expectation of 5.5) and quality accuracy rating of 78.33% (below the expectation of 92%). [Filing No. 39-8 (Performance Totals for 10/1/2013 to 1/17/2014, Pl. Dep. Ex. 15).]

B.      **The Hardship Transfer Request (January 17, 2014)**

18.      On January 17, 2014, Ms. Brown submitted a letter to Human Resources

Specialist Sonya Wilson, addressed to Director Stephens, "requesting a transfer to the St.

Petersburg, FL Regional Office due to a significant hardship." [*Filing No. 39-9* (Hardship

Transfer Request, Pl. Dep. Ex. 3); Filing No. 12 (Am. Compl. ¶ 31); Filing No. 39-1 (Pl. Dep. at

51:14–16).]

19.      In the Hardship Transfer Request, Brown stated that she "ha[d] a chronic health

condition for which [she was] FMLA approved that requires services and care of a specialist

which is not available to [her] in the state of Indiana."[4] [Filing No. 39-9.] The Hardship Transfer

Request did not provide further details of the "health condition." [*Id.*]

20.      On or around the day that she submitted the request, the VA suggested that Ms.

Brown should provide medical documentation to support her Hardship Transfer Request. Ms.

Brown "came down to [Ms. Wilson's] office" in Human Resources, and "was very upset and

angry because she didn't want to have to provide any additional medical documentation" in

connection with the Hardship Transfer request. [Filing No. 39-5 (EEOC Tr. Vol. II at 380:10–

381:5) (Wilson's testimony); *see also* Filing No. 39-2 (Pl. Tel. Aff. at 15:5–16:4).]

21.      Under the VA's "Guidance for Hardship Transfers," hardship transfers are

"considered on a case-by-case basis," but "will not be considered if the employee is under a

P[erformance] I[mprovement] P[lan], leave restriction, or disciplinary action." [Filing No. 39-10

(Guidance for Hardship Transfers).]

---

[4]      Despite this statement in the letter, Ms. Brown cannot recall whether she actually
attempted to locate a specialist for her health condition in Indiana or if she had actually found a
specialist in Florida to treat her at this time. [Filing No. 39-1 (Pl. Dep. at 47:5–49:16).]

22.     The Guidance for Hardship Transfers also specifies that, "[w]hen requesting consideration for a hardship transfer, the employee will complete the attached Hardship Transfer Request Form." [Filing No. 39-10 at 1 (Guidance for Hardship Transfers); *id.* at 3–5 (attaching Hardship Transfer Request Form documents).]

23.     In accordance with that guidance, Ms. Brown completed a Hardship Transfer Request Form at the time that she submitted the Hardship Transfer Request. [*See* Filing No. 39-11 at 2–3 (attaching copy of Ms. Brown's Hardship Transfer Request Form) (DEF000207–08).]

24.     Ms. Wilson relayed Ms. Brown's Hardship Transfer Request to Ms. Lima, the Veterans Service Center Manager. [Filing No. 39-11 (1/17/2014 email).]

25.     Ms. Wilson's email explained that Ms. Brown was "requesting an immediate Hardship Transfer to St. Petersburg, FL." [Filing No. 39-11 (1/17/2014 email at DEF000206).]

26.     The Employee Hardship Transfer Information form attached to that email noted that Ms. Brown was "not meeting performance standards" for her position. [Filing No. 39-11 (1/17/2014 email at DEF00207).]

27.     On January 21, 2014, after examining Ms. Brown's performance data, Ms. Lima replied and expressed that Ms. Brown was demonstrating "performance issues" in "struggl[ing] to meet output and quality measures." [Filing No. 39-12 (1/21/2014 email at DEF000212).] Under the Guidance on Hardship Transfers, Ms. Lima explained, Ms. Brown's "demonstrated performance in the VSR position does not support [granting the Hardship Transfer Request] until she shows significant improvement in all areas of her performance in this position." [*Id.*]

28.     Director Stephens denied the Hardship Transfer Request based on the fact that Ms. Brown's performance was substandard. [Filing No. 12 (Am. Compl. ¶ 37); Filing No. 39-13

(1/23/2014 email, Pl. Dep. Ex. 4); Filing No. 39-3 at p. 3 n.2 (Decision of EEOC Administrative Judge).]

29.    On January 22, 2014, Ms. Lima met with Ms. Brown and informed her that Director Stephens had denied the Hardship Transfer Request. [Filing No. 39-13 (1/23/2014 email, Pl. Dep. Ex. 4); Filing No. 39-1 (Pl. Dep. at 50:14–25).]

30.    Ms. Brown claims that, during this conversation, Ms. Lima said statements to the effect of, "[J]ust because [Ms. Brown] had a disability, that doesn't matter" and that Ms. Lima "d[id not] owe [Ms. Brown] anything." [Filing No. 39-1 (Pl. Dep.  52:4–55:16); *see also* Filing No. 12 (Am. Compl. ¶ 35); Filing No. 39-3 at p. 3 (Decision of EEOC Administrative Judge).]

31.    In her Amended Complaint, Ms. Brown also alleges that, during this conversation, Ms. Lima said, "You can't go have a meltdown in Human Resources to get moved" (apparently referencing Ms. Brown's interaction with Ms. Wilson on January 17, 2014).[5] [Filing No. 12 (Am. Compl. ¶ 35).] At her deposition in this case, though, Ms. Brown could not remember Ms. Lima saying this. [Filing No. 39-1 (Pl. Dep.  52:12–23) (Q: "Okay. But I'm asking do you recall [Ms. Lima] saying 'You can't go have a meltdown in HR'?  A: No, I don't recall.").]

---

[5]    Ms. Lima denies making these remarks. [Filing No. 39-5 (EEOC Tr. Vol. II at 462:11–25) (Lima's testimony).] In her testimony before the EEOC, Ms. Lima explained that she was responding to Ms. Brown's assertion that Director Stephens "had to give her [the] hardship transfer" by making clear that a hardship transfer was subject to the discretion of the Director, not an entitlement. [*Id.*]

C.    **The Request for Reassignment under the Union Master Agreement (February 6, 2014)**

32.    On or around February 6, 2014, Ms. Brown submitted a document, addressed to Director Stephens, Ms. Lima, and Mr. Dean, titled "Request for Reassignment for Medical Reasons." [Filing No. 39-14 (Request for Reassignment, Pl. Dep. Ex. 5).]

33.    In this document, Ms. Brown specifically requested reassignment pursuant to "Article 13" of the "Master Agreement" between the VA and her union, the American Federation of Government Employees (AFGE). [Filing No. 39-14.]

34.    In the Request for Reassignment, Ms. Brown stated that she had "a serious chronic medical condition, hidradenitis suppurativa Stage II." [Filing No. 39-14.]

35.    Ms. Brown attached a statement from her physician, Dr. Robert Huff, in support of her Request for Reassignment. [Filing No. 39-15 (Huff Letter, Pl. Dep. Ex. 6); Filing No. 12 (Am. Compl. ¶ 43).]

36.    In that statement, Dr. Huff indicated that Ms. Brown had last been treated by his office in June 2013—*i.e.,* eight months earlier—for hidradenitis suppurativa. [Filing No. 39-15 (Huff Letter).]

37.    Dr. Huff indicated that hidradenitis suppurativa was a "chronic and often unpredictable inflammatory disorder of the skin." [Filing No. 39-15.] He stated that he had seen "some success in treating [Ms. Brown's skin condition] with high dose antibiotics," but that "the disorder will likely continue to wax and wane indefinitely." [*Id.*] Dr. Huff stated that Ms. Brown required treatment by a "dermatologist" "upon relocation" to St. Petersburg, Florida. [*Id.*]

38.    Article 13, Section 9 of the DVA/AFGE Master Agreement provides that an employee may request reassignment for medical reasons if she is "unable to perform [her] assigned duties as certified by a health care provider." [Filing No. 39-16 (section of Article 13).]

39.     On February 10, 2014, Ms. Lima issued a denial of Ms. Brown's Request for Reassignment. In that denial, Ms. Lima noted that the letter from Dr. Huff "fail[ed] to demonstrate that [Ms. Brown was] unable to perform [her] assigned duties," as required by Article 13. [Filing No. 39-17 (2/10/2014 letter, Pl. Dep. Ex. 7); Filing No. 12 (Am. Compl. ¶ 46).]

40.     In the denial of the Request for Reassignment, Ms. Lima carbon-copied (1) Director Stephens, (2) Assistant Director Yvonne Hamilton, (3) Mr. Dean, (4) AVSCM Adam Kinder, and (5) AVSCM Debra Street. [Filing No. 39-17.] These individuals were all in Ms. Brown's chain of command, and Ms. Lima included them on the reply because they needed to be informed of the outcome of this request under the union agreement, given its impact on staffing and operations of the Veterans Service Center. [Filing No. 39-18 (Defendant's Response to Interrogatory No. 1).]

41.     In that response to the Request for Reassignment, Ms. Lima specifically suggested to Ms. Brown: "If you believe that you need an accommodation due a disability or workplace barrier that precludes you from performing the essential functions of your position, you may request a reasonable accommodation by completing VA Form 0857a, Written Confirmation of Request for Reasonable Accommodation, and submit it to your immediate supervisor." [Filing No. 39-17.]

**D.      The Request for Accommodation (February 24, 2014)**

42.     Ms. Brown took Ms. Lima's advice. On February 24, 2014, she submitted to Mr. Dean a Written Confirmation of Request for Accommodation, on VA Form 0857a, stating that she was requesting accommodations for "[her] health." [Filing No. 39-19 (Request for Accommodation, Pl. Dep. Ex. 8); Filing No. 12 (Am. Compl. ¶ 51).]

43.     In the portion of this document that asked her to explain her requested accommodation, Ms. Brown wrote: "Please refer to doctor's letter submitted on Feb 6, 2014. I originally requested reasonable accommodation on Jan 17, 2014 and again on Jan 23, 2014. No interactive process is yet to take place." [Filing No. 39-19.]

44.     On February 27, 2014, Mr. Dean and Ms. Wilson held an interactive meeting with Ms. Brown and her union steward, Rachel Gentry. [Filing No. 39-20 (email recapping interactive meeting, Pl. Dep. Ex. 9); Filing No. 12 (Am. Compl. ¶ 53).]

45.     During this interactive meeting, Ms. Wilson attempted to explain the reasonable accommodation process to Ms. Brown. However, Ms. Brown was "very angry" and "continually interrupted" Ms. Wilson as she tried to speak. [Filing No. 39-5 (EEOC Tr. Vol. II at 394:6–23) (Wilson's testimony).] After "talk[ing] over" Ms. Wilson for a while, Ms. Brown "sat down in a chair and turned her back to [Ms. Wilson], indicating to [Ms. Wilson] that she was not listening or interested in listening to [Ms. Wilson] explain the [reasonable accommodation] process." [*Id.* at 394:23–395:2.]

46.     Accordingly, Ms. Wilson and Mr. Dean explained the reasonable accommodation process to Ms. Gentry, with Ms. Gentry saying "that she would try to talk to [Ms. Brown] later, after she had calmed down." [Filing No. 39-5 (EEOC Tr. Vol. II at 395:3–11) (Wilson's testimony).]

47.     During the interactive meeting, Ms. Wilson and Mr. Dean attempted to identify the limitations that prevented Ms. Brown from doing her job. Mr. Dean asked Ms. Brown what limitations she had. However, Ms. Brown "stated specifically, 'I don't have any limitations.'" [Filing No. 39-5 (EEOC Tr. Vol. II at 395:12–396:14) (single quotation marks added) (Wilson's

testimony); *id.* at 534:6–16 (Dean's testimony); Filing No. 39-20 (2/27/2014 email, documenting

that during interactive meeting, Ms. Brown "stated that [she] had no limitation").]

48.     Mr. Dean and Ms. Wilson asked Ms. Brown if there were any interim

accommodations that the VA could provide her during the reasonable accommodation process.

[Filing No. 39-5 (EEOC Tr. Vol. II at 307:15–24) (Gentry's testimony).] Ms. Brown "said no,"

and told them that "there[ was] no interim accommodations [the VA] could provide and that she

had no limitations. She wanted to be transferred." [Filing No. 39-5 (EEOC Tr. Vol II at 396:13–

20) (Wilson's testimony); *id.* at 307:15–24 (Gentry's testimony); Filing No. 39-3 at p. 4

(Decision of EEOC Administrative Judge); Filing No. 39-20 (2/27/2014 email, documenting that

during interactive meeting, Ms. Brown "stated that [she] had no interim accommodation").]

49.     Ms. Brown was "very clear" to Mr. Dean and Ms. Wilson that "she would only be

satisfied with the transfer" and that she would not accept any other alternative accommodation.

[Filing No. 39-5 (EEOC Tr. Vol. II at 396:21–397:2) (Wilson's testimony); *see also id.* at 312:4–

9 (Gentry's testimony, confirming "[t]he reasonable accommodation [Ms. Brown] was seeking

was only the transfer").]

50.     Ms. Brown did not raise telework as a potential accommodation that she wanted.

[Filing No. 39-5 (EEOC Tr. Vol. II at 308:3–18) (Gentry's testimony); *id.* at 397:3–16 (Wilson's

testimony).]

51.     During the meeting, Ms. Wilson and Mr. Dean provided Ms. Brown with a

medical request form (VA Form 0857e), which identified the sort of medical information that the

VA needed to help make a determination as to the accommodation request. [Filing No. 39-5

(EEOC Tr. Vol. II at 397:17–398:9) (Wilson's testimony); *see also* Filing No. 39-21 (VA Form

0857e, Pl. Dep. Ex. 10).]

52.     Ms. Brown does not recall asking Dr. Huff to fill out the information on Form 0857e, nor does she recall otherwise providing additional medical documentation in response to the VA's request. [Filing No. 39-1 (Pl. Dep. at 77:2–78:7).]

53.     After Ms. Brown did not provide any additional information, on March 25, 2014, Mr. Young sent Ms. Brown a follow-up email. [Filing No. 39-22 (Pl. Dep. Ex. 11).] Mr. Young wrote that, despite being told in that meeting that she could submit documentation to support her request, "HR ha[d] not received sufficient medication documentation from [Brown] for the deciding management official to make a determination." [*Id.*]

54.     In response, Ms. Brown told Mr. Young to "refer to the Doctor's certification that has already been provided," *i.e.*, Dr. Huff's letter from February. [Filing No. 39-22 (Pl. Dep. Ex. 11).]

55.     During this period, the VA offered to provide Ms. Brown with interim accommodations in the form of "an extra chair or breaks." [Filing No. 39-4 (EEOC Tr. Vol I at 89:23–90:1) (Brown's testimony).] Ms. Brown "rejected a chair or additional breaks as a form of reasonable accommodation." [Filing No. 39-3 at p. 5 (Decision of EEOC Administrative Judge).]

56.     VA Handbook 5975.1 provides that reassignment "is the accommodation of last resort and will be considered only if there is no other accommodation available that will enable the employee to perform the essential functions of his or her current job, and the employee has a permanent or long-term disability." [Filing No. 39-23 (VA Handbook 5975.1, Section 16) (DEF000345–46).]

57.     On April 1, 2014, the VA denied Brown's request for reasonable accommodation. [Filing No. 39-24 (Pl. Dep. Ex. 12).] The denial explained that Ms. Brown had not provided adequate medical documentation and had not shown that she was disabled within the meaning of

the Rehabilitation Act. [*Id.*] The VA stated that Brown's "medical documentation did not show a 'substantial' limitation," and said that "if [Ms. Brown] need[ed] to visit a medical specialist outside of the commuting area, [she] may request leave in accordance with the appropriate leave requesting procedures." [*Id.*]

E.     **Ms. Brown's Ongoing Performance Problems and Refusal to Follow Instructions**

58.     During the period of time that Ms. Brown worked at the Veterans Service Center, all VSRs (along with many other positions) were required to work 20 hours of mandatory overtime each month. [Filing No. 39-25 (1/8/2014 email, Pl. Dep. Ex. 16); Filing No. 39-1 (Pl. Dep. at 96:7–97:7).]

59.     On February 12, 2014, Mr. Dean sent Ms. Brown an email in which he stated that he had not received her mandatory overtime hours for February 2014. Mr. Dean "direct[ed] Brown] to give [him those] hours and days for February OT hours by COB tomorrow (02-13-14)." [Filing No. 39-26 (Pl. Dep. Ex. 17).]

60.     On March 17, 2014, Ms. Brown received a "Warning of Unacceptable Performance." [Filing No. 39-27 (Warning Letter, Pl. Dep. Ex. 18).] In that warning, Mr. Dean documented that, from October 1, 2013 through February 28, 2014, Ms. Brown's output was measured at 4.37 (cumulative), whereas the output standard applicable to her position was 5.5. Mr. Dean recommended that Ms. Brown be placed on a Performance Improvement Plan (PIP) as a result of these issues. [*Id.*]

61.     In April 2014, Ms. Brown received a formal reprimand for "Failure to Follow Instructions," because, despite having been instructed to provide her mandatory overtime hours on February 12, she "did not provide the overtime dates as directed nor did [she] work any required overtime hours for the month of February." [Filing No. 39-28 (Reprimand, Pl. Dep. Ex. 20).]

62.     In approximately mid-2014, Tamieka Graves took over as Coach of the team on which Ms. Brown worked and became Ms. Brown's immediate supervisor. [Filing No. 39-1 (Pl. Dep. at 41:3–10).]

63.     On July 17, 2014, Ms. Graves too noted Ms. Brown's lackluster performance, issuing her a "Letter of Concern" relating to Ms. Brown's failure to meet the quality output metrics for her position. [Filing No. 39-29 (Pl. Dep. Ex. 21).]

64.     Additionally, on July 18, 2014, Ms. Graves gave Ms. Brown her annual performance review, which rated her overall performance as "Unacceptable." [Filing No. 39-30 (Pl. Dep. Ex. 22).] Ms. Graves recommended that Ms. Brown's scheduled promotion be delayed based on Ms. Brown's "performance deficiencies" in failing to meet her output goals for May, June, and July 2014. [*Id.*]

**F.     In Autumn 2014, the VA Transferred Ms. Brown to Florida After She Submitted Another Letter from Dr. Huff**

65.     In late summer 2014, Ms. Brown again requested that she be transferred to Florida as an accommodation of her skin condition. [Filing No. 12 (Am. Compl. ¶ 65).]

66.     On August 21, 2014, Ms. Brown submitted a more detailed letter from Dr. Huff. [Filing No. 39-31 (Pl. Dep. Ex. 13).] Dr. Huff's updated letter noted that Ms. Brown had recently been treated by his office on July 10, 2014, for surgical drainage of a large cyst. [*Id.*] He indicated that, due to her condition, Ms. Brown likely would require "[f]requent time off work . . . when her condition flares." [*Id.*] Dr. Huff stated that Ms. Brown "ha[d] found a center specializing in the treatment of hidradenitis suppurativa in St. Petersburg, FL (Florida West Coast Skin and Cancer Center)," and recommended that she be transferred to this area so that she could pursue treatment there. [*Id.*]

67.     In or around September 2014, the VA transferred Ms. Brown to St. Petersburg, Florida. [Filing No. 12 (Am. Compl. ¶ 68).]

**G.     The EEOC Held that Ms. Brown Was Not Subjected to Discrimination or Harassment on the Basis of Disability**

68.     After filing an administrative complaint, Ms. Brown litigated her allegations of discrimination and harassment at a hearing before an Administrative Judge with the U.S. Equal Employment Opportunity Commission, which included Ms. Brown's testimony and that of numerous VA witnesses. [*See* Filing No. 39-3 at pp. 2–3 (Decision of EEOC Administrative Judge).]

69.     The Administrative Judge resoundingly ruled against Ms. Brown. [Filing No. 39-3 (Decision of EEOC Administrative Judge).] The AJ concluded that the VA "did not deny [Ms. Brown] a reasonable accommodation," that Ms. Brown's allegations of hostile work environment were meritless, and that there was no evidence that the VA's conduct toward Ms. Brown was pretextual. [*Id.* at pp. 12–17.]

70.     Ms. Brown appealed the Administrative Judge's decision to the Commission. [Filing No. 39-32 (EEOC Decision).] On January 14, 2020, the EEOC affirmed, finding that "the substantial evidence of record supports the AJ's determination that [Ms. Brown] has not proven discrimination or a hostile work environment." [*Id.* at 2.]

**SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted where the movant shows its entitlement to judgment as a matter of law through the materials in the record. Fed. R. Civ. P. 56. The non-movant must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). If the non-movant does not come forward

15

with "evidence on which the jury could reasonably find" in her favor, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

Ms. Brown alleges that the VA (1) failed to accommodate her alleged disability in violation of the Rehabilitation Act; (2) subjected her to a hostile work environment; and (3) unlawfully disclosed the details of her medical condition. [Filing No. 12 (Am. Compl. ¶¶ 73–97); Filing No. 37 at 1–2.] Ms. Brown cannot prevail on any of these claims.

### I.  Ms. Brown's Allegations of Failure to Accommodate Cannot Succeed

The Rehabilitation Act of 1973 incorporates the prohibitions contained within the Americans with Disabilities Act, *see* 29 U.S.C. §§ 791(a), (g), and thus requires federal agencies to offer "reasonable accommodation" to "qualified individuals with a disability." *Id.*; 42 U.S.C. § 12112(b)(5)(A). To prevail on her allegations of failure to accommodate, Ms. Brown must prove that (1) she is a "qualified individual with a disability," (2) the VA knew of her disability, and (3) the VA nonetheless failed to make a "reasonable accommodation." *Bellino v. Peters*, 530 F.3d 543, 549 (7th Cir. 2008); *Gibson v. Indiana State Pers. Dep't*, No. 1:17-CV-01212-JPH-TAB, 2020 WL 1956120, at *4 (S.D. Ind. Apr. 21, 2020).

### A.  Ms. Brown Has Not Shown She Is a Qualified Individual with a Disability

First, Ms. Brown must proffer evidence that she is a qualified individual with a disability. An individual has a "disability" if she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1); *Yochim v. Carson*, No. 16 C 4926, 2018 WL 5264247, at *4 (N.D. Ill. Oct. 23, 2018), *aff'd*, 935 F.3d 586 (7th Cir. 2019).

In her Amended Complaint, Ms. Brown alleges that, "[d]uring a flare of her hidradenitis suppurativa, [she] is in extreme pain and limited in her ability to walk, bathe, lift, bend, and work." [Filing No. 12 (Am. Compl. ¶ 25).] At deposition, Ms. Brown was unable to say how

16

frequently she experienced such "flare ups" during the time period relevant to this suit or provide specific information as to how frequently she received medical treatment for this condition. [Filing No. 39-1 (Pl. Dep.  22:14–23:1 & 27:15–29:23).] The note from Dr. Huff that she submitted in February 2014 stated that Ms. Brown had "last [been] seen by [Dr. Huff's] physician assistant in June of 2013," approximately eight months earlier. [Filing No. 39-15.] The note provided no further detail about her medical condition and did not say anything about Brown's ability to perform her job duties. This Court has held that similarly vague allegations relating to hidradenitis suppurativa fail to satisfy a plaintiff's burden of proof that she has a legally protected disability. *Bailey v. Standard Reg. Co.*, No. 1:05-CV-943-SEB-JMC, 2007 WL 671041, at *7 (S.D. Ind. Feb. 28, 2007). *See also Krachenfels v. North Shore Long Island Jewish Health Sys.*, No. 13-CV-243 (JFB)(WDW), 2014 WL 3867560, at *13 (E.D.N.Y. July 29, 2014) (plaintiff's "general statement" that dermatological disorder interfered with major life activities when condition "flare[d] up," causing her pain, insufficient to show substantial limitation).[6]

**B.    Regardless, the VA Did Not Fail to Reasonably Accommodate Ms. Brown**

Even if she can show that her skin condition constitutes a disability within the meaning of the Rehabilitation Act, Ms. Brown's claim still fails because she cannot show that the VA failed to reasonably accommodate her.

"Reasonable accommodations are modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily

---

[6]     At certain points in this case, Ms. Brown also has emphasized that she was approved for FMLA leave. [*See, e.g.,* Filing No. 39-2 (Pl. Tel. Aff. at 14:16–23).] Approval for FMLA leave does not equate to the existence of a qualified disability for purposes of the ADA or Rehab Act. *See, e.g., Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 & n.6 (10th Cir. 2007); *Nicholson v. W. Penn Allegheny Health Sys.*, 297 F. App'x 157, 160 (3d Cir. 2008) (unpublished) (citing 29 C.F.R. § 825.702(b)).

performed, that enable a qualified individual with a disability to perform the essential functions of that position." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (citing 29 C.F.R. § 1630.2(o)(1)(ii)) (cleaned up). "Once an employee requests reasonable accommodation, the employer must meet the employee half way and engage in a 'flexible, interactive process' to identify the necessary accommodations." *Id.* at 701–02 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013)). The Seventh Circuit has repeatedly made clear that the interactive process is a two-way street, where "[b]oth parties are responsible for determining what accommodations are needed." *Id.* at 702 (citing *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). Thus, the employee must "make reasonable efforts to help the [employer] decide what reasonable accommodations are necessary." *Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)) (internal quotation marks omitted).

1. **The Hardship Transfer Request and Request for Reassignment under the Union Agreement Were Not Requests for Accommodation**

First, Ms. Brown claims that the Hardship Transfer Request (January 17, 2014) and the Request for Reassignment under the union master agreement (February 6, 2014) were requests for accommodation under the Rehabilitation Act. [Filing No. 12 (Am. Compl. ¶¶ 76–77 & 79–80); Filing No. 37 at 1.] Not only is this argument incorrect, it gets her nowhere.

In the Hardship Transfer Request, Ms. Brown asked for "a transfer to the St. Petersburg, FL Regional Office due to a significant hardship" based on a "chronic health condition," and specified that a transfer would "alleviat[e her] current hardship." [Filing No. 39-9.] Ms. Brown asserts that "Defendant cherry-picked language to treat [this] request as a hardship transfer that can be provided to non-disabled employees who meet certain criteria, instead of reading the request as related to her disability." [Filing No. 37 at 1.] These accusations of "cherry-picking"

are belied by the plain language of the Hardship Transfer Request, in which Ms. Brown emphasized that she wanted a transfer due to a "hardship."[7] [Filing No. 39-9.] Furthermore, at the time that she submitted the Hardship Transfer Request, Ms. Brown also filled out a Hardship Transfer Request Form. [Filing No. 39-11at 2–3 (DEF000207–08).] That form is specifically required under the VA's Guidance for Hardship Transfers. [Filing No. 39-10.] Both Ms. Brown's words and her actions left no ambiguity that she actually was seeking relief under the Hardship Transfer process.

Likewise, the Request for Reassignment was clear and unequivocal: Ms. Brown specifically sought "a Reassignment for Medical Reasons" under "the 2011 VA/AFGE Master Agreement, Article 13." [Filing No. 39-14 (Request for Reassignment).] Ms. Brown copied her union steward on this request. Again, there was no question what relief Ms. Brown was seeking in this document.

An employee "must normally request an accommodation before liability under [federal law] attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). *See also Stelter v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 491 (7th Cir. 2020); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). While the Seventh Circuit has recognized exceptions to the general rule where, for instance, an employee has a mental disability that interferes with his ability to articulate a request for accommodation, *Bultemeyer*, 100 F.3d at 1285, that exception does not apply here. Ms. Brown was ably equipped to vindicate her rights; indeed, she had secured FMLA leave for her hidradenitis suppurativa just a few months prior. [Filing No. 12 (Am. Compl. ¶ 27).]  The VA cannot be faulted for taking

---

[7]      The Hardship Transfer Request uses the word "hardship" four times in three paragraphs. [Filing No. 39-9.]

Ms. Brown's submissions at face value and interpreting them according to the relief that she specifically was seeking.

Anyway, even if the Hardship Transfer Request and Request for Reassignment had been sufficient to trigger the interactive process obligation (they weren't), failure to engage in the interactive process itself does not establish an independent violation. *E.g., Massey v. Rumsfeld*, No. IP 00-41-CHG, 2001 WL 1397309, at *9 (S.D. Ind. Nov. 5, 2001); *see also Golden v. Indianapolis Hous. Agency*, No. 1:15-CV-00766-RLY-DML, 2017 WL 283481, at *8 (S.D. Ind. Jan. 23, 2017), *aff'd*, 698 F. App'x 835 (7th Cir. 2017) (citing *Basden*, 714 F.3d at 1039). Such failure "is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Basden*, 714 F.3d at 1039. Ms. Brown cannot show that, if the interactive process had commenced a few weeks earlier, she would have received a reasonable accommodation, particularly since—as discussed in further detail *infra*—she refused to accept any alternate accommodations.

### 2.   Once Ms. Brown Submitted the Request for Accommodation, the VA Promptly Tried to Engage in the Interactive Process with Her

Ms. Brown submitted the Request for Accommodation on February 24, 2014, after Ms. Lima specifically suggested she do so. [Filing No. 39-17 (Ms. Lima's letter, explicitly prompting Ms. Brown to request a reasonable accommodation).] And there is no dispute that, once Ms. Brown requested an accommodation, the VA immediately responded by convening an interactive meeting to attempt to get information from Ms. Brown as to what accommodations could be provided to her. [Filing No. 39-20 (Pl. Dep. Ex. 9); Filing No. 12 (Am. Compl. ¶ 53).]

Liability falls on the party who caused the breakdown of the interactive process. *Gibson*, 2020 WL 1956120, at *5. *See also Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975–76 (7th Cir. 2009); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005); *Steffes v. Stepan*

*Co.*, 144 F.3d 1070, 1072 (7th Cir. 1998). And Ms. Brown—not the VA—caused the interactive

process to break down. During the interactive meeting itself, Ms. Brown was angry and

"continually interrupted" Ms. Wilson. Then, Ms. Brown stopped talking altogether, turned her

chair around, and sat with her back to Ms. Wilson and Mr. Dean, leaving Ms. Gentry to handle

the meeting for her. [Filing No. 39-5 (EEOC Tr. Vol. II at 394:6–395:2).]

Putting aside her churlish conduct, Ms. Brown did not actually provide helpful

information to the VA. When Mr. Dean and Ms. Wilson attempted to ascertain what specific

limitations prevented Ms. Brown from doing her job, Ms. Brown told them that she did not have

any limitations. [Filing No. 39-20 (2/27/2014 email); [Filing No. 39-5 (EEOC Tr. Vol. II at

395:12–396:14 & 534:6–16).] When Mr. Dean and Ms. Wilson asked if she needed any interim

accommodations, Ms. Brown said no. [Filing No. 39-5 (EEOC Tr. Vol II at 307:15–24 &

396:13–20) (Wilson's testimony); Filing No. 39-20 (2/27/2014 email).] "Where the employee

does not provide sufficient information to the employer to determine the necessary

accommodations, the employer cannot be held liable for failing to accommodate the disabled

employee." *Reeves*, 759 F.3d at 702.

Following that meeting, moreover, the VA requested that Ms. Brown provide medical

information from her physician and gave her VA Form 0857e to clarify the sort of information

that it needed. [Filing No. 39-5 (EEOC Tr. Vol. II at 397:17–398:2); Filing No. 39-21 (VA Form

0857e, Pl. Dep. Ex. 10).] Ms. Brown did not provide this information (and, by all accounts, did

not even transmit the form to her doctor). [Filing No. 39-22 (Pl. Dep. Ex. 11); Filing No. 39-1

(Pl. Dep. at 77:2–78:7).] Given that this medical information was within Ms. Brown's own

control, her refusal to provide it indicates that she was not engaging in the interactive process in

good faith. *Ekstrand*, 583 F.3d at 976–77; *Jackson v. City of Chicago*, 414 F.3d 806, 813–14 (7th

Cir. 2005); *Beck*, 75 F.3d at 1136. Since Ms. Brown "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions, [the VA] cannot be held liable for failing to provide reasonable accommodations." *Steffes*, 144 F.3d at 1073 (citing *Beck*, 75 F.3d at 1137).

Furthermore, following the interactive meeting on February 27, the VA offered to provide Ms. Brown with interim accommodations in the form of "an extra chair or breaks." [Filing No. 39-4 (EEOC Tr. Vol I at 89:23–90:1) (Brown's testimony).] Ms. Brown rejected those suggestions. [Filing No. 39-3 at p. 5 (Decision of EEOC Administrative Judge).]

Ms. Brown made clear that she would not accept any accommodation other than a transfer. [*E.g.,* Filing No. 39-5 (EEOC Tr. Vol. II at 312:4–9 & 396:21–397:2).] Yet "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Sears*, 417 F.3d at 802 (quoting *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000)). *See also Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer."). The VA's Handbook designates reassignment as "the accommodation of last resort." [Filing No. 39-23 (VA Handbook 5975.1, Section 16) (DEF000345–46).] In denying the request for accommodation, the VA explained that Ms. Brown's failure to provide medical documentation prevented it from ascertaining whether she had a substantial limitation, but stated that "if [she] need[ed] to visit a medical specialist outside of the commuting area, [she] may request leave in accordance with the appropriate leave requesting procedures." [Filing No. 39-24 (Pl. Dep. Ex. 12).]  In sum, the VA acted reasonably.

**3.      Even If She Were Permitted to Belatedly Assert Them, Ms. Brown's
Arguments Regarding Other Possible Accommodations Fail**

At times during this litigation, Ms. Brown has suggested that the VA violated the
Rehabilitation Act because it did not offer alternative accommodations such as telework during
the interactive process. [*E.g.,* Filing No. 39-5 (EEOC Tr. Vol. II at 300:1–301:6).] Ms. Brown
does not assert such a theory in her Statement of Claims, however, and thus presumably has
abandoned it. [*See generally* Filing No. 37.]

Regardless, the facts do not support this theory. Ms. Brown never raised telework as an
accommodation that she would consider. [Filing No. 39-5 (EEOC Tr. Vol. II at 308:3–18 &
397:3–16).] Quite the opposite, she made clear to the VA that the only accommodation that she
would accept was the transfer to St. Petersburg. [*Id.* (EEOC Tr. Vol. II at 312:4–9 & 396:21–
397:2).] Ms. Brown cannot hold the VA liable for her total failure to seek this (or any other)
alternative accommodation. *E.g., Stelter*, 950 F.3d at 491.

**II.      Ms. Brown Was Not Subjected to Hostile Work Environment**

Ms. Brown also cannot prevail on her allegations of hostile work environment. As an
initial matter, the Seventh Circuit "has not determined" whether the Rehabilitation Act
"encompasses a claim of hostile work environment." *Yochim v. Carson*, 935 F.3d 586, 593 (7th
Cir. 2019) (citing *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 712–13 (7th Cir. 2000)). *See
also Williams v. Brennan*, No. 1:16-CV-01600-RLY-TAB, 2018 WL 8636001, at *14 (S.D. Ind.
Mar. 29, 2018). To the extent the Rehab Act does not actually create a cause of action for hostile
work environment, Ms. Brown obviously cannot recover on it.

In any event, Ms. Brown's allegations fall far short of the level of severity necessary to
establish a hostile work environment. Ms. Brown must demonstrate "at a minimum" that the VA
created a work environment that "was both objectively and subjectively offensive because of

'severe or pervasive' harassment." *Yochim*, 935 F.3d at 593 (citing *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016)). Ms. Brown's allegations are based on Ms. Lima's alleged statements that she "did not owe [Ms. Brown] anything," and that Ms. Brown "c[ould not] go have a meltdown in Human Resources to get moved." [Filing No. 12 (Am. Compl. ¶ 90); see also Filing No. 39-1 (Pl. Dep. at 52:4–55:23).] Even if Ms. Lima actually said these, they are not actionable.

In *Mannie v. Potter*, 394 F.3d 977 (7th Cir. 2005), the Seventh Circuit affirmed summary judgment for the employer on hostile work environment claims where the employee alleged that her supervisors "made derogatory statements about her," including "refer[ring] to her as 'crazy,'" and "discussed her mental condition with other employees." *Id.* at 980–83. Similarly, in *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999), the Seventh Circuit held that an employee whose supervisors vulgarly mocked his "medical problems," called him a "medical abuser," and referred to him as a "useless piece of [expletive]" based on his medical condition failed to show that he was subjected to conduct that rose to the level of a hostile work environment. *Id.* at 803–07. By any reasonable measure, Ms. Lima's alleged comments pale in comparison to these cases. If the comments in *Silk* and *Mannie* were not sufficiently severe, Ms. Lima's certainly are not.

Furthermore, Ms. Brown's own testimony undermines her allegations that such comments were sufficiently severe. At deposition in this action, Ms. Brown testified that she could not even recall Ms. Lima making the "meltdown" comment. [Filing No. 39-1 (Pl. Dep. 52:12–23).] The fact that Ms. Brown does not recollect this alleged comment demonstrates the negligible impact it had on her. And, as the EEOC Administrative Judge observed, Ms. Lima's statement was "a simple truism," *i.e.*, that Ms. Brown was not entitled to engage in "bad behavior" in an effort to get the transfer that she wanted. [Filing No. 39-3 at p. 13.] Ms. Brown

may have felt that the comments were "disparaging" [Filing No. 12 (Am. Compl. ¶ 90)], but that does not equate to a hostile work environment.

Ms. Brown also claims to have been subjected to a hostile work environment because, she says, the VA "consistently ignored [her] complaints about the physical pain she was suffering daily." [Filing No. 37 at 1.] This assertion is contradicted by the facts of the case. In 2013, the VA allowed Ms. Brown to take FMLA leave because she was experiencing pain from her medical condition. [Filing No. 12 (Am. Compl. ¶ 27).] Once she started demanding a transfer to Florida, the VA responded to her requests. However, Ms. Brown made clear that she was not interested in any alternatives, and she repeatedly engaged in loud, angry outbursts when the VA did not immediately accede to her demands for the transfer. [*E.g.,* Filing No. 39-5 (EEOC Tr. Vol. II at 380:10–381:5).] Ms. Brown caused the difficulties; the VA did not ignore her.

Putting aside that Ms. Brown's allegations are contradicted by the facts, she essentially alleges that the VA displayed a "pattern of insensitivity" toward her disability. The Seventh Circuit has found similar allegations inadequate for purposes of inferring discriminatory animus. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). Even if she could prove that the VA acted in this way, it would not establish that Ms. Brown experienced a workplace "permeated with intimidation, ridicule, and insult," such that it "alter[ed] the conditions of [her] employment." *Boss*, 816 F.3d at 920. *See also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Finally, in the portion of her Amended Complaint devoted to hostile work environment, Ms. Brown makes a passing reference to the reprimand that she received in 2014. [Filing No. 12 (Am. Compl. ¶ 90).] However, she does not mention that reprimand in her Statement of Claims, and thus abandons it. [*See* Filing No. 37.] In any event, Ms. Brown cannot show that this reprimand constitutes actionable hostile work environment harassment. Ms. Brown received that

reprimand because she deliberately refused to comply with her supervisor's instructions to submit her mandatory overtime hours. [Filing No. 39-28 (Pl. Dep. Ex. 20).] The VA did not subject Ms. Brown to a hostile work environment just because it required her to follow her supervisor's instructions. *See, e.g., Yochim*, 935 F.3d at 593 (citing *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004)).

### III.   The VA Did Not Unlawfully Disclose Ms. Brown's Medical Information

Finally, Ms. Brown claims that the email from Ms. Lima of February 10, 2014, "disclosed details of Ms. Brown's disability to individuals who had no need to know the details of Ms. Brown's disability" in violation of the Rehabilitation Act because Ms. Lima copied Assistant Director Yvonne Hamilton and AVSCMs Adam Kinder and Debra Street to the reply. [Filing No. 12 at 11 (Am. Compl. ¶¶ 48, 95–97); *see also* Filing No. 37 at 2.]

Under the Rehabilitation Act, 29 U.S.C. § 791(f), an employer must treat "information obtained regarding [an employee's] medical condition or history . . . as a confidential medical record, except that . . . supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations." 42 U.S.C. § 12112(d)(4)(C)). The purpose of this confidentiality provision is to "ensur[e] that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee." *Porfiri v. Eraso*, 121 F. Supp. 3d 188, 199 (D.D.C. 2015) (quoting *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003)).

First, as a fundamental matter, Ms. Lima's letter was issued in response to Ms. Brown's Request for Reassignment under the union master agreement. As discussed above, that Request for Reassignment was not a request for accommodation. Thus, Ms. Lima's correspondence in reply to it did not implicate the Rehabilitation Act's provisions at all.

26

Regardless, Ms. Lima's reply did not disseminate Ms. Brown's medical information farther than necessary. Ms. Lima only included in the reply those managerial employees who were in Ms. Brown's chain of command. [Filing No. 39-18 (Defendant's Response to Interrogatory No. 1).] These individuals had a need to know as to the outcome of Ms. Brown's request under the union master agreement, because that request necessarily implicated staffing and personnel issues at the Veterans Service Center. [*Id.*] Furthermore, Ms. Lima deliberately took care to describe Ms. Brown's medical condition in generalized terms, calling it a "dermatological disorder" and "serious chronic medical condition." [Filing No. 39-17 (Pl. Dep. Ex. 7).] Those generic references stand in stark contrast to Ms. Brown's own description in the Request for Reassignment, where she specifically stated that she suffered from "hidradenitis suppurativa, Stage II." [Filing No. 39-14 (Request for Reassignment, Pl. Dep. Ex. 5).]

Ms. Lima limited the distribution of this information to individuals who needed to know about the outcome of the request and specifically described Ms. Brown's condition in generalized terms in order to avoid impinging her privacy. This is not a violation of the Rehab Act's confidentiality provision.

## **CONCLUSION**

This Court should grant summary judgment to Defendant.

> Respectfully submitted,
>
> JOHN E. CHILDRESS
> Acting United States Attorney
>
> By:     */s/ J. Taylor Kirklin*
>          J. Taylor Kirklin
>          Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 2, 2021, a copy of the foregoing was filed electronically. Notice of

this filing was sent to:

> Denise M. Clark
> CLARK LAW GROUP, PLLC
> dmclark@benefitcounsel.com

*/s/ J. Taylor Kirklin*
J. Taylor Kirklin

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN  46204-3048
Telephone: (317) 226-6333
Fax: (317) 226-5027
E-mail: taylor.kirklin@usdoj.gov