## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

TREVENIA BROWN,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No. 1:20-cv-01154-JPH-MJD
                                         )
DENIS MCDONOUGH, Secretary, U.S.         )
Department of Veterans Affairs,          )
                                         )

## RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Trevenia Brown ("Ms. Brown" or Plaintiff) hereby opposes Department of

Veterans Affairs ("Defendant" or "VA") Motion for Summary Judgment.  As stated in more

detail below, a jury could readily find that Ms. Brown's disability was not accommodated, that

her medical information was unlawfully disclosed, and that she was subjected to a hostile work

environment because of her disability and/or accommodation requests in violation of the

Rehabilitation Act of 1973 ("Rehab Act").  Specifically, a jury could find Defendant liable for its

management and human resource personnel failure to process her accommodation requests,

disclosing Ms. Brown's medical information, and improperly deeming her to be disabled before

finally transferring Ms. Brown due to her condition were violations of the statute.  Therefore,

Defendant's Motion should be denied.

### I.    Standard of Review

A motion for summary judgment should only be granted if the movant can show that

there is no genuine dispute of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255

(1986).  Summary judgment is only appropriate if no reasonable jury could find in favor of the

non-movant. *White v. City of Chicago,* 829 F.3d 841 (7th Cir. 2016).  When considering a

motion for summary judgment, the Court should view the evidence in the light most favorable to

the non-moving party, with the non-movant needing to present no more than a "mere scintilla" of

evidence in their favor. *Brown v. Milwaukee Bd. of Sch. Directors*, 855 F.3d 818, 820 (7th Cir.

2017).

## II.    **Summary of Facts**[1]

Ms. Brown was hired to worked as Veterans Service Representative in the Defendant's

Veterans Service Center located Indianapolis, Indiana in September 2011.  [Dkt. 40, Defendant's

Statement of Material Facts ("DMSF") 5].  In or around June 2013, Ms. Brown's disability,

hidradenitis suppurativa, began to flare up, resulting in Ms. Brown taking intermittent FMLA

leave for her condition.  [Dkt. 40, DSMF 15].  Hidradenitis suppurativa is a severe

dermatological disorder that causes painful nodules and cysts to develop throughout Ms.

Brown's body.  DSMF 2.  When flared, the pain can be so extreme that Ms. Brown cannot dress

herself, move, or even sit. [Dkt. 39-4, EEOC Tr. Vol. I, 25-30, 32:5-11].

On January 17, 2014, Ms. Brown's condition escalated to the point that she requested to

be transferred to Defendant's Florida office so that she could see specialists more familiar with

her condition and be around family support to assist her as needed ("Hardship Transfer

Request").  [Dkt. 39-9, Hardship Transfer Request].  Ms. Brown further stated how she had been

repeatedly absent from work due to her condition and hoped that being transferred and thus

under better care would reduce or eliminate her medical related absences.  *Id*.  Ms. Brown also

permitted her FMLA documentation be shared with the deciding official so that they could see

---

[1] Plaintiff's "Statement of Material Facts in Dispute" as required by Local Rule 56-1(b) is
provided below.

more details of her condition.  Rather than engage Ms. Brown in the interactive process as required by VA policy, Defendant simply denied the request.

On February 7, 2014, Ms. Brown attempted to use a VA mechanism to transfer to Florida because of her disability, a "Request for Reassignment" under her collective bargaining agreement.  [Dkt. 40, DSMF 32].  Ms. Brown's request was accompanied by a note from her provider Dr. Robert Huff who described Plaintiff's hidradenitis suppurativa as chronic and unpredictable, leading to secondary bacterial infections and scarring, causing debilitating pain and psychological impacts, and frequently needing medical and surgical intervention. [Dkt. 39-15, Huff Letter Feb. 2014].  He affirmed that transfer of care to an appropriate dermatologist in the St. Petersburg, Florida area was essential to control her disease.  *Id.*   After denying the reassignment request under its rules, the Defendant failed to engage in the interactive process.  Ms. Brown was instructed to submit further paperwork if she wanted to request an accommodation. [Dkt. 39-17, 2-10-14 Letter].

Following an unproductive "interactive process" meeting on February 27, 2014, Ms. Brown was requested to provide Defendant with additional medical information.  When Ms. Brown asked what specifically was needed since she had already submitted medical documentation, her question was met with silence.  [Dkt. 39-22, 3-24-14 Email].[2]  Instead, six days later on April 1, 2014, Defendant denied Ms. Brown's accommodation request, claiming that she was not disabled.  [Dkt. 39-24, Denial Notice].

Still in immense pain, Ms. Brown again requested that be transferred as an accommodation in August 2014.  [Dkt. 39-31, Huff Letter 8-1-2014].  After waiting an additional two months, Defendant finally agreed to the transfer in October 2014. [Dkt. 39-1,

---

[2] Defendant labels this email exchange "3-24-14" when the email exchange is actually from March 25, 2014.  For consistency in referencing the exhibit, Plaintiff will use the "3-24-14" label.

Brown Dep., 82:22–25].  During the approximate ten-month period between Ms. Brown's first request to be transferred due to her disability and her eventual transfer, Ms. Brown was in continual and unnecessary pain.

## III.   Statement of Material Facts in Dispute

### A.  Response to Defendant's Statement of Material Facts

In response to the Defendant's Statement of Material Facts Not in Dispute ("DSMF"), Plaintiff states that she does not dispute the following paragraphs for the purposes of summary judgment: ¶¶ 1, 2, 3, 4, 5, 6, 7, 9, 10, 14, 17, 21, 22, 23, 24, 25, 29, 30, 32, 33, 34, 35, 36, 38, 43, 53, 58, 62, 65, 67, 68.

8.     The VA maintains Equal Employment Opportunity and anti-discrimination policies, which are readily available on its website, among other places. [https://www.va.gov/ORMDI/docs/EEO_Policy.pdf.] These EEO policies address, *inter alia*, reasonable accommodations for employees with disabilities. [*Id.*] Ms. Brown does not know if she ever reviewed or attempted to locate those policies. [Filing No. 39-1 (Pl. Dep. at 32:20–24).]

**Response: Disputed as material.**  An employee is not required to study their employer's EEO policy before requesting accommodations, as Defendant attempts to characterize.

### *(i)*     Supervisory Hierarchy Relevant to Ms. Brown's Employment

11.    Coaches are managed by the Assistant Veterans Service Center Managers (AVSCMs). [Filing No. 39-6 (VSC Management Organizational Chart).] In 2014, Adam Kinder and Debra Street were the AVSCMs at the Indianapolis Veterans Service Center and, thus, Ms. Brown's second-level supervisors. [*Id.*; Filing No. 39-2 (Pl. Tel. Aff. at 5:6–15).]

**Response: Disputed:** In March 2014, Mr. Kinder had replaced Ms. Lima as the acting Veterans Service Center Manager.  He was the acting Veterans Service Center Manager on Apr. 9, 2014.  [Dkt. 39-28, Reprimand].

12.     The AVSCMs are supervised by the Veterans Service Center Manager. [Filing No. 39-6 (VSC Management Organizational Chart).] At the time, Ena Lima was the Veterans Service Center Manager.  [*Id.*; Filing No. 39-1 (Pl. Dep. at 42:21–43:2).]

    **Response: Disputed:** For a portion of the events at issue, Ms. Lima was the acting Assistant Director of the Regional office.  [Dkt. 39-2, Brown Tel. Aff., 46:9-15]

13.     The Director of the Regional Office oversees the Veterans Service Center Manager. Michael Stephens was the Director of the Regional Office. [Filing No. 12 (Am. Compl. ¶ 22); Filing No. 39-1 (Pl. Dep. at 41:11–13).] Yvonne Hamilton was the Assistant Director. [Filing No. 39-2 (Pl. Tel. Aff. at 27:9–13).]

    **Response: Disputed.** For a portion of the events at issue, Ms. Lima was the acting Assistant Director of the Regional office.  [Dkt. 39-2, Brown Tel. Aff., 46:9-15]

*(ii)*     **Productivity and Accuracy Standards Relevant to Ms. Brown's Employment**

15.     In or around June 2013, Ms. Brown was approved to take intermittent leave under the Family Medical Leave Act for her hidradenitis suppurativa. [Filing No. 12 (Am. Compl. ¶ 27).] Ms. Brown agrees that the time that she was out of the office on FMLA leave was excluded from the calculation of her output goals and quality accuracy measurements. [Filing No. 39-1 (Pl. Dep. at 94:12–95:2).]

**Response: Disputed.** Plaintiff does not dispute what she testified to in her 2021 deposition about the calculation of her output goals and quality accuracy measurement in 2014. Plaintiff disputes that her FMLA was not considered in her output goals and quality accuracy measurement in 2014. During this case's EEOC hearing in 2015, union steward for the Indianapolis office Rachel Gentry confirmed that Defendant's calculation system in 2013-2014 caused lower performance scores for individuals who have taken FMLA leave. [Dkt. 39-5, EEOC Tr. Vol. 2, 279:24-280:3, 280:14-281:6, 285:12-286:9]. Ms. Gentry also testified that, after Ms. Brown transferred out of the Indianapolis office, the national chapter of the union grieved the performance tracking system with the VA because of this reason. [Dkt. 39-5, EEOC Tr. Vol. 2, 288:22-289:13]. As a result of that grievance, the system was taken out of use. [Dkt. 39-5, EEOC Tr. Vol. 2, 288:22-289:13].

16. In her monthly performance review for December 2013, Mr. Dean informed Ms. Brown that she was not meeting the output goals or quality accuracy goals for her position. [Filing No. 39-7 (Monthly Performance Review, Pl. Dep. Ex. 14).]

**Response: Disputed as material**. Ms. Brown's performance was rated as fully successful for the evaluation period of October 1, 2013 to April 5, 2014, which includes December 2013. [Dkt. 41-2, 2014 Midyear Appraisal at 4].

**B.  The Hardship Transfer Request (January 17, 2014)**

19. In the Hardship Transfer Request, Brown stated that she "ha[d] a chronic health condition for which [she was] FMLA approved that requires services and care of a specialist which is not

available to [her] in the state of Indiana." [Filing No. 39-9.] The Hardship Transfer Request did not provide further details of the "health condition." [*Id.*]

    **Response: Disputed**.  Ms. Brown stated that her condition caused her to be repeatedly absent from work and hoped that being transferred and thus under better care would reduce or eliminate her medical related absences.  [Dkt. 39-9, Hardship Transfer Request].  The Hardship Transfer request further stated that there were two medical facilities in the St. Petersburg area that could properly treat Ms. Brown's condition.  [Dkt. 39-9, Hardship Transfer Request].  Ms. Brown also wrote in the Hardship Transfer request that she had multiple family members in the Tampa Bay area who would be able to assist her.  [Dkt. 39-9, Hardship Transfer Request].   Ms. Wilson also provided Ms. Brown's FMLA documentation with the Hardship Transfer Request.  [Dkt. 39-5, EEOC Tr. Vol. II, 380: 7-13; 381:1-5]; [Dkt.39-2, Brown Tel. Aff., 15:13-16:11].  This FMLA documentation details Ms. Brown's condition and her work limitations, and it is signed by her treating medical provider. [Dkt. 41-3, FMLA Application].


20.    On or around the day that she submitted the request, the VA suggested that Ms. Brown should provide medical documentation to support her Hardship Transfer Request.  Ms. Brown "came down to [Ms. Wilson's] office" in Human Resources, and "was very upset and angry because she didn't want to have to provide any additional medical documentation" in connection with the Hardship Transfer request. [Dkt. 39-5, EEOC Tr. Vol. II at 380:10–381:5 (Wilson's testimony)]; *see also* [Dkt. 39-2, Pl. Tel. Aff. at 15:5–16:4.]

    **Response: Disputed.**  Ms. Brown testified that she went to see Sonya Wilson that day with the approval of her coach, Mr. Dean.  [Dkt. 39-2, Brown Tel. Aff., 15:7-21].  Ms. Brown had asked Dean a question regarding her paperwork, and Dean could not answer, so Brown went

to HR herself to straighten the issue out.  [Dkt. 39-2, Brown Tel. Aff., 15:7-21].  Additionally, Ms. Brown testified that she was not angry or difficult, but that she was trying to understand what she needed to do to be able to see a specialist for her disability.  [Dkt. 39-2, Brown Tel. Dep., 21:6-12].

26.     The Employee Hardship Transfer Information form attached to that email noted that Ms. Brown was "not meeting performance standards" for her position.  [Filing No. 39-11 (1/17/2014 email at DEF00207).]

**Response: Disputed as material.**  Defendant's policy regarding Hardship Transfers states that "Transfers will not be considered if the employee is under a PIP, leave restriction, or disciplinary action." [Dkt. 39-10, Guidance for Hardship Transfers at 1].  Ms. Brown has never been on a PIP, leave restriction, or disciplinary action. [Dkt. 39-2, Brown Tel. Aff., 16:11-25]. Therefore, Ms. Brown's supposed failure to meet performance standards is not material.

27.     On January 21, 2014, after examining Ms. Brown's performance data, Ms. Lima replied and expressed that Ms. Brown was demonstrating "performance issues" in "struggl[ing] to meet output and quality measures." [Dkt. 39-12, 1-21-14 Email].  Under the Guidance on Hardship Transfers, Ms. Lima explained, Ms. Brown's "demonstrated performance in the VSR position does not support [granting the Hardship Transfer Request] until she shows significant improvement in all areas of her performance in this position." [*Id.*]

**Response: Disputed as material.**  Defendant's policy regarding Hardship Transfers states that "Transfers will not be considered if the employee is under a PIP, leave restriction, or disciplinary action." [Dkt. 39-10, Guidance for Hardship Transfers at 1].  Ms. Brown has never

been on a PIP, leave restriction, or disciplinary action. [Dkt. 39-2, Brown Tel. Aff., 16:11-25].

Therefore, the stated reasons for denying the Hardship Transfer are not material.  Additionally,

Ms. Lima's determination expressly referenced Ms. Brown's FMLA leave usage.  [Dkt. 39-12,

1-21-14 Email].


28.     Director Stephens denied the Hardship Transfer Request based on the fact that Ms.

Brown's performance was substandard. [Dkt. 12, Am. Compl. ¶ 37; Dkt. 39-13, 1-23-14 Email,

Pl. Dep. Ex. 4); Dkt. 39-3, Decision of Administrative Judge at p. 3 n.2].

   **Response: Disputed as material.**  Defendant's policy states that "Transfers will not be

considered if the employee is under a PIP, leave restriction, or disciplinary action." [Dkt. 39-10,

Guidance for Hardship Transfers at 1].  Ms. Brown has never been on a PIP, leave restriction, or

disciplinary action. [Dkt. 39-2, Brown Tel. Aff., 16:11-25].  Therefore, the stated reasons for

denying the Hardship Transfer are not material.


31.     In her Amended Complaint, Ms. Brown also alleges that, during this conversation, Ms.

Lima said, "You can't go have a meltdown in Human Resources to get moved" (apparently

referencing Ms. Brown's interaction with Ms. Wilson on January 17, 2014).5 [Filing No. 12

(Am. Compl. ¶ 35).] At her deposition in this case, though, Ms. Brown could not remember Ms.

Lima saying this. [Filing No. 39-1 (Pl. Dep. 52:12–23) (Q: "Okay. But I'm asking do you recall

[Ms. Lima] saying 'You can't go have a meltdown in HR'? A: No, I don't recall.").]

   **Response: Disputed.**  Plaintiff does not dispute that she did not recall Ms. Lima's

statement during her deposition in 2021.  However, before the EEOC in 2015, Ms. Brown

testified that Ms. Lima made the referenced statement. [Dkt. 39-2, Brown Tel. Aff., 62:12-19,

63:3-9].

**C. The Request for Reassignment under the Union Master Agreement (February 6, 2014)**

37.     Dr. Huff indicated that hidradenitis suppurativa was a "chronic and often unpredictable inflammatory disorder of the skin." [Dkt. 39-15, Huff Letter Feb. 2014]. He stated that he had seen "some success in treating [Ms. Brown's skin condition] with high dose antibiotics," but that "the disorder will likely continue to wax and wane indefinitely." [*Id.*] Dr. Huff stated that Ms. Brown required treatment by a "dermatologist" "upon relocation" to St. Petersburg, Florida. [*Id.*]

        **Response: Undisputed**. However, Defendant omits that Dr. Huff also wrote that "the additional need for medical and surgical treatment is essential to control [Brown's] disease", and that "this disorder can cause significant…debilitating pain with frequent need for medical…intervention." [Dkt. 39-15, Huff Letter Feb 2014].  He also stated that a "significant psychosocial impact" occurs in patients with hidradenitis suppurativa, such that these patients have "the need for a support network of family and possibly mental health care." [Dkt. 39-15, Huff Letter Feb. 2014]. Finally, Dr. Huff wrote that Ms. Brown specifically would "benefit from having close support of her family" as she continues to struggle with hidradenitis suppurativa. [Dkt. 39-15, Huff Letter Feb 2014].

39.     On February 10, 2014, Ms. Lima issued a denial of Ms. Brown's Request for Reassignment. In that denial, Ms. Lima noted that the letter from Dr. Huff "fail[ed] to demonstrate that [Ms. Brown was] unable to perform [her] assigned duties," as required by Article 13.  [Filing No. 39-17 (2/10/2014 letter, Pl. Dep. Ex. 7); Filing No. 12 (Am. Compl. ¶ 46).]

**Response: Disputed as material.**   In response to Dr. Huff's letter and Ms. Brown's earlier communications describing her impairments and needed workplace alterations, Defendant's own policy required its personnel to engage Ms. Brown in the interactive process. [Dkt. 41-5, VA Handbook 5975.1 Full ("VA 5975.1"), 20-21] ("A requestor does not have to use words such as 'reasonable accommodation,' 'disability,' or 'Rehabilitation Act' in the request… The requestor should not be required to make repetitive requests for the same accommodation… When the individual makes an oral or written request for reasonable accommodation, managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request.").

40.      In the denial of the Request for Reassignment, Ms. Lima carbon-copied (1) Director Stephens, (2) Assistant Director Yvonne Hamilton, (3) Mr. Dean, (4) AVSCM Adam Kinder, and (5) AVSCM Debra Street. [Filing No. 39-17.] These individuals were all in Ms. Brown's chain of command, and Ms. Lima included them on the reply because they needed to be informed of the outcome of this request under the union agreement, given its impact on staffing and operations of the Veterans Service Center. [Filing No. 39-18 (Defendant's Response to Interrogatory No. 1).]

**Response: Disputed.** Plaintiff does not dispute that Ms. Lima's denial copied Director Stephens, Ms. Hamilton, Mr. Dean, Mr. Kinder, and Ms. Street.  Plaintiff disputes that these individuals needed to be informed about Ms. Brown's disability in that denial.  The VA Handbook provides that the Human Resources employees must, "Refrain from sharing the specific disability or medical documentation with the DMO or other supervisory officials." [Dkt. 41-5, VA 5975.1, 16].  The Handbook also provides that "supervisors and managers", i.e., the

"chain of command", may only be informed of the "necessary restrictions on the work or duties of the employee and the necessary accommodation(s)," [Dkt. 41-5, VA 5975.1, 25]. Ms. Lima's communication to Director Stephens, Ms. Hamilton, Mr. Dean, Mr. Kinder, and Ms. Street did not inform them of Ms. Brown's necessary restrictions and instead described Ms. Brown as having a "disease" and "a dermatological disorder that is chronic and unpredictable in nature." [Dkt. 39-17, 2-10-14 Letter].

41.      In that response to the Request for Reassignment, Ms. Lima specifically suggested to Ms. Brown: "If you believe that you need an accommodation due a disability or workplace barrier that precludes you from performing the essential functions of your position, you may request a reasonable accommodation by completing VA Form 0857a, Written Confirmation of Request for Reasonable Accommodation, and submit it to your immediate supervisor." [Filing No. 39-17.]

**Response: Disputed as material.**  Ms. Brown had previously made accommodation requests to Ms. Lima and Ms. Wilson.  [Dkt. 39-9, Hardship Transfer Request]; [Dkt. 39-13, Medical Reassignment Request].  Additionally, Defendant's policy affirms that an employee is not required to make an accommodation request in writing or in a specific form. [Dkt. 41-5, VA 5975.1, 20].

**D.  The Request for Accommodation (February 24, 2014)**

42.      Ms.  Brown took Ms. Lima's advice. On February 24, 2014, she submitted to Mr. Dean a Written Confirmation of Request for Accommodation, on VA Form 0857a, stating that she was

requesting accommodations for "[her] health." [Filing No. 39-19 (Request for Accommodation, Pl. Dep. Ex. 8); Filing No. 12 (Am. Compl. ¶ 51).]

**Response: Disputed.**   Ms. Brown did not submit the VA Form 0857a on the advice of Ms. Lima, and the defense has provided no citation to the record that supports that claim.   On the contrary, Ms. Brown felt that Lima had only included the reference to the accommodation application to say she could not do her job.  [Dkt. 39-4, EEOC Tr. Vol. I, 59:17-60:5 (Brown's testimony) ("when I saw that, I said to myself, so they're saying they want me to say I can't do my job."); [Dkt. 39-4, EEOC Tr. Vol. I, 153:19-25]. Plaintiff does not dispute completing VA Form 0857a.

44.     On February 27, 2014, Mr. Dean and Ms. Wilson held an interactive meeting with Ms. Brown and her union steward, Rachel Gentry.  [Filing No. 39-20 (email recapping interactive meeting, Pl. Dep. Ex. 9); Filing No. 12 (Am. Compl. ¶ 53).]

**Response: Disputed.** Plaintiff disputes Defendant's characterization of the meeting as "interactive" because it implies a legal conclusion regarding the accommodations process.  The plaintiff does not dispute that on February 27, 2014, she met with Mr. Dean, Ms. Wilson, and Ms. Gentry.  [Dkt. 39-20, 2-27-14 Email].

45.     During this interactive meeting, Ms. Wilson attempted to explain the reasonable accommodation process to Ms. Brown. However, Ms. Brown was "very angry" and "continually interrupted" Ms. Wilson as she tried to speak. [Filing No. 39-5 (EEOC Tr. Vol. II at 394:6–23) (Wilson's testimony).] After "talk[ing] over" Ms. Wilson for a while, Ms. Brown "sat down in a chair and turned her back to [Ms. Wilson], indicating to [Ms. Wilson] that she was not listening

or interested in listening to [Ms. Wilson] explain the [reasonable accommodation] process." [*Id.* at 394:23–395:2.]

       **Response**: **Disputed**.   Plaintiff disputes Defendant's summary of the meeting as inconsistent with Ms. Brown and Ms. Gentry's testimony. [Dkt. 39-5, EEOC Tr. Vol. II, 274:1-4, 300:9-17, 335:12-18].   Ms. Brown testified that she was in great pain during the meeting due to a cyst, and that she became emotional during this meeting because of her pain.   [Dkt. 39-4, EEOC Tr. Vol. I, 88:14-19, 161:16-162:4].   She denies becoming angry, and Ms. Gentry also testified that it was Ms. Wilson, not Ms. Brown, who became increasingly hostile during the meeting. [Dkt. 39-5, EEOC Tr. Vol. II, 278:5-13, 21-23, 310:6-9, 336:22-24, 603:1-21].   Ms. Brown also testified that she began crying during the meeting out of the extreme pain she was experiencing, and that she may have turned her back so that Ms. Wilson could not see her crying. [Dkt. 39-5, EEOC Tr. Vol. II, 602:3-8, 18-25].   Both Ms. Gentry and Ms. Brown agree that at no time during the meeting did Ms. Brown convey to Ms. Wilson that she was not listening.   [Dkt. 39-5, EEOC Tr. Vol. II, 318:9-12].   Gentry also testified that Ms. Wilson did not seem interested in explaining the reasonable accommodation process to Ms. Brown [Dkt. 39-5, EEOC Tr. Vol. II, 274:11-15, 17-20].   On the contrary, both Gentry and Brown testified that Brown was desperate to understand what more she needed to submit for her request for accommodations to move forward. [Dkt. 39-5, EEOC Tr. Vol. II, 274:4-10 (Gentry's Testimony) ("[Ms. Brown] wanted to submit whatever was necessary.  She wanted to follow the process.  And nobody was giving her clear direction.")].

46.     Accordingly, Ms. Wilson and Mr. Dean explained the reasonable accommodation process to Ms. Gentry, with Ms. Gentry saying "that she would try to talk to [Ms. Brown] later, after she had calmed down." [Filing No. 39-5 (EEOC Tr. Vol. II at 395:3–11) (Wilson's testimony).]

**Response: Disputed**.  Ms. Gentry testified that Wilson was hostile and dehumanizing to Brown and that Brown was in pain and emotional.  [Dkt. 39-5, EEOC Tr. Vol. II, 273:25-274:4, 278:5-13, 335:12-18].  Gentry also testified that, in her opinion, Wilson and Dean did not explain the reasonable accommodation process in the referenced meeting.  [Dkt. 39-5, EEOC Tr. Vol. II, 274:11-15, 17-20].  Gentry further testified that Dean himself "didn't really seem to understand the process of requesting reasonable accommodation either," making it improbable that Dean would have explained the process to anyone.  [Dkt. 39-5, EEOC Tr. Vol. II, 273:11-13].  Ms. Gentry also testified that "Throughout the entire meeting… we were trying to communicate effectively." [Dkt. 39-5, EEOC Tr. Vol. II, 318: 11-12].

47.     During the interactive meeting, Ms. Wilson and Mr. Dean attempted to identify the limitations that prevented Ms. Brown from doing her job. Mr. Dean asked Ms. Brown what limitations she had.  However, Ms. Brown "stated specifically, 'I don't have any limitations.'" [Filing No. 39-5 (EEOC Tr. Vol. II at 395:12–396:14) (single quotation marks added) (Wilson's testimony); id. at 534:6–16 (Dean's testimony); Filing No. 39-20 (2/27/2014 email, documenting that during interactive meeting, Ms. Brown "stated that [she] had no limitation").]

**Response: Disputed.** Ms. Brown and Ms. Gentry both disputed this characterization of the meeting. [Dkt. 39-5, EEOC Tr. Vol. II, 300:9-15].  Ms. Gentry testified that, at no point during the meeting, did Ms. Brown say, "I don't have any limitations." [Dkt. 39-5, EEOC Tr. Vol. II, 342:19-343:3].  Furthermore, Ms. Gentry testified that the email Mr. Dean sent following

15

the meeting was inaccurate in several respects, including the claim that Ms. Brown had no limitations. [Dkt. 39-5, EEOC Tr. Vol. II, 342:3-343:22]. Moreover, Ms. Brown's previously submitted documentation described her limitations. [*See* Dkt. 41-3, FMLA Application; Dkt. 39-9, Hardship Transfer Request; 39-14, Reassignment Request under Union Agreement; 39-15, Huff Letter Feb. 2014.]

48.     Mr. Dean and Ms. Wilson asked Ms. Brown if there were any interim accommodations that the VA could provide her during the reasonable accommodation process. [Filing No. 39-5 (EEOC Tr. Vol. II at 307:15–24) (Gentry's testimony).] Ms. Brown "said no," and told them that "there [was] no interim accommodations [the VA] could provide and that she had no limitations. She wanted to be transferred." [Filing No. 39-5 (EEOC Tr. Vol II at 396:13–20) (Wilson's testimony); id. at 307:15–24 (Gentry's testimony); Filing No. 39-3 at p. 4 (Decision of EEOC Administrative Judge); Filing No. 39-20 (2/27/2014 email, documenting that during interactive meeting, Ms. Brown "stated that [she] had no interim accommodation").]

     **Response: Disputed**.  Ms. Gentry was asked if Ms. Brown had any interim accommodation requests during the EEOC hearing.  Ms. Gentry's response was, "I don't believe at the time we could think of any interim request, and [Dean and Wilson] had no suggestion for how to best accommodate for Trevenia at that point," [Dkt. 39-5, EEOC Tr. Vol. II, 307:21-24]. Ms. Gentry explained that Ms. Brown did not ask for an interim conversation during the meeting, "Because [Wilson and Dean] really didn't explain – they didn't seem like she had any other choice" but to accept the denial of her reasonable accommodations request. [Dkt. 39-5, EEOC Tr. Vol. II, 274:16-20].

49.    Ms. Brown was "very clear" to Mr. Dean and Ms. Wilson that "she would only be satisfied with the transfer" and that she would not accept any other alternative accommodation. [Filing No. 39-5 (EEOC Tr. Vol. II at 396:21–397:2) (Wilson's testimony); see also id. at 312:4–9 (Gentry's testimony, confirming "[t]he reasonable accommodation [Ms. Brown] was seeking was only the transfer").]

**Response: Disputed.**  Ms. Brown would have accepted telework if offered. [Dkt. 39-4, EEOC Tr. Vol. I, 210:13-17].  The VA proposed no alternative accommodation during the meeting. [Dkt. 41-5, Wilson EEOC Aff., 36:7-11].


50.    Ms. Brown did not raise telework as a potential accommodation that she wanted. [Filing No. 39-5 (EEOC Tr. Vol. II at 308:3–18) (Gentry's testimony); *id.* at 397:3–16 (Wilson's testimony).]

**Response: Undisputed as material.**  Ms. Gentry testified that "telework wasn't anything that it wasn't something that was granted at our office." [39-5, EEOC Tr. Vol. II, 308:11-14]. Moreover, the VA did not proffer any alternative accommodations.  [Dkt. 41-5, Wilson EEOC Aff., 36:7-11].


51.    During the meeting, Ms. Wilson and Mr. Dean provided Ms. Brown with a medical request form (VA Form 0857e), which identified the sort of medical information that the VA needed to help make a determination as to the accommodation request. [Filing No. 39-5 (EEOC Tr. Vol. II at 397:17–398:9) (Wilson's testimony); *see also* Filing No. 39-21 (VA Form 0857e, Pl. Dep. Ex. 10).]

17

**Response: Disputed**.  Plaintiff does not dispute receiving VA Form 0857e; Plaintiff disputes receiving it during this meeting.  [Dkt. 39-5, EEOC Tr. Vol. II, 343:11-22]; [Dkt. 39-4, EEOC Tr. Vol. 1, 163:24-164:3, 200:7-201:1, 217:15-219:7] (Ms. Brown stating that she would have "had no problem" taking the form to get completed if she had ever received it).  Plaintiff further disputes that VA Form 0857e "identified the sort of medical information that the VA needed to help make a determination as to the accommodation request." Ms. Brown's previously submitted medical documentation described "(a) the nature, severity, and duration of her impairment; (b) one or more of the activities the impairment limits (walking, reaching, breathing etc.); (c) the extent or degree to which the impairment limits an activity; (d) the reason the individual requires accommodation or the particular accommodation requested, and/or (e) how the accommodation will assist the individual in applying for a job, performing the essential functions of the job, or to enjoy a benefits of employment." [*See* Dkt. 41-3, FMLA Application; Dkt. 39-9, Hardship Transfer Request; 39-14, Reassignment Request under Union Agreement; 39-15, Huff Letter Feb. 2014; 39-19, Request for Accommodation.]

52.    Ms. Brown does not recall asking Dr. Huff to fill out the information on Form0857e, nor does she recall otherwise providing additional medical documentation in response to the VA's request. [Filing No. 39-1 (Pl. Dep. at 77:2–78:7).]

**Response: Disputed.** Ms. Brown testified that she does not recall ever receiving the Form 0857e, and thus does not recall asking her doctor to complete it.  [Dkt. 39-4, EEOC Tr. Vol. 1, 163:24-164:3, 200:7-201:1, 217:15-219:7]

54.     In response, Ms. Brown told Mr. Young to "refer to the Doctor's certification that has already been provided," *i.e.*, Dr. Huff's letter from February. [Filing No. 39-22 (Pl. Dep. Ex. 11).]

     **Response: Disputed.**  On March 25, 2014 at 12:42pm, Ms. Brown responded to Mr. Young: "As I stated previously, I have requested ·reasonable accommodation beginning on January 17, 2014. Please refer to the Doctors certification that have already been provided. Please provide me the details of my decision and the information missing from my doctor's certification if it does not suffice, and my right to appeal. Thank you." [Dkt. No. 39-22, 3-24-14 Email].  At 12:26pm, Ms. Brown added: "Also, if your unable to provide the reasonable accommodation requested; please provide the reasons and what accommodation that you (the agency) propose would benefit me." *Id*.  Ms. Brown did not receive a response from Mr. Young [Dkt. 39-4, EEOC Tr. Vol. I, 87:5-9].


55.     During this period, the VA offered to provide Ms. Brown with interim accommodations in the form of "an extra chair or breaks." [Filing No. 39-4 (EEOC Tr. Vol I at 89:23–90:1) (Brown's testimony).] Ms. Brown "rejected a chair or additional breaks as a form of reasonable accommodation." [Filing No. 39-3 at p. 5 (Decision of EEOC Administrative Judge).]

     **Response: Disputed.** Ms. Brown was not offered "an extra chair or breaks;" instead, "an extra chair or breaks" were described to Ms. Brown as generally what an accommodation request was. [Dkt. 39-5, EEOC Tr. Vol. II, 318:25-319:11].  Moreover, Ms. Brown's condition would not be aided by either a chair or additional breaks. [Dkt. 39-4, EEOC Tr. Vol. I, 158:8-24].

56.     VA Handbook 5975.1 provides that reassignment "is the accommodation of last resort and will be considered only if there is no other accommodation available that will enable the employee to perform the essential functions of his or her current job, and the employee has a permanent or long-term disability." [Filing No. 39-23 (VA Handbook 5975.1, Section 16) (DEF000345–46).]

**Response: Disputed as material.**   Since Defendant deemed Ms. Brown to not be disabled, it did not consider <u>any</u> accommodation for Ms. Brown's disability. [Filing No. 39-24, Denial Notice].

57.     On April 1, 2014, the VA denied Brown's request for reasonable accommodation. [Filing No. 39-24 (Pl. Dep. Ex. 12).] The denial explained that Ms. Brown had not provided adequate medical documentation and had not shown that she was disabled within the meaning of the Rehabilitation Act. [*Id.*] The VA stated that Brown's "medical documentation did not show a 'substantial' limitation," and said that "if [Ms. Brown] need[ed] to visit a medical specialist outside of the commuting area, [she] may request leave in accordance with the appropriate leave requesting procedures." [*Id.*]

**Response: Disputed.**   Plaintiff does not dispute the accuracy of the summary of the decision.  Plaintiff disputes the substance of the decision. Ms. Wilson conceded during the EEOC Hearing that Ms. Brown's medical documentation submitted before the decision was made showed that she had substantial limitations and that she had a disability.  [Dkt. 39-5, EEOC Tr. Vol. II, 424:22-425:12; 427:15-428:11].

**E.     Ms. Brown's Ongoing Performance Problems and Refusal to Follow Instructions**

59.    On February 12, 2014, Mr. Dean sent Ms. Brown an email in which he stated that he had not received her mandatory overtime hours for February 2014.  Mr. Dean "direct[ed Brown] to give [him those] hours and days for February OT hours by COB tomorrow (02-13-14)." [Filing No. 39-26 (Pl. Dep. Ex. 17).]

**Response: Disputed.** Mr. Dean did send Ms. Brown an email regarding overtime on February 12, 2014, however, Ms. Brown promptly responded, asking if and how she could use her FMLA leave for the mandatory overtime hours.  [Dkt. 39-4, EEOC Tr. Vol. I, 70:6-9].  She did not receive a response to her query. [Dkt. 39-4, EEOC Tr. Vol. I, 70:10-24].  Ms. Brown testified that she tried numerous times to explain to Mr. Dean that she could not work overtime due to the flare-ups of her condition, but he did not respond.  [Dkt. 39-4, EEOC Tr. Vol. I, 74:21-75:4, 76:7-14].  Not only did Ms. Brown ask Mr. Dean how she could use FMLA to cover her mandatory overtime, she also reached out to Mr. Kinder, who was listed as the point of contact on the mandatory overtime email. [Dkt. 39-25, 1-8-14 Email at 3]; [Dkt. 39-2, Brown Tel. Aff., 53:20-54:2].  Ms. Brown also asked Ms. Wilson how she could use her FMLA hours to cover mandatory overtime and did not get a timely response.  [Dkt. 39-2, Brown Tel. Aff, 55:24-56:9].


60.    On March 17, 2014, Ms. Brown received a "Warning of Unacceptable Performance." [Filing No. 39-27 (Warning Letter, Pl. Dep. Ex. 18).] In that warning, Mr. Dean documented that, from October 1, 2013 through February 28, 2014, Ms. Brown's output was measured at 4.37 (cumulative), whereas the output standard applicable to her position was 5.5. Mr. Dean recommended that Ms. Brown be placed on a Performance Improvement Plan (PIP) as a result of these issues. [*Id.*]

**Response: Disputed as material**. Within less than a month of this warning, Mr. Dean

rated Ms. Brown as fully successful for the period of October 1, 2013 to April 5, 2014, including

in the "output" review element. [Dkt. 41-2, 2014 Midyear Appraisal].  Mr. Dean wrote that

although Ms. Brown's cumulative output was below standard, "your contribution of

meeting/exceeding 90% or more of daily team output goals during the Surge Project is

recognized and you are deemed fully successful in this [output] element." *Id*. Additionally, the

system that the VA used at this time for tracking performance was removed from operation

shortly after Ms. Brown's transfer to St. Petersburg (October 2014) due to errors related to an

employee's leave, including FMLA leave.  [Dkt. 39-5, EEOC Tr. Vol. II, 288:21-25; 289:3-6,

290:5-9].

61.     In April 2014, Ms. Brown received a formal reprimand for "Failure to Follow

Instructions," because, despite having been instructed to provide her mandatory overtime hours

on February 12, she "did not provide the overtime dates as directed nor did [she] work any

required overtime hours for the month of February." [Filing No. 39-28 (Reprimand, Pl. Dep. Ex.

20).]

    **Response: Disputed**.  See response to DSMF 59.

63.     On July 17, 2014, Ms. Graves too noted Ms. Brown's lackluster performance, issuing

her a "Letter of Concern" relating to Ms. Brown's failure to meet the quality output metrics for

her position. [Filing No. 39-29 (Pl. Dep. Ex. 21).]

    **Response: Disputed as material.**  Ms. Brown was rated as fully successful for the period

of October 1, 2013 to April 5, 2014, including in the "quality of work" and "output" review

elements. [Dkt. 41-2, 2014 Midyear Appraisal]. Defendant does not argue that Ms. Brown's performance after April 5, 2014 had any impact any of its denials of Ms. Brown's requests to transfer due to her disability. Therefore, DSMF 63 is not material.

64.     Additionally, on July 18, 2014, Ms. Graves gave Ms. Brown her annual performance review, which rated her overall performance as "Unacceptable." [Filing No. 39-30 (Pl. Dep. Ex. 22).] Ms. Graves recommended that Ms. Brown's scheduled promotion be delayed based on Ms. Brown's "performance deficiencies" in failing to meet her output goals for May, June, and July 2014. [*Id.*]

**Response: Disputed**. Dkt. 39-30 is not an annual performance review; it is a memorandum regarding a scheduled career ladder promotion accompanied by a review covering a less than three-month time period. [Dkt. 39-30, 7-18-14 Memo.]. Ms. Brown received her mid-year performance review on April 4, 2014 and was rated fully successful, including in the "quality of work" and "output" review elements. [Dkt. 41-2, 2014 Midyear Appraisal]. Defendant does not argue that Ms. Brown's performance after April 4, 2014 had any impact on any of its denials of Ms. Brown's requests to transfer due to her disability. Therefore, DSMF 64 is also not material.

**F.     In Autumn 2014, the VA Transferred Ms. Brown to Florida After She Submitted Another Letter from Dr. Huff**

66.     On August 21, 2014, Ms. Brown submitted a more detailed letter from Dr. Huff. [Filing No. 39-31 (Pl. Dep. Ex. 13).] Dr. Huff's updated letter noted that Ms. Brown had recently been treated by his office on July 10, 2014, for surgical drainage of a large cyst. [*Id.*] He indicated

that, due to her condition, Ms. Brown likely would require "[f]requent time off work . . . when her condition flares." [*Id.*] Dr. Huff stated that Ms. Brown "ha[d] found a center specializing in the treatment of hidradenitis suppurativa in St. Petersburg, FL (Florida West Coast Skin and Cancer Center)," and recommended that she be transferred to this area so that she could pursue treatment there. [*Id.*]

**Response: Disputed.**   Plaintiff disputes Defendant's characterization of Dr. Huff's August 21, 2014 letter as "more detailed." While the document provides an update on his treatment of Ms. Brown's condition, the letter includes a substantially similar description of the impairments caused by Ms. Brown's disability, activities impaired by her disability, the extent of her impairment, the reason for the accommodation request, and how the accommodation would assist Ms. Brown as his February 7, 2014 correspondence. *Compare* [Dkt. 39-31, Huff Letter 8-1-2014]; *with* [Dkt. 39-15, Huff Letter Feb. 2014].

### G.   The EEOC Held that Ms. Brown Was Not Subjected to Discrimination or Harassment on the Basis of Disability

69.     The Administrative Judge resoundingly ruled against Ms. Brown. [Filing No. 39-3 (Decision of EEOC Administrative Judge).] The AJ concluded that the VA "did not deny [Ms. Brown] a reasonable accommodation," that Ms. Brown's allegations of hostile work environment were meritless, and that there was no evidence that the VA's conduct toward Ms. Brown was pretextual. [*Id.* at pp. 12–17.]

**Response: Disputed as material.**   Decisions by the EEOC are subject to *de novo* review by this Court. *See Chandler v. Roudebush*, 425 U.S. 840 (1976).

70.    Ms. Brown appealed the Administrative Judge's decision to the Commission. [Filing No. 39-32 (EEOC Decision).] On January 14, 2020, the EEOC affirmed, finding that "the substantial evidence of record supports the AJ's determination that [Ms. Brown] has not proven discrimination or a hostile work environment." [*Id.* at 2.]

**Response: Disputed as material.**   Decisions by the EEOC are subject to *de novo* review by this Court. *See Chandler v. Roudebush*, 425 U.S. 840 (1976).

### B. Plaintiff's Statement of Additional Material Facts Precluding Summary Judgment

PSMF 1.    In addition DSMF 1-2, Plaintiff has described her disability and their impact on her major life functions as follows:

- Her disability causes painful cysts that made working uncomfortable and often painful in that she could not sit or move without being in pain. Additionally, often the cysts would spontaneously drain. Tr.25-30.

- The cysts can be quite large – reaching to the size of golf balls.  [Dkt. 39-1, Brown Dep., 24:3-10].

- When cysts rupture, they discharge pungent pus and blood. [Dkt. 39-4, EEOC Tr. Vol. I, 21:11-16].

- Her cysts ruptured often while she was working in the Indianapolis office [Dkt. 39-4, EEOC Tr. Vol. II, 32:13-22].

- During a flare-up, Ms. Brown is unable to dress herself or care for herself without debilitating pain.  [Dkt. 39-4, EEOC Tr. Vol. I, 32:5-11].

PSMF 2.      According to the Defendant's Accommodation Policy, the local reasonable accommodation coordinator "LRAC" should have been consulted when evaluating an employee's accommodation request.  [Dkt. 41-7, Dep. of Sonya Robertson 18:10-22:2].

PSMF 3.      Telework was an available accommodation under the Defendant's Accommodation Policy, that was not discussed with Plaintiff.  [Dkt. 41-7, Dep. of Sonya Robertson 22:15-24:16].

PSMF 4.      Under the Defendant's Accommodation Policy, a request for a transfer that included medical information should also be evaluated as a request for an accommodation under the ADA, but Plaintiff's request was not.  [Dkt. 41-7, Dep. of Sonya Robertson 32:1-21; 37:7-41:10].

PSMF 5.      Under the Defendant's Accommodation Policy, an employee's performance is not considered when evaluating a request for a transfer as a reasonable accommodation. [Dkt. 41-7, Dep. of Sonya Robertson 47:2-19].

PSMF 6.      Ms. Brown was rated a fully successful during the time period of September 2011 through November 2013. [Dkt. 39-4, EEOC Tr. Vol. I, 16: 13-19]. *See also*, [Dkt. 41-4, 2013 Appraisal]

PSMF 7.      When Ms. Brown submitted her Hardship Transfer Request to Ms. Wilson, Ms. Brown stated that she needed an accommodation for her medical condition. [Dkt. 39-2, Brown Tel. Aff., 21:10-19]; [Dkt. 39-4, EEOC Tr. Vol. 1, 48:21-49:2, 49:20-50:21, 51:4-6].

PSMF 8.      Ms. Gentry testified that while speaking with Ms. Ena Lima about Complainant's hardship request for transfer, Ms. Lima "[m]ade comments along the lines of [Complainant] can't

just get whatever she wants, . . ., because she just thinks that, you know, she can cry about something and get what she wants. [Dkt. 39-5, EEOC Tr. Vol. II, 272:2-7].

PSMF 9.     Dr. Huff's February 7, 2014 letter described Ms. Brown's hidradenitis suppurativa and stated that the condition was chronic, unpredictable, leading to secondary bacterial infections and scarring, causing debilitating pain and psychological impacts, and frequently needing medical and surgical intervention. [Dkt. 39-15, Huff Letter Feb. 2014].

PSMF 10.     Dr. Huff's February 7, 2014 letter stated that the transfer of care to an appropriate dermatologist in the St. Petersburg, Florida area is essential to control her disease. *Id.*

PSMF 11.     Ms. Gentry testified that in her opinion Ena Lima did not take seriously the information that Ms. Brown submitted to support her accommodation request or an employer's responsibility once an accommodation request is made. [Dkt. 39-5, EEOC Tr. Vol. II, 272:13-25].

PSMF 12.     Ms. Gentry testified that Jim Dean was not knowledgeable about the reasonable accommodation process during the February 27, 2014. [Dkt. 39-5, EEOC Tr. Vol. II, 273:11-24].

PSMF 13.     Ms. Gentry testified that no one in the February 27, 2014 meeting was receptive to Ms. Brown's accommodation request, and that it appeared to her that the request would be denied before it was presented. *Id.*

PSMF 14.     According to Ms. Gentry:

> Sonya [Wilson], at one point, you could say, was somewhat hostile toward
> Trevenia, and frustrated in the fact that what she was saying, you know, wasn't
> just accepted by Trevenia. Because Trevenia was unsure of what she needed to
> do. Because she wanted to submit whatever was necessary. She wanted to follow

the process. And nobody was giving her clear direction. Nobody was explaining that, hey, maybe we can't go this route, but maybe you should try a different route. It was just a cut and dry -- you know, it almost seemed that they just wanted her to accept the fact that they weren't going to be reasonable, or that they weren't going to accommodate her at that point.

…

[they were] hostile toward Trevenia, and frustrated in the fact that what she was saying, you know, wasn't just accepted by Trevenia.

Because Trevenia was unsure of what she needed to do. Because she wanted to submit whatever was necessary. She wanted to follow the process. And nobody was giving her clear direction. Nobody was explaining that, hey, maybe we can't go this route, but maybe you should try a different route. It was just a cut and dry -- you know, it almost seemed that they just wanted her to accept the fact that they weren't going to be reasonable, or that they weren't going to accommodate her at that point. And she didn't ask for an interim accommodation at that point, because they really didn't explain -- they didn't seem like she had any other choice, in all honesty.

[Dkt. 39-5, EEOC Tr. Vol. II, 273:13-274:20.]

PSMF 15.       Ms. Wilson did not ask to speak with Ms. Brown's provider to learn more information about Ms. Brown's condition or accommodation request.  [Dkt. 39-5, EEOC Tr. Vol. II, 437:4-8].

PSMF 16.       On March 25, 2014 at 12:42pm, Ms. Brown responded to Mr. Young's request for more medical information as follows: "As I stated previously, I have requested ·reasonable accommodation beginning on January 17, 2014. Please refer to the Doctors certification that have already been provided. Please provide me the details of my decision and the information missing from my doctor's certification if it does not suffice, and my right to appeal. Thank you." [Dkt. No. 39-22, 3-24-2014 Email].  At 12:26pm, Ms. Brown added: "Also, if your unable to provide the reasonable accommodation requested; please provide the reasons and what accommodation that you (the agency) propose would benefit me." *Id*.

PSMF 17.    Defendant's policy states: "If the information provided by the requestor's health care professional is insufficient to enable an informed determination, additional information may be requested, but only after obtaining agreement from the LRAC [Local Reasonable Accommodation Coordinator] at the next higher organizational level (e.g., VISN level). In this instance, the LRAC should explain to the requestor why the submitted documentation is insufficient, identify the information that is needed, and allow the requestor an opportunity to provide the information." [Dkt. 41-5, VA 5975.1, 23].

PSMF 18.    No one explained to Ms. Brown why her submitted documentation was insufficient. [Dkt. 39-4, EEOC Tr. Vol. I, 87:5-9].

PSMF 19.    Michael Hampton, Plaintiff's spouse, testified about the stress that Ms. Brown suffered as a result of the condition and his inability to provide support to her in her daily activities on a regular basis. He testified that Ms. Brown suffered significant pain from her condition. He also testified how the denial of the accommodation Plaintiff sought made the situation more stressful. [Dkt. 39-4, EEOC Tr. Vol. I, 232-233-].

PSMF 20.    On April 9, 2014, Ms. Brown was rated fully successful for the evaluation period of October 1, 2013 to April 5, 2014. [Dkt. 41-2, 2014 Midyear Appraisal, 5].

PSMF 21.    Mr. Dean stated on his evaluation of Ms. Brown that although her cumulative output was below standard, "your contribution of meeting/exceeding 90% or more of daily team output goals during the Surge Project is recognized and you are deemed fully successful in this [output] element." *Id.*

PSMF 22.     On or about August 1, 2014, Ms. Brown submitted another letter from Dr. Huff to the Agency requesting that Plaintiff be accommodated. [Dkt. 39-31, Huff Letter 8-1-2014]

PSMF 23.     Dr. Huff's August 1, 2014 letter described Ms. Brown's hidradenitis suppurativa and stated that the condition was chronic, unpredictable, leading to secondary bacterial infections and scarring, causing debilitating pain and psychological impacts, and frequently needing medical and surgical intervention.  *Id.*

PSMF 24.     Dr. Huff's August 2014 letter stated that the transfer of care to an appropriate dermatologist in the St. Petersburg, Florida area is essential to control her disease. *Id.*

PSMF 25.     Ms. Brown August 2014 accommodation request was granted in October 2014. [Filing No. 39-1 (Pl. Dep. at 82:22–25).]

PSMF 26.     During the period Ms. Brown was waiting to be transferred, she experienced an increase in the number and severity of flare-ups of her hidradenitis suppurativa in multiple locations, including more than one cyst under each arm, such that she could not lift her arms at times [Dkt. 39-4, EEOC Tr. Vol. I, 30:17-21, 34:14-22, 66:7-12-17].

PSMF 27.     Ms. Brown had cysts spontaneously ruptured at work "frequently" while she worked in the Indianapolis office. [Dkt. 39-4, EEOC Tr. Vol. I, 32:18-22]; [Dkt. 39-1, 109:15-18].

PSMF 28.     If a cyst ruptured while Ms. Brown was at work, she would have to dress the resulting wound in the regular office bathroom.  Dressing her wound was very difficult to do, and Ms. Brown also found it humiliating to do it while at work due to the chance of someone else using the restroom at the same time.  [Dkt. 39-4, EEOC Tr. Vol. I, 33:6-23].

PSMF 29.      When one of Ms. Brown's cysts ruptured at work, they would spill their contents

on to her clothes, causing damage to the clothing and creating a smell. [Dkt. 39-1, 109:15-110:2;

Dkt. 39-4, EEOC Tr. Vol. I, 21:11-16].  On these occasions, Ms. Brown would try to cover the

stains with a sweater until she could go home. [Dkt. 39-1, 119:5-9].

## IV.   <u>The VA Failed to Accommodate Ms. Brown</u>

The VA was required to accommodate Ms. Brown's disability under the Rehab Act, yet

the agency failed to do so.  The statute requires that federal agencies make reasonable

accommodations for their disabled employees unless they establish that such accommodations

would be an undue hardship, which Defendant has not pled.  *Meisser v. Hove*, 872 F. Supp. 507

(N.D. Ill. 1994).  Courts use the standards of the ADA to determine liability under the

Rehabilitation Act.  29 U.S.C. § 791(f); *see also*, *Sturz v. Wisconsin Dept. of Corrections*, 642 F.

Supp 2d. 881, 886 (W.D. Wis. 2009).  A claim under the Rehabilitation Act for failure to

accommodate has four elements: (1) the plaintiff must be disabled, (2) the plaintiff must be

otherwise qualified for the position, (3) the employer is aware of plaintiff's disability, and (4) the

defendant employer failed to provide reasonable accommodations to the plaintiff employee.

*Sturz*, 642 F.Supp. 2d. 881, 887.  The first two elements are equivalent to the requirement in an

ADA claim that the employee be "a qualified individual with a disability." *Peters v. City of*

*Mauston*, 311 F.3d 835, 842 (7th Cir. 2002).

### A.  Ms. Brown Has a Disability

Ms. Brown has established, contrary to the VA's assertions, that her condition is a

disability under the Rehab Act.[3]  Ms. Brown has shown that her hidradenitis suppurativa ("HS"),

---

[3] Defendant does not challenge that Ms. Brown was "qualified," so the issue has been waived for
summary judgment purposes.  *See Sturz*, 642 F. Supp 2d at 887.  Nor could it since Ms. Brown
has and remains employed by the VA as a VSR to this day. [Dkt. 39-1, Brown Dep., 122:4-14].

when flared, substantially limits many major life activities, including her ability to move and sit, and thus she is disabled. Accordingly, Ms. Brown's condition is a disability under the statute.

An individual is disabled if they have a condition that substantially limits one or more major life activities or major bodily functions. 42 U.S.C. 12102 (2018). Major life activities include activities such as walking, reaching, and caring for oneself, while major bodily functions encompass operations of major organs within the body. 29 CFR §1630.2(i). A major bodily function includes the operation of skin. 29 CFR §1630.2(g)(i)(1)(ii). Limitations impairing a major life activity or bodily function include experiencing pain. 29 CFR §1630.2(j)(4)(ii). Additionally, under the ADAAA, a relapsing-remitting impairment constitutes a disability if, when active, it substantially limits a major life function. 42 U.S.C. §12102(4)(d). The frequency or duration of active flare-ups are no longer a consideration for intermittent impairments. *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1173 (7th Cir. 2013).

As disclosed by Ms. Brown in her Hardship Transfer Request and accompanying FMLA documentation, her hidradenitis suppurativa ("HS") is a chronic health condition that has caused her pain and cyst drainage resulting in her repeated absence from work. [Dkt. 39-9]; [Dkt. 41-3, FMLA Application]. In his February 7, 2014 letter, Dr. Huff further described Plaintiff's hidradenitis suppurativa as a chronic and unpredictable condition leading to secondary bacterial infections and scarring, causing debilitating pain and psychological impacts, and frequently needing medical and surgical intervention. [Dkt. 39-15 (Huff Letter Feb. 2014].].

During the EEOC process and this litigation, Ms. Brown has provided further details about her condition and its impact on her life. Ms. Brown's HS prevents her from dressing

---

Moreover, Ms. Brown was rated as fully successful for the evaluation period of October 1, 2013 to April 5, 2014, which is the time frame of all of Ms. Brown's denied accommodations. [April 9, 2014 Appraisal at 00298].

herself, cooking, and walking without pain during a flare-up. [Dkt. 39-4, EEOC Tr. Vol. I, 32:7-11, 236:25-237:18].  The condition causes Ms. Brown intense pain when active.  [Dkt. 39-4, EEOC Tr. Vol. I, 21:17-24].  HS can also interrupt Ms. Brown's workday when cysts rupture in the office, as Ms. Brown testified happened frequently.[4]  [Dkt. 39-4, EEOC Tr. Vol. I, 33:9-34:2].  Dressing oneself, cooking, and walking are all major life activities according to the EEOC regulations, and Ms. Brown is substantially limited in her ability to perform these activities when she is experiencing a flare-up of HS due to the pain caused. 29 CFR § 1630.2(i).  Additionally, Ms. Brown's HS causes her to experience anxiety and depression, which itself is a named disability under EEOC regulations.[5]  [Dkt. No. 39-2, Brown Tel. Aff., 35:13-17]; 29 CFR § 1630.2 (j)(3)(iii).  Given the above, there can be no question that Ms. Brown is a person with a condition – HS – that substantially limits her ability to perform major life functions – walking, dressing, working - when flared.

The VA's argument that Ms. Brown did not provide evidence of the frequency of her flare ups and medical treatment, and thus has not shown herself to be disabled, fails.  It rests on *Bailey v. Standard Reg. Co.*, No. 1:05-cv-943, 2007 WL 671041 (S.D. Ind., 2007), where the

---

[4] The lesions caused by hidradenitis suppurativa also heal very slowly.  *Hidradenitis Suppurativa*, Medline Plus, National Library of Medicine https://medlineplus.gov/hidradenitissuppurativa.html (last updated June 8, 2020).  Additionally, the cysts associated with hidradenitis suppurativa fill with blood and pus, which causes them to eventually burst open.  National Institute of Health, *Hidradenitis Suppurativa*, Genetic and Rare Diseases Information Center https://rarediseases.info.nih.gov/diseases/6658/hidradenitis-suppurativa (last updated Dec. 17, 2018).

[5] Hidradenitis suppurativa is known for causing anxiety and depression in those who suffer from it.  National Institute of Health, *Hidradenitis Suppurativa*, Genetic and Rare Diseases Information Center https://rarediseases.info.nih.gov/diseases/6658/hidradenitis-suppurativa (last updated Dec. 17, 2018).  In addition, patients with hidradenitis suppurativa experience social anguish due to the smell a ruptured cyst causes, the intense pain, and the possibility of a cyst rupturing in public.  *Hidradenitis Suppurativa*, Medline Plus, National Library of Medicine https://medlineplus.gov/hidradenitissuppurativa.html (last updated June 8, 2020).

court found that the plaintiff had not provided evidence of the frequency of her flare-ups. *Bailey*, 1:05-cv-943, at *7. *Bailey,* however, was a pre-ADA Amendments Act ("ADAAA") case, and the court used the "prevents or severely restricts" definition of "substantial limitation", *Bailey*, 1:05-cv-943, at *7, which Congress modified with the ADAAA. Under the pre-ADAAA definition of "substantially limited", the frequency of flare-ups of an intermittent condition is relevant; under the ADAAA definition of "substantially limited", it is not. 42 U.S.C. §12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."). Thus, the defense's reliance on *Bailey*, 1:05-cv-943, is misplaced.

## B. Defendant Cherry Picked How to Respond to Ms. Brown's Requests

An employer's liability to provide a disabled employee with reasonable accommodations begins once an employee notifies the employer of their disability and need for accommodation. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). The employer, upon receiving notification from the employee, has a duty to begin an interactive process to determine whether a reasonable accommodation exists under the circumstances. *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061-62 (7th Cir. 2014).

The VA knew of Ms. Brown's disability and her desire for accommodations for months, yet did nothing. Ms. Brown first informed that Sonya Wilson, Defendant's Local Reasonable Accommodation Coordinator, on January 17, 2014 about her disability and needed accommodations when she submitted her Hardship Transfer Request.[6] The Hardship Transfer Request stated that she had a condition which was causing her to be repeatedly absent from work

---

[6] Wilson testified that, as of Feb. 1, 2014, she was no longer the LRAC, but she acted as an alternate LRAC ("ALRAC") during the period at issue and handled Ms. Brown's request for accommodations. [Dkt. 39-5, EEOC Tr. Vol. II, 391:23-25, 410:15-25].

and requested that she be transferred to Defendant's Florida office so that she could be seen by local specialists and be provided care assistance and support from her family. [Dkt. 39-9]. When Ms. Brown handed in the form, she specifically said that she needed an accommodation for her medical condition. [Dkt. 39-2, Brown Tel. Aff., 21:10-19]; [Dkt. 39-4, EEOC Tr. Vol. 1, 48:21-49:2, 49:20-50:21, 51:4-6].

These communications were sufficient to trigger Defendant's obligation to engage Ms. Brown in the interactive process, under both the Rehab Act and the VA's own policies. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005) ("[Employee's] initial duty, however, requires at most that the employee indicate to the employer that she has a disability and desires an accommodation… Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification."; [Dkt. 41-5, VA 5975.1 at 20, 21] ("A requestor does not have to use words such as 'reasonable accommodation,' 'disability,' or 'Rehabilitation Act' in the request… The requestor should not be required to make repetitive requests for the same accommodation… When the individual makes an oral or written request for reasonable accommodation, managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request."). Therefore, Defendant's claim that Ms. Brown did not request an accommodation until she submitted a written request for accommodation on the VA's specific form on February 24, 2014 should be disregarded. [Dkt. 40, Def's Motion Summ. J., 18-19].

Furthermore, Defendant's Local Reasonable Accommodations Coordinator has confirmed that under the Defendant's Accommodation Policy, a request for a transfer that included medical information should also be evaluated as a request for an accommodation under

the ADA, but Plaintiff's with such information request was not. [Dkt. 41-7, Dep. of Sonya Robertson 32:1-21; 37:7-41:10]. She also testified that the documentation Ms. Brown presented with her Hardship Transfer Request established Ms. Brown as an individual with a disability under the Rehab Act. [Dkt. 39-5, EEOC Tr. Vol. II, 424:22-425:12; 427:15-428:11]. Thus, Ms. Brown's request to transfer due to her disability was sufficient to trigger Defendant's obligations to engage Ms. Brown in the interactive process, not just summarily deny her request. Ms. Brown's performance should not have been considered as a part of her request for transfer as an accommodation. [Dkt. 41-7, Dep. of Sonya Robertson 47:2-19].

Even if Ms. Brown's written hardship transfer request does not qualify as a request for accommodations, which it does, Ms. Brown testified that when she submitted the request to Ms. Wilson, she told Ms. Wilson that she needed accommodation for her medical condition. [Dkt. 39-2, Brown Tel. Aff., 21:10-19]; [Dkt. 39-4, EEOC Tr. Vol. 1, 48:21-49:2, 49:20-50:21, 51:4-6]. This action alone, even without what was written on the Hardship Transfer Request, constitutes a sufficient request for accommodation under the Rehab Act and VA policy. [Dkt. 41-5, VA 5975.1 at 20-21].

When the Hardship Transfer Request was denied, Ms. Brown attempted to use another VA mechanism to transfer to Florida because of her disability, a "Request for Reassignment" under her collective bargaining agreement on February 7, 2014. DSMF 32. Ms. Brown's request was accompanied by a note from her provider Dr. Robert Huff who described Plaintiff's hidradenitis suppurativa as chronic, unpredictable, leading to secondary bacterial infections and scarring, causing debilitating pain and psychological impacts, and frequently needing medical and surgical intervention. [Filing No. 39-15 (Huff Letter, Pl. Dep. Ex. 6)]. He affirmed that transfer of care to an appropriate dermatologist in the St. Petersburg, Florida area was essential

to control her disease. *Id*.   As with the Hardship Transfer Request, Ms. Brown's Request for Reassignment and Dr. Huff's letter were sufficient to trigger Defendant's obligations under the interactive process.  Instead, Defendant simply denied the request.  Ms. Brown was then instructed to submit further paperwork if she wanted to request an accommodation, contrary to even the VA's own policies. [Dkt. 41-5, VA 5975.1, 20-21].

While Defendant does have specific processes that governs hardship transfer requests and requests for reassignment, under both the law and Defendant's own policies, Defendant was required to engage Ms. Brown in the interactive process once it knew that Ms. Brown was seeking to be transferred due to her condition.  Defendant's decision to cherry-pick that it would follow its policy about hardship requests and requests for reassignment, instead of following its accommodation policy that mandates engagement in the interactive process, demonstrates how the Agency's conduct resulted in Ms. Brown not being accommodated for almost an entire year.

### C.  The VA Broke Down the Interactive Process

Once Ms. Brown submitted her unnecessary third set of paperwork requesting an accommodation, Defendant broke down the interactive process and caused Ms. Brown to remain unaccommodated for an additional eight months.  A party that causes the breakdown of the process will be held liable if their actions prevented the identification of a reasonable accommodation. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013); *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).  To establish a failure to accommodate due to a failure of the interactive process, a plaintiff must show that 1) the defendant caused the breakdown of the interactive process, and 2) a reasonable accommodation of the plaintiff's disability was available but not identified. *See Spurling*, 739 F.3d 1055, 1062.

Since the VA caused the breakdown of the interactive process, their request for judgment should be denied.

### i.   *Transfer Was an Available, Reasonable Request*

In the context of summary judgment, the plaintiff is only obliged to show that the proposed accommodation was facially reasonable; the burden then moves to the defense to show that said accommodation was, in fact, an undue hardship. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) ("A plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases").   In this case, Defendant has not pled that transferring Ms. Brown to Florida would have created an undue hardship.[7]   Nor could it since Ms. Brown was eventually transferred in October 2014. [Dkt. 39-1, Brown Dep., 82:22–25].   Thus, Ms. Brown's request was facially reasonable but not provided by Defendant.

### ii.   *Instead of Responding to Ms. Brown's Questions,*
###       *Defendant Deemed Ms. Brown Not Disabled*

As discussed in Plaintiff's Response to Defendant's Statement of Material Facts, there are clearly disputes regarding what happened during Plaintiff's February 27, 2014 meeting with Mr. Dean, Ms. Wilson, and Ms. Gentry. *See* Response to DSMF 44-51.   Nevertheless, what is clear is that on March 25, 2014, Mr. Young asked that Ms. Brown provide additional medical documentation in support of her accommodation request. [Dkt. No. 39-22].   In response, Ms. Brown wrote: "Please refer to the Doctors certification that have already been provided. *Please provide me* the details of my decision and *the information missing from my doctor's certification*

---

[7] The Seventh Circuit has further established that generally, absent undue hardship, reassignment is a reasonable accommodation. *See E.E.O.C.  v. United Airlines, Inc.*, 693 F.3d 760, 764 (7th Cir. 2012); *Feldman v. Olin Corp.*, 692 F.3d 748 (7th Cir. 2012).

*if it does not suffice…" Id.* (emphasis added).[8] Ms. Brown did not receive a response to her request that Defendant specific what information is missing from the information her provider already supplied. [Dkt. 39-4, EEOC Tr. Vol. I, 87:5-9]. Rather than provide Ms. Brown a response, Defendant simply denied her request for accommodation, claiming it did not have enough medical information to determine that Ms. Brown had a disability, which they clearly did. *See infra* § IV.A.[9]

### iii. *Defendant's Argument About Ms. Brown Not Discussing Alternate Accommodations is a Red Herring*

In their brief, the defense contends that Ms. Brown caused the breakdown of the interactive process by insisting on a specific accommodation and not providing alternatives. [Dkt. 40, Def's Motion Summ. J., 21-22]. Notwithstanding the disputed facts regarding what was said during the February 27, 2014 meeting, *see* Response to DSMF 44-51, Defendant's decision demonstrates that it did not consider or proffer any alternative accommodations because it deemed her not disabled. Therefore, whatever discussion occurred during the February 27, 2014 meeting about alternative accommodations, it had no impact on the VA's decision to not accommodate Ms. Brown.

Moreover, even if Ms. Brown's insistence on being transferred and lack of her proposing alternatives impacted Defendant's decision, which it did not, an employer cannot simply reject a proposed accommodation without exploring other options. *Lawler v. Peoria Sch. District No.*

---

[8] Moreover, Defendant's policy states that when additional medical information is requested "the LRAC should explain to the requestor why the submitted documentation is insufficient, identify the information that is needed, and allow the requestor an opportunity to provide the information." [Dkt. 41-5, VA 5975.1, 23]. Defendant did none of these items.

[9] Additionally, the ADA (and thus Rehab Act) does not require employees to provide more medical documentation where the employee has previously provided sufficient information to substantiate their disability and need for accommodations. *Sansone v. Donahoe*, 98 F.Supp. 3d 946, 963-54 (N.D. Ill. 2015) (citing EEOC Compliance Manual(BNA) § 902:156). In this case, the very individual responsible for determining whether an individual is disabled and requires accommodation – Sonya Wilson – admitted at the EEOC hearing that Ms. Brown's documentation was sufficient documentation of her disability.

*150*, 837 F.3d 779, 786 (7th Cir. 2016) (citing *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486 (7th Cir. 1997)).  Ms. Wilson confirmed to Defendant's EEO investigator that no alternative accommodations were proposed during the February 27, 2014 meeting.  [Dkt. 41-5, Wilson EEOC Aff., 36:7-11].  No alternatives were proposed despite teleworking being available under the Defendant's Accommodation Policy, that was not discussed with Plaintiff.  [Dkt. 41-7, Dep. of Sonya Robertson 22:15-24:16].  Like in *Lawler*, the VA denied Ms. Brown's accommodation request for a transfer despite being provided a letter from her provider describing the need.  Therefore, like *Lawler*, the Court should hold that the VA's "outright refusal belies any contention" that it made a sufficient attempt to "explore possible accommodations."  *Lawler*, 837 F.3d 779, 786.

**V.    A Jury Could Conclude that Ms. Brown Suffered a Hostile Work Environment**

Because a reasonable jury could find that the VA's treatment of Ms. Brown rose to the level of a hostile work environment, summary judgment should not be granted on this claim.  As a preliminary matter, the question of whether a particular environment meets the standard of a hostile work environment is generally a fact-intensive inquiry that is not fit for resolution at summary judgment. *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).  As discussed below, a jury could view the facts of the case, including disparaging comments from her supervisor, her management's response, disclosure of medical information, and overall failure to accommodate her, as creating as hostile work environment.

**A.  The VA's Conduct Created a Hostile Work Environment**

The VA claims that the environment Ms. Brown dealt with at the Indianapolis VA did not meet the requisite "severe or pervasive" standard.  They focus, however, solely on the statements made by Ms. Lima and her reprimands, and not on the VA's broader actions with respect to Ms.

40

Brown, which also contributed to the hostile work environment.  It is the cumulative effect of all

of these actions on behalf of the VA that the court should consider, as long as they belong to the

same employment practice.  *See Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 851 ("If the

alleged disability harassment…all belonged to the same employment practice, then it would have

been improper for the district court to grant partial summary judgment as to only [the

supervisor's] conduct").  In the instant case, unlike *Ford v. Marion Cty,* all of the alleged

practices constituting the hostile work environment – the supervisor's discriminatory remarks,

the failure to recognize a request for accommodations, and the VA's callous attitude towards Ms.

Brown's medical condition – occurred under the watch of a single management official (Ms.

Lima) working with a single HR representative (Ms. Wilson).  They also occurred within the

time span of a few months, satisfying the time factor of a "single employment practice" analysis.

*Ford v. Marion Cty.,* 942 F.3d at 852.

An employer's failure to accommodate a plaintiff may demonstrate a hostile work

environment if employment conditions are "objectively intolerable as a result of the defendant's

failure to accommodate." *Sturz*, 642 F.Supp.2d 881, 891.  Ms. Brown has demonstrated that her

work conditions were objectively intolerable due to not being accommodated.  Due to the lack of

accommodation, Ms. Brown was forced to perform first aid measures on her cysts in the

employee bathroom and without proper equipment.  [Dkt. 39-4, EEOC Tr. Vol. I, 32:18-34:2].

This process would sometimes cause pus or other bodily fluids to get on her work clothes, and

that she was humiliated each time she had to clean up a spontaneously drained cyst.  [Dkt. 39-4,

EEOC Tr. Vol. I, 21:11-16, 33:9-34:2].  Such field treatment should not be expected of an

employee.  Adding insult to injury, the VA still expected Ms. Brown to satisfy production

standards while this was occurring, and they gave her a disciplinary warning for her inability to

meet them, even though the agency knew her production was being impacted by her condition since at least January 2014. [Dkt. 39-27, Warning of Unacceptable Performance]; [Dkt. 39-9, Hardship Transfer Request].

Moreover, VA's request for unnecessary medical documentation and the subsequent disclosure of details of Ms. Brown's disability (*see supra* § VI) also contributed to her hostile work environment claim. *See Kyle v. Brennan*, 2020 WL 1330371, No. 17 C 03649, at *6 (N.D. Ill. March 23, 2020) (finding that the plaintiff "being singled out and forced to disclose his private medical diagnosis" contributed to his hostile work environment claim). Ms. Brown has also raised a factual question regarding whether the VA's ten-month delay in accommodating her was unreasonable, and thus contributed to the hostile work environment. *See Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (finding that an "unreasonable delay in providing an accommodation can provide evidence of discrimination"). Whether or not the delay in accommodating Ms. Brown was reasonable turns on a number of factual questions not fit for resolution at summary judgment, including whether the VA was acting in good faith, the reasons for the delay, the complexity of transferring Ms. Brown as an accommodation, and whether the VA offered Ms. Brown interim accommodations. *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). Accordingly, in addition to the conduct described in Defendant's Motion (Ms. Lima's statements and reprimands), a jury could find that Defendant's delay in accommodating Ms. Brown's accommodation request and disclosure of her medical information created a hostile work environment.

### B. The VA's Non-Substantive Arguments Lack Merit

The VA attempts to circumvent the merits of Ms. Brown's case by claiming that the Seventh Circuit has not decided whether a hostile work environment claim is actionable, relying

on *Yochim v. Carson*, 935 F.3d 586, 593 (7th Cir. 2019).  [Dkt. 40, Def. Mot. Supp. Summ. J., 23].  Defendant omits how *three months* after *Yochim* was decided, the Seventh Circuit affirmed that "hostile work environment claims are cognizable under the ADA" and thus also under the Rehab Act. *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 851-52 (7th Cir. 2019).

The VA's other non-substantive argument, that Ms. Brown has forfeited issues by not explicitly mentioning them in her Statement of Claims, is likewise unconvincing.  Ms. Brown timely filed her statement of claims pursuant to the case management order.  [Dkt. 37, Pl's Statement Burden Proof].  In her Statement, Ms. Brown lists every claim at issue here today: the failure to accommodate claim, the hostile work environment claim, and the disclosure of confidential medical information claim.  [Dkt. 37, Pl's Statement Burden Proof].  The Case Management Plan only required Plaintiff to provide a summary of her legal theories which her claims rest, not all the facts supporting her claims.  Defendant has not provided any authority that Plaintiff was required to include the granular details it claims cannot now be presented at summary judgment.  Therefore, the Court should reject Defendant's attempt to limit the facts Plaintiff can assert to support her claims.

## VI.   Ms. Lima Unlawfully Disclosed Ms. Brown's Medical Information

The ADA (and thus the Rehab Act) provides that an employer must treat any "information obtained regarding [an employee's] medical condition or history . . . as a confidential medical record, except that . . . supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations. 42 U.S.C. § 12112(d)(4)(C); 29 U.S.C. § 791(f); *see also* [Dkt. 41-5, VA 5975.1, 16] (instructing employees to "[r]efrain from sharing the specific disability or medical documentation with the DMO or other supervisory officials").  As described in the Court's

decision denying Defendant's Motion to Dismiss, a plaintiff demonstrates that medical information was unlawfully disclosed by showing that "the defendant (1) 'obtained [the plaintiff's] medical information through employment-related medical examinations and inquiries'; (2) did not treat that information as confidential; and (3) caused the plaintiff to 'suffer[] a tangible injury as a result of the disclosure.'" Dkt. 35 (quoting *Foos v. Taghleef Indus., Inc.*, 132 F.Supp.3d 1034, 1050 (S.D. Ind. 2015)).  Defendant's Motion does not challenge that Plaintiff has met elements one and three, and only challenges element two – whether Ms. Brown's medical information was treated confidential.  Accordingly, Plaintiff will only address this element of her claim.  While Plaintiff does not dispute that Ms. Lima was permitted to disclose the result of Plaintiff's Request for Reassignment, Ms. Lima's disclosure of Ms. Brown's medical information in this communication was not necessary and therefore was a violation of the Rehab Act.  Defendant's Motion should thus be denied.

On February 10, 2014, Ms. Lima wrote to Michael Stephens, Yvonne Hamilton, Jim Dean, Debra Street, and Adam Kinder that Ms. Brown suffers from a "serious chronic medical condition that necessitates regular medical intervention… a dermatological disorder that is chronic and unpredictable in nature… [a] disease." [Dkt. 39-17, 2-10-14 Letter].  With the exception of Mr. Stephens, who already knew about Ms. Brown's condition, none of these individuals had any reason to know Ms. Brown's medical information.  Nor does Defendant assert that they needed to know it.  Instead, Defendant argues that they just needed to know the *outcome* of the Request for Reassignment. [Dkt. 40, Def's Motion Supp. Summ. J].  However, Ms. Lima could have easily communicated the outcome of the Request for Reassignment without any reference to Ms. Brown's medical information by simply stating that the Request for Reassignment and accompanying medical statement was received, but the Request denied

because it (supposedly) failed to demonstrate that Ms. Brown was unable to perform her assigned duties.

Nor does Ms. Lima's disclosure fit into 42 U.S.C. § 12112(d)(4)(C)'s exception that "supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations." *See also*, *Foos v. Taghleef Indus., Inc.*, 132 F.Supp.3d 1034, 1050 (S.D. Ind. 2015) (finding disclosure permitted where supervisor believed employee's disability was a safety concern and limited disclosure to specific management officials). Ms. Lima was not advising Ms. Hamilton, Mr. Dean, Ms. Street, or Mr. Kinder of any necessary restrictions or concerns related to Ms. Brown's disability; in fact, her letter (incorrectly) claims that Plaintiff's condition does not impact her ability to perform her duties. [Dkt. 39-17, 2-10-14 Letter]. Thus, Defendant cannot assert that Ms. Lima's disclosure was permitted by statute.

Finally, Defendant appears to defend Ms. Lima's actions by claiming that she "deliberately took care to describe Ms. Brown's medical condition in generalized terms." [Dkt. 40, Def's Motion Supp. Summ. J., at 27.] Although Ms. Lima did not name Ms. Brown's condition, Ms. Lima's communication nevertheless was a disclosure of medical information in violation of the Rehab Act. *See Shoun v. Best Formed Plastics, Inc.*, 28 F. Supp. 3d 786, 791–92 (N.D. Ind. 2014) ("Under the statute's plain language, *all medical information* gathered by [Employer] in that context was required to be treated as a 'confidential medical record.'") (emphasis added) (discussing disclosure of "shoulder injury"); *see also*, *Stark v. Hartt Transp. Sys., Inc.*, 37 F. Supp. 3d 445, 472 (D. Me. 2014) (holding that a reference to "cervical injuries" was protected medical information). Ms. Lima's statement that Ms. Brown suffered from "serious chronic medical condition that necessitates regular medical intervention… a

45

dermatological disorder that is chronic and unpredictable in nature… [a] disease," [Dkt. 39-17, 2-10-14 Letter] that Ms. Lima learned during an employment medical inquiry was thus medical information that should have been kept confidential. Ms. Lima's choice to disclose this information unnecessarily was thus in violation of the Rehab Act.

## VII.   **Conclusion**

For the above stated reasons, Defendant's Motion should be denied. Ms. Brown has shown that the VA failed to accommodate her disability, subjected her to a hostile work environment on the basis of her disability, and unlawfully disclosed her confidential medical information to other VA employees. Despite providing Defendant with sufficient medical information describing her disability and need for accommodation, which was then improperly disclosed, Defendant delayed the process for over a month and then claimed that it needed more information. When Ms. Brown asked specifically what was missing from the information provided, Defendant broke off the interactive process and deemed her not disabled. A jury could thus conclude that Defendant's conduct was in violation of the Rehab Act. Therefore, the Court should deny Defendant's Motion.


Date: July 30, 2021

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Denise M. Clark
Denise M. Clark, Esq. (11525-49)
Clark Law Group, PLLC
1100 Connecticut Ave., N.W.
Suite 920
Washington, D.C. 20036
(202) 293-0015
dmclark@benefitcounsel.com

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on July 30, 2021, a true and accurate copy of the foregoing

was electronically filed with the Clerk's Office served using this court's CM/ECF system, which

will then serve a notice of electronic filing (NEF) on the judge and the following:

J. Taylor Kirklin
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
Telephone: (317) 226-6333
Fax: (317) 226-5027
E-mail: taylor.kirklin@usdoj.gov
*Counsel for Defendant*

/s/ Denise M. Clark
Denise M. Clark